

(9)   Costs associated with a public offering

4.4   Due to the specific context of DAF (including the tax-related constraints for the Participating Shareholders and the Directors' control), the discounts primarily relate to dividend, nature of the company, company's management, and amount of control.

4.5   The restricted stock studies (which suggests typical discounts of 10% - 35%) or put option approach relied upon by Valuescope focus on the restrictions on transferability of stock (i.e., discount for the shares requiring between six months and one year to be sold).[14] In our view such studies do not provide a guide as to the discount for the rights of the Participating Shares.

4.6   As explained above, the rights conferred to Participating Shares are extremely limited, and the potential distribution of cash flows is highly dependent on whether the shareholder's specific circumstance is aligned with the mission of DAF. As a result, we expect:

(1)   a limited discount due to lack of control and marketability (i.e., close to the range concluded by Valuescope) if the shareholder is fully aligned with the mission of DAF; and

(2)   a high discount due to lack of control and marketability for a shareholder who is not aligned with the mission of DAF of over **95%** to be applicable. The reason for not fully discounting the value is that there may be some option value to the acquirer that with the passage of time: (i) they become aligned with the Managing Shareholder's interest; or (ii) there is a change in the Managing Shareholder.

4.7   Our indicative view, as set out in this memorandum, may change if we are provided with further information.

---

[14]   Valuescope Report, pages 26 and 53.

**CHARITABLE DAF HOLDCO, LTD**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE DIRECTORS**
**OF THE COMPANY DATED 2 APRIL 2025**

1.  **DECLARATION AND PAYMENT OF DIVIDENDS**

1.1  **IT IS NOTED** that:

(a)  CDMCFAD, LLC (the "**LLC**"), a Delaware limited liability company, redeemed the Company's entire limited liability company interests in the LLC on 27 March 2025 (the "**CDMCFAD Redemption**") for the aggregate amount of US$1,637,192;

(b)  the current Amended and Restated Articles of Association of the Company (the "**Articles**") provide that all dividends shall be declared and paid in such amounts as may be declared by the Directors in their absolute discretion;

(c)  following receipt of the proceeds of the CDMCFAD Redemption, the Company wishes to make a payment as at the date hereof of dividends on a pro-rata basis to the Participating Shareholders (but excluding DFW Charitable Foundation; collectively, the "**Shareholders**") in the amount of (i) $528,587.54 with respect to each of Highland Dallas Foundation, Inc., Highland Kansas City Foundation, Inc., and Highland Santa Barbara Foundation, Inc.; and (ii) $26,429.39 with respect to The Community Foundation of North Texas;

(d)  the Directors have determined that the sum of **$1,612,192.01** is lawfully available for distribution as profits or share premium of the Company and is distributable in accordance with the Articles and the Companies Act (as amended) (the "**Companies Act**");

(e)  the Directors have confirmed no awareness of any subsequent losses by the Company as at the date hereof which would affect the amount of profits or share premium available for distribution; and

(f)  a distribution may be unlawful, even where the provisions of the Articles and the Companies Act have been complied with, where the Directors are unable to reasonably conclude that the Company would have sufficient funds to be able to continue to be able to meet its debts as they fall due.

1.2  **IT IS RESOLVED** that:

(a)  In the opinion of the Directors, it is reasonable to conclude that following making the payment of the Dividends, the Company will have sufficient funds to be able to continue to be able to meet its debts as they fall due; and

(b)  the Directors make a payment of dividends to the Shareholders as set forth in Section 1.1(c) above.

2.  **GENERAL AUTHORISATION**

2.1  **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) be, and such other persons as are authorised by any of them be, and each hereby is, authorised, in the

1

35901511.2.C8689.187150

CONFIDENTIAL

TDIT005727

name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3.      **RATIFICATION OF PRIOR ACTIONS**

3.1     **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

_____                    _____
Mark Patrick                               Paul Murphy
**Director**                               **Director**


State of Texas
County of Dallas

The foregoing instrument was acknowledged before me by means of physical presence on this day, April 2, 2025 by Mark Patrick. He appeared before me, is personally known to me, has executed the document/instrument, for the purposes and considerations therein expressed.



NATALIE R OLVERA
Notary ID #130890197
My Commission Expires
March 29, 2027

Signature of Notary - State of TX

My commission expires: 3/29/27

2

35901511.2.C8689.187150

**CONFIDENTIAL**                                                          TDIT005728

name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

**3.    RATIFICATION OF PRIOR ACTIONS**

3.1    **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

_____
Mark Patrick
**Director**

Paul Murphy
**Director**

SIGNED IN THE PRESENCE OF

_____
Amy Altneu
Notary Public in and for The Cayman Islands
Dated this __2__ day of ___April___, 20__25__
(My commission expires on 31 January 20__26__)

2

35901511.2.C8689.187150

772

CHARITABLE DAF HOLDCO, LTD

WRITTEN RESOLUTIONS OF
OF THE COMPANY DATED _April 2_ 2025

## 1. ASSIGNMENT OF UNDERTAKINGS

1.1 IT IS NOTED that:

(a) Schedule A of the letter agreement ("Assigned Contracts") from the Company to CDMCFAD, LLC (the "Document"); and

(b) in connection with the Assigned Contracts, CDMCFAD, LLC has agreed to assume all responsibilities and risks in any manner connected with the Assigned Contracts, whether

1.2 IT IS RESOLVED that:

(a) in the opinion of the Directors, the entry into and performance by the Company of its obligations under the Document would be in the best interests of the Company;

(b) the transactions contemplated by the Document be approved;

(c) the Company enter into the Document;

(d) the form of the Document be approved on behalf of the Company subject to such amendments and additions thereto as any Director or any Attorney or Authorised Signatory (defined below) in their absolute discretion and opinion deem appropriate, the signature of any Director or any Attorney or Authorised Signatory on the Document being due evidence for all purposes of the approval of such amendment or addition and the final terms thereof on behalf of the Company;

(e) the Company do give, make, sign, execute and deliver all such notices, agreements, letters, notices, certificates, acknowledgements, instructions, fee letters and other documents (whether of a like nature or not) (the "Ancillary Documents") as may, in the sole opinion and absolute discretion of any Director or any Attorney or Authorised Signatory, be considered necessary or desirable for the purpose of compliance with any condition precedent or the coming into effect of or otherwise giving effect to, completing or procuring the performance and completion of all or any of the transactions contemplated by or referred to in the Document and the Company do all such acts and things as might in the opinion be so desirable in connection therewith. The signature of any Director or any Attorney or Authorised Signatory be necessary or desirable for the purposes stated above;

(f) the Ancillary Documents and any amendments thereto as any Director or any Attorney or Authorised Signatory in their absolute discretion and opinion approve, the signature of any Director or any Attorney or Authorised Signatory on any of the Ancillary Documents being due evidence for all purposes of the approval thereof and the final terms thereof on behalf of the Company; and

(g) the Document and any Ancillary Documents (whether under hand or as a deed), be executed by the signature thereof of any Director

1

35941326.1.C8689.187150

CONFIDENTIAL                    TDIT005730

or any Attorney or Authorised Signatory and where required to be sealed, by affixing

the Company.

2. GENERAL AUTHORISATION

2.1 IT IS RESOLVED that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or other person of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively) or any such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, conclusively evidenced thereby.

3. RATIFICATION OF PRIOR ACTIONS

3.1 IT IS RESOLVED that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

_____  _____
Mark Patrick  Bret Maney
**Director**  **Director**

Before me, Mark Patrick, personally appeared to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that he executed for purposes expressed

Natalie Olvera, as Notary public

NATALIE R OLVERA
Notary ID #130890197
My Commission Expires
March 30, 2027

State of Texas
County of Dallas

SIGNED IN THE PRESENCE OF

_____
Amy Altneu

Dated this 2 day of April, 20 25

35941326.1.C8689.187150

CONFIDENTIAL TDIT005731

**FSD2025-0116**

2025-08-19

Commercial in Confidence

### Total Annual Expenses ($)

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 66,797.39 | 116,173.18 | 398,091.82 | 4,346,447.57 | 4,337,827.65 | 8,044,320.10 | 6,184,744.91 |
| Investment Expense | - | - | - | - | - | 3,044,078.13 | 6,179,478.60 |
| Directors fees | - | - | - | 49,000.00 | 40,250.00 | 599,473.64 | 2,257,660.66 |
| Professional fees expense | 104,844.77 | 93,255.12 | 537,769.44 | 1,100,599.17 | 626,856.17 | 1,197,513.69 | 995,497.60 |
| Interest expense | 5,105,931.21 | 6,886,101.21 | 3,928,638.85 | 2,747,813.34 | 2,072,787.45 | 1,667,391.35 | 811,866.58 |
| Valuation services expense | - | - | 48,072.72 | 286,599.05 | 181,516.46 | 2,044,488.51 | 701,556.14 |
| Administration fees | 179,215.18 | 149,110.70 | 122,603.91 | 895,861.24 | 1,180,146.01 | 1,181,933.45 | 589,608.35 |
| Other expense | 344,897.87 | 1,062,261.79 | 679,023.69 | 388,462.74 | 449,838.72 | 805,068.65 | 571,048.05 |
| Dividend expense | - | 131,955.82 | 7,468.07 | 12,996.55 | 4,988,446.12 | 21,739.62 | 52,534.35 |
| Government fees | 46,343.20 | 52,782.23 | 30,765.73 | 251.20 | 4,647.69 | 7,076.35 | 1,468.44 |
| Management Fees | 5,472,982.35 | 4,468,290.73 | 3,576,464.98 | 230,460.41 | - | - | - |
| Trustee fees | 158,025.00 | 246,150.00 | 290,407.53 | 145,000.00 | - | - | - |
| Deferred Loan Fees Expense | (4,986.97) | 16,095.79 | 8,870.28 | - | 523.67 | - | - |
| Other Income | - | - | - | (2,400,000.00) | (12,768.67) | - | - |
|  |  |  |  |  |  |  |  |
|  | 11,474,050.00 | 13,222,176.57 | 9,628,177.02 | 7,803,491.27 | 13,870,071.27 | 18,613,083.49 | 18,345,463.68 |

*Item flowing through other income as an expense was a true-up/correction of an item that had been booked incorrectly by the fund administrator

### Percentage of Total Expenses

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | 0.58% | 0.88% | 4.13% | 55.70% | 31.27% | 43.22% | 33.71% |
| Investment Expense | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 16.35% | 33.68% |
| Directors fees | 0.00% | 0.00% | 0.00% | 0.63% | 0.29% | 3.22% | 12.31% |
| Professional fees expense | 0.91% | 0.71% | 5.59% | 14.10% | 4.52% | 6.43% | 5.43% |
| Interest expense | 44.50% | 52.08% | 40.80% | 35.21% | 14.94% | 8.96% | 4.43% |
| Valuation services expense | 0.00% | 0.00% | 0.50% | 3.67% | 1.31% | 10.98% | 3.82% |
| Administration fees | 1.56% | 1.13% | 1.27% | 11.48% | 8.51% | 6.35% | 3.21% |
| Other expense | 3.01% | 8.03% | 7.05% | 4.98% | 3.24% | 4.33% | 3.11% |
| Dividend expense | 0.00% | 1.00% | 0.08% | 0.17% | 35.97% | 0.12% | 0.29% |
| Government fees | 0.40% | 0.40% | 0.32% | 0.00% | 0.03% | 0.04% | 0.01% |
| Management Fees | 47.70% | 33.79% | 37.15% | 2.95% | 0.00% | 0.00% | 0.00% |
| Trustee fees | 1.38% | 1.86% | 3.02% | 1.86% | 0.00% | 0.00% | 0.00% |
| Deferred Loan Fees Expense | -0.04% | 0.12% | 0.09% | 0.00% | 0.00% | 0.00% | 0.00% |
| Other Income | 0.00% | 0.00% | 0.00% | -30.76% | -0.09% | 0.00% | 0.00% |
|  |  |  |  |  |  |  |  |
|  | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% | 100.00% |

### Percentage change Y/Y

| Expense | 12/31/2018 | 12/31/2019 | 12/31/2020 | 12/31/2021 | 12/31/2022 | 12/31/2023 | 6/30/2024 |
|---|---|---|---|---|---|---|---|
| Legal Fee Expense | - | 73.92% | 242.67% | 991.82% | -0.20% | 85.45% | -23.12% |
| Investment Expense | - | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 103.00% |
| Directors fees | - | 0.00% | 0.00% | 0.00% | -17.86% | 1389.38% | 276.61% |
| Professional fees expense | - | -11.05% | 476.66% | 104.66% | -43.04% | 91.03% | -16.87% |
| Interest expense | - | 34.86% | -42.95% | -30.06% | -24.57% | -19.56% | -51.31% |
| Valuation services expense | - | 0.00% | 0.00% | 496.18% | -36.67% | 1026.34% | -65.69% |
| Administration fees | - | -16.80% | -17.78% | 630.70% | 31.73% | 0.15% | -50.11% |
| Other expense | - | 207.99% | -36.08% | -42.79% | 15.80% | 78.97% | -29.07% |
| Dividend expense | - | 0.00% | -94.34% | 74.03% | 38282.85% | -99.56% | 141.65% |
| Government fees | - | 13.89% | -41.71% | -99.18% | 1750.20% | 52.26% | -79.25% |
| Management Fees | - | -18.36% | -19.96% | -93.56% | -100.00% | 0.00% | 0.00% |
| Trustee fees | - | 55.77% | 17.98% | -50.07% | -100.00% | 0.00% | 0.00% |
| Deferred Loan Fees Expense | - | -422.76% | -44.89% | -100.00% | 0.00% | -100.00% | 0.00% |
| Other Income | - | 0.00% | 0.00% | 0.00% | -99.47% | -100.00% | 0.00% |

**CONFIDENTIAL**

TDIT005732

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 13th September 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions.

1. **REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK.**

1.1 **NOTED THAT:**

(a) Since 24 March 2021, Mr. Mark Patrick has been appointed as President, Chief Investment Officer and General Counsel of the Company, and appointed as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(b) In or about March 2024, the Company, including Charitable DAF Fund LP, engaged Mercer LLP to conduct an independent compensation review of Mr. Mark Patrick's duties as President, Chief Investment Officer and General Counsel of the Company, and as President and Chief Investment Officer for seven subsidiaries/affiliated entities.

(c) Mercer LLP prepared an independent report dated 26 August 2024 ("Mercer Report") which contains a summary of Mr. Patrick's roles and responsibilities and their methodology for calculating market comparables. At page 5 of that report, Mercer recommended that Mr Patrick's compensation be structured as follows:

    a. Base salary: USD $850,000 or USD $750,000 if general partner liability insurance can be acquired to mitigate Mr Patrick's personal risk exposure.

    b. Long-term incentive ("LTI") tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(d) The Mercer report raised two issue for the Company to consider::

    a. Whether performance for the LTI compensation be calculated based on 2021 performance or start for the 2022 cycle; and

    b. Whether the LTI calculation should be calculated net of all Company expenses or new of fund expenses only.

(e) On 12th September 2024, Mr. Paul Murphy, a co-director of the Company, spoke to Heidi O'Brien, a Partner at Mercer, to discuss the issues identified in 1, 1.1 (d) a. and b. Following this conversation and based on the fact that (i) Ms. O'Brien confirmed that it was not uncommon for similar companies to award employees for the complete fiscal year when starting part way through the year, and (ii) Mr. Patrick was appointed in March 2021, the Directors have concluded that Mr. Patrick's LTI compensation should be calculated on the basis of the 2021 cycle.

(f) In addition, the Directors have concluded that the Company should assess the legal expenses

attributable to investments which impact the LTI compensation and, after that assessment, determine whether the LTI compensation should be increased.

(g) Based on the knowledge of the Directors of Mr. Patrick's roles and responsibilities, the Mercer LLP report and fact that Mr. Patrick is considered a key employee, the Directors have concluded that Mr. Patrick's compensation should be set in accordance with the recommendation in the Mercer report with the additional caveat that Mercer identified that CEOs and CIOs are often compensated on the basis of a base salary, annual incentive and LTI and an annual incentive is not included in the Mercer report. The Directors have concluded that it is in the Company's interest to determine whether an annual incentive should also be included as part of Mr. Patrick's compensation and, if so, how this is to be assessed.

(h) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

1.2    **IT IS RESOLVED** by unanimous written resolution that:

(a) Mr. Patrick's compensation be fixed, in accordance with recommendation of the Mercer LLP report, as follows:

     a. Base salary: USD $850,000, provided that, 100% of the base salary for calendar year 2024 may be paid on or about the date of these resolutions.

     b. Long-term incentive tied to DAF LP returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return), less any amounts previously advanced to Mr. Patrick.

(b) The Directors will assess:

     a. Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

     b. Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

Executed by the Directors comprising the entire Board of Directors of the Company:

BY      _____
Paul Murphy - Director
CHARITABLE DAF HOLDCO, LTD.

BY      _____
Mark Patrick - Director
CHARITABLE DAF HOLDCO, LTD.

**CONFIDENTIAL**         TDIT005734

777

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY**

**MADE ON 1 October 2024**

The undersigned, being all of the Directors of the Company, hereby resolve, pursuant to the Articles of Association of the Company, the following directors' resolutions. Any capitalized terms not defined herein are taken from the Directors' Resolution dated 12ᵗʰ September 2024.

1.  **ESTABLISHMENT OF COMPENSATION COMMITTEE/GUIDELINES AND APPOINTMENT OF MEMBERS OF COMPENSATION COMMITTEE.**

1.1  **NOTED THAT:**

    (a)  The Company does not presently have a compensation committee and the Directors believe it is in the best interest of the Company to establish a compensation committee which will be guided and governed by compensation committee guidelines established by the Directors.

    (b)  Given the Directors knowledge and experience of the Company, the initial appointments to the compensation committee will be Mark Patrick and Paul Murphy.

1.2  **IT IS RESOLVED THAT:**

    (a)  The Company establish a compensation committee (**"Compensation Committee"**) and adopt the guidelines in the form substantially contained in Appendix 1 to these resolutions (**"Compensation Committee Guidelines"**).

    (b)  Mark Patrick and Paul Murphy be appointed to the Compensation Committee.

    (c)  The Company empowers the Compensation Committee to make recommendations to the Directors on all matters outlined in the Compensation Committee Guidelines, provided that, all recommendations by the Compensation Committee are subject to review and approval by the Directors.

    (d)  The Compensation Committee shall not make any recommendations in relation to Mark Patrick's compensation arising from the resolution passed by the Directors on 12ᵗʰ September 2024, in particular, the LTI payment and annual bonus resolution passed in these Directors' Resolutions paragraph number 2.

2.  **FURTHER REVIEW AND APPROVAL OF COMPENSATION FOR MARK PATRICK AND EMPLOYMENT AGREEMENT.**

2.1  **NOTED THAT:**

    (a)  On 12 September 2024, the Directors passed a directors' resolution addressing Mark Patrick's compensation as a Director, President/CEO, Chief Investment Officer and General Counsel of the Company. The Directors approved compensation in the following amounts:

        a.  Base salary: USD $850,000.

    b.  LTI tied to Charitable DAF Fund LP ("DAF LP") returns: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return).

(b) In addition, the Directors resolved that they would assess:

    a.  Whether any adjustment should be made to the LTI calculation based on whether the calculation should be made net of all expenses or net of fund expenses; and

    b.  Whether Mr. Patrick should receive an annual bonus and the basis of that annual bonus.

LTI

(c) Paul Murphy noted that the return of the Company is impacted by whether legal expenses should be included as an operational expense of the Company (in which case the LTI payment would be lower) or whether legal expenses have been incurred not as an operational expense but as an expense to preserve, protect and maximize returns to the Company (in which case it is appropriate to exclude these expenses when assessing the Company's return thereby raising the LTI payment, in whole or in part).

(d) Paul Murphy, having a detailed and working knowledge of the Company's legal issues, and having commissioned Shawn Raver, legal advisor to the Company, to provide a breakdown of legal fees (i) which are attributable to the normal operation of the Company's investment portfolio, and (ii) which have been incurred to preserve, protect and maximize returns to the Company, who has assessed that 75% of those legal fees have been incurred to preserve, protect and maximize returns to the Company.

(e) Accordingly, the LTI calculation should be adjusted to award 75% of the difference between the figures noted in page 9 of the Mercer Report which is $975,000.[1]

Annual Bonus

(f) Paul Murphy conducted an independent assessment of whether Mark Patrick should receive an annual bonus and the basis of that annual bonus having regard to the Mercer Report, further discussions with Heidi O'Brien (Partner at Mercer), further review of industry comparables with CEO/CIO roles in complex structured finance senior positions, and assessment of other charitable organisations/structures (acknowledging that the Company and its subsidiaries are not subject to United States of America regulations).

(g) Having (i) reviewed the Compensation Committee Guidelines and, (ii) a detailed working knowledge of the Company and Mark Patrick's roles and responsibilities, Paul Murphy assessed that Mark Patrick is eligible for an annual bonus in the amount of 2.5 times his base salary for the year 2023 and payable immediately for, inter alia, the following reasons:

    a.  CEOs and CIOs in comparable positions are typically awarded a base salary, annual bonus and form of long term incentive plan which is designed to compensate senior executives for their performance and value to a company on an annual and long term basis (see Mercer Report page 17, which is consistent with and supported by Paul Murphy's

---

[1] The calculation net of all expense is $4,459,000 and net of fund expenses is $5,759,000 leaving a difference of $1.3m of which $975,000 is 75%.

CONFIDENTIAL                                                      TDIT005736

knowledge of US based asset managers).

b. The Company, in the absence of a senior executive willing to undertake the roles and responsibilities of a CEO, CIO and general counsel would, in the US, have to incur annual expenses of at least \$3-4m at the median range and \$5-6m at the upper range[2] to appropriately staff these positions.[3] By undertaking the roles of CEO, CIO and General Counsel, Mark Patrick would be undercompensated if the Company were only to award a base salary and LTI.

c. The Company has faced/is facing significant and complex legal issues in Texas, New York, the Cayman Islands and, until recently, Guernsey, which it has had to manage on a reactive and proactive basis and which Mark Patrick has been instrumental in the prosecution and defence of. These include sophisticated parties including US Bank, UBS and a Trustee in Bankruptcy.

d. Mark Patrick was instrumental in 2023/2024 defeating an action by UBS against the Company in New York which significantly reduced the Company's potential liabilities.

e. The risk profile to Mark Patrick as a director, CEO and CIO is high and his decision making will and is likely to be scrutinized which may lead to personal liability. He is undertaking these positions without the benefit of directors' and officers' insurance.

f. Mark Patrick has been instrumental in implementing and driving forward policies that will bring rigorous scrutiny and governance to the Company.

g. The Company's investments over the past three years have outperformed the S&P 500 significantly where the average returns for the S&P 500 over the same period returned 11.49% compared to 16.46% for the Company.

h. To date, Mark Patrick has not been awarded an annual bonus during his tenure at the Company nor has he received benefits which a CEO/CIO would typically enjoy.

(h) These are not a comprehensive list of factors Paul Murphy took into account but form the basis of his independent conclusion that the Directors should (i) enter into an employment agreement in a form drafted by the Company's US and Cayman Islands counsel which reflects the on-going compensation package, and (ii) award an annual discretionary bonus for 2023 at an amount of 2.5 times his base salary.

(i) Mr. Patrick has declared his interests to the Company in relation to the matters the subject of this resolution, being that Mr Patrick is Director of the Company, and also employed by the Company as President, Chief Investment Officer, and General Counsel of the Company.

2.2 **IT IS RESOLVED** by unanimous written resolution that:

---

[2] Per Mercer Report at page 7 and adjusted to account for base compensation and annual bonus/long term incentive for general counsel.
[3] It is noted that the basis for these figures includes assessment of charities and foundations in the US which the Company is not. Whilst useful guidance, the Company must be mindful of the fact that the Company is a Cayman Islands company that holds complex structured financial products through Cayman Islands companies and is not bound by the same provisions that relate to US charities and foundations.

CONFIDENTIAL TDIT005737

(a)  Mark Patrick be awarded:

a.  An adjustment to the LTI incentive payment in the amount of $975,000.

b.  An annual bonus for the year 2023, payable immediately, of 2.5 times his base salary.

c.  No annual bonus for the years 2021 and 2022 given the entirety of the compensation package provided to Mark Patrick as of 12th September 2024 and the date of this resolution.

Executed by the Directors comprising the entire Board of Directors of the Company:

BY  _____
Paul Murphy - Director

CHARITABLE DAF HOLDCO, LTD.

BY  _____
Mark Patrick - Director

CHARITABLE DAF HOLDCO, LTD.

**CONFIDENTIAL**                        **TDIT005738**

781

FSD2025-0116 **Page 785 of 1530** 2025-08-19

<u>**APPENDIX 1**</u>
<u>**COMPENSATION COMMITTEE GUIDELINES**</u>

<u>**Compensation Policy for Executives and Directors**</u>

As adopted on October 1, 2024

### 1. Overview and Objectives

This document sets forth the Compensation Policy for Executives and Directors of Charitable DAF HoldCo, Ltd., its subsidiaries, and CDH GP, Ltd. (collectively, "**Company**").

Compensation is a key component of the Company's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance the Company's value and otherwise assist the Company's to reach its long-term goals. Accordingly, the structure of this Policy is established to tie the compensation of each officer to the Company's goals and performance.

For purposes of this Policy, "Executive Officers" shall mean the Company's Chief Executive Officer, Chief Investment Officer, Chief Company Officer, and Chief Operating Officer, and such other executive officers as appointed by the Company from time to time.

For purposes of this Policy, "Directors" shall mean the Directors as defined in the organizational and governing documents of the Company.

This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted.

This Policy shall apply to compensation agreements and arrangements which will be approved after the date on which this Policy is adopted and shall serve as Company's Compensation Policy for five (5) years, commencing as of its adoption, unless amended earlier.

The Compensation Committee and the Board of Directors of the Company (the "**Compensation Committee**" and the "**Board**", respectively) shall review and reassess the adequacy of this Policy from time to time.

The Compensation Committee and Board shall have regard to the fact that Charitable DAF HoldCo, Ltd. and its subsidiaries are incorporated and subject to Cayman Islands law ("**Cayman Islands Entities**"). Accordingly, whilst US law, regulation and industry standards ("**US Practices**") may be taken into account when considering the Objectives (as defined below), the US Practices are not binding on the Cayman Islands Entities, the Cayman Islands Entities having been purposely established as non-US entities, and the Compensation Committee will have regard to all factors which, in its discretion, achieve the Objectives (as defined below).

### 2. Objectives

Company's objectives and goals in setting this Policy are to attract, motivate and retain highly experienced leaders who will contribute to Company's success and enhance shareholder value, while demonstrating professionalism in a highly achievement-oriented culture that is based on merit and rewards excellent performance in the long term, and embedding Company's core values as part of a motivated behavior ("**Objectives**"). To that end, this Policy is designed, among others:

FSD2025-0116 2025-08-19

701

**CONFIDENTIAL** TDIT005739

2.1. To closely align the interests of the Executive Officers and Directors with those of Company's shareholders in order to enhance shareholder value;

2.2. To align a significant portion of the Executive Officers' and Directors' compensation with Company's short and long-term goals and performance;

2.3. To provide the Executive Officers and Directors with a structured compensation package, including competitive salaries, performance-motivating cash and equity incentive programs and benefits;

2.4. To strengthen the retention and the motivation of Executive Officers and Directors in the long term; and

2.5. To provide appropriate awards in order to incentivize superior individual excellency and corporate performance.

3. **Compensation Instruments**

3.1 Compensation instruments under this Policy may include, but need not be limited to, the following:

3.1.1 Base salary;

3.1.2 Benefits;

3.1.3 Annual cash bonuses;

3.1.4 Change of control terms;

3.1.5 Retirement and termination terms; and

3.1.6 Long-term and short-term incentive payments

3.2 When fixing compensation instruments the Company may have regard to any matter which, in the Company's complete discretion, is commensurate with the Objectives. Without limitation, this may include:

3.2.1 Assessing an Executive Officer and Director's performance with regard to their contribution to and management of any assets or investments the Company sources or owns from time to time;

3.2.2 Assessing the performance of assets or investments of the Company in relation to overall returns to the Company;

3.2.3 Mitigation of Company liabilities;

3.2.4 Ensuring sound and prudent corporate governance including compliance with all legal, regulatory and industry standards;

3.2.5 Efficient management of service providers;

FSD2025-0116                                                                2025-08-19

3.2.6    Risk the Executive Officer and/or the Director is exposed to;

3.2.7    Responsibilities the Executive Officer and/or the Director undertakes; and

3.2.8    Achieving the Company's business and charitable objectives

4. **Benefits**

4.1    The following benefits may be granted to the Executive Officers and Directors in order, among other things, to comply with legal requirements:

    4.1.1    Vacation days in accordance with market practice;

    4.1.2    Sick days in accordance with market practice;

    4.1.3    Convalescence pay according to applicable law;

    4.1.4    Company may contribute on behalf of the Executive Officer or Director to an insurance policy (including, without limitation, split-dollar life insurance) or a pension fund, as allowed by applicable law and with reference to Company's policies and procedures and the practice in peer group companies (including contributions on bonus payments); and

    4.1.5    Company may contribute on behalf of the Executive Officer or Director towards work disability insurance, as allowed by applicable law and with reference to Company's policies and procedures and to the practice in peer group companies.

4.2    In events of relocation or repatriation of an Executive Officer or Director to another geography, such Executive Officer or Director may receive other similar, comparable or customary benefits as applicable in the relevant jurisdiction in which he or she is employed or additional payments to reflect adjustments in cost of living. Such benefits may include reimbursement for out of pocket one-time payments and other ongoing expenses, such as housing allowance, car allowance, and home leave visit, etc.

4.3    Company may offer additional benefits to its Executive Officers and Directors, which will be comparable to customary market practices, such as, but not limited to: cellular and land line phone benefits, company car and travel benefits, reimbursement of business travel including a daily stipend when traveling and other business related expenses, insurances, other benefits (such as newspaper subscriptions, academic and professional studies), etc., provided, however, that such additional benefits shall be determined in accordance with Company's policies and procedures.

5. **Miscellaneous**

5.1    Nothing in this Policy shall be deemed to grant to any of Company's Executive Officers, employees, directors, or any third party any right or privilege in connection with their employment by or service to the Company, nor deemed to require Company to provide any compensation or benefits to any person. Such rights and privileges shall be governed by applicable personal

CONFIDENTIAL                                                                TDIT005741

FSD2025-0116                                                           2025-08-19

employment agreements or other separate compensation arrangements entered into between Company and the recipient of such compensation or benefits. The Board may determine that none or only part of the payments, benefits and perquisites detailed in this Policy shall be granted, and is authorized to cancel or suspend a compensation package or any part of it.

5.2   In the event that new regulations or law amendment in connection with Executive Officers' and Directors' compensation will be enacted following the adoption of this Policy, Company may follow such new regulations or law amendments, even if such new regulations are in contradiction to the compensation terms set forth herein.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This Policy is designed solely for the benefit of Company and none of the provisions thereof are intended to provide any rights or remedies to any person other than Company.

## EXECUTIVE EMPLOYMENT AGREEMENT

**THIS EMPLOYMENT AGREEMENT** (the "**Agreement**") is made and entered into effective as of March 24, 2021 (the "**Effective Date**"), by and between MARK PATRICK ("**Executive**") and CHARITABLE DAF HOLDCO, LTD., a Cayman Islands company (the "**Company**"), as a "**Party**" or collectively as the "**Parties**".

**WHEREAS**, the Company has employed Executive on the terms and conditions set forth herein since March 24, 2021; and

**WHEREAS**, Executive agrees to be employed by the Company on such terms and conditions as set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants, promises, and obligations set forth herein, the Parties agree as follows:

1.   **Employment Term**. Executive's employment hereunder shall be effective as of the Effective Date and shall continue until terminated pursuant to Section 5 of this Agreement.

2.   **Position and Duties**.

   2.1   **Position**. During the Employment Term, Executive shall serve as the President and CEO, Chief Investment Officer, Chief Financial Officer, and General Counsel of the Company, reporting to the Directors of the Company (the "**Directors**"). In such position, Executive shall have such duties, authority, and responsibilities as shall be determined from time to time by the Directors, which duties, authority, and responsibilities are consistent with Executive's position.

   2.2   **Duties**. During the Employment Term, Executive shall perform such duties, as are reasonably assigned to Executive and devote a reasonable amount of Executive's business time and attention to the performance of Executive's duties, including, without limitation, service as an officer for other affiliates and subsidiaries of the Company.

3.   **Place of Performance**. The principal place of Executive's employment shall be the place as determined by the Parties; however, Executive shall be permitted to work remotely so long as doing so does not interfere with the Executive's responsibilities under this Agreement. Executive may also be required to travel on Company business during the Employment Term.  The Company may provide a remote travel office, or transportation, to accommodate the Executive in his performance of his duties.

4.   **Compensation**.

   4.1   **Base Salary**. Beginning with the 2023 calendar year, the Company shall pay Executive an annual base salary of $850,000 (the "**Base Salary**") in periodic installments in accordance with customary payroll practices and applicable wage payment laws. Notwithstanding the foregoing, the Executive's annual base salary may be advanced in one or more installments from time to time pursuant to a Director's resolution, but in such amounts not to exceed one year of Base Salary.  The Base Salary may be adjusted within the first sixty

**CONFIDENTIAL**                                                        TDIT005743

**FSD2025-0116** 2025-08-19

(60) days of any calendar year by an amendment to this Agreement in accordance with Section 14 below.

**4.2** **Annual Bonus**. For each fiscal year of the Employment Term, Executive shall be eligible to earn an annual bonus (the "**Annual Bonus**"). The decision to provide an Annual Bonus and the amount and terms of such Annual Bonus shall be in the sole and absolute discretion of the Directors, which may be paid in advance of the close of any one year. The Directors may establish and approve written criteria or guidelines that may be taken into account when determining whether an Annual Bonus should be paid and the amount in which it is paid. In exercising their discretion, the Directors will take into account industry standards in relation to annual bonuses awarded to people employed in comparable positions to Executive.

**4.3** **Discretionary Bonuses**. At any time and from time to time during the Employment Term, the Executive shall be eligible to earn discretionary bonuses (each a "**Discretionary Bonus**"). Such Discretionary Bonuses shall be at the sole and absolute discretion of the Directors.

**4.4** **Long Term Incentive Plan**: Executive shall participate in the Long Term Incentive Plan ("**LTIP**"). The LTIP will cover a period of three (3) years. For purposes of this agreement, the LTIP will cover the period from March 24, 2021 through March 24, 2024 (the "**First LTIP**") and is awarded in the total amount of $4,759,000. The second LTIP period will cover the period from March 25, 2024 through March 24, 2027 (the "**Second LTIP**"). The Second LTIP may be awarded at the discretion of the Directors through a cash payment made at the end of 2027, or by periodic awards in the equity of investments of the Company, or a combination of both.

**4.5** **Retirement Incentive Plan**. At the discretion of the Directors, the Company may authorize a "Retirement Incentive Plan" to be put into place on behalf of the Executive.

**4.6** **Employee Benefits**. During the Employment Term, Executive shall be entitled to participate in an employee benefit plan, including but not limited to health insurance, disability benefits, and retirement plan or other benefit practices and programs as may be implemented from time to time by the Company (collectively, "**Employee Benefit Plans**"), to the extent consistent with applicable law and the terms of the applicable Employee Benefit Plans. The Company reserves the right to amend or terminate any Employee Benefit Plans at any time in its sole discretion, subject to the terms of such Employee Benefit Plan and applicable law.

**4.7** **Vacation; Paid Time Off**. During the Employment Term, Executive shall be entitled to forty (40) days of paid vacation per calendar year (prorated for partial years). Executive shall receive other paid time off in accordance with Company policies as may exist from time to time or as otherwise determined by the Directors.

**4.8** **Business Expenses**. Executive shall be entitled to reimbursement for all reasonable and necessary out-of-pocket business, entertainment, and travel expenses incurred by Executive in connection with the performance of Executive's duties hereunder.

**CONFIDENTIAL** TDIT005744

4.9     **Indemnification**. In the event that Executive is made a party or threatened to be made a party to any action, suit, or proceeding, whether civil, criminal, administrative, or investigative (a "**Proceeding**"), other than any Proceeding initiated by Executive or the Company related to any contest or dispute between Executive and the Company or any of its affiliates or subsidiaries with respect to this Agreement or Executive's employment hereunder, by reason of the fact that Executive is or was a director or officer of the Company, or any affiliate or subsidiary of the Company, or is or was serving at the request of the Company as a director, officer, member, employee, or agent of another corporation or a partnership, joint venture, trust, or other enterprise, Executive shall be indemnified and held harmless by the Company from and against any liabilities, costs, claims, and expenses, including all costs and expenses incurred in defense of any Proceeding (including attorneys' fees).

5.     **Employment Term and Termination of Employment**. The initial term of employment of Executive shall be the period from the Effective Date until December 31, 2021, and thereafter shall automatically renew from year-to-year for additional one (1) year periods, unless either Party provides written notice of non-renewal to the other Party within sixty (60) days prior to the expiration of the applicable Employment Term, or Executive's employment is otherwise terminated in accordance with this Section 5 below (the "**Employment Term**"). In the event of non-renewal of the Employment Term by either Party, Executive shall be entitled to payment of the Severance Payment Amount (as defined in Section 5.2(d) below). The Employment Term and Executive's employment hereunder may be terminated by either the Company or Executive at any time and for any reason; provided that, unless otherwise provided herein, either Party shall be required to give the other Party at least sixty (60) days advance written notice of any termination of Executive's employment. On termination of Executive's employment during the Employment Term, Executive shall be entitled to the compensation and benefits described in this Section 5 and shall have no further rights to any compensation or any other benefits from the Company or any of its affiliates.

5.1     **For Cause or Without Good Reason**.

(a)     Executive's employment hereunder may be terminated by the Company for Cause or by Executive without Good Reason. If Executive's employment is terminated by the Company for Cause or by Executive without Good Reason, Executive shall be entitled to receive:

(i)     any accrued but unpaid Base Salary and accrued but unused vacation which shall be paid on the Termination Date (as defined below);

(ii)     any earned but unpaid Annual Bonus with respect to any completed calendar year immediately preceding the Termination Date, which shall be paid on the otherwise applicable payment date; provided that, if Executive's employment is terminated by the Company for Cause, then any such accrued but unpaid Annual Bonus shall be forfeited;

(iii)     reimbursement for unreimbursed business expenses properly incurred by Executive in accordance with Section 4.8 of this Agreement; and

CONFIDENTIAL                                                             TDIT005745

FSD2025-0116                                                                                          2025-08-19

(iv)     such employee benefits, if any, to which Executive may be entitled under the Company's employee benefit plans as of the Termination Date; provided that, in no event shall Executive be entitled to any payments in the nature of severance or termination payments except as specifically provided herein; and

(v)      accrued and unpaid First or Second LTIP.

Items 5.1(a)(i) through 5.1(a)(v) are referred to herein collectively as the "**Accrued Amounts**". For the avoidance of doubt, any LTIP that has awarded any exposure to an investment such as equity shall be deemed vested if not vested already.

(b)     For purposes of this Agreement, "**Cause**" shall mean:

(i)      Executive's conviction of or plea of guilty or nolo contendere to a crime that constitutes a felony (or state law equivalent);

(ii)     Executive's material breach of the provisions of this Agreement in the course of performing Executive's duties that results in material harm to the Company; or

(iii)    Executive is deemed by a court of competent jurisdiction to have engaged in any act or omission constituting willful misconduct, gross negligence, or fraud in the course of performing Executive's duties.

Notwithstanding the foregoing, for subsections (i) to (iii), the Employment Term and Executive's employment shall not be deemed to have been terminated for Cause unless the Company shall have given Executive: (A) written notice setting forth the reasons for the Company's intention to terminate Executive's employment for Cause, and (B) a reasonable opportunity, not to exceed thirty (30) days, to cure such default.

(c)     For purposes of this Agreement, "**Good Reason**" shall mean the occurrence of any of the following, in each case during the Employment Term, without Executive's written consent:

(i)      a material reduction of, or failure to pay, Executive's Base Salary; or

(ii)     a material, adverse change in Executive's authority, duties, or responsibilities (other than (i) temporarily while Executive is physically or mentally incapacitated, (ii) where, if applicable, in Executive's capacity as a director, officer, managing member or other position to exert control or influence in the Company or subsidiary (**"Controlling Position"**), the Executive has directed or caused a material adverse change himself, (iii) where the Company's business has materially changed through no fault of the Company, (iv) or as required by applicable law); or

(iii)    Company's material breach of the provisions of this Agreement.

FSD2025-0116                                                                                          2025-08-19
708
CONFIDENTIAL                                                                            TDIT005746

Executive cannot terminate employment for Good Reason unless: (i) Executive has provided written notice to the Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company has had at least thirty (30) days from the date on which such notice is provided to cure such circumstances. Executive agrees and acknowledges that if he holds a Controlling Position he is obliged to act in good faith and with all due diligence and expedition to help the Company cure any such grounds.

**5.2** **Without Cause or for Good Reason**. The Employment Term and Executive's employment hereunder may be terminated by Executive (i) for Good Reason, (ii) by the Company without Cause, or in the event of non-renewal of the Employment Term in accordance with Section 5. In the event of such termination, Executive shall be entitled to receive the Accrued Amounts and, subject to Executive's compliance with Section 6, Section 7, and Section 8 of this Agreement, Executive shall be entitled to receive the following:

(a)     continued Base Salary for twelve (12) months following the Termination Date payable in equal installments, but no less frequently than monthly;

(b)     a payment equal to the product of (i) the Annual Bonus, if any, that Executive would have earned for the fiscal year in which the Termination Date (as determined in accordance with Section 5.5) occurs based on achievement of the applicable performance goals for such year and (ii) a fraction, the numerator of which is the number of days Executive was employed by the Company during the year of termination and the denominator of which is the number of days in such year (the "**Pro-Rata Bonus**"), plus any accrued but unpaid Discretionary Bonuses as determined by the Directors. These amounts shall be paid on the date that Annual or Discretionary Bonuses are normally paid;

(c)     If Executive timely and properly elects health continuation coverage under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("**COBRA**"), the Company shall reimburse Executive for the monthly COBRA premium paid by Executive for Executive and Executive's dependents. Such reimbursement shall be paid to Executive on the seventh (7th) day of the month immediately following the month in which Executive timely remits the premium payment. Executive shall be eligible to receive such reimbursement until the earliest of: (i) the date Executive is no longer eligible to receive COBRA continuation coverage; and (ii) the date on which Executive becomes eligible to receive substantially similar coverage from another employer or other source; and

(d)     An early termination payment in the nature of a severance payment in the amount of $10,000,000 payable at termination (the "**Severance Payment Amount**").

FSD2025-0116                                                                                 2025-08-19

5.3     **Death or Disability**.

(a)     Executive's employment hereunder shall terminate automatically on Executive's death during the Employment Term, and the Company may terminate Executive's employment on account of Executive's Disability.

(b)     If Executive's employment is terminated during the Employment Term on account of Executive's death or Disability, Executive (or Executive's estate and/or beneficiaries, as the case may be) shall be entitled to receive the following:

(i)     the Accrued Amounts; and,

(ii)     a lump sum payment equal to the Pro-Rata Bonus, and any accrued but unpaid discretionary bonuses, if any, that Executive earned for the fiscal year in which the termination date occurs which shall be payable on the date that annual bonuses are normally paid to the Company's executives, but in no event later than three (3) months following the end of the fiscal year in which the termination date occurs; and,

(iii)     in the event of the Executive's death or disability, the Company shall pay the Executive's estate an amount equal to the Severance Payment Amount.

Notwithstanding any other provision contained herein, all payments made in connection with Executive's Disability shall be provided in a manner which is consistent with federal and state law.

(c)     For purposes of this Agreement, "**Disability**" shall mean a condition that entitles Executive to receive long-term disability benefits under the Company's long-term disability plan, or if there is no such plan, Executive's inability, due to physical or mental incapacity, to perform the essential functions of Executive's job, with or without reasonable accommodation, for a period of ninety (90) consecutive days or a period of ninety (90) days in any one hundred eighty (180) day period. Any question as to the existence of Executive's Disability as to which Executive and the Company cannot agree shall be determined in writing by a qualified independent physician mutually acceptable to Executive and the Company. If Executive and the Company cannot agree as to a qualified independent physician, each shall appoint such a physician and those two physicians shall select a third who shall make such determination in writing. The determination of Disability made in writing to the Company and Executive shall be final and conclusive for all purposes of this Agreement.

5.4     **Notice of Termination**. Any termination of Executive's employment hereunder by the Company or by Executive during the Employment Term (other than termination pursuant to Section 5.3(a) on account of Executive's death) shall be communicated by written notice of termination ("**Notice of Termination**") to the other party hereto in accordance with Section 20 herein. The Notice of Termination shall specify:

(a)     The termination provision of this Agreement relied upon;

FSD2025-0116                                                                                 2025-08-19
                                                                                              710
**CONFIDENTIAL**                          TDIT005748

FSD2025-0116                                                                                                       2025-08-19

(b)     To the extent applicable, the facts and circumstances claimed to provide a basis for termination of Executive's employment under the provision so indicated;

(c)     To the extent applicable, the date notice of intention to terminate Executive's employment was provided or the date notice of existence of the circumstances providing grounds for termination for Good Reason was provided; and

(d)     The applicable Termination Date.

5.5     **Termination Date**. Executive's "**Termination Date**" shall be:

(a)     If Executive's employment hereunder terminates on account of Executive's death, the date of Executive's death;

(b)     If Executive's employment hereunder is terminated on account of Executive's Disability, the date that it is determined that Executive has a Disability;

(c)     Unless otherwise indicated herein, if the Company terminates Executive's employment hereunder for Cause, the date the Notice of Termination is delivered to Executive. If the Company is required to give notice of intention to terminate Executive's employment and an opportunity to cure, and Executive fails to cure same, the date on which the cure period expires;

(d)     If the Company terminates Executive's employment hereunder without Cause, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(e)     If Executive terminates Executive's employment hereunder without Good Reason, the date specified in Executive's Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered;

(f)     If Executive terminates Executive's employment hereunder with Good Reason, and subject to Executive providing written notice to Company of the existence of the circumstances providing grounds for termination for Good Reason within fifteen (15) days of the initial existence of such grounds, and (ii) the Company having had at least thirty (30) days from the date on which such notice is provided to cure such circumstances and fails to cure same, the date on which the cure period expires; and

(g)     In the event of non-renewal of the Employment Term by either Party, the date specified in the Notice of Termination, which shall be no less than sixty (60) days following the date on which the Notice of Termination is delivered

5.6     **Resignation of All Other Positions**. On termination of Executive's employment hereunder for any reason, Executive shall be deemed to have resigned from all positions that Executive holds as an officer or director of the Company or any of its affiliates or subsidiaries.

FSD2025-0116                                                                                                       2025-08-19

CONFIDENTIAL                                                711

TDIT005749

    **6.**    <u>**Cooperation**</u>. The parties agree that certain matters in which Executive will be involved during the Employment Term may necessitate Executive's cooperation in the future. Accordingly, following the termination of Executive's employment for any reason, to the extent reasonably requested by the Directors, Executive shall cooperate with the Company, its affiliates and subsidiaries in connection with matters arising out of Executive's service to the Company; its affiliates or subsidiaries, provided that, the Company shall make reasonable efforts to minimize disruption of Executive's other activities. The Company shall reimburse Executive for reasonable expenses incurred in connection with such cooperation.

    **7.**    <u>**Confidential Information**</u>. Executive understands and acknowledges that during the Employment Term, Executive will have access to and learn about Confidential Information, as defined below.

    **7.1**    <u>**Confidential Information Defined**</u>.

    (a)    <u>Definition</u>.

    For purposes of this Agreement, "**Confidential Information**" includes, but is not limited to, all information not generally known to the public, in spoken, printed, electronic or any other form or medium, relating directly or indirectly to: business processes, practices, methods, policies, plans, publications, documents, research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, applications, operating systems, software design, web design, work-in-process, databases, device configurations, embedded data, compilations, metadata, technologies, manuals, records, articles, systems, material, sources of material, supplier information, vendor information, financial information, results, accounting information, accounting records, legal information, marketing information, advertising information, pricing information, credit information, design information, payroll information, staffing information, personnel information, employee lists, supplier lists, vendor lists, developments, reports, internal controls, security procedures, graphics, drawings, sketches, market studies, sales information, revenue, costs, formulae, notes, communications, algorithms, product plans, designs, styles, models, ideas, audiovisual programs, inventions, unpublished patent applications, original works of authorship, discoveries, experimental processes, experimental results, specifications, customer information, customer lists, client information, client lists, manufacturing information, factory lists, distributor lists, and buyer lists of the Company, or its businesses including its affiliates and subsidiaries, or any existing or prospective customer, supplier, investor or other associated third party, or of any other person or entity that has entrusted information to the Company or its businesses including its affiliates and subsidiaries in confidence.

    Executive understands that the above list is not exhaustive, and that Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, or that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

FSD2025-0116                                                                                  2025-08-19

Executive understands and agrees that Confidential Information includes information developed by Executive in the course of employment by the Company, its affiliates or subsidiaries as if the Company, its affiliates or subsidiaries furnished the same Confidential Information to Executive in the first instance. Confidential Information shall not include information that is generally available to and known by the public at the time of disclosure to Executive; provided that, such disclosure is through no direct or indirect fault of Executive or person(s) acting on Executive's behalf.

(b)   <u>Disclosure and Use Restrictions</u>.

Executive agrees and covenants: (i) to treat all Confidential Information as strictly confidential; (ii) not to directly or indirectly disclose, publish, communicate, or make available Confidential Information, or allow it to be disclosed, published, communicated, or made available, in whole or part, to any entity or person whatsoever (including other employees of the Company, its affiliates or subsidiaries) not having a need to know and authority to know and use the Confidential Information in connection with the business of the Company, its affiliates or subsidiaries and, in any event, not to anyone outside of the direct employ of the Company, its affiliates or subsidiaries, except as required in the performance of Executive's authorized employment duties to the Company or with the prior written consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent); and (iii) not to access or use any Confidential Information, and not to copy any documents, records, files, media, or other resources containing any Confidential Information, or remove any such documents, records, files, media, or other resources from the premises or control of the Company, its affiliates or subsidiaries except as required in the performance of Executive's authorized employment duties to the Company, its affiliates or subsidiaries or with the prior consent of the Directors acting on behalf of the Company, its affiliates or subsidiaries, as applicable, in each instance (and then, such disclosure shall be made only within the limits and to the extent of such duties or consent).

(c)   <u>Permitted Disclosures</u>. Nothing herein shall be construed to prevent disclosure of Confidential Information as may be required by applicable law or regulation, or pursuant to the valid order of a court of competent jurisdiction or an authorized government agency, provided that the disclosure does not exceed the extent of disclosure required by such law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

(d)   <u>Notice of Immunity Under the Economic Espionage Act of 1996, as amended by the Defend Trade Secrets Act of 2016 ("DTSA")</u>. Notwithstanding any other provision of this Agreement:

(i)   Executive will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that:

FSD2025-0116                                                                                  2025-08-19

CONFIDENTIAL                                                        TDIT005751

(A)      is made (1) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney; and (2) solely for the purpose of reporting or investigating a suspected violation of law; or

(B)      is made in a complaint or other document filed under seal in a lawsuit or other proceeding.

(ii)      If Executive files a lawsuit for retaliation by the Company for reporting a suspected violation of law, Executive may disclose the Company's trade secrets to Executive's attorney and use the trade secret information in the court proceeding if Executive:

(A)      files any document containing trade secrets under seal; and

(B)      does not disclose trade secrets, except pursuant to court order.

## 8.    Restrictive Covenants.

**8.1      Acknowledgement**. Executive understands that the nature of Executive's position gives Executive access to and knowledge of Confidential Information and places Executive in a position of trust and confidence with the Company, its affiliates and subsidiaries. Executive understands and acknowledges that the services Executive provides to the Company, its affiliate and subsidiaries are unique, special, or extraordinary.

Executive further understands and acknowledges that the Company's ability to reserve these for the exclusive knowledge and use of the Company, its affiliates and subsidiaries is of great competitive importance and commercial value to the Company, its affiliates and subsidiaries and that improper use or disclosure by Executive is likely to result in unfair or unlawful competitive activity.

**8.2      Non-Competition**. Because of the Company's legitimate business interest as described herein and the good and valuable consideration offered to Executive, during the Employment Term and for a period of one (1) year, beginning on the last day of Executive's employment with the Company, Executive agrees and covenants not to engage in Prohibited Activity within the areas in which the Company has conducted business.

For purposes of this Section 8.2, "**Prohibited Activity**" is activity in which Executive contributes Executive's knowledge, directly or indirectly, in whole or in part, as an employee, employer, owner, operator, manager, advisor, consultant, agent, employee, partner, director, stockholder, officer, volunteer, intern, or any other similar capacity to an entity engaged in the same or similar business as the Company, or its affiliates. Prohibited Activity also includes activity that may require or inevitably requires disclosure of trade secrets, proprietary information, or Confidential Information.

Nothing herein shall prohibit Executive from purchasing or owning less than one percent (1%) of the publicly traded securities of any corporation, provided that such ownership represents a passive investment and that Executive is not a controlling person of, or a member of a group that controls, such corporation.

This Section 8 does not, in any way, restrict or impede Executive from exercising protected rights to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by the law, regulation, or order. Executive shall promptly provide written notice of any such order to the Directors.

**8.3** **<u>Non-Solicitation of Employees</u>**. Executive agrees and covenants not to directly or indirectly solicit, hire, recruit, attempt to hire or recruit, or induce the termination of employment of any employee of the Company, or attempt to do so, for a period of one (1) year, to run consecutively, beginning on the last day of Executive's employment with the Company.

**8.4** **<u>Non-Solicitation of Customers</u>**. Executive understands and acknowledges that because of Executive's experience with and relationship to the Company, its affiliates and subsidiaries, Executive will have access to and learn about the Company's, its affiliates' and subsidiaries' customer information. "**Customer Information**" includes, but is not limited to, names, phone numbers, addresses, email addresses, order history, order preferences, chain of command, decisionmakers, pricing information, and other information identifying facts and circumstances specific to the customer and relevant to services.

Executive understands and acknowledges that loss of this customer relationship and/or goodwill will cause significant and irreparable harm.

Executive agrees and covenants, for a period of one (1) year, not to directly or indirectly solicit, contact (including but not limited to email, regular mail, express mail, telephone, fax, instant message, or social media), attempt to contact, or meet with the Company's, its affiliates' or its subsidiaries' customers for purposes of offering or accepting goods or services similar to or competitive with those offered by the Company, its affiliates or subsidiaries.

**9.** **<u>Acknowledgement</u>**. Executive acknowledges and agrees that the services to be rendered by Executive to the Company, its affiliates and subsidiaries, are of a special and unique character; that Executive will obtain knowledge and skill relevant to the Company's, its affiliates' and subsidiaries' industries, their methods of doing business and marketing strategies by virtue of Executive's employment; and that the restrictive covenants and other terms and conditions of this Agreement are reasonable and reasonably necessary to protect the legitimate business interest of the Company, its affiliates and subsidiaries.

Executive further acknowledges that the benefits provided to Executive under this Agreement, including the amount of Executive's compensation, reflects, in part, Executive's obligations and the Company's rights under Section 7 and Section 8, of this Agreement; that

CONFIDENTIAL TDIT005753

Executive has no expectation of any additional compensation, royalties, or other payment of any kind not otherwise referenced herein in connection herewith; and that Executive will not suffer undue hardship by reason of full compliance with the terms and conditions of Section 7 and Section 8 of this Agreement or the Company's enforcement thereof.

**10.    Remedies**. In the event of a breach or threatened breach by Executive of Section 7 and Section 8 of this Agreement, Executive hereby consents and agrees that the Company, its affiliates and subsidiaries shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, and that money damages would not afford an adequate remedy, without the necessity of showing any actual damages, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

**11.    Proprietary Rights**.

**11.1    Work Product**. Executive acknowledges and agrees that all right, title, and interest in and to all writings, works of authorship, technology, inventions, discoveries, processes, techniques, methods, ideas, concepts, research, proposals, materials, and all other work product of any nature whatsoever, that are created, prepared, produced, authored, edited, amended, conceived, or reduced to practice by Executive individually or jointly with others during the Employment Term and relate in any way to the business or contemplated business, products, activities, research, or development of the Company, its affiliates or subsidiaries or result from any work performed by Executive for the Company, its affiliates or subsidiaries (in each case, regardless of when or where prepared or whose equipment or other resources are used in preparing the same), all rights and claims related to the foregoing, and all printed, physical and electronic copies, and other tangible embodiments thereof (collectively, "**Work Product**"), as well as any and all rights in and to US and foreign (a) patents, patent disclosures and inventions (whether patentable or not), (b) trademarks, service marks, trade dress, trade names, logos, corporate names, and domain names, and other similar designations of source or origin, together with the goodwill symbolized by any of the foregoing, (c) copyrights and copyrightable works (including computer programs), mask works, and rights in data and databases, (d) trade secrets, know-how, and other confidential information, and (e) all other intellectual property rights, in each case whether registered or unregistered and including all registrations and applications for, and renewals and extensions of, such rights, all improvements thereto and all similar or equivalent rights or forms of protection in any part of the world (collectively, "**Intellectual Property Rights**"), shall be the sole and exclusive property of the Company, its affiliates or subsidiaries, as applicable.

**11.2    Work Made for Hire; Assignment**. Executive acknowledges that, by reason of being employed by the Company, its affiliates or subsidiaries, at the relevant times, to the extent permitted by law, all of the Work Product consisting of copyrightable subject matter is "work made for hire" as defined in 17 U.S.C. § 101 and such copyrights are therefore owned by the Company, its affiliates or subsidiaries, as applicable. To the extent that the foregoing does not apply, Executive hereby irrevocably assigns to the Company, its affiliates or subsidiaries, as applicable, for no additional consideration, Executive's entire right, title, and interest in and to all Work Product and Intellectual Property Rights therein, including the right

**CONFIDENTIAL**                                                              **TDIT005754**

to sue, counterclaim, and recover for all past, present, and future infringement, misappropriation, or dilution thereof, and all rights corresponding thereto throughout the world. Nothing contained in this Agreement shall be construed to reduce or limit the Company's, its affiliates' or subsidiaries' rights, title, or interest in any Work Product or Intellectual Property Rights so as to be less in any respect than that the Company, its affiliates, subsidiaries or assigns, would have had in the absence of this Agreement.

**11.3** **Further Assurances; Power of Attorney**. During and after the Employment Term, Executive agrees to reasonably cooperate with the Company, its affiliates, subsidiaries and assigns to (a) apply for, obtain, perfect, and transfer to the Company, its affiliates or subsidiaries, as applicable, the Work Product as well as any and all Intellectual Property Rights in the Work Product in any jurisdiction in the world; and (b) maintain, protect and enforce the same, including, without limitation, giving testimony and executing and delivering to the Company, its affiliates and subsidiaries, as the case may be, any and all applications, oaths, declarations, affidavits, waivers, assignments, and other documents and instruments as shall be requested by the Company, its affiliates or subsidiaries. Executive hereby irrevocably grants the Company, its affiliates or subsidiaries, as applicable, power of attorney to execute and deliver any such documents on Executive's behalf in Executive's name and to do all other lawfully permitted acts to transfer the Work Product to the Company, its affiliates or subsidiaries, as the case may be. The power of attorney is coupled with an interest and shall not be affected by Executive's subsequent incapacity.

**11.4** **No License**. Executive understands that this Agreement does not, and shall not be construed to, grant Executive any license or right of any nature with respect to any Work Product or Intellectual Property Rights or any Confidential Information, materials, software, or other tools made available to Executive by the Company.

**12.** **Security**.

**12.1** **Security and Access**. Executive agrees and covenants (a) to comply with all security policies and procedures as in force from time to time including without limitation those regarding the Company's, its affiliates' or subsidiaries' facilities, IT resources and communication technologies ("**Facilities and Information Technology Resources**"); (b) not to access or use any Facilities and Information Technology Resources except as authorized by the Company, its affiliates or subsidiaries; and (iii) not to access or use any Facilities and Information Technology Resources in any manner after the termination of Executive's employment by the Company, its affiliates or subsidiaries whether termination is voluntary or involuntary. Executive agrees to promptly notify the Company, its affiliates or subsidiaries, as applicable, in the event Executive learns of any violation of the foregoing by others, or of any other misappropriation or unauthorized access, use, reproduction, or reverse engineering of, or tampering with any Facilities and Information Technology Resources or other Company, affiliate or subsidiary property or materials by others.

**13.** **Entire Agreement**. Unless specifically provided herein, this Agreement contains all of the understandings and representations between Executive and the Company pertaining to the subject matter hereof and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter. The

**CONFIDENTIAL**                                                             **TDIT005755**

parties mutually agree that the Agreement can be specifically enforced in court and can be cited as evidence in legal proceedings alleging breach of the Agreement.

14.    **Modification and Waiver**. No provision of this Agreement may be amended or modified unless such amendment or modification is agreed to in writing and signed by Executive and the Director of the Company. No waiver by either of the parties of any breach by the other party hereto of any condition or provision of this Agreement to be performed by the other party hereto shall be deemed a waiver of any similar or dissimilar provision or condition at the same or any prior or subsequent time, nor shall the failure of or delay by either of the parties in exercising any right, power, or privilege hereunder operate as a waiver thereof to preclude any other or further exercise thereof or the exercise of any other such right, power, or privilege.

15.    **Severability**. Should any provision of this Agreement be held by a court of competent jurisdiction to be enforceable only if modified, or if any portion of this Agreement shall be held as unenforceable and thus stricken, such holding shall not affect the validity of the remainder of this Agreement, the balance of which shall continue to be binding upon the parties with any such modification to become a part hereof and treated as though originally set forth in this Agreement.

The parties further agree that any such court is expressly authorized to modify any such unenforceable provision of this Agreement in lieu of severing such unenforceable provision from this Agreement in its entirety, whether by rewriting the offending provision, deleting any or all of the offending provision, adding additional language to this Agreement, or by making such other modifications as it deems warranted to carry out the intent and agreement of the parties as embodied herein to the maximum extent permitted by law.

The parties expressly agree that this Agreement as so modified by the court shall be binding upon and enforceable against each of them. In any event, should one or more of the provisions of this Agreement be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions hereof, and if such provision or provisions are not modified as provided above, this Agreement shall be construed as if such invalid, illegal, or unenforceable provisions had not been set forth herein.

16.    **Captions**. Captions and headings of the sections and paragraphs of this Agreement are intended solely for convenience and no provision of this Agreement is to be construed by reference to the caption or heading of any section or paragraph.

17.    **Counterparts**. This Agreement may be executed in separate counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

18.    **Section 409A**.

18.1    **General Compliance**. This Agreement is intended to comply with Section 409A or an exemption thereunder and shall be construed and administered in accordance with Section 409A. Notwithstanding any other provision of this Agreement, payments provided under this Agreement may only be made upon an event and in a manner that complies with Section 409A or an applicable exemption. Any payments under this Agreement that may be excluded from Section 409A either as separation pay due to an involuntary separation from

CONFIDENTIAL                                                                      TDIT005756

FSD2025-0116                                                                                      2025-08-19

service or as a short-term deferral shall be excluded from Section 409A to the maximum extent possible. For purposes of Section 409A, each installment payment provided under this Agreement shall be treated as a separate payment. Any payments to be made under this Agreement upon a termination of employment shall only be made upon a "separation from service" under Section 409A. Notwithstanding the foregoing, the Company makes no representations that the payments and benefits provided under this Agreement comply with Section 409A, and in no event shall the Company be liable for all or any portion of any taxes, penalties, interest, or other expenses that may be incurred by Executive on account of non-compliance with Section 409A.

18.2 **Specified Employees**. Notwithstanding any other provision of this Agreement, if any payment or benefit provided to Executive in connection with Executive's termination of employment is determined to constitute "nonqualified deferred compensation" within the meaning of Section 409A and Executive is determined to be a "specified employee" as defined in Section 409A(a)(2)(b)(i), then such payment or benefit shall not be paid until the first payroll date following the six-month anniversary of the Termination Date or, if earlier, on Executive's death (the "**Specified Employee Payment Date**"). The aggregate of any payments that would otherwise have been paid before the Specified Employee Payment Date and interest on such amounts calculated based on the applicable federal rate published by the Internal Revenue Service for the month in which Executive's separation from service occurs shall be paid to Executive in a lump sum on the Specified Employee Payment Date and thereafter, any remaining payments shall be paid without delay in accordance with their original schedule.

18.3 **Reimbursements**. To the extent required by Section 409A, each reimbursement or in-kind benefit provided under this Agreement shall be provided in accordance with the following:

(a) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during each calendar year cannot affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year;

(b) any reimbursement of an eligible expense shall be paid to Executive on or before the last day of the calendar year following the calendar year in which the expense was incurred; and

(c) any right to reimbursements or in-kind benefits under this Agreement shall not be subject to liquidation or exchange for another benefit.

18.4 **Tax Gross-ups**. Any tax gross-up payments provided under this Agreement shall be paid to Executive on or before December 31 of the calendar year immediately following the calendar year in which Executive remits the related taxes.

19. **Successors and Assigns**. This Agreement is personal to Executive and shall not be assigned by Executive. Any purported assignment by Executive shall be null and void from the initial date of the purported assignment. The Company may assign this Agreement to any successor or assign (whether direct or indirect, by purchase, merger, consolidation, or otherwise) to all or

FSD2025-0116                                                                                      2025-08-19

CONFIDENTIAL                                                                              TDIT005757

substantially all of the business or assets of the Company. This Agreement shall inure to the benefit of the Company and permitted successors and assigns.

20.    **Notice**. Notices and all other communications provided for in this Agreement shall be in writing and shall be delivered personally or sent by registered or certified mail, return receipt requested, or by overnight carrier to the parties at the addresses set forth below (or such other addresses as specified by the parties by like notice):

If to the Company:

CHARITABLE DAF HOLDCO, LTD.

PAUL MURPHY
paul@gkmanagement.com.ky

If to Executive:

MARK PATRICK
Mpatricktax1040@gmail.com

21.    **Representations of Executive**. Executive represents and warrants to the Company that:

(a)    Executive's acceptance of employment with the Company and the performance of duties hereunder will not conflict with or result in a violation of, a breach of, or a default under any contract, agreement, or understanding to which Executive is a party or is otherwise bound.

(b)    Executive's acceptance of employment with the Company and the performance of duties hereunder will not violate any non-solicitation, non-competition, or other similar covenant or agreement of a prior employer.

22.    **Withholding**. The Company shall have the right to withhold from any amount payable hereunder any Federal, state, and local taxes in order for the Company to satisfy any withholding tax obligation it may have under any applicable law or regulation.

23.    **Survival**. Upon the expiration or other termination of this Agreement, the respective rights and obligations of the parties hereto shall survive such expiration or other termination to the extent necessary to carry out the intentions of the parties under this Agreement.

24.    **Governing Law and Jurisdiction.** This agreement is governed by and shall be construed in accordance with the laws of Cayman Islands. Each of the parties hereto irrevocably agrees that the courts of Cayman Islands shall have exclusive jurisdiction to hear and determine any suit, action or proceeding, and to settle any disputes, which may arise out of or in connection with this agreement and, for such purposes, irrevocably submits to the exclusive jurisdiction of such courts.

CONFIDENTIAL                                                      TDIT005758

25.     __Acknowledgement of Full Understanding__. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS FULLY READ, UNDERSTANDS AND VOLUNTARILY ENTERS INTO THIS AGREEMENT. EXECUTIVE ACKNOWLEDGES AND AGREES THAT EXECUTIVE HAS HAD AN OPPORTUNITY TO ASK QUESTIONS AND CONSULT WITH AN ATTORNEY OF EXECUTIVE'S CHOICE BEFORE SIGNING THIS AGREEMENT.

[*SIGNATURE PAGE FOLLOWS*]

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

COMPANY:

CHARITABLE DAF HOLDCO, LTD.

By: _____
Name: Paul Murphy
Title: Director

EXECUTIVE:

MARK PATRICK

**CONFIDENTIAL**                                                        **TDIT005760**



Report of Independent Auditors and
Consolidated Financial Statements

**Santa Barbara Foundation**

December 31, 2023 with
Summarized Comparative Totals for December 31, 2022

MOSSADAMS

FSD2025-0116 **Page 808 of 1530** 2025-08-19

# Table of Contents

| | Page |
|---|---|
| **Report of Independent Auditors** | 1 |
| **Consolidated Financial Statements** | |
| Consolidated Statements of Financial Position | 3 |
| Consolidated Statements of Activities and Changes in Net Assets | 4 |
| Consolidated Statements of Functional Expenses | 5 |
| Consolidated Statements of Cash Flows | 6 |
| Notes to Consolidated Financial Statements | 7 |

CONFIDENTIAL TDIT005762

FSD2025-0116                                                                                    2025-08-19

 MOSSADAMS

# Report of Independent Auditors

The Audit Committee
Santa Barbara Foundation

**Report on the Audit of the Financial Statements**

*Opinion*

We have audited the accompanying consolidated financial statements of Santa Barbara Foundation and its supporting organizations and affiliates, which comprise the consolidated statement of financial position as of December 31, 2023, and the related consolidated statements of activities and changes in net assets, functional expenses, and cash flows for the year then ended, and the related notes to the consolidated financial statements.

In our opinion, the accompanying consolidated financial statements present fairly, in all material respects, the financial position of Santa Barbara Foundation and its supporting organizations and affiliates as of December 31, 2023, and the changes in their net assets and cash flows for the year then ended, in accordance with accounting principles generally accepted in the United States of America.

*Basis for Opinion*

We conducted our audit in accordance with auditing standards generally accepted in the United States of America (GAAS). Our responsibilities under those standards are further described in the Auditor's Responsibilities for the Audit of the Financial Statements section of our report. We are required to be independent of Santa Barbara Foundation and its supporting organizations and affiliates and to meet our other ethical responsibilities, in accordance with the relevant ethical requirements relating to our audit. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Other Matter*

We have previously audited the Santa Barbara Foundation and its supporting organizations and affiliates' December 31, 2022, consolidated financial statements, and our report dated September 7, 2023, expressed an unmodified audit opinion on those audited consolidated financial statements. In our opinion, the summarized comparative information presented herein as of and for the year ended December 31, 2023, is consistent, in all material respects, with the audited consolidated financial statements from which it has been derived.

*Responsibilities of Management for the Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America, and for the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

1

FSD2025-0116                                                                                    2025-08-19

CONFIDENTIAL                                                                              TDIT005763

725

In preparing the consolidated financial statements, management is required to evaluate whether there are conditions or events, considered in the aggregate, that raise substantial doubt about Santa Barbara Foundation and its supporting organizations and affiliates' ability to continue as a going concern within one year after the date that the consolidated financial statements are available to be issued.

### Auditor's Responsibilities for the Audit of the Financial Statements

Our objectives are to obtain reasonable assurance about whether the consolidated financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance but is not absolute assurance and therefore is not a guarantee that an audit conducted in accordance with GAAS will always detect a material misstatement when it exists. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control. Misstatements are considered material if there is a substantial likelihood that, individually or in the aggregate, they would influence the judgment made by a reasonable user based on the consolidated financial statements.

In performing an audit in accordance with GAAS, we:

- Exercise professional judgment and maintain professional skepticism throughout the audit.

- Identify and assess the risks of material misstatement of the consolidated financial statements, whether due to fraud or error, and design and perform audit procedures responsive to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of Santa Barbara Foundation and its supporting organizations and affiliates' internal control. Accordingly, no such opinion is expressed.

- Evaluate the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluate the overall presentation of the consolidated financial statements.

- Conclude whether, in our judgment, there are conditions or events, considered in the aggregate, that raise substantial doubt about Santa Barbara Foundation and its supporting organizations and affiliates' ability to continue as a going concern for a reasonable period of time.

We are required to communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit, significant audit findings, and certain internal control-related matters that we identified during the audit.

Moss Adams LLP

Los Angeles, California
September 5, 2024

CONFIDENTIAL                                                                                          TDIT005764

**FSD2025-0116**                                                        **2025-08-19**

# Consolidated Financial Statements

**FSD2025-0116**                                                        **2025-08-19**

**CONFIDENTIAL**                                                        **TDIT005765**

CONFIDENTIAL

FSD2025-0116                                                                                                    2025-08-19

**Santa Barbara Foundation**
**Consolidated Statements of Financial Position**
**December 31, 2023 With Summarized Comparative Totals for 2022**

### ASSETS

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| ASSETS | | | | |
| Cash and cash equivalents | $ 82,285,249 | $ 56,094 | $ 82,341,343 | $ 68,287,954 |
| Investments | 543,799,297 | 67,038,247 | 610,837,544 | 458,590,918 |
| Contributions receivable, net | 13,553,708 | 206,926 | 13,760,634 | 21,780,784 |
| Notes receivable, net | 1,390,156 | - | 1,390,156 | 2,336,894 |
| Beneficial interest in trusts | - | 81,184,680 | 81,184,680 | 78,421,897 |
| Property and equipment, net | 12,414,779 | - | 12,414,779 | 12,866,063 |
| Other assets | 258,749 | - | 258,749 | 289,531 |
| Total assets | $ 653,701,938 | $ 148,485,947 | $ 802,187,885 | $ 642,574,041 |

### LIABILITIES AND NET ASSETS

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| LIABILITIES | | | | |
| Accounts payable and accrued expenses | $ 593,763 | $ - | $ 593,763 | $ 397,965 |
| Grants payable, net | 68,750 | - | 68,750 | 132,940 |
| Note payable | 2,741,924 | - | 2,741,924 | 2,828,357 |
| Liabilities under split-interest agreements | - | 1,032,190 | 1,032,190 | 1,035,112 |
| Funds held on behalf of others | 33,165,254 | - | 33,165,254 | 27,537,507 |
| Total liabilities | 36,569,691 | 1,032,190 | 37,601,881 | 31,931,881 |
| NET ASSETS | 617,132,247 | 147,453,757 | 764,586,004 | 610,642,160 |
| Total liabilities and net assets | $ 653,701,938 | $ 148,485,947 | $ 802,187,885 | $ 642,574,041 |

See accompanying notes.

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 41 of 759

FSD2025-0116                                                                                                    2025-08-19

TDIT005766

CONFIDENTIAL

**Santa Barbara Foundation**
**Consolidated Statements of Activities and Changes in Net Assets**
**Year Ended December 31, 2023 With Summarized Comparative Totals for 2022**

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 42 of 759

| | Without Donor Restrictions | With Donor Restrictions | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|
| **REVENUE, GAINS, AND OTHER SUPPORT** | | | | |
| Contributions | $ 128,873,729 | $ 1,282,500 | $ 130,156,229 | $ 51,180,134 |
| Less contributions raised on behalf of others | (2,306,227) | - | (2,306,227) | (3,105,942) |
| Total contributions and bequests | 126,567,502 | 1,282,500 | 127,850,002 | 48,074,192 |
| Investment income net | 53,348,430 | 7,589,590 | 60,938,020 | 40,128,982 |
| Less investment (income) loss on behalf of others, net | (892,414) | - | (892,414) | 3,862,958 |
| Total investment income, net | 52,456,016 | 7,589,590 | 60,045,606 | 43,991,940 |
| Change in value of split-interest agreements | - | 3,278,277 | 3,278,277 | (4,412,801) |
| Other income | 398,023 | - | 398,023 | 460,673 |
| Net assets released from restrictions | | | | |
| Available for distribution per spending policy | 2,853,154 | (2,853,154) | - | - |
| Reclassifications and other releases from restrictions | 1,154,491 | (1,154,491) | - | - |
| Total revenue, gains, and other support | 183,429,186 | 8,142,722 | 191,571,908 | 88,114,004 |
| **EXPENSES** | | | | |
| Program services | | | | |
| Grants, net of rescinds | 28,279,240 | - | 28,279,240 | 27,653,249 |
| Less grants made on behalf of others | (564,508) | - | (564,508) | (1,050,740) |
| Total grants, net of rescinds | 27,714,732 | - | 27,714,732 | 26,602,509 |
| Grant making and direct program | 4,715,266 | - | 4,715,266 | 3,749,274 |
| Total program services | 32,429,998 | - | 32,429,998 | 30,351,783 |
| Support services | | | | |
| Administrative and fund management | 3,293,005 | - | 3,293,005 | 2,953,052 |
| Fundraising and development | 1,905,061 | - | 1,905,061 | 1,569,928 |
| Total support services | 5,198,066 | - | 5,198,066 | 4,522,980 |
| Total expenses | 37,628,064 | - | 37,628,064 | 34,874,763 |
| CHANGE IN NET ASSETS | 145,801,122 | 8,142,722 | 153,943,844 | 53,239,242 |
| NET ASSETS, beginning of year | 471,331,125 | 139,311,035 | 610,642,160 | 557,402,918 |
| NET ASSETS, end of year | $ 617,132,247 | $ 147,453,757 | $ 764,586,004 | $ 610,642,160 |

See accompanying notes.

4

TDIT005767

FSD2025-0116

2025-08-19

**Santa Barbara Foundation**
**Consolidated Statements of Functional Expenses**
**Year Ended December 31, 2023 With Summarized Comparative Totals for 2022**

| | Program Services | Administrative and Fund Management | Fundraising and Development | 2023 Total | Summarized 2022 Total |
|---|---|---|---|---|---|
| **EXPENSES** | | | | | |
| Grants, net of rescinds | $ 27,714,732 | $ - | $ - | $ 27,714,732 | $ 26,602,509 |
| Salaries | 1,177,854 | 1,781,244 | 885,822 | 3,844,920 | 3,385,689 |
| Consultants and professional services | 1,298,783 | 258,161 | 45,310 | 1,602,254 | 1,280,988 |
| Employee benefits | 302,636 | 416,124 | 226,976 | 945,736 | 758,898 |
| Project | 731,022 | - | - | 731,022 | 310,942 |
| Depreciation and amortization | 171,858 | 222,086 | 119,819 | 513,763 | 502,228 |
| Technology | 121,944 | 161,392 | 80,158 | 363,494 | 291,011 |
| Community relations | 166,538 | 4,339 | 185,796 | 356,673 | 294,751 |
| Meetings and conferences | 204,176 | 77,806 | 38,543 | 320,525 | 200,558 |
| Payroll taxes | 83,692 | 115,076 | 62,769 | 261,537 | 235,257 |
| Occupancy | 68,548 | 75,289 | 56,312 | 200,149 | 195,114 |
| Rent | 133,892 | 36,673 | 18,167 | 188,732 | 152,931 |
| Advertising | 72,631 | - | 69,268 | 141,899 | 121,849 |
| Publications | 39,056 | 8,926 | 53,560 | 101,542 | 99,026 |
| Dues, subscriptions, licenses, and permits | 39,288 | 38,798 | 19,220 | 97,306 | 134,192 |
| Interest | 29,130 | 39,178 | 16,544 | 84,852 | 87,431 |
| Office | 33,091 | 23,782 | 9,507 | 66,380 | 53,925 |
| Telephone | 19,260 | 21,457 | 10,630 | 51,347 | 49,767 |
| Insurance | 21,867 | 12,674 | 6,660 | 41,201 | 50,697 |
| Unrelated business income tax | - | - | - | - | 67,000 |
| Total expenses, 2023 | $ 32,429,998 | $ 3,293,005 | $ 1,905,061 | $ 37,628,064 | |
| Percentage of total expenses, 2023 | 86% | 9% | 5% | 100% | |
| Total expenses, 2022 | $ 30,351,783 | $ 2,953,052 | $ 1,569,928 | | $ 34,874,763 |
| Percentage of total expenses, 2022 | 87% | 8% | 5% | | 100% |

See accompanying notes.

5

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 43 of 759

TDIT005768

**FSD2025-0116**                                                                                                    **2025-08-19**

**Santa Barbara Foundation**
**Consolidated Statements of Cash Flows**
**Years Ended December 31, 2023 and 2022**

|  | 2023 | 2022 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | | |
| Contributions received from donors, net of amounts restricted for endowments | $   31,401,782 | $   33,828,587 |
| Cash received (spent) into funds held on behalf of others, net of distributions and fees | 5,627,747 | (1,807,755) |
| Cash received from state, county, and city contracts and grants | 791,262 | 969,679 |
| Interest and dividends received | 7,306,381 | 4,426,741 |
| Miscellaneous receipts | 398,023 | 460,674 |
| Interest paid | (84,852) | (87,431) |
| Unrelated business income tax paid | - | (67,000) |
| Grants and awards paid | (26,778,922) | (25,741,569) |
| Cash paid to employees and suppliers for program services | (4,686,136) | (3,719,258) |
| Cash paid to employees and suppliers for support services | (4,402,000) | (3,584,758) |
| Net cash provided by operating activities | 9,573,285 | 4,677,910 |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | | |
| Payment of lease commissions | (62,479) | - |
| Purchases of property and equipment | - | (74,201) |
| Purchases of investments | (66,406,472) | (336,769,209) |
| Proceeds from sales of investments | 66,024,096 | 356,949,829 |
| Proceeds from notes receivable | 25,000 | 25,000 |
| Return on capital shareholder distribution | 3,250,828 | 1,003,245 |
| Net cash provided by investing activities | 2,830,973 | 21,134,664 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | | |
| Distributions received from charitable remainder trusts | 453,064 | 1,108,367 |
| Contributions restricted for endowments | 1,282,500 | 51,530 |
| Payments on notes payable | (86,433) | (83,854) |
| Net cash provided by financing activities | 1,649,131 | 1,076,043 |
| **CHANGE IN CASH AND CASH EQUIVALENTS** | 14,053,389 | 26,888,617 |
| **CASH AND CASH EQUIVALENTS, beginning of year** | 68,287,954 | 41,399,337 |
| **CASH AND CASH EQUIVALENTS, end of year** | $   82,341,343 | $   68,287,954 |

See accompanying notes.

6

**CONFIDENTIAL**                                                                                           **TDIT005769**

# Santa Barbara Foundation
## Notes to Consolidated Financial Statements

**Note 1 – Organization and Summary of Significant Accounting Policies**

**Organization** – The Santa Barbara Foundation (SBF) is a community foundation incorporated in 1928 under the laws of the State of California as a nonprofit corporation to enrich the lives of the people of Santa Barbara County through philanthropy. It is the mission of SBF to mobilize collective wisdom and philanthropic capital to build empathetic, inclusive, and resilient communities. SBF continues to serve as one of the largest private funding sources for area nonprofits, agencies, and college-bound students.

**Supporting organizations** – SBF works with entities organized as supporting organizations to SBF for the specific and primary purpose of benefiting, performing functions of, and engaging in activities consistent with SBF's charitable purposes. SBF appoints a majority of the members of the governing boards of the supporting organizations. Each governing board may create its own investment policy and grant guidelines. In 2023 and 2022, the following supporting organizations were effectively under SBF's control and were consolidated for financial statement purposes:

- Highland Santa Barbara Foundation, Inc. (HSBF) – organized in November 2011; and

- The Eric and Kelly Schwartz Charitable Trust (EKSCT) – organized in August 2015.

**Affiliates** – In 2023 and 2022, the following affiliates were effectively under SBF's control and were consolidated for financial statement purposes:

- 1111 Chapala Street, LLC, whose primary operating asset is a commercial building located in Santa Barbara, California;

- 300 East Islay Street, LLC, whose primary operating asset is a residential building located in Santa Barbara, California; and

- SBF Properties, LLC, whose purpose is to receive gifts of real property.

**Principles of consolidation** – The accompanying consolidated financial statements as of December 31, 2023 and 2022, include the financial statements of SBF and its supporting organizations and affiliates, listed above. All material inter-organizational transactions and balances have been eliminated in the consolidation.

**Basis of accounting** – The accompanying consolidated financial statements of SBF have been prepared on the accrual basis of accounting under generally accepted accounting principles (U.S. GAAP).

**Reclassifications** – Certain amounts from the December 31, 2022, financial statements have been reclassified to conform to the December 31, 2023 financial statement presentation.

**Description of net assets** – SBF reports information regarding its financial position and activities in two classes of net assets—with donor restrictions and without donor restrictions—based on the existence or absence of donor-imposed restrictions.

CONFIDENTIAL                                                              TDIT005770

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

SBF's governing documents provide the Board of Trustees with the variance power to modify any restriction or condition placed on gifts to SBF if, in its sole judgment, the Board of Trustees determines that the restriction becomes in effect unnecessary, incapable of fulfillment, or inconsistent with the charitable needs of the community served.

- *Net assets without donor restrictions* represent net assets that are not subject to donor-imposed time restrictions. Net assets without donor restrictions include board-designated funds that have been purposed for designing an Impact Investing program that will promote philanthropic donations, further community impact, and enhance opportunity for financial return.

- *Net assets with donor restrictions* represent net assets that are subject to donor-imposed time restrictions. Net assets with donor restrictions generally include contributions and bequests receivable and planned gifts. Earnings on net assets with donor restrictions are reported as an increase in net assets with donor restrictions. Earnings on donor-restricted endowment funds that have not yet been appropriated are also classified as net assets with donor restrictions. When a restriction expires, net assets with donor restrictions are reclassified to net assets without donor restrictions and reported in the consolidated statements of activities and changes in net assets as "net assets released from restrictions." Net assets with donor restrictions include perpetual income trusts for which the related income is reported as contributions without donor restrictions when received on the consolidated statements of activities and changes in net assets. The change in value of the underlying assets is recorded as an unrealized gain or loss in net assets with donor restrictions on the consolidated statements of activities and changes in net assets. Net assets with donor restrictions also consist of those donor-restricted endowments held by SBF as defined under the Uniform Prudent Management of Institutional Funds Act (UPMIFA).

**Functional expense allocation** – Salaries, employee benefits, and payroll taxes are allocated based on time spent in each functional area by specific employee as estimated by management. Indirect costs included in meetings and conferences, depreciation and amortization, technology, occupancy, office, and rent expense are allocated based on number of employees by functional area based on time spent by specific employee as estimated by management. Certain advertising costs are allocated based on the percentage of the publication devoted to each functional area. All other costs are charged directly to the appropriate functional category.

**Comparative amounts** – The amounts shown for 2022 in the accompanying consolidated financial statements are included to provide a basis for comparison with 2023 and are not intended to present all information necessary for a fair presentation of the 2022 consolidated financial statements in conformity with U.S. GAAP. Accordingly, such information should be read in conjunction with SBF's consolidated financial statements for the year ended December 31, 2022, from which the summarized information was derived.

**Cash and cash equivalents** – SBF considers all highly liquid investments with an initial maturity of three months or less to be cash equivalents.

**Use of estimates** – The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect certain amounts and disclosures. Those estimates and assumptions affect the reported amounts of assets, liabilities, the disclosure of contingent assets and liabilities, and the reported revenues and expenses. It is at least reasonably possible that the significant estimates could change in the coming year.

**CONFIDENTIAL**                                           TDIT005771

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

Significant estimates used in the preparation of these consolidated financial statements include:

- Allocation of certain expenses by function;

- Discount factors used in determining contributions receivable, notes receivable, grants payable, annuities payable by charitable trust, and income interest in charitable trusts;

- Allowance for uncollectible contributions;

- Fair value of assets held by charitable trusts;

- Fair value of certain investments; and

- Depreciable lives of property and equipment.

**Contributions** – Unconditional contributions received are recorded at their fair value on the date of donation. Contributions have been evaluated and determined to be non-reciprocal and unconditional for the year ended December 31, 2023. Unconditional contributions, including promises to give, are recognized as revenue when received. Unconditional promises to give must be accompanied by written documentation prior to being recognized as revenue. Conditional promises to give are recognized when the conditions on which they depend are substantially met. Bequests are recorded at their estimated fair value when all the events required for the transfer of the assets from the estate of the donor to SBF have occurred and/or the court has issued an order to transfer the assets. Noncurrent contributions and bequests receivable are discounted at the net present value utilizing the applicable federal rate set by the Internal Revenue Service (IRS) at the date of the gift.

**Donated goods and services** – Donated goods and services received by SBF are recorded as contributions at fair value at the time of the donation or receipt. For the year ended December 31, 2023, numerous volunteers gave their time and expertise to SBF in a wide variety of areas including: committees, administrative activities, technical and financial advice, and office and public relations activities. These contributions, despite their considerable value to the mission of SBF, are not reflected in the consolidated financial statements. Donated or contributed services are reported at fair value in the consolidated financial statements for voluntary donations of services when those services (1) create or enhance nonfinancial assets, or (2) require specialized skills provided by individuals possessing those skills and are services which would be typically purchased if not provided by donation.

**Investments** – SBF records investments at fair value. The fair value of investments in securities traded on national securities exchanges is valued at the closing price on the last business day of the year. The investments in hedge funds, partnerships, and private equity, for which quoted market prices are not readily available, are determined by management in good faith with the assistance of third-party investment managers using methods they consider appropriate at net asset value (NAV). Realized and unrealized gains and losses are included in the change in net assets, net of investment expenses.

CONFIDENTIAL                                                      TDIT005772

FSD2025-0116                                                                          2025-08-19

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

**Income taxes** – SBF and its supporting organizations and affiliates are tax exempt organizations and are not subject to federal or state income taxes, except on unrelated business income, in accordance with Section 501(a) of the Internal Revenue Code. In addition, SBF and its supporting organizations and affiliates qualified for the charitable contribution deduction under Section 170(b)(1)(A) of the Internal Revenue Code and have been classified as organizations that are not private foundations. Unrelated business income tax, if any, is immaterial and no tax provision has been made in the accompanying consolidated financial statements.

SBF and its supporting organizations and affiliates evaluate uncertain tax positions, whereby the effect of the uncertainty would be recorded if the outcome were considered probable and reasonably estimable. As of December 31, 2023, SBF and its supporting organizations and affiliates have no uncertain tax positions requiring accrual.

**Beneficial interest in trusts and split interest agreements** – SBF has a beneficial interest in various trusts and other split-interest agreements. A split-interest agreement is a contribution that results in the sharing of legal rights to certain assets by the nonprofit entity and the donor, including other specified individuals or organizations designated by the donor. Such split-interest agreements are held in charitable remainder trusts, life insurance policies, charitable lead trusts, charitable gift annuities, pooled income funds, and perpetual interest trusts, as follows:

*Charitable remainder trusts* – SBF is named as an irrevocable remainder beneficiary of charitable trusts, which have been established by donors to provide income, generally for life, to designated beneficiaries. SBF is also the irrevocable remainder beneficiary of two life insurance policies. At the end of the term, or upon the death of the income beneficiaries, assets remaining in the trusts will be transferred to SBF. Each year, beneficiaries receive a percentage of the trust's fair value, generally limited to net income or net income with make-up provisions.

If SBF is the trustee, the fair value of the trust is included in investments within the consolidated statements of financial position, a corresponding liability is recorded for the present value of estimated future payments as specified in the trust agreement, and the difference is recognized as a contribution. As of December 31, 2023, there were six such trusts valued at $937,813, with a corresponding liability for estimated future payments of $611,069, factored by discount rates ranging between 2% and 8.2%.

If SBF is not the trustee, contribution revenue and related assets are recognized at the fair value of the trusts' investments, net of the present value of estimated future payments to beneficiaries. As of December 31, 2023, there were thirty such trusts and two life insurance policies valued at a total of $60,502,543, factored by discount rates ranging between 1.4% and 10%, included in beneficial interests in trusts within the consolidated statements of financial position.

*Charitable lead trusts* – SBF is named the lead beneficiary for a charitable lead trust held by third-party trustees. The charitable lead trust is included in beneficial interests in trusts within the consolidated statements of financial position at the present value of future payments to be received under the trust agreement. As of December 31, 2023, there was one such trust valued at $753,114, factored by a discount rate of 1.6%.

FSD2025-0116                                                                  2025-08-19
**735**

CONFIDENTIAL                                      TDIT005773

**FSD2025-0116**  **Page 820 of 1530**  **2025-08-19**

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

*Charitable gift annuities* – Charitable gift annuity donors have contributed assets to SBF in exchange for a promise by SBF to pay a fixed amount for a specified period to the donor or to individuals or organizations designated by the donor. Under the terms of the agreements, no trust exists, as the assets received are held by SBF, and the liability is an obligation of SBF. SBF records new gifts at the fair value of the assets net of the present value of the estimated future payments to beneficiaries factored by the IRS applicable federal rate (AFR) discount rate in effect at the date of the gift contract. As of December 31, 2023, there were twenty-four charitable gift annuities valued at $511,515 with a corresponding liability for estimated future payments of $334,213, factored by discount rates ranging between 4.0% and 11.3%, included in investments within the consolidated statements of financial position. The value of $511,515 exceeds the state of California required reserve of $392,362 by $119,153.

*Pooled income funds* – Pooled income fund donors have contributed assets to SBF in exchange for a net income payout for a specified period. Under the terms of the agreements, no trust exists, as the assets are held by SBF. The fair value of the asset is included in investments within the consolidated statements of financial position and a corresponding liability is recorded for the present value of estimated future payments to beneficiaries factored by the highest yearly rate of return for the past three years for each portfolio ranging between -11.3% and 7.9%. As of December 31, 2023, the fair value of the pooled income funds was $426,525 with a corresponding liability of $86,908.

*Perpetual income trust interest* – SBF is an income beneficiary of seven perpetual trusts. Under these arrangements, the corpus is not controlled by the management of SBF, but SBF has the irrevocable right to receive income on the underlying assets in perpetuity. Five trusts provide discretionary income, and two trusts provide restricted income for student aid and Lompoc area projects. As of December 31, 2023, SBF's share of the fair value of the trusts' investments of $19,929,023 is included in beneficial interests in trusts within the consolidated statements of financial position.

For all beneficial interests in trusts and split-interest agreements, changes in value in subsequent years are recognized in the consolidated statements of activities and changes in net assets as change in value of split-interest agreements.

Beneficial interests in trusts and split-interest agreements for which SBF is trustee totaled $1,875,853 with a corresponding liability under split interest agreements of $1,032,190 as of December 31, 2023. Beneficial interests in trusts and split-interest agreements for which SBF is not trustee and does not control contribution revenue and related assets totaled $81,184,680 as of December 31, 2023.

**Property and equipment** – Property and equipment are stated at cost, or fair value if donated. In general, SBF capitalizes assets with a cost of $5,000 or more and an expected useful life of greater than one year. Depreciation is calculated using the straight-line method over their estimated useful lives as follows:

| | |
|---|---|
| Land | Non-depreciable |
| Building | 27.5–40 years |
| Leasehold improvements | Lesser of lease term or 10–40 years |
| Office equipment | 3–10 years |
| Furniture | 5–10 years |

11

**CONFIDENTIAL** **TDIT005774**

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

**Funds held on behalf of others** – SBF receives and distributes assets under certain agency and intermediary arrangements. If a not-for-profit organization (NPO) establishes a fund at SBF with its own funds and specifies itself or its affiliate as the beneficiary of that fund, then SBF accounts for this transfer of assets by such NPO as a liability. The liability is established at the fair value of the funds, which is generally equivalent to the present value of future payments expected to be made to the NPO and is reflected under "funds held on behalf of others" on the consolidated statements of financial position.

**Grants** – Grants are recorded as expenses when they are approved by the Board of Trustees. Grants that are expected to be paid in more than one year are recorded at the present value of future payments factored by a discount using the applicable federal rate at the date of the grant award. All grants payable as of December 31, 2023, are expected to be paid within one year and are not required to be discounted at the present value. SBF records the rescission of grants in the year the grant is cancelled.

**Recently adopted accounting standards** – In June 2016, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update (ASU) 2016-13, *Financial Instruments – Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments* (CECL), which introduced an expected credit loss methodology for the measurement and recognition of credit losses on most financial assets, including trade accounts receivables. The expected credit loss methodology under ASU 2016-13 is based on historical experience, current condition, and reasonable and supportable forecasts, and replaces the measurement under current U.S. GAAP. The ASU also requires disclosure of information regarding how a company developed its allowance, including changes in the factors that influenced management's estimate of expected credit losses and the reason for those changes. The ASU and its related clarifying updates are effective for fiscal years beginning after December 15, 2022, and interim periods for those fiscal years, for non-public entities. SBF adopted the new standard on January 1, 2023, using the modified-retrospective approach, which did not have a material impact on the consolidated financial statements as of and for the year ended December 31, 2023. Therefore, there was no cumulative effect to beginning net assets as it was determined to be immaterial.

**Subsequent events** – SBF has evaluated subsequent events through September 5, 2024, the date which the consolidated financial statements were available to be issued.

### Note 2 – Contributions Receivable

Unconditional promises to give are included in the consolidated financial statements as contributions receivable, net. There is no allowance for contributions receivable recorded at December 31, 2023. At December 31, 2023, contributions and bequests receivable are expected to be collected as follows:

| | |
|---|---:|
| In one year or less | $ 13,553,708 |
| In more than one year | 242,100 |
| Total contributions receivable | 13,795,808 |
| Discount to present value | (35,174) |
| Contributions receivable, net | $ 13,760,634 |

**CONFIDENTIAL** TDIT005775

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

### Note 3 – Notes Receivable

SBF has two unsecured promissory notes from a donor-advised fund and from a board-designated fund to a nonprofit charitable organization. The notes are presented within the consolidated statements of financial position as notes receivable, net, and are comprised of the following as of December 31, 2023:

| | |
|---|---:|
| Receivable in less than one year | $ 225,000 |
| Receivable in two to five years | 1,225,000 |
| Total notes receivable | 1,450,000 |
| Discount to present value | (59,844) |
| Notes receivable, net | $ 1,390,156 |

In December 2016, SBF issued two promissory notes in the amount of $4,000,000 and $500,000, each bearing interest at a variable rate of 1-month SOFR, formerly LIBOR (5.38% at December 31, 2023), plus 1%, not to exceed 5%. Interest is payable in semi-annual installments. Principal payments of 5% of the original principal amount have been due annually since October 15, 2022, with the remaining principal balance due October 15, 2026. The $4,000,000 note has been partially forgiven, $1,000,000 annually, in December 2021, 2022, and 2023. The forgiven portion of the loan satisfied the conditions to be recognized as a contribution expense pursuant to FASB Accounting Standards Codification (ASC) 720-25-25 and FASB ASC 958-605-25-11. The notes are discounted at a rate of 1.68%.

### Note 4 – Investments Return

The following summarizes the investment return in the consolidated statements of activities and changes in net assets for the year ended December 31, 2023:

| | |
|---|---:|
| Interest and dividends | $ 8,372,201 |
| Less interest and dividends on behalf of others | (556,105) |
| Total interest and dividends | 7,816,096 |
| Realized gain on investments | 1,966,761 |
| Unrealized gain on investments | 54,359,839 |
| Less net realized and unrealized gain on behalf of others | (3,670,584) |
| Total realized and unrealized gain on investments | 52,656,016 |
| Less: investment fees | (472,734) |
| Add back investment fees on behalf of others | 46,228 |
| Total investment fees | (426,506) |
| Investment income, net | $ 60,045,606 |

13

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

**Note 5 – Fair Value Measurement**

Fair value is defined as the price that would be received by SBF to sell an asset or be paid by SBF to transfer a liability (an exit price) in an orderly transaction between market participants on the measurement date. A fair value hierarchy has been established that prioritizes valuation inputs into three broad levels to ensure consistency and comparability. There are three levels of inputs to measure fair value. The valuation hierarchy gives the highest priority to quoted prices in active markets (Level 1) and the lowest priority to unobservable inputs (Level 3).

The standard describes the three levels used to measure fair value:

**Level 1** – Quoted prices in active markets for identical assets or liabilities.

**Level 2** – Observable inputs other than Level 1 prices, such as quoted prices for similar assets or liabilities, quoted prices in markets that are not active, discounted cash flows, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

**Level 3** – Unobservable inputs that are supported by little or no market activity and that are significant to the fair value of the assets or liabilities.

Following is a description of the valuation methodologies used for instruments measured at fair value on a recurring basis and recognized in the consolidated statements of financial position, as well as the general classification of such instruments pursuant to the valuation hierarchy.

Where quoted market prices are available in an active market, securities are classified within Level 1 of the valuation hierarchy. If quoted market prices are not available, then Level 2 fair values are estimated by using pricing models for quoted prices of securities with similar characteristics or discounted cash flows. The asset's fair value measurement level within the fair value hierarchy is based on the lowest level of any input that is significant to the fair value measurement.

Fair value of Level 3 securities is based on information provided by fund managers, external investment advisors, and other market factors to determine if the carrying value of these investments should be adjusted. Other factors may include, but are not limited to, estimates of liquidation value, prices of recent transactions in the same or similar funds, current performance, future expectations of the particular investment, and changes in market outlook and the financing environment. Because of the inherent uncertainty of valuations, however, those estimated values may differ from the values that would have been used had a ready market existed, and the differences could be material. Independent appraisals of significant real estate held for investment are conducted at frequencies as determined by the fund manager for valuation purposes.

Financial instruments are considered valued at NAV when the investments (hedge funds, private equity, commingled funds, and real asset/real estate funds) are valued at NAV based on capital statements provided by entities that calculate fair value using NAV per share or its equivalent.

**CONFIDENTIAL**          TDIT005777

**FSD2025-0116**  2025-08-19

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

The Investment Committee, in conjunction with the external investment advisors, monitors and analyzes the valuation of the investments on a quarterly basis. The Investment Committee reports to the Board of Trustees. The valuation considers variables such as financial performance of investments, recent sale prices of investments, and other pertinent information.

The following table presents assets recognized in the consolidated statements of financial position measured at fair value on a recurring basis and the level in which the fair value measurements fall at December 31, 2023:

| Description | Level 1 | Level 2 | Level 3 | NAV or Equivalent | Total |
|---|---|---|---|---|---|
| **Investments** | | | | | |
| Global equities | $ 76,289,230 | $ - | $ - | $ 32,312,633 | $ 108,601,863 |
| Domestic equities | 34,381,933 | - | - | - | 34,381,933 |
| International equities | 6,228,985 | - | - | - | 6,228,985 |
| Domestic fixed income funds | 7,285,201 | - | - | - | 7,285,201 |
| Global fixed income funds | 31,334,450 | - | - | 20,528,566 | 51,863,016 |
| Fixed income (illiquid) | - | - | 78,284,712 | - | 78,284,712 |
| Closely held stock | - | - | 249,568,735 | - | 249,568,735 |
| Real estate/natural resources | 7,967,280 | - | - | 17,106,498 | 25,073,778 |
| Infrastructure | - | - | - | 8,195,753 | 8,195,753 |
| Private equity | - | - | - | 26,858,685 | 26,858,685 |
| Partnerships | - | - | 3,094,723 | - | 3,094,723 |
| Hedge funds | - | - | - | 11,400,160 | 11,400,160 |
| Total investments | 163,487,079 | - | 330,948,170 | 116,402,295 | 610,837,544 |
| **Beneficial interest in trusts** | | | | | |
| Remainder and lead | - | - | 61,255,657 | - | 61,255,657 |
| Perpetual income | - | - | 19,929,023 | - | 19,929,023 |
| Total beneficial interest in trusts | - | - | 81,184,680 | - | 81,184,680 |
| Total assets measured at fair value | $ 163,487,079 | $ - | $ 412,132,850 | $ 116,402,295 | $ 692,022,224 |
| Liabilities under split-interest agreements | $ - | $ 1,032,190 | $ - | $ - | $ 1,032,190 |

The following is a description of the general classification of investments pursuant to the valuation hierarchy:

*Global equities* – Includes investment in domestic and international equities of varying market capitalizations selected by the investment manager. Equities are held as separate ownership shares of a specific company or in the form of mutual funds, commingled funds, or exchange-traded funds (ETFs).

*Domestic and international equities* – Includes investment in either domestic or international equities of varying market capitalizations. Equities are held as separate ownership shares of a specific company or in the form of mutual funds, commingled funds, or ETFs.

*Domestic fixed income funds* – Includes investment in domestic fixed income positions as held in the investment portfolio through either individual bond holdings (treasuries, corporate, government, mortgage, etc.), commingled funds, or through fixed income mutual funds.

*Global fixed income funds* – Includes investment in domestic and international fixed income positions held through either individual bond holdings (treasuries, corporate, government, mortgage, etc.) or through fixed income mutual funds, commingled funds, or ETFs.

15

**FSD2025-0116**  2025-08-19

**CONFIDENTIAL**

740

TDIT005778

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

*Fixed income (illiquid)* – Includes 100 participation shares in a non-controlling partnership interest composed primarily of collateralized loan obligations. 100% of this investment is held by a supporting organization, HSBF, at fair value.

*Closely held stock (illiquid)* – Includes shares of a C corporation held by EKSCT, a supporting organization; series seed shares of a California nonpublic benefit corporation; and series seed units of a limited liability company focusing on renewable energy development.

*Real estate/natural resources* – Includes thirteen limited partnerships that invest in a diverse group of private real estate investment funds or similar entities that focus on the acquisition, redevelopment, operation, and management of real estate properties or natural resources: timber, precious metals, commodities, mining, energy, etc.; and a local residential rental property held in SBF Properties, LLC.

*Infrastructure* – Includes four core infrastructure funds that have exposure in transportation, communication, food-related water and electricity, power, and energy services.

*Private equity* – Includes twenty-one broadly diversified private equity partnerships with varying allocations to buyouts, distressed opportunities, venture capital, special situations, and secondary funds. Holdings are invested in diversified portfolios of investment partnerships, each of which has a defined term, typically ten to fifteen years, with no right to withdraw prior to termination of the investment partnership. Funds are called as needed by managers and distributions are received through the liquidation of the underlying assets of the fund.

*Partnerships* – Includes three limited partnership interests that are illiquid and receive varying income distributions controlled by the general partner: (1) 24% interest, invested locally in a real estate holding; (2) 45% interest, terminating in June 2062, invested locally in multiple real estate holdings; and (3) 7% interest, invested in multiple other partnerships with domestic and international exposure.

*Hedge funds* – Includes four risk mitigating hedge funds.

The following table provides a reconciliation of assets measured at fair value using significant unobservable inputs (Level 3) for the year ended December 31, 2023:

| Description | January 1, 2023 | Net Gains and (Losses) | Purchases and Issuances | Transfers In and Out | Sales and Settlements | December 31, 2023 |
|---|---|---|---|---|---|---|
| Fixed income (illiquid) | $ 76,654,941 | $ 1,629,771 | $ - | $ - | $ - | $ 78,284,712 |
| Partnerships | 3,216,723 | (169,000) | 47,000 | - | - | 3,094,723 |
| Beneficial interest in trusts | 78,421,897 | 3,204,122 | - | (441,339) | - | 81,184,680 |
| Closely held stock | 126,267,375 | 25,159,762 | 101,392,426 | (3,250,828) | - | 249,568,735 |
| Total assets measured at fair value – Level 3 | $ 284,560,936 | $ 29,824,655 | $ 101,439,426 | $ (3,692,167) | $ - | $ 412,132,850 |

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

The following table represents the Level 3 financial instruments as of December 31, 2023, the valuation techniques used to measure the fair value of those financial instruments, and the significant unobservable inputs and the ranges of values for those inputs.

| Investment | Total Fair Value | Valuation Technique | Unobservable Inputs | Range |
|---|---|---|---|---|
| Fixed income (illiquid) | $  78,284,712 | Fair value with qualitative discounting model | Lack of control discount and lack of marketability discount | 6.5%–8% |
| Partnerships | 3,094,723 | Market comparable | Listing prices and general partner estimates | 6%–34% |
| Beneficial interest in trusts | 81,184,680 | Present value of annuity or remainder interest | Discounted rate, life expectancies, and remaining payments | 1.4%–10%, 2 to 65 years |
| Closely held stock | 249,568,735 | Discounted cash flow method | Control premium, lack of marketability discount | 5%–25% |
| Total assets measured at fair value – Level 3 | $  412,132,850 | | | |

The following table provides redemption data and unfunded commitments for investments held at NAV or equivalent:

| Investment | Total Fair Value | Unfunded Commitments | Redemption Frequency | Redemption Notice Period |
|---|---|---|---|---|
| Global equities | $  32,312,633 | $          - | Monthly | 2 to 14 days |
| Global fixed income | 20,528,566 | - | Monthly | 2 to 10 days |
| Real estate/natural resources | 17,106,498 | 8,656,210 | Non-redeemable | - |
| Infrastructure | 8,195,753 | 2,147,611 | Non-redeemable | - |
| Private equity | 26,858,685 | 15,987,785 | Non-redeemable | - |
| Hedge funds | 11,400,160 | - | Daily to Semiannually | 2 to 90 days |
| Total | $  116,402,295 | $ 26,791,606 | | |

17

**CONFIDENTIAL**                                                              **TDIT005780**

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

**Note 6 – Property and Equipment**

Property and equipment at December 31, 2023, consist of the following:

| | |
|---|---:|
| Building and leasehold improvements | $ 14,280,359 |
| Land | 3,265,379 |
| Office equipment | 385,971 |
| Furniture | 347,086 |
| Donated artwork | 17,500 |
| Total property and equipment | 18,296,295 |
| Less accumulated depreciation and amortization | (5,881,516) |
| Property and equipment, net | $ 12,414,779 |

**Note 7 – Note Payable**

**Mortgage note payable** – SBF has a mortgage note payable on the 1111 Chapala Street building with Montecito Bank & Trust, which is secured by the property, at an interest rate of 3%. Principal and interest payments of $14,274 are due monthly, with a final balloon payment due on January 20, 2031. In January 2021, the mortgage was refinanced to modify the interest rate to 3% and to extend the maturity date to January 20, 2031. The outstanding principal balance on the mortgage as of December 31, 2023, is $2,741,924.

Future maturities of principal obligations for years ending December 31 are as follows:

| Years ending December 31: | |
|---|---:|
| 2024 | $ 88,914 |
| 2025 | 91,889 |
| 2026 | 94,724 |
| 2027 | 97,645 |
| 2028 | 100,457 |
| Thereafter | 2,268,295 |
| Total | $ 2,741,924 |

18

824

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

### Note 8 – Grants

Grants payable as of December 31, 2023, of $68,750 are due within one year.

Grant expense is comprised of the following for the years ended December 31, 2023 and 2022:

|  | 2023 | 2022 |
|---|---|---|
| Donor advised | $ 17,520,112 | $ 16,776,698 |
| Competitive | 3,714,747 | 4,074,689 |
| Field of interest | 2,022,143 | 2,564,099 |
| Donor designated | 1,900,816 | 1,685,353 |
| Supporting organizations | 2,124,957 | 876,157 |
| Fiscal sponsorships | 281,899 | 455,147 |
| Pass-through | 150,058 | 170,366 |
| Total grants, net of rescinds | $ 27,714,732 | $ 26,602,509 |

### Note 9 – Concentrations and Risks

**Credit risk** – SBF maintains cash balances at several banks insured by the Federal Deposit Insurance Corporation (FDIC). The FDIC only insures the first $250,000 of funds on deposit at any one institution. SBF had uninsured cash of approximately $13,237,000 deposited with four different banks. In addition, SBF maintains significant cash balances in money market funds. Such balances are not fully insured. Certain Investments held with financial institutions are insured up to a specific limit by the Securities Investors Protection Corporation (SIPC). At December 31, 2023, the Foundation had amounts that were in excess of the SIPC insurance limits.

**Market risk** – SBF holds its investments in a diversified portfolio. Nevertheless, these investments are exposed to various risks and overall market volatility. Due to the level of risk associated with certain investments, it is reasonably possible that changes in the values of investments will occur in the near term and that such change could materially affect the amounts reported in the consolidated financial statements.

**Concentrated investments** – As of the year ended December 31, 2023, approximately 54% of the fair value of investments and a significant portion of the unrealized gains and losses are attributable to the two supporting organizations, HSBF and EKSCT. The fair value of HSBF's illiquid fixed income and EKSCT's closely held stock position are based upon annual independent third-party valuations using the same techniques and variables as in prior years.

**Supporting organization assets** – As of the year ended December 31, 2023, approximately 41% of total assets were in the two supporting organizations, HSBF and EKSCT.

**Major donors** – For the year ended December 31, 2023, approximately 78% of contributions revenue was from one donor.

19

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

**Note 10 – Endowment Funds**

**Interpretation of relevant law** – The Board of Trustees of SBF, in concurrence with the advice of legal counsel, has interpreted the California adopted UPMIFA as requiring a long-term investment strategy designed to preserve the fair value of the original gift, as of the gift date. As a result of this interpretation, SBF has classified with the explicit prohibition by the donor as net assets with donor restrictions (a) the original value of gifts donated to the perpetual endowment, (b) the original value of subsequent gifts to the perpetual endowment, and (c) accumulations to the perpetual endowment made in accordance with the direction of the applicable donor gift instrument at the time the accumulation is added to the fund. The remaining portion of the donor-restricted endowment funds are classified as net assets with donor restrictions until those amounts are appropriated for expenditure by SBF in a manner consistent with the standard for prudence prescribed by UPMIFA. In accordance with California UPMIFA, the organization considers the following factors in making a determination to appropriate or invest donor-restricted endowment funds:

1. The duration and preservation of the fund.

2. The purposes of SBF and the donor-restricted endowment fund.

3. General economic conditions.

4. The possible effect of inflation and deflation.

5. The expected total return from income and the appreciation of investments.

6. Other resources of SBF.

7. The investment policies of SBF.

**Endowment investment and spending policies** – SBF has adopted investment and spending policies for endowment assets that attempt to provide a predictable stream of funding to programs supported by its endowment while seeking to maintain the long-term purchasing power of the endowment assets. Endowment assets include those assets of donor-restricted funds that the organization must hold in perpetuity for donor-specified purposes. The endowment assets are invested in a manner that is intended to produce results that provide a reasonable balance between the quest for growth and the need to protect principal. The investment policy calls for a diversified portfolio utilizing various asset classes with a goal of reducing portfolio volatility and risk.

SBF's long-term endowment is invested in a diversified portfolio of domestic equities, international equities, fixed income, and a broad array of alternative investments. The portfolio employs both passive index funds and actively managed funds. The portfolio's objective is to achieve a total return equivalent to or greater than SBF's financial requirements over the long-term time horizon. Long-term investment strategies are used to manage risk with the goal to grow charitable dollars over time. SBF also provides four other investment options for donors that have a shorter time horizon and more immediate spending needs, including a socially responsible investment option.

**CONFIDENTIAL**                TDIT005783

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

SBF uses a total investment return methodology for determining its spending policy each year. The portfolio's total returns are achieved through both capital appreciation (realized and unrealized) and current yield (interest and dividends). The spending policy calculates the amount of money annually distributed from SBF's various discretionary funds and other endowed funds for grant making and administrative support. The approved spending policy for the year ended December 31, 2023, for discretionary funds was 4.5%, while other endowed funds were 4%. These percentages are calculated based on a rolling average of the market value for the previous three years.

The spending policy is reviewed annually in light of changing market assumptions, investment returns, and the rate of inflation. Accordingly, over the long term, SBF expects current spending policy to allow its endowment assets to grow.

**Endowment funds with deficiencies** – From time to time, the fair value of the assets associated with individual donor-restricted funds may fall below the level that current law requires SBF to retain for a fund of perpetual duration. In accordance with U.S. GAAP, these deficiencies are reported as a reduction in net assets with donor restrictions. Such deficiencies may result from unfavorable market fluctuations, particularly if the funds were invested in the endowment pool shortly prior to significant market declines. SBF has adopted a policy to spend from underwater endowments with certain limitations. As of December 31, 2023, SBF held seven endowment funds where the principal had fallen below the original corpus due to market conditions. The total fair values, original gift amounts, and deficiencies related to this fund as of December 31, 2023, is as follows:

| | |
|---|---|
| Fair value of underwater endowments | $ 13,296,771 |
| Original endowment gift amount | 14,402,299 |
| Deficiencies of underwater endowment funds | $ (1,105,528) |

Endowment net assets with donor restrictions totaled $65,162,394 consisting of total original gift endowment contributions of $57,176,629 and accumulated earnings of $7,985,765 as of December 31, 2023. Changes in the endowment net assets with donor restrictions for the year ended December 31, 2023, are as follows:

| | With Donor Restrictions |
|---|---|
| Endowment net assets, beginning of year | $ 59,847,087 |
| Net investment return | 7,589,590 |
| Contributions | 1,282,500 |
| Appropriation of endowment net assets for expenditure | (2,853,154) |
| Reclassifications and other releases from restrictions | (703,629) |
| Endowment net assets, end of year | $ 65,162,394 |

There were no endowment net assets without donor restrictions or assets classified as board-restricted endowment funds as of December 31, 2023.

21

CONFIDENTIAL TDIT005784

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

### Note 11 – Related-party Transactions

A majority of trustees and committee members of SBF also serve as trustees of entities receiving grants and support from SBF. Each trustee and committee member completes a conflict of interest declaration form annually. Trustees and committee members who have conflicts abstain from voting.

### Note 12 – Commitments

SBF leases office equipment and office space under non-cancellable operating leases through January 2028. Rent expense under operating leases for the year ended December 31, 2023, was approximately $72,000.

### Note 13 – Retirement Plans

SBF employees who work at least 1,000 hours per year are eligible to participate in a deferred salary savings plan under Section 401(k) of the Internal Revenue Code after one full calendar month of service. SBF matches at its discretion up to 4% of the eligible salary upon participation. For eligible employees with more than one year of service, SBF, at its discretion, contributes up to an additional 6% of the participant's eligible salary for a total of 10%. SBF employer contributions for the year ended December 31, 2023, totaled $303,333.

In addition, SBF has a non-qualified deferred compensation plan. SBF employer contributions for the year ended December 31, 2023, totaled $22,500.

### Note 14 – Liquidity

SBF structures its financial assets to be available as its general expenditures, liabilities, and other obligations become due. SBF invests cash in excess of daily requirements in short-term investments and money market funds.

Financial assets available to meet cash needs for general expenditure for the following year are comprised of current assets and investments, adjusted for amounts unavailable due to illiquidity, endowments, and other funds with spending policy appropriations beyond one year, and current liabilities payable to vendors, financial institutions, and nonprofit organizations.

CONFIDENTIAL                                                                  TDIT005785

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

Financial assets available to meet cash needs for general expenditures within one year as of December 31, 2023:

| | |
|---|---:|
| Cash and cash equivalents | $   82,341,343 |
| Contributions and bequests receivable, current portion | 13,553,708 |
| Less non-cash bequests receivable of illiquid assets | (5,937,716) |
| Notes receivable, current portion | 225,000 |
| Other assets | 258,749 |
| Current assets | 90,441,084 |
| Investments | 610,837,544 |
| Less investments not available for general expenditures within one year | |
| Illiquid, not convertible to cash beyond one year | (330,948,170) |
| Endowments and other funds subject to spending policy appropriations beyond one year | |
| Without donor restrictions | (113,233,039) |
| With donor restrictions | (65,162,394) |
| Funds held on behalf of others | (33,165,254) |
| Investments available for general expenditures within one year | 68,328,687 |
| Financial assets available to meet cash needs for general expenditures within one year | $   158,769,771 |

23

**CONFIDENTIAL**                                    **TDIT005786**

## Santa Barbara Foundation
### Notes to Consolidated Financial Statements

**Note 15 – Net Assets**

Net assets consist of the following for the years ended December 31, 2023 and 2022:

**Net assets without donor restrictions**

| | 2023 | 2022 |
|---|---|---|
| Supporting organizations | $ 327,432,299 | $ 203,276,249 |
| Donor-advised funds | 126,914,251 | 124,955,164 |
| Undesignated funds | 96,194,074 | 89,771,251 |
| Field of interest funds | 50,561,579 | 43,271,369 |
| Donor-designated funds | 11,571,347 | 6,158,669 |
| Board-designated funds | 2,479,073 | 2,358,513 |
| Fiscal sponsorship | 1,979,624 | 1,539,909 |
| Total net assets without donor restrictions | $ 617,132,247 | $ 471,331,124 |

**Net assets with donor restrictions**

| | 2023 | 2022 |
|---|---|---|
| Donor-restricted endowment funds | $ 65,162,394 | $ 59,847,087 |
| Beneficial interest in remainder and lead trusts | 61,255,657 | 61,084,833 |
| Beneficial income interest in perpetual trusts | 19,929,023 | 17,337,064 |
| Split interest agreements | 899,757 | 837,328 |
| Contributions receivable | 206,926 | 204,723 |
| Total net assets with donor restrictions | $ 147,453,757 | $ 139,311,035 |

24

**CONFIDENTIAL**                                        TDIT005787

FSD2025-0116

2025-08-19



CONFIDENTIAL

TDIT005788

## Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd

### As Of
### December 31, 2023

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd



VALUESCOPE
Measure | Create | Defend

**FSD2025-0116**    **Page 836 of 1530**    **2025-08-19**



April 11, 2024

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

**RE: *Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of December 31, 2023 (the "Valuation Date"). This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

950 E. State Highway 114 • Suite 120 • Southlake • Texas 76092 • Tel: 817.481.4901 • Fax: 817.481.4905
www.valuescopeinc.com

**FSD2025-0116**    **2025-08-19**

**752**

**CONFIDENTIAL**    **TDIT005790**

Mr. Mark Patrick
April 11, 2024
Page 2

The premise of value followed herein is going concern.[1]  The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry.  We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances.  Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of December 31, 2023

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd

- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information, as well as on other data we developed.

---

[1]   The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

VALUESCOPE, Inc.

Mr. Mark Patrick
April 11, 2024
Page 3

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$78,284,712**
**SEVENTY-EIGHT MILLION TWO HUNDRED EIGHTY-FOUR THOUSAND SEVEN HUNDRED TWELVE DOLLARS**

| FMV Summary | | |
|---|---|---|
| Company Net Asset Value (NAV) | $277,573,090 | Schedule A.2 |
| Shares Outstanding | 305 | |
| **NAV Per Share** | **$910,076** | |
| **Applicable Discounts** | | |
| Discount for Lack of Control | 8.0% | Schedule B.3 |
| Discount for Lack of Marketability | 6.5% | Schedule C.5 |
| Combined Discount | 14.0% | ($127,229) |
| **FMV Per Share** | **$782,847** | |
| Subject Shares | 100 | |
| **FMV of Subject Interest** | **$78,284,712** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis. Our fee for these valuation services was in no way influenced by the results of our analysis. The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report. If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope, Inc.*

ValueScope, Inc.

**VALUE**SCOPE, Inc.

# TABLE OF CONTENTS

ENGAGEMENT OVERVIEW ................................................................. 1

DESCRIPTION OF THE ASSIGNMENT ........................................... 1
SCOPE.................................................................................. 1
PROCEDURES....................................................................... 1

DAF OVERVIEW.............................................................................. 2

COMPANY OVERVIEW ............................................................ 2
SUBJECT INTEREST OVERVIEW.............................................. 2
CLO OVERVIEW..................................................................... 2
HISTORICAL FINANCIAL ANALYSIS ......................................... 5

ECONOMIC AND INDUSTRY OVERVIEW............................................ 6

OVERVIEW OF THE U.S. ECONOMY ........................................ 6
OVERVIEW OF THE REAL ESTATE LOANS & COLLATERALIZED DEBT INDUSTRY ............ 15

VALUATION METHODOLOGY .......................................................... 19

VALUATION APPROACHES....................................................... 19
VALUATION METHODS ........................................................... 20
SUMMARY OF THE VALUATION APPROACHES AND METHODS ....................... 20

VALUATION ANALYSIS .................................................................. 21

ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE ................. 21

CONCLUSION OF VALUE - SUBJECT INTEREST................................... 24

DISCOUNT FOR LACK OF CONTROL ........................................ 24
DISCOUNT FOR LACK OF MARKETABILITY ................................ 24
CONCLUSION - SUBJECT INTEREST VALUE................................ 26

ASSUMPTIONS AND LIMITING CONDITIONS ..................................... 27

APPRAISAL CERTIFICATION ........................................................... 32

VALUESCOPE, Inc.

CONFIDENTIAL                                                            TDIT005793

## TABLE OF SCHEDULES

HISTORICAL VALUATION SUMMARY ........................................................ SUMMARY 1

CURRENT VALUATION SUMMARY........................................................ SUMMARY 2

DAF NET ASSET VALUE ANALYSIS.................................................................. A

    CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ........................................ A.1
    CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET ........................... A.2

DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS ...................................... B

    CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS............................ B.1
    CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS ................................ B.2
    DLOC CONCLUSION.......................................................................... B.3

DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS ............................ C

    DLOM DETERMINATION - PUT OPTION APPROACH .................................... C.1
    PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY....................... C.2
    DLOM DETERMINATION - RESTRICTED STOCK STUDIES.............................. C.3
    DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS ......... C.4
    DLOM CONCLUSION........................................................................ C.5

VALUESCOPE, Inc.

## ENGAGEMENT OVERVIEW

### DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of December 31, 2023 (the "Valuation Date"). This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

### SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Company's financial position. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

### PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

VALUESCOPE, Inc.

Page 1

## DAF OVERVIEW[2]

### COMPANY OVERVIEW

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. At the Company's inception, the partners agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (the "DAF Agreement") and the Companies Law of the Cayman Islands (the "Law"). As a holding company, DAF's predominant assets are interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

### SUBJECT INTEREST OVERVIEW

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares. The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's director. According to the DAF Agreement, the appointed director controls the business, affairs, and power of the Company (Section 89), including the issuance and purchase of shares on such terms and in such manner as the director determines (Section 44). Director consent is also required for shareholders to transfer their interests in DAF (Section 34). Finally, although shareholders may determine the timing and amounts of dividends (Sections 117 and 118), no dividend can exceed an amount approved by the director (Section 118).

### CLO OVERVIEW

Because the assets ultimately held by DAF predominately reflect equity tranches in one or more CLOs, some discussion is warranted describing a CLO. The diagram below depicts a typical CLO's balance sheet and cash flow. A CLO holds a pool of income-producing assets funded through the issuance of several classes of notes and preferred shares. The notes issued by the CLO are separated into rated and unrated classes.

---

[2]   Based on the Company's memorandum and articles of association and information from management.

Page 2

VALUESCOPE, Inc.

DAF OVERVIEW



The rating of each class is primarily determined through the priority of rights in respect of the cash flows generated by the collateral and the quality of the collateral. The notes issued are long-term notes designed to match or exceed the maturity of the underlying collateral pool. The most subordinated notes or preferred shares of the CLO function in the same manner as voting common stock in a corporation and are generally unrated. They are the residual ownership interest in the CLO issuer. They earn all the excess spread, but concomitantly bear the first loss.

From the example depicted below, CLOs seek to earn the excess spread between lower-rated/higher interest collateral and lower blended cost of its liabilities. Returns are a function of excess spread, less any collateral losses and fees and expenses incurred during the life of the CLO.

**Example:**

| | |
|---|---|
| Yield on assets | LIBOR + 4.0% |
| Liabilities Weighted Avg. Coupon | LIBOR + 1.0% |
| Excess spread (or net interest margin) | 3.0% |

CLOs typically are subject to a number of collateral tests that are designed to protect the holders of, and maintain the credit ratings associated with, CLO debt. Collateral Coverage Tests are cash flow CLO tests that divert cash flows from subordinated tranches, prevent the purchase of new CLO assets, and cause senior tranches to be paid down when their standards are not met. When these tests are violated or are anticipated to be violated

VALUESCOPE, Inc.

Page 3

due to negative downward trends, any future cash flow would be used to pay down the highest rated debt within the CLO capital structure, thus, eliminating any distributions and potential recovery to CLO equity interests. The two main collateral coverage tests are the over-collateralization test and the interest coverage test. The over-collateralization test measures how much the value of the pool of assets held by the CLO exceeds the obligations of the CLO. The interest coverage test measures how much the interest income of the CLO from its pool of assets exceeds the interest payment costs on the CLOs' obligations. Collateral Quality Tests are cash flow CLO tests that restrict sales of CLO assets. These tests may include objective measures of pool diversity, average rating, average life, prospective average recovery, and minimum weighted average coupon or spread. Concentration Tests address the presence in the pool of single issuers, percentage of the collateral represented by loan participations, non-U.S. obligors, triple-C rated credits, deferred interest instruments and other factors.

A rating agency approves the legal and credit structure of the CLO, performs due diligence on the parties involved, and rates the various tranches of the debt issued by the CLO and rates the assets owned by the CLO. The Servicer selects the initial collateral of the CLO and supervises it according to prescribed guidelines contained in an indenture or trust deed. The trustee is similar to a custodian in that it holds the assets for the benefit of the debt and equity holders, enforces the terms of the indenture, monitors and reports on collateral performance, and disburses cash to note-holders, preferred shareholders, and service providers according to the indenture.

The assets that have been purchased earn interest. That interest is used to pay fees, expenses and interest of the CLO on a prioritized basis. This is referred to as the interest waterfall. The interest earned is paid down the "waterfall" beginning with the Trustee and Administrative expenses and ending with the equity holders, with a percentage going to the Class I and Class II Equities.

CONFIDENTIAL                                                        TDIT005798

DAF OVERVIEW



The diagram above depicts the cash flow from a CLO and its respective ordering of payments and obligations. As one can see, the CLO "equity" is the last in line to receive a cash distribution. Accordingly, the valuation of the CLO equity tranches within DAF is strongly influenced by this dynamic.

## HISTORICAL FINANCIAL ANALYSIS

We were provided with the Company's internal financial statements for the three months ended December 31, 2023. These financial statements reflect various professional valuations of DAF's ultimate underlying CLO holdings (assets).

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo"). CLO HoldCo is a holding company which invests in CLOs and other investments. The net asset value for CLO HoldCo was reported as $277.6 million. DAF reported no liabilities as of the Valuation Date. As a result, DAF's book equity as of the Valuation Date was determined to equal $277.6 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

VALUESCOPE, Inc.

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

The third quarter of 2023 had positive economic growth, higher than the second quarter of 2023. Inflation is cooling down with its lowest rate over a twelve-month period in the last two years recorded in June 2023. This was largely on the back of declining energy prices. In its constant efforts to mitigate the effects of high inflation, the Federal Reserve has kept interest rates at elevated levels so far with cuts expected to begin in early 2024. Initial steady interest rate hikes in 2023 have led to the yield curve inverting, indicating investor's expectation of an economic slowdown. However, the US stock markets gained momentum and have closed higher than their prices at the same time last year due to the declining inflation rate and the expectation of future loosening of monetary policy.

### Gross Domestic Product[3]

Real gross domestic product (GDP) increased at an annual rate of 4.9 percent in the third quarter of 2023, following an increase of 2.1 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected an upturn in exports, and acceleration in consumer spending and private inventory investment that were partially offset by a deceleration in nonresidential fixed investment.



---

3   U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2023. (Release Date: 12/21/2023).

### Population

Population growth is an important driver of long-term growth in an economy. The total population increased from 334.3 million in November 2022 to 336.0 million in November 2023.[4] The working-age population (15-64) increased from 207.2 million in October 2022 to 208.8 million in October 2023.[5]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic. It partially recovered in just several months and has been trending upward. In November 2022, the civilian labor force participation rate was 62.2% and stands at 62.8% as of November 2023.[6]





---

[4]   U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

[5]   Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

[6]   U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

VALUESCOPE, Inc.

FSD2025-0116     **Page 848 of 1530**     2025-08-19

ECONOMIC AND INDUSTRY OVERVIEW

### Employment

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 199,000 in November 2023 and the unemployment rate edged down to 3.7 percent. Notable job gains occurred in health care and government. Employment also increased in manufacturing, reflecting the return of workers from a strike. Employment in retail trade declined.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased slightly from 6.7% in November 2022 to 7.0% in November 2023.[7]





Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 3.7% in 2023 to 4.0% in 2026.

---

7   U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

VALUESCOPE, Inc.

Page 8

ECONOMIC AND INDUSTRY OVERVIEW

### Inflation

According to the BLS, the Consumer Price Index for All Urban Consumers (CPI-U) increased 0.1 percent in November on a seasonally adjusted basis, after being unchanged in October. Over the last 12 months, the all-items index increased 3.1 percent before seasonal adjustment.

The index for shelter continued to rise in November, offsetting a decline in the gasoline index. The energy index fell 2.3 percent over the month as a 6.0-percent decline in the gasoline index more than offset increases in other energy component indexes. The food index increased 0.2 percent in November, after rising 0.3 percent in October. The index for food at home increased 0.1 percent over the month and the index for food away from home rose 0.4 percent.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has increased dramatically since April 2021, increasing from 74.2% as of October 2021 to a high of 96.6% in April 2022, and declined to 89.3% in December 2022. The price pressure measure for August 2023 was 86.9%.[8] The forecasters predict current-quarter headline CPI inflation will average 3.5 percent at an annual rate, slightly up from the forecast of 3.4 percent in the last survey[9].



---

[8]   Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 8, 2023.
[9]   Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters*, January 10, 2024.

Page 9

VALUESCOPE, Inc.

### Interest Rates

The interest rate on the three-month Treasury bill increased from 4.42% as of December 30, 2022, to 5.40% as of December 29, 2023.[10] The interest rate on the ten-year Treasury note remained the same at 3.88% over the same period.[11]



The interest rate on Moody's Aaa-rated corporate bonds decreased from 4.70% as of December 30, 2022 to 4.65% as of December 29, 2023.[12] The interest rate on the Moody's Baa-rated corporate bonds decreased from 5.87% to 5.49% over the same period.[13]

---

[10]   Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

[11]   Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

[12]   Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2024.

[13]   Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

ECONOMIC AND INDUSTRY OVERVIEW



In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill remaining the same between December 30, 2022, to December 29,2023 at -0.59%.[14]



---

14    U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2024.

Page 11

VALUESCOPE, Inc.

### Corporate Profits

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $108.7 billion in the third quarter.



### Stock Markets

The stock markets gained momentum from December 30, 2022, to December 29, 2023. The S&P 500 Total Return[15] Index closed at 7,138.77 on December 30, 2022, and closed higher at 8,971.07 on December 29, 2023. The NASDAQ Composite Total Return Index closed at 12,588.95 on December 30, 2022, and closed higher at 18,208.50 on December 29, 2023.[16] The Dow Jones Industrial Average Total Return Index closed at 79,728.48 on December 30, 2022 and closed higher at 92,630.57 on December 29, 2023.[17] In the graph below, the June 30, 2022, values were set to 100.



---

15    Total return indices include returns from both income and capital gains.
16    S&P Capital IQ Database, last accessed January 10, 2024.
17    S&P Capital IQ Database, last accessed January 10, 2024.

Page 12

VALUESCOPE, Inc.

ECONOMIC AND INDUSTRY OVERVIEW

### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts increased from 1.427 million units in November 2022 to 1.560 million units in November 2023.[18] Construction spending, a seasonally adjusted annual figure, increased from $1.84 trillion in November 2022 to $2.05 trillion in November 2023.[19]



---

[18] U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

[19] U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2024.

Page 13

VALUESCOPE, Inc.

ECONOMIC AND INDUSTRY OVERVIEW

### Consumer Confidence

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased significantly since the post-COVID high of 88.3 in April 2021, coming in at 61.3 in November 2023.[20] The index remains significantly lower than the December 2019 (pre-COVID) value of 99.3. The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions. The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S.  This is considered a leading indicator of future consumer expenditures and economic activity.



---

[20]   University of Michigan, *Surveys of Consumers*, November 2023

VALUESCOPE, Inc.

**CONFIDENTIAL**                                    **TDIT005808**

## OVERVIEW OF THE REAL ESTATE LOANS & COLLATERALIZED DEBT INDUSTRY[21]

The industry comprises non-depository operators that specialize in primary and secondary market lending. Unlike banks and other traditional lenders, industry participants do not rely on deposits to issue loans. Instead, to finance primary market lending to consumers and business, industry operators generate income by securitizing and selling mortgages and other loans on the secondary market. The industry also includes miscellaneous forms of collateralized lending, such as pawn lending.

The primary activities of this industry are:

- Secondary market financing and securitization (i.e. MBSs and CDOs)
- Loans (businesses, real estate, consumers)
- Consumer lending and financing
- Providing other non-depository credit intermediation (i.e. pawnshop operations)
- International trade financing

### Executive Summary

The Real Estate Loans and Collateralized Debt industry is composed of non-depository institutions that conduct primary and secondary market lending. Operators in this industry include government agencies in addition to nonagency issuers of mortgage-related securities. Through 2023, rising per capita disposable income and low levels of unemployment helped fuel the increase in primary and secondary market sales of collateralized debt. Nonetheless, due to the outbreak of COVID-19 and the sharp contraction in economic activity due to lockdowns, revenue contracted in 2020, but has since rebounded as the economy has normalized and interest rates have shot up. These trends caused revenue to grow at a CAGR of 0.4% to an estimated $480.6 billion through 2023, with an anticipated spike of 6.4% in 2023. Profit, measured as revenue-less interest and noninterest income, is expected to account for 9.7% of revenue in 2023.

Higher access to credit and greater disposable income have fueled primary market lending over much of the past five years, increasing the variety and volume of loans to be securitized and sold in secondary markets. An additional boon for institutions has been an increase in interest rates, which has raised interest income as the spread between short- and long-term interest rates increased. These macroeconomic factors, combined with changing risk appetite and regulation in the secondary markets, have resurrected collateralized debt trading since the middle of the period. The pandemic had reversed the period's early gains as the 30-year conventional mortgage rate had dropped sharply. Nonetheless, this proved to only be temporary, as rates following the end of pandemic-related restrictions exceeded those earlier in the period.

---

21    IBISWorld Industry Report 52229, November 2023, *Real Estate Loans & Collateralized Debt in the U.S.*

Although institutions are poised to benefit from a strong economic recovery following the pandemic, slumping rates of homeownership, coupled with an expected plunge of the 30-year mortgage rate, are expected to damage the primary market through 2028. Shaky demand from commercial banking and uncertainty surrounding inflationary pressures will influence institutions' decisions on whether or not to sell mortgage-backed securities and commercial loans to secondary markets. These trends are expected to cause revenue to inch upward at a CAGR of 0.1% to an estimated $483.9 billion through 2028.

### Industry Performance

The financial industry has experienced steady revenue growth, with a compound annual growth rate (CAGR) of 0.4%, leading to an estimated $480.6 billion in revenue for the year 2023. This growth includes an anticipated 6.4% surge in 2023, with profits expected to reach 9.7%. The strong economic recovery following the challenges of COVID-19 has played a pivotal role in boosting revenue for financial institutions.

Non-depository institutions within the industry rely heavily on stable economic conditions and favorable interest rates to ensure a consistent stream of revenue and customer demand for their services. During the COVID-19 pandemic, the Federal Reserve took measures to cut interest rates in an attempt to stabilize economic conditions, causing homeownership rates to falter due to dampened consumer sentiment. However, as the economy rebounded post-pandemic, homeownership rates flourished, and commercial banking demand rebounded, bolstering institutions' recovery and stimulating new consumer interest in homeownership.

Many companies dealing in mortgage-backed securities (MBSs) seek stability in the broader economy and positive trends in the consumer and real estate markets to continue financing sales into the secondary market.

The shift in Federal Reserve policy toward a more hawkish stance on interest rates and macroeconomic conditions following COVID-19 has influenced core markets among institutions. This shift has also boosted core revenue channels for operators. To counter rising inflationary pressures, the Federal Reserve adopted a hawkish stance on interest rates, leading to steady rate hikes to combat heightened inflation. This has had a notable impact on mortgage rates and the interest rates charged by commercial banks on core financial instruments. Recently, the Federal Reserve decided to hold steady the interest rate level, with the current range standing between 5.25%-5.50%. Institutions benefit from higher interest rates as they generate larger revenue when selling to secondary markets, making the Fed's pivot toward higher interest rates an accelerant for these institutions.

ECONOMIC AND INDUSTRY OVERVIEW

Consistent growth in corporate markets has further bolstered collateralized debt demand among banks. Even during challenging economic conditions, larger corporate companies and commercial banks have remained significant drivers of revenue growth for operators. Over the past five years, growth in corporate profit has heightened this trend and provided commercial banks with greater flexibility to pursue lucrative real estate and collateralized debt opportunities. Despite inflationary pressures across the broader economy, corporate clients have been able to leverage advantageous trends from the Federal Reserve through acquisitions of MBSs, contributing to the industry's growth.

However, shaky consumer metrics have tempered the industry's overall growth rate. While institutions encompass a range of entities, from government-sponsored enterprises like Fannie Mae and Freddie Mac to traditional mortgage companies, consumer sentiment plays a crucial role in influencing revenue growth. If consumers have a lower propensity to acquire mortgages or pursue student loans due to difficulties in repayment, it can shrink demand in the secondary market for MBSs and hinder growth for operators. Recent volatility in student loan delinquencies and consumers' tightening fiscal conditions during COVID-19 have dampened the potential for larger revenue growth from the sale of MBSs and collateralized mortgage obligations (CMOs). Given the uncertainty in consumer confidence due to inflationary pressures, institutions involved in direct sales of securities or policies must remain vigilant regarding consumer sentiment to maximize their growth potential.

### Industry Outlook

The financial industry is bracing for a challenging period ahead, with anticipated revenue rising at a compound annual growth rate (CAGR) of 0.1% and expected to reach $483.9 billion by 2028. Furthermore, profit margins are poised to decrease to 11.2% in the same year. This projection is driven by several key factors that are expected to shape the industry's trajectory.

One significant factor contributing to this outlook is the uncertainty in the real estate market, which is set to push back the gains made following the COVID-19 pandemic. Despite the prospect of strong consumer confidence in the future, newfound uncertainty surrounding real estate is expected to impact institutional gains. With both the 30-year mortgage rate and homeownership rate projected to decline through 2028, institutions are facing a dual challenge of reduced revenue from core instruments like Mortgage-Backed Securities (MBSs) and decreased consumer activity in primary markets. The Federal Reserve's focus on quashing inflation further complicates matters, as future rate hikes are contingent on steady inflationary pressure, a trend expected to dissipate in the coming years as indicated by the projected decline in the Consumer Price Index (CPI).

VALUESCOPE, Inc.

Page 17

ECONOMIC AND INDUSTRY OVERVIEW

Additionally, there is a continuous shift towards the primary market, which is impacting core revenue streams. The disposable income of consumers and their ability to cover immediate expenses, such as credit card debt and student loan payments, is crucial in determining broader consumer sentiment. As these metrics are expected to grow in the coming years, institutions are increasingly turning to primary markets for lucrative alternative loans that can be packaged and securitized. This trend is underscored by the declining agency trading of MBSs, as highlighted by recent data from the Securities Industry & Financial Market Association (SIFMA). Operators are now seeking the safest and most consistently in-demand securities to trade, with a greater focus on student loans and credit cards due to the shifting market dynamics.

Furthermore, the evolving regulatory landscape poses challenges to the lending rate of core financial instruments. The rate of adoption of new federal regulations and the enforcement of existing regulatory laws remains uncertain. Recent changes, such as the removal of a stipulation in the Dodd-Frank Act regarding collateralized loan obligations (CLOs), have impacted investment and liquidity in secondary markets. However, to prevent a recurrence of the 2008 sub-prime mortgage crisis, the federal government may consider imposing regulations aimed at increasing transparency among institutions and minimizing risks in the primary market, which would lead to higher compliance costs for operators.

Lastly, technological evolution is poised to accelerate operational efficiency within the industry. In an uncertain economic landscape, operators are turning to artificial intelligence (AI) and other technology solutions to stabilize expenditures. By upgrading back-end technology for loan processing and market trend analysis, non-depository institutions can make more informed decisions about securitizing and selling less risky loans in open markets. Moreover, leveraging technology can reduce operational costs and streamline manual labor-intensive processes, a trend that gained momentum during the pandemic and is expected to persist in the industry's future.

CONFIDENTIAL TDIT005812

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### Income Approach

The income approach quantifies the present value of anticipated future income generated by a business or an asset. Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes. One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow. The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate. The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### Market Approach

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets. Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset. Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions. The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### Asset-Based (Cost) Approach

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities. Replacement cost is often a primary indicator of the value of a business' assets. The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it. Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors. The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

Page 19

VALUESCOPE, Inc.

VALUATION METHODOLOGY

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
   1. Discounted Cash Flow Method (multi-period model)
   2. Direct Capitalization Method (single period model)
   3. Excess Earnings Method

B. Market Approach
   1. Guideline Public Company Method
   2. Merger and Acquisition Method

C. Asset-Based Approach
   1. Reproduction Cost Method
   2. Replacement Cost Method
   3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used. When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities). The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

## VALUATION ANALYSIS

### ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in the equity tranches of CLOs, the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities. Accordingly, the fair market value of DAF's equity is based directly on the valuation of these lower tier entities' assets.

DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of $513 thousand in CLO investments and $233.4 million in other investments[22]. CLO HoldCo reported $323.6 million in total assets. CLO HoldCo also reported $46.0 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $277.6 million.

---

22   Other investments consist of equity investments in approximately 44 entities.

VALUESCOPE, Inc.

Page 21

CONFIDENTIAL                                              TDIT005815

VALUATION ANALYSIS

### CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of: 12/31/2023 | |
|---|---|---|
| | Actual | % |
| **Current Assets** | $86,127,092 | 26.6% |
| Cash & Equivalents | 86,127,092 | 26.6% |
| **Total Current Assets** | | |
| | | |
| **CLO Investments** | 0 | 0.0% |
| Aberdeen CLO, Ltd | 2,608 | 0.0% |
| Red River CLO, Ltd. Preferred Shares | 98,985 | 0.0% |
| Westchester CLO, Ltd | 10,244 | 0.0% |
| VAHA 2004-1A 0.0% | 8,195 | 0.0% |
| VAHA 2004-1X 0.0% | 278,584 | 0.1% |
| Brentwood CLO, Ltd. | 114,556 | 0.0% |
| Liberty CLO, Ltd. | 157 | 0.0% |
| Grayson CLO, Ltd. Class II Preference Shares | 118 | 0.0% |
| Rockwall CDO, Ltd. | 0 | 0.0% |
| HLF 1X Floating C1 | 0 | 0.0% |
| PAMCO 1997-1X B | 513,446 | 0.2% |
| **Total CLO Investments** | | |
| | | |
| **Other Assets** | 233,444,862 | 72.1% |
| Other Investments | 81,419 | 0.0% |
| Cash Collateral | 811,850 | 0.3% |
| Interest Receivable | 33,730 | 0.0% |
| Dividends Receivable | 1,471,448 | 0.5% |
| Note Receivable | 470,000 | 0.1% |
| Due from Affiliate | 637,419 | 0.2% |
| Due from Broker | | |
| | 323,591,266 | 100.0% |
| **Total Assets** | | |
| | 46,018,176 | 14.2% |
| **Total Liabilities** | | |
| | 277,573,090 | 85.8% |
| **Total Equity** | | |
| | 323,591,266 | 100.0% |
| **Total Liabilities & Equity** | | |

### DAF NAV Conclusion

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity. Therefore, DAF's NAV can be reasonably stated as $277.6 million (rounded). This analysis is summarized in the following table and in Schedule A.2.

VALUESCOPE, Inc.

Page 22

CONFIDENTIAL                                                                  TDIT005816

VALUATION ANALYSIS

| | Balance Sheet as of: | |
|---|---|---|
| | **12/31/2023** | |
| | Actual | % |
| **Assets** | | |
| CLO HoldCo, LTD | $277,573,090 | 100.0% |
| **Total Assets** | $277,573,090 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $277,573,090 | 100.0% |
| **Total Liabilities & Equity** | $277,573,090 | 100.0% |

VALUESCOPE, Inc.

Page 23

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAF's NAV was determined to equal $277.6 million as of the Valuation Date. Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $910,076. However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment. This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests. Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

### DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund. Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities. However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares. Rather, they must sell them on the open market. The price they receive is not usually equal to the fundamental or net asset value of the investment. Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds. The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 3.9% and 4.3%, respectively. The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 10.5% and 11.7%, respectively. Based on these indications, we selected a discount for lack of control of 8.0% to be applicable to the Subject Interest, as shown in Schedule B.3.

### DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable. Several factors are widely recognized to affect

CONCLUSION OF VALUE - SUBJECT INTEREST

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others. We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

### Put Option Approach

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset. For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability. The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[23] Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 15.0% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction. As a result of these inputs, the put option approach indicated a discount for lack of marketability of 3.3%. This DLOM indication is presented in Schedule C.1.

### Restricted Stock Study Analysis

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[24] As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year. Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

### DLOM Conclusion

The put option approach in Schedule C.1 indicated a DLOM of 3.3%. The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%. Based on these indications, we

---

[23]  Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973

[24]  See Schedule C.3

Page 25

VALUESCOPE, Inc.

CONCLUSION OF VALUE - SUBJECT INTEREST

concluded a discount for lack of marketability of 6.5%. This conclusion is presented in Schedule C.5.

## CONCLUSION - SUBJECT INTEREST VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$78,284,712**
**SEVENTY-EIGHT MILLION TWO HUNDRED EIGHTY-FOUR THOUSAND SEVEN HUNDRED TWELVE DOLLARS**

| FMV Summary | | |
|---|---|---|
| Company Net Asset Value (NAV) | $277,573,090 | Schedule A.2 |
| Shares Outstanding | 305 | |
| **NAV Per Share** | **$910,076** | |
| **Applicable Discounts** | | Schedule B.3 |
| Discount for Lack of Control | 8.0% | Schedule C.5 |
| Discount for Lack of Marketability | 6.5% | |
| Combined Discount | 14.0% | ($127,229) |
| **FMV Per Share** | **$782,847** | |
| Subject Shares | 100 | |
| **FMV of Subject Interest** | **$78,284,712** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report. We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information as well as on other data we developed. We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.

VALUESCOPE, Inc.

Page 26

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever. Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent. In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent. Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study. The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts. The appraisal was prepared solely for the purpose, function, and party so identified in the report. The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

VALUESCOPE, Inc.

Page 27

ASSUMPTIONS AND LIMITING CONDITIONS

## OPERATIONAL ASSUMPTIONS

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

## COMPETENT MANAGEMENT ASSUMED

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership. This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

## NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement. If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s). We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

VALUESCOPE, Inc.

Page 28

ASSUMPTIONS AND LIMITING CONDITIONS

## NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE

No opinion is rendered as to legal fee or property title. No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

## LIENS AND ENCUMBRANCES

ValueScope will give no consideration to liens or encumbrances except as specifically stated. We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks. We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

## INFORMATION PROVIDED BY OTHERS

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

## PROSPECTIVE FINANCIAL INFORMATION

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted. Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA). We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

VALUESCOPE, Inc.

Page 29

CONFIDENTIAL                                                    TDIT005823

ASSUMPTIONS AND LIMITING CONDITIONS

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities. Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount. Such matters, if any, are noted in the report. To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

Page 30

VALUESCOPE, Inc.

867

ASSUMPTIONS AND LIMITING CONDITIONS

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

## INDEMNIFICATION BY THE COMPANY

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

Page 31

VALUESCOPE, Inc.

787

CONFIDENTIAL                                                                     TDIT005825

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8. This report and analysis were prepared under the direction of Steven C. Hastings.

9. I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By:    ValueScope, Inc.

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

Page 32

VALUESCOPE, Inc.

APPENDIX: QUALIFICATIONS OF THE APPRAISER

## APPENDIX: QUALIFICATIONS OF THE APPRAISER

### Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA
### Principal
shastings@valuescopeinc.com, 817-481-4901

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*ValueScope, Inc.*

*2006 – Present*

*Principal*
Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*Value Capital, LLC*

*2001 – 2006*

*Principal*
Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Finance Commission of Texas*

*Public Service - 1994 to 2000*

*Director*
The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

VALUESCOPE, Inc.

APPENDIX: QUALIFICATIONS OF THE APPRAISER

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001*                                              *MedCare Financial Solutions, Inc.*

*President*
Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

*1986 – 1994*                                              *H.D. Vest Financial Services*

*Executive Vice President and CFO*
As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

*1979 – 1986*                                              *Arthur Andersen & Co.*

*Senior Manager*
Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

VALUESCOPE, Inc.

CONFIDENTIAL                                                            TDIT005828

APPENDIX: QUALIFICATIONS OF THE APPRAISER

## CERTIFICATIONS AND LICENSES

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

## ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

## RECENT IRS CASES - OFFICE OF CHIEF COUNSEL

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
  • Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
  • Expert Report April 2016
  • Testimony June 2016
  • Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
  • Expert Report September 2015

VALUESCOPE, Inc.

CONFIDENTIAL                        TDIT005829

APPENDIX: QUALIFICATIONS OF THE APPRAISER

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

VALUESCOPE, Inc.

CONFIDENTIAL

TDIT005830

APPENDIX: QUALIFICATIONS OF THE APPRAISER

## RECENT IRS CASES – LMSB AUDIT DIVISION

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

## RECENT DEPARTMENT OF JUSTICE CASE

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America. Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No. 4:16-cv-03302, ALPC Services of Texas, Inc. v. United States of America and Internal Revenue Service. Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No. 12-844, *The Estate of David W. Longaberger v. The United States.* Valuation issues report, 2014.

## RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al. Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al. Fraudulent transfer, solvency and economic damages.

VALUESCOPE, Inc.

APPENDIX: QUALIFICATIONS OF THE APPRAISER

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

VALUESCOPE, Inc.

CONFIDENTIAL                                                        TDIT005832

APPENDIX: QUALIFICATIONS OF THE APPRAISER

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

"Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

### WHITE PAPERS

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v. Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

VALUESCOPE, Inc.

CONFIDENTIAL                                          TDIT005833

# SCHEDULES

VALUESCOPE, Inc.

CONFIDENTIAL

**Charitable DAF HoldCo, Ltd**
**Table of Contents**

Valuation Date: December 31, 2023

| Table of Contents | |
|---|---|
| **Schedule Name** | **Schedule** |
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| | |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| | |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

FSD2025-0116
CONFIDENTIAL
FSD2025-0116

2025-08-19
TDIT005835

877

797

2025-08-19

**Charitable DAF HoldCo, Ltd**
**Historical Valuation Summary**

Summary Schedule 1
Valuation Date: December 31, 2023

| | For the Quarter Ended: | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 12/31/2021 | 3/31/2022 | 6/30/2022 | 9/30/2022 | 12/31/2022 | 3/31/2023 | 6/30/2023 | 9/30/2023 | 12/31/2023 |
| Company Net Asset Value (NAV) | $243,189,674 | $262,539,795 | $291,234,287 | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | $277,573,090 |
| Discount for Lack of Control | 5.0% | 7.3% | 5.6% | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% |
| Discount for Lack of Marketability | 6.9% | 6.9% | 6.9% | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% |
| Combined Discount | 11.6% | 13.7% | 12.1% | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% |
| FMV of Subject Interest (Per 100 Shares) | $70,521,019 | $74,289,035 | $83,919,780 | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | $78,284,712 |

CONFIDENTIAL TDIT005836

**Charitable DAF HoldCo, Ltd**
**Current Valuation Summary**

**Summary Schedule 2**
**Valuation Date: December 31, 2023**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $277,573,090 | Schedule A.2 |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$910,076** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.0% | | Schedule B.3 |
| Discount for Lack of Marketability | 6.5% | | Schedule C.5 |
| Combined Discount | 14.0% | ($127,229) | |
| **FMV Per Share** | | **$782,847** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$78,284,712** | |

FSD2025-0116
CONFIDENTIAL

FSD2025-0116

2025-08-19
TDIT005837

2025-08-19

880

**Charitable DAF HoldCo, Ltd**
**DAF Net Asset Value Analysis**

Schedule A.1
Valuation Date: December 31, 2023

CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of:12/31/2023Actual | % |
|---|---|---|
| **Current Assets** | $86,127,092 | 26.6% |
| Cash & Equivalents | 86,127,092 | 26.6% |
| **Total Current Assets** | | |
| | | |
| **CLO Investments** | 0 | 0.0% |
| Aberdeen CLO, Ltd | 2,608 | 0.0% |
| Red River CLO, Ltd. Preferred Shares | 98,985 | 0.0% |
| Westchester CLO, Ltd | 10,244 | 0.0% |
| VAHA 2004-1A 0.0% | 8,195 | 0.0% |
| VAHA 2004-1X 0.0% | 278,584 | 0.1% |
| Brentwood CLO, Ltd. | -114,556 | 0.0% |
| Liberty CLO, Ltd. | 157 | 0.0% |
| Grayson CLO, Ltd. Class B Preference Shares | 118 | 0.0% |
| Rockwall CDO, Ltd. | 0 | 0.0% |
| HLF 1X Floating C1 | 0 | 0.0% |
| PAMCO 1997-1X B | 513,446 | 0.2% |
| **Total CLO Investments** | | |
| | | |
| **Other Assets** | 17,737,063 | 5.5% |
| Highland CLO Funding, Ltd. | 122,998 | 0.0% |
| Highland CLO Funding, Ltd. - Participation Rights | 1,713,498 | 0.5% |
| TerreStar Corporation New Common | 2 | 0.0% |
| Sable Permian Resources 7.375% | 0 | 0.0% |
| Celtic Pharma Phinco B.V. (Pharma VII) 17.000% | 0 | 0.0% |
| Bruce Mansfield - 1-07 - Escrow Units | 351 | 0.0% |
| iHeartCommunications, Inc. (fka Clear Channel Communications, Inc.) 6.375% | 113,229 | 0.0% |
| Crusader Fund II, Ltd. | 2,740,993 | 0.8% |
| NXDT | 1,805,440 | 0.6% |
| NXRT | 3,942,093 | 1.2% |
| FFWM | 3,043,330 | 0.9% |
| .SERENG | 3,101,541 | 1.0% |
| Conservation Equity Fund I | 618,844 | 0.2% |
| Multi Strat | 0 | 0.0% |
| Highland Loan Funding V | 77,770,586 | 24.0% |
| TerreStar Corporation Term Loan A - Non Convertible | 36,427 | 0.0% |
| TerreStar Corporation Term Loan C - Non Convertible | 270,770 | 0.1% |
| NHT Holdco, LLC - Membership Units | 94,000 | 0.0% |
| Big Valley Power Property, LLC | 940,000 | 0.3% |
| NCI Apache Trail, LLC | 874,200 | 0.3% |
| NCI Fort Worth Land, LLC | 5,649,400 | 1.7% |
| NCI Royse City Land, LLC | 1,250,000 | 0.4% |
| NCI Stewart Creek, LLC | 1,301,000 | 0.4% |
| NLA Assets, LLC | 3,899,547 | 1.2% |
| WMG BELLE AVENUE MEZZANINE, LLC | 1,452,000 | 0.4% |
| WMG Belle Avenue Orlando Partners, LLC | 5,154,586 | 1.6% |
| NREA SB I Holdings LLC | 11,283,713 | 3.5% |
| NexPoint Adare - Tranche 1 | 45,887,717 | 14.2% |
| NexPoint Skorpios | 20,560 | 0.0% |
| Total Wire - Convertible Promissory Note | 651,162 | 0.2% |
| NexPoint Poro Glen DST | 527,460 | 0.2% |
| MFMQ Appraisal Rights Claims | 92,248 | 0.0% |
| COLL | 194,400 | 0.1% |
| ACHC US | 167,199 | 0.0% |
| BIO | 2,278 | 0.0% |
| ACRG/A/U CN | 1,728 | 0.0% |
| ACRG/B/U CN | 6,221,786 | 1.9% |
| NREF | 9,350 | 0.0% |
| HRTX | 243,390 | 0.1% |
| TGTX | 242,571 | 0.1% |
| TMO | 1,488 | 0.0% |
| PRTK | 280,500 | 0.1% |
| SRG | 3,858,132 | 1.2% |
| SPXU | 3,310,274 | 1.0% |
| SQQQ | 3,598,779 | 1.1% |
| SRTY | 13,305,790 | 4.1% |
| NexPoint Capital, INC. | 1,164,415 | 0.4% |
| FREMF 21K-F103 CS FRN | 8,807,107 | 2.7% |
| NRSZX | 17 | 0.0% |
| RWIC | 233,444,862 | 72.1% |
| Other Investments | 81,419 | 0.0% |
| Cash Collateral | 811,850 | 0.3% |
| Interest Receivable | 33,730 | 0.0% |
| Dividends Receivable | 1,471,448 | 0.5% |
| Note Receivable | 470,000 | 0.1% |
| Due from Affiliate | 637,419 | 0.2% |
| Due from Broker | | |
| | | |
| **Total Assets** | 323,591,266 | 100.0% |
| **Total Liabilities** | 46,018,176 | 14.2% |
| **Total Equity** | 277,573,090 | 85.8% |
| **Total Liabilities & Equity** | 323,591,266 | 100.0% |

CONFIDENTIAL TDIT005838

FSD2025-0116
CONFIDENTIAL

FSD2025-0116

2025-08-19

2025-08-19
TDIT005839

**Charitable DAF HoldCo, Ltd**
**DAF Net Asset Value Analysis**

**Schedule A.2**
**Valuation Date: December 31, 2023**

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: 12/31/2023 | |
|---|---|---|
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $277,573,090 | 100.0% |
| **Total Assets** | $277,573,090 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $277,573,090 | 100.0% |
| **Total Liabilities & Equity** | $277,573,090 | 100.0% |

FSD2025-0116

CONFIDENTIAL

FSD2025-0116

2025-08-19

2025-08-19

802

TDIT005840

FSD2025-0116

Page 886 of 1530

882

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Control (DLOC) Analysis**

Schedule B.1
Valuation Date: December 31, 2023

*Closed-End Fund Data - Investment Grade Bond Funds*

**Closed-End Fund Data - Investment Grade Bond Funds**

| Fund Ticker | Fund Name | Net Asset Value | Market Price | Premium (Discount) |
|---|---|---|---|---|
| BKT | BlackRock Income Trust, Inc. | $12.73 | $12.18 | (4.3%) |
| FMY | First Trust Mortgage Income Fund | $11.72 | $12.12 | 3.4% |
| VBF | Invesco Bond Fund | $15.87 | $15.21 | (4.2%) |
| IHTA | Invesco High Income 2024 Target Term Fund | NA | $6.89 | N/A |
| JLS | Nuveen Mortgage and Income Fund | NA | $16.88 | N/A |
| JMM | Nuveen Multi-Market Income Fund | $6.35 | $5.91 | (6.9%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.05 | $11.17 | (7.3%) |

| Summary Statistics | | |
|---|---|---|
| Mean Premium (Discount) | | (3.9%) |
| Median Premium (Discount) | | (4.3%) |
| Standard Deviation | | 4.3% |

*Source: S&P Capital IQ as of market close December 31, 2023*

FSD2025-0116
CONFIDENTIAL

FSD2025-0116

| | | | Schedule B.2 |
|---|---|---|---|
| **Charitable DAF HoldCo, Ltd** | | | **Valuation Date: December 31, 2023** |
| **Discount for Lack of Control (DLOC) Analysis** | | | |

*Closed-End Fund Data - US General Equity Funds*

| | Closed-End Fund Data - US General Equity Funds | | | |
|---|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| ADX | Adams Diversified Equity Fund, Inc. | $20.56 | $17.71 | (13.9%) |
| BIF | Boulder Growth & Income Fund, Inc. | $0.33 | $0.54 | 65.3% |
| CET | Central Securities Corp. | $46.49 | $37.77 | (18.8%) |
| FOF | Cohen & Steers Closed-End Opportunity Fund, Inc. | NA | $11.20 | N/A |
| GRF | Eagle Capital Growth Fund, Inc. | $10.82 | $9.45 | (12.7%) |
| EVT | Eaton Vance Tax-Advantaged Dividend Income Fund | $21.57 | $22.25 | 3.1% |
| EQS | Equus Total Return, Inc. | $3.49 | $1.45 | (58.4%) |
| FXBY | Foxby Corp. | $23.65 | $13.12 | (44.5%) |
| GDV | The Gabelli Dividend & Income Trust | $25.58 | $21.64 | (15.4%) |
| GAB | The Gabelli Equity Trust Inc. | $5.19 | $5.08 | (2.1%) |
| GAM | General American Investors Company, Inc. | $51.96 | $42.95 | (17.3%) |
| HTD | John Hancock Tax-Advantaged Dividend Income Fund | $19.02 | $18.97 | (0.3%) |
| USA | Liberty All-Star Equity Fund | $6.75 | $6.38 | (5.5%) |
| ASG | Liberty All-Star Growth Fund, Inc. | $5.75 | $5.28 | (8.2%) |
| RMT | Royce Micro-Cap Trust, Inc. | $10.47 | $9.24 | (11.7%) |
| RVT | Royce Value Trust Inc. | $16.42 | $14.56 | (11.3%) |
| SOR | Source Capital, Inc. | $43.91 | $40.38 | (8.1%) |
| SPE | Special Opportunities Fund, Inc. | $14.30 | $11.86 | (17.1%) |
| FUND | Sprott Focus Trust, Inc. | $8.91 | $8.00 | (10.2%) |
| TY | Tri-Continental Corporation | $32.66 | $28.83 | (11.7%) |

| **Summary Statistics** | | |
|---|---|---|
| | Mean Premium (Discount) | (10.5%) |
| | Median Premium (Discount) | (11.7%) |
| | Standard Deviation | 23.3% |

*Source: S&P Capital IQ as of market close December 31, 2023*

FSD2025-0116

CONFIDENTIAL

| Charitable DAF HoldCo, Ltd | Schedule B.3 |
| Discount for Lack of Control (DLOC) Analysis | Valuation Date: December 31, 2023 |

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 3.9% | Schedule B.1 |
| DLOC Determination - Closed End Bond Funds (Median) | 4.3% | Schedule B.1 |
| | | |
| DLOC Determination - Closed End Equity Funds (Mean) | 10.5% | Schedule B.2 |
| DLOC Determination - Closed End Equity Funds (Median) | 11.7% | Schedule B.2 |
| Concluded Discount for Lack of Control | 8.0% | |

884

804

TDIT005842

FSD2025-0116
CONFIDENTIAL

FSD2025-0116
Page 889 of 1530

885

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.1
Valuation Date: December 31, 2023

*DLOM Determination - Put Option Approach*

### Discount for Lack of Marketability - Put Option Approach

**Option-Pricing Inputs:**

| | | | |
|---|---|---|---|
| Stock Price | S | $1.00 | |
| Strike Price | X | $1.00 | (Set to same as stock price) |
| Expected Life | T | 0.75 | (Years) |
| Volatility | s | 15.0% | Schedule C.2 |
| Risk-free rate | R | 5.50% | US Treasury Implied Yield for Expected Life |
| Dividend Yield | Q | 0.00% | * |

*Intermediate Calculations:*

| | | | |
|---|---|---|---|
| d1 | 0.38220588 | -d1 | -0.38220588 |
| d2 | 0.25230207 | -d2 | -0.25230207 |
| N(d1) | 0.64884567 | N(d1) | 0.35115433 |
| N(d2) | 0.59959620 | N(d2) | 0.40040380 |

| | | | |
|---|---|---|---|
| Black-Scholes Call Option Price | $0.07 | Black-Scholes Put Option Price | $0.03 |

| | |
|---|---|
| **Implied Discount for Lack of Marketability (DLOM)** | 3.3% |

*\* Distributions not expected in the near future*

FSD2025-0116
CONFIDENTIAL

886

2025-08-19
806
TDIT005844

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.2
Valuation Date: December 31, 2023

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical Volatility Term | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 14.1% | 15.2% | 11.5% | 14.6% | 15.0% | 30.4% | 30.3% | 40.7% | 11.7% | 18.4% |
| 1 Year | 12.7% | 15.0% | 11.5% | 12.1% | 14.7% | 27.5% | 26.0% | 40.6% | 11.6% | 19.8% |
| 1.5 Years | 13.4% | 17.0% | 15.0% | 11.9% | 16.5% | 27.2% | 34.6% | 52.3% | 14.2% | 23.9% |
| 2 Years | 13.3% | 16.4% | 15.1% | 12.0% | 15.7% | 27.9% | 37.0% | 49.5% | 14.8% | 25.5% |
| 2.5 Years | 13.1% | 15.2% | 14.1% | 11.4% | 15.1% | 27.8% | 34.0% | 47.5% | 14.3% | 24.3% |
| 3 Years | 12.5% | 14.5% | 13.2% | 10.9% | 14.6% | 122.0% | 31.7% | 48.3% | 13.8% | 23.6% |
| 3.5 Years | 11.8% | 14.1% | 13.4% | 11.0% | 14.1% | 113.8% | 30.4% | 53.8% | 14.7% | 23.1% |
| 4 Years | 12.3% | 15.3% | 18.0% | 17.2% | 16.5% | 108.4% | 32.3% | 56.1% | 24.1% | 29.6% |
| 4.5 Years | 11.7% | 14.7% | 17.3% | 16.3% | 16.1% | 102.4% | 31.5% | 54.8% | 22.9% | 28.3% |
| 5.0 Years | 11.3% | 14.1% | 16.6% | 15.6% | 15.5% | 97.9% | 31.0% | 53.2% | 21.9% | 27.3% |

| Historical Volatility Term | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| | Low | 25th % | Median | Mean | 75th % | High |
| 0.5 Years | 11.5% | 14.2% | 15.1% | 20.2% | 27.3% | 40.7% |
| 1 Year | 11.5% | 12.3% | 14.8% | 19.2% | 24.5% | 40.6% |
| 1.5 Years | 11.9% | 14.4% | 16.8% | 22.6% | 26.4% | 52.3% |
| 2 Years | 12.0% | 14.8% | 16.1% | 22.7% | 27.3% | 49.5% |
| 2.5 Years | 11.4% | 14.2% | 15.1% | 21.7% | 26.9% | 47.5% |
| 3 Years | 10.9% | 13.4% | 14.5% | 30.5% | 29.7% | 122.0% |
| 3.5 Years | 11.0% | 13.5% | 14.4% | 30.0% | 28.6% | 113.8% |
| 4 Years | 12.3% | 16.7% | 21.0% | 33.0% | 31.6% | 108.4% |
| 4.5 Years | 11.7% | 16.1% | 20.1% | 31.6% | 30.7% | 102.4% |
| 5.0 Years | 11.3% | 15.5% | 19.3% | 30.4% | 30.1% | 97.9% |

| Concluded Volatility | 15.0% |
|---|---|

*Source: Yahoo Finance*

FSD2025-0116

CONFIDENTIAL

FSD2025-0116

Page 891 of 1530

887

2025-08-19

2025-08-19
TDIT005845
807

| | | | Schedule C.3 |
|---|---|---|---|
| **Charitable DAF HoldCo, Ltd** | | | **Valuation Date: December 31, 2023** |
| **Discount for Lack of Marketability (DLOM) Analysis** | | | |

*DLOM Determination - Restricted Stock Studies*

| | **Restricted Stock Studies** | | | | | | **Reported** | **Reported** |
|---|---|---|---|---|---|---|---|---|
| | | **Study** | **Period Covered** | | **Sub-Sample** | **Observations** | **Mean** | **Median** |
| | **Name of Study** | **Date** | **From** | **To** | | | | |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

**Charitable DAF HoldCo, Ltd**
**Schedule C.4**
**Discount for Lack of Marketability (DLOM) Analysis**
**Valuation Date: December 31, 2023**

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | Mean | Median |
|---|---|---|
| **All Studies after 1997 and before 2008** | 9.7% | 9.0% |
| Low | 15.5% | 14.8% |
| Median | 15.5% | 15.2% |
| Mean | 21.5% | 26.7% |
| High | 5.2% | 7.0% |
| Standard Deviation | | |
| **All Studies Encompassing 2008** | 10.9% | 9.3% |
| Low | 13.8% | 11.8% |
| Median | 13.8% | 11.8% |
| Mean | 16.6% | 14.3% |
| High | 4.0% | 3.5% |
| Standard Deviation | | |
| | | |
| **Indicated Discount for Lack of Marketability** | 9.7% | |

FSD2025-0116
CONFIDENTIAL

FSD2025-0116

2025-08-19
TDIT005846



**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.5
Valuation Date: December 31, 2023

*DLOM Conclusion*

| Discount for Lack of Marketability | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 3.3% | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies | 9.7% | Schedule C.4 |
| **Concluded Discount for Lack of Marketability** | 6.5% | |

FSD2025-0116
CONFIDENTIAL
FSD2025-0116
889
Page 893 of 1530
2025-08-19
809
TDIT005847
2025-08-19

<br>

**Valuation Analysis of**
**100 Participation Shares of**
**Charitable DAF HoldCo, Ltd**

**as of**
**September 30, 2024**

<br>

Prepared for:

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd

**CONFIDENTIAL**                                                     **TDIT005848**

**FSD2025-0116**                                                                 **2025-08-19**

January 7, 2025

Mr. Mark Patrick
Director
Charitable DAF HoldCo, Ltd
2101 Cedar Springs Road, Suite 1200
Dallas, Texas 75201

***RE: Valuation Analysis of 100 Participation Shares of Charitable DAF HoldCo, Ltd***

Dear Mr. Patrick:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date"). ValueScope has not independently verified the total number of participation shares outstanding.[1] This valuation analysis was conducted for internal reporting purposes. No other use for this analysis is intended or should be inferred.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.
2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.

---

[1] The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

950 E. State Highway 114 • Suite 120 • Southlake • Texas 76092 • Tel: 817.481.4901 • Fax: 817.481.4905
*www.valuescopeinc.com*

**CONFIDENTIAL**                                                          TDIT005849

FSD2025-0116
Mr. Mark Patrick
January 7, 2025
Page 2

2025-08-19

7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.

8. The marketability, or lack thereof, of the securities.

The premise of value followed herein is going concern.[2]  The liquidation premise of value was considered and rejected as not applicable because the going-concern value results in a "highest and best use" value for the interest.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's advisors. To understand the environment in which DAF operates, we researched relevant information concerning the collateralized debt industry.  We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances.  Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Financial statements for the Company as of September 30, 2024

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd

- Information regarding the Company's history and current operations

We relied on information received as indicative of the Company as of the Valuation Date.  We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information, as well as on other data we developed.

---

[2] The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

**VALUE**SCOPE, Inc.

FSD2025-0116

2025-08-19

812

CONFIDENTIAL

TDIT005850

FSD2025-0116

Mr. Mark Patrick
January 7, 2025
Page 3

2025-08-19

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis.  Our fee for these valuation services was in no way influenced by the results of our analysis.  The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report.  If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,

*ValueScope, Inc.*

ValueScope, Inc.

**VALUE**SCOPE, Inc.
FSD2025-0116
2025-08-19
813
CONFIDENTIAL
TDIT005851

FSD2025-0116 2025-08-19

## TABLE OF CONTENTS

ENGAGEMENT OVERVIEW ...........................................................................................1

    DESCRIPTION OF THE ASSIGNMENT ...................................................................... 1
    SCOPE............................................................................................................................ 1
    PROCEDURES................................................................................................................ 1

DAF OVERVIEW.............................................................................................................2

    COMPANY OVERVIEW .................................................................................................. 2
    SUBJECT INTEREST OVERVIEW................................................................................. 2
    HISTORICAL FINANCIAL ANALYSIS .......................................................................... 2

ECONOMIC AND INDUSTRY OVERVIEW.....................................................................4

    OVERVIEW OF THE U.S. ECONOMY .......................................................................... 4
    OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY
    ............................................................................................................................... 12

VALUATION METHODOLOGY .....................................................................................15

    VALUATION APPROACHES......................................................................................... 15
    VALUATION METHODS .............................................................................................. 16
    SUMMARY OF THE VALUATION APPROACHES AND METHODS ................................. 16

VALUATION ANALYSIS ...............................................................................................17

    ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE ...................................... 17

CONCLUSION OF VALUE - SUBJECT INTEREST.........................................................19

    DISCOUNT FOR LACK OF CONTROL ......................................................................... 19
    DISCOUNT FOR LACK OF MARKETABILITY ............................................................. 19
    CONCLUSION - SUBJECT INTEREST VALUE ............................................................. 21

ASSUMPTIONS AND LIMITING CONDITIONS ............................................................23

APPRAISAL CERTIFICATION .......................................................................................28

895

## TABLE OF SCHEDULES

**HISTORICAL VALUATION SUMMARY** ................................................................ SUMMARY 1

**CURRENT VALUATION SUMMARY** ...................................................... SUMMARY 2

**DAF NET ASSET VALUE ANALYSIS** ........................................................................ A

CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ............................................................ A.1
CHARITABLE DAF HOLDCO, LTD - SUMMARY BALANCE SHEET .................................... A.2

**DISCOUNT FOR LACK OF CONTROL (DLOC) ANALYSIS** ...................................................... B

CLOSED-END FUND DATA - INVESTMENT GRADE BOND FUNDS .................................. B.1
CLOSED-END FUND DATA - US GENERAL EQUITY FUNDS ........................................ B.2
DLOC CONCLUSION ....................................................................................... B.3

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ...................................... C

DLOM DETERMINATION - PUT OPTION APPROACH ....................................................... C.1
PUT OPTION APPROACH - HISTORICAL VOLATILITY SUMMARY .................................... C.2
DLOM DETERMINATION - RESTRICTED STOCK STUDIES ........................................... C.3
DLOM DETERMINATION - RESTRICTED STOCK STUDIES SUMMARY STATISTICS ......... C.4
DLOM CONCLUSION ..................................................................................... C.5

## ENGAGEMENT OVERVIEW

**DESCRIPTION OF THE ASSIGNMENT**

We were retained to perform an independent valuation analysis to determine the fair market value of 100 participation shares (the "Subject Interest") out of an assumed 305 participation shares of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of September 30, 2024 (the "Valuation Date").  ValueScope has not independently verified the total number of participation shares outstanding.[3]  This valuation analysis was conducted for internal reporting purposes.  No other use for this analysis is intended or should be inferred.

**SCOPE**

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections.  The first section outlines the description, scope, and procedures of our analysis.  The second section provides a brief description of the Company and the Company's financial position.  The third section includes a discussion of the national economy and the industry in which the Company operates.  The fourth section details a discussion of valuation theory and methodology.  The fifth section presents our valuation analysis, and the sixth section presents our conclusion and reconciliation of the fair market value of the Subject Interest.

**PROCEDURES**

This valuation analysis was conducted in accordance with generally accepted valuation procedures.  These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances.  We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information.  Our analysis was based in part on this information, as well as on other data obtained through additional research.  A full discussion of the methodologies employed appears in the following sections of this report.

---

[3]  The Subject Interest is assumed to effectively represent approximately 32.8% of all participation shares.

897

## DAF OVERVIEW[4]

### COMPANY OVERVIEW

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011. Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law"). As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.

### SUBJECT INTEREST OVERVIEW

Based on information provided by the Company's management ("Management"), the Subject Interest shares are participation shares that from time to time are expected to receive cash distributions to fulfill certain charitable and expense goals of the owners of the participation shares. The Subject Interest shares are directly affected by the terms of the DAF Agreement and the actions of DAF's directors. According to the DAF Agreement, the appointed directors control the business, affairs, and power of the Company (Sections 72 and 77), including the issuance and purchase of shares on such terms and in such manner as the director determines (Sections 7-10). Director consent is also required for shareholders to transfer their interests in DAF (Section 18). Finally, although shareholders may determine the timing and amounts of dividends (Section 100), no dividend can exceed an amount approved by the directors (Section 101).

### HISTORICAL FINANCIAL ANALYSIS

We were provided with the Company's balance sheet as of September 30, 2024. These financial statements reflect various professional valuations of DAF's ultimate underlying assets.

As reported as of the Valuation Date, DAF's sole asset consisted of 100% of the equity of CLO HoldCo, Ltd ("CLO HoldCo"). CLO HoldCo is a holding company which invests in CLOs and other various investments. The net asset value for CLO HoldCo was reported as

---

[4] Based on the Company's memorandum and articles of association and information from management.

**FSD2025-0116**

DAF OVERVIEW   **2025-08-19**

$269.1 million.  DAF reported no liabilities as of the Valuation Date.  As a result, DAF's book equity as of the Valuation Date was determined to equal $269.1 million.

DAF's balance sheet as of the Valuation Date is presented in Schedule A.2.

**VALUE**SCOPE, Inc.

**FSD2025-0116**

Page 3

**2025-08-19**

818

**CONFIDENTIAL**

**TDIT005856**

## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the second quarter of 2024, the US economy experienced positive growth that surpassed the pace of the first quarter.  Inflation has moderated significantly from its peak of 8.99% in June 2022 to 2.59% by August 2024, reflecting progress toward the Federal Reserve's inflation target.  After an extended period of elevated interest rates to curb inflation, recent data pointed to a cooling labor market and continued price stability, prompting the Fed to cut rates by 50 basis points.  The steady rate hikes initiated in 2023 led to an inverted yield curve, suggesting investor expectations of an economic slowdown.  Nevertheless, US stock markets have gained momentum, with indices closing higher year-over-year, supported by declining inflation and anticipated further monetary easing.

### Gross Domestic Product[5]

Real gross domestic product (GDP) increased at an annual rate of 3.0 percent in the second quarter of 2024, following an increase of 1.6 percent in the first quarter. The acceleration in real GDP in the second quarter primarily reflected accelerations in consumer spending, private inventory investment, and nonresidential fixed investment. These movements were partly offset by a deceleration in residential fixed investment. Imports increased.

---

[5]    U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Second Quarter 2024. (Release Date: 9/26/2024).

**FSD2025-0116**                    **Page 904 of 1530** ECONOMIC AND INDUSTRY OVERVIEW **2025-08-19**

### Population

Population growth is an important driver of long-term growth in an economy.  The total population increased from 335.4 million in August 2023 to 337.2 million in August 2024.[6] The working-age population (15-64) increased from 208.7 million in August 2023 to 208.9 million in August 2024.[7]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic.  It partially recovered in just several months and has been trending upward/flat.  In August 2023, the civilian labor force participation rate was 62.8% and stands at 62.7% as of August 2024.[8]

---

[6]   U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[7]   Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[8]   U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

### Employment

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 142,000 in August 2024 and the unemployment rate increased slightly to 4.2 percent. Job gains occurred in construction and healthcare.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.1% in August 2023 to 7.9% in August 2024.[9]





Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will be 4.2% for both 2026 and 2027.

---

[9]    U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

**FSD2025-0116**                                ECONOMIC AND INDUSTRY OVERVIEW                        **2025-08-19**

## Inflation

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.2 percent in August on a seasonally adjusted basis, after the same increase in July. Over the last 12 months, the all-items index increased 2.5 percent before seasonal adjustment.[10]

The index for shelter rose 0.5 percent in August and was the main factor in the all items increase. The food index increased 0.1 percent in August, after rising 0.2 percent in July. The index for food away from home rose 0.3 percent over the month, while the index for food at home was unchanged. The energy index fell 0.8 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, August 2023, declining from 88.97% to 24.05% in August 2024[11].The forecasters predict current-quarter headline CPI inflation will average 2.3 percent at an annual rate, down from the prediction of 2.8 percent in the previous survey[12].



---

10    Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.
11    Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.
12    Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* August 9, 2024.

**FSD2025-0116**
ECONOMIC AND INDUSTRY OVERVIEW
**2025-08-19**

### Interest Rates

The interest rate on the three-month Treasury bill declined from 5.32% as of September 29, 2023, to 4.52% as of September 30, 2024.[13]  The interest rate on the ten-year Treasury note declined from 4.59% as of September 29, 2023, to 3.81% as of September 30, 2024.[14]

The interest rate on Moody's Aaa-rated corporate bonds declined from 5.36% as of September 29, 2023, to 4.72% as of September 30, 2024.[15] The interest rate on the Moody's Baa-rated corporate bonds declined from 6.37% to 5.44% over the same time.[16]



---

[13]   Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[14]   Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

[15]   Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last October 7, 2024.

[16]   Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

**VALUE**SCOPE, Inc.

Page 8

**FSD2025-0116**
**2025-08-19**
**823**

**CONFIDENTIAL**
TDIT005861

In the last twelve months, the yield curve remained inverted, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing/flattening between September 29, 2023, to September 30,2024 from -0.54% to 0.21%.[17]

### Corporate Profits

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) increased $132.4 billion in the second quarter of 2024 from the first quarter of 2024.

---

[17]   U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed October 7, 2024.

### Stock Markets[18]

The stock markets gained momentum from September 29, 2023, to September 30, 2024. The S&P 500 Index (SPY) closed at 427.48 on September 29, 2023, and closed higher at 573.76 on September 30, 2024. The NASDAQ Composite Index (QQQ) closed at 334.95 on September 29, 2023, and closed higher at 423.12 on September 30, 2024. The Dow Jones Industrial Average Index (DIA) closed at 358.27 on September 29, 2023 and closed higher at 488.07 on September 30, 2024. In the graph below, the September 30, 2022, values were set to 100.

### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy. Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment. Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy. Housing starts increased from 1.305 million units in August 2023 to 1.356 million units in August 2024.[19] Construction spending, a seasonally adjusted annual figure, increased from $2.05 trillion in August 2023 to $2.13 trillion in August 2024.[20]

---

[18]   CapIQ Database, last accessed October 7, 2024.
[19]   U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.
[20]   U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed October 7, 2024.

906

*Consumer Confidence*

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has decreased from 69.40 a year ago in August 2023 to 67.90 in August 2024. Although it has declined slightly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[21] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions.  The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S.  This is considered a leading indicator of future consumer expenditures and economic activity.

---

[21]   University of Michigan, *Surveys of Consumers*, September 2024

826

**CONFIDENTIAL**                                                      **TDIT005864**

**OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY**[22]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles. Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments. This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

### Executive Summary

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset-management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite challenges posed by the COVID-19 pandemic in 2020 and 2021. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated, and businesses pivoted their strategies due to the unprecedented nature of the crisis. In the past five years, industry revenue grew at a CAGR of 4.0% to $312.2 billion, including 5.2% in 2024 alone, when profit will increase to 48.9%.

Industry revenue will grow at a CAGR of 4.2% to $383.6 billion over the five years to 2029, when profit will rise to 50.5%. The Federal Reserve is increasing interest rates to quell historically high inflation. These higher interest rates are reducing liquidity in the markets. Private equity firms and hedge funds will have more difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

### Industry Performance

The Federal Reserve has increased interest rates to combat rampant inflation, which has surged due to persistent supply chain issues and a global energy crisis. After lowering

---

[22]  IBISWorld Industry Report 52599, July 2024, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

rates to historic lows in response to the COVID-19 pandemic, the Fed began raising them in 2022, with the current target rate ranging from 5.25% to 5.50%. These higher rates are reducing liquidity in financial markets, compelling private equity and hedge funds to seek new methods of raising capital, while those unable to adapt are exiting the industry. The previous decade's low-interest-rate environment had been advantageous for these investment vehicles, as it led investors to shift away from fixed-income and credit securities in favor of potentially higher returns. With more accessible funds during that period, fundraising activity surged, and those who capitalized on lower rates are currently benefiting from reduced interest payments and enhanced returns.

Simultaneously, there is a growing interest in Environmental, Social, and Governance (ESG) factors among investors who wish to align their investments with their values. This shift has led private equity firms and hedge fund managers to increasingly incorporate ESG considerations into their investment strategies. For instance, investments are now evaluated for their long-term environmental impact. Investors are also demanding that companies disclose information about their environmental and social performance. In response, private equity firms and hedge funds are diversifying their workforces and integrating ESG principles into their organizational frameworks.

Moreover, minority stakes are becoming more common in private equity firms. As internal competition intensifies, firms are diversifying their investments and establishing smaller, targeted funds, driven by a decrease in liquidity. The significant volatility in prominent markets like the S&P 500 during the COVID-19 pandemic encouraged companies to acquire minority stakes either in other companies or investments. There is a trend towards large private equity groups acquiring minority stakes in one another, as firms seek creative strategies to unlock potential investments. Changes in management types, with CEOs preferring to retain control while leveraging private equity expertise for growth, have also contributed to this trend.

Finally, technology and data analytics are increasingly being utilized by private equity firms and hedge funds to enhance their investment processes. These firms are employing machine learning algorithms to analyze vast amounts of data—such as financial statements, news articles, and social media posts—to uncover trends and insights not immediately visible to human analysts. Additionally, some are automating back-office functions like accounting and compliance using artificial intelligence (AI), which improves task processing and operational efficiency.

### Industry Outlook

The Federal Reserve's ongoing battle against inflation is likely to result in volatile interest rates in the near future. As inflation continues to affect the U.S. economy, the Fed has signaled that it may maintain or further increase interest rates if necessary. These higher rates will reduce market liquidity, making it more challenging for hedge funds and private

equity firms to raise capital. Firms that cannot adapt may be forced out of the industry. Typically, investors turn to lower-risk investments, such as bonds, when interest rates are high, which will pose significant obstacles for the industry due to decreased liquidity and shifting investor preferences. Consequently, hedge funds and private equity firms will need to be more strategic and innovative in finding profitable investments as liquidity tightens.

At the same time, there is a sustained interest in Environmental, Social, and Governance (ESG) factors. Investors are increasingly concerned about the impact of their investments on the environment and society, seeking to align their portfolios with their values. Private equity firms and hedge fund managers are expected to continue integrating ESG considerations into their investment strategies, with climate change effects increasingly influencing investment decisions across various sectors. As environmental conditions worsen, the importance of selecting investments that contribute positively to the environment will grow. Additionally, as the population becomes more diverse, there is an expectation for hedge funds and private equity firms to reflect this diversity in their operations.

The use of technology and data analytics by private equity firms and hedge funds is expected to expand further. These firms will increasingly rely on advanced technology to identify and evaluate potential investments, and to manage and monitor existing portfolios. With the growing dependence on technology, cybersecurity will become increasingly critical, prompting firms to invest more in securing their technological networks. As artificial intelligence (AI) evolves, it will enable hedge funds and private equity firms to analyze extensive data sets in real-time, facilitating more informed trading and investment decisions. Given that data is now considered a crucial asset, industry players will use improved tools to access and analyze data, aiming to discover new investment opportunities.

Moreover, fintech is emerging as an attractive investment area for private equity, hedge funds, and investment vehicles. The rapidly growing fintech and biotechnology sectors, though currently constrained, are poised for future expansion and will likely attract increased investment. The proximity of Silicon Valley and Wall Street offers industry players easy access to cutting-edge technological innovations and robust financial networks, enhancing their ability to invest in promising new ideas. As the distinction between Silicon Valley and Wall Street continues to blur, private equity firms and hedge funds that can sift through the hype to find valuable opportunities will be well-positioned in the evolving fintech landscape.

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

## VALUATION APPROACHES

### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset.  Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes.  One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow.  The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate.  The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets.  Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset.  Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions.  The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities.  Replacement cost is often a primary indicator of the value of a business' assets.  The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it.  Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors.  The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

FSD2025-0116

2025-08-19

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
   1. Discounted Cash Flow Method (multi-period model)
   2. Direct Capitalization Method (single period model)
   3. Excess Earnings Method

B. Market Approach
   1. Guideline Public Company Method
   2. Merger and Acquisition Method

C. Asset-Based Approach
   1. Reproduction Cost Method
   2. Replacement Cost Method
   3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used.  When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

CONFIDENTIAL

TDIT005869

912

**FSD2025-0116**          **Page 916 of 1530**          **2025-08-19**

## VALUATION ANALYSIS

### ASSET-BASED APPROACH ANALYSIS - NET ASSET VALUE

DAF's ultimate holdings are interests in various investment assets. DAF's sole asset reported as of the Valuation Date consisted of 100% of the equity of CLO HoldCo. CLO HoldCo is a holding company which invests in CLOs and other investments. We relied upon DAF management's determination of CLO HoldCo's NAV based on the values of its various underlying investments and assets. CLO HoldCo's balance sheet as of the Valuation Date is shown in the following charts and in Schedule A.1.

As shown below, CLO HoldCo's primary assets consist of cash & cash equivalents and other investment investments[23]. CLO HoldCo reported $316.3 million in total assets. CLO HoldCo also reported $47.2 million in total liabilities as of the Valuation Date. Therefore, CLO HoldCo's equity can be reasonably stated as $269.1 million.

### *CLO HoldCo, Ltd - Summary Balance Sheet*

|  | Balance Sheet as of: 9/30/2024 | |
|---|---|---|
|  | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

---

[23] Other investments consist of investments in approximately 39 entities.

913

### DAF NAV Conclusion

As of the Valuation Date, DAF's balance sheet consisted solely of a 100% ownership interest in CLO HoldCo's equity.  Therefore, DAF's NAV can be reasonably stated as $269.1 million (rounded).  This analysis is summarized in the following table and in Schedule A.2.

|  | Balance Sheet as of: | |
|---|---|---|
|  | **9/30/2024** | |
|  | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

## CONCLUSION OF VALUE - SUBJECT INTEREST

DAF's NAV was determined to equal $269.1 million as of the Valuation Date.  Dividing this NAV by the 305 total participation shares outstanding results in a NAV per share of $882,140.  However, sellers of fractional interests in holding companies rarely receive a price equal to the NAV of their investment.  This is because the interest holders do not have direct control over the entity's assets and have a limited market for their interests.  Therefore, in order to arrive at the fair market value of the Subject Interest shares that are the subject of this analysis, we applied relevant discounts (control and marketability).

### DISCOUNT FOR LACK OF CONTROL

Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls.  Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Due to the Company's ultimate holdings in debt and equity investments, the Company exhibits some of the characteristics of a closed-end fund.  Closed-end funds, like open-ended mutual funds, are asset holding companies that typically hold a portfolio of publicly traded securities.  However, unlike unit holders in open-ended funds, closed-end fund unit holders who wish to liquidate their investment cannot look to the fund to repurchase their shares.  Rather, they must sell them on the open market.  The price they receive is not usually equal to the fundamental or net asset value of the investment.  Therefore, the fair market value of closed-end funds is generally described in terms of a discount or premium to net asset value.

To align with the Company's holdings, we selected closed-end fund data from investment grade bond funds and general equity funds.  The investment grade bond fund data shown in Schedule B.1 indicated mean and median discounts of 2.9% and 2.5%, respectively.  The general equity fund data shown in Schedule B.2 indicated mean and median discounts of 12.1% and 13.6%, respectively.  Based on these indications, we selected a discount for lack of control of 8.1% to be applicable to the Subject Interest, as shown in Schedule B.3.

### DISCOUNT FOR LACK OF MARKETABILITY

Discounts for lack of marketability (DLOMs) are applied to the shares of private companies based on the premise that an asset or interest in an entity without a readily available market would sell for less to a hypothetical buyer than an identical asset or interest that is readily marketable.  Several factors are widely recognized to affect

marketability, such as distributions or dividends, investment performance, holding period to complete a sale, and management performance, among others. We utilized two methods of quantifying a relevant DLOM: the put option approach and an analysis of restricted stock studies.

### Put Option Approach

The price of a contract providing the right to sell a number of shares (a put option) represents the difference between the non-marketable and marketable price of an asset. For example, if a holder of restricted or non-marketable stock purchases a put option on the underlying asset, the holder would be purchasing marketability. The price of the put determines the size of the DLOM.

In order to determine the price of such a put, we utilized the Black-Scholes put option model.[24] Based on our analysis, we determined that an appropriate volatility for investment grade bond funds and general equity bond funds such as DAF is approximately 12.3% (Schedule C.2) and between one half and one year (averaged to 0.75 years) would be required to sell the Subject Interest in an orderly transaction. As a result of these inputs, the put option approach indicated a discount for lack of marketability of 2.8%. This DLOM indication is presented in Schedule C.1.

### Restricted Stock Study Analysis

There are several studies that attempt to measure discounts for lack of marketability, and a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest.[25] As mentioned, we would expect between six months and one year to be required to sell the Subject Interest in an orderly transaction.

Schedule C.4 presents a summary of restricted stock studies performed involving issuances of shares during the time period 1997 through 2008, which is when the SEC-mandated lock-up period for restricted stocks was one year. Based on a range of low discounts of 9.0%-10.9%, we selected a 9.7% DLOM utilizing the findings of the restricted stock studies.

### DLOM Conclusion

The put option approach in Schedule C.1 indicated a DLOM of 2.8%. The restricted stock study analysis in Schedule C.4 indicated a DLOM of 9.7%. Based on these indications, we

---

[24] Black, F. and M. Scholes, "The Pricing of Options and Corporate Liabilities," *Journal of Political Economy*, May 1973

[25] See Schedule C.3

concluded a discount for lack of marketability of 6.3%.  This conclusion is presented in Schedule C.5.

**CONCLUSION - SUBJECT INTEREST VALUE**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$75,961,370**
**SEVENTY-FIVE MILLION NINE HUNDRED SIXTY-ONE THOUSAND THREE HUNDRED SEVENTY DOLLARS**

| FMV Summary | | | |
|---|---|---|---|
| Company Net Asset Value (NAV) | | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | | 305 | |
| **NAV Per Share** | | **$882,140** | |
| **Applicable Discounts** | | | |
| Discount for Lack of Control | 8.1% | | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) | |
| **FMV Per Share** | | **$759,614** | |
| Subject Shares | | 100 | |
| **FMV of Subject Interest** | | **$75,961,370** | |

Our conclusion of value is presented in Summary Schedule 2 as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report.  We relied on information received as indicative of the Company as of the Valuation Date.  We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information as well as on other data we developed.  We have no obligation to update this

**FSD2025-0116**                CONCLUSION OF VALUE - SUBJECT INTEREST        **2025-08-19**

report or our conclusion of value for information that comes to our attention after the date of this report.

FSD2025-0116 2025-08-19

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, Inc. is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated; they should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever.  Neither the valuation report, nor its contents, nor any reference to the appraiser or ValueScope, Inc. may be referred to or quoted in any registration statement, prospectus, offering memorandum, sales brochure, other appraisal, loan or other agreement or document given to third parties without our prior written consent.  In addition, except as set forth in the report, our analysis and report are not intended for general circulation or publication, nor are they to be reproduced or distributed to third parties without our prior written consent.  Notwithstanding the foregoing, ValueScope, Inc. permits the Company to distribute this Report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, and we shall have no responsibility for any such unauthorized change.

The valuation may not be used in conjunction with any other appraisal or study.  The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts.  The appraisal was prepared solely for the purpose, function, and party so identified in the report.  The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, without the express written consent of ValueScope, Inc.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

FSD2025-0116

838

CONFIDENTIAL TDIT005876

**OPERATIONAL ASSUMPTIONS**

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

**COMPETENT MANAGEMENT ASSUMED**

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership.  This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

**NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION**

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement.  If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, Inc. must be made in advance. ValueScope, Inc. reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s).  We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

### NO CONSIDERATION IS RENDERED AS TO THE LAW OF THE CAYMAN ISLANDS

No consideration is rendered as to the law of the Cayman Islands.  Implications of Cayman Island jurisdiction are not considered.

### NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE

No opinion is rendered as to legal fee or property title.  No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

### LIENS AND ENCUMBRANCES

ValueScope will give no consideration to liens or encumbrances except as specifically stated.  We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks.  We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

### INFORMATION PROVIDED BY OTHERS

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain. All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

### PROSPECTIVE FINANCIAL INFORMATION

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted.  Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA).  We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation

**CONFIDENTIAL**                                                          **TDIT005878**

guidelines.

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities.  Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount.  Such matters, if any, are noted in the report.  To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided.  An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time.  Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

### INDEMNIFICATION BY THE COMPANY

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement.  Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement.  In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1.  We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2.  We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3.  We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4.  Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5.  To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6.  No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7.  The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8.  This report and analysis were prepared under the direction of Steven C. Hastings.

9.  I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By:    ValueScope, Inc.

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, Inc.

CONFIDENTIAL                                                                 TDIT005881

## APPENDIX:  QUALIFICATIONS OF THE APPRAISER

### Steven C.  Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

### EMPLOYMENT HISTORY

*2006 – Present*                                                        *ValueScope, Inc.*

*Principal*

Mr.  Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis.  As a CPA with significant valuation and financial reporting experience, Mr.  Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*2001 – 2006*                                                           *Value Capital, LLC*

*Principal*

Mr.  Hastings served as a principal with Value Capital, LLC.  During his tenure at Value Capital Mr.  Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries.  He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions.  His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                                     *Finance Commission of Texas*

*Director*

The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner.  As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets.  Mr.  Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations.   He was instrumental in assisting the Savings and Loan Department in writing new Mortgage

Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001*                                                    *MedCare Financial Solutions, Inc.*

*President*

Mr. Hastings served as an officer of MedCare Financial Solutions, Inc. and MedCapital Funding Corporation. MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers. MedCare Financial Solutions provided other financial and operational services to health care providers. These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending. Mr. Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

1986 – 1994                                                    *H.D. Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D. Vest Financial Services, Mr. Hastings assisted in placing over $1.5 billion annually in investment. Responsible for day-to-day financial operations and capital structuring, Mr. Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers. Mr. Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr. Hastings supervised stockbrokers' and investment advisors' day-to-day activities. As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies. Being licensed in life, disability, health, property and casualty insurance, Mr. Hasting was instrumental in implementing this line of business at HD Vest.

1979 – 1986                                                    *Arthur Andersen & Co.*

*Senior Manager*

Mr. Hastings served as a senior manager with significant responsibilities in the several industries. He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona
Bachelor of Science - Indiana University, Bloomington, Indiana

## CERTIFICATIONS AND LICENSES

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

## ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

## RECENT IRS CASES - OFFICE OF CHIEF COUNSEL

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report September 2015

- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C. Docket No. 1045-13, Estate of Jinana M. Bowey, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C. Docket No. 8401-13, Estate of Edward S. Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C. Docket No. 223630-12, Michael Tricarichi, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C. Docket No. 6936-10, et al, John M. Alterman, et al, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No. 8097-13, *Sumner Redstone, Petitioner, v. Commissioner of Internal Revenue, Respondent. Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No. 20177-11, *Richard H. Cullifer, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

CONFIDENTIAL

## RECENT IRS CASES – LMSB AUDIT DIVISION

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.
- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.
- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.
- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.
- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

## RECENT DEPARTMENT OF JUSTICE CASE

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America.  Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No.  4:16-cv-03302, ALPC Services of Texas, Inc.  v.  United States of America and Internal Revenue Service.  Valuation issues report, 2017.
- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No.  12-844, *The Estate of David W.  Longaberger v. The United States.*  Valuation issues report, 2014.

## RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al.  Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.
- Expert Report June 2018
- Deposition Testimony May 2019

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al.  Fraudulent transfer, solvency and economic damages.

- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No. CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al. Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No. 2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No. 14-671C. Always at Market, Inc. v. United States of America (DOD/DOJ). Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No. CV-05-1483, General Medicine, PC v. Healthsouth Corporation v. General Medicine, PC. Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

930

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

 "Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International


**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v.  Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

**SCHEDULES**

VALUESCOPE, Inc.

FSD2025-0116

2025-08-19

851

CONFIDENTIAL

TDIT005889

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 165 of 759

**Charitable DAF HoldCo, Ltd**
Table of Contents

**Valuation Date: September 30, 2024**

| Table of Contents | |
|---|---|
| **Schedule Name** | **Schedule** |
| | |
| **Historical Valuation Summary** | Summary Schedule 1 |
| **Current Valuation Summary** | Summary Schedule 2 |
| | |
| **DAF Net Asset Value Analysis** | |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.1 |
| Charitable DAF HoldCo, Ltd - Summary Balance Sheet | Schedule A.2 |
| | |
| **Discount for Lack of Control (DLOC) Analysis** | |
| Closed-End Fund Data - Investment Grade Bond Funds | Schedule B.1 |
| Closed-End Fund Data - US General Equity Funds | Schedule B.2 |
| DLOC Conclusion | Schedule B.3 |
| | |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Put Option Approach | Schedule C.1 |
| Put Option Approach - Historical Guideline Company Volatility Summary | Schedule C.2 |
| DLOM Determination - Restricted Stock Studies | Schedule C.3 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.4 |
| DLOM Conclusion | Schedule C.5 |

TDIT005890

CONFIDENTIAL

**FSD2025-0116**

**2025-08-19**

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 166 of 759

| Charitable DAF HoldCo, Ltd Historical Valuation Summary | | | | | | | | | Summary Schedule 1 Valuation Date: September 30, 2024 |
|---|---|---|---|---|---|---|---|---|---|
| | **For the Quarter Ended:** | | | | | | | | |
| | **9/30/2022** | **12/31/2022** | **3/31/2023** | **6/30/2023** | **9/30/2023** | **12/31/2023** | **3/31/2024** | **6/30/2024** | **9/30/2024** |
| Company Net Asset Value (NAV) | $289,502,301 | $276,241,856 | $275,227,939 | $270,414,002 | $288,884,011 | $277,573,090 | $272,449,558 | $270,432,538 | **$269,052,808** |
| Discount for Lack of Control | 8.0% | 8.7% | 7.8% | 11.6% | 13.9% | 8.0% | 8.7% | 9.7% | 8.1% |
| Discount for Lack of Marketability | 7.0% | 7.3% | 7.1% | 6.6% | 6.4% | 6.5% | 6.6% | 6.2% | 6.3% |
| Combined Discount | 14.4% | 15.4% | 14.3% | 17.4% | 19.4% | 14.0% | 14.7% | 15.3% | 13.9% |
| **FMV of Subject Interest (Per 100 Shares)** | $81,212,514 | $76,654,941 | $77,292,849 | $73,202,932 | $76,331,301 | $78,284,712 | $76,173,502 | $75,101,687 | **$75,961,370** |

TDIT005891

**FSD2025-0116**

**2025-08-19**

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 167 of 759

| Charitable DAF HoldCo, Ltd | Summary Schedule 2 |
|---|---|
| **Current Valuation Summary** | **Valuation Date: September 30, 2024** |

| FMV Summary | | |
|---|---|---|
| Company Net Asset Value (NAV) | $269,052,808 | *Schedule A.2* |
| Shares Outstanding | 305 | |
| **NAV Per Share** | **$882,140** | |
| **Applicable Discounts** | | |
| Discount for Lack of Control | 8.1% | *Schedule B.3* |
| Discount for Lack of Marketability | 6.3% | *Schedule C.5* |
| Combined Discount | 13.9% | ($122,527) |
| **FMV Per Share** | **$759,614** | |
| Subject Shares | 100 | |
| **FMV of Subject Interest** | **$75,961,370** | |

TDIT005892

| Charitable DAF HoldCo, Ltd | Schedule A.1 |
|---|---|
| DAF Net Asset Value Analysis | Valuation Date: September 30, 2024 |

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
|---|---|---|
| | **9/30/2024** | |
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| | | |
| **Other Assets** | | |
| Highland CLO Funding, Ltd. | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. (Participation Rights) | 69,385 | 0.0% |
| MidWave Common | 1,640,571 | 0.5% |
| MidWave - Term Loan A | 85,552,571 | 27.1% |
| MidWave - Term Loan C | 40,174 | 0.0% |
| NexPoint Capital, Inc. (BDC) | 14,223,433 | 4.5% |
| NexPoint Real Estate Strategies Fund Z | 8,487,030 | 2.7% |
| NexPoint Real Estate Finance (NREF) | 6,174,381 | 2.0% |
| NexPoint Residential (NXRT) | 2,338,207 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 2,331,025 | 0.7% |
| Small Bay II (Class I) | 3,770,609 | 1.2% |
| Small Bay II (Class II) | 4,047,276 | 1.3% |
| Small Bay II (Class III) | 2,357,682 | 0.7% |
| Polo Glen | 678,545 | 0.2% |
| NHT Holdco | 109,056 | 0.0% |
| ACHC | 158,525 | 0.1% |
| COLL | 115,804 | 0.0% |
| HRTX | 10,945 | 0.0% |
| ACRG/AU | 3,267 | 0.0% |
| ACRG/BU | 1,409 | 0.0% |
| TGTX | 333,308 | 0.1% |
| TMO | 282,686 | 0.1% |
| BIO | 111,081 | 0.0% |
| iHeart Communications | 365 | 0.0% |
| Multi Strat | 107,324 | 0.0% |
| Crusader Fund II, Ltd. | 38,131 | 0.0% |
| BVP Property | 94,000 | 0.0% |
| NCI Apache Trail | 1,104,000 | 0.3% |
| NCI Fort Worth Land | 874,200 | 0.3% |
| NCI Royse City Land | 11,448,367 | 3.6% |
| NCI Stewart Creek | 1,250,000 | 0.4% |
| NLA Assets | 1,766,000 | 0.6% |
| FFWM | 2,541,184 | 0.8% |
| SRG | 139,500 | 0.0% |
| SRTY | 2,380,529 | 0.8% |
| SQQQ | 1,818,805 | 0.6% |
| SPXU | 2,174,013 | 0.7% |
| Serengetti | 2,951,678 | 0.9% |
| Conservation Equity Fund | 3,253,139 | 1.0% |
| MMPQ | 527,460 | 0.2% |
| Total Wire Convertible Promissory Note | 20,560 | 0.0% |
| Sable Permian Resources | 2 | 0.0% |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| | | |
| **Total Liabilities** | 47,204,916 | 14.9% |
| | | |
| **Total Equity** | 269,052,808 | 85.1% |
| | | |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

**CONFIDENTIAL**   **TDIT005893**

CONFIDENTIAL

FSD2025-0116

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 169 of 759

| Charitable DAF HoldCo, Ltd | Schedule A.2 |
|---|---|
| DAF Net Asset Value Analysis | Valuation Date: September 30, 2024 |

*Charitable DAF HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
|---|---|---|
| | **9/30/2024** | |
| | **Actual** | **%** |
| **Assets** | | |
| CLO HoldCo, LTD | $269,052,808 | 100.0% |
| **Total Assets** | $269,052,808 | 100.0% |
| **Total Liabilities** | $0 | 0.0% |
| **Total Equity** | $269,052,808 | 100.0% |
| **Total Liabilities & Equity** | $269,052,808 | 100.0% |

TDIT005894

FSD2025-0116

2025-08-19

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 170 of 759

| Charitable DAF HoldCo, Ltd | Schedule B.1 |
|---|---|
| Discount for Lack of Control (DLOC) Analysis | Valuation Date: September 30, 2024 |

*Closed-End Fund Data - Investment Grade Bond Funds*

### Closed-End Fund Data - Investment Grade Bond Funds

| Fund Ticker | Fund Name | Net Asset Value | Market Price | Premium (Discount) |
|---|---|---|---|---|
| BKT | BlackRock Income Trust, Inc. | $12.65 | $12.43 | (1.7%) |
| FMY | First Trust Mortgage Income Fund | $13.05 | $12.49 | (4.3%) |
| VBF | Invesco Bond Fund | $16.87 | $17.01 | 0.8% |
| VLT | Invesco High Income Trust II | $11.74 | $11.53 | (1.8%) |
| JLS | Nuveen Mortgage and Income Fund | $19.54 | $18.43 | (5.7%) |
| JMM | Nuveen Multi-Market Income Fund | $6.68 | $6.36 | (4.8%) |
| DMO | Western Asset Mortgage Opportunity Fund Inc. | $12.28 | $11.97 | (2.5%) |

### Summary Statistics

| | |
|---|---|
| Mean Premium (Discount) | (2.9%) |
| Median Premium (Discount) | (2.5%) |
| Standard Deviation | 2.2% |

*Sources: CEF Connect as of market close September 30, 2024*

TDIT005895

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 171 of 759

| Charitable DAF HoldCo, Ltd | Schedule B.2 |
|---|---|
| **Discount for Lack of Control (DLOC) Analysis** | **Valuation Date: September 30, 2024** |

*Closed-End Fund Data - US General Equity Funds*

| Closed-End Fund Data - US General Equity Funds | | | |
|---|---|---|---|
| **Fund Ticker** | **Fund Name** | **Net Asset Value** | **Market Price** | **Premium (Discount)** |
| ADX | Adams Diversified Equity Fund, Inc. | $24.31 | $21.56 | (11.3%) |
| BIGZ | BlackRock Innovat and Growth Term Trust | $8.54 | $7.55 | (11.6%) |
| CET | Central Securities Corp. | $56.17 | $45.84 | (18.4%) |
| CRF | Cornerstone Total Return Fund | $6.85 | $8.09 | 18.1% |
| GRF | Eagle Capital Growth | $12.03 | $9.88 | (17.9%) |
| FXBY | FOXBY Corp | $27.70 | $16.00 | (42.2%) |
| GDV | Gabelli Dividend & Income | $28.46 | $24.45 | (14.1%) |
| GAM | General American Investors | $62.92 | $53.61 | (14.8%) |
| USA | Liberty All-Star Equity | $7.17 | $7.10 | (1.0%) |
| ASG | Liberty All-Star Growth | $6.03 | $5.61 | (7.0%) |
| JCE | Nuveen Core Equity Alpha | $15.21 | $15.37 | 1.1% |
| RMT | Royce Micro-Cap Trust | $10.84 | $9.61 | (11.3%) |
| STEW | SRH Total Return Fund | $20.51 | $15.80 | (23.0%) |
| SPE | Special Opportunities | $16.37 | $13.91 | (15.0%) |
| FUND | Sprott Focus Trust | $8.91 | $7.70 | (13.6%) |

| Summary Statistics | |
|---|---|
| Mean Premium (Discount) | (12.1%) |
| Median Premium (Discount) | (13.6%) |
| Standard Deviation | 13.0% |

*Sources: CEF Connect as of market close September 30, 2024*

CONFIDENTIAL

TDIT005896

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 172 of 759

| Charitable DAF HoldCo, Ltd | Schedule B.3 |
|---|---|
| Discount for Lack of Control (DLOC) Analysis | Valuation Date: September 30, 2024 |

*DLOC Conclusion*

| Discount for Lack of Control Conclusion | | |
|---|---|---|
| DLOC Determination - Closed End Bond Funds (Mean) | 2.9% | *Schedule B.1* |
| DLOC Determination - Closed End Bond Funds (Median) | 2.5% | *Schedule B.1* |
| | | |
| DLOC Determination - Closed End Equity Funds (Mean) | 12.1% | *Schedule B.2* |
| DLOC Determination - Closed End Equity Funds (Median) | 13.6% | *Schedule B.2* |
| | | |
| **Concluded Discount for Lack of Control** | **8.1%** | |

TDIT005897

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 173 of 759

| Charitable DAF HoldCo, Ltd | Schedule C.1 |
|---|---|
| **Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024** |

*DLOM Determination - Put Option Approach*

### Discount for Lack of Marketability - Put Option Approach

**Option-Pricing Inputs:**

| | | | |
|---|---|---|---|
| Stock Price | **S** | $1.00 | |
| Strike Price | **X** | $1.00 | *(Set to same as stock price)* |
| Expected Life | **T** | 0.75 | *(Years)* |
| Volatility | **s** | 12.3% | *Schedule C.2* |
| Risk-free rate | **R** | 4.18% | *US Treasury Implied Yield for Expected Life* |
| Dividend Yield | **Q** | 0.00% | * |

*Intermediate Calculations:*

| | | | |
|---|---|---|---|
| d1 | 0.34756838 | -d1 | -0.34756838 |
| d2 | 0.24104726 | -d2 | -0.24104726 |
| N(d1) | 0.63591782 | N(d1) | 0.36408218 |
| N(d2) | 0.59524076 | N(d2) | 0.40475924 |

| Black-Scholes | | Black-Scholes | |
|---|---|---|---|
| Call Option Price | $0.06 | Put Option Price | $0.03 |

| **Implied Discount for Lack of Marketability (DLOM)** | **2.8%** |
|---|---|

*\* Distributions not expected in the near future*

TDIT005898

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 174 of 759

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.2
Valuation Date: September 30, 2024

*Put Option Approach - Historical Guideline Company Volatility Summary*

| Historical Volatility Term | Bond Funds | | | | | Equity Funds | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | BKT | FMY | JMM | JLS | VBF | FXBY | GRF | EQS | SPE | RVT |
| 0.5 Years | 10.1% | 10.8% | 9.5% | 9.0% | 8.3% | 20.9% | 16.6% | 43.0% | 11.6% | 20.3% |
| 1 Year | 12.3% | 13.7% | 9.9% | 12.0% | 13.0% | 20.7% | 20.2% | 41.7% | 11.4% | 20.1% |
| 1.5 Years | 11.5% | 13.2% | 10.3% | 11.0% | 12.3% | 25.9% | 23.0% | 42.1% | 10.7% | 19.3% |
| 2 Years | 11.8% | 15.3% | 12.5% | 11.0% | 14.4% | 25.6% | 28.6% | 48.3% | 12.3% | 21.7% |
| 2.5 Years | 12.7% | 15.1% | 13.3% | 11.3% | 14.8% | 25.8% | 32.2% | 48.6% | 13.6% | 23.8% |
| 3 Years | 12.6% | 14.8% | 13.4% | 11.2% | 14.2% | 27.4% | 32.2% | 47.4% | 13.6% | 23.8% |
| 3.5 Years | 12.3% | 14.1% | 12.8% | 10.8% | 13.8% | 113.1% | 30.2% | 45.4% | 13.3% | 22.9% |
| 4 Years | 11.8% | 13.9% | 12.6% | 10.6% | 13.7% | 106.5% | 29.2% | 51.4% | 13.4% | 22.7% |
| 4.5 Years | 11.5% | 13.8% | 14.2% | 12.3% | 14.0% | 101.9% | 29.4% | 52.7% | 15.9% | 24.1% |
| 5.0 Years | 11.8% | 14.5% | 16.6% | 15.9% | 15.5% | 97.5% | 30.1% | 53.5% | 22.0% | 27.6% |

| Historical Volatility Term | Statistical Summary | | | | | |
|---|---|---|---|---|---|---|
| | Low | 25th % | Median | Mean | 75th % | High |
| **0.5 Years** | 8.3% | 9.6% | **11.2%** | 16.0% | 19.4% | 43.0% |
| **1 Year** | 9.9% | 12.0% | **13.3%** | 17.5% | 20.1% | 41.7% |
| 1.5 Years | 10.3% | 11.1% | 12.8% | 17.9% | 22.1% | 42.1% |
| 2 Years | 11.0% | 12.3% | 14.8% | 20.1% | 24.6% | 48.3% |
| 2.5 Years | 11.3% | 13.4% | 15.0% | 21.1% | 25.3% | 48.6% |
| 3 Years | 11.2% | 13.5% | 14.5% | 21.1% | 26.5% | 47.4% |
| 3.5 Years | 10.8% | 13.0% | 14.0% | 28.9% | 28.3% | 113.1% |
| 4 Years | 10.6% | 12.8% | 13.8% | 28.6% | 27.6% | 106.5% |
| 4.5 Years | 11.5% | 13.9% | 15.0% | 29.0% | 28.1% | 101.9% |
| 5.0 Years | 11.8% | 15.6% | 19.3% | 30.5% | 29.5% | 97.5% |

| Concluded Volatility | 12.3% |
|---|---|

*Source: Yahoo Finance*

TDIT005899

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 175 of 759

| **Charitable DAF HoldCo, Ltd** | **Schedule C.3** |
|---|---|
| **Discount for Lack of Marketability (DLOM) Analysis** | **Valuation Date: September 30, 2024** |
| *DLOM Determination - Restricted Stock Studies* | |

| | | | **Restricted Stock Studies** | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Name of Study** | **Study Date** | **From** | **To** | **Sub-Sample** | **Observations** | **Reported Mean** | **Reported Median** |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

TDIT005900

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 176 of 759

| Charitable DAF HoldCo, Ltd | Schedule C.4 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Determination - Restricted Stock Studies Summary Statistics*

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
|  | **Mean** | **Median** |
| **All Studies after 1997 and before 2008** | | |
| **Low** | **9.7%** | **9.0%** |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 2008** | | |
| **Low** | **10.9%** | **9.3%** |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
|  | | |
| **Indicated Discount for Lack of Marketability** | **9.7%** | |

TDIT005901

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 177 of 759

| Charitable DAF HoldCo, Ltd | Schedule C.5 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: September 30, 2024 |

*DLOM Conclusion*

| Discount for Lack of Marketability | | |
|---|---|---|
| DLOM Determination - Put Option Approach | 2.8% | *Schedule C.1* |
| DLOM Determination - Restricted Stock Studies | 9.7% | *Schedule C.4* |
| **Concluded Discount for Lack of Marketability** | **6.3%** | |

TDIT005902

FSD2025-0116
FSD2025-0116

2025-08-19
2025-06-04

**VALUATION ANALYSIS OF
CERTAIN PARTICIPATION SHARES OF
CHARITABLE DAF HOLDCO, LTD**

**AS OF
MARCH 25, 2025**

Prepared for:

Mr. Bart F. Higgins
Attorney
Shields Legal Group

FSD2025-0116
FSD2025-0116

2025-06-04
2025-08-19

PM-17300

865

CONFIDENTIAL

TDIT005903

March 26, 2025

Mr. Bart F. Higgins
Attorney
Shields Legal Group
16400 Dallas Parkway
Dallas, Texas 75248

*RE: Valuation Analysis of Certain Participation Shares of Charitable DAF HoldCo, Ltd*

Dear Mr. Higgins:

Pursuant to your request, we were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[1]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

**DEFINITION AND PREMISE OF VALUE**

The standard of value is fair market value. Fair market value is defined by IRS Revenue Ruling 59-60, 1959-1 C.B. 237 as the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

To develop our conclusion of value for the Subject Interest, we considered all of the factors listed in Revenue Ruling 59-60. These factors include:

1. The nature of the business and its history from inception.

---

[1] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

950 E. State Highway 114 • Suite 120 • Southlake • Texas 76092 • Tel: 817.481.4901 • Fax: 817.481.4905
www.valuescopeinc.com

947

FSD2025-0116
FSD2025-0116

Page 951 of 1530
Page 306 of 687

2025-08-19
2025-06-04

Mr. Bart F. Higgins
March 26, 2025
Page 2

2. The economic outlook in general and the condition and outlook of the specific industry in which it operates.
3. The book value and the financial condition of the business.
4. The earning capacity of the business.
5. The dividend-paying capacity of the business.
6. Whether the enterprise had goodwill or other intangible value.
7. The market prices of the stocks of corporations engaged in the same or similar line of business having their stocks actively traded on an exchange or over the counter.
8. The marketability, or lack thereof, of the securities.

The valuation is conducted under the assumption that the DAF will continue as a going concern.[2]  The liquidation premise of value was considered but deemed inapplicable, as the going-concern premise reflects the "highest and best use" of the Participation Shares.

**SCOPE OF WORK**

To gain an understanding of DAF's operations, we reviewed the Company's financial and operational data and spoke with the Company's management shareholder ("Management"). To understand the environment in which DAF operates, we researched relevant information concerning the US private equity, hedge funds & investment vehicles industry.  We also studied economic conditions as of the Valuation Date and their impact on DAF and the industry.

We valued the Company in accordance with generally accepted valuation standards and included such valuation tests and procedures that we considered necessary under the circumstances.  Our conclusion of value reflects these findings, our judgment and knowledge of the marketplace, and our expertise in valuation.

In performing our work, we were provided with and/or relied upon various sources of information, including (but not limited to):

- Balance sheet for CLO HoldCo, Ltd. as of September 30, 2024

- The Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd, amended and restated as of January 24, 2024

---

[2]   The *International Glossary of Business Valuation Terms* defines "Going Concern" as "an ongoing operating business enterprise," and "Going Concern Value" as "the value of a business enterprise that is expected to continue to operate into the future. The intangible elements of going concern value result from factors such as having a trained workforce, an operational plant, and the necessary licenses, systems, and procedures in place."

VALUESCOPE, LLC

FSD2025-0116
FSD2025-0116

2025-06-04
PM-17302
2025-08-19
867

CONFIDENTIAL                                                        TDIT005905

Mr. Bart F. Higgins
March 26, 2025
Page 3

- Information regarding the Company's history and current operations

- Historical distributions paid to the holders of the Subject Interest

- The organizational structure chart for Charitable DAF HoldCo, Ltd

- Discussions with the Company's Management

- Pepperdine 2024 Private Capital Markets Report, dated June 10, 2024

- IBISWorld Industry Report 52599, *Private Equity, Hedge Funds & Investment Vehicles in the US*, October 2024

The procedures employed in valuing the Subject Interest included such steps that we considered necessary, including (but not limited to):

- An analysis of the general economic environment and industry as of the Valuation Date

- An interview with Management regarding expectations for future distributions

- An application of appropriate valuation techniques and procedures, including the income approach

- An analysis of other pertinent facts and data influencing our conclusion of value

We relied on information received as indicative of the Company as of the Valuation Date. We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation. Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data. Our analysis was based in part on this information, as well as on other data we developed.

VALUESCOPE, LLC

FSD2025-0116
FSD2025-0116

CONFIDENTIAL

PM-17303

2025-06-04
2025-08-19
868

TDIT005906

FSD2025-0116
FSD2025-0116

2025-08-19
2025-06-04

Mr. Bart F. Higgins
March 26, 2025
Page 4

## CONCLUSION OF VALUE

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

### $1,637,192
### ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

We are independent of DAF and have no current or prospective economic interest in the assets that are the subject of this analysis.  Our fee for these valuation services was in no way influenced by the results of our analysis.  The content of this valuation report is subject to the Assumptions and Limiting Conditions and the Appraisal Certification at the end of this report.  If you have any questions concerning this report, please contact Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA.

Very truly yours,



ValueScope, LLC

VALUESCOPE, LLC

FSD2025-0116
FSD2025-0116

PM-17304
2025-06-04
2025-08-19

869

CONFIDENTIAL

TDIT005907

## TABLE OF CONTENTS

**ENGAGEMENT OVERVIEW** ........................................................................................**1**

DESCRIPTION OF THE ASSIGNMENT ...................................................................... 1

SCOPE.................................................................................................................. 1

PROCEDURES....................................................................................................... 1

**DAF OVERVIEW**..........................................................................................................**2**

COMPANY OVERVIEW .......................................................................................... 2

CAPITALIZATION TABLE ....................................................................................... 2

COMPANY STRUCTURE CHART ............................................................................ 3

FINANCIAL POSITION ........................................................................................... 3

SUBJECT INTEREST OVERVIEW............................................................................. 6

**ECONOMIC AND INDUSTRY OVERVIEW** ....................................................................**8**

OVERVIEW OF THE U.S. ECONOMY ...................................................................... 8

OVERVIEW OF THE PRIVATE EQUITY... & INVESTMENT VEHICLES INDUSTRY................. 16

**VALUATION METHODOLOGY** ................................................................................**17**

VALUATION APPROACHES................................................................................... 17

VALUATION METHODS ....................................................................................... 18

SUMMARY OF THE VALUATION APPROACHES AND METHODS ........................... 18

**VALUATION ANALYSIS** ...........................................................................................**20**

INCOME APPROACH ANALYSIS ........................................................................... 20

**CONCLUSION OF VALUE - SUBJECT INTEREST**........................................................**22**

DISCOUNT FOR LACK OF MARKETABILITY ......................................................... 22

PRE-IPO STUDIES................................................................................................ 34

APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST ................. 35

DISCOUNT ADJUSTMENT DISCUSSION............................................................... 36

SUBJECT INTEREST DISCOUNT CALCULATION.................................................... 37

FAIR MARKET VALUE CONCLUSION.................................................................... 38

**ASSUMPTIONS AND LIMITING CONDITIONS** ........................................................**39**

**APPRAISAL CERTIFICATION** ....................................................................................**44**

## TABLE OF SCHEDULES

**VALUATION SUMMARY** ................................................................. SUMMARY SCHEDULE

**HISTORICAL FINANCIAL ANALYSIS** ....................................................................... **A**

HISTORICAL DISTRIBUTIONS TABLE ................................................................. A.1
HISTORICAL DISTRIBUTIONS CHARTS ............................................................. A.2
CLO HOLDCO, LTD - SUMMARY BALANCE SHEET ......................................... A.3

**INCOME APPROACH** ............................................................................................. **B**

DISCOUNTED CASH FLOW (DCF) ANALYSIS .................................................. B.1
SENSITIVITY ANALYSIS – HYPOTHETICAL RISK-FREE BOND ......................... B.2

**DISCOUNT FOR LACK OF MARKETABILITY (DLOM) ANALYSIS** ....................................... **C**

RESTRICTED STOCK STUDIES............................................................................. C.1
RESTRICTED STOCK STUDIES SUMMARY STATISTICS ...................................... C.2
DLOM QUALITATIVE SCORING ....................................................................... C.3
CALCULATION OF MARKETABILITY DISCOUNT ............................................... C.4
DLOM FOOTNOTES AND COMMENTS.............................................................. C.5

FSD2025-0116
FSD2025-0116

2025-08-19
2025-06-04

## ENGAGEMENT OVERVIEW

### DESCRIPTION OF THE ASSIGNMENT

We were retained to perform an independent valuation analysis to determine the fair market value of following participation shares (the "Subject Interest" or the "Participation Shares") of Charitable DAF HoldCo, Ltd ("DAF" or the "Company") as of March 25, 2025 (the "Valuation Date").[3]

- 100 Participation Shares of DAF held by *Highland Dallas Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Kansas City Foundation, Inc.*
- 100 Participation Shares of DAF held by *Highland Santa Barbara Foundation, Inc.*
- 5 Participation Shares of DAF held by *The Community Foundation of North Texas*

This valuation analysis was conducted for internal reporting, transaction support (including the issuance and redemption of shares), dispute resolution, regulatory compliance, or any other context where a fair market valuation is required.

### SCOPE

This report provides a detailed discussion of the valuation analysis we performed and is divided into six major sections. The first section outlines the description, scope, and procedures of our analysis. The second section provides a brief description of the Company and the Subject Interest. The third section includes a discussion of the national economy and the industry in which the Company operates. The fourth section details a discussion of valuation theory and methodology. The fifth section presents our valuation analysis, and the sixth section presents our conclusion of the fair market value of the Subject Interest.

### PROCEDURES

This valuation analysis was conducted in accordance with generally accepted valuation procedures. These procedures included such substantive valuation tests that we considered necessary and appropriate under the circumstances. We relied upon information received regarding the Company's operations and we made limited investigation as to the accuracy and completeness of such information. Our analysis was based in part on this information, as well as on other data obtained through additional research. A full discussion of the methodologies employed appears in the following sections of this report.

---

[3] Our analysis assumes that the Company's financial position remains materially consistent between September 30, 2024 and the Valuation Date.

FSD2025-0116
FSD2025-0116

2025-06-04
2025-08-19
872

CONFIDENTIAL

TDIT005910

## DAF OVERVIEW

### COMPANY OVERVIEW[4]

Charitable DAF HoldCo, Ltd is a Cayman Islands "company limited by shares" formed in October 2011.  Upon the shareholders' acceptance of shares, the shareholders agreed to the provisions of the Memorandum and Articles of Association of Charitable DAF HoldCo, Ltd (as amended from time to time in accordance with the provisions thereof, the "DAF Agreement") and the Companies Law of the Cayman Islands (as amended from time to time, the "Law").  As a holding company, DAF's predominant assets were historically interests in the equity tranches of Collateralized Loan Obligations ("CLOs"), the ownership of which is held through tiered entities that function as unrelated trade or business income tax blocker entities.  In recent periods, however, the DAF's underlying assets have been allocated across a broader and more diverse range of asset classes, including but not limited to cash and cash equivalents, public equity, private equity, private credit, real estate, and other alternative investments.

### CAPITALIZATION TABLE

On February 7, 2025, the Company issued 318 participation shares to *DFW Charitable Foundation*, increasing the total number of participation shares to 623, composed of:

- 318 participation shares held by *DFW Charitable Foundation*
- 100 participation shares held by *Highland Dallas Foundation, Inc.*
- 100 participation shares held by *Highland Kansas City Foundation, Inc.*
- 100 participation shares held by *Highland Santa Barbara Foundation, Inc.*
- 5 participation shares held by *The Community Foundation of North Texas*

All the Company's management shares are held by Mark Patrick.

---

[4]   Based on the Company's memorandum and articles of association and information from Management.

FSD2025-0116
FSD2025-0116

2025-08-19
DAF OVERVIEW 2025-06-04

## COMPANY STRUCTURE CHART



## FINANCIAL POSITION

The Company's only asset stems from its indirect interest in CLO HoldCo, Ltd ("CLO HoldCo"). The Company provided an unaudited balance sheet (the "Balance Sheet") for CLO HoldCo as of September 30, 2024. Based on a review of the Balance Sheet, CLO HoldCo reported total assets of $316.3 million, including $138.4 million of cash & cash equivalents, $175.3 million of other investments, and $2.5 million of other assets. CLO HoldCo reported total liabilities of $47.2 million. CLO HoldCo has net assets of $269.1 million on its books as of September 30, 2024. The Balance Sheet is presented below and in Schedule A.3.

VALUESCOPE, LLC

FSD2025-0116
FSD2025-0116

Page 3
2025-06-04
PM-12309 2025-08-19
874

CONFIDENTIAL
TDIT005912

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 188 of 759

955

FSD2025-0116                         Page 959 of 1530                      2025-08-19
FSD2025-0116                         Page 314 of 687                      2025-06-04
                                                                 DAF OVERVIEW

### CLO HoldCo, Ltd - Summary Balance Sheet

| | Balance Sheet as of: | |
| --- | --- | --- |
| | **9/30/2024** | |
| | **Actual** | **%** |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

The Company paid distributions to the Participation Shareholders of $819,050 in 2019, $619,050 in 2020, $834,450 in 2021, $968,950 in 2022, $950,881 in 2023, and $317,796 in the first three quarters of 2024. Fourth quarter distributions were historically larger than in the first three quarters.[5] Historical Distributions are presented in the following charts and in Schedules A.1 and A.2.

---

[5] Distributions are typically paid a few months following the end of a quarter. As a result, fourth quarter distributions may be paid in the first or second quarter of the following calendar year.

FSD2025-0116
FSD2025-0116



Note: Q4 2024 distributions have not yet been paid.



FSD2025-0116
FSD2025-0116

CONFIDENTIAL

FSD2025-0116
FSD2025-0116

2025-08-19
2025-06-04
DAF OVERVIEW

## SUBJECT INTEREST OVERVIEW

The Subject Interest consists of participation shares, which from time to time may receive discretionary cash distributions intended to support the charitable and expense goals of the holders. The rights and limitations of the participation shares are defined by the DAF Agreement and are directly influenced by the discretion and actions of the Company's Management and directors.

The DAF Agreement grants the directors substantial discretion over distributions, share issuances, governance, and financial transparency, leaving participation shareholders with little influence over corporate decisions. They are subject to potential dilutions, transfer restrictions, and limited access to information, with limited voting rights and no ability to amend governing documents. Given these extensive limitations, the participation shares represent a highly restricted and passive financial interest with limited control or enforceable rights.

### *Limited Rights Over Distributions*

Participation shareholders do not have:

- The right to cause, vote on, or receive pro-rata distributions.
- The right to annual, timed, or guaranteed distributions.
- The right to receive notice of distributions made to other participation shareholders.
- The ability to amend the DAF Agreement to modify distribution rights.

### *Governance and Voting Limitations*

Participation shareholders do not have:

- The right to remove or appoint directors.
- The right to vote on the issuance of additional participation shares, receive notice of such issuance, or exercise pre-emption rights.
- The right to vote on or receive notice of share redemptions.

The appointed directors and Management have full control over the management, operations, and affairs of the Company (subject to requiring a two-thirds majority of the participation shareholders for any material adverse variation or abrogation of rights attached to the participation shares), including the issuance and purchase of shares on terms they determine. Since participation shareholders do not have voting or approval rights over further issuances, additional participation shares may be issued at any time, potentially impacting the economic interests associated with existing shares (noting that

VALUESCOPE, LLC

FSD2025-0116
FSD2025-0116

Page 6
2025-06-04
PM-17312
2025-08-19
877

CONFIDENTIAL

TDIT005915

the purchase of participation shares, or issuance of further shares ranking pari passu or subsequent to the participation shares, is not regarded as causing a material adverse variation or abrogation of the rights of the participation shareholders). Additionally, the transfer of participation shares requires director approval, and directors may reject transfer at their discretion.

### Restrictions on Meetings and Information Access

Participation shareholders do not have:

- The right to receive notice of, attend, speak at, or vote at general meetings.
- The right to inspect company records, accounts, or documents, except at the director's sole discretion (or in the very limited circumstances conferred by law).
- The ability to modify or amend the DAF Agreement in any capacity.

### Restricted Persons Clause

Certain individuals or entities may be classified as Restricted Persons, including:

- Any holder of participation shares in breach of applicable laws.
- Any holder that is not exempt from taxation under Section 501(c)(3).
- Any holder whose participation, in the opinion of the directors, could cause the Company to incur tax, legal, regulatory, administrative, or pecuniary liabilities that it would not otherwise face.

If the directors become aware that any participation shares are held by a Restricted Person, they may, by written notice, require the transfer of such shares in accordance with the DAF Agreement.

For further details, refer to Appendix A for key provisions of the DAF Agreement.



## ECONOMIC AND INDUSTRY OVERVIEW

### OVERVIEW OF THE U.S. ECONOMY

In the third quarter of 2024, the US economy expanded at a faster pace than in the second quarter.  Inflation, which peaked at 8.99% in June 2022, declined to 2.73% by November 2024, reflecting progress toward the Federal Reserve's target.  After a prolonged period of elevated interest rates to curb inflation, signs of a cooling labor market and stable prices led the Fed to cut rates by 25 basis points in December.  The rate hikes that began in 2023 initially resulted in an inverted yield curve, signaling investor concerns about an economic slowdown, but the curve has since normalized following the presidential election.  Meanwhile, US equity markets gained momentum, with major indices ending the year higher, supported by easing inflation and expectations of further monetary policy accommodation.

### Gross Domestic Product[6]

Real gross domestic product (GDP) increased at an annual rate of 3.1 percent in the third quarter of 2024, following an increase of 3.0 percent in the second quarter. The acceleration in real GDP in the third quarter primarily reflected accelerations in exports, consumer spending, and federal government spending.  These movements were partly offset by a downturn in private inventory investment and a larger decrease in residential fixed investment.

---

[6]   U.S. Department of Commerce, Bureau of Economic Analysis, Gross Domestic Product (Third Estimate), Corporate Profits (Revised Estimate), and GDP by Industry, Third Quarter 2024. (Release Date: 12/19/2024).

## *Population*

Population growth is an important driver of long-term growth in an economy.  The total population increased from 335.9 million in November 2023 to 337.7 million in November 2024.[7]  The working-age population (15-64) increased from 208.9 million in November 2023 to 209.0 million in November 2024.[8]

Labor force participation had a sharp decline at the onset of the COVID-19 pandemic.  It partially recovered in just several months and has been trending upward/flat.   In November 2023, the civilian labor force participation rate was 62.8% and stands at 62.5% as of November 2024.[9]

---

[7]   U.S. Bureau of Economic Analysis, Population [POPTHM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[8]   Organization for Economic Co-operation and Development, Working Age Population: Aged 15-64: All Persons for the United States [LFWA64TTUSM647N], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[9]   U.S. Bureau of Labor Statistics, Civilian Labor Force Participation Rate [CIVPART], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

## Employment

Nonfarm payroll employment, according to the Bureau of Labor Statistics (BLS), rose by 227,000 in November 2024 and the unemployment rate changed little at 4.2 percent. Employment trended up in health care, leisure and hospitality, government, and social assistance. Retail trade lost jobs.

The U6 unemployment rate, which includes all marginally attached workers and those employed part-time for economic reasons, increased from 7.0% in November 2023 to 7.7% in November 2024.[10]

Forecasters surveyed by the Federal Reserve Bank of Philadelphia predicted the unemployment rate will increase from 4.0 percent in 2024 to 4.3 percent in 2025 and then decrease to 4.1 percent in 2027.

---

[10] U.S. Bureau of Labor Statistics, Total unemployed, plus all marginally attached workers plus total employed part time for economic reasons [U6RATE], Civilian Unemployment Rate [UNRATE], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

*Inflation*

According to the BLS, The Consumer Price Index for All Urban Consumers (CPI-U) increased 0.3 percent in November on a seasonally adjusted basis, after rising 0.2 percent in each of the following 4 months. Over the last 12 months, the all-items index increased 2.7 percent before seasonal adjustment.[11]

The index for shelter rose 0.3 percent in November and was the main factor in the all items increase. The food index increased 0.4 percent in November. The index for food away from home rose 0.5 percent over the month, while the index for food at home rose 0.3 percent. The energy index fell 0.2 percent over the month, after being unchanged in the preceding month.

The price pressures measure estimates the probability that the personal consumption expenditures price index inflation rate will exceed 2.5% over the next twelve months. This price pressures measure has declined significantly since a year ago, November 2023, declining from 53.20% to 5.10% in November 2024[12].The forecasters predict current-quarter headline CPI inflation will average 2.2 percent at an annual rate, down from the prediction of 2.5 percent in the previous survey[13].



---

[11]    Federal Reserve Bank of St. Louis, Consumer Price Index for All Urban Consumers: All Items in U.S. City Average [CPIAUCSL], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[12]    Federal Reserve Bank of St. Louis, Price Pressures Measure [STLPPM], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[13]    Federal Reserve Bank of Philadelphia, *Survey of Professional Forecasters,* November 15, 2024.

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 196 of 759

963

Page 967 of 1530

Page 322 of 687 ECONOMIC AND INDUSTRY OVERVIEW

FSD2025-0116                                                                    2025-08-19
FSD2025-0116                                                                    2025-06-04

*Interest Rates*

The interest rate on the three-month Treasury bill declined from 5.20% as of December 29, 2023, to 4.23% as of December 31, 2024.[14]  The interest rate on the ten-year Treasury note increased from 3.88% as of December 29, 2023, to 4.58% as of December 31, 2024.[15]

The interest rate on Moody's Aaa-rated corporate bonds increased from 4.65% as of December 29, 2023, to 5.40% as of December 31, 2024.[16] The interest rate on the Moody's Baa-rated corporate bonds increased from 5.49% to 6.00% over the same time.[17]

---

[14]   Board of Governors Federal Reserve System, 3-Month Treasury Bill: Secondary Market Rate [DTB3MS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[15]   Board of Governors Federal Reserve System, 10-Year Treasury Constant Maturity Rate [DGS10], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

[16]   Moody's, Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], Moody's Seasoned Aaa Corporate Bond Yield© [DAAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last January 10, 2025.

[17]   Moody's, Moody's Seasoned Baa Corporate Bond Yield© [DBAA], Moody's Seasoned Baa Corporate Bond Yield© [DBAA], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

In the last twelve months, the yield curve transitioned from being inverted to normal, with the spread between the twenty-year Treasury Bond and the one-year Treasury Bill increasing between December 29, 2023, to December 31,2024 from -0.59% to a positive 0.70%.[18]

### Corporate Profits

Profits from current production (corporate profits with inventory valuation and capital consumption adjustments) decreased slightly by 15 billion in the third quarter of 2024 from the second quarter of 2024.

---

[18]    U.S. Department of the Treasury, *Daily Treasury Yield Curve Rates*, last accessed January 10, 2025.

### Stock Markets[19]

The stock markets gained momentum from December 29, 2023, to December 31, 2024. The S&P 500 Index (SPY) closed at 475.31 on December 29, 2023, and closed higher at 586.08 on December 31, 2024.  The Dow Jones Industrial Average Index (DIA) closed at 376.87 on December 29, 2023, and closed higher at 425.50 on December 31, 2024.  The NASDAQ Composite Index (QQQ) closed at 409.52 on December 29, 2023, and closed higher at 511.23 on December 31, 2024.  In the graph below, the December 30, 2022, values were set to 100.

### Construction & Housing Starts

Construction spending and housing starts are two other important indicators for the economy.  Construction spending may indicate the sentiment in real estate markets and the soundness of the economy while housing starts are an alternative indicator of consumer sentiment.  Increases in demand for newly constructed homes can lead to job growth in the construction industry, increased demand for appliances and furniture, and have ripple effects throughout the economy.  Housing starts decreased from 1.510 million units in November 2023 to 1.289 million units in November 2024.[20]  Construction spending, a seasonally adjusted annual figure, increased from $2.09 trillion in November 2023 to $2.15 trillion in November 2024.[21]

---

[19]   CapIQ Database, last accessed January 10, 2025.
[20]   U.S. Census Bureau and U.S. Department of Housing and Urban Development, Housing Starts, New Privately-Owned Housing Units Started [HOUST], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.
[21]   U.S. Census Bureau, Total Construction Spending, Seasonally Adjusted Annual Rate [TTLCONS], retrieved from FRED, Federal Reserve Bank of St. Louis, last accessed January 10, 2025.

***Consumer Sentiment***

The University of Michigan Survey of Consumers reported that the Index of Consumer Sentiment has increased from 61.30 a year ago in November 2023 to 71.80 in November 2024. Although it has increased significantly from a year ago, the index is still well below the pre-COVID high of 101.0 in February 2020.[22] The index is based on a survey of consumer perceptions of present economic conditions and expectations of future conditions.  The survey is based on a sample of 500 phone interviews consisting of 50 core questions conducted across the continental U.S.  This is considered a leading indicator of future consumer expenditures and economic activity.

---

[22]   University of Michigan, *Surveys of Consumers*, November 2024

**OVERVIEW OF THE PRIVATE EQUITY, HEDGE FUNDS & INVESTMENT VEHICLES INDUSTRY**[23]

This industry is composed of private equity funds, hedge funds, closed-end funds, unit investment trusts and other financial vehicles.  Entities in this industry manage securities or other assets on behalf of shareholders, unit holders or other beneficiaries to achieve high returns on targeted investments.  This industry excludes insurance and employee-benefit funds, open-end investment funds and trusts, estates and agency accounts.

*Executive Summary*

In recent years, industry assets have become increasingly integral to institutional investors' portfolios and the larger asset management market. Institutional investors are individuals or organizations that trade securities in such substantial volumes that they qualify for lower commissions and fewer protective regulations since it's assumed that they're knowledgeable enough to protect themselves. Increasing demand from institutional investors has contributed to the surge in the industry's assets under management (AUM) and revenue during the current period.

In recent years, the industry has continued to enmesh itself more deeply within the broader financial ecosystem despite the challenges posed at the onset of the period. The pandemic, mainly in the first quarter of 2020, contributed to revenue declines for many operators. Many portfolios, previously thought to be sound investments, were reevaluated and businesses pivoted their strategies due to the unprecedented nature of the crisis. However, as inflation was rampant in the latter part of the period, the FED increased interest rates to control high inflation, although as inflationary pressures eased in 2024, the FED cut interest rates, which will increase liquidity in financial markets. The Fed is anticipated to cut rates further in 2025, increasing liquidity and driving the shift of investments into equities from fixed-income securities. Overall, over the past five years, industry revenue grew at a CAGR of 4.2% to $310.1 billion, including an increase of 2.5% in 2025 alone. Industry profit has climbed significantly and will comprise 49.6% of revenue in the current year.

Industry revenue will grow at a CAGR of 2.7% to $353.7 billion over the five years to 2030. The Federal Reserve is anticipated to cut interest rates as inflationary pressures continue to ease. These declining interest rates will increase liquidity in the markets. Private equity firms and hedge funds will have less difficulty raising capital for investments. As characteristics of the financial system change in light of post-financial crisis banking regulations and regulators' recognition of the importance of hedge funds within the financial system, hedge funds will likely experience heightened oversight.

---

[23]   IBISWorld Industry Report 52599, March 2025, *Private Equity, Hedge Funds & Investment Vehicles in the U.S.*

## VALUATION METHODOLOGY

There are three conceptually distinct methodologies that can be applied to estimate indications of value of a business or asset: (a) the income approach, (b) the market approach, and (c) the cost approach.

**VALUATION APPROACHES**

### *Income Approach*

The income approach quantifies the present value of anticipated future income generated by a business or an asset.  Forecasts of future income require analyses of variables that influence income, such as revenues, expenses, and taxes.  One form of the income approach, the discounted cash flow (DCF) analysis, defines future economic income as net cash flow and takes into account not only the profit-generating abilities of a business but also the investment in capital equipment and working capital required to sustain the projected net cash flow.  The forecasted net cash flow is then discounted to present value using an appropriate rate of return or discount rate.  The income approach is unique in its ability to account for the specific contribution to the overall value of various factors of production.

### *Market Approach*

The market approach considers the implied pricing in third-party transactions of comparable businesses or assets.  Transactions are analyzed in order to identify pricing patterns or trends that can be used to infer value on the subject business or asset.  Adjustments are made to the transaction data to account for relative differences between the subject and the comparable transactions.  The primary strength of the market approach is that it offers relatively objective pricing evidence from the market at large and, aside from certain adjustments to the transaction data, requires few assumptions to be made.

### *Asset-Based (Cost) Approach*

The asset-based approach considers the value of a business or security based on the value of its assets net of its liabilities.  Replacement cost is often a primary indicator of the value of a business' assets.  The asset-based approach is based on the reasoning that a prudent investor would not pay more for a business or asset than the cost to the investor to replace or re-create it.  Historical cost data and reported book values are often used as initial indications of value, with certain adjustments made for physical deterioration, obsolescence, input costs, appreciation, or other factors.  The asset-based approach makes fewer assumptions than the income approach, but its primary limitation is its inability to capture the value of many categories of intangible assets.

CONFIDENTIAL  TDIT005926

969

FSD2025-0116
FSD2025-0116

Page 973 of 1530
Page 328 of 687

2025-08-19
2025-06-04

VALUATION METHODOLOGY

## VALUATION METHODS

The following are common valuation methods used under the three approaches:

A. Income Approach
1. Discounted Cash Flow Method (multi-period model)
2. Direct Capitalization Method (single period model)
3. Excess Earnings Method

B. Market Approach
1. Guideline Public Company Method
2. Merger and Acquisition Method

C. Asset-Based Approach
1. Reproduction Cost Method
2. Replacement Cost Method
3. Net Asset Value Method

## SUMMARY OF THE VALUATION APPROACHES AND METHODS

For the valuation of non-controlling interests in holding companies such as DAF, the asset-based approach is most commonly used.  When applied to such companies, the approach consists of measuring the underlying net asset value (NAV) of an entity (the fair market value of the entity's assets less the fair market value of its liabilities).  The NAV is then discounted as appropriate to determine the fair market value of the fractional interest in the entity.

However, in the case of the participation shares under consideration, the asset-based approach is not applicable.  These shares do not confer control and only have a claim in respect of the underlying assets in a winding up.  Unlike equity interests that derive value from an allocable portion of the entity's net assets, the economic benefits of these shares are contingent upon discretionary distributions by the director.  As such, their value is not directly tied to the entity's NAV, and an alternative valuation approach is required to appropriately reflect their characteristics and economic reality.[24]

Given the nature of the participation shares, the income approach, specifically the discounted cash flow (DCF) method, is the most appropriate valuation methodology.[25]

---

[24] Previous valuations conducted by ValueScope did not account for the rights of the participation shares under the applicable law, specifically that these shares confer an extremely limited enforceable claim to the entity's underlying NAV.

[25] The market approach was considered but deemed inapplicable due to the absence of comparable transactions involving securities with characteristics similar to the participation shares.

VALUESCOPE, LLC

FSD2025-0116
FSD2025-0116

Page 18
PM-17324

2025-06-04
2025-08-19

889

CONFIDENTIAL

TDIT005927

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 203 of 759

970

FSD2025-0116

Page 974 of 1530

2025-08-19

FSD2025-0116

Page 329 of 687

VALUATION METHODOLOGY 2025-06-04

This approach estimates the present value of expected future distributions, if any, based on reasonable assumptions regarding the manager's discretion in making such distributions.  If no future distributions are expected, the value of the Subject Interest would be nominal.  The DCF method captures the time value of money and the risk associated with the uncertainty of future distributions, providing a more accurate measure of the fair market value of the Participation Shares.

VALUESCOPE, LLC

Page 19

FSD2025-0116

2025-06-04

FSD2025-0116

PM-17325

2025-08-19

890

CONFIDENTIAL

TDIT005928

## VALUATION ANALYSIS

### INCOME APPROACH ANALYSIS

The income approach estimates the fair market value of an interest based on the present value of expected future economic benefits.  In the case of the Participation Shares, these economic benefits are exclusively tied to discretionary distributions made by the director, rather than earnings or cash flows of the DAF's underlying assets.  The approach involves forecasting expected future distributions and discounting them to present value using a rate of return that reflects the risk associated with the uncertainty and discretionary nature of these payments.  The resulting present value represents the fair market value of the Subject Interest.

#### Discounted Cash Flow Method

We developed a DCF model to determine the fair market value of the Subject Interest as of the Valuation Date.  The DCF method projects the distributions that the Participation Shareholders are expected to receive.  Each projected distribution is discounted to present value using a rate that reflects the risk associated with the uncertainty and discretionary nature of these payments.

#### Projected Distributions

Distributions to the holders of the Subject Interest were projected based on discussions with Management and a review of historical distributions.  Management indicated that the timing and size of future distributions will be discretionary, and that DAF does not intend to establish reserves for distributions.

Despite this discretion, Management currently intends to maintain distributions to the holders of the Subject Interest at levels consistent with those paid over the past 12 to 24 months.  We projected distributions to occur quarterly, with the next four quarters reflecting the average distribution of the corresponding quarters from the prior two years, totaling approximately $950,000.  Beyond this period, distributions were assumed to grow at an annual rate of 2.5%, consistent with expected inflation, in perpetuity.

#### Cost of Equity

A cost of equity of 68.3% was applied to discount the expected discretionary distributions to the holders of the Subject Interest, reflecting their high-risk profile, extremely limited claim on underlying NAV, and absence of control over distributions.  This rate was selected based on the third quartile of required returns for pre-seed venture capital investments from the Pepperdine 2024 private capital markets report, aligning with the speculative nature of potential cash flows, significant legal and governance risks, and the

inability to force a sale or liquidity event. The Subject Interest exhibits characteristics similar to early-stage equity investments, where cash flows are highly uncertain, illiquidity risks are substantial, and investor returns are largely dependent on discretionary managerial decisions. Given these factors, a higher-end venture capital return benchmark was deemed appropriate.

### Conclusion – Income Approach Analysis

Based on the forecasts and methodologies presented in this analysis, the income approach indicated a minority and marketable value of the Subject Interest of $2,045,531 as of the Valuation Date.

This conclusion of value implies a discount for lack of control (DLOC) of 99.2%, calculated as the concluded marketable value of the Subject Interest divided by the NAV of CLO HoldCo.[26]

To assess the impact of the discount rate, a sensitivity analysis was performed under the hypothetical assumption that projected distributions followed the risk profile of a risk-free perpetual bond with identical expected cash flows. In this scenario, a 4.65% discount rate, equivalent to the 30-year US Treasury yield as of the Valuation Date, was applied. Under this assumption, the minority, marketable value of the Subject Interest would be $44.7 million, resulting in an implied DLOC of 83.4%. However, this analysis does not reflect the substantial risks associated with the Subject Interest.

---

[26] Discounts for lack of control are applied based on the premise that an asset or interest in an entity in which an owner lacks decision making control would sell for less to a hypothetical buyer than an identical asset or interest which the same owner controls. Lack of control removes the investor's ability to make key decisions, including how to best manage the business, whether and how much cash to distribute to shareholders, or whether to pursue an acquisition or sale of the business.

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 206 of 759

973
Page 977 of 1530
Page 332 of 687

FSD2025-0116                                                                                2025-08-19
FSD2025-0116                                                                                2025-06-04

## CONCLUSION OF VALUE - SUBJECT INTEREST

Based on the methodologies presented in this analysis, it is our opinion that the value of the Subject Interest on a minority and marketable basis, as of the Valuation Date, can reasonably be stated as $2,045,531.

### DISCOUNT FOR LACK OF MARKETABILITY

A discount for lack of marketability (DLOM) is necessary to determine the fair market value of the Subject Interest, as it cannot be readily sold or liquidated in an active market. The absence of a public exchange and transfer restrictions further constrain liquidity.  A review of restricted stock studies was conducted to support the DLOM, examining the price differences between freely traded shares and comparable shares with resale restrictions.  These studies provide empirical evidence of the impact of illiquidity on value, reinforcing the rationale for applying a marketability discount.

### *Restricted Stock Studies*

The restricted stock studies reviewed included data from 1966 through 2010.  The studies analyzed the difference in prices between publicly traded stock and restricted stocks of the same entity.  The restricted stocks were identical to the traded stock except for marketability.  A summary of the mean and median discounts of the restricted stock studies is presented in the following figure.

VALUESCOPE, LLC
Page 22
PM-17328

FSD2025-0116                                                                                2025-06-04
FSD2025-0116                                                                                2025-08-19
893

CONFIDENTIAL                                                                                TDIT005931

FSD2025-0116

FSD2025-0116 CONCLUSION OF VALUE - SUBJECT INTEREST 2025-06-04

**Summary of Restricted Stock Studies**

**SEC Institutional Investor Study[27]**

The SEC Institutional Investor Study is a comprehensive restricted stock study with 398 transactions from January 1, 1966, through October 22, 1969. The study analyzed differences in discounts based on the following categories: trading market, type of institution purchasing the security, transaction size, sales of the issuer, and earnings of the issuer. The study found significant differences in discounts for type of exchange, sales, and earnings of the issuer. Stocks listed on the major exchanges had lower

---

[27] U.S. Securities and Exchange Commission, "Institutional Investor Report," 92nd Congress, 1st Session, House Documents No. 92-4, Part 5, 1971.

FSD2025-0116 2025-06-04

FSD2025-0116 2025-08-19

894

CONFIDENTIAL TDIT005932

discounts than smaller exchanges and over-the-counter stocks.  The study found higher discounts for companies with smaller sales and lower earnings.

### Johnson & Racette Study[28]

Richard Johnson and George Racette performed a study on restricted securities purchased by registered investment companies between 1967 and 1973.  The study included 86 observations sent from 75 investment companies that met the selection criteria.  Johnson and Racette's analysis indicated an average marketability discount of 34%, in line with the range with the most common observations of 30-40%.

### Gelman Study[29]

Milton Gelman of National Economic Research Associates, Inc. conducted a study of 89 restricted stock transactions executed by four investment companies from 1968 to 1970.  The investment companies were formed in 1968 to specialize in restricted securities.  A significant portion of the funds of the investment companies were invested in restricted stock transactions consisting of shares of large and small companies listed on large and small exchanges, over the counter, purchased directly from the companies, or from selling stockholders.  Gelman's analysis found mean and median discounts of approximately 33%.  In addition, 59% of the transactions had discounts of 30% or more and 36% of the transactions had discounts of 40% or more.

### Trout Study[30]

Robert R. Trout, a principal of Trout, Shulman & Associates, analyzed 60 transactions involving the purchase of restricted stock by mutual funds from 1968 to 1972.  Trout performed a regression analysis to determine the relationship between discounts and certain variables such as exchange listing, number of shares outstanding, and transaction size relative to total outstanding shares.  Trout's findings suggested an intercept or implied mean and median discount of 43.5%.

---

[28]   Richard D. Johnson and George A. Racette, "Discounts on Letter Stock Do Not Appear to Be a Good Base on Which to Estimate Discounts for Lack of Marketability on Closely Held Stocks," *Taxes—The Tax Magazine*, August 1981, 574-581.

[29]   Milton Gelman, "An Economist-Financial Analyst's Approach to Valuing Stock of a Closely-Held Company, "*The Journal of Taxation*, June 1972, 353-354.

[30]   Robert R. Trout, "Estimation of the Discount Associated With the Transfer of Restricted Securities," *Taxes—The Tax Magazine*, June 1977, 381-385.

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 209 of 759

976
Page 980 of 1530
Page 335 of 687

FSD2025-0116
FSD2025-0116                    CONCLUSION OF VALUE - SUBJECT INTEREST      2025-08-19
                                                                           2025-06-04

### Moroney Study[31]

Robert E. Moroney of Moroney, Beissner & Co. in Houston presented his restricted stock study to the Texas CPA Tax Institute in November 1972.  The study was subsequently published in 1973.  The analysis focused on 146 transactions in restricted securities by 10 registered investment companies.  The discounts ranged from a 30% premium to a 90% discount with a mean and median discount of 35.8% and 32.8%, respectively.

### Maher Study[32]

Michael Maher, a former estate and gift tax agent with the Internal Revenue Service, published his study results in 1976.  The study observed discounts for 34 restricted stock transactions from 1966 to 1973.  The results of his study suggested a mean discount for his total and adjusted analyses of 35.4% and 34.7%, respectively.

### Standard Research Consultants Study[33]

A 1983 study by two Standard Research consultants, William F. Pittock and Charles H. Stryker, CPA, observed discounts relating to 28 private placements of common stock from October 1978 to June 1982.  The discounts varied from 7% to 91% with a median of 45%.  The results of the study tend to suggest higher discounts for companies with smaller revenues.

### Wruck Study[34]

Karen Wruck's Harvard University study on firm value analyzed 83 sales of unregistered securities from 1979 to 1984, 37 of which were observable and included in the study's sample.  On average, the offering price of the unregistered securities was set at 86.5% of the market price of the stock on the day before the announcement, indicating a discount of 13.5%.  The median discount indicated was similar at 12.2%.

---

[31]   Robert E. Moroney, "Most Courts Overvalue Closely Held Stocks," *Taxes—The Tax Magazine*, March 1973, 144-155.

[32]   J. Michael Maher, "Discounts for Lack of Marketability for Closely Held Business Interests," *Taxes—The Tax Magazine*, September 1976, 562-570.

[33]   William F. Pittock and Charles H. Stryker, "Revenue Ruling 77-287 Revisited," *SRC Quarterly Reports*, Spring 1983, 1-3, cited in Quantifying Marketability Discounts by Z. Christopher Mercer, 63.

[34]   Karen H. Wruck, "Equity Ownership Concentration and Firm Value, Evidence From Private Equity Financings," *Journal of Financial Economics*, Vol. 23. 1989, 3-1.

Case 19-34054-sgj11 Doc 4627-6 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc
Exhibit 211 Part 02 Page 210 of 759

977

FSD2025-0116       **Page 981 of 1530**       2025-08-19
FSD2025-0116       **Page 336 of 687** CONCLUSION OF VALUE - SUBJECT INTEREST 2025-06-04

### FMV Opinions Study[35]

The FMV Study included over 230 transactions from 1980 through April 1997, the date of the most recent amendment of Rule 144. The mean and median discounts were 22.3% and 20.1%, respectively. The authors of the study made the following generalization regarding their analysis:

- Companies with higher revenues resulted in lower discounts and vice versa
- Companies with unrestricted stock traded on exchanges exhibited lower discounts
- Discounts were higher for blocks exceeding 10% of ownership
- Discounts for companies with capitalization under $50 million ranged from 30% to 40%

### Barclay, Holderness, Sheehan Study[36]

Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan's study observed private placements of large-percentage blocks of stock from 1980 to 1996. Specifically, the study analyzed private placements to a variety of different types of investors, namely active investors, passive investors, and management. Active investors were found to be willing to pay higher prices in their placements, indicating lower discounts, while management placements had the highest discounts, although they were found to not have a statistically significant difference from private placements. In total, the average discount across all private placements was 18.7% while the median discount was 17.4%.

### Hertzel & Smith Study[37]

A 1993 study by Michael Hertzel and Richard L. Smith analyzed private placements between 1980 between 1987. The study's sample included private placements of 106 companies listed on the NYSE and AMEX exchanges as well as OTC firms. While the mean and median indicated discounts were 20% and 13%, respectively, more than 35% of the private placements observed had discounts greater than 25%.

---

[35] Hall, Lance S., and Timothy C. Polacek, "Strategies for Obtaining the Largest Valuation Discounts," *Estate Planning*, January/February 1994. pp. 38-44.

[36] Michael J. Barclay, Clifford G. Holderness, and Dennis P. Sheehan, "Private Placements and Managerial Entrenchment," *The Journal of Corporate Finance*, 2007, Vol. 13, Issue 4, 461-484.

[37] Michael Hertzel and Richard L. Smith, "Market Discounts and Shareholder Gains for Placing Equity Privately," *The Journal of Finance*, Vol. 48, No. 2. June 1993, 459-485.

## Management Planning Study[38]

Management Planning, Inc.  published the results of a study performed from 1980-1996 by Robert P. Oliver, ASA and Roy H.  Meyers, ASA, CFA.  They started with a base on 231 transactions and looked at discounts from the total sample, discounts from 53 transactions without registration rights, and discounts from 27 transactions with registration rights.  A summary of the mean and median discounts from their study is presented in the following table.

**Results of Management Planning Study**

| Discount | Entire Sample of 231 Transactions | 53 Transactions without Registration Rights | 27 Transactions with Registration Rights |
|---|---|---|---|
| Low | N/A | 3.0% | N/A |
| Mean | 29.0% | 27.0% | 12.8% |
| Median | 28.0% | 25.0% | 9.1% |
| High | N/A | 58.0% | N/A |

The authors cite the difference between discounts with and without registration rights as evidence of the lack of marketability on an investment.  Certain factors were also cited by the authors as the most influential in determining discounts.  The factors include:

- Companies with higher revenues tend to have lower discounts
- Companies with higher earnings tend to have lower discounts
- Higher per share prices tend to have lower discounts
- Lower price volatility tends to result in lower discounts
- Block sizes representing a higher percentage of average trading volume tend to have higher discounts
- Large dollar blocks tend to have lower discounts

## Hertzel, Lemmon, Linck, Rees Study[39]

A 2001 study by Michael Hertzel, Michael Lemmon, James Linck, and Lynn Rees analyzed private placements from 1980 to 1996.  A total of 619 private placements were ultimately selected for the sample, which primarily consisted of small-cap, technology companies as 79% of the sample companies were traded on the NASDAQ exchange and the mean market value of equity for the companies was $188 million.  Of the 619 private

---

[38]   A Study by Management Planning Inc. published in Z. Christopher Mercer, "Analysis of Restricted Stocks of Public Companies 1980-1995," *Quantifying Marketability Discounts*, Peabody Publishing, 1997, Chapter 12, 345-370.  Retrieved from John J. Stockdale Sr., *BVR's Guide to Discounts for Lack of Marketability*. 5th ed. Vol. 1. Portland, OR: Business Valuation Resources, LLC, 2013.

[39]   Michael Hertzel, Michael Lemmon, James S. Linck, and Lynn L. Rees, "Long-Run Performance Following Private Placements of Equity," workpaper, Dec. 21, 2001.

placements in the sample, 404 had sufficient information and disclosures to determine relevant discounts. The study indicated a mean discount of 16.5% and a median discount of 13.4%.

### Wruck & Wu Study[40]

A study by Karen Wruck and YiLin Wu in 2008 supplemented Ms. Wruck's 1989 study and analyzed private placements of companies between 1980 and 1999. 1,976 private placements were selected in the sample. Of these, 1,854 had data for observed discounts. The study found a mean discount of 11.33% and a median discount of 10.96%.

### Angrist, Curtis, Kerrigan (MPI) Study[41]

A study by Ezra Angrist, Harry Curtis, III, CFA, ASA, and Daniel Kerrigan, CFA in 2011 grouped a total of 402 transactions of unregistered stock into four groups based on the timing of the issuances in respect to the changes in holding period restrictions per Rule 144 as follows:

**Results of Angrist, Curtis, Kerrigan (MPI) Study**

| Period | Observations | Mean Discount | Median Discount |
|---|---|---|---|
| Pre-1990 | 79 | 30.5% | 32.3% |
| 1990 - Apr 1997 | 110 | 25.1% | 22.5% |
| May '97 - Feb '08 | 164 | 20.8% | 16.6% |
| Feb '08 - Dec '08 | 49 | 5.9% | 5.0% |
| Total | 402 | 22.1% | 19.6% |

Results of the study show that as restriction periods have declined, so have discounts.

### Willamette Management Associates Study[42]

Willamette performed an analysis of 33 private placements of restricted stock from January 1, 1981 through May 27, 1984. There was a brief overlap in the latter part of the period included in the Standard Research Consultants Study. The Willamette study resulted in a mean discount of 31.2%.

---

[40] Karen H. Wruck and Yi Lin Wu, "Business Relationships, Corporate Governance, and Performance: Evidence From Private Placements of Common Stock," *Journal of Corporate Finance*, 15, 2009, 30-47.

[41] Ezra Angrist, Harry Curtis III, and Daniel Kerrigan, "Regression Analysis and Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 30, No. 1 Spring 2011, 36-48.

[42] Shannon Pratt, Robert F. Reilly, and Robert P. Schweihs, *Valuing a Business*, 2nd edition, 247.

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 213 of 759

980
Page 984 of 1530

FSD2025-0116                          Page 339 of 687                          2025-08-19
FSD2025-0116                       CONCLUSION OF VALUE - SUBJECT INTEREST          2025-06-04

### Silber Study[43]

William L.  Silber, a professor of finance and economics at the Stern School of Business at New York University analyzed 69 private placements from 1981 through 1989.  Silber's study results ranged from a 12.7% premium to an 84% discount with a mean discount of 33.8%.  Silber also cited in his findings that discounts are larger when the block of restricted stock is large relative to the total shares outstanding and the dollar size is inversely related to the discount.

### Krishnamurthy, et al. Study[44]

Srinivasan Krishnamurthy, Pual Spindt, Venkat Subramaniam, and Tracie Woidtke's 2001 study analyzed private placements from 1983 to 1992.  The study performed different discount calculations for the following classifications: 1) restricted shares, 2) shares with registration pending, 3) shares not known to be restricted, and 4) shares with pending registration or not known to be restricted (groups 2 and 3 combined).  The mean discounts for Groups 1-4 were 34.0%, 23.3%, 15.4%, and 16.0%, respectively.  The overall mean discount was 19.4%.

### Wu Study[45]

YiLin Wu's study on private placements was published in the Journal of Financial Economics in 2004.  The study analyzed 301 private placements taking place from 1986 to 1997.  Mean and median discounts of 8.7% and 19.8%, respectively, were observed.

### Bajaj Study[46]

The Bajaj study expands on previous restricted stock studies, namely by Wruck and by Hertzel and Smith.  This study analyzed 88 private placements occurring between 1990 and 1995.   The 88 observations revealed results ranging from a premium of approximately 14% to a discount of 68%, with mean and discounts of 22% and 21%, respectively.  The authors note four characteristics to consider regarding the target firm and private placement itself when analyzing discounts: the percentage of total shares offered, business risk, financial distress, and total proceeds.

---

[43]  William L. Silber, "Discounts on Restricted Stock: The Impact of Illiquidity on Stock Prices," *Financial Analysts Journal*, July-August 1991, 60-64.

[44]  Srinivasan Krishnamurthy, Paul Spindt, Venkat Subramaniam, and Tracie Woidtke, "Does Investor Identity Matter in Equity Issues? Evidence From Private Placements," *Journal of Financial Intermediation*, 14, 2005, 210–238.

[45]  Yi Lin Wu, "The Choice of Equity Selling Mechanisms," *Journal of Financial Economics*, 74, 2004, 93-119.

[46]  Mukesh Bajaj, David J. Denis, Stephen P. Ferris, and Atulya Sarin, "Firm Value and Marketability Discounts," *Journal of Corporation Law*, Vol. 27, Fall 2001, 89-115.

### Johnson Study (Business Valuation Review)[47]

Bruce A. Johnson, ASA of Munroe, Park & Johnson conducted a restricted stock study from 1991 to 1995. The study included 72 private placements with results varying from a 10% premium to a 60% discount with a mean discount of 20%. Johnson also cited four important factors to consider when evaluating potential discounts: positive net income, sales volume, transaction value, and net income strength.

### Finnerty Study[48]

John D. Finnerty, professor of finance at Fordham University, performed two studies to compare the impact of the changes in law regarding restriction periods for private placements that occurred in 1997 and 2008. The first study focused on private placements from 1991 to 1997 and resulted in mean and median discounts of 26% and 20%, respectively. The second study focused on private placements from 1997 to 2008 and resulted in mean and median discounts of 22% and 16%, respectively.

### Chaplinsky Purchase Discount and Warrant Study[49]

Susan Chaplinsky's and David Haushalter's 2010 study analyzed private placements with a concentration on contract terms. The study asserts that companies that are riskier and have poorer performance more commonly have private placement contracts with contingency terms rather than just offering a pure discount. The indicated mean discount considering only the purchase discount was 19%, and the median was 15%. The indicated mean discount considering purchase discounts as well as warrants was 17%, and the median was 14%.

### Brophy PIPE Study[50]

David J. Brophy, Paige P. Ouimet, and Clemens Sialm of the University of Michigan performed a 2006 study that compared the effects of issuing private placements to hedge fund investors versus other investors. The study indicated a mean discount of 14% when private placements were issued to hedge funds, but the mean discount when the issuance involved other investors was just 9%.

---

[47] Bruce A. Johnson, "Quantitative Support for Discounts for Lack of Marketability," *Business Valuation Review*, Vol. 18, No. 4, December 1999, 152-155.

[48] John D. Finnerty, "An Average-Strike Put Option Model of the Marketability Discount," *The Journal of Derivatives*, April 19, 2012, 53-69.

[49] Susan Chaplinsky and David Haushalter, "Financing Under Extreme Risk: Contract Terms and Returns to Private Investments in Public Equity," *Review of Financial Studies*, 2010, 23 (7), 2,789-2,820.

[50] David Brophy, Paige Ouimet, and Clemens Sialm, "Hedge Funds as Investors of Last Resort?" workpaper, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=782791.

## Columbia Financial Advisors Study[51]

This study focused on the effect of the Rule 144 holding period reduction to one year. The study considered two periods: January 1, 1996, to April 30, 1997, and May 1, 1997, to December 31, 1998.  The one-year holding period became effective April 29, 1997.  A summary of the study results is presented in the following table.

**Summary of Columbia Financial Advisors Study**

|  | January 1, 1996 to April 30, 1997 | May 1, 1997 to December 31, 1998 |
|---|---|---|
| Number of Transactions | 23 | 15 |
| Low | 0.8% | 0.0% |
| Mean | 21.0% | 13.0% |
| Median | N/A | 9.0% |
| High | 67.5% | 30.0% |

## Meidan Study[52]

Danny Meidan's 2006 study observed PIPE transactions between 1996 and 2003.  The study categorized a total of 1,726 total private placement transactions into three groups: placements issued at discounts greater than 30%, placements issued between a 30% discount and 5% premium, and placements issued at a premium greater than 5%.  The majority of these transactions fell into the 30% discount to 5% premium category at 1,278 placements, or roughly 74% of the total sample.  The weighted average of the mean discounts was calculated as 9.8%.

## Verdasca Study[53]

Andrew Verdasca of the Leonard N. Stern School of Business of New York University performed a 2007 study on a sample of 771 private placement transactions.  The study found a discount range from a 78% discount to a 93% premium, but both the mean and median results indicated discounts of approximately 10%.

---

[51] Kathryn F. Aschwald, "Restricted Stock Discounts Decline as Result of 1-Year Holding Period," *Shannon Pratt's Business Valuation Update*, Vol. 6, No. 5, May 2000, 1-5.

[52] Danny Meidan , "The Informativeness of Offer Characteristics Versus Investor Identity in PIPE Transactions," April 2, 2006, papers.ssrn.com/sol3/papers.cfm?abstract_id=894689.

[53] Andrew Verdasca , "Common Stock PIPE Discounts and Long-Term Performance," April 2, 2007, www.stern.nyu.edu/cons/groups/content/documents/webasset/uat_024319.pdf.

### Billett & Floros Study[54]

Matthew T. Billett and Ioannis V. Floros' 2012 study focuses on two key features of financial relationships, contract terms and investor identity, in regard to private placements between 2001 and 2008. These factors were found to both complement and substitute for the other depending on individual circumstances. By analyzing 12,004 transactions in the PlacementTracker and PrivateRaise databases, the study concluded a median discount of 26.7%.

### Stout Risius Ross Study[55]

Aaron M. Stumpf, CPA/ABV, Robert L. Martinez, and Christopher T. Stallman of the valuation firm Stout Risius Ross performed a study of restricted stock transactions from September 2005 through May 2010, focusing on discounts associated with shorter holding periods. The chosen time period includes transactions both before and after Rule 144 implementation. The study found that for all transactions considered, the average and median discounts were 10.9% and 9.3%, respectively. Stout Risius Ross also found that the most significant and reliable factors influencing discounts were subject company volatility, block size, dividends, profitability, growth, and size.

### Harris-Trugman Study[56]

William Harris, AM of Trugman Valuation Associates, Inc.'s study was performed to analyze the impact of the economic recession on implied restricted stock discounts and the statistical relationships between implied restricted stock discounts and various company-specific variables. The study originally included 80 transactions of restricted stock sales that took place in 2007-2008. Due to the volatility of the Rule 144 holding period implementation, an additional 56 transactions were included in 2011. For the 47 transactions that took place prior to Rule 144 implementation, the average and median discounts were 17.9% and 14.8%, respectively. The 89 transactions analyzed after the rule implantation had average and median discounts of 15.9% and 14.3%, respectively. The overall group indicated mean and median discounts of 16.6% and 14.3%, respectively. The Harris-Trugman study noted that the only company-specific variable that had a notable statistical relationship with the implied discounts was volatility.

---

[54] Matthew Billett and Ioannis Floros, "Do Investor Identity and Contract Terms Interact? Evidence From the Wealth Effects of Private Placements," workpaper, April 2012, papers.ssrn.com/sol3/papers.cfm?abstract_id=1784498.

[55] Aaron Stumpf, Robert Martinez, and Christopher Stallman, "The Stout Risius Ross Restricted Stock Study: A Recent Examination of Private Placement Transactions From September 2005 Through May 2010," *Business Valuation Review*, Vol. 30, No. 1, Spring 2011, 36-48.

[56] William Harris, "Trugman Associates, Inc. (TVA) Restricted Stock Study—An Update," *Business Valuation Review*, Vol. 30, No. 4, Winter 2011, 132-139.

CONCLUSION OF VALUE - SUBJECT INTEREST

## Summary of Restricted Stock Studies

The restricted stock studies previously mentioned were performed based on data from 1966 to 2010.  Reported mean discounts range from 8.7% to 35.6%.  The average of reported mean discounts was 20.8%, while the median was 19.4%.   Reported median discounts range from 9.0% to 45.0%.  The average of reported median discounts was 19.9%, while the median was 15.3%.

Some of the variation in the studies has to do with the specific periods analyzed.  Prior to April 1997, the SEC-required holding period for restricted stocks was two years.  That was decreased to one year on April 29, 1997.  Similarly, the holding period was reduced from one year to six months effective February 15, 2008.

The following table shows the summary statistics for studies based upon the period studied.

### Analysis of Restricted Stock Studies for Different Periods

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | Mean | Median |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |
| | | |

**CONFIDENTIAL**

TDIT005942

985

Page 989 of 1530

Page 344 of 687

CONCLUSION OF VALUE - SUBJECT INTEREST

2025-08-19

2025-06-04

FSD2025-0116
FSD2025-0116

The studies also cited several company and security specific factors in determining the estimated discount.

**PRE-IPO STUDIES**

In recent years, a number of pre-IPO studies were performed to support marketability discounts.  The methodology applied in these studies is based on the initial offering price (the price prior to public trading).  This price is reduced by the price per share at the time of the last private transaction (which must be less than five months prior to the initial offering to qualify for the study) and adjusted by an appropriate index to account for related market or sector movements over the five-month period.  The resulting amount is divided by the initial offering price to arrive at the appropriate discount.  The pre-IPO methodology of determining marketability discounts is a relevant method as private stockholders experience an inability to freely sell their stock in the open market, similar to restricted stockholders.  Furthermore, private stockholders differ from unrestricted public stockholders, much like restricted stockholders, because there is not a public forum in which investments can be easily liquidated (which is only one of the differences between private and public stockholders).

### *Emory Studies*

John Emory, Sr., ASA began his pre-IPO studies with Baird & Co. and continued his studies with his own firm, Emory Business Valuation, LLC.  Emory has completed nine studies with the original published in June 1986.  The first eight studies eliminated development-stage companies, companies with historical operating losses and companies with IPO prices less than $5 per share.  The ninth study deviated from the previous studies as follows:

- Included only companies with "com" in their names

- Review period was increased from 18 months in the previous studies to 35 months

- All transactions were actual sales as opposed to the previous studies that included options

- Most of the companies did not have earnings

The study consisted of 53 transactions.  The mean and median discounts by study are presented in the following chart.


FSD2025-0116
FSD2025-0116
CONFIDENTIAL
2025-06-04
2025-08-19
905
TDIT005943



**Willamette Management Associates Pre-IPO Study**

This study observed 556 companies and 1,007 transactions from 1975 through 1997. The adjusted mean discount[57] for each time period varied from 28.9% to 56.8%. The mean for the entire review period was 44.2%. The median discount range was from 31.8% to 73.1% with the overall median at 50.4%. The Willamette study found the standard mean discount was greater than 35% for all but three of the 14 periods in the study and that median discounts exceeded 40% in all but one year.

**Valuation Advisors Pre-IPO Study**

Two studies were conducted by Valuation Advisors for the calendar years of 1999 and 2000. The mean discount of these studies was 48.9%. The key feature of this study was the inclusion of holding period based upon the length of time between the private transaction and the IPO. The study confirmed the author's initial hypothesis that higher discounts accompany longer holding periods.

**APPLICATION OF RESTRICTED STOCK STUDIES TO THE SUBJECT INTEREST**

While there are potential application problems associated with various studies, especially the pre-IPO studies, a review of these studies is helpful in assessing a reasonable marketability discount for the Subject Interest. The mean and median discounts from the restricted stock studies ranged from 9% to 45%. The findings of the restricted stock studies as well as additional private placement studies by Hertzel and Smith suggest discounts can vary greatly depending on size, profitability and other company or security specific factors.

---

[57] Excluded highest and lowest deciles of indicated discounts

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 220 of 759

987

FSD2025-0116                         Page 991 of 1530                          2025-08-19
   FSD2025-0116                    Page 346 of 687                           2025-06-04
                              CONCLUSION OF VALUE - SUBJECT INTEREST

The latest restricted stock studies indicate mean and median marketability discounts in 14% range.  We view the latest restricted stock studies as shorter term and therefore have taken the full sample of restricted stock studies into account in our analysis.  Our analysis compares these interests to the comparable transactions and makes adjustments from the baseline discounts noted in the comparable transactions.  Since the latest one-year study does not measure restricted securities with similar hold periods relative to the vast majority of other discount studies and since it has a relatively small sample size, we relied upon all the restricted stock studies' findings as the basis for our comparison.

The pre-IPO studies may be less indicative of appropriate marketability discounts, as much of the differences in the transaction prices between pre-IPO and IPO may include event premiums, such as the securing of additional capital which promotes the viability of the company.  We did not use these studies for our analysis.

### Factors Affecting Marketability

Based on the SEC Study, we noticed that as company size and profitability decreases, the marketability discount associated with restricted stock in these companies increase.  We also note that various other factors affected discounts observed in the other studies.  Most notably, the following affect marketability discounts:

- Increase in dividend payment decreases marketability discounts
- Increase in the size of interest and amount of control decreases discounts
- Increase in financial strength of the company decreases discounts
- Increase in restrictions increases marketability discounts

Given the characteristics of size, lack of distribution history, etc., we concluded a 20.8% marketability discount, with a standard deviation of 8.2%, as the baseline observed from all the restricted stock studies we reviewed.

### DISCOUNT ADJUSTMENT DISCUSSION

In the following sections, we adjust the marketability discount to reflect the attributes of the Subject Interest.

The analysis originates with the baseline discount concluded in the previous section.  Then, our analysis reviews several factors that affect marketability for both the interests being valued and the comparable interest which provides the base of comparison.  Each interest is assigned a ranking from 1 to 5 (from Poor to Strong) based upon the respective feature.  Then, the feature ranking for the Subject Interest is subtracted from the feature ranking from the comparable interest.  This results in a range of outputs from -4 to +4

FSD2025-0116
FSD2025-0116                    CONCLUSION OF VALUE - SUBJECT INTEREST    2025-06-04

(from significantly worse to significantly better).  The output is then multiplied by the standard deviation of the restricted stock studies (lack of marketability) to give an indication as to the adjustment necessary to the baseline discount based upon this feature.  An importance factor (from low to high) is also attributed to each feature to provide a final scaling factor for the specific feature.

Once the individual feature scaling factors are computed, the baseline discounts are adjusted upward and downward by multiplying the baseline discount by the product of all relevant feature scaling factors.

**SUBJECT INTEREST DISCOUNT CALCULATION**

*Adjustment Analysis – Marketability*

The Subject Interest is characterized by a lack of rights and, is therefore, somewhat riskier and more volatile.  The Participation Shares have restrictions on the transfer of their shares and only have a claim in respect of the underlying assets in a winding up.

The 20.8% baseline lack of marketability discount of the comparable investments reflects the discount that would apply to the Subject Interest if it had illiquidity features similar to restricted stock.  Since the Subject Interest did not exhibit these exact characteristics, further adjustments were necessary to conclude fair market value.

Schedule C.3 summarizes the differences between the Subject Interest and the comparable investments used in our analysis.  Overall, these factors resulted in a modest decrease in the discount from the baseline.

Based on the analyses and procedures outlined herein, we concluded that a lack of marketability discount of 20.0% is appropriate for the Subject Interest.

FSD2025-0116                                                    2025-06-04
FSD2025-0116                                                    2025-08-19

908

CONFIDENTIAL                                                    TDIT005946

**FAIR MARKET VALUE CONCLUSION**

Based on the procedures outlined herein and the corresponding analysis, it is our opinion that the fair market value of the Subject Interest as of the Valuation Date can be reasonably stated as:

**$1,637,192**

**ONE MILLION SIX HUNDRED THIRTY-SEVEN THOUSAND ONE HUNDRED NINETY-TWO DOLLARS**

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | 20.0% | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

Our conclusion of value implies an expected payback period of 1.27 years for the Subject Interest.  Our conclusion of value is presented in the Summary Schedule as well as in the chart above.

This conclusion is subject to the Assumptions and Limiting Conditions and to the Appraisal Certification found at the end of this report.  We relied on information received as indicative of the Company as of the Valuation Date.  We made limited investigation as to the accuracy and completeness of such information and did not verify this information as part of our valuation.  Therefore, we express no opinion or other form of assurance regarding the accuracy of the source data.  Our analysis was based in part on this information as well as on other data we developed.  We have no obligation to update this report or our conclusion of value for information that comes to our attention after the date of this report.



FSD2025-0116
Page 994 of 1530
2025-08-19
FSD2025-0116
Page 349 of 687
2025-06-04

## ASSUMPTIONS AND LIMITING CONDITIONS

This valuation by ValueScope, LLC is subject to and governed by the following Assumptions and Limiting Conditions and other terms, assumptions and conditions contained in the engagement letter.

### LIMITATION ON DISTRIBUTION AND USE

The report, the final estimate of value, and the prospective financial analyses included therein are intended solely for the information of the person or persons to whom they are addressed and solely for the purposes stated.  They should not be relied upon for any other purpose, and no party other than the Company may rely on them for any purpose whatsoever.  Notwithstanding the foregoing, the valuation report and its contents may be disclosed to third parties, including potential investors, acquirers, and advisors, to establish the fair market value of the Company or in connection with transactions involving the Company, without requiring prior written consent from ValueScope, LLC.  Additionally, the Company may distribute this report to outside professional accounting and legal advisors, and to the Company's shareholders and their professional accounting and legal advisors.

No change of any item in this report shall be made by anyone other than ValueScope, LLC, and we shall have no responsibility for any such unauthorized change.

The valuation report has been prepared based on specific assumptions, methodologies, and data outlined herein.  This report may be used alongside other appraisals or studies for comparative or analytical purposes.  The value conclusion(s) stated in this appraisal is based on the program of utilization described in the report and may not be separated into parts.  The report may not be reproduced, in whole or in part, and the findings of the report may not be utilized by a third party for any purpose, other than as expressly permitted herein, without the express written consent of ValueScope, LLC.

### NOT A FAIRNESS OPINION

Neither our opinion nor our report are to be construed as an opinion of the fairness of an actual or proposed transaction, a solvency opinion, or an investment recommendation but, instead, are the expression of our determination of value as the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date, including our analysis whether impairment of goodwill exists.

CONFIDENTIAL
TDIT005948

FSD2025-0116                        **ASSUMPTIONS AND LIMITING CONDITIONS**                2025-08-19
FSD2025-0116                                                                              2025-06-04

## OPERATIONAL ASSUMPTIONS

Unless stated otherwise, our analysis (i) assumes that as of the valuation date, the Company and its assets will continue to operate as configured as a going concern, (ii) is based on the past, present, and future projected financial condition of the Company and its assets as of the valuation date, and (iii) assumes that the Company has no undisclosed real or contingent assets or liabilities, other than in the ordinary course of business, that would have a material effect on our analysis.

We did not make an onsite visit to Company facilities.

## COMPETENT MANAGEMENT ASSUMED

It should be specifically noted that the valuation assumes the property will be competently managed and maintained over the expected period of ownership.  This appraisal engagement does not entail an evaluation of management's effectiveness, nor are we responsible for future marketing efforts and other management or ownership actions upon which actual results will depend.

## NO OBLIGATION TO PROVIDE SERVICES AFTER COMPLETION

Valuation assignments are accepted with the understanding that there is no obligation to furnish services after completion of this engagement.  If the need for subsequent services related to a valuation assignment (e.g., including testimony, preparation for testimony, other activity compelled by legal process, updates, conferences, reprint or copy services, document production or interrogatory response preparation, whether by request of the Company or by subpoena or other legal process initiated by a party other than the Company) is requested, special arrangements for such services acceptable to ValueScope, LLC must be made in advance. ValueScope, LLC reserves the right to make adjustments to the analysis, opinion, and conclusion set forth in the report as we deem reasonably necessary based upon consideration of additional or more reliable data that may become available.

In all matters that may be potentially challenged by a Court or other party, we do not take responsibility for the degree of reasonableness of contrary positions that others may choose to take nor for the costs or fees that may be incurred in the defense of our recommendations against challenge(s).  We will, however, retain our supporting work papers for your matter(s) and will be available to assist in defending our professional positions taken, at our then current rates plus direct expenses at actual and according to our then current Standard Professional Agreement.

FSD2025-0116                                                               PM-17346  2025-06-04
FSD2025-0116                                                                         2025-08-19
                                                                                    911

**CONFIDENTIAL**                                                          TDIT005949

## NO OPINION IS RENDERED AS TO LEGAL FEE OR PROPERTY TITLE

No opinion is rendered as to legal fee or property title.  No opinion is intended in matters that require legal, engineering, or other professional advice that has been or will be obtained from professional sources.

## LIENS AND ENCUMBRANCES

ValueScope will give no consideration to liens or encumbrances except as specifically stated.  We will assume that all required licenses and permits are in full force and effect, and we make no independent on-site tests to identify the presence of any potential environmental risks.  We assume no responsibility for the acceptability of the valuation approaches used in our report as legal evidence in any particular court or jurisdiction.

## INFORMATION PROVIDED BY OTHERS

Information furnished by others is presumed to be reliable; no responsibility, whether legal or otherwise, is assumed for its accuracy and cannot be guaranteed as being certain.  All financial data, operating histories, and other data relating to income and expenses attributed to the business have been provided by management or its representatives and have been accepted without further verification except as specifically stated in the report.

## PROSPECTIVE FINANCIAL INFORMATION

Valuation reports may contain prospective financial information, estimates, or opinions that represent reasonable expectations at a particular point in time, but such information, estimates, or opinions are not offered as forecasts, prospective financial statements or opinions, predictions or as assurances that a particular level of income or profit will be achieved, that events will occur, or that a particular price will be offered or accepted.  Actual results achieved during the period covered by our prospective financial analysis will vary from those described in our report, and the variations may be material.

Any use of management's projections or forecasts in our analysis will not constitute an examination, review, or compilation of prospective financial statements in accordance with standards established by the American Institute of Certified Public Accountants (AICPA).  We will not express an opinion or any other form of assurance on the reasonableness of the underlying assumptions or whether any of the prospective financial statements, if used, are presented in conformity with AICPA presentation guidelines.

993
Page 997 of 1530
Page 352 of 687
ASSUMPTIONS AND LIMITING CONDITIONS

FSD2025-0116
FSD2025-0116
2025-08-19
2025-06-04

## REGULATORY AND ENVIRONMENTAL CONSIDERATIONS

The report assumes all required licenses, certificates of occupancy, consents, or legislative or administrative authority from any local, state or national government, or private entity or organization have been or can be obtained or reviewed for any use on which the opinion contained in the report are based.

ValueScope is not an environmental consultant or auditor, and it takes no responsibility for any actual or potential environmental liabilities.  Any person entitled to rely on this report, wishing to know whether such liabilities exist or the scope and their effect on the value of the property, is encouraged to obtain a professional environmental assessment. ValueScope does not conduct or provide environmental assessments and has not performed one for the subject property.

ValueScope has not determined independently whether the Company is subject to any present or future liability relating to environmental matters (including but not limited to CERCLA/Superfund liability) or the scope of any such liabilities. ValueScope's valuation takes no such liabilities into account, except as they have been reported to ValueScope by the Company or by an environmental consultant working for the Company, and then only to the extent that the liability was reported to us in an actual or estimated dollar amount.  Such matters, if any, are noted in the report.  To the extent such information has been reported to us, ValueScope has relied on it without verification and offers no warranty or representation as to its accuracy or completeness.

Unless otherwise stated, no effort has been made to determine the possible effect, if any, on the subject business due to future federal, state, or local legislation, including any environmental or ecological matters or interpretations thereof.

ValueScope has not made a specific compliance survey or analysis of the subject property to determine whether it is subject to, or in compliance with, the American Disabilities Act of 1990, and this valuation does not consider the effect, if any, of noncompliance.

ValueScope expresses no opinion for matters that require legal or other specialized expertise, investigation, or knowledge beyond that customarily employed by business appraisers.

## POTENTIAL FUTURE SALES

Any decisions to purchase, sell, or transfer any interest in the subject company or its subsidiaries shall be your sole responsibility, as well as the structure to be utilized and the price to be accepted.

VALUESCOPE, LLC

Page 42
PM-17348

FSD2025-0116
FSD2025-0116
2025-06-04
2025-08-19
913

CONFIDENTIAL
TDIT005951

FSD2025-0116                                                                                    2025-08-19
FSD2025-0116                  ASSUMPTIONS AND LIMITING CONDITIONS        2025-06-04

The selection of the price to be accepted requires consideration of factors beyond the information we will provide or have provided. An actual transaction involving the subject business might be concluded at a higher value or at a lower value, depending upon the circumstances of the transaction and the business and the knowledge and motivations of the buyers and sellers at that time. Due to the economic and individual motivational influences which may affect the sale of a business interest, the appraiser assumes no responsibility for the actual price of any subject business interest if sold or transferred.

**INDEMNIFICATION BY THE COMPANY**

The following indemnifications apply only to the extent that any losses, claims, damages, judgments, or liabilities are not caused by fraud, bad faith, gross negligence, or willful malfeasance on the part of ValueScope.

The Company agrees to indemnify and hold harmless ValueScope and its respective principals, affiliate, agents, and employees ("Indemnified Party") against any losses, claims, damages, judgments, or liabilities arising out of or based upon any professional advisory services rendered pursuant to this agreement. Furthermore, the Company agrees to indemnify ValueScope and any Indemnified Party against any losses, claims, damages, judgments, or liabilities incurred as a result of a third party initiating a lawsuit against any Indemnified Party based upon any consulting services rendered to the Company pursuant to this agreement. In consideration for this indemnification agreement, ValueScope will provide professional advisory services.

The Company agrees to reimburse ValueScope and any Indemnified Party for any necessary and reasonable expenses, attorneys' fees, or costs incurred in the enforcement of any part of the indemnity agreement 30 days after receiving written notice from ValueScope.

The obligations of ValueScope under this agreement are solely corporate obligations, and no officer, director, employee, agent, shareholder, or controlling person in ValueScope shall be subjected to any personal liability whatsoever to any person, nor will any such claim be asserted by or on behalf of you or your affiliates.

CONFIDENTIAL                                                                    TDIT005952

995

FSD2025-0116
FSD2025-0116

Page 999 of 1530
Page 354 of 687

2025-08-19
2025-06-04

## APPRAISAL CERTIFICATION

I certify that, to the best of my knowledge and belief:

1. We have not inspected certain assets, properties, or business interests encompassed by this appraisal.

2. We have no present or prospective future interest in the assets, properties, or business interests that are the subject of this appraisal report.

3. We have no personal interest or bias with respect to the subject matter of this report or the parties involved.

4. Our compensation for conducting the appraisal is in no way contingent upon the value reported or on any predetermined value.

5. To the best of our knowledge and belief, the statements of facts contained in this report, on which the analyses, conclusions, and opinions expressed herein are based, are true and correct.

6. No persons other than us have provided significant professional assistance regarding the analyses, opinions, and conclusions set forth in this report.

7. The reported analyses, opinions, and conclusions are limited only by the reported contingent and limiting conditions, and they represent our unbiased professional analyses, opinions, and conclusions.

8. This report and analysis were prepared under the direction of Steven C. Hastings.

9. I am in compliance with all professional appraisal certifications and licensing.

10. The National Association of Certified Valuators and Analysts (NACVA) has a mandatory recertification program for its accredited members and I am in compliance with that program.

By:    ValueScope, LLC

Steven C. Hastings, CPA/ABV/CFF, CGMA, ASA, CVA
Principal
ValueScope, LLC

VALUESCOPE, LLC

Page 44

FSD2025-0116
FSD2025-0116

PM-17350

2025-06-04
2025-08-19

915

CONFIDENTIAL

TDIT005953

## APPENDIX A
## KEY DAF AGREEMENT PROVISIONS

1. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restriction whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided. [Paragraph 7, Memorandum]

2. Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

   a. issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

   b. and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

   and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued. [Article 7]

3. The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, establishing and designated (or re-designated as the case may be) and the variations in the relative rights (including without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligation as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution. [Article 8]

4. The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether



FSD2025-0116
FSD2025-0116

APPENDIX A: KEY DAF AGREEMENT PROVISIONS

2025-08-19
2025-06-04

absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerages as may be lawful on any issue of Shares. [Article 9]

5. The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason. [Article 10]

6. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote in general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles. [Article 12]

7. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes. [Article 13]



FSD2025-0116
FSD2025-0116

2025-06-04
2025-08-19
917

CONFIDENTIAL

TDIT005955

998

FSD2025-0116                 Page 1002 of 1530                 2025-08-19
FSD2025-0116          Page 357 of 687 APPENDIX A: KEY DAF AGREEMENT PROVISIONS 2025-06-04

8. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares raking *pari passu* with or subsequent to them or the redemption of purchase of any Participating Shares of any Class by the Company. [Article 14]

9. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws. [Article 18]

10. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles. [Article 21]

11. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution. [Article 65]

12. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed. [Article 72]

13. The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article. [Article 77]

14. Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor. [Article 100]

15. Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors. [Article 101]

999



APPENDIX A:  KEY DAF AGREEMENT PROVISIONS

16. Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rate basis as to the paid-up or par value of the Shares. [Article 105]

17. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions and regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors of by Ordinary Resolution. [Article 110]

VALUESCOPE, LLC

FSD2025-0116                                                    2025-06-04
FSD2025-0116                                                    2025-08-19

Page A-4
PM-17354
919

CONFIDENTIAL                                                    TDIT005957

FSD2025-0116                                                                    2025-08-19
FSD2025-0116                                                                    2025-06-04

## APPENDIX B
## QUALIFICATIONS OF THE APPRAISER

### Steven C. Hastings, MBA, CPA/ABV/CFF, CGMA, ASA, CVA
**Principal**
**shastings@valuescopeinc.com, 817-481-4901**

Mr. Hastings has conducted valuations of common and preferred stock, other equity, and debt instruments of banks and privately held companies.

**EMPLOYMENT HISTORY**

*2006 – Present*                                                        *ValueScope, LLC*

*Principal*

Mr. Hastings joined the company as a principal to provide valuation and financial modeling and expert advisory services to a select group of clients that expect a high level of accurate financial analysis. As a CPA with significant valuation and financial reporting experience, Mr. Hastings bridges the gap between deal structuring, valuation and the requirements of financial reporting.

*2001 – 2006*                                                        *Value Capital, LLC*

*Principal*

Mr. Hastings served as a principal with Value Capital, LLC. During his tenure at Value Capital Mr. Hastings gained extensive experience in business financings, as well as the analysis of market dynamics in various industries. He provided services to clients in several transactions involving mergers and acquisitions and consulted on and was party to several creative financing transactions. His clients include: health care providers; software development, India outsource services, pre-media print services, and e-learning; video productions and TV show producers; finance companies; restaurant development companies; and other service industries.

*Public Service - 1994 to 2000*                              *Finance Commission of Texas*

*Director*

The Commission provides overall policy and supervisory control for three key state agencies: the Banking Department, the Savings and Loan Department and the Office of Consumer Credit Commissioner. As the CPA member of the Finance Commission, Mr. Hastings was responsible for testifying to the Texas Senate on the validity and achievability of bi-annual budgets. Mr. Hastings served as chairman of the Audit Committee for the Texas Department of Banking, which provided the guidance and oversight for compliance with Texas's banking rules and regulations. He was

VALUESCOPE, LLC                                                        Page B-1

FSD2025-0116                                                            2025-06-04
FSD2025-0116                                                     PM-17355
                                                                       2025-08-19
                                                                       920

CONFIDENTIAL                                                        TDIT005958

1001
FSD2025-0116                          Page 1005 of 1530                          2025-08-19
FSD2025-0116                     Page 360 of 687                          2025-06-04

APPENDIX B:  QUALIFICATIONS OF THE APPRAISER

instrumental in assisting the Savings and Loan Department in writing new Mortgage Broker regulations and worked closely with the Consumer Credit Commissioner in clarifying the Texas payday lending regulations.

*1994 – 2001*                                              *MedCare Financial Solutions, Inc.*

*President*

Mr.  Hastings served as an officer of MedCare Financial Solutions, Inc.  and MedCapital Funding Corporation.   MedCapital provided Medicare, Medicaid and private pay receivable financing to health care providers.   MedCare Financial Solutions provided other financial and operational services to health care providers.   These services included: divestitures; mergers and acquisitions; claims processing; educational/training; financial consulting; and financing advice regarding working capital, subordinated debt and equity lending.   Mr.  Hastings developed several reimbursement and financing training courses and is an accomplished speaker on topics related to health care reimbursement and financing systems.

*1986 – 1994*                                              *H.D.  Vest Financial Services*

*Executive Vice President and CFO*

As executive vice president and CFO of H.D.  Vest Financial Services, Mr.  Hastings assisted in placing over $1.5 billion annually in investment.   Responsible for day-to-day financial operations and capital structuring, Mr.  Hastings gained experience in a wide variety of industries and gained strategic relationships with other investment bankers and business brokers.   Mr.  Hastings was instrumental in taking HD Vest public.

As a general securities principal, Mr.  Hastings supervised stockbrokers' and investment advisors' day-to-day activities.   As a securities financial and operations principal, he was responsible for filing net capital reports and other types of certifications with the NASD, SIPIC and other state and federal regulating bodies.   Being licensed in life, disability, health, property and casualty insurance, Mr.  Hasting was instrumental in implementing this line of business at HD Vest.

*1979 – 1986*                                              *Arthur Andersen & Co.*

*Senior Manager*

Mr.  Hastings served as a senior manager with significant responsibilities in the several industries.  He consulted on accounting, finance, tax, operations, and systems issues.

**FORMAL EDUCATION**

Master of Business Administration - Arizona State University, Tempe, Arizona

FSD2025-0116                                                            2025-06-04
FSD2025-0116                                          PM-17356          2025-08-19
                                                                            921
**CONFIDENTIAL**                                                        TDIT005959

APPENDIX B: QUALIFICATIONS OF THE APPRAISER

Bachelor of Science - Indiana University, Bloomington, Indiana

**CERTIFICATIONS AND LICENSES**

Certified Public Accountant (CPA)
Accredited Senior Appraiser (ASA)
Certified Valuation Analyst (CVA)
Accredited in Business Valuations, AICPA (ABV)
Certified in Financial Forensics, AICPA (CFF)
Chartered Global Management Accountant, AICPA (CGMA)
Former, Certified Health Insurance Claims Professional (NACAP)
Former, Securities Financial and Operations Principal
Former, General Securities Principal
Former, Registered Investment Advisor Principal
Former, Life, Disability, Health, Property and Casualty Licenses

**ORGANIZATIONS AND PROFESSIONAL ASSOCIATIONS**

American Institute of CPAs (CPA license, ABV and CFF credential)
Texas Society of CPAs (CPA license)
Dallas Society of CPAs (Past: Secretary, Ethic Committee Chairman, Financial Planning Committee Chairman)
American Society of Appraisers (ASA credential)
National Association of Certified Valuation Analysts (CVA credential)
AICPA Business Valuation & Forensic Litigation Support (CFF Credential)
Financial Executive Institute

**RECENT IRS CASES - OFFICE OF CHIEF COUNSEL**

Expert Witness – United States Tax Court (New York) 2018, Consolidated T.C. Docket No. 23516-16, Marc Chrem & Esther Chrem v. Commissioner of Internal Revenue, Economic interest in a corporation for gift tax purposes.
- Expert Report April 2018

Expert Witness – United States Tax Court (Nashville) 2009, T.C. Docket No. 30515-09, Nancy Sue Hawk, Transferee, Petitioner v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.
- Expert Report April 2016
- Testimony June 2016
- Court Opinion November 2017

Expert Witness – United States Tax Court (Dallas) 2016, T.C. Docket No. 3030-14, Red River Ventures, Petitioner, v. Commissioner of Internal Revenue, Respondent. Transferee of a transferee liability issues.

FSD2025-0116      2025-06-04
FSD2025-0116      2025-08-19
922

CONFIDENTIAL      TDIT005960

FSD2025-0116
FSD2025-0116

2025-08-19
2025-06-04

- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Washington DC) 2016, T.C.  Docket No.  1045-13, Estate of Jinana M.  Bowey, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report September 2015
- Stipulated Tax Court Opinion December 2016

Expert Witness – United States Tax Court (Boston) 2014, T.C.  Docket No.  8401-13, Estate of Edward S.  Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Economic interest in a corporation for gift tax purposes.
- Expert Report June 2014
- Testimony August 2014
- Tax Court Opinion October 2015

Expert Witness – United States Tax Court (Washington DC) 2014, T.C.  Docket No.  223630-12, Michael Tricarichi, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report April 2014
- Testimony June 2014
- Tax Court Opinion October 2015

Expert Witness - United States Tax Court (Chicago, IL) 2014, T.C.  Docket No.  6936-10, et al, John M.  Alterman, et al, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.
- Expert Report March 2014
- Testimony May 2014
- Tax Court Opinion December 2015

Expert Witness – United States Tax Court (Los Angeles), 2013 - 2014, Docket No.  8097-13, *Sumner Redstone, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Economic interest in a corporation for gift tax purposes.*
- Expert Report January 2014
- Testimony March 2014
- Tax Court Opinion December 2015

Expert Witness – IRS & DOJ, United States Tax Court (Houston) 2013, Docket No.  20177-11, *Richard H.  Cullifer, Petitioner, v.  Commissioner of Internal Revenue, Respondent.  Transferee of a transferee liability issues.*
- Expert Report August 2013
- Testimony November 2013
- Tax Court Opinion October 2014

FSD2025-0116
FSD2025-0116

2025-06-04
2025-08-19

923

CONFIDENTIAL

TDIT005961

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 237 of 759

1004
Page 1008 of 1530
Page 363 of 687    APPENDIX B:  QUALIFICATIONS OF THE APPRAISER

FSD2025-0116                                                                                                                2025-08-19
FSD2025-0116                                                                                                                2025-06-04

**RECENT IRS CASES – LMSB AUDIT DIVISION**

Expert Witness for the IRS LSMB Audit Division – Plantation, FL, 2016, International debt transactions subject to IRC Sections 163(a) and 385.

- Federal Tax Appeals Testimony – Houston, TX, November 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2016, International financing transactions subject to IRC Section 482.

- Federal Tax Fast Track Appeals Testimony – Houston, TX, January 2016.

Expert Witness for the IRS LSMB Audit Division – Houston, TX, 2015, Split-dollar life insurance policy dealing with IRC Sections 1.7872, 1.61-22 and 20.2031.

- Federal Tax Appeals Testimony – Houston, TX, August 2015.

Expert Witness for the IRS LSMB Audit Division – Detroit, MI, 2015, International Inversion Case dealing with IRC Section 7874.

- Federal Tax Appeals Testimony – Detroit, MI, June 2015.

**RECENT DEPARTMENT OF JUSTICE CASE**

Expert Witness – United States District Court for the Northern District of Texas, Civil Cause No. 3:17-cv-0609-B, Tony and Mii's, Inc, et al, v. United States of America.  Fraudulent valuation issues report, October 2018.

Expert Witness – United States District Court for the Southern District of Texas, Civil Action No.  4:16-cv-03302, ALPC Services of Texas, Inc.  v.  United States of America and Internal Revenue Service.  Valuation issues report, 2017.

- Stipulated Settlement, 2017

Expert Witness – Federal Court, Case No.  12-844, *The Estate of David W.  Longaberger v. The United States.*  Valuation issues report, 2014.

**RECENT CIVIL COURT REPORTS, TESTIMONY AND DEPOSITIONS**

Expert Witness – The U.S. District Court for the District of Delaware, C.A. No. 06-451-SLR, Alcoa v. Alcan, Century Aluminum, Pechiney, et al.  Deferred tax benefits and the improper recording of revenue and expenses for federal tax purposes.

- Expert Report June 2018
- Deposition Testimony May 2019

1005

Expert Witness - Dallas County District Court, Texas, Cause No. DC-15-00923, Enterprise Financial Group, Inc. v. NAVISS, LLC et al.  Fraudulent transfer, solvency and economic damages.
- Expert Report April 2018
- Daubert Hearing Testimony May 2018 (Report and Testimony Accepted by Court)

Expert Witness – Dallas County District Court, Texas, Cause No. DC-16-00270, Victor Bernal, et al v. DK8, LLC, et al (Honda of Burleson). Shareholder buyout dispute.
- Expert Report November 2016

Expert Witness – Dallas County, Texas, Cause No.  CC-14-06294-C, Caden Clark v. Columbia Medical Center of Arlington et al.  Economic damages related to lost wages.
- Expert Report February 2016
- Deposition May 2016
- Jury Trial August 2016

Expert Witness – State of Louisiana Division of Administrative Law, Docket No.  2015-4059-HH, Department of Health and Hospitals in the Matter of General Medicine. Medicaid claims coding issues.
- Expert Report February 2016
- Trial Testimony March 2016

Expert Witness – Federal Magistrate, Washington D.C., Case No.  14-671C.  Always at Market, Inc.  v.  United States of America (DOD/DOJ).  Army & Air Force Exchange Service economic damages.
- Expert Report September 2015
- Deposition February 2016
- Stipulated Settlement August 2016

Expert Witness – Circuit Court of Jefferson County, Alabama, Civil Action No.  CV-05-1483, General Medicine, PC v.  Healthsouth Corporation v.  General Medicine, PC.  Economic damages related to contract dispute.
- Expert Report April 2014
- Deposition June 2014
- Jury Trial February 2015

**SPEAKING ENGAGEMENTS**

"How to Finance Your Company" – National Med Trade

"Employee Stock Ownership Plans – When They Make Sense" – TAHC

"Documentation Linking Systems" – Oklahoma Healthcare Association

"CORF – What You Need to Know to Run A Successful Business" – PT Association

"Surviving a Prospective Payment System" – TAHC

"Diversification Strategies for Healthcare Providers" – Missouri Healthcare Association

"Diversification Strategies" – NAHC

"Cost Reporting Under IPS and PPS" –TAHC

"Key Survival Strategies under the Balanced Budget Act of 1997" – NAHC

"Financing Receivables" – Kitchens, Lambert & Associates

 "Getting Paid" – NAHC

"The Cost Reimbursement System – Achieving Your Goals" – Amedisys Corporation Annual Client Seminar

"Cost Reporting – What You Need to Know to Run A Successful Business" – The Southwest Region AHH

"The Political Process and Your Business" – The Dallas/Fort Worth Association of Mortgage Brokers

"Underwater Stock Options: A Drag on the Company's Financial Performance" – Polaris International

"Estate & Gift Tax Discount Issues – Case Studies" – Internal Revenue Service

"Discounted Cash Flow Analysis: The Four-Step Process" – Internal Revenue Service

"Purchase Price Allocation: Valuation Challenges During Due Diligence" – Strafford Publications

"What's It Worth" – Financial Executives International

**WHITE PAPERS**

Attaining Reasonable Certainty in Economic Damages Calculations
Healthcare Compensation Arrangements at Risk - OIG Issues Alert on Physician Compensation
An Easy Tool for Determination of Personal v.  Enterprise Goodwill
Common Transfer Pricing Mistakes
Possible Changes to Valuation Discount Rules is Unlikely
Common Transfer Pricing Mistakes
Audit Risk for Captive Insurance Companies

CONFIDENTIAL
TDIT005964

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 240 of 759

1007

FSD2025-0116
FSD2025-0116

Page 1011 of 1530
Page 366 of 687

2025-08-19
2025-06-04

**SCHEDULES**

VALUESCOPE, LLC

FSD2025-0116
FSD2025-0116

PM-17362

2025-06-04
2025-08-19

927

CONFIDENTIAL

TDIT005965

CONFIDENTIAL

FSD2025-0116
FSD2025-0116

1008
Page 1012 of 1530
Page 367 of 687

2025-08-19
2025-06-04

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 241 of 759

## Charitable DAF HoldCo, Ltd
**Table of Contents**

**Valuation Date: March 25, 2025**

| Table of Contents | |
|---|---|
| **Schedule Name** | **Schedule** |
| **Valuation Summary and Conclusion** | Summary Schedule |
| **Historical Financial Analysis** | |
| Historical Distributions Table | Schedule A.1 |
| Historical Distributions Charts | Schedule A.2 |
| CLO HoldCo, Ltd - Summary Balance Sheet | Schedule A.3 |
| **Income Approach** | |
| Discounted Cash Flow (DCF) Analysis | Schedule B.1 |
| Sensitivity Analysis - Hypothetical Risk-Free Bond | Schedule B.2 |
| **Discount for Lack of Marketability (DLOM) Analysis** | |
| DLOM Determination - Restricted Stock Studies | Schedule C.1 |
| DLOM Determination - Restricted Stock Studies Summary Statistics | Schedule C.2 |
| DLOM Qualitative Scoring | Schedule C.3 |
| Calculation of Marketability Discount | Schedule C.4 |
| DLOM Footnotes and Comments | Schedule C.5 |

TDIT005966

FSD2025-0116
FSD2025-0116

PM-17363
2025-06-04
2025-08-19

928

CONFIDENTIAL

FSD2025-0116  
FSD2025-0116  
1009  
Page 1013 of 1530  
Page 368 of 687  
2025-08-19  
2025-06-04

Case 19-34054-sgj11  Doc 4627-6  Filed 05/11/26  Entered 05/11/26 17:05:52  Desc  
Exhibit 211 Part 02  Page 242 of 759

| Charitable DAF HoldCo, Ltd | Summary Schedule |
|---|---|
| Valuation Summary and Conclusion | Valuation Date: March 25, 2025 |

*Synthesis of Fair Market Value*

| Fair Market Value Summary | | | |
|---|---|---|---|
| | | Value | Reference |
| **Income Approach** | | | |
| Value of Subject Interest, Minority, Marketable | | $2,045,531 | *Schedule B.1* |
| Less: Discount for Lack of Marketability | *20.0%* | ($408,339) | *Schedule C.4* |
| Value of Subject Interest, Minority, Non-Marketable | | $1,637,192 | |
| Total Subject Interest Shares | | 305 | |
| **Fair Market Value per Share** | | **$5,368** | |

| Subject Interest Valuation Breakout | | |
|---|---|---|
| | Shares | Fair Market Value |
| Highland Dallas Foundation, Inc. | 100 | $536,784 |
| Highland Kansas City Foundation, Inc. | 100 | $536,784 |
| Highland Santa Barbara Foundation, Inc. | 100 | $536,784 |
| The Community Foundation of North Texas | 5 | $26,839 |
| Total Subject Interest | 305 | $1,637,192 |

TDIT005967

FSD2025-0116  
FSD2025-0116  
2025-06-04  
PM-17364  
2025-08-19  
929

CONFIDENTIAL

FSD2025-0116
FSD2025-0116



Page 1014 of 1530
Page 369 of 687

2025-08-19
2025-06-04

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 243 of 759

| Charitable DAF HoldCo, Ltd |
|---|
| **Historical Financial Analysis** |

Schedule A.1
Valuation Date: March 25, 2025

*Historical Distributions Table*

| Quarterly Distributions - Previous 5 Years | | | | | |
|---|---|---|---|---|---|
| **Organization** | **Highland Dallas Foundation, Inc.** | **Highland Kansas City Foundation, Inc.** | **Highland Santa Barbara Foundation, Inc.** | **The Community Foundation of North Texas** | **Total** |
| **Holding** | **100 Participation Shares** | **100 Participation Shares** | **100 Participation Shares** | **5 Participation Shares** | **305 Participation Shares** |
| 31-Mar-19 | 39,750 | - | $51,000 | - | $90,750 |
| 30-Jun-19 | 39,438 | - | 50,688 | - | 90,125 |
| 30-Sep-19 | 36,813 | - | 48,063 | - | 84,875 |
| 31-Dec-19 | 231,738 | - | 53,313 | - | 553,300 |
| **2019 Subtotal** | **$347,738** | **$168,250** | **$203,063** | **$100,000** | **$819,050** |
| 31-Mar-20 | 25,750 | - | 37,000 | - | 62,750 |
| 30-Jun-20 | 27,625 | - | 38,875 | - | 66,500 |
| 30-Sep-20 | 27,125 | - | 38,375 | - | 65,500 |
| 31-Dec-20 | 162,738 | 120,250 | 41,313 | 100,000 | 424,300 |
| **2020 Subtotal** | **$243,238** | **$120,250** | **$155,563** | **$100,000** | **$619,050** |
| 31-Mar-21 | 33,188 | - | 44,438 | - | 77,625 |
| 30-Jun-21 | 40,063 | - | 51,313 | - | 91,375 |
| 30-Sep-21 | 43,063 | - | 54,313 | - | 97,375 |
| 31-Dec-21 | 236,513 | 176,250 | 55,313 | 100,000 | 568,075 |
| **2021 Subtotal** | **$352,825** | **$176,250** | **$205,375** | **$100,000** | **$834,450** |
| 31-Mar-22 | 46,438 | - | 57,688 | - | 104,125 |
| 30-Jun-22 | 52,438 | - | 63,688 | - | 116,125 |
| 30-Sep-22 | 50,750 | - | 62,000 | - | 112,750 |
| 31-Dec-22 | 285,013 | 191,750 | 59,188 | 100,000 | 635,950 |
| **2022 Subtotal** | **$434,638** | **$191,750** | **$242,563** | **$100,000** | **$968,950** |
| 31-Mar-23 | 48,313 | - | 59,563 | - | 107,875 |
| 30-Jun-23 | 45,750 | - | 57,000 | - | 102,750 |
| 30-Sep-23 | 47,688 | - | 58,938 | - | 106,625 |
| 31-Dec-23 | 277,741 | 195,712 | 60,178 | 100,000 | 633,631 |
| **2023 Subtotal** | **$419,491** | **$195,712** | **$235,678** | **$100,000** | **$950,881** |
| 31-Mar-24 | 47,608 | - | 58,858 | - | 106,467 |
| 30-Jun-24 | 46,939 | - | 58,189 | - | 105,127 |
| 30-Sep-24 | 47,476 | - | 58,726 | - | 106,202 |
| 31-Dec-24 | **TBD** | **TBD** | **TBD** | **TBD** | **TBD** |
| **2024 Subtotal** | **$142,023** | **$0** | **$175,773** | **$0** | **$317,796** |
| **Grand Total (2019 - 2024)** | **$1,939,952** | **$852,212** | **$1,218,013** | **$500,000** | **$4,510,177** |

Note:  Payments are typically made a few months following the end of each period.

TDIT005968

FSD2025-0116
FSD2025-0116

PM-17365

2025-06-04
2025-08-19
930

FSD2025-0116

1011
Page 1015 of 1530
Page 370 of 687

2025-08-19
2025-06-04

CONFIDENTIAL

FSD2025-0116



**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

Schedule A.2
Valuation Date: March 25, 2025

*Historical Distributions Charts*



**Historical Annual Distributions**

Legend:
- Highland Dallas Foundation, Inc.
- Highland Kansas City Foundation, Inc.
- Highland Santa Barbara Foundation, Inc.
- The Community Foundation of North Texas



**Quarterly Distributions by Year**

Legend: 2019, 2020, 2021, 2022, 2023, 2024

Note: Q4 2024 distributions have not yet been paid.

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 244 of 759

TDIT005969

FSD2025-0116
FSD2025-0116

PM-17366
2025-06-04
2025-08-19
931

CONFIDENTIAL

FSD2025-0116
FSD2025-0116
1012
Page 1016 of 1530
Page 371 of 687
2025-08-19
2025-06-04

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 245 of 759

**Charitable DAF HoldCo, Ltd**
**Historical Financial Analysis**

**Schedule A.3**
**Valuation Date: March 25, 2025**

*CLO HoldCo, Ltd - Summary Balance Sheet*

| | Balance Sheet as of: | |
|---|---|---|
| | 9/30/2024 | |
| | Actual | % |
| **Current Assets** | | |
| Cash & Equivalents | $138,419,315 | 43.8% |
| **Total Current Assets** | 138,419,315 | 43.8% |
| **Other Assets** | | |
| Other Investments | 175,328,461 | 55.4% |
| Cash Collateral | 81,419 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 0 | 0.0% |
| Note Receivable | 1,321,109 | 0.4% |
| Due from Affiliate | 470,000 | 0.1% |
| Due from Broker | 637,419 | 0.2% |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

TDIT005970

FSD2025-0116
FSD2025-0116

PM-17367
2025-06-04
2025-08-19
932

CONFIDENTIAL

FSD2025-0116
FSD2025-0116

1013
Page 1017 of 1530
Page 372 of 687

2025-08-19
2025-06-04

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 246 of 759

**Charitable DAF HoldCo, Ltd**
**Income Approach**

Schedule B.1
Valuation Date: March 25, 2025

*Discounted Cash Flow (DCF) Analysis*

| | | For the Projected Period Ending: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ WACC = | 68.3% | 0.9663 | 0.8484 | 0.7449 | 0.6540 | 0.5742 | 0.5041 | 0.4426 | 0.3886 | 0.3412 | 0.2995 | 0.2630 | 0.2309 | |
| **Present Value (PV) Net Cash Flow** | | **$613,430** | **$90,926** | **$77,423** | **$69,593** | **$373,598** | **$55,377** | **$47,153** | **$42,384** | **$227,533** | **$33,726** | **$28,718** | **$25,813** | |

| | |
|---|---|
| PV net cash flow | $1,685,675 |
| PV residual value | $359,856 |
| **Value of Subject Interest, Minority, Marketable** | **$2,045,531** |
| Less: Discount for Lack of Marketability | |
| *(see schedule C.4)* | 20.0% |
| **Value of Subject Interest, Minority, Non-Marketable** | **$1,637,192** |
| Number of Subject Interest Participation Shares | 305 |
| **Value per Share, Minority, Non-Marketable** | **$5,368** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 99.2% |
| Valuation as a % of NAV | 0.6% |
| Estimated Payback Period (Years) | 1.27 |

**Residual Value - Gordon Growth Model**

| | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 68.3% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 1.5x |
| Residual value : | $1,558,568 |
| x PV factor : | 0.2309 |
| PV residual value : | $359,856 |

TDIT005971

FSD2025-0116
FSD2025-0116

PM-17368
2025-06-04
2025-08-19
933

CONFIDENTIAL

FSD2025-0116
FSD2025-0116
1014
Page 1018 of 1530
Page 373 of 687
2025-08-19
2025-06-04

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 247 of 759

**Charitable DAF HoldCo, Ltd**
**Income Approach**

Schedule B.2
Valuation Date: March 25, 2025

*Sensitivity Analysis - Hypothetical Risk-Free Bond*

| | | For the Projected Period Ending: | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 18-Apr-25 | 30-Jun-25 | 30-Sep-25 | 31-Dec-25 | 31-Mar-26 | 30-Jun-26 | 30-Sep-26 | 31-Dec-26 | 31-Mar-27 | 30-Jun-27 | 30-Sep-27 | 31-Dec-27 | Residual (Annual) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Projected Distributions | | $634,791 | $107,171 | $103,939 | $106,413 | $650,660 | $109,850 | $106,537 | $109,074 | $666,927 | $112,596 | $109,200 | $111,801 | $1,025,537 |
| | | | | | | | | | | | | | | |
| Period | | 0.07 | 0.32 | 0.57 | 0.82 | 1.07 | 1.32 | 1.57 | 1.82 | 2.07 | 2.32 | 2.57 | 2.82 | |
| PV Factor @ Risk Free Rate = | 4.7% | 0.9970 | 0.9858 | 0.9746 | 0.9636 | 0.9527 | 0.9420 | 0.9313 | 0.9208 | 0.9104 | 0.9001 | 0.8899 | 0.8799 | |
| | | | | | | | | | | | | | | |
| **Present Value (PV) Net Cash Flow** | | **$632,896** | **$105,644** | **$101,300** | **$102,540** | **$619,894** | **$103,473** | **$99,219** | **$100,433** | **$607,158** | **$101,348** | **$97,180** | **$98,370** | |

| | |
|---|---|
| PV net cash flow | $2,769,456 |
| PV residual value | $41,969,350 |
| | |
| **Value of Subject Interest, Minority, Marketable** | **$44,738,806** |
| | |
| Less: Discount for Lack of Marketability | 20.0% |
| *(see schedule C.4)* | |
| | |
| **Value of Subject Interest, Minority, Non-Marketable** | **$35,807,821** |
| | |
| Number of Subject Interest Participation Shares | 305 |
| | |
| **Value per Share, Minority, Non-Marketable** | **$117,403** |

| Key Valuation Statistics | |
|---|---|
| CLO HoldCo Net Asset Value | $269,052,808 |
| Implied Discount for Lack of Control | 83.4% |
| Valuation as a % of NAV | 13.3% |
| Estimated Payback Period (Years) | 26.53 |

| Residual Value - Gordon Growth Model | |
|---|---|
| Residual annual net cash flow : | $1,025,537 |
| Residual discount rate (k) : | 4.7% |
| Residual growth rate (g) : | 2.5% |
| x Gordon multiple [ 1 / (k-g) ] : | 46.5x |
| Residual value : | $47,699,415 |
| x PV factor : | 0.8799 |
| PV residual value : | $41,969,350 |

TDIT005972

FSD2025-0116
FSD2025-0116
PM-17369
2025-06-04
2025-08-19
934

FSD2025-0116
**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**
FSD2025-0116
*DLOM Determination - Restricted Stock Studies*

**Schedule C.1**
Valuation Date: March 25, 2025

2025-08-19
2025-06-04

| | | | Period Covered | | | | Reported | Reported |
|---|---|---|---|---|---|---|---|---|
| | **Name of Study** | **Study Date** | **From** | **To** | **Sub-Sample** | **Observations** | **Mean** | **Median** |
| 1 | SEC Overall Average | 1971 | 1966 | 1969 | Prior to Feb 1997 | 338 | 24.0% | NA |
| 2 | Johnson and Racette | 1981 | 1967 | 1973 | Prior to Feb 1997 | 86 | 34.0% | NA |
| 3 | Milton Gelman | 1972 | 1968 | 1970 | Prior to Feb 1997 | 89 | 33.0% | 33.0% |
| 4 | Robert R. Trout | 1977 | 1968 | 1972 | Prior to Feb 1997 | 60 | 33.5% | NA |
| 5 | Robert E. Moroney | 1973 | 1969 | 1972 | Prior to Feb 1997 | 146 | 35.6% | 33.0% |
| 6 | J. Michael Maher | 1976 | 1969 | 1973 | Prior to Feb 1997 | 34 | 35.4% | 34.0% |
| 7 | Stryker and Pittock (Standard Research Consultants) | 1983 | 1978 | 1982 | Prior to Feb 1997 | 28 | NA | 45.0% |
| 8 | Wruck, Karen H. (Unregistered only) | 1989 | 1979 | 1985 | Prior to Feb 1997 | 37 | 13.5% | 12.2% |
| 9 | FMV Opinions (Hall/Polacek) | 1994 | 1979 | 1992 | Prior to Feb 1997 | >100 | 23.0% | NA |
| 10 | Barclay, Holderness, and Sheehan | 2006 | 1979 | 1997 | Prior to Feb 1997 | 594 | 18.7% | 17.4% |
| 11 | Hertzel and Smith | 1993 | 1980 | 1987 | Prior to Feb 1997 | 106 | 20.1% | 13.3% |
| 12 | Management Planning, Inc. | 1997 | 1980 | 1995 | Prior to Feb 1997 | 49 | 27.7% | 28.9% |
| 13 | Hertzel, Lemmon, Linck, and Rees | 2001 | 1980 | 1996 | Prior to Feb 1997 | 404 | 16.5% | 13.4% |
| 14 | Wruck and Wu | 2008 | 1980 | 1999 | Encompassing 1997 | 1,854 | 11.3% | 11.0% |
| 15 | Angrist, Curtis, and Kerrigan (MPI) (Unregistered only) | 2011 | 1980 | 2009 | Spanning 1997 | 402 | 22.1% | 19.6% |
| 16 | Willamette Management Associates | 1989 | 1981 | 1984 | Prior to Feb 1997 | 33 | NA | 31.2% |
| 17 | Silber (1981-1988) | 1991 | 1981 | 1988 | Prior to Feb 1997 | 69 | 33.8% | NA |
| 18 | Krishnamurthy, Spindt, Subramanium, and Woidtke: | 2001 | | | | | | |
| | *All* | | 1983 | 1992 | Prior to Feb 1997 | 391 | 19.4% | NA |
| | *Restricted Shares* | | 1983 | 1992 | Prior to Feb 1997 | 75 | 34.0% | NA |
| | *Shares with Registration Pending* | | 1983 | 1992 | Prior to Feb 1997 | 23 | 23.3% | NA |
| | *Shares Not Known to Be Restricted* | | 1983 | 1992 | Prior to Feb 1997 | 293 | 15.4% | NA |
| | *Shares with Pending Registration or Not Known* | | 1983 | 1992 | Prior to Feb 1997 | 316 | 16.0% | NA |
| 19 | Wu | 2003 | 1986 | 1997 | Prior to Feb 1997 | 301 | 8.7% | 19.8% |
| 20 | Bajaj, Denis, Ferris, Sarin (Unregistered only) | 2001 | 1990 | 1995 | Prior to Feb 1997 | 51 | 28.1% | 26.5% |
| 21 | BVR (Johnson) | 1999 | 1991 | 1995 | Prior to Feb 1997 | 72 | 20.2% | NA |
| 22 | Finnerty: | 2012 | | | | | | |
| | *Pre-February 1997* | | 1991 | 1997 | Prior to Feb 1997 | 41 | 26.3% | 20.3% |
| | *Post-February 1997* | | 1997 | 2007 | After 1997 & Before 2008 | 176 | 21.5% | 15.6% |
| 23 | Chaplinsky and Haushalter: | 2010 | 1995 | 2000 | | | | |
| | *Purchase Discount Only* | | | | Encompassing 1997 | 382 | 18.7% | 15.0% |
| | *Purchase Discount and Warrant* | | | | Encompassing 1997 | 235 | 17.3% | 14.0% |
| 24 | Brophy, Ouimet, and Sialm: | 2006 | | | | | | |
| | *Hedge Funds - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 586 | 14.1% | NA |
| | *Other Investors - Traditional PIPEs* | | 1995 | 2002 | Encompassing 1997 | 1,559 | 9.0% | NA |
| 25 | Columbia Financial Advisors: | 2000 | | | | | | |
| | *Pre-February 1997* | | 1996 | 1997 | | 23 | 21.0% | 14.0% |
| | *Post-February 1997* | | 1997 | 1998 | After 1997 & Before 2008 | 15 | 13.0% | 9.0% |
| 26 | Meidan | 2006 | 1996 | 2003 | Encompassing 1997 | 1,726 | 9.8% | NA |
| 27 | Verdasca | 2007 | 2000 | 2006 | After 1997 & Before 2008 | 711 | 9.7% | 10.1% |
| 28 | Billett and Floros | 2012 | 2001 | 2008 | After 1997 & Before 2008 | 12,004 | NA | 26.7% |
| 29 | Stout Risius Ross | 2011 | 2005 | 2010 | Encompassing 2008 | 98 | 10.9% | 9.3% |
| 30 | Harris-Trugman Valuation Associates: | 2011 | | | | | | |
| | *All* | | 2007 | 2010 | Encompassing 2008 | 136 | 16.6% | 14.3% |
| | *Pre-SEC Rule Change* | | 2007 | 2007 | After 1997 & Before 2008 | 47 | 17.9% | 14.8% |
| | *Post-SEC Rule Change* | | 2008 | 2010 | Post 2008 | 89 | 15.9% | 14.3% |

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 248 of 759

TDIT005973

FSD2025-0116
FSD2025-0116

PM-17370
2025-06-04
2025-08-19
935

CONFIDENTIAL

**FSD2025-0116**
**FSD2025-0116**

2025-08-19
2025-06-04

**Charitable DAF HoldCo, Ltd**
**Discount for Lack of Marketability (DLOM) Analysis**

Schedule C.2
Valuation Date: March 25, 2025

*DLOM Determination - Restricted Stock Studies Summary Statistics*

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 249 of 759

| Descriptive Statistics for Reported Mean and Median Discounts | | |
|---|---|---|
| | **Mean** | **Median** |
| **All Studies** | | |
| Low | 8.7% | 9.0% |
| Median | 19.4% | 15.3% |
| **Mean** | **20.8%** | 19.8% |
| High | 35.6% | 45.0% |
| Standard Deviation | 8.2% | 9.4% |
| **All Studies Prior to Feb 1997** | | |
| Low | 8.7% | 12.2% |
| Median | 23.3% | 23.4% |
| Mean | 24.4% | 24.4% |
| High | 35.6% | 45.0% |
| Standard Deviation | 7.9% | 10.1% |
| **All Studies after 1997 and before 2008** | | |
| Low | 9.7% | 9.0% |
| Median | 15.5% | 14.8% |
| Mean | 15.5% | 15.2% |
| High | 21.5% | 26.7% |
| Standard Deviation | 5.2% | 7.0% |
| **All Studies Encompassing 1997** | | |
| Low | 9.0% | 11.0% |
| Median | 14.1% | 14.5% |
| Mean | 14.6% | 14.9% |
| High | 22.1% | 19.6% |
| Standard Deviation | 4.9% | 3.6% |
| **All Studies Encompassing 2008** | | |
| Low | 10.9% | 9.3% |
| Median | 13.8% | 11.8% |
| Mean | 13.8% | 11.8% |
| High | 16.6% | 14.3% |
| Standard Deviation | 4.0% | 3.5% |
| | | |
| **Indicated Discount for Lack of Marketability** | **20.8%** | |

**FSD2025-0116**
**FSD2025-0116**

TDIT005974

CONFIDENTIAL

FSD2025-0116
FSD2025-0116
1017
Page 1021 of 1530
Page 376 of 687
2025-08-19
2025-06-04

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 250 of 759

| Charitable DAF HoldCo, Ltd | Schedule C.3 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: March 25, 2025 |

*DLOM Qualitative Scoring*

| Feature | Restricted Stock | Rating | Discount for Lack of Marketability (DLOM) Analysis | Rating | Advantage |
|---|---|---|---|---|---|
| Asset liquidity | Securities examined in marketability studies often are of smaller industrial operating companies, often with poor cash flows. | Fair | A majority of investments are in illiquid securities with poor cash flows. However, CLO HoldCo has approximately $91 million in net cash, representing approximately 34% of net asset value. | Strong | Better |
| Cash flow expectations | Restricted securities typically have a lower likelihood of paying dividends since they are associated with emerging companies. | Fair | Distributions are entirely dependent on director discretion as to the timing and amount. Distributions are not required. However, regular distributions have been made over the last five years. | Good | Slightly better |
| Contingent liabilities | Moderate probability of contingent liabilities depending on type of company and size.  Smaller companies can fall prey to securities litigation. | Fair | Higher probability of contingent liabilities. The Company and CLO HoldCo has been engaged in numerous litigation matters. | Weak | Slightly worse |
| Debt capacity | Company leverage is usually on the higher side, as they are typically in the emerging stage. | Weak | CLO HoldCo has a small amount of debt representing 15% of net asset value. | Good | Better |
| Redemption/ withdrawal | No redemption rights. | Poor | No redemption rights. | Poor | Equal |
| Transfer restrictions | Transfer restrictions are limited to securities laws, with holding periods of two years.  Holding period was shortened to one year in 1997, but studies generally relate to two year holds. Once the restriction time period is complete, no restrictions on transfer exist. Markets are liquid for non-restricted shares. | Fair | Transfers must be approved by the directors. | Poor | Worse |
| Value of entity | Companies range in size, however, restricted securities are more commonly utilized by smaller companies in the development stage. Approximately 50 percent of the companies issuing restricted stock included in the Silber study had sales less than $40 million. | Fair | Participating shareholders have no direct rights to the underlying net asset value other than in a winding up.  CLO HoldCo is expected to generate revenue well in excess of the expected distributions. | Good | Slightly better |
| Value of interest | Purchasers of restricted securities tend to be institutional or private investors that are active in the public markets.  The analysis associated with these types of securities precludes small holders from purchasing. Size of interests tend to be moderate. | Fair | Participation shareholders are small, private foundations.  The foundations must be 501c3 non-profit organizations. At the director's discretion, participating shareholders may be diluted through the issuance of additional participation shares to non-existing participating shareholders. | Poor | Worse |

FSD2025-0116
FSD2025-0116
PM-17372
2025-06-04
2025-08-19
937

TDIT005975

CONFIDENTIAL

FSD2025-0116
FSD2025-0116
2025-08-19
2025-06-04

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 251 of 759

| Charitable DAF HoldCo, Ltd | Schedule C.4 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: March 25, 2025 |

*Calculation of Marketability Discount*

| Feature | Net Advantage | Gross Adjustment | Importance | Weight | Adjustment | Scaling Adjustment | Final Adjustment |
|---|---|---|---|---|---|---|---|
| | | | | | | F = 1+E or | |
| | A (Schedules B) | B = F(A) | C | D = F(C) | E = B x D | 1/(1-E) | |
| **Marketability Factors** | | | | | | | |
| Asset liquidity | Better | -16% | High | 100% | -16% | 86% | -2.9% |
| Cash flow expectations | Slightly better | -8% | High | 100% | -8% | 92% | -1.4% |
| Contingent liabilities | Slightly worse | 8% | High | 100% | 8% | 108% | 1.4% |
| Debt capacity | Better | -16% | Low | 25% | -4% | 96% | -0.7% |
| Redemption/ withdrawal | Equal | 0% | High | 100% | 0% | 100% | 0.0% |
| Transfer restrictions | Worse | 16% | High | 100% | 16% | 116% | 2.8% |
| Value of entity | Slightly better | -8% | Medium | 50% | -4% | 96% | -0.8% |
| Value of interest | Worse | 16% | Low | 25% | 4% | 104% | 0.8% |
| **Net Scaling Adjustment** | $G = Product (F_i), i = 1 to n$ | | | | | 96% | -0.8% |
| | | | | | | | |
| **Marketability Discount** | | | | | | | |
| Unadjusted discount | I (See Report) | | | | 20.8% | | |
| Scaling adjustment | G (See above) | | | | 96% | | |
| **Concluded Marketability Discount** | J = G x I | | | | 20.0% | | |

FSD2025-0116
FSD2025-0116
PM-17373
2025-06-04
2025-08-19
938

TDIT005976

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 252 of 759

| Charitable DAF HoldCo, Ltd | Schedule C.5 |
|---|---|
| Discount for Lack of Marketability (DLOM) Analysis | Valuation Date: March 25, 2025 |

*DLOM Footnotes and Comments*

---

**A)** Our comparison matrix ranks the features of the Subject Interest and the comparable interests on a scale from 1 to 5.

1 = Poor   2 = Weak   3 = Fair   4 = Good   5 = Excellent

We then subtract the Subject Interest feature score from the comparable feature score to determine the advantage.

0 = Equal   
1 = Slightly Better   2 = Better   3 = Much Better   4 = Significantly Better   
-1 = Slightly Worse   -2 = Worse   -3 = Much Worse   -4 = Significantly Worse

**B)** B is calculated as the weighted average standard deviation of the comparable investments in closed end funds multiplied by the Advantage Score.

**C)** The importance of the feature is assessed.   
1 = Low   2 = Medium   3 = High

**D)** Weights are allocated as follows:   
Low = 25%   Medium = 50%   High = 100%

**E)** To compute the adjustment, B is multiplied by D.

**F)** The scaling adjustment is computed as 1+E if E > 0 or 1/(1-E) if E < 0 for the particular feature.

**G)** The net scaling adjustment for marketability factors is the product of all marketability features' scaling adjustments.

**H)** The net scaling adjustment for control factors is the product of all control features' scaling adjustments.

**I)** This is the concluded baseline marketability discount determined for comparable investments.

**J)** This is the baseline marketability discount multiplied by the scaling factor.

**K)** This is the concluded baseline minority interest discount determined for comparable investments.

**L)** This is the baseline minority interest discount multiplied by the scaling factor.

**M)** This is the combined discount of both marketability and minority interest discounts.

TDIT005977

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

From: David N. Corkern
To: Charitable DAF HoldCo, Ltd.
Date: March 25, 2025

<u>Executive Summary</u>

This memorandum will serve to amplify the initial thoughts I provided regarding the U.S. tax issues as they related to the issuance of new participation shares in and reorganization of Charitable DAF HoldCo, Ltd. and its related companies (collectively "DAF"). My analysis is based upon a review of relevant sections of the Internal Revenue Code of 1986, as amended ("Code"), United States Treasury regulations ("Treasury Regulations" or "Treas. Reg."), relevant case law, and the facts that you have provided to me (outlined below) concerning DAF, James Dondero ("Dondero"), DAF's shareholders/supporting organizations, i.e., Highland Dallas Foundation, Inc. ("Highland Dallas"), Highland Kansas City Foundation, Inc. ("Highland Kansas City"), Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara"), and HMLP Charitable Fund (collectively "SOs"), and the historical interactions by and among DAF, Dondero, Dondero affiliates/entities, and SOs. I have not been asked to nor have I independently verified the facts that you have provided to me as they relate to DAF, Dondero, SOs (individually or collectively, including tax-exempt status by the IRS), and other individuals or entities associated therewith or who may have contracted or interacted therewith.

<u>Facts</u>[1]

DAF currently has four (4) non-voting SOs, each of which has been recognized as an organization exempt from U.S. income taxes under Code Section 501(c)(3).

Dondero appointed his college roommate, Grant Scott ("Scott"), to be the control person of DAF, who, at no time during his tenure at DAF, hired outside counsel, an independent director, or outside valuation experts to evaluate the transactions that Dondero undertook with DAF, either directly or through various entities that he controlled or exercised significant influence, including, but not limited to, SOs. In addition, Highland Capital Management, LP, an entity controlled by Dondero, charged investment manager fees to DAF. (It is my understanding that Scott never evaluated the reasonableness of those fees.) As outlined in the ValueScope Presentation (defined below), Scott approved deals with various Dondero-controlled entities for below-mark investment returns, effectively enriching Dondero to the detriment of both DAF and SOs, and the charitable organizations that they serve.

Dondero has operated his businesses (including Highland and now NexPoint) with very little excess cash and has looked to DAF as a source of $300 million that he can control, typically

---

[1] See Exhibit C for a timeline of relevant events.

1

FSD2025-0116                                                                                    2025-08-19

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

approaching DAF to serve as short-term or emergency bridge financing to enable his businesses to close speculative investments, each of which require DAF to take outsize risk for below-market investment returns.

In November 2023, Dondero attempted to exert influence over DAF's current director/manager, Mark Patrick, asking him to transfer from DAF approximately $1,500,000 to Sentinel Reinsurance, Ltd. (a Dondero-owned entity)[2] in payment of legal fees unrelated to DAF or its charitable purposes. This request would have taken money from DAF and its charitable beneficiaries and put it into Dondero's pockets. Outside counsel advised DAF leadership that the cash transfer proposed by Dondero would be "impermissible and illegal for a number of reasons."

Dondero is enmeshed in Highland Dallas, Highland Kansas City, and Highland Santa Barbara (the "Highland SOs"). Dondero is the Individual Member under the Bylaws of each. Dondero is also one of three members of the Board of Directors of each Highland SO, as well as the President of each. In addition to the authority granted by the Bylaws of the Highland SOs to Dondero, Dondero wields broad influence over the Highland SOs and their officers and directors, who view him as the "donor"[3] with respect to DAF. Dondero has appointed his public relations specialist, Lucy Bannon, as his primary contact with the Highland SOs.[4]

On October 2, 2024, Mark Patrick resigned from his position at Skyview Group, which is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or owned by Dondero. Skyview Group itself is owned by Scott Ellington, a long-time associate of Dondero.[5] On the same date, Mark Patrick also directed the DAF to terminate its services agreement with Skyview Group. Douglas Mancino of Seyfarth Shaw LLP, long-time compliance counsel to DAF, advised Mark Patrick to resign from Skyview Group to create more independence from Dondero. While Mark Patrick was at Skyview Group, Dondero had made demands that Mark Patrick meet with him three times a week in person regarding various Dondero-proposed investment opportunities to benefit Dondero and/or his affiliated entities, which demands Mark Patrick declined on behalf of DAF. While Mark Patrick was at Skyview Group, the Highland SOs had never raised a concern with Mark Patrick's leadership or his investment decisions or the financial information provided to the SOs. When Mark Patrick resigned from Skyview Group, he

---

[2] Dondero used Sentinel as part of a fraudulent insurance scheme to hide assets from a creditor of a fund and other investors.

[3] Dondero has donated an antique gun collection and hedge fund interest to the Highland Dallas Foundation. A confidential source has indicated to DAF that Dondero is promising the Dallas Foundation he will donate NexBank stock (the predominant source of his wealth) into a similar structure as DAF.

[4] DAF believes Ms. Bannon is assisting in writing the correspondence (detailed below) from Holland & Knight. A confidential source has indicated to DAF that Ms. Bannon has been appointed to an official position with the Highland SOs to act on their behalf.

[5] Although Ellington owns Skyview Group, all Skyview employees know, including its human resources department, that Dondero determines Skyview's employee's compensation, including Scott Ellington's. This is another example of Dondero creating a façade of an independent entity that is not independent.

2

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

made clear to Dondero associates that he did not intend to have further conversations directly with Dondero and that Mark Patrick viewed his resignation and the termination of the Skyview Group services agreement as in the best interest of DAF.

Immediately after Mark Patrick's resignation from Skyview Group, Dondero was furious and directed his associates at Skyview Group and NexPoint to begin a campaign to turn the Highland SOs against DAF. Dondero's associates, including Chris Rice (who works for both Skyview Group and NexPoint), reached out to DAF's back-office services provider, SEI, and requested financial information on the DAF. Chris Rice did not reveal to SEI that he was working at Dondero's behest. Chris Rice promptly took this information, after modifying it and trying to frame it as a parade of horrible, to the Highland SOs. The inaccurate information Chris Rice presented to the Highland SOs included: (i) 2024 director fees were on track to exceed $5 million (which is false and several multiples higher than the true amount) and (ii) 2024 legal expenses were on track to equal $12 million (which is again false and represents an annualized number only through June 30, 2024). Skyview Group had access to DAF financials throughout Mark Patrick's tenure, but Skyview Group did not go running to the Highland SOs until after Mark Patrick resigned from Skyview Group. Other than via the Skyview Group and the ValueScope quarterly reports, the Highland SOs do not have access to any of DAF's financial information.

Following Mark Patrick's resignation from Skyview Group and to assure the Highland SOs that DAF's charitable giving to the Highland SOs would continue as usual and that the Highland SOs would continue to receive the quarterly ValueScope reports as usual, Mark Patrick arranged meetings with the heads of the Highland SOs[6]. These meetings went well, and the discussions raised no concerns about DAF, its finances, or its governance. Despite these meetings and open lines of communication, Mark Patrick was never asked whether the information Chris Rice presented to the Highland SOs was true or false, which demonstrates the Highland SOs had marching orders by Dondero to attempt to wind up DAF and reject any other solution.

In early November 2024, DAF made clear it would not proceed with a Dondero-recommended investment, TCAL, which is outlined in the ValueScope presentation. NexPoint proposed TCAL to DAF in September 2024. TCAL represented an illiquid asset with no income, and the Dondero-proposed structure would have required DAF to pay all the costs while providing a right of repurchase to a Dondero-controlled entity to capture the upside, if any. This is another example of Dondero's hubris and his view of DAF's money as his money.

While the meetings by and among Mark Patrick, Doug Mancino, and the SOs were occurring, during October and November 2024, Dondero directed his personal attorney, Johnny Sutton at Ashcroft Sutton Reyes LLC, to reach out to DAF's counsel and ask if Mark Patrick would accept money to resign from the DAF. Sutton made various offers, including offering Mark Patrick

---

[6] These meetings are listed on Exhibit C.

3

FSD2025-0116                                                                                           2025-08-19

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

large sums of money, his own island in the Caribbean, and other accommodations (including releases) to resign. Each of these offers were rejected. Mark Patrick believed that Dondero made these offers because Dondero sensed he had lost any semblance of control over DAF and its assets. Mark Patrick believed that, if he were to resign, Dondero would appoint another individual loyal to Dondero's personal interests, which would enable Dondero to use DAF's assets to enrich himself once again at DAF's expenses. Johnny Sutton also suggested that he spoke on behalf of the Highland SOs.

On November 20, 2024, DAF arranged a presentation by ValueScope, a financial services provider to DAF, to counsel to the Highland SOs (the "ValueScope Presentation"). Attached as Exhibit A is the ValueScope Presentation. Among other things, this detailed DAF's historical investments and Dondero's influence on DAF's investments, and it also explained the voluminous and expensive lawsuits for which Dondero was responsible. It detailed that DAF had been named as a defendant in at least eight lawsuits due to its affiliation with Dondero and had also brought at least four lawsuits at Dondero's recommendation and insistence. The ValueScope presentation also outlines certain transactions proposed by Dondero to DAF that would have had outsized benefits for Dondero's own pockets[7] while creating significant risk and capped upside for DAF.

Courts have ruled that Dondero is a "vexatious litigant" due to his long, documented, and colorful history of bringing frivolous lawsuits motivated by personal animus, which are, almost without exception, losing cases.[8] Dondero's lawsuits follow a consistent theme: Dondero is sued for taking other peoples' money.[9] This is precisely what Dondero has tried to do with DAF.

Unbeknownst to DAF, prior to the ValueScope Presentation, the Highland SOs had written a letter dated November 11, 2024, asserting that the Highland SOs had no confidence in the governance structures of DAF and directing (without authority) DAF to avoid any depletion of assets (the "No Confidence Letter"). The No Confidence Letter was not mentioned during the

---

[7] There are numerous examples of Dondero financially benefitting from the DAF. A few include: (i) the Tall Pine scheme where Dondero employees appropriated $1MM from the DAF in a fraudulent transaction, (ii) directing money due by a Dondero entity to a DAF entity to instead pay one of Dondero's personal friends, Patrick McCabe, for a payment McCabe was owed by a Highland SO, and (iii) the aforementioned embezzlement request for Sentinel.

[8] Attached as Exhibit D is Dondero's Vexatious Reply Brief, in which he acknowledges he has no indirect or direct control over DAF and transferred control of Charitable DAF GP, LLC, the general partner of Charitable DAF Fund, LP to Grant Scott.

[9] A examples include: (i) Dondero diverted $160MM from a Highland-advised fund to a private insurance company under the guise of a fraudulent insurance policy to frustrate UBS on collection of a judgment and now is being sued in New York State Court by UBS for over $1 billion, (ii) Dondero withdrew tens of millions in cash from a fund called Crusader and justified it as "management fees owed"; the eventual arbitration award against him was so large his investment company had to file bankruptcy, (iii) Dondero funneled assets from a joint venture he had with Highland partner Josh Terry; this resulted in an involuntary bankruptcy to prevent the assets being funneled out of a joint venture to a Dondero entity, and (iv) after a falling out with Patrick Daughtery, Dondero funneled assets out of an employee retention vehicle and effectively away from Daughtery, resulting in extensive litigation.

4

FSD2025-0116                                                                                           2025-08-19

943

**CONFIDENTIAL**                                                                          TDIT005981

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

ValueScope Presentation. Further, the No Confidence Letter was not received from the Highland SOs or their counsel—the No Confidence Letter was provided by Johnny Sutton of Ashcroft, Dondero's personal attorneys, nearly a month after it was written, on December 6, 2024. Given the timing (barely a month after Mark Patrick had resigned from Skyview Group) and the source (Dondero's personal attorneys), it seems highly probable that the No Confidence Letter was written at Dondero's behest.

The No Confidence Letter also came as a surprise to DAF and its counsel because the ValueScope Presentation and the Murphy Presentation were well received. The Highland SOs made no effort to verify the information provided to them by Chris Rice and were undeterred and even communicating in bad faith given the No Confidence Letter's timing and the ValueScope and Murphy Presentations.

Following the ValueScope Presentation, on December 11, 2024, DAF held a presentation by its independent director, Paul Murphy, that provided extensive corporate governance and investment information (the "Murphy Presentation"), which is attached as Exhibit B. During the Murphy Presentation, Michael Stockham of H&K said the contents of the presentation were exactly what he wanted to hear and asked Paul Murphy to present it directly to the Highland SOs. Walkers (Cayman counsel to DAF) was also scheduled to present on the rights of participation shareholders during the Walkers presentation, but Stockham indicated that if Walkers were there to detail the limited rights of participation shareholders, he was already aware, and the presentation was unnecessary.

Based on the reception to the presentations (including Michael Stockham indicating he wanted to end on a "positive" note), and with a promise to continue addressing the Highland SOs' concerns, DAF's counsel requested the No Confidence Letter be withdrawn. This request was rejected. Notwithstanding the rejection of this request, DAF and the Highland SOs' counsel agreed that the best next step was to schedule a presentation by Paul Murphy directly to the Highland SOs.

On January 7, 2025, the ValueScope quarterly financial update was provided to the Highland SOs, which has been provided on a quarterly basis for years.

On January 10, 2025, Mark Patrick successfully negotiated that Dondero direct about $8 million to pay amounts that were due to DAF on the Small Bay II transaction. Since Mark Patrick's resignation from Skyview Group in October, Dondero had directed NexPoint to cease required payments to DAF on Small Bay II and other NexPoint-led investments.

On January 21, 2025, the Highland SOs' counsel emailed a request to set up a Zoom call for the Murphy presentation to the Highland SOs. Only two days later, on January 23, 2025, despite the pending Zoom call, Julie Diaz, CEO of the Highland Dallas Foundation, emailed Mark

5

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Patrick's out-of-use email address (which was communicated to her previously) to request additional financial information by February 10, 2025. On January 28, 2025, despite the pending Zoom call and the timeline in January 23, 2025, email, Julie Diaz sends a second email, this time requesting a winding up of DAF. These emails, of course, were inconsistent with the Zoom call with Paul Murphy.

On January 30, 2025, DAF responded to the Highland SOs and expressed concern (not for the first time) that Dondero was directing the Highland SOs to express these concerns and send this inconsistent communication.

On January 31, 2025, the Highland SOs' counsel responded and ignored DAF's concern that Dondero was controlling the Highland SOs. Instead, the Highland SOs' counsel adopted a confrontational, accusatory, and threatening tone, in stark contrast to the "positive" note that concluded the Murphy Presentation.

DAF emailed on February 4, 2025; to express it was willing to cooperate with the Highland SOs and provide them information but also requested the Highland SOs confirm they would like to continue to work with DAF to resolve their concerns.

H&K responded with an adversarial email on February 7, 2025, that contained misleading claims such as "over the last three months, you have not provided any information about the assets and financial health of the fund." This email ignored the fact that DAF provided the quarterly financial report for 9/30/24 on January 7, 2025, the ValueScope Presentation, and the Murphy Presentation. It is clear to DAF's leadership that the Highland SOs will not be satisfied by additional information and are being directed and controlled by their Individual Member, Director, and President—Dondero. Holland & Knight, as counsel to the Highland SOs, has opted for an adversarial, ostrich-head-in-the-sand approach to Dondero's misdeeds.

H&K's February 7, 2025, response also discussed Charitable DAF GP, LLC, the former general partner of Charitable DAF Fund, LP. Historically, Dondero once owned Charitable DAF GP, LLC, but transferred it to Grant Scott in 2012. DAF and its counsel identified that Dondero would be likely to contest the transfer to Scott and thereby seek to gain control of DAF and its assets, so for compliance purposes, DAF dissolved Charitable DAF GP, LLC and transitioned to a Cayman general partner for Charitable DAF Fund, LP.[10]

---

[10] Prior to receiving the February 7, 2025, email, DAF also heard from a confidential source that Dondero's associates were planning to assert control of Charitable DAF GP, LLC and thereby regain control of DAF. DAF interpreted this as a strategy that Dondero would attempt to assert his transfer to Grant Scott was invalid and then Dondero would control the general partner and direct the DAF to distribute its assets to Dondero or Dondero's affiliates.

6

## CARRINGTON COLEMAN

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

On February 12, 2025, Andrew Johnstone of Johnstone Law emailed Paul Murphy to say he represents Charitable DAF Fund 2 LP (DAF 2) and requested a meeting with Paul to discuss "DAF 1 and DAF 2." DAF has information that Dondero has been working to form another "DAF" with the intention to combine the two DAFs and assert control over the assets. DAF believes this is another attempt, directly or indirectly, by Dondero to assert control over DAF and its assets.

On February 13, 2025, Atlas IDF, LP, an entity controlled by Mark Patrick, filed a lawsuit against NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC ("NREP") and Nancy Dondero, as Trustee of The Dugaboy Investment Trust, due to NREP's and Dugaboy's (as a guarantor) failure to repay ~$13 million in demand notes. While Atlas IDF, LP is not owned by DAF, this filing shows more independence between Mark Patrick and Dondero.

On February 14, 2025, Doug Mancino emailed Michael Stockham of H&K correcting the various financial misstatements in H&K's email, addressing the control that Dondero is seeking to exert over DAF and the Participating Shareholders, and offering to have a call with Paul Murphy as previously discussed.

On February 25, 2025, Liberty CLO HoldCo, Ltd. ("Liberty"), a subsidiary of Charitable DAF HoldCo, Ltd., filed a lawsuit against Highland Capital Management Services, Inc. ("HCMSI"), an entity believed to be controlled by NexPoint and/or Dondero, because HCMSI defaulted on a ~$1.3 million promissory note payable to Liberty. Instead of making a required payment to Liberty, HCMSI directed the payment to a personal friend of Dondero named Patrick McCabe. This is more evidence that NexPoint and Dondero fail to repay their debts and more evidence of independence between DAF and Dondero.

On February 27, 2025: Michael Stockham of H&K sent letter requesting presentation from Paul Murphy in the next two weeks, as initially discussed in December. This request is a change of course from the January 21 and January 28 letters from Julie Diaz, which said that a presentation would not occur before DAF turned over to them substantial financial information.

On February 28, 2025, Liberty filed a lawsuit against Nancy Dondero, as Trustee for Dugaboy, Grant Scott, as Trustee of The SLHC Trust, NexPoint Advisors, and other NexPoint entities due to the NexPoint Affiliates' failure to satisfy their obligations under a put option contract. This is more evidence that Dondero and his entities fail to repay their debts and more evidence of independence between DAF and Dondero.

---

DAF believes the frustration in H&K's email is due, in large part, to the realization that the Dondero-GP strategy would not work. H&K attempted to twist the GP reorganization as evidence Mark Patrick was going rogue, but the GP reorganization also had benefits from a Cayman legal standpoint. This Dondero-GP strategy is also inconsistent with Dondero's Vexatious Reply Brief attached as Exhibit D, in which he acknowledges (i) he has no direct or indirect control over DAF and (ii) he transferred Charitable DAF GP, LLC to Grant Scott.

7

**CONFIDENTIAL**                                                      TDIT005984

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Historically, DAF was funded with assets from Highland Capital Management Partners Charitable Trust #2, which Dondero funded and obtained a charitable deduction for his contribution.

Application

1. Donative intent; Self-dealing penalties

Under U.S. tax law, when someone donates to charity, they have to give up "dominion and control" of the donated assets, meaning the donor has to completely and irrevocably transfer ownership and control of the property to the charity. This includes relinquishing any power to change the use or disposition of the donated assets. For the donation to be tax-deductible, the donor must (i) intend to permanently give up control of the property, (ii) transfer legal title and control of the property, (iii) deliver the property, and (iv) ensure the charity accepts the donation. To qualify for a charitable deduction, the donor cannot reclaim the property or dictate how it is used. See Code Section 170; Code Section 2511; Treas. Reg. Section 25.2511-2(b). The aforementioned facts suggest that Dondero is attempting, through his control of the Highland SOs, to exert dominion and control over the cash and property that he previously donated to DAF and for which he claimed charitable deductions, all for his personal benefit). If the Internal Revenue Service ("IRS") were to make a finding that Dondero never intended to part with dominion and control over the "gifts" he made to DAF, then they would likely disallow the income and gift tax deductions that he took, and impose civil penalties, including, but not limited to, the accuracy-related penalty on underpayments under Code Section 6662 and potentially the civil fraud penalty authorized by Code Section 6663.

In addition, Code Section 4941 imposes significant penalties on self-dealings between a private foundation (such as each Highland SO) and a "disqualified person." The term "disqualified person" is defined by Code Section 4946(a)(1) to include a "substantial contributor," as well as a "foundation manager" (i.e., officer, director, or trustee of a foundation) Based upon the facts provided, it seems clear that Dondero would be considered a "disqualified person" with respect to each and every Highland SOs. Dondero's past transactions (e.g., NexPoint) and other attempts to garner personal benefit at the expense of DAF and the Highland SOs. Along with the potential for self-dealing penalties under Code Section 4941, Dondero's persistent pattern of self-dealing with the Highland SOs exposes each of those entities to revocation by the IRS of its tax-exempt status. If the IRS were to determine that Dondero's pattern of self-dealing constituted a willful attempt to evade or avoid federal income taxes, then the IRS could refer to the matter for criminal prosecution. See Code Section 7201, et seq.

2. Private inurement/benefit

8

**CONFIDENTIAL** **TDIT005985**

**FSD2025-0116** **2025-08-19**

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

Organizations enjoying tax-exempt status under Code Section 501(c)(3) must comply with requirements set forth in relevant Code sections, as well as relevant Treasury Regulations. Code Section 501(c)(3) provides:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, <u>no part of the net earnings of which inures to the benefit of any private shareholder or individual</u>, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation (except as otherwise provided in subsection (h)), and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to ) any candidate for public office. (*Emphasis added*.)

The prohibition against private inurement is a statutory in nature and is also set forth in Treas. Reg. Section 1.501(c)(3)-1(c)(2). Private inurement is a subset of private benefit (discussed below) and has often been restricted to unjust payments of money to those individuals in positions of control within tax-exempt organizations. <u>See</u> IRS EO CPE (2001).

The concept of private benefit is derived from that part of Code Section 501(c)(3) that requires organizations (such as SOs) to be operated exclusively for tax-exempt purposes. Organizations will not be deemed exempt under Code Section 501(c)(3) unless they serve public rather than a private function. According to Treas. Reg. Section 1.501(c)(3)-1(d)(ii), an organization will not be deemed exempt unless it serves a public rather than a private interest. This concept was endorsed by the United States Supreme Court when it addressed the predecessor to Code Section 501(c)(3). <u>See</u> <u>Better Business Bureau of Washington, D.C. v. United States</u>, 326 U.S. 279 (1945). If an activity would benefit an individual or for-profit entity (regardless of whether such individual or for-profit entity is affiliated with or controls the tax-exempt entity) substantially, then the transaction would run afoul of the private benefit proscription, regardless of whether payments were unreasonable or excessive. <u>See</u> <u>Church by Mail v. Commissioner</u>, 765 F. 2d 1387 (9th Cir. 1985), <u>aff'g</u> TCM 1984-349 (1984). Other examples of private benefit/inurement have involved an inadequately secured loan (<u>Lowry Hospital Association v. Commissioner</u>, 66 T.C. 850 (1976) and payment of excessive rent (<u>Texas Trade School v. Commissioner</u>, 30 T.C. 642, aff'd 272 F. 2d 168 (5th Cir. 1959). The United States Tax Court has opined that, while some benefits can be conferred without jeopardizing an organizations tax-exempt status, "private benefits" should be defined as "nonincidental benefits conferred on disinterested persons that serve private interests."

9

**FSD2025-0116** **2025-08-19**
**948**

**CONFIDENTIAL** **TDIT005986**

1029

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

IRS and Treasury Regulations require that organizations enjoying tax-exempt status under Code Section 501(c)(3) be both organized and operated exclusively for tax-exempt purposes. Treas. Reg. Section 1.501(c)(3)-1(c)(1) provides that an organization will not be compliant with the operational test "if more than an insubstantial part of its activities is not in furtherance of an exempt purpose." While it is my understanding that each of the SOs has met the organizational test of Code Section 501(c)(3) and relevant Treasury Regulations, each SO must also pass the operational test throughout its existence. Whether a tax-exempt organization has engaged in activities that violate the proscriptions against private inurement and/or private benefit is highly fact specific. Treas. Reg. Section 1.501(c)(3)-1(d)(ii) places the burden of proof squarely upon a tax-exempt organization to demonstrate its continued compliance with the operational test described above.

While the current manager has been acting independently of Dondero and those under Dondero's influence and/or control, this pattern of Dondero's using DAF as his personal "piggy bank" may be perceived by the IRS and Dondero's creditors that DAF has been or is as his financial alter ego. Any suggestion or perception of alter ego status between Dondero and DAF increases the risk that DAF could find itself embroiled in litigation directed against Dondero, one or more SOs, and any of the other entities that he does or may control, whether directly or indirectly.

To the extent that any of the SOs have either encouraged or acquiesced in Dondero's accessing DAF funds for his personal benefit, either directly or through the entities that he controls or in which he has considerable financial interest, those organizations run an increased risk of losing their tax-exempt status by operating for private and not public benefit. As discussed above, each organization that has received tax-exempt status under Code Section 501(c)(3) must be organized <u>and</u> operating primarily for charitable purposes.

Given what has been detailed about Dondero's past and continued actions with SOs and DAF, there is a significantly heightened risk that the IRS could severely penalized and/or revoke the tax-exempt status of one or more SOs, which could imperil the status and assets of DAF. To help insulate DAF from any such exposure and to facilitate and expand its charitable purposes, DAF adopted a corporate restructuring on December 18, 2024, which resulted in the use of a Delaware blocking corporation to lessen the negative effect to DAF of Dondero's influence over the existing SOs.

Increasing the number of supporting organizations to current SOs would mitigate considerations of undue influence/private inurement/private benefit and broaden the scope of DAF's charitable reach to the public. The IRS will look favorably upon any and all attempts for DAF to maintain its independence from what seems to be persistent attempts by Dondero, and the entities controlled by him to use DAF for his private benefit and private inurement.

10

949

CONFIDENTIAL

TDIT005987

FSD2025-0116                                                    2025-08-19

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

**Exhibit A**

**November 20, 2024, ValueScope Presentation to Foundations**

[See attached.]

11

CONFIDENTIAL                                          TDIT005988

FSD2025-0116                                                                    2025-08-19

**CARRINGTON COLEMAN**

**David N. Corkern**
Senior Counsel
214-855-3099
DCorkern@ccsb.com

### Exhibit B

**December 11, 2024, Paul Murphy Presentation to Foundations**

[See attached.]

12

CONFIDENTIAL                                                              TDIT005989

### Exhibit C

### Timeline

- June 2023: DAF exposure to NexPoint DST transactions is over $100MM.[11]
- October 2023: DAF turns down NexPoint-proposed Storage Partners DST IV due to unfavorable economics for DAF.
- November 2023: DAF turns down NexPoint-proposed Storage Partners DST V due to unfavorable economics for DAF.
- November 2023: Dondero requests Mark Patrick direct DAF to wire money to Dondero's entity, Sentinel Reinsurance Ltd., so that Sentinel can pay some legal bills. The legal bills bear no relation to the DAF. Mark seeks the advice of counsel who suggests doing this may be illegal, so Mark refuses to do so.
- March 7, 2024: David Rosenberg emails Mark Patrick and NexPoint to inform them that Highland Dallas Foundation, Inc. will do business in Texas under the assumed name NexPoint Philanthropies, Inc.
- June 13, 2024: DAF closes NexPoint-proposed Small Bay II transaction, which diverts $10MM to Dondero's trust, Dugaboy.
- August 22, 2024: Doug Mancino speaks with David Rosenberg about various developments regarding the Highland Dallas Foundation and Jim Dondero
- September 2024: DAF turns down two NexPoint-proposed transactions that would benefit NexPoint and Dondero: (i) the preferred dividend financing and (ii) a new Storage Partners DST VI.
  - Rob Harris, NexPoint's general counsel, tells Shields that if DAF does not do the deal, "People will lose their jobs, and it isn't going to be me."
- September 2024: NexPoint proposed DAF invest $45 million in TCAL, receive a capped upside on its investment, and assume all the financial risk.
- September 26, 2024: Scott Ellington and Dylan Wiltermuth at Carey Olsen reach out to Paul Murphy and ask whether Paul would consider becoming a director of the DAF (which he obviously already was).
- September 30, 2024: Doug Mancino provides advice to Mark Patrick that there is a conflict of interest between DAF and Skyview Group and recommends Mark Patrick resign from Skyview Group and terminate the services agreement with Skyview Group

---

[11] From June 2023 until the present day, DAF and its counsel have successfully reduced this exposure level to about $700k in February 2025. In October 2023, DAF received advice from counsel "…you should substantially reduce any such [Dondero-led investments] so that they compromise only an insubstantial amount of the assets held in the DAF structure" due to concerns that, as of June 2023, DAF entities' investments in Dondero-led investments was 44% of its total investments. DAF was concerned that Dondero would direct his entities (including NexPoint) to stop payment on Dondero-led investments if DAF rejected Dondero's proposals. This concern was validated in October, November, and December of 2024 because, when Mark Patrick left Skyview Group, Dondero directed NexPoint to stop paying DAF about $8 million that it was due on Small Bay II.

- October 2, 2024: Mark Patrick resigns from Skyview Group
- October 2, 2024: DAF terminates services agreement with Skyview Group
- October 3-October 24, 2024: Chris Rice (a Skyview Group employee and a NexPoint employee) reaches out to SEI and convinces SEI to provide financial information relating to the DAF
- October 10, 2024
    o Mark Patrick meets with Julie Diaz of the Highland Dallas Foundation, Inc.
    o Mark Patrick has a telephone call with Debbie Wilkerson, the CEO of Highland Kansas City Foundation, Inc.
- October 10, 2024: NexPoint ceases payments to DAF that NexPoint is contractually obligated to make regarding Small Bay II
- October 14, 2024: Doug Mancino talks to Tammy Sims Johnson of the Highland Santa Barbara Foundation, Inc.
- October 3-November 11, 2024: Supporting organizations hire H&K (including a litigator) to represent them
- November 8, 2024: DAF effectively declines TCAL transaction proposed to Mark Patrick by Dondero because the economics were unfavorable for DAF
- November 11, 2024: Supporting organizations sign letter addressed to Paul Murphy, conspicuously not signed by Dondero
    o This letter is the first indication to DAF, Mark Patrick, Paul Murphy, and Doug Mancino that the supporting organizations have any issues, despite
- November 20, 2024: ValueScope and Doug Mancino make presentation to H&K, counsel to the supporting organizations
- December 6, 2024: Supporting organizations' letter received by Brian Shaw, counsel to DAF/Mark Patrick, who forwards it to Paul Murphy, who confirms he had not previously received it.
- December 11, 2024: DAF holds presentation with Paul Murphy re: corporate governance and investments. Walkers (Cayman counsel) also joins. H&K declines to hear from Walkers re: participation share rights.
- December 13, 2024: Doug Mancino emails H&K requesting withdrawal of the November 11 letter and proposing a path forward.
- December 18, 2024: Doug Mancino follows up on his December 13, 2024, email.
- December 19, 2024: David Rosenberg of H&K refuses to withdraw letter and discusses a presentation by Paul Murphy to the foundations.
- January 7, 2025: the ValueScope 9/30/24 quarterly report is provided to the Highland SOs.
- January 8, 2025: David Rosenberg of H&K proposes times for presentation by Paul Murphy to the foundations.

14

FSD2025-0116                                                                                            2025-08-19

- January 10, 2025: In a matter related to the HCMLP bankruptcy, Mark Patrick successfully negotiated that Dondero direct about $8 million to pay amounts that were due to DAF on the Small Bay II transaction.

- January 21, 2025: David Rosenberg confirms a Zoom call is fine.

- January 23, 2025: Julie Diaz, CEO of the Highland Dallas Foundation, emailed Mark Patrick's out-of-use email address (which was communicated to her previously) to request additional financial information by February 10, 2025

- January 28, 2025: Julie Diaz sends a second email, this time requesting a winding up of the DAF.

- January 30, 2025: DAF (Paul Murphy) responded to the Highland SOs and expressed concern (not for the first time) that Dondero was directing the Highland SOs to express these concerns and send this inconsistent communication.

- January 31, 2025: Michael Stockham of H&K sends an adversarial email ignoring DAF's concerns.

- February 4, 2025: DAF (Paul Murphy) emails and says it is willing to cooperate with the Highland SOs and provide them with information but also requested the Highland SOs confirm they would like to continue to work with DAF to resolve their concerns.

- February 7, 2025: DAF HoldCo approves issuance of participation shares to DFW Charitable Foundation, which result in DFW Charitable Foundation holding 51.04% of the participation shares.

- February 7, 2025: Michael Stockham of H&K sends another adversarial email that contains misleading claims.

- February 12, 2025: Andrew Johnstone of Johnstone Law emails Paul Murphy saying Johnstone acts for "Charitable DAF Fund 2 LP (DAF 2)".

- February 13, 2025: Atlas IDF, LP, an entity controlled by Mark Patrick, filed lawsuit against NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, and Nancy Dondero, as Trustee of The Dugaboy Investment Trust, alleging that NexPoint (as payor) and Dugaboy (as guarantor) failed to repay ~$13 million in demand notes following demand.

- February 14, 2025: Doug Mancino emails Michael Stockham of H&K correcting the various financial misstatements in H&K's email, addressing the control that Dondero is seeking to exert over DAF and the Participating Shareholders, and offering to have a call with Paul Murphy as previously discussed.

- February 25, 2025: Liberty CLO HoldCo, Ltd. ("Liberty"), a subsidiary of Charitable DAF HoldCo, Ltd., filed lawsuit against Highland Capital Management Services, Inc. ("HCMSI"), an entity believed to be controlled by NexPoint and/or Dondero, alleging that HCMSI defaulted on a ~$1.3 million promissory note payable to Liberty. Instead of making a payment to Liberty, HCMSI directed the payment to a personal friend of Dondero, Patrick McCabe.

15

CONFIDENTIAL                                                                            TDIT005992

- February 27, 2025: Michael Stockham of H&K sent letter requesting presentation from Paul Murphy in the next two weeks.
  - This is the presentation that was planned for January prior to the letters on January 21, 2025 and January 28, 2025, which effectively retracted the request for a presentation.
- February 28, 2025: Liberty filed lawsuit against Nancy Dondero, as Trustee for Dugaboy, Grant Scott, as Trustee of The SLHC Trust, NexPoint Advisors, and other NexPoint entities due to the NexPoint Affiliates' failure to satisfy their obligations under a put option contract.
- February 28, 2025: Charitable DAF HoldCo, Ltd. received FTI Consulting valuation analysis that suggests a discount of 95% of net value should be applied to the Participation Shares.
- March 3, 2025: Charitable DAF HoldCo, Ltd. received ValueScope valuation analysis of 100 Participation Shares at $529,183.
- March 20, 2025: Charitable DAF HoldCo, Ltd. sends letter to Internal Revenue Service raising issues with Highland Dallas Foundation, Inc.
- March 21, 2025: Charitable DAF HoldCo, Ltd. sent copy of IRS letter to Texas AG, Missouri AG, and California AG

16

**CONFIDENTIAL**                          **TDIT005993**

**<u>Exhibit D</u>**

**Vexatious Reply Brief**



Dondero Vexatiuos
Reply Brief and DAF

CONFIDENTIAL                TDIT005994



Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201-5241

www.seyfarth.com

March 20, 2025

**FEDEX**

TEGE Referrals Group
Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re:   Highland Dallas Foundation, Inc. (EIN: 45-3961755)

Dear Sir or Madam:

I am writing on behalf of my client, Charitable DAF Holdco, Ltd., a Cayman Islands exempt[1] company ("DAF Holdco"), concerning the deterioration of its relationship with one of its Participating Shareholders, Highland Dallas Foundation, Inc. ("Highland Dallas"). Highland Dallas is a supporting organization of the Dallas Foundation.[2]

The deterioration of this relationship is due directly to the undue influence and control exercised over Highland Dallas by James D. Dondero and his affiliates, as described in this Form 13909, *Tax-Exempt Organization Complaint (Referral)*. This disclosure letter supplements in detail and in exhibits the more general information described in the accompanying Form 13909 and is an integral part of that form (collectively, the Form 13909 and this letter are referred to as the "Referral").

We believe the information described in this Referral will demonstrate clearly that Mr. Dondero's influence and control is an inappropriate donor relationship with representatives of the Dallas Foundation who serve on the Board of Directors of and as officers of Highland Dallas. We believe this undue influence and control potentially jeopardizes the tax-exempt status of Highland Dallas as an organization described in section 501(c)(3) and, at a minimum, causes it to fail to remain a supporting organization described in section 509(a)(3) because of the

---

[1] To be clear, DAF Holdco is not a tax-exempt organization under U.S. tax law, notwithstanding the use of the term "DAF" in its corporate name.. However, under its Cayman Islands Articles of Association, a "Restricted Person," i.e., an entity that *cannot* own Participating Shares, is an organization that is *not* described in section 501(c)(3) of the Code. As a consequence, all Participating Shareholders of DAF Holdco must be and remain organizations described in section 501(c)(3).
[2] The Dallas Foundation is a tax-exempt community foundation described in sections 501(c)(3), 509(a)(1) and 170(b)(1)(A)(vi) of the Internal Revenue Code of 1986 (the "Code").

CONFIDENTIAL                                                        TDIT005995

March 20, 2025
Page 2

excessive influence of a disqualified person and substantial contributor, i.e., Mr. Dondero, under section 509(a)(3)(C).

This Referral is divided into three major parts, with multiple subparts.

Part I provides the Internal Revenue Service (the "IRS" or the "Service") with extensive factual information concerning Highland Dallas, its governance and control. As will be seen, Mr. Dondero exerts undue influence and control over Highland Dallas directly, as a director, President and substantial contributor, and indirectly through his and his associates' influence over Highland Dallas's supported organization representatives on the Highland Dallas Board of Directors, and the Dallas Foundation itself.

Part II provides the IRS with background information on DAF Holdco and Mr. Dondero's efforts to exert dominion and control over DAF Holdco and its assets. Because Highland Dallas is a Participating Shareholder of DAF Holdco, Mr. Dondero's efforts (both successful and unsuccessful) to control DAF Holdco for his personal gain directly affect Highland Dallas financially and provide him an additional amount of private benefit and private inurement from a donation where he once benefitted from a charitable contribution deduction to a charitable remainder trust ("CRT").

As will be discussed in Part III, the tax discussion section, Mr. Dondero's influence and control is pervasive and is exercised primarily for Mr. Dondero's financial benefit directly and for the financial benefit he derives indirectly through several entities owned or controlled by him. We believe he therefore derives more than insubstantial benefit form Highland Dallas and causes its net earnings to inure to his benefit, all in violation of section 501(c)(3)'s most basic operational requirements. Also, at a minimum, we believe his influence and control over Highland Dallas has caused it to become a private foundation, thereby subjecting Mr. Dondero to Chapter 42 excise tax exposure.

I.     **Background Concerning the Formation and Legal Structure of Highland Dallas, Highland Capital Management, L.P., and NexPoint Advisors, L.P.**

**A. Highland Dallas**

Highland Dallas was incorporated as a Delaware nonprofit nonstock corporation by Mr. Dondero in 2011 in connection with his desire to form three tax-exempt public charities to become the three remaindermen of a CRT of which he was the income beneficiary. Highland Dallas applied for and was recognized by the IRS as a charitable organization described in section 501(c)(3) of the Code and as a supporting organization of the Dallas Foundation described in section 509(a)(3) of the Code. Highland Dallas did not register as a foreign corporation to do business in Texas until 2020.

At the time of its formation, Mr. Dondero became the sole "individual" member of Highland Dallas, with the legal power to select one director. The Dallas Foundation became the sole "institutional" member of Highland Dallas, with the power to select two directors. Thus, in 2011, Highland Dallas satisfied the requirements for being classified as a Type I supporting organization of the Dallas Foundation.

CONFIDENTIAL

TDIT005996

March 20, 2025
Page 3

In addition, Mr. Dondero, in 2011, became and remains today the President of Highland Dallas and a member of its Board of Directors.

The other two supporting organizations are the Highland Santa Barbara Foundation, Inc. ("Highland Santa Barbara") (EIN 45-3962008) and the Highland Kansas City Foundation, Inc. ("Highland Kansas City") (EIN 45-3961865). These two supporting organizations of the Santa Barbara Foundation and Greater Kansas City Community Foundation, respectively, also have the same legal structure as Highland Dallas and, like Highland Dallas, each owns 100 Participating Shares of DAF Holdco.

We do not believe either Highland Santa Barbara or Highland Kansas City is as easily manipulated by Mr. Dondero and his affiliates as Highland Dallas because, according to their Forms 990 for 2023 (which is the last year those forms are available on Guidestar.com), Participating Shares of DAF Holdco are their only assets. By contrast, Mr. Dondero has made substantial additional contributions to Highland Dallas after 2011, either directly or through trusts or other entities owned or controlled by Mr. Dondero, some of which will be addressed later in this Referral. Thus, we believe Mr. Dondero is in a position to exert greater influence as a substantial contributor to Highland Dallas on the Directors of Highland Dallas appointed by the Dallas Foundation (including the Dallas Foundation's President & CEO, Julie Diaz).[*]

### B.  Mr. Dondero and Highland Capital Management, L.P.

Highland Capital Management, L.P. ("HCM") is an investment management firm located in Dallas, Texas that was co-founded in 1992 and controlled by Mr. Dondero and individuals close to him. As described on page 7 of the *Special Turnover Petition* filed by UBS Securities LLC and UBS AG London Branch in the New York Supreme Court in 2023, a complete copy of which is enclosed with this Referral as Exhibit 1 (the "2023 UBS Petition"), before HCM filed for bankruptcy, "HCM was an investment management firm that managed billions of dollars of assets 'through its organizational structure of approximately 2,000 separate business entities'" (citation omitted). It is estimated by a plaintiff in another action that, at its height, HCM managed as much as $40 billion in assets.

Mr. Dondero was not only HCM's co-founder with Mark Okada,[*] he served as HCM's President and Chief Executive Officer until he was removed by the bankruptcy trustee in 2020.

---

[*] By way of example, the consolidated financial statements of the Dallas Foundation for 2023 available on its website include the assets of seven supporting organization, including Highland Dallas. Page 22 of the statements disclose that approximately $163.4 million of its assets were held by supporting organizations. On page 19, it appears that approximately $92.3 million (almost 57%) represent Highland Dallas assets. Also, in 2023, Highland Dallas received almost $34 million in charitable contributions, presumably all from Mr. Dondero and entities affiliated with or controlled by him. Thus, it is understandable why the Dallas Foundation representatives who serve on the Highland Dallas Board would acquiesce to almost any request or demand made by Mr. Dondero or one of his associates such as Lucy Bannon.

[*] In the Dallas Foundation's 2022 Form 990, the most recent available on Guidestar.com, Mr. Okada was listed as a member of the Board of Governors of the Dallas Foundation. On its website, the Dallas Foundation identifies another consultant and employee of Mr. Dondero, Lucy Bannon, as an "Advisory Member" of the Board of Governors (last visited March 5, 2025). Thus, Mr. Dondero continues to exert substantial indirect influence over Highland Dallas's supported organization, the Dallas Foundation.

March 20, 2025
Page 4

C. Mr. Dondero, NexPoint Advisors, L.P., and NexPoint Hospitality Trust

In 2012, prior to his removal as President of HCM in 2020, Mr. Dondero formed NexPoint Advisors, L.P. ("NexPoint Advisors"), a Dallas-based portfolio real estate and investment firm. NexPoint Advisors is one of a vast array of entities operating under the "NexPoint" umbrella. After the HCM bankruptcy, Mr. Dondero and his affiliates seamlessly shifted their operations from HCM to NexPoint Advisors and its affiliates.

As alleged in another lawsuit filed in 2021 in the United States Bankruptcy Court of the Northern District of Texas by Marc S. Kirshner as a litigation trustee in the HCM bankruptcy case, "NexPoint [Advisors] was effectively a shell entity that Dondero created in March 2012 to siphon profits from [HCM] in order to evade [HCM's] creditors." *See Complaint and Objection to Claims* in *Kirschner v. Dondero, et. Al.* Case No. 19-34054-sgj11, at pages 18-21, a copy of which is attached as Exhibit 2.

Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), a grantor trust, allegedly owns 99.9% of NexPoint Advisors. Mr. Dondero is the income beneficiary of Dugaboy and his sister, Nancy Dondero, is the family trustee of Dugaboy.

One of the entities affiliated with and advised by NexPoint Advisors is NexPoint Hospitality Trust, an open-ended real estate investment trust (the "REIT") based in Ontario, Canada. The REIT was formed in 2018 for the purpose of acquiring and operating income-producing hotel properties in the United States. The REIT's investment interests (called "Units") were listed for public trading on the TSX Venture Exchange of the Toronto Stock Exchange ("TSXV").

Dugaboy contributed 1,500,000 Class B non-voting Units of the REIT to Highland Dallas on December 24, 2019 and also granted Highland Dallas an "embedded" put option to sell them back to Dugaboy for $6.19 per share (the "Put Option"). The net asset value of the REIT as of December 24, 2019 was $6.19 per share. The Put Option is exercisable at any time prior to December 24, 2026. See the Dugaboy/REIT documents included as Exhibit 2.

The significance of the Put Option at that time is that the Class B non-voting Units could be treated for valuation purposes as equivalent to the Class A voting Units, which were owned or controlled by Mr. Dondero. Therefore, for purposes of determining their fair market value on the date of the charitable contribution, the valuation firm could value them as if they were voting Units unreduced by a 2.9% discount for lack of control. That allowed Dugaboy to claim a charitable deduction in 2019 of $11,505,000, which we assume passed through to Mr. Dondero as the income beneficiary of Dugaboy. We also assume that Highland Dallas signed a Form 8283, *Noncash Charitable Contributions*, form acknowledging it received the Units that would have been included with Mr. Dondero's 2019 Form 1040 along with a qualified appraisal of the Units (we have no actual knowledge of this, however).

On information and belief, we believe Mr. Dondero has used his influence and control over Highland Dallas to cause it defer exercising the Put Option at least through the effective time of the merger for at least three reasons.

- First, the forbearance to exercise the Put Option allows Mr. Dondero and Dugaboy to enjoy the benefits of an interest-free loan of $9,285,000 (the put exercise price ($6.19 x 1,500,000 units) while the Put Option remains outstanding and unexercised.

CONFIDENTIAL                                                         TDIT005998

1041

March 20, 2025
Page 5

- Second, the forbearance to exercise the Put Option effectively has protected Mr. Dondero from the declining value of the REIT between December 2019 and November 2024. As of November 22, 2024, the reported fair value of the Units was $0.015 per Unit, so the fair value on that date of 1,500,000 Units was only $22,500, less than one percent of the Put Option value of $9,285,000.

- Third, most charitable organizations have a policy of immediately selling contributed shares that are listed for trading on a stock exchange in order both to diversify and to reinvest the sale proceeds in a manner that aligns more closely with the charity's investment policy. Had Highland Dallas sold the Units on the TSXV at any time within three years after their receipt, Highland Dallas would have been required to file a Form 8282, *Donee Information Return*, with the Service that would likely have reflected a much lower value of the original contribution amount claimed in 2019. Thus, in effect, Highland Dallas was acting to protect Mr. Dondero from having to address the precipitous fall in fair market value as the REIT Units plummeted in value beginning shortly after the gift was made.

Highland Dallas's failure to exercise the Put Option up until now becomes all the more significant because on November 25, 2024, the REIT announced the execution of a definitive agreement (the "Merger Agreement") pursuant to which the REIT will be dissolved and its subsidiary entities will be merged with and into entities owned or controlled, directly or indirectly, by NexPoint Diversified Real Estate Trust. Under the Merger Agreement, The proposed price per Unit is $0.36 per Unit. According to the press release issued by the REIT announcing the merger, "[t]he proposed price of US$0.36 per Unit represents a premium of approximately 2300% to the 30-day volume weighted average price per Unit on the TSXV ended November 22, 2024 of US$0.015."

Last month, in a press release issued on February 21, 2025, it was announced that a majority of minority votes approved of the merger. Under Canadian law, when a person such as Mr. Dondero owns or controls a majority of a Canadian public company's voting shares, a transaction such as this merger must be approved by two-thirds of the minority shares, or in this instance the 5,131,020 Class B non-voting Units.

Based on public filings with the U.S. Securities and Exchange Commission, we believe the REIT had approximately 29,353,660 Units, of which 82.52% were owned by entities owned or controlled by Mr. Dondero.

We have to assume that Highland Dallas voted its 1,500,000 Units in favor of the merger at Mr. Dondero's request.[5] That suggests that the merger needed Highland Dallas's 29.2% (almost one-third of the two-thirds vote required) of minority Unit's approval. That also suggests that

---

[5] We understand that the Board of Directors of Highland Dallas usually acts by Unanimous Written Consent Without a Meeting, which means the Mr. Dondero along with the two Dallas Foundation Board appointees would have approved voting in favor of the merger. Presumably the same would be true if a decision were taken by the Board to refrain from exercising the Put Option.

961

CONFIDENTIAL                                              TDIT005999

March 20, 2025
Page 8

Highland Dallas chose not to exercise its Put Option to permit Mr. Dondero to retain control over the REIT even as its finances deteriorated.

We have no way of knowing whether Highland Dallas will exercise the Put Option before the REIT is dissolved (projected for the end of the first quarter of 2025, i.e., by the end of this month), but clearly if it fails to do so this will result in a $9 million inappropriate windfall to both Dugaboy and Mr. Dondero. Obtaining the answer to this question would only require the IRS to open an examination of Highland Dallas and issue an Information Document Request and/or issue a third-party subpoena to Dugaboy.[6]

### D. Highland Dallas's Assumed Name

In March 2024, Highland Dallas filed an Assumed Name certificate with the Texas Secretary of State to permit it to operate under the name "NexPoint Philanthropies Dallas, Inc." This is consistent with Mr. Dondero's current ownership and control of NexPoint Advisers and his loss of control of HCM in the bankruptcy and consistent with the goal of allowing a private company (NexPoint) and Mr. Dondero to take credit for and enjoy the halo effect from NexPoint Philanthropies Dallas's (really Highland Dallas's) charitable giving.

### E. Mr. Dondero's Firearms Contributions to Highland Dallas

Several years ago, Mr. Dondero (either directly or through entities owned and controlled by him) made contributions of a collection of firearms to Highland Dallas. Presumably, a Highland Dallas officer signed the donee acknowledgement on Form 8283, Noncash Charitable Contributions, and checked the box "No" asking whether the organization intended to use the property for an unrelated use, because checking "Yes" would limit Mr. Dondero's charitable contribution deduction to his adjusted basis and not its appraised fair market value. This in itself demonstrates Mr. Dondero's improper influence over the Dallas Foundation representatives serving as Board members and officers of Highland Dallas, especially as it is hard to believe a supporting organization of a community foundation could possibly use firearms in a related trade or business.

But to further demonstrate his abuse and diversions of assets for his own benefit, earlier this year in 2025 he diverted a substantial debt service payment of $1.3 million on a loan owed to one of DAF Holdco's subsidiaries to pay for a specially-designed and built vault for those firearms (shotguns). That diversion of assets has caused a default of that loan that has now landed in Texas State court, thereby depleting DAF Holdco's assets further because of legal fees. It is unknown whether the vault was requested by anyone associated with the Dallas Foundation serving as a director or officer of Highland Dallas, such as Julie Diaz, but we believe it likely was.

### F. Mr. Dondero's Character

Mr. Dondero has a demonstrated pattern of behavior of stealing assets from those he perceives as adversaries. What is also demonstrated by even a cursory reading of the 2023 UBS Petition

---

[i] We will be happy to provide the IRS with a copy of the S-4 filed with the SEC available on EDGAR and the REIT's press releases that were used to develop this data.

CONFIDENTIAL

TDIT006000

March 20, 2025
Page 7

and the *First Amended Original Complaint* filed by Highland Employee Retention Assets LLC against Mr. Dondero and his affiliates on July 15, 2024 in the U.S. District Court for the Northern District of Texas, Dallas Division, a complete copy of which is enclosed as Exhibit 4 with this Referral (the "2024 Complaint"), Mr. Dondero, to put it mildly, has no respect for corporate formalities and is willing to engage in self-dealing to strip entities of their assets without regard to any fiduciary duty of care or loyalty to serve his personal needs and to benefit himself financially to the detriment of others, including his own former HCM employees.[7]

The 2023 UBS Petition outlines how Mr. Dondero, facing a $1 billion judgment, directed various entities he owned and controlled to shift substantially all of their assets offshore to a Cayman Islands insurance company for a fraudulent insurance policy. The 2023 UBS Petition is an attempt to collect on a 2020 $1 billion judgment in favor of the UBS entities. Mr. Dondero has been so successful at hiding assets that the UBS entities have not been paid.

The 2024 Complaint seeks recovery of hundreds of millions from Mr. Dondero. It describes how a former Mr. Dondero employee at HCM, Patrick Daugherty, had a falling out with Mr. Dondero. After the falling out, Mr. Dondero took extraordinary steps to ruin Mr. Daugherty's life—depriving him of assets, removing his long-term incentive plan, embroiling him in lawsuits, and the list goes on.

These are not isolated incidents. In the ACIS Capital Management, L.P. matter,[8] Mr. Dondero had a falling out with Josh Terry, a former employee of HCM, and took extraordinary steps to ruin Mr. Terry's life—the same playbook as above with Mr. Daugherty.

In fact, Mr. Dondero and his litigiousness is widely known in the Dallas/Fort Worth area. Mr. Dondero is variously described as "Highland Capital's Giraffe-Eating Hedge Fund Manager" (Dallas Observer June 1, 2012), and "the distressed debt investor who was once a scourge to private equity. . . " (Financial Times March 10, 2023).

As it relates to this Referral more specifically, in a May 3, 2023 post entitled "James Dondero: Dallas's Surprising Philanthropy Hero," the post states: "Most gifts are made through the Highland Dallas Foundation, Inc., the philanthropic arm of Highland Capital Management." Note that this post appears to have been prepared by Mr. Dondero himself and appeared three years after he was ousted as HCM's President. What's more to the point is that it outlines in Mr. Dondero's own words the likely failures of Highland Dallas to comply with the section 509(a)(3) operational test discussed below. A copy of that post is included as Exhibit 6.

### G. Skyview Group

Skyview Group is a back-office and administrative service provider whose clients consist 99% of entities affiliated with or controlled by Mr. Dondero. Mr. Mark Patrick was engaged as a tax

---

[7] *See also In Re: Highland Capital Management L.P. v. Dondero*, Case No. 19-34054-sgj11 (June 6, 2021), a decision by the U.S. Bankruptcy Court for the Northern District of Dallas. In that opinion, the Bankruptcy Judge found Mr. Dondero to be in contempt for violating a temporary restraining order. A copy of that opinion is enclosed as Exhibit 5.

[8] We can provide the IRS with a copy of this complaint if that would be of interest.

CONFIDENTIAL

TDIT006001

March 20, 2025
Page 8

consultant by Skyview Group until Mr. Patrick resigned in October 2024 on the advice of the undersigned counsel. Skyview Group charged DAF Holdco management fees for its services.

Skyview Group is nominally owned and controlled by Scott Ellington, who was HCM's Chief Legal Officer and General Counsel until his removal by the bankruptcy trustee in 2021. Despite this nominal ownership and control by Mr. Ellington, Mr. Dondero controls all compensation decisions, including decisions relating to Mr. Ellington's compensation, and thus dominates Skyview Group as if he owned it himself.

Since Mr. Patrick's resignation from Skyview Group, Mr. Patrick has been directly employed and compensated by DAF Holdco rather than Skyview Group. In addition, Mr. Patrick, again acting on advice of counsel, caused DAF Holdco to give six-months' notice in October 2024 to Skyview Group that it was terminating its contract with Skyview Group.

Mr. Dondero became furious when he learned of these actions, and that is when (for the first time in over a decade) Highland Dallas and Dallas Foundation executives and attorneys started raising questions about DAF Holdco's investments and management. In addition, this is when Highland Dallas, and Julie Diaz (who serves as both the President of the Dallas Foundation and as a Director and Vice President of Highland Dallas), began voicing concerns over DAF Holdco's investment performance, concerns that were never raised when Mr. Dondero's lackey, Grant Scott was rubber-stamping NexPoint and other Dondero-related investments and that were never raised prior to Mr. Patrick's resignation from Skyview Group.

## II.   DAF Holdco

### A. The Grant Scott Control Era

Back in 2011, when Highland Dallas and the two other supporting organizations were being formed, one of the highly successful types of investments designed and marketed by HCM through investment partnerships were collateralized loan obligations, or CLOs.

A CLO is a single security backed by a pool of corporate debt issued by corporate borrowers with low credit ratings or loans taken out by private equity firms to conduct leveraged buyouts. With a CLO, the investor receives scheduled debt payments from the underlying loans, assuming most of the risk in the event of a default. In exchange for taking on that default risk, the investor is offered greater diversity and the potential for higher-than-average investment returns. DAF Holdco was formed initially in 2011 to hold partnership interests in partnerships that held CLOs.

Mr. Dondero caused DAF Holdco to be formed to have a structure through which he could have his CRT make remainder interest distributions of the Participating Shares of DAF Holdco to Highland Dallas and to the other two supporting organizations.[9] How CLOs work is not relevant

---

[9] This is documented in Part III, Line 4a of each of the three supporting organizations' Form 990, *Return of Organization Exempt From Income Tax*, for 2023 (the last year for which a Form 990 for the organizations was posted on Guidestar.com).

CONFIDENTIAL                                                            TDIT006002

March 20, 2025
Page 8

to this Referral except to the extent that Management Shares of DAF Holdco were initially issued to Mr. Dondero's college roommate and long-time close friend, Grant Scott.[15]

Grant Scott's ownership of the Management Shares from 2011 to 2021 effectively allowed Mr. Dondero to retain control of DAF Holdco and, thereby, use DAF Holdco's assets as a piggybank for other investments described below. Management Shares have no economic right to distributions; the value for Mr. Dondero is in their control over DAF Holdco and the ability to utilize its assets either to make dividend distributions to the Participating Shareholders (i.e., the supporting organizations) or to fund Dondero-managed investments on non-market terms and with below-market returns on investment.

NexPoint Advisors repeatedly reached out to DAF Holdco for investment-backing with below market terms and rates of returns while under the control of Grant Scott. Grant Scott consummated these transactions without hiring outside counsel or valuation experts for DAF Holdco. The lack of arms'-length dealing under Grant Scott's control is made patently obvious in the ValueScope November 18, 2024 presentation materials included as Exhibit 7. The economics of these transactions clearly show that Mr. Dondero was directing Grant Scott to cause DAF Holdco to enter into below-market deals for DAF Holdco that redirected the profits to Mr. Dondero and entities he owns. In other words, Mr. Dondero was stealing from DAF Holdco and, in turn, the supporting organizations.

Mr. Dondero's theft was not limited to below-market transactions. In March 2020, Mr. Dondero and his affiliates directed Grant Scott to make a $1 million payment to an entity called Tall Pine Group, LLC. The payment was allegedly for professional services rendered, but no such services were rendered to DAF Holdco. In subsequent court filings, it became clear that the $1 million went to pay Mr. Dondero's affiliates' employment compensation bonuses, which could not be paid in the normal course because HCM was subject to various bankruptcy restrictions at the time. Further detail is available in the *Kirschner Complaint*, at page 81, a copy of which is attached hereto as Exhibit 2.

## B. The Mark Patrick Control Era (including present day)

Grant Scott assigned the Management Shares to Mark Patrick in March 2021. Mr. Patrick now controls DAF Holdco and the timing of distributions to the supporting organizations, including Highland Dallas. Mr. Patrick also controls the negotiations and approvals of the terms and conditions of all investments since he assumed control. Since then, under Mark Patrick's leadership DAF Holdco has begun to diversify away from Dondero-managed investments.

Total DAF Holdco (including its subsidiaries) exposure to Dondero-managed investments was over $100 million in June 2023. Because of the formation history of DAF Holdco and the various transactions between DAF Holdco and Dondero-managed investments, DAF Holdco has been named as a defendant in numerous lawsuits claiming it is an alter ego of Mr. Dondero and his

---

[15] On pages 7 and 8 of the litigation trustee's Complaint and Objection to Claims in *Kirschner v. Dondero* included as Exhibit 2, the trustee described Grant Scott as follows: "Dondero personally selected Scott as his successor to run the Charitable DAF Fund . . . Scott has no training in finance or compliance and no investment experience. Scott routinely rubber-stamped Dondero's and [HCM's] directives without asking questions or requesting additional information."

CONFIDENTIAL TDIT006003

March 20, 2025
Page 10

entities and that the initial funds transferred to DAF Holdco from the CRT were fraudulent transfers. These lawsuits have been very expensive and time-consuming for DAF Holdco, which disadvantages Highland Dallas and the other Participating Shareholders because the payment of legal fees depletes available cash.

Because Mr. Patrick viewed the $100 million exposure to Dondero-related and the lawsuits as a risk to DAF Holdco (and therefore the Participating Shareholders), he has taken steps to create layers of independence between DAF Holdco and Mr. Dondero. As documented by an independent valuation consultant, ValueScope, LLC (a copy of the ValueScope report is enclosed as Exhibit 7), upon assuming control of DAF Holdco, Mr. Patrick engaged independent counsel to assist him in negotiating "market" terms and returns on investment for investments with all outside parties, especially those controlled by or affiliated with Mr. Dondero, such as NexPoint Advisors. Neither Mr. Dondero nor his associates expected this because no market discipline was exercised by DAF Holdco when it was controlled by Mr. Dondero's college roommate and close friend Grant Scott.

Outside counsel and valuation experts frequently either negotiated more market-standard (and more favorable to DAF Holdco) terms for Dondero-managed investments or advised against the transactions on the terms proposed by Mr. Dondero (via his various entities, including NexPoint Advisors). And, because Mr. Patrick refused to simply rubber-stamp Dondero-related investment asks, Mr. Dondero became upset with Mr. Patrick and demanded that Mr. Patrick provide him with increased levels of control over DAF Holdco, including meetings between Mr. Patrick and Mr. Dondero three times per week when he was still a consultant with Skyview Group, and permitting one of Mr. Dondero's affiliates increased access to DAF Holdco information and finances. Mr. Patrick refused these requests.

Mr. Patrick also hired an independent director for DAF Holdco, Paul Murphy. During Mr. Scott's control, Mr. Scott served as sole director and sole person in control. There was no requirement under Cayman law to hire an independent director, Mr. Patrick did so for the benefit of DAF Holdco (and, indirectly, Highland Dallas and the other Participating Shareholders).

Mark Patrick also resigned from Skyview Group in October 2024. As noted above, Mr. Dondero effectively controls Skyview Group, and it is nominally owned by one of his affiliates, Scott Ellington. Mr. Dondero viewed this as the last straw—he viewed this as his final loss of control over DAF Holdco and its assets. On the same day, in order to complete the separation, Mr. Patrick directed DAF Holdco to terminate a services agreement with Skyview Group.

Mr. Patrick's resignation from Skyview Group was recommended by outside counsel, including this firm. Mr. Patrick recognizes he has fiduciary duties to DAF Holdco and its subsidiaries. Mr. Dondero created tension with these duties by demanding that Mr. Patrick rubber-stamp Dondero-managed investments, as did Grant Scott. For example, in September 2024, Mr. Dondero recommended that DAF Holdco consummate a real property acquisition on The Campus at Legacy (described in Exhibit 7) for $45 million and provide one of Mr. Dondero's entities a repurchase option if the price were to appreciate. In no uncertain terms, DAF Holdco would take all the downside financial and real estate risk and transfer the upside financial benefit to Mr. Dondero if this proposal had been accepted. This was typical for Dondero-managed investments.

966

CONFIDENTIAL                                                    TDIT006004

March 70, 2025
Page 11

Mr. Dondero also demanded that Mr. Patrick cause DAF Holdco to wire one of Mr. Dondero's offshore entities, Sentinel, $1.5 million in November 2023. Mr. Patrick sought the advice of outside counsel, who told Mr. Patrick the payment would be "impermissible and illegal for a number of reasons". Mr. Patrick accordingly refused the payment (i.e., embezzlement) request.

Mr. Dondero's behavior and attitude toward DAF Holdco is nothing if not consistent. Whether Mr. Scott or Mr. Patrick was in control, Mr. Dondero never abandoned the belief that the assets he caused his CRT to distribute to DAF Holdco remained his own. Mr. Patrick's steps toward independence and then resigning from Skyview Group in October 2024 led to Mr. Dondero exerting his influence over Highland Dallas in a manner we believe results in improper private benefit accruing to him as discussed in the tax aspects portion of this disclosure letter.

Following Mr. Patrick's resignation from Skyview Group, Mr. Dondero directed his entities to cease all principal and interest payments owed on Dondero-managed investments to DAF Holdco and its subsidiaries, which has led to several ongoing lawsuits discussed below and outlined in Exhibit 7. It is inevitable that Mr. Patrick will receive the same treatment as Mr. Daugherty and Mr. Terry (described above)—he will be subject to frivolous, vexatious lawsuits and harassment because he is Mr. Dondero's newest villain.

### C. October 2024 to Present

The events that have unfolded show Mr. Dondero's anger at his loss of control of DAF Holdco's assets. Mr. Patrick met with Highland Dallas shortly after his resignation from Skyview Group and assured Julie Diaz of Highland Dallas and the Dallas Foundation that his resignation would not modify management of distributions to the Dallas Foundation. Mr. Patrick believed the meeting went well. Ms. Diaz voiced no concerns and actually requested additional distributions.

Shortly thereafter, Highland Dallas and the two other Participating Shareholders hired the law firm Holland & Knight (which had already represented the Dallas Foundation for years) to represent them and to send a "no confidence" letter to DAF Holdco. This purported lack of confidence was a new sentiment by Highland Dallas, which had never previously expressed any concern when it received ValueScope reports from Grant Scott. The "no confidence" letter came out of the blue—there were no calls, emails, or other communications that expressed a lack of confidence or requested any information whatsoever.

DAF Holdco subsequently learned that Mr. Dondero directed his subordinates at Skyview Group and NexPoint Advisors to provide false and misleading financial information to Highland Dallas and to the other Participating Shareholders. Rather than contact DAF Holdco or Mr. Patrick to question this information (especially given the questionable source), Highland Dallas sent the "no confidence" letter without any attempt to verify it. (As a post-script, DAF Holdco has refuted the false and misleading information, but the dispute continues because it was never really about that.)

Despite the November 11, 2024 date on the "no confidence" letter, DAF Holdco did not receive it until December 8, 2024, after the November 18, 2024 presentation to the supporting organizations' attorneys, Holland &Knight. In addition, DAF Holdco received the "no confidence" letter from Mr. Dondero's personal attorneys, who do not represent Highland Dallas or the other Participating Shareholders.

CONFIDENTIAL                                                           TDIT006005

March 30, 2025
Page 12

DAF Holdco responded and voiced its concerns that Mr. Dondero was directing Highland Dallas to take these actions. Recall that Mr. Dondero is a Director and President of Highland Dallas. Holland & Knight ignored the accusations that Mr. Dondero was calling the shots and began sending acrimonious (but toothless) emails to DAF Holdco. Finally, Julie Diaz, a Director and Vice President of Highland Dallas (and President of the Dallas Foundation), sent an email requesting a winding up of DAF Holdco and distribution of all of its assets to Highland Dallas and the other Participating Shareholders.

Paul Murphy, an independent Director of DAF Holdco, made a presentation to the supporting organizations' attorneys from Holland & Knight in which he reviewed all of the governance and management improvements that have already been made, but they persist behind the scenes to facilitate Mr. Dondero's attempts to undermine Mr. Patrick and regain control over DAF Holdco's assets for use by NexPoint for investments.

DAF Holdco was contacted in February 2025 by Cayman Islands counsel stating they represent "DAF 2." DAF Holdco believes this "DAF 2" is an attempt by Mr. Dondero and his affiliates to fraudulently obtain DAF's assets.

In February 2025, DAF Holdco subsidiaries filed two lawsuits against Mr. Dondero's entities for non-payment on Dondero-managed investments. Mr. Patrick also directed a non-DAF entity he controls to file a third lawsuit against Mr. Dondero's entities for non-payment. These lawsuits are fundamentally the same as other lawsuits where creditors have sued Mr. Dondero and his entities for nonpayment. Mr. Dondero has not changed—he refuses to pay his debts and he believes he is the rightful owner of DAF Holdco's assets. Mr. Dondero's instrument is Highland Dallas. He controls Highland Dallas and will cause it to continue its crusade against DAF Holdco. As noted by James Seery, the HCM bankruptcy trustee who removed Mr. Dondero from HCM, Mr. Dondero will "burn the place down" if he does not get his way.

    III.    Discussion of Tax Exemption-Related Lack of Compliance and Outright Avoidance

In order for an organization to qualify for tax-exempt status under section 501(a) of the Code as a charitable organization described in section 501(c)(3) of the Code, it must be organized and operated exclusively for one or more charitable purposes described in section 501(c)(3) and the Treasury Regulations promulgated thereunder. We do not question whether Highland Dallas is organized for charitable purposes, nor do we question whether Highland Dallas's grantmaking to the Dallas Foundation and other bona-fide charitable organizations is consistent with its charitable purposes.

We do question whether Mr. Dondero's influence and control over at least Highland Dallas has allowed some portion of their net earnings to indirectly inure to Mr. Dondero's benefit as a result of his historic access to DAF Holdco's assets at below market rates and terms that appear to have been acquiesced to by each supporting organization. As we discuss below, Mr. Dondero's influence and control over DAF Holdco when Grant Scott was the Management Shareholder was never of concern, especially to Highland Dallas, even as each supporting organization received periodic valuation reports prepared by ValueScope detailing DAF Holdco's NexPoint investments. See report prepared for Grant Scott by ValueScope, attached hereto as Exhibit E. In fact, we believe those valuation reports were used by each of them to prepare their Forms 990 and to prepare consolidated financial statements.

CONFIDENTIAL
TDIT006006

March 20, 2025
Page 13

We also believe that each of the supporting organizations operates for Mr. Dondero's private benefit when he uses his influence or control over them to cause them to use or attempt to use their influence as Participating Shareholders of DAF Holdco to wrest control of DAF Holdco and its assets now that Mr. Patrick declined NexPoint investment requests that are both on non-market proposed terms and provide below market returns on investment.

If Highland Dallas elects not to exercise the Put Option before the REIT dissolves, we believe that would be an excess benefit transaction under section 4958 of the Code in which the organization managers had to have knowingly participated.

We also believe Mr. Dondero exercises such control as a substantial contributor of Highland Dallas, resulting from gifts he has made since the initial gift of Participating Shares were made by the ORT in 2011, that Highland Dallas should no longer satisfy the requirement in section 509(a)(3)(C) that there be no control by disqualified persons.

Finally, as discussed briefly below, we believe the donor advised fund rules in section 4966 and 4967 may be implicated, but have insufficient knowledge of the facts to assert conclusively that they do apply.

### A. Private Benefit

We respectfully submit that Highland Dallas in particular no longer satisfies the operational test of section 501(c)(3) because its actions taken at Mr. Dondero's direction serve his private interests more than incidentally as prohibited by Treasury Regulation § 1.501(c)(3)-1(d)(1)(ii).

As we have outlined above, Mr. Dondero and affiliates such as NexPoint Advisors used DAF Holdco, when it was controlled by Grant Scott, as his personal piggybank. And, when Grant Scott controlled DAF Holdco, neither Julie Diaz (in her capacity as Director and Vice President of Highland Dallas) nor the Dallas Foundation questioned whether DAF Holdco's investment were prudent or generated market returns. Rather, even as they received and used for tax and financial reporting purposes the ValueScope valuation opinions which disclosed DAF Holdco's NexPoint and other Dondero-related investments, they never questioned whether the terms were market terms or whether the asset allocations were prudent. It was only after Mr. Patrick took over as Management Shareholder of DAF Holdco and (a) started declining NexPoint investment asks—really demands, (b) started diversifying DAF Holdco's investments away from NexPoint investments, (c) began demanding repayment of amounts owed with respect to NexPoint investments, and (d) Mr. Patrick resigned from Skyview Group and terminated its contract for back office and other services, that the supporting organizations collectively hired outside counsel and, under the lead of Julie Diaz, a Director and Vice President of Highland Dallas began sending no-confidence emails to DAF Holdco Directors (including Mr. Patrick and Mr. Murphy) demanding information to which they were not even legally entitled (a fact that their attorneys openly acknowledged in a Zoom call) and a complete restructuring of DAF Holdco to bring it back under Mr. Dondero's control.

In the seminal decision, *American Campaign Academy v. Commissioner*, 92 T.C. 1053 (1989), the Tax Court concluded that the absence of private inurement to the benefit of a private shareholder or individual does not end the analysis of whether an organization satisfies the operational test of exemption under section 501(c)(3). It went on to state: "when the Court concludes that no prohibited inurement of net earnings exists, it cannot stop there but must

CONFIDENTIAL                                                              TDIT006007

March 20, 2025
Page 14

inquire further and determine whether a prohibited private benefit is conferred."(citation omitted) *Id.* at 1070. It concluded that "an organization's conferral of benefits on disinterested persons may cause it to serve 'a private interest' within the meaning of section 1.501(c)(3)-1(d)(1)(ii)." *Id.* at 1070.

Finally, after looking at the organization's exclusive source of funding (much the same as Mr. Dondero's exclusive funding of Highland Dallas), control of a majority of the Board by members of the Republican Party (analogous to Mr. Dondero's role as President and Director of Highland Dallas and his substantial influence over the two Dallas Foundation directors evidenced by their epiphany that something has to be done since Mr. Dondero no longer controls DAF Holdco), and several other factors, "we conclude that petitioner is operated for the benefit of private interests, a nonexempt purpose." *Id.* at 1080

In another case, *Airlie Foundation, Inc. v. United States*, 55 F.3d 684 (D.C. Cir. 1995), the relationship between the founder and executive director of the foundation bears a strong resemblance to the relationship between Mr. Dondero and Highland Dallas and served as a basis for sustain the Service's revocation of its section 501(c)(3) exemption on the ground that it provided more than incidental private benefit to the founder. Although the actual basis for revocation of exemption was a finding of inurement of net earnings, the pervasive control of the founder clearly influenced the D.C. Circuit to affirm the District Court and, equally important, the court cited *American Campaign Academy* for the proposition that an organization does not operate exclusively for tax-exempt purpose if it serves a private interest rather than a public interest and "[t]his requirement applies to the organization's actual, not purported purposes." *Id.* at 75 AFTR 2d 95-2068, 95-2071

### B. Potential Inurement

Section 501(c)( also requires that "no part of the net earnings " of the organization may "inure to the benefit of any private shareholder or individual." As observed in the *Airlie Foundation* case, "the extent of the inurement is immaterial." *Id.* As noted in that case, and as is the case with Mr. Dondero, the founder of Airlie Foundation, Inc. "established and controlled a network of taxable and tax-exempt entities. The transactions that took place within the network organizations formed the basis for the IRS's revocation of AFI's tax-exempt status, as discussed at length by the district court."

We respectfully submit that if the Service audits Highland Dallas it will identify many more instances of inurement, beyond the single instance of forgiving $33,672 by Airlie Foundation, Inc. owed by one of the founder's affiliated entities. The Dugaboy effective interest-free loan and potential windfall if Highland Dallas fails to exercise its Put Option should be enough, but we believe there will be many other transactions such as management and administrative fees that generate income for Dondero-related entities.

As discussed above in Section II.A., during the Grant Scott control era of DAF Holdco, Mr. Dondero's effective control of DAF Holdco led DAF Holdco to make investments that benefitted him personally. These investment deprived DAF Holdco of assets that could be distributed to Participating Shareholders, including Highland Dallas.

CONFIDENTIAL                                                              TDIT006008

March 20, 2025
Page 15

**C. The Failure to Exercise the Put Option as an Excess Benefit Transaction**

As you know, section 4958 treats as excess benefit transactions between a public charity such as Highland Dallas and a disqualified person such as Mr. Dondero economic arrangements that are above or below market between them. Section 4958(c)(3)(A) also treats as "automatic" excess benefit transactions "any grant, loan, compensation or other similar payment to" a disqualified person such as a substantial contributor.

We believe, upon examination, the Service will find that Highland Dallas has engaged in multiple automatic excess benefit transactions with Mr. Dondero or entities owed and controlled by him such as NextPoint Advisors.

First, the forbearance to exercise the Put Option effectively created an interest free loan to Dugaboy, a disqualified person. Thus, the mere fact it has remained outstanding for years means it is an automatic excess benefit transaction that requires not only the payment of the 25% excise tax by Dugaboy but also the correction of it through the payment of the full $8,260,000 plus interest.

Second, if NexPoint Advisors performs investment management services for a fee that would be an automatic excess benefit transaction requiring not only correction but also payment of the 25% excise tax. In fact, we know from public SEC filings that NexPoint Advisors or one of its affiliates does perform investment management services for the REIT, which may itself be an excess benefit transaction requiring correction.

Finally, while other excess benefit transactions may be identified during an examination of Highland Dallas, any forbearance to exercise the Put Option to benefit Dugaboy should be regarded, at a minimum, as a "similar payment" given the fact that Mr. Dondero benefits economically in a substantial way from that forbearance.

Given that the other two directors must act to approve these actions, it is likely they have done so knowingly and willfully.

**D. Potential Non-Compliance with Section 509(a)(3) Operational Test Sufficient to Cause Highland Dallas to be Reclassified as a Private Foundation and Thus Subject to Chapter 42 Rules**

In Mr. Dondero's article entitled "James Dondero: Dallas's Surprising Philanthropy Hero" (May 3, 2023, copy enclosed as Exhibit 6), Mr. Dondero said as follows:

"Mr. Dondero and his firm have supported The Family Place, The Dallas Zoo, SMU's Tower Scholars program, The Perot Museum of Nature and Science, Education is Freedom, and many more local charity organizations. Most gift are made through the philanthropic arm of Highland Capital Management."

Thus, in his own words, Mr. Dondero has acknowledged Highland Dallas has violated the section 509(a)(3) operational test in Treasury Regulation § 1.509(a)-4(e)(1) concerning permissible beneficiaries of a supporting organization and should be reclassified as a private foundation. That would mean that all dealings between Highland Dallas and entities owned or controlled by Mr. Dondero should be scrutinized to determine whether they constitute acts of

CONFIDENTIAL                                              TDIT006009

March 20, 2025
Page 16

self-dealing described in section 4941 of the Code or violate other provisions of Chapter 42 of the Code, such as the taxable expenditure rules in section 4945.

Under Treasury Regulation § 1.509(a)(-4(e)(1), "[a] supporting organization will be regarded as 'operated exclusively' to support one or more specified publicly supported organizations only if it engages solely in activities which support or benefit the specified publicly supported organizations." (emphasis supplied)

The only exception to the requirement that a supporting organization benefit the supported organization "solely" is when the supporting organization provides benefits to individual members of the charitable class benefited by the supported organization, such as by granting scholarships to graduates of a particular high school for college. See, e.g., *Nellie Callahan Scholarship Fund v. Commissioner*, 73 T.C. 626 (1980). The word "solely" is unambiguous. Therefore, Mr. Dondero's own acknowledgement that Highland Dallas is the source of his funding of other admittedly charitable organizations provides conclusive evidence that Highland Dallas fails the operational test of section 509(a)(3).

Furthermore, section 509(a)(3)(C) provides that a supporting organization may not be controlled directly or indirectly by a disqualified person. A substantial contributor to a supporting organization is a disqualified person under section 4946(a)(1)(A). Thus, Mr. Dondero's Dugaboy gift of the REIT Units to Highland Dallas made him a disqualified person and his effective veto power places him in control of Highland Dallas.

Therefore, we respectfully submit that that the Service should examine Highland Dallas to determine if it should be reclassified as a private foundation for the foregoing reasons and, if it is so-reclassified, all transactions between Mr. Dondero and his related or controlled entities should be evaluated to determine whether any constitute acts of self-dealing under section 4941. This should include the failure on the part of Highland Dallas to exercise its Put Option.

   E. Potential Non-Compliance with Section 4966/4967 Rules Applicable to Donor Advised Funds

Finally, we respectfully submit that the Service should examine Highland Dallas to determine whether it, in effect, functions as a donor advised fund of Mr. Dondero given the fact he provided substantially all of its funding, effectively controls it and may personally benefit financially more than incidentally through entities he owns or controls from management fees, charity special events such as banquets and other means.

CONFIDENTIAL                                                                      TDIT006010

March 20, 2025
Page 17

Representatives of DAF Holdco will be available to be interviewed by the Service in a manner that will not result in compromising confidentiality under section 6103 and without the need for an administrative summons.

Very truly yours,

SEYFARTH SHAW LLP

*Douglas M. Mancino*

Douglas M. Mancino

cc. Mark Patrick, Paul Murphy and Texas, California and Missouri Offices of the Attorney General (Charitable Trusts Sections)

DMM

CONFIDENTIAL                                                            TDIT006011

FSD2025-0116    **Page 1058 of 1530**    2025-08-19



# Memorandum

---

TO:    **Charitable DAF Holdco, Ltd**

FROM:    **FTI Consulting**

DATE:    **27 March 2025**

RE:    **Discounts relating to participation shares**

---

PRIVILEGED AND CONFIDENTIAL

## 1.    Introduction

1.1    Charitable DAF Holdco, Ltd ("**DAF**") is a Cayman Islands registered company formed in 2011. We understand DAF invests in real estate, hedge funds, and money market funds.

1.2    DAF's share classes comprise: (i) Management Shares; and (ii) Participating Shares. The 100 Management Shares are solely held by Mark Patrick ("**Mr Patrick**"), a director of DAF at all relevant times.[1] In respect of the Participating Shares:

     (1)    305 Participating Shares had been issued as of 30 September 2024 (the "**Valuation Date**").[2] These were held by: (i) Highland Dallas Foundation, Inc; (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) The Community Foundation of North Texas. We understand that these companies are all "Support Organizations" for nonprofit charities, except for The Community Foundation of North Texas which is a nonprofit charity itself;

     (2)    623 Participating Shares had been issued as of 11 February 2025 following the Board's resolution on 7 February 2025 ("**Feb 2025 Resolution**"). Under the Feb 2025 Resolution, 318 new Participating Shares were issued to DFW Charitable Foundation (a nonprofit charity). We understand that the number of Participating Shares held by each of the other parties in point (1) above has not changed.

1.3    Holders of Participating Shares may, from time to time and subject to the Directors' sole discretion, receive cash distributions from DAF to fulfil their charitable goals. As we explain further in this memo, the rights conferred to the Management Shares and Participating Shares are significantly different.

---

[1]    Paul Murphy is the other director of DAF. Based on our discussion, we understand that Mr Patrick is the main decision maker.

[2]    Valuescope Report, page 7.

200 Aldersgate  |  Aldersgate Street  |  London EC1A 4HD
T: +44 (0)20 3727 1000  |  F: +44 (0)20 3727 1007  |  fticonsulting.com

FTI Consulting LLP. Registered in England and Wales at the above address. Registered number OC372614, VAT number GB 815 0575 42.
A full list of Members is available for inspection at the registered address.



Privileged and Confidential

1.4     Valuescope, Inc prepared a report dated 7 January 2025 (the "**Valuescope Report**") for Mr Patrick.[3] Valuescope's scope was to perform a valuation of the fair market value of 100 Participation Shares of DAF as of the Valuation Date, and they conclude on a value of US$ 76m as summarised in the table below.

**Table 1-1: Summary of Valuescope's conclusions**

| | | |
|---|---|---|
| DAF's net asset value ("**NAV**") | [a] | US$ 269.05m |
| Participation Shares outstanding | [b] | 305 |
| **NAV per share** | **[c] = [a]/[b]** | **US$0.88m** |
| Discount for lack of control | [d] | 8.1% |
| Discount for lack of marketability | [e] | 6.3% |
| Subject shares | [f] | 100 |
| **FMV of subject shares** | **[g] = [c] x (1-[d]-[e]) x [f]** | **$75.96m** |

*Source: Valuescope Report, page 4.*

### FTI's scope

1.5     We have been asked to prepare a memorandum setting out our indicative view of the discount applicable (if any) in assessing the fair market value of Participating Shares by considering: (i) how the rights associated with the Participating Shares differ from the rights typically associated with ordinary shares in a company; and (ii) the impact of the existence of an additional share class (being the management shares owned by Mr Patrick).

1.6     We understand the above issues have not been considered by Valuescope in their report. That is, we assume that Valuescope's conclusions are based on a valuation of 100 Participating Shares as if they confer rights that are typically attached to a minority holding of ordinary shares in a private company.

1.7     As we explain in this memorandum, we consider that the rights conferred to Participating Shares are extremely limited, and the potential distribution of cash flows is highly dependent on whether the shareholder's specific circumstance is aligned with the mission of DAF. As a result, we expect:

(1)     a limited discount due to lack of control and marketability (i.e., close to the range concluded by Valuescope) if the shareholder is fully aligned with the mission of DAF; and

(2)     a high discount due to lack of control and marketability for a shareholder who is not aligned with the mission of DAF of over **95%** to be applicable. The reason for not fully discounting the value is that there may be some option value to the shareholder if, with the passage of time, the interests of the Managing Shareholder become aligned with the shareholder's interests.

---

[3]     We understand that Valuescope provides quarterly updates of such report.

CONFIDENTIAL
TDIT006013

F T I
CONSULTING

### Limitations and restrictions

1.8   We understand that this memo will be used by the DAF in order to assist it in the context of understanding how a valuation expert may assess the discount referenced in 1.5. It is understood that this analysis is indicative in nature and should not be used to support a transaction. This memo does not constitute: (i) our views on the value of any Participating Shares; and/or (ii) financial or tax advice on the fair value (or any other basis of value) of such shares. It should not be relied upon for any other purpose other than that as stated.

1.9   It is not within our scope to verify or assess the accuracy of any financial information of DAF, including its NAV (as provided in the Valuescope Report or otherwise). We do not opine on matters of law. If any of our assumptions regarding legal matters change, then our opinion may change.

1.10   This memorandum is confidential. It should not be used, reproduced or circulated for any other purpose, in whole or in part, without our prior written consent.

### Structure of memorandum

1.11   In the remainder of this memorandum, we:

(1)   summarise our understanding of the history and structure of DAF relevant to our assessment. This is set out in Section 2;

(2)   explain whether the rights of holders in Participating Shares materially affects the value of the shares compared to ordinary shares. This is set out in Section 3 below; and

(3)   conclude on the discount applicable in valuing the Participating Shares. This is summarised in Section 4 below.

**FT I**
**CONSULTING**

## 2. Our understanding of DAF's history and structure

2.1 We have the following understanding from Mr Patrick in relation to DAF's history and current position, in respect of: (i) intent of the shareholding structure; (ii) dividend distribution policy; and (iii) the assets that are held by DAF and its reported NAV. We summarise our understanding of these topics in turn below.

### Intent of the shareholding structure

2.2 DAF is set up in a structure such that the Participating Shareholders (i.e., nonprofit organisations) hold a passive economic, non-voting interest. The Participating Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed – we understand that any attempts to do so may be regarded as a criminal offense by the IRS or result in significant tax liabilities.

2.3 The foregoing tax issues and structure is the primary reason for the separation of control between Participating Shares (holders of which have very limited rights as described further in Section 3) and the Management Shares (holders of which have effective control over DAF). That is, the holder of the Management Shares needs to exercise independence and act on an arms' length basis to the holders of the Participating Shares and their affiliates.

### CDMCFAD LLC

2.4 As at February 2025, DAF holds a 100% of CDMCFAD LLC (the "**Delaware LLC**"), a Delaware limited liability company, which in turn owns a 100% LP interest in Charitable DAF Fund, LP. Mr Patrick is the Manager of the Delaware LLC.[4]

2.5 We understand that Mr Patrick, as the Manager of the Delaware LLC, has similar rights to the Delaware LLC as he does to DAF. Therefore, we consider the discount applicable to the shares in Delaware LLC to be the same as the discount we estimate for the Participation Shares.

2.6 We understand that no specific arrangements in the LLC agreement are considered to be extraordinary. In this context, we note that the discount applicable when determining the value of the DAF shares (which is based on the value of CLO Holdco, Ltd) should only consider the discount we estimate as applicable to the Participation Shares (as opposed to discount applicable to the Participation Shares multiplied by the discount applicable to the Delaware LLC shares).

### Dividend distribution policy

2.7 When DAF was created in 2011, it was roughly targeting US$ 3m to 4m of annual distributions. It has done so until around 2019. From 2019, DAF became involved in a legal dispute, and the quantum of distributions has declined. [5]

---

4 2025.02.12 DAF Structure Chart.

5 We have not received details supporting the figure of historical distributions by DAF.



Privileged and Confidential

2.8     Going forwards, we understand that DAF has recently wrote its charitable mission into its corporate documents. The Directors of DAF aim to use and distribute DAF's funds to organisations that are aligned DAF's charitable mission, which may include educational and communal projects.

### Assets held by DAF

2.9     We understand that, in addition to cash and liquid assets (such as money market type funds), DAF holds CLOs and real estate assets. We provide a snapshot of the assets as at 30 September 2024, as shown in the Valuescope Report.

**Figure 2-1: NAV reported by DAF as of 30 September 2024**

| | 9/30/2024 | |
| --- | --- | --- |
| | Actual | % |
| **Current Assets** | $138,419,315 | 43.8% |
| Cash & Equivalents | 138,419,315 | 43.8% |
| **Total Current Assets** | | |
| **Other Assets** | 10,002,234 | 3.2% |
| Highland CLO Funding, Ltd. | 69,385 | 0.0% |
| Highland CLO Funding, Ltd. (Participation Rights) | 1,640,571 | 0.5% |
| MidWave Common | 85,552,571 | 27.1% |
| MidWave - Term Loan A | 40,174 | 0.0% |
| MidWave - Term Loan C | 14,223,433 | 4.5% |
| NexPoint Capital, Inc. (BDC) | 8,487,030 | 2.7% |
| NexPoint Real Estate Strategies Fund Z | 6,174,381 | 2.0% |
| NexPoint Real Estate Finance (NREF) | 2,338,207 | 0.7% |
| NexPoint Residential (NXRT) | 2,331,025 | 0.7% |
| NexPoint Diversified Real Estate (NXDT) | 3,770,609 | 1.2% |
| Small Bay II (Class I) | 4,047,276 | 1.3% |
| Small Bay II (Class II) | 2,357,682 | 0.7% |
| Small Bay II (Class III) | 678,545 | 0.2% |
| Polo Glen | 109,056 | 0.0% |
| NHT Holdco | 158,525 | 0.1% |
| ACHC | 115,804 | 0.0% |
| COLL | 10,945 | 0.0% |
| HRTX | 3,267 | 0.0% |
| ACRG/AU | 1,409 | 0.0% |
| ACRG/BU | 333,308 | 0.1% |
| TGTX | 282,686 | 0.1% |
| TMO | 111,081 | 0.0% |
| BIO | 365 | 0.0% |
| iHeart Communications | 107,324 | 0.0% |
| Multi Strat | 38,131 | 0.0% |
| Crusader Fund II, Ltd. | 94,000 | 0.0% |
| BVP Property | 1,104,000 | 0.3% |
| NCI Apache Trail | 874,200 | 0.3% |
| NCI Fort Worth Land | 11,448,367 | 3.6% |
| NCI Royse City Land | 1,250,000 | 0.4% |
| NCI Stewart Creek | 1,766,000 | 0.6% |
| NLA Assets | 2,541,184 | 0.8% |
| FPWM | 139,500 | 0.0% |
| SRG | 2,380,529 | 0.8% |
| SRTY | 1,818,805 | 0.6% |
| SQQQ | 2,174,013 | 0.7% |
| SPXU | 2,951,678 | 0.9% |
| Serengeti | 3,253,139 | 1.0% |
| Conservation Equity Fund | 527,460 | 0.2% |
| MMPQ | 20,560 | 0.0% |
| Total Wire Convertible Promissory Note | 2 | 0.0% |
| Sable Permian Resources | | |
| | 175,328,461 | 55.4% |
| Other Investments | 81,419 | 0.0% |
| Cash Collateral | 0 | 0.0% |
| Interest Receivable | 0 | 0.0% |
| Dividends Receivable | 1,321,109 | 0.4% |
| Note Receivable | 470,000 | 0.1% |
| Due from Affiliate | 637,419 | 0.2% |
| Due from Broker | | |
| **Total Assets** | 316,257,723 | 100.0% |
| **Total Liabilities** | 47,204,916 | 14.9% |
| **Total Equity** | 269,052,808 | 85.1% |
| **Total Liabilities & Equity** | 316,257,723 | 100.0% |

*Source: Valuescope report, page 46.*



Privileged and Confidential

2.10    We understand that the NAV in the snapshot above is unlikely to reflect updated market value of the assets. For example, some real estate assets are reported at historical cost, which are dated and would not reflect their market values as at the reporting date.

2.11    Valuescope applies two discounts to the reported NAV of $269m in their valuation:

(1)    a 8.1% discount for lack of control. This is calculated by reference to the average discount in traded close-end funds against their reported NAV; and

(2)    a 6.3% discount for lack of marketability. This is calculated as the average of: (i) 2.8%, calculated using a put option approach; and (ii) 9.7%, based on findings of studies on restricted stocks.

2.12    We understand from you that Valuescope has not considered the rights of the Participating Shares in their assessment of the above discounts. That is, Valuescope valued the Participating Shares as if they confer rights that are typically attached to a hypothetical minority holding of ordinary shares in a private company.

2.13    The studies and approaches considered by Valuescope are commonly referred to in valuations in the context of tax reporting in US. We consider that other approaches may be used and further adjustments may be required to reflect the circumstance of DAF's history (even in respect of valuing a hypothetical ordinary share).[6] However, it is not within our scope to review and/or adjust Valuescope's assessment.

---

[6]    Further, the discount to NAV observed in traded close-end funds may not necessarily reflect a 'lack of control'. Such discounts may be due to the assumptions regarding the yield curve and other assumptions used by the fund in determining its NAV.



## 3.    Participating Shareholder Rights

3.1    In this section, we discuss the rights of the holders in Participating Shares, specifically in respect of:

(1)    the issuance of new shares;

(2)    dividends;

(3)    voting and the appointment and removal of directors;

(4)    share transfers;

(5)    share redemption; and

(6)    the access to information.

3.2    The analysis of these rights is based on information you have provided to us.

3.3    At the outset, we note an overarching point relating to the Participating Shares. That is, we understand from you that Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission. We understand that the Directors acting in the best interests of the company is generally regarded as the interests of the members as a whole and in certain circumstances the object of the company may be taken into account when determining what is in the best interests of the company. In preparing this note, we have assumed, as agreed with you, that Directors acting in the best interests of the company relates to the interests of the members, and ensuring charitable causes are served, in alignment with, as we understand it, DAF's mission.

### (1) Issuance of new shares

3.4    We understand that Participating Shareholders do not have: (i) the right to vote on the issuance of further Participating Shares; (ii) pre-emption rights; or (iii) the right to receive notice of such issuance.

3.5    In accordance with the Articles, DAF's Directors may unilaterally issue additional Participating Shares and thereby dilute the power of existing shareholders. On 7 February 2025, through the Board's resolution, DAF issued 318 new Participating Shares (reflecting 51% of all outstanding Participating Shares) to DFW Charitable Foundation, thereby diluting the power of other shareholders.

3.6    Based on the above, we understand that the Participation Shares can be diluted (without corresponding price or compensation paid to existing shareholders) without approval from any shareholders. This introduces a high uncertainty to the value of such shares. Such risks of dilution (without compensation) in the Participating Shares would therefore be materially higher than ordinary shares in typical companies, which confer rights to block such dilution.

Privileged and Confidential

### (2) Dividends

3.7 In respect of the timing and amounts of dividends in Participation Shares, DAF's Directors have "*sole and absolute discretion*" to declare dividends "*without a requirement to pay such dividends on a pro-rata basis*".

3.8 We understand from you that Participating Shareholder do not have

- the right to cause or vote on distributions;

- the right to pro rata distributions based on their shareholding;

- the right to annual or timed distributions; or

- the right to receive notice of distributions to other Participating Shareholders.

3.9 With respect to these four points, we have regard to the UK 'Model Articles for private companies limited by shares' as a guide to what would be considered typical rights to ordinary shareholders in respect of dividends.[7][8]

(1) **Cause or vote on distributions**. Dividends may be declared 'by ordinary resolution'. A dividend must not be declared unless the directors have made a recommendation for such amount. Therefore, whilst ordinary shareholders typically have a final vote on distributions, it is expected that such dividends need to be recommended by the director in the first place. In the context of DAF, the lack of rights to cause or vote on distributions may not merit a significant discount because of the common reliance placed on the directors' recommendation.

(2) **Pro rata distributions**. Under the UK's model articles: "*Unless the shareholders' resolution to declare or directors' decision to pay a dividend, or the terms on which shares are issued, specify otherwise, it must be paid by reference to each shareholder's holding of shares*".[9] The default position of ordinary shareholder is that they would receive dividends on a pro rata basis (by reference to each shareholder's holding of shares). Alternatively, if the terms of shares allow, or that there would be a shareholders' resolution, there may be non pro rata distributions. However, in our experience we expect the extent of the disproportionate distribution to be clearly defined in the company's articles or shareholder's agreement (e.g., Shareholder A gets 10% voting rights but 50 % access to dividends).

---

[7] We understand that in Cayman Islands, the companies act is designed to be flexible so that the memorandum and articles can be tailored to meet the requirements of the company. Therefore we have chosen the UK's guide as that would be more informative of the expectations of a 'typical ordinary shareholder'.

[8] https://www.gov.uk/government/publications/model-articles-for-private-companies-limited-by-shares/model-articles-for-private-companies-limited-by-shares#declaringdividends

[9] See also UK government's guide on directors' duties, stating that "*You must usually pay dividends to all shareholders.*" https://www.gov.uk/running-a-limited-company/print

9/14



In the context of DAF, we consider that the discount relating to the uncertainty of dividends is high, given that: (i) the directors have the sole discretion to issue dividends without the Participating Shareholders' approval; and (ii) the terms do not specify to the extent of the potential non pro rata distribution, such that the uncertainty arises for each dividend payment.

(3) **Annual or timed distributions**. This is not a typical right attached to ordinary shareholders (such characteristic may be more prevalent in preference shares). We therefore do not consider this to merit additional discount.

(4) **Right to receive notice of distributions to other shareholders.** In itself, this right is not valuable if the shareholders are expected to receive a pro rata dividend (or are clear about the extent of disproportion of their dividends), as they can calculate the dividends received by each shareholder. It is only the uncertainty of non pro rata distributions (i.e., point 2 above) which means this right may be useful. We therefore do not consider any additional discounts applied based on point 2 above.

3.10 As above, since 2019, DAF has continued to make distributions, albeit of a reduced quantum. Therefore, in respect of the Participating Shareholder, there is a high uncertainty regarding: (i) whether its charity goals are aligned with DAF's mission such that it would receive distributions (this may change over time but also appears binary at any given date); (ii) the timing of any future cash flows; and (iii) the relevant amount of such cash flows.

3.11 We understand that the Participating Shareholders' only right to DAF's assets is in the situation where DAF gets wound up.[10] We understand that the Participating Shareholders have the right to seek a winding up of the company, as conferred upon them by the Companies Act. However, it is not clear whether the court would approve the winding up of the company. We understand that if the company is acting in a manner consistent with its articles then the winding up petition is unlikely to be successful.

3.12 Given the differences to rights that are typically attached to ordinary shareholders as explained above, we consider that a very material discount to be applicable.

### (3) Voting and the appointment and removal of directors

3.13 Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the company. Further, the right to appoint or remove directors is held by the Management Shareholder.

3.14 The above rights are typically granted to ordinary shareholders. In this regard, the Participating Shares are similar to typical 'preferred shares' or non-voting shares. This can be considered as a lack of control over the company's operations or investments.

---

[10] Article 121 to 123, Memorandum and articles of association.



Privileged and Confidential

3.15   Normally, the discount applied to non-voting rights is relatively low (valuers typically consider a range of 3-5%[11]). This is because this risk, generally labelled as corporate governance risk, is somewhat contained by the directors' duties to act in the best interest of the shareholders. For example, the UK companies act requires a director of a company to act in the way he or she considers, in good faith, would "*most likely promote the success of the company for the benefit of its members as a whole*" and having regard to "*the need to act fairly as between members of the company*."[12]

3.16   We understand that the above is not fully applicable to DAF, given the Articles of the company and that its Directors only need to act to promote its charitable mission without any influence exerted by the holders of the Participating Shares.[13]

3.17   In our view, the lack of rights to appoint or remove directors would merit a discount that would be more material than the usual discounts considered for a lack of voting rights.

### (4) Share transfer

3.18   DAF's Directors may require the transfer of Participating Shares if it comes into notice that such shares are held by a Restricted Person, i.e., a person in breach of laws and regulations or in the Directors' opinion might result in DAF incurring liabilities or suffering penalties.

3.19   Given that such transfer happens only in cases relating to potential threats to the company (including legal threats), we understand that this clause offers protection to DAF's operations. Therefore, additional discounts to the Participating Shareholders may not be applicable, unless there is doubt as to the Directors' judgement, which is discussed in the topic of appointment and removal of directors above.

### (5) Redemption of shares

3.20   Participating Shares are defined as non-redeemable shares. We therefore do not consider discounts relating to this feature in respect of the Participating Shares.

3.21   To the extent that CDMCFAD LLC shares are redeemable, given the potential dilution and no guarantee to a pro rata cash distribution rights (as explained above), we have not considered any additional discount to be applied on this factor. That is, we consider that the discount applied to the factors above would also cover the risk of redemption.

---

[11]   See, e.g., BVR's guide to discounts for lack of marketability, page 281; and Stanford Law Review (2019), Nonvoting Shares and Efficient Corporate Governance, page 44.

[12]   https://www.legislation.gov.uk/ukpga/2006/46/section/172

[13]   As explained above, the attempt to exert influence may be a criminal tax offense.



Privileged and Confidential

### (6) Access to information

3.22 Participating shareholders have limited information rights (except those as conferred by law or authorised by the Directors). Specifically, the articles do not provide the Participating Shareholders with the following: (i) the right to inspect any account; (ii) the right to inspect any book; or (iii) the right to inspect any document of the Company.

3.23 The lack of information creates uncertainty to the shareholder. However, we understand that the shareholders have quarterly financial reports that provide basic access to the company's financial information but are not entitled to further information except as provided at the discretion of management. For the purpose of a valuation of the Participating Shares' fair market value based on its NAV - which we understand to be accurate for the purpose of our exercise - a discount may not be applicable (or in any case would be covered under the lack of control).

1066



Privileged and Confidential

## 4.    Discounts applicable in valuing the Participating Shares

4.1    The table below summarises our view of the materiality of each factors in considering the value of Participating Shares as discussed in Section 3.

**Table 4-1 Materiality of rights in Participating Shareholders in valuation**

| | **Materiality (in principle)** |
|---|---|
| Issuance of new shares | Very material due to potential dilution effect |
| Dividends | Very material due to no rights for pro-rata distribution, and uncertainty as to alignment with mission of DAF |
| Voting and change in Directors | Material due to uncertainty as to alignment with mission of DAF |
| Share transfer | Limited |
| Share redemption | None for Participating Shares. Potentially material for CDMCFAD LLC; however discount would be covered in the discount due to lack of control over issuance of new shares and rights to dividends |
| Access to information | Very limited – has certain access conferred by law |

4.2    Judge Laro's comments in *Mandelbaum v Commissioner* on discount for lack of marketability is often referred to by valuation practitioners determining discounts for lack of marketability:

> *"Ascertaining the appropriate discount for lack of marketability is a factual determination.  Critical to this determination is an appreciation of the fundamental elements of value that are used by an investor making his or her investment decision."*

4.3    The list of issues that Judge Laro went on to cite as important in a determination of the discount are now commonly referred to as the "Mandelbaum factors", which are broadly summarised as:

(1)    Financial statement analysis

(2)    Dividend policy

(3)    Nature of the company (history, position in industry, economic outlook)

(4)    Company's management

(5)    Amount of control in the transferred shares

(6)    Restrictions on transferability of stock

(7)    Holding period for stock

(8)    Company's redemption policy

13/14



Privileged and Confidential

      (9)     Costs associated with a public offering

4.4     Due to the specific context of DAF (including the tax-related constraints for the Participating Shareholders and the Directors' control), the discounts primarily relate to dividend, nature of the company, company's management, and amount of control.

4.5     The restricted stock studies (which suggests typical discounts of 10% - 35%) or put option approach relied upon by Valuescope focus on the restrictions on transferability of stock (i.e., discount for the shares requiring between six months and one year to be sold).[14] In our view such studies do not provide a guide as to the discount for the rights of the Participating Shares.

4.6     As explained above, the rights conferred to Participating Shares are extremely limited, and the potential distribution of cash flows is highly dependent on whether the shareholder's specific circumstance is aligned with the mission of DAF. As a result, we expect:

      (1)     a limited discount due to lack of control and marketability (i.e., close to the range concluded by Valuescope) if the shareholder is fully aligned with the mission of DAF; and

      (2)     a high discount due to lack of control and marketability for a shareholder who is not aligned with the mission of DAF of over **95%** to be applicable. The reason for not fully discounting the value is that there may be some option value to the acquirer that with the passage of time: (i) they become aligned with the Managing Shareholder's interest; or (ii) there is a change in the Managing Shareholder.

4.7     Our indicative view, as set out in this memorandum, may change if we are provided with further information.

---

[14]     Valuescope Report, pages 26 and 53.

14/14

CONFIDENTIAL

987

TDIT006025

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 301 of 759

welcome to brighter

*Confidential – Subject to Attorney / Client Privilege*

# Market Compensation Assessment

## Charitable DAF

August 26, 2024

**Heidi O'Brien,** Partner
**Matthew Mullen**, Senior Principal
**Katy Ringenberg–Means**, Senior Associate
**Chuhan Huang**, Senior Analyst

A business of Marsh McLennan

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 302 of 759

# Context

- Mercer was engaged to assess compensation for Charitable DAF's top executive, Mark Patrick, who serves as:
  - President, Chief Investment Officer and General Counsel of Charitable DAF Holdco, Ltd.
  - President and Chief Investment Officer for seven subsidiaries/affiliated entities

- To gather additional context and understand the current role, we conducted stakeholder interviews with Mr. Patrick and six other individuals that work closely with him:
  - Alex McGeoch *(Partner, Hunton Andrews Kurth)*
  - Steve Hastings *(Principal, Valuescope, Inc.)*
  - Ken Gill *(Principal, GILL Real Estate Advisory)*
  - Shawn Raver *(Tax Attorney/Consultant)*
  - Paul Murphy *(G.K. Management)*
  - Jim Shields *(Founder/Attorney, Shields Legal)*

- Mercer summarized market compensation levels for:
  - Base salary
  - Total Compensation *(base salary + annual incentives + long-term incentives)*

> This report summarizes our interview findings, benchmarking methodology, market compensation findings, and recommendations for the go-forward compensation package

Confidential – Subject to Attorney / Client Privilege

TDIT0006027

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 303 of 759

# Summary of Interview Findings

- Our stakeholder interviews illustrated the complexity of the current role, with the incumbent serving in multiple different capacities:

| | |
|---|---|
| 1 | **Chief Executive Officer (CEO):** Managing Charitable DAF corporate structure and operational issues, and determining charitable disbursements |
| 2 | **Chief Investment Officer (CIO):** fund management and investment strategy development, dealing with highly complex investments |
| 3 | **Legal:** Handling complex and contentious litigation, asset recovery, and complex tax structures – some stemming from the Highland Capital Management bankruptcy |
| 4 | **Compliance:** Navigating regulations and compliance requirements across multiple states and internationally |

Confidential – Subject to Attorney / Client Privilege

3

TDIT006028

CONFIDENTIAL

# Methodology

- *Market positions*: based on input from the stakeholder interviews and our understanding of the role, the **Chief Executive Officer** and **Chief Investment Officer** are the most relevant positions for the purposes of benchmarking compensation
  - While there is a legal and compliance component of Mr. Patrick's role, the CEO and CIO roles will reflect the highest-level roles in the market and are a better representation of the complexity of the role

- *Market Sectors*: As Charitable DAF and Mr. Patrick's role are unique in structure and complexity, we summarized market data for a variety of sectors/industries. Data were scoped as closely as possible to Charitable DAF's asset size of $350M, or revenue size of $78M *(for those surveys that scope only on revenue)*

| CEO Markets | • **Publicly-traded REITs**[1] with assets of $3B or less<br>• **Private Equity firms** with assets of $150M-$500M[2]<br>• **General Industry companies** with revenue of $25M-$100M |
|---|---|
| CIO Markets | • **Private Equity firms** with assets of $400M-$1B<br>• **Non-profit Endowments and Foundations** with assets of $3B or less |

- We also summarized market practices for benefits and perquisites

[1] Combination of mortgage REITs (which invest in collateralized loan obligations (CLOs)) and other REITs. The REIT reference is relevant given that the portfolio Mr. Patrick oversees has 1) a large concentration of CLOs and 2) a focus on real estate development on a large amount of raw land

[2] Reflects an equal blend of two survey sources, Preqin and Heidrick & Struggles *(see Appendix for details)*

4

Confidential – Subject to Attorney / Client Privilege

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc Exhibit 211 Part 02   Page 304 of 759

TDIT006029

CONFIDENTIAL

Case 19-34054-sgj11  Doc 4627-6  Filed 05/11/26  Entered 05/11/26 17:05:52  Desc
Exhibit 211 Part 02  Page 305 of 759

# Summary of Recommendations

- **Recommended package includes base salary, plus long-term incentive (LTI) tied to fund returns:**
  - Base salary: $850K ($750K, if general partner liability insurance can be acquired to mitigate Mr. Patrick's personal risk exposure)
  - LTI: 7.5% of annualized net fund returns in excess of 10% (capped at 25% annualized return)
    - Initial LTI cycle should capture some past performance, as annual compensation to date (which Charitable DAF confirmed has been far below the market salary levels reflected in this report) has not reflected fund performance

- Rationale for the recommended package:
  - Salary is targeted at top quartile of the composite market given the complexity of Mr. Patrick's role, and aligns more closely with the publicly traded REITs, which have additional complexity of their own
  - Recommended salary also incorporates market benefits value*, as benefits are not provided by Charitable DAF
  - LTI opportunity links pay to fund performance, with an upside limit to prevent excessive levels of pay

- **Question for Charitable DAF to consider:** Whether 2021 performance should be captured in the initial cycle, given Mr. Patrick's start date in March 2021, or whether performance should be considered only for 2022 and later years

*See Appendix for overview of market benefits practices

Confidential – Subject to Attorney / Client Privilege

5

TDIT0006030

Case 19-34054-sgj11 Doc 4627-6 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc
Exhibit 211 Part 02 Page 306 of 759

# Base Salary Market Data

- Average base salary *(at the median)* is $525K for CEO and $455K for CIO

- Blending the data for the two roles is not recommended, as it reduces the higher-paid role, rather than reflecting an incumbent playing multiple roles

- In this case the more relevant reference is likely the CEO data, because:
  - Mr. Patrick's role is more complex than that of a typical CIO
  - While CEOs of organizations of the sizes reflected here likely have broader employee size / operational scope, Mr. Patrick's role reflects other complexities that may not be reflected in these CEO roles

*Compensation values in $000's*

| CEO | 25th %ile | Median | 75th %ile |
|---|---|---|---|
| **Private Equity firms** *($150-$500M assets)* | $391 | $477 | $565 |
| **REITs** | $409 | $663 | $987 |
| **General Industry** | $347 | $436 | $646 |
| **Composite** | $382 | $525 | $733 |

| CIO | 25th %ile | Median | 75th %ile |
|---|---|---|---|
| **Private Equity firms** *($400M-$1B assets)* | $314 | $338 | $559 |
| **Endowments and Foundations** | $481 | $571 | $714 |
| **Composite** | $398 | $455 | $637 |

6

Confidential – Subject to Attorney / Client Privilege

TDIT006031

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 307 of 759

1074

# Total Compensation Market Data

- Total compensation is the sum of **base salary, annual incentives, and long-term incentives** *(where provided)*
  - The market data also include carried interest, where we were not able to break it out separately
  - We would typically exclude carried interest *(when itemized)*, as 1) the value fluctuates meaningfully based on fund returns, 2) value is often reported on an accumulated rather than annualized basis, and 3) individuals receiving carried interest are also typically responsible for raising funds/capital

- Average total compensation *(at the median)* is $1.4M for CEO and $1.5M for CIO

*Compensation values in $000's*

| CEO | 25th %ile | Median | 75th %ile |
|---|---|---|---|
| **Private Equity firms**[1] *($150-$500M assets)* | $888 | $1,837 | $2,927 |
| **REITs** | $725 | $1,840 | $3,012 |
| **General Industry** | $365 | $570 | $1,000 |
| **Composite** | $659 | $1,416 | $2,313 |

| CIO | 25th %ile | Median | 75th %ile |
|---|---|---|---|
| **Private Equity firms**[2] *($400M-$1B assets)* | $1,523 | $1,983 | $6,166 |
| **Endowments and Foundations** | $731 | $941 | $1,313 |
| **Composite** | $1,127 | $1,462 | $3,740 |

[1] *Includes carried interest in one of the two surveys used, as the survey combined LTI and carried interest into one value*

[2] *Includes carried interest, as the survey combined LTI and carried interest into one value*

Confidential – Subject to Attorney / Client Privilege

7

994

TDIT006032

CONFIDENTIAL

# Long-Term Incentive (LTI) Tied to Fund Returns

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 308 of 759

## 3-Year Performance Example

- Payment after <u>3 years</u>: **7.5% of fund earnings** (net of expenses) **in excess of 10%** annualized
  - Maximum annualized return included in calculation: **25%**

**Payout after 3 years**

**7.5% of Excess Fund Earnings**

| Year 1 | Year 2 | Year 3 |

Assumptions:
- **Starting Salary**: $750K
- **Starting Fund Value**: $350M
- **Annualized Net Fund Return**: 15%

*Values in $000's*

| Year | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
|---|---|---|---|---|---|---|---|
| Payment | — | — | — | $4,984 | — | — | $7,580 |

**Annualized Pay Years 1-3: $2.4M**
*(Avg. salary\* + 1/3 of $4.98M payment)*

*\*Example assumes 3% annual salary increases*

## LTI Outcomes Assuming Various Net Fund Returns

- With **3-year performance periods** and a starting fund value of $350M, payment opportunity after 3 years ranges from **$0 - $16.3M**

**LTI Payment after 3 Years**
*(in $000's)*

| Annualized Return | Payment After 3 Years |
|---|---|
| 10% | — |
| 15% | $4,984 |
| 20% | $10,421 |
| 25% | $16,331 |
| 30% | $16,331 |

Confidential – Subject to Attorney / Client Privilege

8

TDIT006033

CONFIDENTIAL

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 309 of 759

# Initial LTI Period Can Recognize Some Prior Performance

- Mr. Patrick assumed the role during 2021. Compensation to date has been base salary only (not been tied to fund returns)

- The first 3-year performance period could measure 2021-2023 performance, or, a 2022-2024 performance period could be more appropriate given Mr. Patrick's mid-2021 start date

- If the first period measures performance for 2021-2023, LTI payment for that period would be $4.46M or $5.76M, depending on whether the return calculation is net of legal expenses:

| Return Calculation Approach | LTI Payment for 2021-2023* ($000's) |
|---|---|
| Net of All Expenses | $4,459 |
| Net of Fund Expenses Only | $5,759 |

- Charitable DAF should consider which approach is more appropriate, given the circumstances. Things to consider:

  – While the legal expenses are tied to the operation of Charitable DAF, most of these legal expenses are *not* tied to the operation of the fund.

  – Mr. Patrick indicated that he uses litigation as an investment tool; therefore, some of the legal fees likely *are* tied to fund management (although this may be a small portion). If these investment-related legal fees were to become significant in the future, excluding them would become more inappropriate.

  – Mark's salary was positioned high relative to market in part due to his personal risk exposure from the ongoing litigation.

*Reflects LTI formula of 7.5% of annualized returns in excess of 10% (capped at 25% annualized), and based on the historical fund balances and fund earnings provided to use by Charitable DAF

Confidential – Subject to Attorney / Client Privilege

9

TDIT006034

CONFIDENTIAL

1077

FSD2025-0116

2025-08-19

# Appendix

FSD2025-0116

2025-08-19

997

TDIT006035

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 311 of 759

# Benchmarking Methodology

| | Description |
|---|---|
| **Geographic Scoping** | • National, to reflect the national labor market for executive talent (i.e. no geographic adjustment) |
| **Compensation Data Sources and Size Scopes** | **Private Equity Firms**<br>• 2024 & 2023 Preqin Private Capital Compensation and Employment Review *(scoped to 7 private equity companies with $150M-$400M in assets and 11 private equity companies with $400M-$1B in assets)*<br>• 2022 Heidrick & Struggles' North America Private Equity Compensation Survey *(scoped to 10 private equity companies with $250-$500M in assets)*<br><br>**REITs**<br>• Most recent Proxy filings *(10 REITs with less than $3B in assets)*<br><br>**General Industry**<br>• 2023 Mercer US Benchmark Database *(scoped to 38 general industry companies with $25M-$100M in revenue)*<br><br>**Endowments and Foundations**<br>• 2024 US Endowments and Foundations Investment Groups Survey *(scoped to 37 orgs with less than $3B in assets)* |
| **Data Aging** | • Data were aged to 7/1/2024 by an annual aging factor of 3%, which reflects average increases for executives according to Mercer's *US Compensation Planning Survey* |
| **Benefit Survey Sources** | • Mercer's North America Executive Rewards Year-End Survey *(scoped to 42 US banking/financial services companies)*<br>• Mercer's Executive and Broad-based Employee Retirement Tool *(scoped to 51 US financial services companies)*<br>• Mercer's Executive Benefit and Perquisite Practices Survey for Tax-Exempt Organizations *(scoped to 71 foundations & higher education institutions)* |

Confidential – Subject to Attorney / Client Privilege

11

998

TDIT0006036

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc<br>Exhibit 211 Part 02   Page 312 of 759

# Details on Market Data Sources

| Compensation Data Sources and Size Scopes | |
| --- | --- |
| **Private Equity Firms** | **2024 & 2023 Preqin Private Capital Compensation and Employment Review**<br>• **Overview:** The review analyzes the data on thousands of professionals at contributing private capital firms with data by fund type<br>• **Survey Scope:** Scoped to *$150M-$400M in assets (CEO data) & $400M-$1B in assets (CIO data; smaller cut not available)*<br>• **Sample Size:** 7 orgs *($150M-$400M in assets) & 11 orgs ($400M-$1B in assets)*<br>**2022 Heidrick & Struggles' North America Private Equity Compensation Survey**<br>• **Overview:** This report provides a comprehensive picture of compensation for North American private equity executives<br>• **Survey Scope:** Scoped to organizations with *$250-$500M* in assets<br>• **Sample Size:** 10 orgs |
| **REITs** | **Most recent Proxy filings**<br>• **Overview:** Proxy filings for publicly traded of REITs<br>• **Survey Scope:** Scoped to organizations with $69M-$2.7B in assets (median asset size $509M)<br>• **Sample Size:** 10 orgs (5 REITs and 5 MREITs) |
| **General Industry** | **2023 Mercer US Benchmark Database (MBD)**<br>• **Overview:** MBD delivers data for 7+ million incumbents<br>• **Survey Scope:** Scoped to general industry companies with $25M-$100M in revenue<br>• **Sample Size:** 38 orgs |
| **Endowments and Foundations** | **2024 Mercer US Endowments and Foundations Investment Groups Survey**<br>• **Overview:** The most comprehensive and credible source of compensation data for the not-for-profit investment community<br>• **Survey Scope:** Scoped to organizations with less than $3B in assets (smallest available cut)<br>• **Sample Size:** 37 orgs |

Confidential – Subject to Attorney / Client Privilege

12

TDIT006037

CONFIDENTIAL

FSD2025-0116

2025-08-19

# REIT Details

- Mercer initially focused on mortgage REITs *(MREITs)*, given the portfolio Mr. Patrick oversees; however, given the insufficient number of MREITs with similar asset size to Charitable DAF, other REITs were added as well

| Companies | Classification | Assets ($M) | Executive Name | Executive Title | Base Salary | Total Compensation |
|---|---|---|---|---|---|---|
| Granite Point Mortgage Trust Inc. | MREIT | $2,720 | John ("Jack") A. Taylor | President & CEO | $1,000,000 | $4,036,920 |
| Seven Hills Realty Trust | MREIT | $698 | Thomas J. Lorenzini | President & CEO | $944,308 | $2,027,633 |
| Wheeler Real Estate Investment Trust, Inc. | REIT | $668 | M. Andrew Franklin | President & CEO | $400,000 | $600,000 |
| Sachem Capital Corp | MREIT | $627 | John L. Villano | Chairman of the Board, CEO, President & Director | $750,000 | $1,500,000 |
| Postal Realty Trust, Inc. | REIT | $584 | Andrew Spodek | CEO | $388,265 | $2,545,584 |
| NewLake Capital Partners, Inc. | REIT | $433 | Anthony Cogniglio | President, CEO & Director | $400,000 | $1,139,706 |
| Sotherly Hotels Inc. | REIT | $405 | David R. Folsom | President & CEO | $537,595 | $738,082 |
| Highlands REIT, Inc. | REIT | $344 | Richard Vance | President & CEO | $750,000 | $3,250,000 |
| Bimini Capital Management Inc | MREIT | $122 | Robert E. Cauley | President & CEO | $1,088,805 | $2,815,555 |
| Manhattan Bridge Capital, Inc. | MREIT | $69 | Assaf Ran | President & CEO | $350,000 | $480,000 |

**Summary Statistics** [1]

| | | | | | | |
|---|---|---|---|---|---|---|
| 75th Percentile | | $675 | | | $986,978 | $3,011,891 |
| 50th Percentile (Median) | | $509 | | | $663,111 | $1,839,906 |
| 25th Percentile | | $288 | | | $408,978 | $724,668 |

(1) Summary statistics for base salary and total compensation have been aged to 7/1/2024

Confidential – Subject to Attorney / Client Privilege

FSD2025-0116

2025-08-19

TDIT006038

# Private Equity Market Details for CEO Role

*Compensation values in $000's*

| 2024 Market Data | | | | | | |
|---|---|---|---|---|---|---|
| **CEO** | **Base Salary** | | | **Total Compensation** | | |
| | 25th %ile | Median | 75th %ile | 25th %ile | Median | 75th %ile |
| **Preqin: $150M-400M Assets** (1) | $357 | $419 | $535 | $892 | $1,783 | $3,176 |
| **Heidrick & Struggles: $250M-500M Assets** | $424 | $535 | $594 | $883 | $1,890 | $2,677 |
| **Composite** | $391 | $477 | $565 | $888 | $1,837 | $2,927 |

(1) *Includes carried interest in one of the two surveys used, as the survey combined LTI and carried interest into one value*

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 314 of 759

14

Confidential – Subject to Attorney / Client Privilege

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 315 of 759

# 2023 Market Data

*Compensation values in $000's*

| CEO | Base Salary | | | Total Compensation | | |
|---|---|---|---|---|---|---|
| | 25th %ile | Median | 75th %ile | 25th %ile | Median | 75th %ile |
| **Private Equity firms**[1] *($150-$500M assets)* | $379 | $463 | $548 | $862 | $1,783 | $2,841 |
| **REITs** | $397 | $644 | $958 | $704 | $1,786 | $2,924 |
| **General Industry** | $336 | $423 | $627 | $355 | $554 | $971 |
| **Composite** | $371 | $510 | $711 | $640 | $1,374 | $2,245 |

| CIO | Base Salary | | | Total Compensation | | |
|---|---|---|---|---|---|---|
| | 25th %ile | Median | 75th %ile | 25th %ile | Median | 75th %ile |
| **Private Equity firms**[2] *($400M-$1B assets)* | $305 | $329 | $543 | $1,479 | $1,926 | $5,987 |
| **Endowments and Foundations** | $467 | $555 | $693 | $710 | $913 | $1,275 |
| **Composite** | $386 | $442 | $618 | $1,095 | $1,420 | $3,631 |

(1) *Includes carried interest in one of the two surveys used, as the survey combined LTI and carried interest into one value*

(2) *Includes carried interest, as the survey combined LTI and carried interest into one value*

15

Confidential – Subject to Attorney / Client Privilege

CONFIDENTIAL

FSD2025-0116

1083

Page 1087 of 1530

2025-08-19

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 316 of 759

# Incentive Plan Alternatives

- Compensation package can consist solely of base salary, or can be a combination of salary *(at a lower level)* plus annual and/or long-term incentives

| | Annual Incentive | Long–Term Incentive | Deferred Compensation |
|---|---|---|---|
| Description | • Annual incentive tied to fund returns or other metrics | • Incentive based on fund returns over a 3–5 year period | • Deferred compensation granted annually; balance grows at the fund's rate of return |
| Example | • Target annual payment is 100% of salary, max is 200% | • Target as % of salary, OR as a % of excess returns<br>• Payment made every 3–5 years | • Paid at termination of employment (or earlier date, if elected) |

- While deferred compensation is feasible for some organizations, Charitable DAF's outside legal counsel has confirmed that IRC Section 457A would likely apply, which would tax any deferred compensation at vesting. Therefore, this report focuses only on annual and long-term incentives as viable alternatives

16
Confidential – Subject to Attorney / Client Privilege

TDIT006041

CONFIDENTIAL

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 317 of 759

# Pros/Cons of Alternatives

- Note that for outcomes tied to fund returns, absolute return *(vs. relative)* may be the only feasible measure, as a comparable benchmark return likely doesn't exist

|  | Annual Incentive | Long–Term Incentive (LTI) | |
|---|---|---|---|
|  |  | % of Salary | % of Excess Returns |
| **Pros** | • Fairly simple, formulaic approach | • More predictable incentive value than a % of excess returns approach<br>• Rewards longer–term vs. annual performance | • Greater upside / greater linkage to performance vs. % of salary approach<br>• Rewards longer–term vs. annual performance |
| **Cons** | • Pays based on annual results, not long–term returns<br>• If not tied to fund returns, requires goal setting each year | • Less upside potential than % of returns approach<br>• Greater cost to organization in low performance years<br>• Delay in payment compared to annual incentive | • No value provided unless fund returns exceed threshold<br>• Greater cost to organization in high performance years<br>• Delay in payment compared to annual incentive |

- Based on our interviews, long-term performance seems a more appropriate measure than annual performance; however, the organization should consider whether a focus on short-term and/or long-term results is more appropriate

Confidential – Subject to Attorney / Client Privilege

17

TDIT006042

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 318 of 759

# Market Benefits Landscape

**Retirement Benefits:**

- At the executive level, retirement benefits are typically the largest component of benefits value. Total employer contributions as a % of base salary are:

|  | Median | 75th %ile |
|---|---|---|
| **For-profit Financial Services** | 4% | 6% |
| **Non-profit Foundations & Higher-Ed** | 8% | 11% |

**Other Benefits:**

- Most companies provide basic health and welfare benefits, which typically is not feasible until the employee size is larger

**Perquisites:**

- While perquisites have declined in prevalence, **~75%** of Financial Services and **~60%** of Foundations & Higher-Ed provide at least one perquisite to the CEO



**CEO Perquisites**

- Financial Services
- Foundations & Higher-Ed

| Car Benefit | Financial/Legal/Tax Counseling | First Class Air Travel | Club Benefit |
|---|---|---|---|
| 37% / 40% | 35% / 1% | 26% / 0% | 21% / 16% |

Confidential – Subject to Attorney / Client Privilege

18

TDIT006043

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 319 of 759

# Disclaimers

- Mercer is not licensed to practice law, and our evaluation should not be considered a legal opinion on the level or structure of Mr. Patrick's compensation; legal counsel should weigh in on both matters

- In determining where to set pay, the organization should also consider the impact on overall organizational expenses, and the organization's ability to meet the expected distributions to the charities

- Charitable DAF should confirm with counsel the tax implications of the chosen compensation structure/program

Confidential – Subject to Attorney / Client Privilege

19

TDIT006044

CONFIDENTIAL

FSD2025-0116

2025-08-19

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 320 of 759

A business of Marsh McLennan

Copyright © 2024 Mercer (US) LLC. All rights reserved.

TDIT006045

1088

FSD2025-0116   Case 19-34054-sgj11   Doc 2547-2   Filed 09/21/23   Entered 09/21/23 00:14:30   2025-08-19
Exhibit 3 - July 9   2021 Memo on DAFs and Sponsoring Orgs   Page 2 of 6

EXHIBIT 3

# M E M O R A N D U M

**Date: July 9, 2021**

**To:  Mark Patrick**

**Company:  Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd.**

**From:  Haynes and Boone, LLP, by Kenneth Bezozo**

**Subject:  Donor Advised Funds ("*DAFs*"), Sponsoring Organizations and Supporting Organizations -- The Reasons for Making Investments in Offshore Jurisdictions**

---

1. *What are Donor Advised Funds, Sponsoring Organizations and Supporting Organizations?*

A donor advised fund, or DAF, is a separately managed charitable investment account established by a donor within a public charity (a section 501(c)(3) organization), which is generally referred to as a sponsor.  Sponsors may include a community foundation, university, religious organization, or financial institution.  The donor (or the donor's designee) typically maintains certain advisory privileges over the DAF funds or account – specifically with respect to charities that should receive donations, although the DAF account is fully and completely owned and controlled by the sponsor.

In some cases, a sponsor can create as a subsidiary a "supporting organization" which also is a Section 501(c)(3) public charity.  A supporting organization is a separate entity controlled by the sponsor through its ability to elect a majority of the supporting organization's governing board.  Because of this control, a supporting organization is treated financially as part of a consolidated unit with the sponsor.

Here, for example, The Dallas Foundation formed, and owns and controls, a supporting organization named Highland Dallas Foundation, Inc. ("*Highland Dallas Foundation*") to assist The Dallas Foundation in carrying out its charitable mission in helping support a wide variety of community affairs.  Donations were made to the Highland Dallas Foundation as both the sponsor and the supporting organization.  The Highland Dallas Foundation from time to time makes distributions of funds to The Dallas Foundation which in turn makes further distributions to local public charities.  *Exhibit 1* attached shows these above-described entities, as well as other entities referenced herein that are pertinent to this donor advised fund.

2. *How Does a Donor Establish a DAF Account?*

To establish a DAF fund or account, a donor must make an irrevocable contribution of assets, such as cash, stock or securities or other business or financial assets, to a sponsoring public charity. The donor's contribution is recorded and recognized as a donation to the sponsoring

1089

FSD2025-0116  Case 19-34054-sgj11  Doc 2542  Page 10 of 1550  Entered 07/09/21 07:26:39:00  Page 3  2025-08-19
Exhibit 3 - July 9   2021 Memo on DAEs and Sponsoring Orgs   Page 3 of 6

EXHIBIT 3

public charity of the DAF. A donor can make additional contributions to the sponsoring organization whenever they choose.

Because a contribution to a sponsoring organization is, for tax purposes, the equivalent of a contribution to a public charity and because the donor gets an immediate tax benefit for the contribution, the contribution, when made, is permanent and irrevocable.  This is true even though the donor contribution to the sponsoring organization is in an account that grows tax-free and the donor has advisory rights as to where to invest the assets and donations made from these assets.

Here, the Highland Dallas Foundation is the sponsor of the DAF account which it fully owns and controls. Although the donor has advisory rights regarding investments and donations to charities (by way of a board seat he fills in the supporting organization), the Highland Dallas Foundation has full authority and control over all such decision-making.

3.  ***What Type of Investments Can be Made by a Sponsor/Supporting Organization?***

A sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are able to invest in a wide variety of assets including, but not limited to, marketable securities, financial assets, businesses, real estate, private equity and hedge funds.  But because the sponsor and supporting organization are both public charities that are tax-exempt organizations, their investments must take into account all laws that could possibly effect their tax-exempt status.

a. ***Can a Sponsor and its Supporting Organization Invest in a Hedge Fund, Private Equity Fund or Similar Investment Vehicle?***

The short answer is yes, but as stated above, a sponsor and its supporting organization, such as The Dallas Foundation and Highland Dallas Foundation, are both public charities that are tax-exempt organizations.  As a strong general rule, a tax-exempt organization will avoid any investments that will subject it to federal or state taxes.  A tax-exempt organization is generally exempt from all federal and state taxes except to the extent it receives income classified as unrelated business taxable income (UBTI), which would be taxed at a 21% rate.  The term "unrelated business taxable income" generally means the income derived from an unrelated trade or business regularly conducted by the tax-exempt organization.  UBTI also can arise from the receipt of income from debt-financed investments, which is why hedge and private equity funds generally utilize a special investment structure to ensure tax-exempt investors do not have UBTI.

To prevent UBTI from flowing through to a tax-exempt organization, a corporation can be utilized to "block" this income at the corporate level, which is accomplished by having a corporation interposed between the tax-exempt organization and the hedge fund, such as The Charitable DAF Holdco, Ltd. (a corporate blocker) from the Charitable DAF Fund, L.P.  Using a structure in this manner is often described as using a "blocker" because the UBTI is blocked out and does not flow through to the tax-exempt investor. Instead, the UBTI is included in the income of, and subject to tax in, the blocker corporation.  The blocker corporation thereafter distributes the income to the tax-exempt

4822-2891-9537 v.7

2

CONFIDENTIAL

TDIT006047

1090

FSD2025-0116   Case 19-34054-sgj11  Doc 2542  Page 1094 of 1530  Entered 07/09/21 07:26:39:00: Page 4   2025-08-19
Exhibit 3 - July 9   2021 Memo on DAFs and Sponsoring Orgs   Page 4 of 6
EXHIBIT 3

investor through the payment of dividends which are not UBTI and therefore not taxable to a tax-exempt organization.

Although using a domestic corporate blocker can avoid the problem of having UBTI passed through to a tax-exempt sponsor or its supporting organization, a U.S.-based blocker corporation will be required to pay corporate and state-level income tax on the income they receive from an investment fund.

> b. *Are There Particular Jurisdictions in Which Hedge and Private Equity Funds form Investment Partnerships and Blocker Corporations for their tax-exempt investors?*

It is common for hedge and private equity funds that have tax-exempt investors such as The Dallas Foundation and Highland Dallas Foundation to utilize an offshore structure to form its investment partnership.  In addition, these funds may form offshore blocker corporations as well as for other reasons including the ability to make non-U.S. investments or U.S. investments that do not give rise to U.S. tax for foreign investors (i.e., U.S. investments that do not cause the investor to be "engaged in a U.S. trade or business.")  Jurisdictions such as Bermuda and the Cayman Islands are typically used because those countries do not have an income tax regime.

By utilizing an offshore structure with corporate blockers, hedge and private equity funds can ensure their tax-exempt investors will not receive any UBTI from investments held by The Dallas Foundation or Highland Dallas Foundation. In addition, to the extent the sole source of UBTI is through debt financing (which is often the case in a hedge fund), then using an offshore corporate blocker can eliminate this type of UBTI (because the debt financing will not flow through the corporate blocker to taint the income received by the tax-exempt investor).  This allows the sponsor (i.e., Highland Dallas Foundation), as well as any other charities that receive distributions from Highland Dallas Foundation or The Dallas Foundation, to receive the largest possible distributions.

Utilizing an offshore structure for hedge and private equity funds in the manner described above for tax-exempt investors is a best practice used by many U.S. law firms representing U.S. hedge and private equity funds.  In fact, if a U.S. law firm didn't use offshore blockers in the manner described above, it could be considered a poor practice.

In summary, using an offshore blocker corporation, such as Charitable DAF Holdco, Ltd. and CLO Holdco, Ltd., for many hedge funds minimizes taxes and increases the net after-tax cash flow to the tax-exempt investors because investments grow tax-free, giving a sponsor, such as Highland Dallas Foundation, the potential to create even more capital for philanthropic giving.

4. *Who Has Control and Authority over the Assets Held by the Sponsor?*

Because a DAF is an account within a sponsor organization, the sponsoring organization has full, complete and final control over the funds in the DAF, which is the case here with the sponsor, the Highland Dallas Foundation.  Although the supporting organization permits the donor or the donor's designee to recommend how funds should be invested and how funds should be

CONFIDENTIAL                                                         TDIT006048

distributed to other public charities, Highland Dallas Foundation must approve any investments and all distributions to charities.

In this case, the donor of the charitable DAF, or his designee, is able to appoint a representative to the board of the Highland Dallas Foundation, which allows the donor to recommend investments or distributions to charitable organizations, i.e., organizations that are tax-exempt under Internal Revenue Code section 501(c)(3) and classified as public charities under Internal Revenue Code section 509(a).  But the donor (or the donor's designee) only has advisory privileges over making investments and the distribution of funds.

5. ***What Are the Benefits to a Donor of a Contribution to a DAF account?***

A DAF account allows a donor who makes an irrevocable charitable contribution to the DAF account to receive an immediate tax deduction, and with the ability to recommend distributions be made by the sponsor to specific charities either presently or in the future.  Also, if the donor contributes certain appreciated assets to the DAF account, such as stock or securities, the donor avoids the recognition of any gain in these appreciated assets.  This is a significant additional benefit to donors made available in the Internal Revenue Code.

The DAF assets that are not immediately distributed to charities are then invested and depending on the type of investments and the jurisdiction in what the investments are made, the assets may grow tax-free.

CONFIDENTIAL

### Exhibit 1

### Charitable DAF/CLO Holdco
### Structure Chart



CONFIDENTIAL

FSD2025-0116                    **Page 1097 of 1530**                    2025-08-19

**IN THE MATTER OF:**

**CHARITABLE DAF HOLDCO LTD**

_____

**OPINION**

_____

### A.    INTRODUCTION

1.    I am asked to advise Charitable DAF Holdco Ltd (the "**Company**") upon the following matters:

    a.    Whether the issue and allotment of shares in February 2025 is potentially open to challenge by the Company's pre-existing shareholders;

    b.    Whether certain changes to the Company's memorandum and articles of association that were adopted in February 2025 are open to challenge (in particular, the Company's adoption of revised objects, changes made to the voting and quorum provisions for board meetings, to the appointment of directors and approval of transactions, and the dispute resolution clauses in the Company's articles);

    c.    Whether it is open to the board of directors forcibly to redeem the shares of certain Participating Shareholders;  and

    d.    Whether it is open to the board of directors to require certain Participating Shareholders to transfer their shares.

### B.    BACKGROUND

2.    I am instructed that the Company's "mission statement" provides that the Company makes investments "_in order to support community-focused non-profit foundations with a demonstrates focus of giving funds to worth causes and making a difference_".

**The 2024 Memorandum and Articles of Association**

3.    The Company adopted an amended and restated memorandum of association pursuant to a special resolution dated 24 January 2024 (the "**2024 Memorandum**"). Despite the mission statement referred to above, the 2024 Memorandum made no reference to the Company's charitable purposes and merely provided at para. 3 that the objects for which the Company

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

FSD2025-0116                                                                2025-08-19

1013

is established "*are unrestricted*" and "*the Company shall have full power and authority to carry out any object not prohibited by any law  as provided by Section 7(4) of the Companies Act )(as revised) of the Cayman Islands*".

4.   Para. 7 of the 2024 Memorandum provided that the capital of the Company was divided into 4,999,900 "*Participating Shares*" of a nominal or par value of $0.01 each and 100 "*Management Shares*" of equivalent nominal/par value per share.   Para. 7 provides further as follows (emphasis added):

> "*provided always that subject to the Act and the Articles of Association the Company shall have power to redeem or purchase any of its shares ... and to issue all or any part of its capital whether original, redeemed, increased or reduced without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided*".

5.   I have also been provided with a set of Articles of Association which I understand were adopted by special resolution in January 2024 (the "**2024 Articles**").[1]

6.   The 2024 Articles included the following provisions:

a.   Subject to the Articles, all Shares for the time being unissued were under the control of the Directors, who might, inter alia, issue, allot and dispose of the same (Art. 7);

b.   Management Shares in the Company carried the right to receive notice of, to attend and vote at a general meeting of the Company, but conferred no right to participate in the profits and assets of the Company save where provided in the Articles (Art. 11);

c.   Participating Shares conferred no right upon the holder to receive notice of, to attend or vote at a general meeting but such shareholders "*may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article [i.e. Art. 13]*" (Art.12);

d.   The "*rights attached to any such Class may ..... only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a*

---

[1] The version I have seen does not identify the day in January 2024 that the special resolution was passed.  I proceed, however, on the basis that there was such a special resolution adopting the 2024 Articles in January 2024. #83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

*resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes case at such a meeting*" (Art.13);

e. The rights conferred upon the holders of the Participating Shares of any Class issued with preference or other rights shall not *"... be deemed to be materially adversely varied or abrogated by, inter alia, the creation, allotment or issue of further Participating Shares ranking pari passu with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company*" (Art. 14);

f. When paying any dividends, such dividends shall be declared and paid "*by the Directors in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares*" (Art. 105);

g. In a winding up of the Company, the assets available for distribution among shareholders fell to be divided first between the holders of Participating and Management Shares up to the par value of their shares, and then between the Participating Shareholders in proportion to their shareholding of that class of shares (Art. 123);

h. Subject to the Companies Act and the rights attaching to the various classes of shares, the Company could by Special Resolution alter the Articles in whole or in part (Art. 125).

7. I set out other relevant articles where appropriate in the discussion below.

8. The Company's 100 Management Shares are held by Mr Mark Patrick. Mr Patrick is a director of the Company together with Mr Paul Murphy.

**The 2025 Share Issue**

9. By resolutions of the directors dated 7 February 2025, the Company resolved to issue 318 Participating Shares to DFW Charitable Foundation ("**DFW**"), described in para. 5.1 as "*a Delaware non-profit non-stock corporation*" (the "**February 2025 Resolutions**"). Those shares were subsequently issued and allotted to DFW (the "**2025 Share Issue**"). It would appear that the shares were issued at par, and so the 2025 Share Issue did not generate a benefit in the form of a capital inflow into the Company.

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

CONFIDENTIAL TDIT006053

**FSD2025-0116**  **Page 1100 of 1530**  **2025-08-19**

10.  Prior to the 2025 Share Issue, the Company had four Participating Shareholders. Of those, Highland Dallas Foundation, Inc, Highland Kansas City Foundation, Inc and Highland Santa Barbara Foundation Inc (together, the "**Highland Shareholders**") each held 100 Participating shares.  Mr James Dondero was or is affiliated with the Highland Shareholders. The fourth Participating Shareholder, The Community Foundation of North Texas ("**CFNT**"), held 5 participating shares.

11.  I understand that the Highland Shareholders and CFNT were "gifted" their shares.

12.  The effect of the 2025 Share Issue is as follows:

   a.  DFW now holds 51.04% of the total Participating Shares;

   b.  The percentage of the Participating Shares held by each of the Highland Shareholders has reduced to 16.05% of the total Participating Shares; and

   c.  CFNT's holding has reduced to 0.8% of the total Participating Shares.

13.  The February 2025 Resolutions include a narrative explanation of the rationale for the 2025 Share Issue.  I discuss that explanation later in this opinion.

**The 2025 Memorandum and Articles**

14.  On 20 February 2025, by a special resolution, the Company resolved to replace the 2024 Memorandum and the 2024 Articles with a new memorandum and articles of association (the "**2025 M&A**").

**C.    IS THE 2025 SHARE ISSUE POTENTIALLY OPEN TO CHALLENGE?**

15.  As set out above, the 2024 Memorandum contains express power on the part of the directors to issue fresh shares.  The 2025 Share Issue was accordingly within the Company's corporate capacity and within the powers of the board of directors of the Company.  Equally, it was not an action which engaged the requirement for approval of a two-thirds majority of the Participating Shareholders: Art. 14 of the 2024 Articles makes clear that the creation, allotment or issue of further Participating Shares is not deemed to materially adversely vary or abrogate the rights of Participating Shareholders.

16.  Although there is no doubt that the directors had power to cause the 2025 Share Issue, the question remains whether that exercise by the directors of their powers is capable of

**FSD2025-0116**  **2025-08-19**

**CONFIDENTIAL**  **TDIT006054**

challenge. The Privy Council has recently confirmed in *Tianrui (International) Holding Company Ltd v China Shanshui Cement Group Ltd* [2024] UKPC 36 at [4], on appeal from the Cayman Islands, that a shareholder has a right of action against the company to challenge the allotment of shares by the board of directors if the allotment was made for an improper purpose in circumstances where the allotment will cause detriment to the shareholder. I address below the relevant legal principles and the application of those principles to the facts as I understand them.

**Relevant legal principles**

17. Based on the authorities as they stand, the following principles apply:

    a. When registered, a company's memorandum of association binds the company and its members as if each member had subscribed the memorandum and it contained a covenant on the part of the member, his heirs and administrators to observe all its conditions: s.12 of the Companies Act (2023 revision) ("**CA**"). Similarly, when registered the articles of association bind the company and its members as if each member had subscribed the articles and it contained a covenant on the part of the member, his heirs and administrators to conform to the regulations contained in the articles: s.25 of the CA.

    b. The consequence is that there is a contract between the company and its members and between its members *inter se* that the company and its members will observe the conditions of the memorandum and the regulations of the articles of association (*Tianrui*, [31]).

    c. Directors of a company have duties owed to the company, including a fiduciary duty to exercise their powers only for proper purposes. Where the memorandum confers a power upon the directors of a company to issues shares, that power is necessarily a fiduciary power and must therefore only be exercised for proper purposes (*Tianrui*, [69]). As "*an intrinsic feature of the contract constituted by the memorandum and articles of association*", it is "*implicit that when exercising their powers on behalf of the company the directors will exercise them in accordance with their fiduciary duties, including the duty to exercise powers only for a proper purpose*" (*Tianrui*, [43] and see [70]). As it was put in Tianrui at [75] and [76], "*the contract between the shareholder and the company contains the implied term that, in exercising the power to allot and issue shares, the directors as the company's agents will do so in accordance*

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

CONFIDENTIAL TDIT006055

*with their fiduciary duties*", which term "*falls to be implied into the contract between the shareholder and the company and between the shareholders inter se and it arises out of the nature of the contractual constitution of the company*". That term is implied "*as a result of the nature of the contract and the relationship thereby created between the parties to that contract*".

d.   The proper purposes for the exercise of the power to allot and issue shares "*include the raising of new capital where that is genuinely considered to be in the best interests of the company, but there can be other legitimate purposes*" (*Tianrui,* [69]); although "*[n]o part of those proper purposes includes deliberately altering the balance of power between shareholders*" (emphasis added).

e.   Where the directors exercise their powers for an improper purpose, then the act is voidable not void (*Tianrui,* [74]). It might be challenged by the affected shareholder(s) bringing their own action against the Company to set aside the relevant transaction (*Tianrui*, [72]). Additionally, or alternatively, it might in itself be relied upon as a ground for arguing that it is just and equitable to wind up the company pursuant to s.92(e) of the CA.

f.   Whether or not the directors have breached that duty to exercise their powers for proper purposes involves identifying the directors' subjective reasons for exercising the relevant power (*i.e.* the reasons which led them to act as they did): *Eclairs Group Ltd v JKX Oil & Gas plc* [2015] UKSC 71 at [15].

g.   Those reasons must then be considered in light of the purposes for which the relevant power was conferred, in order to identify whether the directors' subjective reason meant that they exercised the power for an improper purpose. In identifying the purpose of the relevant power, there is, or may be, some complexity.

h.   Where the directors act for multiple reasons, and where some reasons are legitimate reasons for exercising the relevant power and others reasons are not, although the matter is not yet finally settled as a matter of law, on present authority it is likely that

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

FSD2025-0116                                                    2025-08-19

1018

CONFIDENTIAL                                                    TDIT006056

the Court will look to whether, but for the improper reason(s) the relevant action would still have been taken (*Eclairs*, [21]).[2]

18. I make reference to further authorities which illuminate the application of the above principles in the discussion which follows.

**Analysis**

19. As the above summary makes clear, whether an issue of shares by directors is capable of challenge is an intensively fact-sensitive question which requires consideration of the reasons behind the exercise of the power to issue shares and an evaluation of whether such reasons are in conformity with the proper purpose for which the power to issues shares is to be exercised.

*The effect of the 2025 Share Issue*

20. In the instant case, the Participating Shareholders have limited voting rights: whilst they are not in general entitled to attend or vote at meetings of the Company, Arts. 12 and 13 of the 2024 Articles provide that the Participating Shareholders are able to vote at a meeting convened in relation to the modification of rights attached to their class of shares where such modification may materially adversely vary or abrogate their rights.   At such a meeting (or in order for such a modification to be approved in writing) a majority of two-thirds of the class must support the modification.  The effect of the 2025 Share Issue is that, if there were to be a meeting / proposal to approve a modification that effects the Participating Shareholders' rights, the ability of the prior Participating Shareholders to vote down such a change has been negatively affected (DFW now having over 50% of the total Participating Shares). It follows that the issue of the additional shares has an impact upon the balance that previously existed, at least in relation to changes that might have a material adverse effect upon or cause an abrogation of rights attached to the Participating Shares.

21. In addition to the impact upon voting rights in such circumstances, there are other consequences which may flow from the 2025 Share Issue. As set out earlier, Art. 105 of the 2024 Articles conferred discretion upon the directors as to the payment of dividends, "*without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the*

---

[2] That was the view of Lord Sumption, supported by Lord Hodge. Lord Clarke was inclined to agree but considered that further argument was needed on this point.  Lord Mance (with whom Lord Neuberger agreed) also felt that the point would require further argument.

~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~35772500.2.C8689.187150

1100

FSD2025-0116     **Page 1104 of 1530**     2025-08-19

*Shares*". Whilst it follows that the issue of additional Participating Shares did not necessarily entail any impact upon the sums that the existing Participating Shareholders might receive by way of dividend upon their shareholding (as the directors retained the ability to spread the dividends as they so fit), there are still further effects upon the Participating Shareholders:

22. First, whilst they had no right to a pro-rata share of any dividend declared by the Company payable out of profits, the 2024 Articles made clear that, in the event of a winding up of the Company, Participating Shareholders would be entitled to share in the division of the Company's surplus assets (*i.e.* those available after discharge of the Company's prior debts and liabilities) in proportion to their shareholding within the class. The issue and allotment to DFW of additional Participating Shares thus had an potential impact upon the return they might receive in the event of the Company's entry into liquidation.

23. Second (and to some extent linked to the first point), the issue of fresh shares may have impacted negatively upon the value of the original Participating Shareholders' shares. The dilution of voting rights (albeit in the limited circumstances discussed earlier in connection with modifications to their rights) may make the shares less attractive to a third party. Further, an increase in the number of Participating Shareholders (and/or the addition of a different Participating Shareholder), might be perceived to a potential purchaser as making it less likely that any dividend declared by the Company would be paid to the existing Participating Shareholders (or else, might reduce the amount paid).

24. All that said, it is important to note that the dilution of voting rights will commonly be a consequence of the issue of additional shares. Equally, it will commonly be the case that the issue of additional shares with similar rights will impact upon the value of the shares of those already holding shares. That is particularly so if (as I understand happened here) the new shares were allotted at par value rather than for a premium, so there was no corresponding in-flow of capital into the Company.[3] However, the fact that the issue of shares has such <u>effects</u> is not in itself a problem – not least since, as a matter of general law, a shareholder does not have a right not to be diluted. Rather, what matters is whether the <u>purpose</u> for which the shares were issued so as to cause such effects was a proper one.

25. This point was made in *Tianrui*:

---

[3] Even if there were, in this case, the absence of any expectation to a pro rata share in any dividends would likely mean that the inflow would not result in a correlative increase in the value of the existing Participating Shares. ~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150~~

a.   At [69]: *"The proper purposes for the exercise of the power to allot and issue shares include the raising of new capital where that is genuinely considered by the directors to be in the best interests of the company, but there can be other legitimate purposes. No part of those proper purposes includes deliberately altering the balance of power between shareholders. But, of course, an allotment and issue of new shares will frequently have that effect, save where the allotment is made to, and taken up by, all existing shareholders in strict proportion to their existing holdings. Equally, an allotment to the whole of one class of shareholders may alter that balance of power, ..."* (emphasis added).

b.   At [71] (emphasis added): *"It is not, of course, any part of the corporate contract that a shareholder's holding will not be diluted, or that nothing will be done by the directors which alters the balance of power between shareholders. The Board may for example perfectly legitimately decide to issue shares for proper business purposes to new shareholders and that issue, while diluting all existing shareholders' holdings in equal proportions, incidentally alters the balance of power by depriving a shareholder or group of majority control, or of negative control. But it is part of the corporate contract that, if this is to happen, it is done only by a proper exercise of the power, ie one that is exercised bona fide for the benefit of the company as a whole and exercised for the purposes for which the power was conferred. This will necessarily exclude, for example, an allotment and issue of shares which is deliberately aimed at altering the balance of power between shareholders, so as to advance the power of one (or one group) at the expense of another"* (emphasis added).

26.   As those statements suggest, an allotment and issue of shares "*which is deliberately aimed at altering the balance of power between shareholders*" is problematic. The Privy Council referred in general to the requirement that the power is "*exercised bona fide for the benefit of the company as a whole and exercised for the purposes for which the power was conferred*".

27.   It is important to note that a power may be exercised improperly even where the directors genuinely believe that they are acting for good reason.

28.   In *Hogg v Cramphorn Ltd* [1967] Ch 254 the directors of a company, fearing a takeover bid and their own dismissal from the board, took steps which included allotting shares to persons who would support them. It was common ground that the directors were not motivated by

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

FSD2025-0116                                                    2025-08-19
1021
CONFIDENTIAL                                                    TDIT006059

personal advantage and believed that, in acting to preserve their position on the board, they were serving the company's best interests (it being their view that they believed that their actions to prevent the takeover bid and maintaining their status were in the company's interests). However, it was held that they had used the power of allotment for a purpose for which it was not intended to be used and that the allotment was accordingly voidable:

> *"Accepting as I do that the board acted in good faith and that they believed that the establishment of a trust would benefit the company, and that avoidance of the acquisition of control by Mr. Baxter would also benefit the company, I must still remember that an essential element of the scheme, and indeed its primary purpose, <u>was to ensure control of the company by the directors and those whom they could confidently regard as their supporters</u>. Was such a manipulation of the voting position a legitimate act on the part of the directors?"*

29.    The Judge concluded that it was not a legitimate act.

30.    In *Punt v. Symons & Co. Ltd* [1903] 2 Ch 506, an injunction was granted against a company to restrain it from holding a general meeting after its directors had issued shares for the purpose of gaining a sufficient majority to pass a special resolution to alter the company's articles of association. The Judge said this (emphasis added):

> *"<u>A power of the kind exercised by the directors in this case, is one which must be exercised for the benefit of the company: primarily it is given them for the purpose of enabling them to raise capital when required for the purposes of the company</u>. There may be occasions when the directors may fairly and properly issue shares in the case of a company constituted like the present for other reasons. For instance, it would not be at all an unreasonable thing to create a sufficient number of shareholders to enable statutory powers to be exercised; <u>but when I find a limited issue of shares to persons who are obviously meant and intended to secure the necessary statutory majority in a particular interest, I do not think that is a fair and bona fide exercise of the power</u>."*

31.    The suggestion that the only purpose for the issue of shares is for raising capital was rejected by the Privy Council in *Howard Smith Ltd v Ampol Petroleum* [1974] AC 821 as being unduly narrow. However, it was said that:

> *"it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers."*

32.    In *Piercy v S. Mills & Co. Ltd* [1920] 1 Ch 77, it was said that:

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

> *"... directors are not entitled to use their powers of issuing shares merely for the purpose of maintaining their control or the control of themselves and their friends over the affairs of the company, or merely for the purpose of defeating the wishes of the existing majority of shareholders. That is, however, exactly what has happened in the present case. With the merits of the dispute as between the directors and the plaintiff I have no concern whatever. The plaintiff and his friends held a majority of the shares of the company, and they were entitled, so long as that majority remained, to have their views prevail in accordance with the regulations of the company; and it was not, in my opinion, open to the directors, for the purpose of converting a minority into a majority, and solely for the purpose of defeating the wishes of the existing majority, to issue the shares which are in dispute in the present action."*

33.   The Judge said that it did not therefore matter if the directors said that "*We genuinely believe that what we seek to prevent the majority from doing will harm the company and therefore our act in arming ourselves or our party with sufficient shares to outvote the majority is a conscientious exercise of our powers under the articles, which should not be interfered with*". The Judge said (emphasis added):

> *"Such a belief, even if well founded, would be irrelevant. <u>A majority of shareholders in general meeting is entitled to pursue what course it chooses within the company's powers, however wrong-headed it may appear to others, provided the majority do not unfairly oppress other members of the company</u>."*

34.   The overall tenor of those authorities (as further explained by the Privy Council in *Tianrui*), is that the exercise of the power to issue shares is one that should not be exercised with a view to altering an existing balance of power, and that is the case irrespective of whether the directors consider that doing so is in the interests of the company.

35.   To this, I would add one potential qualification.  It might be possible to argue that the statements contained in the various authorities should be interpreted against the particular facts, and should not be read out of their particular context and treated as setting red lines which can never be crossed.  It might be said (for example) that whilst the court in *Hogg* appears to have suggested that it would never be permissible for directors to issue shares so as to defeat a takeover bid, there may be circumstances where doing so is permissible.  In that regard, in the first instance decision in *Cayne v Global Natural Resources Plc* [1984] 1 All ER 225[4],  the judge suggested that it might be permissible for directors to issue shares to remove the threat of control from a competing company that had acquired a large holding of

---

[4] There was an appeal but the judge's comments were not discussed, as the Court of Appeal's focus was on different aspects of the appeal.

~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~35772500.2.C8689.187150

shares in the target company in order to run that company down. The Judge suggested that in such circumstances:

> "[t]he object is not to retain control as such, but to prevent [their company] from being reduced to impotence and beggary, and the only means available to the directors for achieving this purpose is to retain control."

*The Directors' reasons for the 2025 Share Issue*

36.  The February 2025 Resolutions contain information which illuminates the reasons behind the decision to bring about the 2025 Share Issue.

37.  It would appear that some of the Participating Shareholders had sent communications "*requesting information and making false and misleading claims regarding the Company's and its subsidiaries' finances*" which the directors believed were motivated or else directed by Mr Dondero.[5] It is further recorded that the directors believed that Mr Dondero's motivations were connected to Mr Patrick's resignation from "*Skyview Group*" as well as efforts taken by the Company to "*create independence between the Company and its subsidiaries*" on the one hand and "*Mr Dondero and his affiliates*" on the other hand. Pausing there, it is not immediately clear – at least form the text of the February 2025 Resolutions – whether those particular matters (which appear under the heading, "*Recent Developments*") were actually relevant to the decision to enter into the 2025 Share Issue.  If they were relevant, it is not explained in the text why the issue of shares to DFW would prevent information requests or false claims being made by Mr Dondero / his affiliates.  It may be, therefore, that those matters are part of the context, rather than part of the reason for the decision to issue the shares.

38.  There is a separate section of the February 2025 Resolutions headed "*U.S. Counsel's Tax Advice*" which appears more directly relevant. It is there stated that the Directors had received United States Tax Counsel advice to the effect that:

   a.  There was a "*significantly heighted risk*" that the US Internal Revenue Service (the "**IRS**") could "*severely penalise and/or revoke the tax-exempt status of one or more of*

---

[5] I understand that Mr Dondero was behind Highland Capital Management, which is the subject of insolvency proceedings in the USA.
~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150~~

the current Participating Shareholders, which could imperil the status and assets of the Company";

b.    An increase in the number of Participating Shareholders "*would mitigate considerations of undue influence/private inurement/private benefit*" and "*broaden the scope of [the Company's] reach to the public*"; and

c.    The IRS "*will look favourably upon any and all attempts for [the Company] to maintain its independence from what seems to be persistent attempts by James Dondero and the entities controled by him to use [the Company] for his private benefit and private inurement*".

39.    Although a full understanding of those passages would require a detailed familiarity not only with the various parties and the background, and also of the taxation and related issues adverted to in the February 2025 Resolutions (to which I am not privy), on their face, those passages in the February 2025 Resolutions suggest that the directors were motivated by a desire to benefit the Company.

40.    Of course, if called upon to justify their decision as being for the benefit of the Company:

a.    It would be necessary for the directors to be able to explain how the penalisation or loss of tax-exempt status of one or more of the current Participating Shareholders would potentially have "*imperil[ed]*" the "*status*" and "*assets*" of the Company, and hence why the issue of shares was considered to be in the interests of the Company.

b.    Similarly, an explanation would be needed of the detrimental issues that the Company was facing that the directors believed would be beneficially mitigated by the addition of DFW as a Participating Shareholder – and why DFW's addition as a shareholder had the effect of broadening "*the scope*" of the Company's reach to the public (and what exactly this meant and why it was beneficial for the Company).

c.    Likewise, the references to how the IRS would look upon attempts to "*maintain independence*" would need explanation – this would include explaining why the Company would benefit, and how this was able to be achieved by the 2025 Share Issue.

41.    I assume that such explanations can be provided and would support the conclusion that the directors caused the 2025 Share Issue for proper purposes.

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

42.  I have discussed above that the genuine desire by directors to benefit a company by altering the existing balance of power is not relevant, since that would still not be a proper purpose. However, given that Participating Shareholders do not have the voting powers that enable them to remove the board and such-like, this does not appear to be a case where it can be said that the purpose of the 2025 Share Issue was to remove an operative majority or to prejudice the existing balance of power.[6] Nor does it appear that the Company was concerned with imminent liquidation such that the share issue was motivated by a desire to reduce any possible distribution to the existing Participating Shareholders.

43.  It is worth noting that, if the 2025 Share Issue is challenged by the Participating Shareholders, they might still suggest that the February 2025 Resolutions are self-serving and do not tell the full story, but rather seek to obscure the true motivations of the board. As I have said, there is no doubt a considerable background to the decision, which will inform the steps taken. I am not in a position to evaluate the evidence for and against any such arguments. Sufficient to say, it would be for the shareholders making the challenge to the 2025 Share Issue: (a) to identify the reasons which they say caused the directors' decision to issue the shares; (b) to prove that such reasons were behind the decision; and (c) to establish that such reasons meant the exercise of the power to issue shares was carried out for an improper purpose. Moreover, as earlier discussed, on current authority, in order to set aside the 2025 Share Issue the challenging shareholders are likely to have to show that the "improper" reasons were causative of the 2025 Share Issue, in the sense that, had such reasons not been present in the directors' mind, the share issue would not have come about.[7]

44.  I should add that I have seen an email sent by Mr Patrick seeking clarification of the potential implications if the Participating Shareholders were to seek a winding up of the Company on the just and equitable basis and that petition was opposed by the holders of newly issued shares. In an email in response from a Mr Murphy, it was said that the issue of new participating shares, which had the effect of reducing the percentage held by the others, would "*weaken any petition based on the just and equitable grounds*" but "*we must be careful that they don't point to this as [a] ground to wind up i.e. the existing foundations say we're artificially trying to weaken their position by diluted them therefore the company should be*

---

[6] I have adverted earlier to the fact that the 2025 Share Issue changed the balance in relation to possible amendments to rights attached to Participating Shareholders (which require a two-thirds majority of the relevance class). However, it does not appear from what I have seen that the directors were motivated by a desire to affect such rights and that they issued the shares to make that easier. Consistent with this, to my knowledge there has been no class meeting / decision in which a two-thirds majority was sought to make any such changes.

[7] That might not be a hurdle if they rely upon the 2025 Share Issue as conduct justifying a just and equitable winding up of the Company.

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

CONFIDENTIAL                                                    TDIT006064

*wound up or an order made for change of management / revocation of the share issuances*". I note that those instructing me (who were copied into that exchange) subsequently commented that if other shareholders are opposed to a just and equitable winding up, that will be taken into consideration but it may not be determinative of any such petition, since the "*question will still be whether, in all of the circumstances, it is just and equitable for the company to be wound up*".

45. In light of this, and noting its absence from the February 2025 Resolutions, I do not know whether in ultimately bringing about the 2025 Share Issue the directors were motivated by the view that dilution might affect the prospects of a winding up if one were sought by any of the existing Participating Shareholders.

46. If they were so motivated, there is a potential argument that this would involve the exercise of the power to issue shares for an improper purpose. The argument would run as follows:

    a. Participating Shareholders have the statutory right to petition to wind up the Company (that right not having been excluded by the 2024 Articles). It seems to me that there is force in the argument that this right, which was an incident of their membership, was one that should be respected.

    b. Whilst the issue of additional shares plainly would not deprive the other shareholders of their <u>right</u> to seek a winding up (and the percentage of shares held by the petitioner does not affect whether or not the grounds for a winding up may be established), it can be relevant to the exercise of the court's powers whether or not other shareholders support or oppose the relief sought in the petition.

    c. If shares are issued for the purpose of prejudicing the ability of existing shareholders to obtain the appointment of a liquidator, this might be seen by the Court as an improper purpose. This is on the basis that the allotment is designed to invade the rights of the existing shareholders and to cause them detriment in the exercise of their existing rights, which rights (whilst statutory) are incidental to their shareholding.

    d. There is, I think, some possible similarity with the reasoning underlying the following comments in *Howard Smith*:

       *"The constitution of a limited company normally provides for directors, with powers of management, and shareholders, with defined voting powers having power to appoint the directors, and to take, in general meeting, by majority vote, decisions on matters not reserved for management. Just as it is established that directors, within their*

~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~35772500.2.C8689.187150

CONFIDENTIAL                                                    TDIT006065

*management powers, may take decisions against the wishes of the majority of shareholders, and indeed that the majority of shareholders cannot control them in the exercise of these powers while they remain in office ..., so it must be unconstitutional for directors to use their fiduciary powers over the shares in the company purely for the purpose of destroying an existing majority, or creating a new majority which did not previously exist. To do so is to interfere with that element of the company's constitution which is separate from and set against their powers."*

e.   Whilst that discussion was about the separation between rights in the articles and the directors' powers, I think that the fact that the right to petition is an incident of the status of shareholder (which has not been excluded by the articles) could support the conclusion that the power to issue shares should not be exercised for the purpose of prejudicing that right, or indeed its exercise. I recognise that the issue of shares does not deprive the shareholders of the right to petition, but if the shares are issued for the purpose of adversely affecting that right, there could be scope for characterising that as an improper purpose.

47.   All that said, as I have observed, it is not clear to me that this was part of the reasoning for the 2025 Share Issue.

*Shares issued at par*

48.   For completeness, I note that the shares were issued to DFW at par. The editors of *Gore-Browne on Companies* say (at Ch. 16, [4]):

> *"It has been suggested that if the directors issue shares at par at a time when they would be able to find shareholders willing to take them at a premium, they are in breach of duty for having caused the company to lose the amount of the premium, but it cannot be said that this is a firmly established rule. On the other hand, it is clear that the directors must not in such circumstances allot the shares to themselves or to their friends at par, without obtaining the approval of the company in general meeting."*

49.   One of the authorities cited in support of the above propositions is *Lowry v Consolidated African Selection Trust Limited* [1940] AC 648. In that case it was said:

> *"The power to issue further capital is only a potentiality. But the fact of issue makes it actual capital, and creates the fasciculus of rights and liabilities between the company and the shareholder which flow from the share when issued. If the share stands at a premium, the directors prima facie owe a duty to the company to obtain for it the full value which they are able to get. It is true that it is within their powers under the Companies Acts to issue it at par, even in such a case, but their duty to the company is not to do so unless for good reason. Normally they would transfer the difference between the market value and the par value to a premium reserve or similar capital account. But*

~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~35772500.2.C8689.187150

> *they could justify issuing the share at par on the ground that the difference has been utilized to secure a benefit to the company, as here by paying the extra remuneration to the employees and it may be also by giving them an interest in the company."*

50.    In *Hilder v Dexter* [1902] AC 474, Lord Davey observed that he was not aware "*of any law which obliges a company to issue its shares above par because they are saleable at a premium in the market. It depends on the circumstances of each case whether it will be prudent or even possible to do so, and it is a question for the directors to decide*".

51.    I am not aware whether the shares would have commanded a premium, and if so, of what amount.  Given the limited nature of the rights attached to Participating Shares and the nature of the business of the Company (which I understand was not designed to generate profits but rather to pursue charitable objects), I expect that there is reason to doubt that the shares would have had significant value.  In any case, as the cases mentioned above make clear, the circumstances may well justify issuing shares at par even if they are saleable at a premium in the market.[8]

52.    It may be that the directors had good reason to issue and allot the shares to DFW at par, even if they might otherwise have commanded a premium.

**Approval / ratification by the holder of the Management Shares?**

53.    If the directors did exercise their powers for an improper purpose when they brought about the 2025 Share Issue, is that something that the Company could ratify by a vote at a general meeting (i.e. by Mr Patrick as the holder of the Management Shares)? In my view, that is unlikely to be possible.

54.    As was explained in *Tianrui*:

    a.    At [81]: *"... if the shareholders seek to use their power to act by a majority, then they are constrained by the equitable principle that they may not do so by way of oppression of the dissenting minority …  That constraint is inherent in the power of the majority of a class to bind the minority. Whether it is actionable by the minority having a mere equity of their own to set the majority action aside, or because that constraint is also*

---

[8] As I understand it, that is consistent with the fact that the other Participating Shareholders did not contribute to the Company in respect of their shares – although I do not know the full circumstances of that prior allotment. ~~#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final~~35772500.2.C8689.187150

*embedded in the corporate contract, may be a matter for debate, but it makes no practical difference for present purposes."*

    b.    At [83]: *"There will also be cases where the nature of the breach of duty by the directors is such that ratification will be seen to be impossible, either because it has been attempted without success or because any attempt in the future would be bound to fail. For example, a breach constituted by the directors having the improper purpose of assisting an existing majority to oppress a minority could hardly be ratified by the majority, without itself falling foul of the constraint against majority oppression: see in* Residues *at p 1167, King CJ's doubt whether the share allotment in that case could be ratified. As Dixon J explained in Peters, pp 504ff and especially pp 511-513, the power of the shareholders in general meeting to alter the articles of association must be exercised in a manner which is both within the power and consistent with the contemplated purpose of the power".*

55.    It seems to me that <u>if</u> the directors acted for an improper purpose in the issue of the shares and hence invaded the rights of the Participating Shareholders, it would be surprising if the Company (acting by the holder of the Management Shares) could validate such an action. That would involve the oppression of the class (the Participating Shareholders) whose rights were invaded. I do not think that would be permissible.

**D.    THE ADOPTION OF THE 2025 M&A**

56.    Art. 125 of the 2024 Articles provided that, subject to the CA and the rights attaching to the various classes of shares, the Company could by Special Resolution alter the Articles in whole or in part.

57.    Section 10 of the CA provides that, subject to s.13 (which is not relevant for present purposes), a company may, by special resolution, alter its memorandum with respect to any objects, powers or other matters specified therein. Section 24 provides that subject to the Act and to conditions contained in its memorandum, a company may by special resolution, alter or add to its articles.

58.    The Company adopted the 2025 M&A upon a special resolution passed by Mr Patrick as holder of the Management Shares. This was not, therefore, the exercise by <u>the directors</u> of a power conferred upon them, but the exercise by a class of shareholder of its rights. As discussed earlier, in *Tianrui*, it was said at [81] that "*if the shareholders seek to use their*

<span style="color:red">#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150</span>

*power to act by a majority, then they are constrained by the equitable principle that they may not do so by way of oppression of the dissenting minority … That constraint is inherent in the power of the majority of a class to bind the minority".*

### Alteration of the Company's objects

59.    The Company's 2024 Memorandum was amended to replace para. 3 with a new objects clause in the following terms:

> *"The objects for which the Company is established are:*
>
> *(a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charities, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worth causes and making a difference"; and*
>
> *(b) to do all such things [which] in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them".*

60.    Given that the Company's objects were previously unlimited, and the alternation was designed to reflect the Company's mission statement, I see no realistic basis for any challenge to this. I cannot see how this change could amount to oppression and (for completeness) I do not consider that this involved any material adverse variation or abrogation of rights of Participating Shareholders which might have required the consent of a majority of two-thirds of the Participating Shareholders under Art. 13.

### Weighted voting at board meetings

61.    Under the 2025 M&A, Art. 70 of the articles provides that the Management Director (defined as the holder of the Management Shares) shall be entitled to cast ten votes on all matters and each other director shall be entitled to cast one vote.

62.    As I see it, this did not involve affecting any rights attached to the shares of Participating Shareholders, so the requirements of a two-third majority consent under Art. 14 was not engaged.

63.    The original and revised articles provide that, unless fixed by ordinary resolution, the minimum and maximum number of directors shall be one and two, respectively. I do not know whether there was any resolution that required at least two directors.

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

64. Given that there does not appear to be any particular need to have more than one director (and if there had been any ordinary resolution that effect, it could be changed) it is not wholly clear to me what the reason was for the change.  It does not appear to me to give rise to oppression given that the Management Shareholder is able to procure that there be a single director in any event.

**No provision for alternate directors and proxies**

65. Arts. 70 and 71 of the 2024 Articles, which enabled a director to appoint another as their alternate and to appoint another as proxy have been deleted.  Given that the prior directors were able to choose whether to appoint another, presumably this was linked to a perception that one of the directors might appoint an inappropriate alternate / proxy.

66. I cannot see that this is likely to be challengeable.

**Quorum at director's meetings**

67. Art. 87 of the new articles provides that the quorum necessary for the transaction of the business of the Company may be fixed by the directors, and unless so fixed, shall be two if there be two or more directors, and shall include the Management Director.

68. Given that there only appear to be two directors and Art. 88 of the 2024 Articles already provided that, if there were two directors, the quorum for a meeting needed to be two directors (unless otherwise fixed by the directors), I cannot see any material effect of this change.  It does not appear to me to be likely to be challengeable.

**Material transaction**

69. Art. 93 of the new articles introduces a requirement for a notarised written resolution of the directors in respect of a Material Transaction (any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000).

70. It does not appear to me to be likely to be challengeable.

**Optional dispute resolution clauses**

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

FSD2025-0116 2025-08-19

71.  Art. 136 provides that the existing dispute resolution provisions (which were previously mandatory) are now subject to the consent of the parties.

72.  Given that those provisions are ones that were exercisable by shareholders, it seems to me that this involved the change of a "*right conferred upon*" Participating Shareholders, so as potentially to engage the requirements in Art. 14, if such changes materially adversely varied or abrogated such rights.

73.  The question then is whether the change "*materially adversely varied or abrogated*" the right to require mediation or arbitration. I think that, from first principles, it may be. Participating Shareholders previously had a right to insist on mediation / arbitration; they no longer can do so.

74.  This might therefore require compliance with Art.14, noting that (if the 2025 Share Issue is not challenged), the new Participating Shareholder can vote as well. However, I would not suggest taking that step – not least as it would potentially feed a narrative that the 2025 Share Issue was driven by the aim of changing the balance of votes with a view to obtaining alterations in the articles that might otherwise be refused.

75.  It may be sensible to circulate the 2025 M&A (if that has not yet been done) to see whether there is any challenge to this change, however. If they did, the alteration could always be reversed.

### E.    DO THE DIRECTORS HAVE THE POWER TO REDEEM SHARES?

76.  There are two issues to consider:

   a.    Whether there is a power vested in the directors to require the redemption of the shares of Participating Shareholders;

   b.    If such a power exists, what constraints there may be on the exercise by the directors of such a power.

**Is there a power to redeem?**

77.  Section 37(1) and (2) of the CA provides as follows:

   *37. Redemption and purchase of shares*

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

FSD2025-0116 2025-08-19

CONFIDENTIAL TDIT006071

*(1) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, issue shares which are to be redeemed or are liable to be redeemed at the option of the company or the shareholder and, for the avoidance of doubt, it shall be lawful for the rights attaching to any shares to be varied, subject to the provisions of the company's articles of association, so as to provide that such shares are to be or are liable to be so redeemed.*

*(2) Subject to this section, a company limited by shares or limited by guarantee and having a share capital may, if authorised to do so by its articles of association, purchase its own shares, including any redeemable shares.*

*(3) (a) No share may be redeemed or purchased unless it is fully paid. (b) A company may not redeem or purchase any of its shares if, as a result of the redemption or purchase, there would no longer be any issued shares of the company other than shares held as treasury shares. (c) Redemption or purchase of shares may be effected in such manner and upon such terms as may be authorised by or pursuant to the company's articles of association. (d) If the articles of association do not authorise the manner and terms of the purchase, a company shall not purchase any of its own shares unless the manner and terms of purchase have first been authorised by a resolution of the company. (da) For the avoidance of doubt — (i) a company's articles of association; or (ii) a resolution of the company, may authorise the company's directors to determine the manner or any of the terms of, any such redemption or purchase not being inconsistent with such articles of association or resolution and subject to such restrictions (if any) as may be provided therein.*

78. In *Culross Global SPC Ltd.* v. *Strategic Turnaround Partnership Ltd* 2010 (2) CILR 364, Lord Mance said at [8]:

> *"It is a basic principle of company law that capital subscribed to a company may not be redeemed to shareholders otherwise than as prescribed by statute. Section 37(1) of the Companies Law permits the issue by a company of shares liable to be redeemed at the option of the company or the shareholder, and s.37(3)(c) goes on to provide that "redemption of shares may be effected in such manner as may be authorised by or pursuant to the company's articles of association." It is uncontroversial that this means that the manner in which any redemption may be effected must be authorized by or pursuant to the articles of association."*

79. It seems to me that it is implicit in s.37(1) that to be redeemable a share must be either: (a) ~~be~~ issued as a redeemable share (and this can only happen if the articles permit the issue of the shares); or (b) subsequently converted into a redeemable share by variation of the rights attached to the share (again, so far as permissible under the articles).

80. As I understand it, the Participating Shareholders' shares were <u>not</u> issued as redeemable shares.

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

FSD2025-0116                                                                2025-08-19

1034

**CONFIDENTIAL**                                                          TDIT006072

81. I note that the Company's memorandum (both the 2024 and 2025 version) provides that the Company "*shall have power to redeem or purchase any of its shares*", and that the articles also have references to the redemption of shares (*e.g.* Arts. 14, 28 and 29).  However, as I see it, that does not address the prior question, which is whether the shares in question were issued as redeemable shares.  If they were not issued as such, then unless the rights attached to them are varied so as to make them redeemable, it does not seem to me that the pre-condition for redemption is met.

82. On the basis that (as I understand it) they were not issued as redeemable shares, I am doubtful that the Participating Shares may be redeemed, unless there is first a variation of the rights ascribed to them. That would require the consent of a two-thirds majority of Participating Shareholders.  Needless to say, were there to be a proposal to vary the rights attached to the shares to make them redeemable, that would feed an argument that the 2025 Share Issue was itself procured with a view, ultimately, to disenfranchising the pre-existing Participating Shareholders, and that this was accordingly an improper exercise of the power to issue the shares.

**Constraints on the exercise of the power to redeem**

83. If there is a power to redeem the shares (which as set out above, I doubt), following the analysis in *Tianrui*, in exercising the power to redeem, the directors must ensure that they exercise that power for a proper purpose. If they failed to do so, that would render any redemption challengeable and also potentially amount to a ground for seeking a winding-up on a just and equitable basis.

84. The critical question, therefore, would be the reasons why the directors redeemed the shares and whether such reasons would mean the exercise of the power is for a proper purpose.  I do not know what the specific reasons would be.  Some general observations may be of assistance, however.

85. As a starting point, the power to redeem the shares of particular shareholders is one that should be exercised for the benefit of the Company.  In identifying what might be for the benefit of the Company in relation to such a power, assistance -might be found in the decision in *Gaiman v National Association for Mental Health* [1971] Ch 317.  That case involved a company limited by guarantee which was a non-profit mental health association.  –The directors had a power to request a member of the company to resign, so as to bring about

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

their resignation. A number of members of the company (who were Scientologists) were expelled by the directors and then sought to challenge their expulsion.

86.   The Court noted that there was "*a direct power to deprive a member of his membership: it is not a power to reduce capital (if that could be good) which is being employed with the ulterior purpose of depriving a member of his membership*". Having identified that power, it was said:

> "*The question, then, is whether that power of deprivation of membership has been exercised by the council in good faith for the purpose for which it was conferred. Such a power is, I think, plainly conferred in order that it may be exercised in the best interests of the association. The association is, of course, an artificial legal entity, and it is not very easy to determine what is in the best interests of the association without paying due regard to the members of the association. The interests of some particular section or sections of the association cannot be equated with those of the association, and I would accept the interests of both present and future members of the association, as a whole, as being a helpful expression of a human equivalent...*"

87.   It was held that the power had been properly exercised:

> "*The basic reason for the decision is stated to be 'the threat that Scientology posed to the association and all that it stood for', and various other factors are set out, including the loss of moral and active support for the association, loss of revenue, and the association's responsibility to those in its charge. The evidence before me provides ample grounds for saying that at the very lowest this is a possible view to hold.*"

88.   Essentially, therefore, an express power to deprive members of their membership was properly used when the individuals were posing a "threat" to the association's future both financially and more broadly, having regard to its purposes/objectives.

89.   Whilst not a company case, a similar approach can be found in *RSPCA v Attorney General* [2002] 1 WLR 448. The council of the Royal Society for the Prevention of Cruelty to Animals had a discretion as to who to admit to membership. The council wished to exclude from membership supporters of hunting with dogs. The court declined to interfere (citing *Gaiman*):

> "*...the powers are fiduciary and accordingly the obligation is upon the council to exercise the powers for the purposes for which they are conferred in what they consider to be the best interests of the society. I am satisfied that the council is acting in good faith and in what it considers to be the best interests of the society in deciding that it should adopt the membership policy. It seems to me that if the trustees honestly take this view and it is one that they can honestly and reasonably take ... this is a course which they are entitled to take and which I can and should endorse; see e.g. Gaiman v National Association for Mental Health [1971] Ch 317 .*"

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

90.  In the present case, I have already noted the content of the February 2025 Resolutions.  If, as I apprehend might be the case, the continued shareholding of certain Participating Shareholders risks undermining the Company in the pursuit of charitable objectives, then that might well be a justification for the exercise of the power (if it exists).  Needless to say, the precise reasons why continued membership poses a risk, and how, and to what degree, would need careful consideration.

## F.    EXERCISE OF POWER TO REQUIRE THE TRANSFER OF SHARES

91.  Art. 21 provides as follows:

> *"If it comes to the attention of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles".*

92.  The term "*Restricted Person*" is defined in Art.1.  It includes any Person (defined as including natural persons and companies and other entities) holding Participating Shares:

> *"in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered."*

93.  If any shares are held by such a person then the Directors have the power to require such person to transfer their shares.  Of course, the exercise of such power must be exercised for a proper purpose.  In that regard, the purpose of the power is fairly easily identifiable from the definition of a Restricted Person: –if shares are held by a person that falls within the description, then the power has been conferred to enable a change to remedy that issue.

94.  Of course, the particular sub-definition identified above requires the directors to be of the opinion that the holding of shares in the Company by the particular person might result in the consequences that are identified (*e.g.* suffering administrative disadvantage).  That opinion will need to be one genuinely held.  There is likely to be a requirement (linked to the equitable nature of a directors' powers) that the disadvantages are of some degree of materiality and likelihood.  Put another way, if the justification for treating a person as a "*Restricted Person*" is a self-evidently slight concern about the possible consequences to the Company, that could leave the decision more open to challenge.

## G.    CONCLUSION

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

CONFIDENTIAL                                                      TDIT006075

95.    I have set out my answers to the questions posed above.  I would be happy to advise further if any additional matters come to light.

**Tony Beswetherick KC**

**Twenty Essex**

**March 2025**

#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final#83355458v1<CAYMAN> - 2025.03.05 - DAF Draft opinion of T Beswetherick KC - final35772500.2.C8689.187150

**FSD2025-0116**                                                    **2025-08-19**
1038

**CONFIDENTIAL**                                                    **TDIT006076**

FSD2025-0116                                                                                    2025-08-19
Rachel Baxendale

| | |
|---|---|
| **From:** | Jamie Lawlor (KY) <jamie.lawlor@pwc.com> |
| **Sent:** | 11 February 2025 4:43 PM |
| **To:** | Geoffrey Sykes; Dakshina Vyas (KY) |
| **Cc:** | Barnaby Gowrie; Philip Aubry; Simon Conway (KY); Christian Begg (KY) |
| **Subject:** | Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181] |

**[this message is from an external sender]**

Hi Geoffrey - thanks for arranging the call today.

Having discussed again on our side, our view is that the new Delaware entity (CDMCFAD, LLC) effectively has full economic interest *and* control over the Fund, so we don't really see a basis for applying any discounts to the underlying Fund NAV for that entity.

As it relates to the participating shareholders' interest in Charitable DAF Holdco, Ltd, we don't think we can reliably estimate the value / discount given the current fact pattern. While we could make hypothetical assumptions about how the articles may be interpreted, and/or how future cash flows may or may not be distributed, the impact on value is so substantial that we don't think it would be a meaningful exercise (i.e. we'd end up with the discount being 100% in one scenario, but 0% in another).

On that basis, I don't think there is a fee / scope that can work for us currently. If you think we've misunderstood something, or can provide more clarity on the legal position in the future, then we could perhaps revisit this. It sounds like the situation is evolving daily so let us know if anything changes and we can be of assistance elsewhere in the case.

Best,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, February 11, 2025 2:43 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Simon, Jamie, all

Thanks for your time on the phone.

FSD2025-0116                                                                                    2025-08-19
                                                                                                        1039
CONFIDENTIAL                                                                                    TDIT006077

FSD2025-0116                                                                                                              2025-08-19

Further to the call, we would be grateful if you could please revert back with your views as to next steps by COB tomorrow.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes
**Sent:** 10 February 2025 17:50
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

We'll send a dial-in shortly.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 10 February 2025 16:15
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - yes, I think that would make sense too. We can do 2pm if you're happy to share an invite?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

FSD2025-0116                                                                                                              2025-08-19

CONFIDENTIAL                                                                                                         TDIT006078

FSD2025-0116                                                                          2025-08-19

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Monday, February 10, 2025 3:42 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Happy to discuss.  We suggested looping in onshore counsel as they will likely have more information, and in turn they would like to include Delaware counsel.

Unfortunately we can't do tomorrow at 9am, but we have sought onshore counsel's availability for a call tomorrow at 2pm.  Would that suit you?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 10 February 2025 13:12
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - would you be available for a quick call with Simon on this, and the other updates we discussed earlier.

Conscious the scope / nature of the request is moving around a bit so just want to get aligned on next steps. We could do 9am tomorrow if that works for you?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Friday, February 7, 2025 3:17 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>

FSD2025-0116                                                                          2025-08-19
1041
CONFIDENTIAL                                                                          TDIT006079

**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Geoffrey - let us discuss internally briefly before confirming.

My initial thought is that there is no meaningful difference between the two separate valuations being requested. I.e. The economic interest in the underlying NAV still fully accrues to the participating shareholders. However, voting power / control is with Mark (or entities controlled by Mark). Do you know what your client is expecting to achieve with the restructuring (as this may help us understand the valuation implications)?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Friday, February 7, 2025 8:02 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Following on from the below, we had a call with onshore counsel yesterday afternoon.

A new Delaware entity, CDMCFAD LLC, has been inserted into the structure between Charitable DAF HoldCo Ltd and Charitable DAF Fund LP.  Please see attached an updated structure chart and the LLC agreement of CDMCFAD.

In addition to the initial exercise, our client would also like a valuation of all of the issued shares in CDMCFAD (all of which are held by Charitable DAF HoldCo), which valuation will again rely on the underlying NAV as previously advised.  Please could you provide us with a fee estimate in respect of that valuation, and an updated engagement letter containing Part 1 (Charitable DAF HoldCo) and Part 2 (CDMCFAD).

Please let us know if you require any further information at this stage or if it would be helpful to discuss.

Separately, our client is considering your template NDA, we will let you know once we hear back from them.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

4

FSD2025-0116                                                                                              2025-08-19

**From:** Geoffrey Sykes
**Sent:** 05 February 2025 09:23
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]


Thanks Jamie, will do.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**


**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 05 February 2025 08:39
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]


**[this message is from an external sender]**

Thanks Geoffrey - see NDA attached. Let us know if this works for your client.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky


**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, February 4, 2025 5:01 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]


Hi Jamie

Thanks for your draft engagement letter, we will pass on to our client and let you know if they have any comments.

Thanks also re your template NDA – we expect any time saving (in respect of your internal risk approval) will be welcomed by our client, so yes if you could please send a draft we will seek instructions on that as well.

FSD2025-0116                                                                                              2025-08-19

1043

**CONFIDENTIAL**                                                                                    TDIT006081

Regarding the further related valuation exercise we discussed briefly on the phone yesterday, we have a call with our clients tomorrow and will revert back with more detail after that.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** 04 February 2025 13:41
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Christian Begg (KY) <christian.begg@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - please see a draft engagement letter attached for your client's review.

Let us know any comments from your side. Please also send through the NDA when you can. Alternatively, we have a standard template we can use without needing separate risk approval on our side if you'd rather use that?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Monday, February 3, 2025 11:19 AM
**To:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Dakshina

Thanks for confirming, and noted re ensuring privilege is maintained if this becomes an expert witness report in due course.

We are content to proceed on that basis, please could you share with us your engagement letter so that we may pass on to our client?

Best regards,

**CONFIDENTIAL**                                                                **TDIT006082**

**FSD2025-0116**  **Page 1129 of 1530**  2025-08-19

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Sent:** 31 January 2025 10:53
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey,

Thank you for confirming. We are happy to contract directly with the client at this stage. However, I wanted to confirm that if this engagement were to move to an expert witness stage later on, we would need to structure it in a way to ensure that our privilege is maintained over the information we share.

Looking forward to your confirmation on this matter.

Regards,
Dakshina

**Dakshina Vyas**
PwC | Manager | Corporate Finance
Office: +1 (345) 914 1791| Mobile: +1 (345) 525 1791
Email: dakshina.vyas@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1-1104
http://www.pwc.com/ky

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 30, 2025 5:08 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie, Dakshina

Thanks for your emails.  We appreciate that you would prefer to contract with Walkers or on a joint basis, however unfortunately our firm policy is not to act as the client in matters such as these.  Are you able to enter into the agreement directly with Charitable DAF HoldCo Ltd?

We will revert back regarding a proposed NDA as soon as possible.

Best regards,

**FSD2025-0116**  2025-08-19
1045
CONFIDENTIAL  TDIT006083

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Wednesday, January 29, 2025 2:38 PM
**To:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - yes, thanks for confirming.

Just to follow up on this, we'd prefer to contract with Walkers, but we can make it a joint engagement contract with the underlying client as the party responsible for payment of our fees, and Walkers responsible for giving instructions if that's preferred?

Re: onboarding info - I think we have what we need but will confirm tomorrow. Do you have a standard NDA you'd need us to enter into? If so, please could you share this so we can have our risk team review and approve.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Dakshina Vyas (KY) <dakshina.vyas@pwc.com>
**Sent:** Wednesday, January 29, 2025 2:34 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip.Aubry@walkersglobal.com <Philip.Aubry@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Geoffrey,

Thanks for this. Could you please confirm if the Engagement Letter should be with Charitable DAF HoldCo Ltd (as the Client) and Walkers as our point of contact, or if Walkers will be contracting us on behalf of the client and should be addressed as the client?

Regards,

**FSD2025-0116**                    **2025-08-19**
**1046**
**CONFIDENTIAL**                    **TDIT006084**

FSD2025-0116                          **Page 1131 of 1530**                          2025-08-19
Dakshina

**Dakshina Vyas**
PwC | Manager | Corporate Finance
Office: +1 (345) 914 1791| Mobile: +1 (345) 525 1791
Email: dakshina.vyas@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1-1104
http://www.pwc.com/kyHi geo,

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Wednesday, January 29, 2025 2:12 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

We are pleased to have been instructed to retain your firm for the valuation.

Please could you send us your engagement letter and let us know what else you need in terms of onboarding.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes
**Sent:** Tuesday, January 28, 2025 6:31 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)
<simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

We will pass that on to our client and revert back once we have instructions.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

9

CONFIDENTIAL                                          TDIT006085

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 28, 2025 5:00 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry
<Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)
<simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - I would say 1.5-2 weeks realistically (from date of engagement / receipt of information) for a relatively short-form report.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, January 28, 2025 3:20 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)
<simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Many thanks for your time on the call last week and your estimate.

As indicated on the call, our client considers that time is of the essence – when is the soonest you could produce the valuation report following formal engagement and execution of an NDA?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 28, 2025 2:41 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry
<Philip.Aubry@walkersglobal.com>

CONFIDENTIAL   TDIT006086

**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)
<simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi all - thanks again for the time on Friday to get a bit more background on this.

As discussed, we've attached an estimate for the valuation work, including the assumptions we've made about the requirements and the specifics of the capital structure.

Let us know if you'd like to discuss.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 3:28 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)
<simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Apologies, my mistake – yes 9.30am tomorrow still works.

We look forward to speaking then.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Thursday, January 23, 2025 3:23 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry
<Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)

**FSD2025-0116**                                                        **2025-08-19**
<simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - I think we've already got a call in the diary for 9.30am tomorrow if that still works?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 2:23 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Happy to discuss – would 3.30 tomorrow afternoon suit you?

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Thursday, January 23, 2025 12:22 PM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Geoffrey - thanks for the update. I think it would still be helpful to jump on a quick call just for a bit more background on the context and what the varying rights are that need to be considered.

**FSD2025-0116**                                                        **2025-08-19**

**1050**

**CONFIDENTIAL**                                                        **TDIT006088**

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Thursday, January 23, 2025 9:16 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

We have had a further discussion with onshore counsel – they would like to proceed with the valuation relying on an NAV figure contained in a previous report dated 30 September 2024. That report found that the NAV of Charitable DAF HoldCo Ltd is $269,052,808. If we are instructed to retain your firm for the valuation our client would be happy to share that report with you following entry into an appropriate NDA.

On that basis, we expect that the valuation will now be primarily concerned with the rights attached to the shares, rather than an analysis of the underlying assets and businesses.

Please let us know if you would still like to discuss tomorrow morning, or if you are able to provide an estimate on that basis.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes
**Sent:** Wednesday, January 22, 2025 9:37 AM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Thanks Jamie.

9.30am tomorrow suits us. I will send a dial-in shortly.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Wednesday, January 22, 2025 8:31 AM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry
<Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)
<simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey - yes, we could do 9.30am or 10.30am on Friday morning if either of those times work?

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, January 21, 2025 8:35 PM
**To:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Simon Conway (KY)
<simon.r.conway@pwc.com>
**Subject:** RE: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Jamie

Thanks for confirming.  Are you available for a call on Friday morning this week?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Tuesday, January 21, 2025 5:53 PM
**To:** Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Simon Conway (KY) <simon.r.conway@pwc.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Philip - just wanted to follow up on the below to let you know that all our checks are now complete and clear. Let us know when works to discuss.

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**From:** Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Sent:** Monday, January 20, 2025 11:21 AM
**To:** Simon Conway (KY) <simon.r.conway@pwc.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi all - thanks again for reaching out on this.

We've cleared conflicts and are just waiting for one last adverse data check to come back, which we should have tomorrow. Don't foresee any issues with that, so perhaps we could set up a call to discuss the requirement in a bit more detail. Let us know if you have any availability within the windows below:
- Weds 22nd - 11 - 11.30am
- Thurs 23rd - 1pm - 4pm
- Friday 24th - 9.30am - 10am

Thanks,

**Jamie Lawlor**
PwC | Director | Corporate Finance
Mobile: +1 (345) 322-6219 | Office: +1 (345) 914-8680
Email: jamie.lawlor@pwc.com
PricewaterhouseCoopers
18 Forum Lane, Camana Bay, P.O. Box 258 Grand Cayman, Cayman Islands, KY1 1104
http://www.pwc.com/ky

**CONFIDENTIAL**                                           TDIT006091

**From:** Simon Conway (KY) <simon.r.conway@pwc.com>
**Sent:** Tuesday, January 14, 2025 1:52 PM
**To:** Philip Aubry <Philip.Aubry@walkersglobal.com>; Jamie Lawlor (KY) <jamie.lawlor@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes
<Geoffrey.Sykes@walkersglobal.com>
**Subject:** Re: Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Philip,

Thanks for your note.

Yes, certainly we'll run our conflict checks on the below and, assuming we're clear, a call to discuss the matter would be very helpful for us in coming up with an estimate.

I've copied my colleague Jamie Lawlor, who runs our valuation practice.

Best regards,
Simon



Simon Conway

PwC | Partner
Office: +1 (345) 914 8688 | Mobile: +1 (345) 938 8685 | Fax: +1 (345) 945 4237
Email: simon.r.conway@pwc.com
PricewaterhouseCoopers
PO Box 258, 18 Forum Lane, Camana Bay, Grand Cayman, KY1 1104 Cayman Islands
http://www.pwc.com/

---

**From:** Philip Aubry <Philip.Aubry@walkersglobal.com>
**Sent:** Tuesday, January 14, 2025 1:35 PM
**To:** Simon Conway (KY) <simon.r.conway@pwc.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes
<Geoffrey.Sykes@walkersglobal.com>
**Subject:** Conflict Check and Estimate - Potential Valuation [WALKERS-AMER_DOCS.FID2294181]

Hi Simon,

I am working with Barney Gowrie and am reaching out for assistance with respect to a potential valuation of the shares of Charitable DAF HoldCo Ltd.  In the first instance, we would be grateful if you could please run a conflict check in respect of the parties below and confirm you are able to proceed with this instruction.  If you are able to proceed with this instruction, please provide an estimate so that we can seek instructions from the client.

For the purposes of your conflict check, the parties are the following:
    a)   We act for Charitable DAF HoldCo Ltd. (a Cayman entity); and

**CONFIDENTIAL**                                                             TDIT006092

FSD2025-0116                                                                                2025-08-19

b)  The potential adverse parties are: Highland Dallas Foundation Inc., Highland Kansas City Foundation Inc., and Highland Santa Barbara Foundation Inc. (all Delaware entities), which all hold the participating shares in Charitable DAF HoldCo Ltd.

For your reference, please find attached a structure chart illustrating the above.

Please let us know if you require anything further at this stage.

If helpful, we are happy to discuss.

Best regards,

**Philip Aubry**
Senior Counsel
Walkers (Cayman) LLP

**Walkers** | Making financial services work

**T** +1 345 814 4666 | **M** +1 345 938 4666 | **E** Philip.Aubry@walkersglobal.com
190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands
www.walkersglobal.com

**Secretary**
Monina Thompson | **T** +1 345 814 6842 | **E** Monina.Thompson@walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

FSD2025-0116                                                                                2025-08-19

1055

CONFIDENTIAL

TDIT006093

FSD2025-0116

2025-08-19

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is

FSD2025-0116

2025-08-19

1056

CONFIDENTIAL

TDIT006094

FSD2025-0116 2025-08-19

disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

The information transmitted, including any attachments, is intended only for the person or entity to which it is addressed and may contain confidential and/or privileged material. Any review, re-transmission, dissemination or other use of, or taking of any action in reliance upon, this information by persons or entities other than the intended recipient is prohibited, and all liability arising therefrom is disclaimed. If you received this in error, please contact the sender and delete the material from any computer.

FSD2025-0116 2025-08-19

1057

CONFIDENTIAL TDIT006095

1138

**FSD2025-0116**    2025-08-19

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Mark Patrick <mpatrick@dafholdco.com> |
| **Sent:** | 17 March 2025 1:48 PM |
| **To:** | Geoffrey Sykes |
| **Cc:** | Bart Higgins; Brandon R. Schaller; Barnaby Gowrie; Philip Aubry; Hugh Anderson |
| **Subject:** | Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181] |

**[this message is from an external sender]**

Agree we need to finalize the reports. I thought they were finalized. We should request any limits on use removed.

We are seeking U.S. tax counsel to send emails to both Paul and I that the non profits are Restricted Persons and/or best interests of the Company to have non dondero holders of the its interests.

After that, an alternative approach is to give them what they want - liquidate Holdco Ltd after its only investment is redeemed by the US. LLC  pursuant to U.S. counsel advice above, that it's in the best interests of the Company to redeem all non-profits affiliated with Dondero.

US LLC has same valuation conducted on its shares as the participation shares. so we would redeem the LLC interest, then distribute the proceeds out of Holdco Ltd., and file articles of Dissolution for Charitable daf Holdco Ltd before a wind up petition is filled.  That would put us on the "high ground" to fight (rather the way this is currently heading in a defensive posture). they would have to scrap their wond up petition and fight for reinstatement, gripe about the valuations, and file fiduciary breach actions (all of which they will do anyway under a wind up).

We will stage this in light of the Doug letter, new advice of two separate U.S Tax counsel, and seeing how successful (or not) our outreach to the Texas attorney general office is....

Note : US LLC would make DFW its sole owner.

On Mon, Mar 17, 2025, 1:11 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

Hi Mark, Bart, Brandon

**IRS complaint**

Thanks for providing the draft IRS complaint.  We have reviewed and attach our comments on the Cayman Islands aspects of the letter.

1

**FSD2025-0116**    2025-08-19

1058

**CONFIDENTIAL**    TDIT006096

FSD2025-0116

**Details of transfer**

2025-08-19

In response to Brandon's question, we would not advise seeking to perform the redemption in the alternative. In our view, any purported redemption would be susceptible to challenge for the reasons previously set out, and accordingly we should focus on the forced transfer under Article 21.

In respect of the details of a forced transfer, noting Mark's comments, our views are as follows:

*The signatories to the share transfer instrument*

1. Article 21 provides that "*If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.*" The Articles do not provide that the directors may complete the transfer on behalf of the relevant Restricted Person, rather than they can give notice to require that the shares are transferred. In the absence of any additional guidance in the Articles, and in light of Article 17 noted below, we anticipate that this will require that the directors give notice to the relevant Restricted Person requiring them to transfer their shares to a person who is not a Restricted Person within a reasonable period of time to comply with Article 21. Failing this, the Company, would need to bring proceedings in the Cayman Court to seek orders that the shares are transferred as is required under the Articles.

2. Article 17 provides that "*The instrument of transfer of any Share shall … be executed by or on behalf of the transferor*". We appreciate your comments that it may not make sense for the transferor to be required to sign the transfer form when a transfer is being forced, and that Article 17 also provides that the directors have discretion as to the form of the instrument of transfer. However, on our reading of Article 17, whatever form the transfer instrument may be in, we cannot escape the requirement for it to be signed by the transferor. Article 21 does not provide that the transfer mechanics for shares are altered in the case of a Restricted Person and as such, Article 17 will still apply. If we purported to transfer the shares without the signature of the transferor, it is difficult to say that the transfer is made in accordance with the Articles, we may have difficulty convincing the Registered Office to update the register (and in Cayman the Register is *prima facie* evidence of the true shareholders of the company), and in any event we consider that the transfer would be more susceptible to challenge.

*The identity of the transferee*

3. Article 21 does not confer upon the directors the power to dictate to whom those shares may be transferred, although Article 18 provides the directors with "*absolute discretion decline to register any transfer of Shares without assigning any reason therefor [sic]*". On that basis, whilst the directors cannot force a transfer to any particular entity, the letter requiring Highland Dallas Foundation ("**HDF**") to transfer its shares could indicate that the directors would approve a transfer to the DFW Charitable Foundation ("**DFW**").

*The price of the transfer*

2

FSD2025-0116

2025-08-19

CONFIDENTIAL

TDIT006097

4. Similarly, the directors do not have the power to mandate the price paid for the transfer.  If HDF found a willing buyer and the directors approved of them, HDF could transfer the shares for whatever value they could agree with the buyer.  However, if we had the agreement of DFW to pay a certain price, then in addition to indicating that DFW would accept the transfer, the letter to HDF requiring the transfer of shares could also indicate a suggested price.

5. To come up with a suggested price, we should look to our valuation reports.  We note Mark's preference for the ValueScope report as it specifies a figure rather than percentage discount.  However, as we already have two reports we consider that we should have regard to both in arriving at market value (and if we choose to rely only on one we may need to be able to justify why that was appropriate).  Further:

   a. The reports are in draft form and should be finalised before we rely on them;
   b. We have substantive comments on both draft reports, which we consider should be addressed before the reports are finalised; and
   c. Both reports have limitations on use including that they may not be circulated to third parties without the written consent of the authors (FTI report at [1.8]-[1.10], ValueScope report at page 38).  Whilst we may not wish to circulate the reports initially, we may be called upon to justify our approach and will likely want to rely on them at that stage.  Accordingly, we will need the valuers to give us their written consent for the reports to be used in this context.

6. If the transfer price could not be agreed with HDF, establishing an appropriate price could form part of an application to Court to force the transfer.

**Next steps**

On the basis of the above, the following are what we see as the next steps:

7. **Finalise valuation reports**

   a. We will reach out to ValueScope and FTI to request that they finalise their reports on the basis outlined above, noting the context in which we will seek to rely on them.  We appreciate that this is likely to delay the subsequent steps to a degree, however we consider it to be a critical part of the plan, and part which should be completed before the letters to the IRS and HDF are issued.

8. **Seek DFW's views**

   a. We suggest that Mark reaches out to DFW (we understand he has the relationship) to confirm whether they are prepared to become involved on the basis set out above (in principle and subject to review of the documents).

9. **Resolutions**

   a. Mark and Paul execute resolutions in respect of the issue of the letter to the IRS, and the forced transfer of shares (including the payment of market value on the basis set out above).  We do not consider resolutions in respect of sending the letter to be strictly speaking necessary, but we do consider that

3

CONFIDENTIAL                                                                    TDIT006098

FSD2025-0116                                                                              2025-08-19

there is no harm in doing so and it will add an extra layer of protection.  We do, however, consider resolutions in respect of Article 21 to be necessary.

10. **IRS letter**

   a. The letter is issued to the IRS.

11. **Letter to Highland Dallas Foundation**

   a. Immediately after the IRS letter is issued, a letter should be issued to the Highland Dallas Foundation requiring it to transfer its shares under Article 21.  A copy of the IRS letter should be sent at the same time, along with the board resolutions in respect of the issue of the IRS letter and the share transfer, a share purchase agreement, and the share transfer instrument.  That letter will specify a reasonable time for Highland Dallas to sign the transfer documents or otherwise transfer its shares, following which we will reserve the right to commence proceedings to force the transfer without further notice.

12. **IRS letter issued to other recipients**

   a. Copies of the IRS letter should then be sent to the other intended recipients, who we understand are the other Participating Shareholders and the Texas Attorney-General.

13. **Prepare for litigation**

   a. At this stage, this seems likely to take the form of us commencing proceedings to enforce the Articles and force the transfer, or HDF commencing proceedings potentially by filing a just and equitable winding up petition relying in part on the attempt to force the transfer.

Please let us know if you have any comments on the above approach.  Subject to your views, concurrently with seeking finalised valuation reports, we will circle back as soon as possible with drafts of the following for consideration:

14. the resolutions in respect of the issue of the letter to the IRS, and the forced transfer of shares;
15. the letter to the Highland Dallas Foundation;
16. a short form share purchase agreement; and
17. the share transfer instrument.

Finally, we have followed Tony up regarding his availability to discuss the further documents, and will let you know once we have some proposed times.

Please let us know if you have any comments or if you would like to discuss.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

4

CONFIDENTIAL

TDIT006099

**FSD2025-0116**                                                                                    **2025-08-19**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 15 March 2025 06:13
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]


**[this message is from an external sender]**

---

Walkers:


If a holder is determined to be a Restricted Person by the directors, and so under article 21 the directors can cause a transfer of that holder's shares, then implicit in the execution of Article 21 is that the directors are causing effectuation of the transfer. Therefore, the Transfer Agreement would look similar to a redemption action of such shares, in that the directors would be sole signatories to the document (acting in the place of the transferor) and DFW Foundation as the appointed transferee (by the directors / or management shareholder) - would be the accepting party.


It would make no sense that a participation holder would agree to the Restricted label and sign any document. Therefore, Article 21 leaves corporate discretion in the practical implementation of such Article 21 as it implicitly assumes the non-agreement by the former Restricted person holder.


Further, directors could cause the value of such interest to be paid to the former holder, but it's not clear that would be consistent with the charitable mission of the company. However it would be consistent perhaps following corporate formalities (like a redemption) of giving value for property had. Therefore, It would seem  conservative here to pay out such value to the holder nevertheless via director resolution for the Transfer.


I would agree and reference FTI valuation and ValueScope valuations in the resolutions, and use the specific number valuescope determined (as both valuations where independently arrived yet determined the same method of valuation) to pay for the share transfered. (Taking the conservative approach in balance)

**FSD2025-0116**                                                                                    **2025-08-19**

CONFIDENTIAL                                                                                    TDIT006100

In sum, corporate effectuation of Article 21 via implementation at the directors discretion as to what the corporate plumbing might look like is as follows:

1. Transfer Agreement written similar to a redemption. Directors sign, transferring the Restricted person's shares to dfw Foundation. The current holder does not sign the agreement (as it's akin to a forced redemption for value).

2. Dfw Foundation "accepts" the transfer either as a separate acknowledgement letter or signs the transfer agreement. Consider both proposals.

3. The transfer is recorded in the books of the company and register.

4. A Notice document is sent to the former holder Restricted Person, (like a redemption would do) along with consideration paid for such transfer.

 Does the company attach the two valuations conducted with such Notice and payment or just reference it? What happens in a typical forced redemption situation?

Thoughts on this overall approach?

Mark

On Fri, Mar 14, 2025, 12:38 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

Hi Bart, Brandon

Taking your initial questions in turn:

**CONFIDENTIAL**                                                   **TDIT006101**

FSD2025-0116                                **Page 1148 of 1530**                                2025-08-19

1. *Do you think any other provisions are relevant?*

    a. There are other provisions in the M&A which refer to redemption, for example the Memorandum at Para 7, and Article 30.  However, on further consideration, in our view the relevant point is that the Participating Shares were not issued as redeemable (as per their definition), and the rights attaching to them do not appear to have been varied.  On that basis, they are not liable to be redeemed at the option of either shareholder or company.

2. *If you take the position that "non-redeemable" is operative, doesn't that make other provisions inoperative?*

    a. Whilst there are provisions in the M&A which refer to redemption, the better view is that they do not provide redemption rights or indicate that the Company necessarily holds such rights; they contemplate that redeemable shares may be issued.  Those provisions are currently 'inoperative' in relation to the Participating Shares, but may be 'operative' in relation to Management Shares (noting that Management shares are redeemable by the Company).  Further, they may become 'operative' in relation to the Participating Shares if those shares are converted to redeemable, or if further Participating Shares are issued which are redeemable.

3. *If you take the position that "non-redeemable" is operative, do you think the directors could amend the definition of Participating Shares pursuant to Art. 14 (without Participating Shareholder consent) to make them redeemable and then consummate the redemption?*

    a. We do not consider that such an amendment could be made without Participating Shareholder consent.  In our view, amending the definition of Participating Shares to convert them to redeemable would likely constitute a material adverse variation or abrogation of the rights of the Participating Shareholders, and as such it would require a two-thirds majority of the Participating Shareholders (Article 13).

    b. Further consideration would need to be given as to whether the rights of the Participating Shares could be varied in that manner even with two-thirds Participating Shareholder consent.  As we do not expect there will be any appetite to seek the consent of the Participating Shareholders at this stage, we have not considered that question in detail.

    c. However, the directors have a right to require the transfer of Participating Shares held by a Restricted Person (Article 21).  If the directors form the view that one of the Participating Shareholders is a Restricted Person, assuming they are acting for proper purposes they would be able to exercise that right to require the transfer of those Participating Shares.  Noting that the M&A is silent on the mechanics of a required transfer, if the directors intend to exercise that right further consideration will need to be given as to how that would work in practice, for example whether consideration would be required, and to whom the shares may be transferred.  However, we note that if the directors can require the shares of one of the Highland Foundations to be transferred to the DFW Charitable Foundation, it would then hold 67.09% of the Participating Shares.

    d. At that stage, if any further action was required, further consideration could be given as to whether we seek to vary the rights of the Participating Shares with two-thirds consent of the Participating Shareholders, or to pursue another course of action, for example agreeing with DFW Charitable Foundation a repurchase of the relevant shares, which could then be cancelled, and new shares issued which are redeemable by the Company.

We are available to discuss this afternoon at 3pm, including regarding the preparation of the documents as below.  Please let us know if that is convenient for you.

7

FSD2025-0116                                                                              2025-08-19
                                                                                          **1064**

**CONFIDENTIAL**                                                                          TDIT006102

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 14 March 2025 11:53
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Bart Higgins <bhiggins@shieldslegal.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]


**[this message is from an external sender]**

Geoffrey,


In the interim, can you please continue prepping the documents for (i) redemption and (ii) exercising rights under Art. 21?


We need these to be ready to execute on Monday.


Thanks,

Brandon


**Brandon R. Schaller**

**ATTORNEY**


**Phone** | 469.726.3055

**CONFIDENTIAL**                                        **TDIT006103**

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Friday, March 14, 2025 9:51 AM
**To:** Bart Higgins <bhiggins@shieldslegal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Thanks Bart, noted.

We will do what we can.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Bart Higgins <bhiggins@shieldslegal.com>
**Sent:** 14 March 2025 09:44
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** Re: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

CONFIDENTIAL                                                    TDIT006104

Geoffrey, client would like a conference today if you can make it work.

Sent from my iPhone

On Mar 14, 2025, at 9:38 AM, Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

CAUTION: This email originated from outside of the organization.

Hi Brandon

Apologies for the delay, we are finalising our views and will revert back as soon as possible regarding a call, which will likely be this afternoon or early next week.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 14 March 2025 08:32
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh Anderson <Hugh.Anderson@walkersglobal.com>; mpatrick@dafholdco.com
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Geoffrey,

CONFIDENTIAL                                                                         TDIT006105

FSD2025-0116                                                                              2025-08-19

Adding Mark. We were hoping to have a call scheduled by now. Please let us know.

Thanks,

Brandon

**Brandon R. Schaller**

**ATTORNEY**

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Wednesday, March 12, 2025 12:14 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie
<Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Hugh
Anderson <Hugh.Anderson@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Hi Brandon

Thanks for the below.  We will revert back in substance once we've had a chance to consider, including
regarding a time for a call.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

FSD2025-0116                                                                              2025-08-19

1068

CONFIDENTIAL

TDIT006106

**FSD2025-0116**  T +1 345 814 6834  |  **M** +1 345 814 6834    2025-08-19

www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 12 March 2025 09:56
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie
<Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Geoffrey,

Trying to collect the relevant provisions in one email for reference.

Pro-redemption

1. Art. 8: suggests Directors can redeem shares.
2. Art. 14: Rights conferred on Participating Shares shall not be materially adversely varied or abrogated by...redemption...of any Participating Shares...by the Company.

    1. Art. 13: Participating Shares can vote if materially adversely varied or abrogated.
    2. Arts. 13 and 14: Directors can redeem Participating Shares, and Participating Shares cannot vote on that.

Anti-redemption

1. Definition of "Participating Share: "non-redeemable".
2. Art. 28(b) and (d): refers to "any redeemable Shares", suggesting some are redeemable and others may not be.

Do you think any other provisions are relevant?

12

**FSD2025-0116**    2025-08-19

1069

CONFIDENTIAL    TDIT006107

FSD2025-0116 If you take the position that "non-redeemable" is operative, doesn't that make other provisions inoperative? 2025-08-19

If you take the position that "non-redeemable" is operative, do you think the directors could amend the definition of Participating Shares pursuant to Art. 14 (without Participating Shareholder consent) to make them redeemable and then consummate the redemption?

Thanks,

Brandon

## Brandon R. Schaller

**ATTORNEY**

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Brandon R. Schaller
**Sent:** Wednesday, March 12, 2025 8:31 AM
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

Thanks Geoffrey. Can you please let us know some times you are available to discuss?

Also, we agree that a call with Tony prior to his next draft would be helpful, and we are happy to join that.

## Brandon R. Schaller

FSD2025-0116 2025-08-19

CONFIDENTIAL

1070

TDIT006108

FSD2025-0116    2025-08-19

ATTORNEY

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** Tuesday, March 11, 2025 11:23 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>; Barnaby Gowrie
<Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]

CAUTION: This email originated from outside of the organization.

Hi Brandon

We have forwarded those documents to counsel for review.  Once Tony has had a chance to consider, we suggest that a call to discuss would be helpful.

Regarding the question as to redeemability of the Participating Shares, in light of Tony's advice we have considered and discussed further with colleagues in our corporate team.  We note that the Memorandum at Para 7 appears to provide the Company with the right to redeem its shares, and certain provisions of the Articles envisage redemption by the Company (e.g. Arts 14 and 28).  On the other hand, the rights attached to the Participating Shares as per their definition include that they are non-redeemable (without specifying whether that applies to the company or the shareholder).  Following further consideration, on the basis of the documents we have seen we consider that the better view is that the Participating Shares are not redeemable by either the company or the shareholder.  If you are aware of any further documents (e.g. resolutions) which might operate to alter the rights attached to the Participating Shares, please let us know.

However, we note that Tony's advice, with which we agree, is that the company does have the power to force the transfer of shares held by a Restricted Person.  In the circumstances, we may be able to rely on that power.

Once Tony has considered the further documents we will revert back regarding a time for a call.

14

FSD2025-0116    2025-08-19

1071

CONFIDENTIAL    TDIT006109

FSD2025-0116                                                                                           2025-08-19

Best regards,


**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 06 March 2025 12:24
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** RE: DAF - Materials for KC [WALKERS-AMER_DOCS.FID2294181]


Hi Brandon


Thanks for your time on the phone and the below.


We will share those documents with Tony and discuss his advice in light of them.


Best regards,


**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** 06 March 2025 11:38
**To:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Cc:** Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** DAF - Materials for KC

15

FSD2025-0116                                                                                           2025-08-19
1072
**CONFIDENTIAL**                                                                                       TDIT006110

1153

**[this message is from an external sender]**

Walkers team,


Here are factual materials to be shared with KC:

1. Carrington Coleman (US law firm) tax memo – this provides a general history (see Exhibit C) of the facts, so we would suggest the review begin here.
2. ValueScope Presentation to Supporting Organizations – this was presented to the Supporting Organizations on November 20, 2024 and provides financial background.
3. Paul Murphy Presentation – this was presented to the Supporting Organizations in early December 2024 and provides corporate governance background.
4. Walkers Presentation re: Participation Shareholder rights – this provides an overview of the rights of the Participation Shareholders
5. UBS Petition – this provides background on Dondero's various misdeeds. In particular, search for "Sentinel". It is not necessary to review the entire petition.
6. Highland Employee Retention Assets Petition – this provides background on Dondero's various misdeeds. In particular, search for "A Recurring Theme" and read pgs. 36-47.
7. News article re: Judge Jernigan -Texas Judge Jernigan Accused of More Ethics Violations – Dondero attempted to weaponize the U.S. Securities and Exchange Commission to investigate Judge Jernigan, who had ruled against him in numerous bankruptcy matters.


We are happy to discuss with KC after he has had a chance to review. Let us know of any questions.


Thanks,

Brandon


**Brandon R. Schaller**

**ATTORNEY**


16400 Dallas Parkway, Suite 300

CONFIDENTIAL                                TDIT006111

**FSD2025-0116**       **2025-08-19**

Dallas, TX 75248

**Phone** | 469.726.3055

**Email** | bschaller@shieldslegal.com

**Bio** | **LinkedIn** | **vCard**

## SHIELDSLEGAL.COM

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message.  You should not copy it or disclose its contents to any other person.  Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses.  This e-mail message does not contain or constitute legal advice and/or federal tax advice.  The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

17

**FSD2025-0116**    **2025-08-19**

1074

**CONFIDENTIAL**    **TDIT006112**

**FSD2025-0116**                                                                                              **2025-08-19**

**Rachel Baxendale**

| | |
|---|---|
| **From:** | Anaman, Alexis <Alexis.Anaman@fticonsulting.com> |
| **Sent:** | 27 March 2025 2:11 AM |
| **To:** | Geoffrey Sykes; Shek, Chun Yin |
| **Cc:** | Barnaby Gowrie; Philip Aubry; Chris Beck |
| **Subject:** | RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181] |
| **Attachments:** | Non reliance letter (Template).docx |

**[this message is from an external sender]**

Hi Geoffrey,

Thanks for the comments. A few questions

- You have asked for us to include language which notes: "We understand that the Directors acting in the best interests of the company is generally regarded as the interests of the members as a whole, <u>which includes future members</u> ..." The underlined language is new. Can you confirm reference to a member relates to participating shareholders? What is the intention of adding that directors should act in the interests of future members? I am struggling conceptually to understand how a director could act in a manner which is beneficial for future shareholders which is not also helpful for existing shareholders. Therefore the addition seems unnecessary.

- I am surprised that distributions were made. This seems inconsistent with a phone call we had. But perhaps I misheard. Can you provide more detail as to the nature of the distributions. The proposed language is as follows: "From 2019, DAF became involved in a legal dispute, and whilst DAF has still made distributions to allow the Participating Shareholders to make unrestricted grants to the supported community foundations, it has curtailed additional discretionary distributions". What is an unrestricted grant? What falls in the category of additional discretionary distributions?

- The limitations in our note will remain. To do a valuation which can support a transaction, we will need to do significantly more detailed work. This is an unusual/complicated situation.  We are open to doing a fairness opinion on the transaction. However, this will require *inter alia*  approval from our risk committee to proceed and more information on the proposed transaction and situation.

- We are happy for CDMCFAD LLC to have our memo on a non-reliance basis – please see attached for our template NRL. But this memo should not be used to support a transaction.

Happy to discuss.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**FSD2025-0116**                                                                                              **2025-08-19**

**1075**

**CONFIDENTIAL**                                                                                                **TDIT006113**

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 26 March 2025 13:02
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for the below.

We have discussed further with our client and onshore counsel, and together with them set out some further clarificatory amendments as per the comments in the attached.

In addition to those minor amendments, we note that:
1. we have not received any material addressing reliance on the memorandum by CDMCFAD LLC; and
2. the "*Limitations and restrictions*" section is unchanged, and still provides that the memorandum "*should not be used to support a transaction*" ([1.8]-[1.10]).

In order for the memorandum to be useful in the circumstances, CDMCFAD needs to be able to rely on it (in addition to DAF HoldCo), or a separate, comparable memorandum would need to be addressed to CDMCFAD on which it may rely.  Further, both entities will need to be able to rely on the memorandum(s) to support the proposed transaction.  We confirm that we do not intend to disclose the memorandum(s) to any third parties.  Apologies if we did not communicate those points clearly during our call on Friday.

Please let us know if there are any issues with either of those – if so, of course we would be happy to discuss.

Otherwise, we would be grateful to receive a draft engagement letter addressed to CDMCFAD LLC, and appropriate amendments to the memorandum(s) regarding reliance by both entities, and in support of a transaction.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 25 March 2025 10:54
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

[this message is from an external sender]

Hi Geoffrey, please find attached a comparison against the last draft of the original version on our server.

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**

FSD2025-0116                                                                          2025-08-19
                                                                                          1076
CONFIDENTIAL                                                          TDIT006114

FSD2025-0116                                                                     2025-08-19

+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 25 March 2025 12:55
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Thanks Alexis.

Please could you also send a redline against the previous version in word?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 25 March 2025 02:15
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey,

Please find attached an updated memo.

Thank you

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 March 2025 17:55

FSD2025-0116                                                                     2025-08-19

3

**CONFIDENTIAL**                                                                 TDIT006115

1077

FSD2025-0116            2025-08-19

**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

A Participating Shareholder may consider an absence of distributions to be sufficient grounds for a winding up order on the just and equitable basis, and they would be able to present a winding up petition on those grounds. However, it is difficult for us to say whether that petition would be successful, i.e. whether a Court would agree with the Participating Shareholder. In coming to a determination, the Court would consider all of the circumstances surrounding the absence of distributions, whatever those circumstances might be. In saying that, one point which would be relevant to the Court's determination is that the quantum of dividends is to be determined by the directors "*in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis*" (Article 104).

If a winding up petition is presented and a winding up order is then made, any alteration in the status of a company's members after the petition was presented is void unless the Court orders otherwise (Companies Act sections 99 and 100). On that basis, if: (a) a Participating Shareholder presented a winding up petition; (b) new shares were purportedly issued; and (c) the Court then made a winding up order, the issue of the new shares would be void and accordingly would not impact the amounts the existing Participating Shareholders would receive in the winding up (unless the Court ordered otherwise).

Please let us know if you need anything else.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 22 March 2025 03:36
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey,

Many thanks for your response.

Would an absence of distributions be sufficient grounds to make an application to wind the company up?

If the participating shareholders did make the application, would Mark be able to issue a vast number of shares to another party before the distributions were made thereby ensuring the existing shareholders received very little?

Thanks

Alexis

FSD2025-0116            2025-08-19

1078

CONFIDENTIAL            TDIT006116

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 21 March 2025 20:00
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for your time on the phone last night and your email.

We confirm that, if DAF HoldCo was wound up, the Participating Shareholders would receive distributions. Those distributions would be made *pari passu*, and Mark (if he was the liquidator) would not be able to ensure that the existing Participating Shareholders get nothing. Article 122 provides that in a winding up, the assets available for distribution between Shareholders shall be applied: (a) first to pay both Participating and Management Shareholders *pari passu* for the par value of their shares, then (b) to pay any balance to the Participating Shareholders "*in proportion to the number of Participating Shares of the relevant Class and Series held*". The M&A are attached for convenience.

Whilst the Participating Shareholders have the right to seek to cause a winding up under the Companies Act, they need to have a proper basis on which to make an application to wind the company up. Until they have such a basis, they cannot cause the company to be wound up. We can only assume that the current Participating Shareholders have not commenced proceedings seeking to wind the company up because they do not have a proper basis on which to do so, but of course we do not know what is in their minds.

Please let us know if we can be of any further assistance.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 21 March 2025 09:34
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

[this message is from an external sender]

Hi Walkers team,

**CONFIDENTIAL**        TDIT006117

Your comments note that "the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles)".

Can you confirm that if the firm was wound down, it would result in distributions to the existing participating shareholders? Or would Mark still be able to shareholder structure to ensure the existing participating shareholders got nothing?

Given they haven't received dividends since 2019 (and presumably would like cash from DAF), why haven't the existing participating shareholders just triggered a wind down?

If the holder of the share can trigger a wind down and then in short order receive $300m of distributions, it does change things re discount.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 20:23
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Further to the below, and noting that it is getting quite late for you, we could do a call this afternoon at 4.30pm (Cayman) / 9.30pm (London) if that was more convenient than tomorrow?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Geoffrey Sykes
**Sent:** 20 March 2025 14:31
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

CONFIDENTIAL                                                            TDIT006118

FSD2025-0116                          **Page 1165 of 1530**                          2025-08-19

Hi Alexis

We appreciate you making yourself available at that hour this evening, but unfortunately we cannot do 8pm UK tonight.

We are under some time pressure from the client to progress the proposed transaction, and accordingly to have the report finalised as soon as we can.  We would prefer to have the call before Monday if possible, are there any times tomorrow that would suit you?

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 14:07
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey,

I am travelling at that time tomorrow.

Monday would be better if possible. I can also do 20.00 UK time tonight.

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 18:42
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

We think it would be best to discuss on a call, are you available tomorrow at 10am (Cayman) / 3pm (London)?

FSD2025-0116                                                                              2025-08-19
                                             7                                           **1081**

**CONFIDENTIAL**                                                                          TDIT006119

**FSD2025-0116**       **2025-08-19**

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 12:45
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Excellent. Many thanks.


**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com


**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 14:19
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for getting back to us.

We are instructed that our client has settled your invoice this morning.

We will otherwise consider your comments and revert back.

Best,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 20 March 2025 05:50

**FSD2025-0116**       **2025-08-19**

**1082**

CONFIDENTIAL       TDIT006120

FSD2025-0116                                                                                    2025-08-19

**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey,

Some comments below in red.

Thanks

Alexis


**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com


**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 March 2025 00:47
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

We have considered your draft valuation report dated 28 February 2025, and attach a version including our comments (along with the current Memorandum and Articles dated 20 February 2025).

**The Substance of the Report**

Most significantly:
1.  We have obtained clarification from onshore counsel regarding the operation of the DAF structure.  Accordingly, please replace [2.2] and [2.3] with the following amended versions:
    "*2.2    DAF is set up in a structure such that the Participating Shareholders (i.e., nonprofit organisations) hold a passive economic, non-voting interest. The Participating Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed – we understand that any attempts to do so may be regarded as a criminal offense by the IRS or result in significant tax liabilities.*
    *2.3    The foregoing tax issues and structure is the primary reason for the separation of control between Participating Shares (holders of which have very limited rights as described further in Section 3) and the Management Shares (holders of which have effective control over DAF). That is, the holder of the Management Shares needs to exercise independence and act on an arms' length basis to the holders of the Participating Shares and their affiliates.*" Fine to make change.

2.  It is stated at [3.2(1)] that Mr Patrick has "*an ultimate right to override the articles*".  However, any amendment to the articles which constitutes a material adverse variation or abrogation of the rights of the Participating Shareholders must be approved by two-thirds of the Participating Shareholders, which is a significant restriction on Mr Patrick's ability to affect the rights of the Participating Shareholders (Article 13). We can delete this paragraph.

9

FSD2025-0116                                                                    2025-08-19

3. It is stated at [3.2(2)] that "*there is no overriding duty of DAF's Directors to act in the shareholders' interest. The Directors will act according to the best interest of the company, that is, to achieve the charitable causes that are aligned with DAF's mission*".  However, as a matter of Cayman law, DAF's directors owe their various duties to the company, and must act in the best interests of the company.  The best interests of the company are generally regarded as the interests of the members as a whole, and in certain circumstances the objects of the company may be taken into account when determining what is in the best interests of the company. Can you explain how it was in the interests of the company to materially dilute the existing shareholders?

4. It is stated at [3.10] that "*the Participating Shareholders do not have any rights to cause a liquidation/winding up of the company*".  However, the Participating Shareholders do have the right to seek a winding up of the company, as conferred upon them by the Companies Act (rather than the Articles). Why won't they just do this immediately and seek distributions? Isn't the ability to trigger a liquidation contradictory with point 1 which states *"Shareholders do not have any right to exert influence on whether/how the funds of DAF are used or distributed".*

5. As per our comments in a number of places, please could you delete references to our advice so as to avoid any potential arguments about waiver of privilege. Your advice is important in us arriving at our conclusions. I understand from our legal team that we either (i) keep the reference to your advice or (ii) address the memo to you. Are you expecting there to be litigation in relation to the proposed transaction? The more colour you can give the better.

In addition, we note that you were provided with material which indicated that the Participating Shares were redeemable at the option of the Company but not at the option of the shareholder.  On further consideration, we consider the better view to be that the Participating Shares are not redeemable at the option of the Company or the shareholder.  It appears that your report refers to redemption rights at [3.1], [3.19]-[3.20], and [4.1].  Noting your comments that "*the discount applied to the factors above would also cover the risk of redemption*" (at [3.20]) this may not impact your assessment of value, but please consider and make amendments to the draft as necessary. Sure, will do.

The above comments are also reflected in the attached, along with some other comments which are relatively minor and we hope will be self-explanatory.  In any event, please let us know if you have any queries. We can run through these comments.

Of course, please consider the impact that any of the above may have on your assessment of value.

**The Permitted Uses of the Report**

Further, the context in which our client is operating has changed since your draft report was issued.  Our client now seeks a valuation report which may, in connection with a proposed redemption of the membership interests in CDMCFAD, be disclosed to third parties and relied on to establish fair market value of both the membership interests in CDMCFAD, and in turn DAF HoldCo.  This is a material change in the purpose and access rights of the report. Please provide more detail of the transaction. Is it the case that Mark will make CDMCFAD, LLC redeem the shares owned in by DAF? And who would you like to share the report with? And on what basis (e.g. non-reliance)? We also note that our memo is not a valuation – it is a quantification of discounts given the rights of the participating shares. To do a valuation, we would need to do a more detailed exercise, including valuing the underlying assets.

**Next Steps**

On the basis of the above, please could you provide an updated draft:

1. In light of our comments as above and in the attached, including to account for any amendment to your assessment of value; and
2. With the section headed "*Limitations and restrictions* " (at [1.8]-[1.10]) amended so as to permit the report to be used and relied on in the manner set out above.

If you could consider the next step (prior to the above) being our invoice for work done so far to be settled it would be appreciated.

Please let us know if you would like to discuss.

Best regards,

**Geoffrey Sykes**
Associate

FSD2025-0116                                                                    2025-08-19

1084

CONFIDENTIAL                                                                    TDIT006122

**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 18 March 2025 02:12
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Great. Look forward to receiving the comments and thanks re invoice.

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 17 March 2025 23:36
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Thanks for your timely email.

We do have some comments on your draft report – we are discussing with onshore counsel and our client and will revert back in substance in the coming days.

We have also passed on a reminder regarding your invoice.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 17 March 2025 11:45
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>

CONFIDENTIAL

1085

TDIT006123

FSD2025-0116                                                                                    2025-08-19

**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

Hi Geoffrey,

Trust all is well with the report?

Will the invoice be settled soon?

Thanks

Alexis

**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 03 March 2025 15:15
**To:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Alexis

Many thanks for the below.

We will consider in tandem with our client, and will let you know if we have any comments.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Anaman, Alexis <Alexis.Anaman@fticonsulting.com>
**Sent:** 02 March 2025 10:26
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Cc:** Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

FSD2025-0116                                                                                    2025-08-19

                                                          12                                              1086

FSD2025-0116                                                                                                    2025-08-19

Hi Walkers team,

Please find attached our draft memo and invoice (fees are at the bottom of our fee estimate range).

If you have any comments on the draft memo, or would like to discuss it, please do let me know.

Thanks

Alexis


**Alexis Anaman**
Senior Managing Director | Corporate Finance

**FTI Consulting**
+44 (0) 7766 734 520 M
alexis.anaman@fticonsulting.com

---

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 20 February 2025 14:52
**To:** Shek, Chun Yin <Marco.shek@fticonsulting.com>; Mark Patrick <mpatrick@dafholdco.com>
**Cc:** Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

Hi Mark, Marco

That suits us, and thanks Marco and team for making yourselves available at that hour.

**Mark** – please let us know if that suits you.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834  |  **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Shek, Chun Yin <Marco.shek@fticonsulting.com>
**Sent:** 20 February 2025 09:30
**To:** Mark Patrick <mpatrick@dafholdco.com>; Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** RE: [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

**[this message is from an external sender]**

---

Hi Mark, Geoffrey,

FSD2025-0116                                                                                                    2025-08-19
                                                                                                                    1087

CONFIDENTIAL                                                                                          TDIT006125

1168

**FSD2025-0116**   **Page 1172 of 1530**   **2025-08-19**

Alexis and I are available to speak at 3-4pm Cayman (8-9pm UK) today, if that works for you.

Otherwise please suggest times for Friday/early next week and we will try our best to accommodate.

Best regards,
Marco

**Chun Yin (Marco) Shek, CFA**
Senior Director

**FTI Consulting**
+44 203 727 1410 T | +44 7976 326 013 M
Email: marco.shek@fticonsulting.com

200 Aldersgate | Aldersgate Street
London | EC1A 4HD | United Kingdom
www.fticonsulting.com

---

**From:** Mark Patrick <mpatrick@dafholdco.com>
**Sent:** 20 February 2025 00:09
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Cc:** Shek, Chun Yin <Marco.shek@fticonsulting.com>; Stahl, Matt <Matt.Stahl@fticonsulting.com>; Anaman, Alexis <Alexis.Anaman@fticonsulting.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>; Philip Aubry <Philip.Aubry@walkersglobal.com>
**Subject:** [EXTERNAL] Re: Charitable DAF HoldCo Ltd and CDMCFAD LCC - Valuations [WALKERS-AMER_DOCS.FID2294181]

I'm traveling in the morning tomorrow.  Either late afternoon Thursday or late afternoon Friday  works for me.

On Wed, Feb 19, 2025, 6:01 PM Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com> wrote:

> Hi Mark, Marco
>
> Mark, as we understand you have discussed with Brandon, and Marco, as per our previous emails with you, we are arranging a call to further discuss the valuation exercise.
>
> In particular, Mark would like to discuss his plans for future distributions, and Marco and the FTI team would like to discuss the 30 September 2024 valuation and the 7 February 2025 share issue.
>
> Please let us know if you are available tomorrow (Thursday) at 10.30am (CT) / 11.30am (Cayman) / 4.30pm (London).
>
> Otherwise, we are available tomorrow anytime after that, or on Friday during the Cayman morning.

**FSD2025-0116**   **2025-08-19**

1088

**CONFIDENTIAL**   **TDIT006126**

Best regards,

**Geoffrey Sykes**
Associate
Walkers (Cayman) LLP

**Walkers** | Making financial services work

**T** +1 345 814 6834 | **M** +1 345 814 6834 | **E** Geoffrey.Sykes@walkersglobal.com
190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands
www.walkersglobal.com

**Secretary**
Alexandra Irwin | **T** +1 345 814 4609 | **E** Alexandra.Irwin@walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

---

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

---

Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us immediately by replying to the sender and then delete this copy and the reply from your system. Thank you for your cooperation.

FTI Consulting LLP. Registered Number OC372614. Registered in England and Wales at 200 Aldersgate, Aldersgate Street, London, EC1A 4HD. A full list of Members is available for inspection at the registered address.

1170

FSD2025-0116                                                                    2025-08-19

**[to be printed on relevant FTI letterhead]**

[COMPANY]
[ADDRESS 1]
[ADDRESS 2]
[ADDRESS 3]
[ADDRESS 4]

[date]

Dear Sir or Madam,

**Release Letter for [*matter description / project name*]**

FTI Consulting LLP ("FTI") refers to its report regarding [●] (the "Report") regarding [●], supplied to [●] (the "Client") pursuant to an engagement letter between FTI and Client dated [●] 20[●].

FTI understands that you are [*insert description of recipient and purpose of disclosure of report*] (the "Purpose") and wish to be provided with a copy of the Report.  The Client has authorised FTI to provide a copy of the Report to you. This letter sets out the terms on which FTI will agree to release the Report to you and explains certain matters in relation to the Report.  Those terms are:

1) You accept that in providing you with a copy of the Report and otherwise communicating with you concerning the Report or the Client, FTI shall have no responsibility or liability to you, whether in contract, tort (including negligence) or otherwise.  Any use that you or any of Representatives (as defined below) make of the Report is entirely at your own risk. You agree to release FTI and its personnel from any claim arising out of or in connection with the Report (and shall procure that your Representatives (as defined below) do the same).

2) You shall keep the Report confidential and shall not provide the Report to third parties by any means without FTI's prior written consent, unless you are requested to do so by order of a court of competent jurisdiction or pursuant to law or regulation or any valid request or demand of any governmental or regulatory body or authority.  Unless FTI has given its consent in this release letter, it may, at its sole discretion, withhold consent.  Whether or not FTI has given its consent, FTI will not accept any liability or responsibility to any third party who may get access to the Report.

3) You may make copies of the Report available to your directors and officers, those employees involved in considering the Report, and your legal advisers (your "Representatives"), provided that in each case you take reasonable steps to ensure that they understand and agree that:

1

FSD2025-0116                                                                    2025-08-19

1090

a) The Report is confidential and may not be disclosed to any other parties without FTI's prior written consent;

b) The Representatives may use the Report only for the Purpose, in the case of advisers, only for the purpose of advising you in relation to the Purpose; and

c) FTI accepts no duty of care to the Representatives in respect of any use they may make of the Report, and/or any other information and explanations we may provide.

You shall be responsible for any breach of the terms of this letter agreement by your Representatives.

The terms of this letter will continue to apply in respect of the Report released under its terms, even if FTI later agrees to accept a duty of care to you in respect of some other report.

The work underlying the Report covered only the matters set out in FTI's contract or engagement letter with Client.  In agreeing to the scope of work with the Client, FTI had regard to possible areas of interest to Client in general, but without the interests or concerns of any other third party in mind.  The issues covered in the Report and the emphasis placed upon them, may not address or reflect your specific requirements, interests or circumstances.

FTI has not carried out any work or made any enquiries of the Client's management since [●] 20[●] being the date on which we completed our fieldwork.  The Report does not incorporate the effects, if any, of events and circumstances which may have occurred or information which may have come to light subsequent to that date.  FTI makes no representation as to whether, had it carried out such work or made such enquiries, there would have been a material effect on the Report.  Further, FTI has no obligation to notify you if any matters come to its attention which might affect the continuing validity of the comments or conclusions in the Report.

The Report may contain Personal Data as defined by the General Data Protection Regulation (EU) 2016/679. In respect of any such Personal Data, we shall each be separate and individual controllers and shall each be responsible for compliance with our own obligations under applicable data protection laws. You shall ensure that you will comply with the requirements of applicable data protection laws in respect of your receipt, use and any subsequent disclosure of the Personal Data, including any disclosures made pursuant to this release.

This letter, any non-contractual obligations arising out of or in connection with it and our relationship with you, shall be governed by and interpreted in accordance with the laws of England & Wales. The English courts shall have exclusive jurisdiction in respect of all disputes or claims (including non-contractual disputes or claims) arising out of or in connection with this letter or the Report.

If you wish to receive a copy of the Report on the terms set out above, please acknowledge and agree to the terms by signing the enclosed copy of this letter in the space provided and returning it to FTI.

Yours faithfully,

**[*name*]**
**Senior Managing Director**
**For and on behalf of FTI Consulting LLP**

**Confirmation**

We confirm that we wish to receive a copy of the Report on the Client and acknowledge and agree to abide by the terms set out in the letter dated **[●]** from FTI Consulting LLP.  We also acknowledge and agree that these terms will apply to each version of the Report provided to us.

ACKNOWLEDGED AND AGREED:

For and on behalf of [*INSERT NAME OF RECIPIENT COMPANY*]

By:     _____
      Signature

      _____
      Title

      _____
      Date

3

**CONFIDENTIAL** **TDIT006130**

**Campbells**

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**D** +1 345 914 5898
**T** +1 345 949 2648
**F** +1 345 949 8613
**E** MGoodman@campbellslegal.com

campbellslegal.com

Our Ref:  MGM/ROD/18955-44959
Your Ref:  20250506

CAYMAN **|** BVI **|** HONG KONG

**BY EMAIL**

Margot McInnis and Sandipan Bhowmilk
Grant Thornton Specialist Services (Cayman) Limited
2nd Floor Century Yard
Cricket Square
Grand Cayman KY1-1102
Cayman Islands

16 March 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

We refer to our letter dated 12 March 2025 ("**Our Letter**") and adopt the definitions used therein.

**Communications with Service Providers**

We acknowledge receipt of your email dated 14 May 2025 indicating that the JOLs are considering Our Letter. We enclose herewith a letter from US Counsel for the CDM Entities, Richards Layton and Finger, to Vista Bank which reinforces the points made in Our Letter, i.e. that the JOLs have no power or authority to act on behalf of any of the CDM Entities, or with respect to the accounts or assets of any of the CDM Entities which are held with Vista Bank.

Please confirm that the JOLs have not contacted any other third-party service providers connected with the CDM Entities' operations, and that the JOLs will not issue similar requests to such parties in respect of any assets of the CDM Entities in future.

**Appointment Order**

We note from the Appointment Order which accompanied Your Letters that, pursuant to paragraph 6(a) and 6(b), the JOLs are authorized to exercise the below powers without further sanction of the Court:

3203729-1

#3241091v5

CONFIDENTIAL                                                          TDIT006131

a) *"the power to present a petition for the winding up of Charitable DAF Fund, LP (the "**Fund**") if so advised; and*

b) *the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…"*

It is not immediately clear to us on what basis the JOLs could seek to present a petition for the winding up of the Fund in circumstances where, *inter alia*, (i) the Company was not a shareholder/limited partner of the Fund; and (ii) where the Company is not a creditor of the Fund. To the extent that it is alleged that the restructuring of the Company's assets gives rise to a claim by the Company (which is denied), it is trite law that a petitioner cannot rely on a speculative or potential claim to wind up a company (which any claim brought by the JOLs in respect of the restructuring of the Company would be).

It follows that where the Company has neither standing nor grounds to petition for the liquidation of the Company it would have neither standing nor grounds to apply for the appointment of provisional liquidators, irrespective the manner in which the CDM Entities are being managed (as to which, see below).

It is therefore surprising that the Appointment Order contained those provisions. Please provide a copy of the transcript of the petition hearing as it relates to paragraph 6 of the Appointment Order. To the extent that paragraph 6(a) and (b) were not specifically addressed in submissions, please confirm that. As a party affected by that order, we reserve the right to apply to vary the Appointment Order to remove these provisions, which do not appear to have been made in a manner consistent with the requirements of the CWR, or with any proper consideration of the relevant facts.

It is also telling that the Appointment Order, which was presumably drafted by counsel to the petitioner, prospectively included these provisions before the JOLs could possibly have had any basis to objectively consider those matters and calls into serious question the propriety of the JOLs now retaining the petitioner's counsel as their own.

**Ex Parte Relief**

As you are aware, Messrs Patrick and Murphy are independent professional directors. They are well aware of their duty to act in the interests of the company over which they are appointed, which is (when solvent) equated with the interests of shareholders, present and future. Messrs Patrick and Murphy also have access to legal advice, which they have (without waiver of privilege) sought and followed where necessary or appropriate. The CDM Entities, including the Fund, continue to operate in accordance with the objects for which they were established (i.e. to make investments on behalf of, and to support charitable causes).

2

Accordingly, the Company would be unable to overcome the 'necessity hurdle' described by Justice Doyle in *Re Position Mobile Ltd SEZC* (Unreported, 31 October 2023) and "*prove that the appointment of JPLs is "necessary" in order to prevent (i) the dissipation or misuse of the company's assets, or (ii) the oppression of minority shareholders; or (iii) mismanagement or misconduct on the part of the company's directors*" (at paragraph 133).

However, in an effort to assuage any concerns the JOLs may have regarding the commercial activities of the Fund and the risk of dissipation of assets outside of the ordinary course of business, the CDM Entities would be prepared to enter into a form of Protocol which provided for, amongst other necessary and appropriate terms, the reporting of material transactions on the basis that such information was held confidentially by the JOLs. We would be happy to discuss the terms of that Protocol in further detail.

Should the JOLs choose to disregard this offer and take steps to seek either the appointment of provisional liquidators, or any other interim relief, we expect that you will provide this letter to the Court in furtherance of the duty of full and frank disclosure. For the avoidance of doubt, we will strenuously oppose any such application on behalf of the Fund and will rely on this letter for costs purposes.

Nothing in this letter should be taken as a waiver of privilege or as an admission of any position advanced in Your Letters.

Yours faithfully,

*Campbells LLP*

**Campbells LLP**

3203729-1

#3241091v5

**CONFIDENTIAL**                                                                 **TDIT006133**

FSD2025-0116



2025-08-19

30 May 2025

aj@j-law.ky
+1 (345) 929 3000
Ref: 00022

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010
Cayman Islands
Your ref: MGM/ROD/18955-44959

**By email: mgoodman@campbellslegal.com**

Dear Colleagues

**In the matter of Charitable DAF HoldCo, Ltd (In Official Liquidation) (the *Company*) | Proceedings FSD No. 116 of 2025 (JAJ)**

We refer to our letter dated 22 May 2025 (the ***Letter***) to which you have failed to respond.

You did however attend the directions hearing before Justice Asif KC on 23 May 2025 (the ***Directions Hearing***) purportedly on behalf of your clients, notwithstanding the fact that the hearing was held in chambers and, as had been made clear in the Letter, that your clients have no standing in the liquidation (and certainly not in respect of any sanction application). Not only did your clients have no standing (and indeed should not have even attended the Directions Hearing at all), but to compound the situation your Mr Doherty, without invitation, made submissions from the back of the Court in which he represented that your clients had sought to cooperate and comply with the JOLs' requests for information in your letter of 16 May 2025 by proposing a 'protocol' with which the JOLs had not engaged, which is a plain mischaracterisation of events.

(a)     In your letter dated 12 May 2025, you expressly stated: "*the [JOLs'] request for documents relating to the business of the CDM Entities is not properly made. The CDM Entities decline to provide any such documents at this stage.*"

(b)     In your letter dated 16 May 2025, you stated: "*the CDM Entities would be prepared to enter into a form of Protocol which provided for, amongst other necessary and appropriate terms, the reporting of material transactions on the basis that such information was held confidentially by the JOLs. We would be happy to discuss the terms of that Protocol in further detail.*"

(c)     By our Letter, the JOLs' advised that as your clients are not willing to assist the JOLs, it is likely to be necessary to seek the Court's assistance to enable them to discharge their obligations, and noting "*it would be regrettable if your clients were to seek to obstruct reasonable requests from the JOLs, requiring them to obtain orders compelling your clients to provide information*". In this regard, the JOLs' requested that your clients confirm by 5pm on 23 May 2025:



Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman
PO Box 926, 10 Market St, Grand Cayman, KY1-9006
345 929 3000 | info@j-law.ky | www.j-law.ky | LinkedIn

**CONFIDENTIAL**

**TDIT006134**

1177

*"a) The identity of the parties for whom you act;*

*b) Details of the full structure of the "CDM Entities" including registers of members and directors for each entity;*

*c) The assets held by each of your clients and details of any transactions undertaken by your clients since 1 July 2024; and*

*d) Firm undertakings that no transactions will be taken in respect of the assets held by your clients without 7 clear days advance notice to the JOLs."*

(d)     The Letter noted that you act for three named entities "*along with other unspecified directly and indirectly held subsidiaries*" and requested that you therefore provide a full list of the parties for whom you act by return.

Your clients failed to respond to the Letter or to cooperate with the JOLs' reasonable requests for information. It is in this context that Mr Doherty made submissions at the Directions Hearing without standing to do so to the effect that your clients had in fact sought to cooperate with the JOLs, including by proposing a protocol – with which the JOLs had not engaged – such matters being plainly incorrect, if not actively misleading.

In these circumstances, the JOLs request as a matter of urgency but certainly by no later than 5pm on **30 May 2025** that you and your clients provide: (i) an explanation for your conduct and the representations from the back of the Court at the Directions Hearing, and (ii) substantive responses to all matters raised in our Letter, including with respect to the JOLs' request for confirmation that no transactions will be taken in respect of the assets held by your clients without 7 clear days advance notice to the JOLs. In particular, it has come to our attention that your clients have, since the date of the Letter, sought approval of a transaction involving Hunter Mountain Investment Trust without consultation with the JOLs. The JOLs assert proprietary claims over all assets held by the Fund and any transaction involving the Fund's assets must therefore be undertaken only on notice to the JOLs.

Separately we understand that you (Campbells) have circulated outstanding invoices to the JOLs and have indicated that you intend to submit a proof of debt against the Company in due course. Please also explain therefore the basis on which as a purported creditor of the Company you consider you are able to act for the entities holding assets to which the Company has *prima facie* claims.

Should you and/or your clients fail to provide satisfactory responses to the JOLs by 5pm on **30 May 2025**, the JOLs reserve their right to seek appropriate orders against your clients without further notice.

Yours faithfully

**Johnstone Law**

2

## Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**D** +1 345 914 5898
**T** +1 345 949 2648
**F** +1 345 949 8613
**E** MGoodman@campbellslegal.com

campbellslegal.com

Our Ref:  MGM/ROD/18955-44959
Your Ref:

CAYMAN **|** BVI **|** HONG KONG

**BY EMAIL**

Johnstone Law
Unit 9, Tropic Centre
18 Earth Close,
PO Box 926,
Grand Cayman, KY1-9006
Cayman Islands

30 May 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

We refer to your letters dated 22 and 30 May 2025 sent on behalf of the joint official liquidators (the "**JOLs**") of the Company.  Capitalised terms, unless otherwise defined, adopt the definitions applied in our letters dated 12 and 16 May 2025 ("**Our Letter**)" which were addressed to the JOLs.

As a preliminary point, we received a letter from Maples and Calder dated 28 May 2025 indicating that they have recently been instructed to act for the JOLs. We understood, based on your 22 May letter, that Johnstone Law were engaged as counsel by the JOLs (subject to sanction by the Court). In circumstances where two law firms are now corresponding with us, purportedly on behalf of the JOLs, it is incumbent on the JOLs to immediately clarify the situation.

Please confirm, by **no later than 5pm on Monday, 2 June 2025**, the respective roles of Maples and Calder and Johnstone Law.

**Attendance at the Directions Hearing**

1.  Your letters repeatedly assert that our clients have "*no standing in the liquation*". This is patently incorrect. The JOLs were specifically authorised to commence proceedings against our client as a direct result of the evidence and draft order prepared by your firm, on behalf of the petitioner, at

3203729-1

#3248355v4

the supervision hearing.[1] This resulted in the Court making an Order which granted the JOLs authority to present a petition / seek the appointment of provisional liquidators to the Fund before they could possibly have had an opportunity to consider the relevant facts, or if such steps were necessary or appropriate. In the circumstances, it is obvious that, (i) your firm cannot objectively advise the JOLs, and (ii) the Fund, as a party named in the Appointment Order, have standing to address the Court on those provisions.

2.   As Lord Millet observed on behalf of the Privy Council in *Deloitte and Touche AG v Johnson,*[2] "*Orders made by the court are coercive. Every order of the court affects the freedom of action of the party against whom it is made*". Accordingly, when determining whether an applicant has standing, the Court will first consider if it has jurisdiction to make the order, and secondly, in words of Lord Millet, whether the applicant has a "*legitimate interest in the relief which they seek*". Clearly, given the Fund is the party directly affected by the inclusion of these '*coercive*' provisions, they have standing to bring an application to have the offending paragraphs removed from the Appointment Order.

3.   As regards the reporting 'Protocol' proposed in Our Letter and referred to at the Directions Hearing, your 22 May letter, despite seeking "*assurances regarding the assets under the control of*" our clients, did not address the Protocol, or take us up on our offer to "*discuss the terms of the Protocol in further detail*". We were therefore surprised to hear Mr Johnstone summarily dismiss the Protocol as "*paper thin*" at the Directions Hearing. For the avoidance of doubt, our clients' offer to enter into a reporting Protocol in respect of material transactions remains open (to which, see paragraph 12 below).

4.   As to the balance of the entirely baseless criticisms in your 30 May letter, we have no obligation to, and no intention of, addressing these. The appropriate forum to address those issues was in front of Mr Justice Asif KC at the Directions Hearing. They warrant no further comment.

**JOLs' Powers**

5.   As regards paragraph 3 of your 22 May letter, the powers conferred on liquidators by the CWR and the Act to collect in the books and records of a company in liquidation, including those in paragraph 1 of Part II to Schedule 3, are to be exercised by the liquidator in respect the "*property of the Company*" and / or "*the company's books and records*". As these statutory powers do not extend to distinct legal entities which are not the subject of a liquidation or other court order, it follows

---

[1] Your 22 May letter indicates that these provisions were granted by the Court "*on the basis of the evidence before it*", although it is notable that you have not provided the transcript of the petition hearing (insofar as it relates to paragraphs 6(a) and (b) of the Appointment Order) we requested in Our Letter, or confirmation as to whether these provisions were addressed in legal submissions.

[2] [1999] CILR 297

2

3203729-1

that our clients' documents are not the "*property of the Company*" and JOLs have no basis to claim that the Company is entitled to these documents.

6.  Further, any duty which Messrs Patrick or Murphy owe to the JOLs in their capacity as former directors of the Company does not extend to the books and records of the CDM Entities which are separate entities over which the JOLs have no power or authority. It is plainly incorrect to suggest that directors of the CDM Entities can disregard their duties to those companies on the basis of your assertion that they fall within the definition of "relevant persons" under s.103 of the Act. Directors are bound by duties under common law and statute to protect the interests, confidentiality, and assets of the companies they serve. To comply with your baseless requests would place them in breach of those duties unless and until a court determines otherwise.

7.  If the JOLs believe it necessary to investigate particular transactions involving the CDM Entities, the proper course is to seek the appropriate order from the Grand Court under section 103 or 138 of the Act. This approach ensures that the statutory process is respected and our clients' rights are protected.

**Response to Requests in your 22 May Letter**

8.  In response to the requests listed at paragraph 5 of your 22 May letter, please see the Schedule to this letter which lists each of the CDM Entities we represent.

9.  As to paragraphs 5(b), (c) and (d), for the reasons outlined above, your request for extensive documentation, including registers, asset holdings, and transaction histories, has no legal basis. Nor is there any basis on which the JOLs can demand "*firm undertakings*" from our clients not to deal with their assets.

10. We do not understand the reference to the purported transaction involving Hunter Mountain Trust in your 30 May letter. The bare assertion of a proprietary claim (which is made for the first time in this letter) is completely unsubstantiated and legally flawed. Needless to say, the JOLs have no interest, proprietary or otherwise, in any assets held by the Fund and our clients do not need to seek approval or consult with the JOLs regarding transactions in the ordinary course of business.

11. Notwithstanding, our clients have already offered to enter into a reporting Protocol in an effort to assuage any misplaced concerns the JOLs may have regarding the commercial activities of the Fund and the risk of dissipation of assets outside of the ordinary course of business. However, it is notable that your letters have eschewed this reasonable and constructive proposal in favour of misconceived and unsustainable requests of our clients.

3

3203729-1

#3248355v4

12. We now enclose a draft reporting Protocol whereby our clients offer to provide, *inter alia*, the following information to the JOLs:

   (a) a report listing all transactions undertaken by the Fund, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000;

   (b) a 'business plan' explaining the ordinary day to day business of the Fund;

   (c) a monthly transactions report; and

   (d) advance notice of any single transaction exceeding US$5,000,000, or any series of transactions in an aggregate amount exceeding US$5,000,000 (save for transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers).

13. For the avoidance of doubt, our clients reject the suggestion that they are under any duty to provide this information. However, in circumstances where the CDM Entities, including the Fund, are operating in the ordinary course to make investments on behalf of, and to support charitable causes, our clients are offering this Protocol to ensure that these charitable operations are not unnecessarily impacted by the JOLs.

14. Please confirm your agreement to, or provide any comments on, the draft protocol by **3pm on Wednesday, 4 June 2025**.

**Paragraphs 6(a) and 6(b) of the Appointment Order**

15. With regard to paragraphs 6(a) and (b) of the Appointment Order, as noted above and in Our Letter, we have serious concerns regarding the propriety of the JOLs seeking to retain the same counsel who had expressly sought, and obtained, an order that the JOLs be authorised to present a petition for the winding up of, and appointment of provisional liquidators to, the Fund "*if so advised*". There is simply no legal or practical basis for the JOLs to present a petition for the winding up of the Fund and, as foreshadowed at the Directions Hearing, our clients intend to apply to have paragraphs 6(a) and (b) struck from the Appointment Order.

16. It is well established in this jurisdiction that, per Mr Justice Jones KC in *Re ICP Strategic Credit Income Fund Limited*,[3] "*an official liquidator's power to 'bring or defend any action or other legal proceeding in the name and on behalf of the company' is exercisable only with the sanction of the Court.*" In addition, when determining whether to sanction such proceedings, "*the court must be satisfied that they have causes of action against the proposed defendants with a reasonable prospect of success*

---

[3] [2014] 1 CILR 314

4

3203729-1

1182

*and that the interests of the creditors will be best served by allowing proceedings to be commenced. As officers of the court, official liquidators are expected to behave in an exemplary manner and to perform their duties and exercise their powers fairly. The court will not allow its official liquidators to threaten or commence litigation speculatively as a means of extracting a settlement from a party against whom there is no genuine cause of action or no evidence from which to infer that a possible cause of action has any real prospect of success*" (at paragraph 10).

17. Accordingly, it is clear that, despite the inexplicable inclusion of paragraphs 6(a) and (b) in the Appointment Order, the JOLs should be expected to obtain Court sanction before issuing any proceedings in the name of the Company. However, were the JOLs to seek sanction for the presentation of a winding up petition against the Fund, such an application would be destined to fail in circumstances where, for the reasons outlined in Our Letter, there is no genuine cause of action and no realistic prospect of the petition being successful.

18. Furthermore, given these provisions were sought and included in the Appointment Order without any proper consideration of the underlying transactions or the relevant facts, our clients have serious concerns with the manner in which the JOLs, presumably influenced by legal counsel, appear to have predetermined the course of the liquidation and the investigations which will be required into the affairs of our clients. Such conduct by the JOLs, without first ensuring they are "*thoroughly acquainted with the affairs of the company*" clearly disregards the dicta of the Court of Appeal in *In re Contract Corporation, Gooch's Case* (as applied by the Cayman Islands Court of Appeal in *In Re China Branding Group Ltd*).[4] In the circumstances, Mr Justice Jones KC's observation at paragraph 11 in *Re ICP Strategic Credit Income Fund Limited* that "*the Court's decision to sanction the commencement of litigation can never be entirely divorced from questions about how and by whom it will be financed*" seems particularly relevant.

19. We enclose herewith a draft Summons seeking a variation of the Appointment Order by removing paragraphs 6(a) and (b). As stated at the Directions Hearing, our instructions are to file this Summons and, given the narrow scope of the issue to be determined, to request that it is heard with the existing JOLs' sanction application on 24 June 2025.

20. However, in the circumstances, including, *inter alia*, the reasons set out above, we believe it would be practical for the JOLs to agree to vary the Appointment Order without requiring the issuance of

---

[4] In *re Contract Corporation, Gooch's Case* [1871] 12 LR Ch App 207, p 211: "*In truth, it is of the utmost importance that <u>the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding up. He should have no leaning for or against any individual whatever.</u> <u>It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company</u>; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect*" (emphasis added).

5

3203729-1

#3248355v4

1102

**CONFIDENTIAL**                                                                    TDIT006140

a Summons and the associated hearing costs. We therefore invite the JOLs to agree a consent order agreeing that paragraphs 6(a) and (b) should be struck from the Appointment Order which we can jointly submit for His Lordship's consideration.

21. Please confirm by **3pm (Cayman Islands time) on Wednesday, 4 June 2025**, if the JOLs are amenable to agreeing a consent order in the manner proposed. If we do not hear from you before this, we are instructed to file a Summons without further notice to you and will rely on this letter for costs purposes.

Yours faithfully,

**Campbells LLP**

3203729-1

#3248355v4

**CONFIDENTIAL**                                                    **TDIT006141**

**FSD2025-0116** 2025-08-19

**Schedule**

(i)      CDH GP, Ltd. (Cayman Islands)

(ii)     CDMCFAD, LLC (Delaware)

(iii)    Charitable DAF Fund 2, LP (Cayman Islands)

(iv)    Charitable DAF Fund, LP (Cayman Islands)

(v)     CLO HoldCo, Ltd. (Cayman Islands)

(vi)    Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)   HCT Holdco 2, Ltd. (Cayman Islands)

(viii)  MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)    Liberty CLO HoldCo, LLC (Delaware)

(x)     Liberty Sub, Ltd. (Delaware)

(xi)    Charitable DAF Holdings Corp. (Delaware)

(xii)   DST Investco, LLC (Delaware)

(xiii)  Allanon Capital Management LLC (Texas)

7

3203729-1

#3248355v4

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

———————————

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

———————————

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a)    *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b)    *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")

2033932-1

#3253267v2

CONFIDENTIAL                                                                              TDIT006143

**FSD2025-0116**   **2025-08-19**

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick and Paul Murphy are the directors of the GP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a) To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

b) To the Directors:

---

[1]Letter dated 22 May from Johnstone Law to Campbells.

2

**FSD2025-0116**  **2025-08-19**

**CONFIDENTIAL**  **TDIT006144**

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

**2        Transactional Reporting**

2.1      Upon execution of this Protocol, the Directors will provide a report to the JOLs listing all transactions undertaken by DAF LP, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000.

2.2      The Directors shall provide a business plan within 21 days of the signing of this Protocol which can be revised from time-to-time if it is determined to be necessary by the Directors and within the ordinary course of buisness for DAF LP (the "**Business Plan**"). Steps taken with respect to the management of DAF LP will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.3      The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Mission Statement. The Directors shall provide a monthly transactions report to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.

2.4      If the JOLs have any doubt about whether a transaction is or is not in the ordinary course of DAF LP's business, they may contact the Directors for clairfation.

2.5      The Directors will endeavour to provide advance notice to the JOLs in respect of any single transaction of DAF LP exceeding US$ 5,000,000 or any series of transactions in an aggregate amount exceeding US$5,000,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or related to the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6      Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3        Legal and Professional Fees**

The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4        Consultation**

Save in exceptional circumstances, the JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM

3

**FSD2025-0116**                                                                                    **2025-08-19**

Entities. The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.

**5        Confidentiality**

5.1       In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a)   keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 6.2 below; and

(b)   ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2       The JOLs may disclose Confidential Information:

(a)   to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b)   where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c)   with the Directors' prior written consent.

**6        Formalities**

6.1       This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2       This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3       For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4       In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such

4

complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct. If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary). Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

5

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 423 of 759

**Annexure 1 – List of CDM Entities**

(i)    CDH GP, Ltd. (Cayman Islands)

(ii)   CDMCFAD, LLC (Delaware)

(iii)  Charitable DAF Fund 2, LP (Cayman Islands)

(iv)   Charitable DAF Fund, LP (Cayman Islands)

(v)    CLO HoldCo, Ltd. (Cayman Islands)

(vi)   Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)  HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)   Liberty CLO HoldCo, LLC (Delaware)

(x)    Liberty Sub, Ltd. (Delaware)

(xi)   Charitable DAF Holdings Corp. (Delaware)

(xii)  DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

TDIT006148

**FSD2025-0116**

2025-08-19

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

_____

**SUMMONS**

_____

**LET ALL PARTIES CONCERNED** attend before the Judge in Chambers, at the Law Courts, George Town, Grand Cayman on        day of        2025, at        am/pm, on the hearing of an application by Charitable DAF Fund, LP (the "**DAF LP**") that:

1. The supervision order in these proceedings dated 6 May 2025 which ordered, _inter alia_, that the voluntary liquidation of Charitable DAF HoldCo, Ltd be continued under the supervision of the Court pursuant to s.131 of the Companies Act (2025 Revision) and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation) (the "**Supervision Order**") be varied such that paragraphs 6(a) and 6(b) of the Supervision Order, which authorised the joint official liquidators to take certain steps in respect of DAF LP, be deleted forthwith.

2. Such further or other orders and directions as the Court thinks fit.

3. Orders as to costs.

This **Summons** was filed by Campbells LLP, Attorneys-at-Law for and on behalf of the DAF LP, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959).

#3245656v1

**FSD2025-0116**

2025-08-19

1111

**FSD2025-0116**                                       **2025-08-19**

Dated: [.] May 2025

_____

**Campbells LLP**

Attorneys for the Charitable DAF Fund, LP

**TO:**              The Registrar of the Financial Services Division

**AND TO**:         Johnstone Law, Attorneys for the Joint Official Liquidators

**TIME ESTIMATE**:   1 hour

2

This **Summons** was filed by Campbells LLP, Attorneys-at-Law for and on behalf of the DAF LP, whose address for service is Floor 4 Willow House, Cricket Square, George Town, Grand Cayman (Ref: MGM/ROD/18955-44959)

#3245656v1

**FSD2025-0116**                                                        **2025-08-19**

**CONFIDENTIAL**                                                        TDIT006150

**FSD2025-0116**



**2025-08-19**

5 June 2025
aj@j-law.ky
+1 (345) 929 3000
Ref: 00022

Campbells LLP
Floor 4, Willow House Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

**By email: mgoodman@campbellslegal.com**

Dear Colleagues

**Charitable DAF HoldCo, Ltd (In Official Liquidation) (the *Company*) | FSD No. 116 of 2025 (JAJ)**

We refer to your letter dated 30 May 2025 and our recent correspondence in relation to the above matter.

**Maples engagement**

1.  The JOLs have engaged both Johnstone Law (*JL*) and Maples and Calder (Cayman) LLP (*Maples*) in these proceedings and their respective involvement subject to the JOLs oversight and instruction. Both engagements are subject to the sanction of the Court.

**Directions Hearing**

2.  The Directions Hearing related to an application for sanction under s.110 of the Act of the attorneys engaged by the JOLs. Irrespective of wider questions of standing (see below), your clients have and had no arguable standing to appear on a sanction application, being neither creditors nor contributories of the Company. You avoid this question because there is no answer to it.

3.  With respect to your assertion that the specific terms of the Appointment Order give your clients standing to challenge it – you are simply wrong.

**JOLs' Powers and Requests for Information**

4.  The JOLs assert no right to the books and records of your clients under their powers to collect in the books and records of the Company and your refusal to cooperate on this basis is entirely unhelpful.

5.  The JOLs were appointed on 6 May 2025 and have now been in office almost a month. Despite ample opportunity, almost no information of substance or genuine utility has been provided to the JOLs by the majority of parties, your clients included. Instead, the weeks since the JOLs' appointment have been occupied with meritless challenges and tenuous technical objections at best rather than assisting the liquidators in their investigation of the C$270m that has been removed from the Company.



Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman
PO Box 926, 10 Market St, Grand Cayman, KY1-9006
345 929 3000 | info@j-law.ky | www.j-law.ky | LinkedIn

**FSD2025-0116**

**2025-08-19**
1113

CONFIDENTIAL

TDIT006151

6.    It is mandatory for your clients to cooperate with the JOLs and they are choosing not to do so. If required, as warned, the JOLs will take steps to obtain the information they require with the assistance of the Court.

**Protocol**

7.    The JOLs' preliminary view is that the Company may have inter alia clear prima facie proprietary and other claims to the asset transferred pursuant to the transfer of the Company's interest in the Charitable DAF Fund, LP to your client, CDMCFAD, LLC, pursuant to a deed of assignment and assumption on 18 December 2024 (the **Deed**). Nothing in your letter changes that analysis.

8.    The protocol you propose is entirely inappropriate both to responding to proprietary claims and to the current circumstances. No dealing of any nature is appropriate in assets over which proprietary claims are asserted, whether in the ordinary course of business or subject to any threshold. Further, no expenditure from these assets on legal or any other professional fees is appropriate at any time.

9.    It is in any event impossible for the JOLs to engage with the protocol in circumstances where they have no serious knowledge or understanding of what is happening at any underlying level.  Your clients have had since 12 May 2025 to provide that knowledge and understanding and continue to decline to provide it to the JOLs.  We again urge all your clients to set aside their distractive tactics and cooperate, and provide all information and documents, in an open and frank manner.

10.   In the circumstances, the JOLs require your clients to provide undertakings by **3pm on 6 June 2025** that there will be no dealing in the assets formerly owned by the Company, and the provision of full and complete information on the whereabouts, ownership and control of all assets owned by the Company (directly or indirectly, legally or beneficially) prior to execution of the Deed. Nothing short of those assurances and undertakings is acceptable at this stage to the JOLs.

**Hunter Mountain Investment Trust**

11.   We highlight below one specific aspect of the JOLs' concerns about dealing in assets.  This relates to the Hunter Mountain Investment Trust (**HMIT**) transaction. As stated in our 30 May letter, the JOLs have become aware that your clients have, since receipt of the JOLs letter dated on 12 May 2025 (the **Initial Letter**), and without notice to the JOLs, sought approval of a transaction involving HMIT.  We requested information about this transaction and sought your urgent confirmation that no transactions will be undertaken involving any assets held by them.

12.   HMIT was formerly the sole beneficiary of the Rand PE Fund, I, LP.  The disclosure of those for whom you act includes a number of entities unknown to the JOLs, and does not include the HMIT Entities[1] which formerly held Fund assets.

---

[1]  '**HMIT Entities'** defined in Settlement Agreement as Hunter Mountain Investment Trust, Beacon Mountain LLC, Rand Advisors LLC, Rand PE Fund I, L.P, Rand-PE Fund Management, LLC, Atlas IDF, LP, and Atlas IDF GP, LLC

13. In your 30 May letter, you stated that your clients *"do not understand the reference to the purported transaction involving HMIT"*. The JOLs have however since been provided with a copy of a settlement agreement between the Highland Entities[2] and the HMIT Entities[3] (the **Settlement Agreement**) which was **executed by Mark Patrick on behalf of the HMIT Entities** on <u>19 May 2025</u> – a mere matter of days after receipt of the Initial Letter.

14. Under the Settlement Agreement, HMIT stands to receive *inter alia* (i) initial payment of US$500,000, (ii) promissory note with an original face amount of $24,268,621.69 and other interests, (iii) distributions from its *Class 10 Interest* until 2029, and (iv) distributions from various other interests.

15. This appears to be a transaction involving assets which at some stage were indirectly owned by the Company, although your clients' continued non-disclosure makes it difficult for the JOLs to conduct a full and complete analysis of the true position. It is particularly concerning however that this transaction was executed after the JOLs' appointment and without notice to the JOLs, and it would be inappropriate for this transaction to be approved without their input, or at the very least prior to the JOLs being fully apprised of the nature and circumstances giving rise to this transaction. Please provide a full explanation, with all relevant details, by return.

**Appointment Order**

16. It is a matter for your clients if they wish to seek to challenge the Appointment Order, albeit such an application would clearly be hopeless.

17. The evidence supporting the applications in FSD No. 99 and FSD No. 116 was uncontested, and the issues ventilated over the course of two hearings during which Justice Asif KC engaged with the parties as to the form of the draft order, and indeed variously amended its terms (which is abundantly clear on the face of the draft and final versions).

18. The JOLs do not consent to the proposed (or any other) variation of the Appointment Order.

**Conclusion**

19. The JOLs would prefer to work cooperatively and constructively with your clients to protect the assets of the Fund and to "hold the ring", to obtain information necessary for the JOLs' investigations, and to expedite the conclusion of those investigations. They have provided a more than significant opportunity for your clients to offer and provide such cooperation, but it has not been forthcoming. On the contrary, your clients have continued to deal in assets to which the JOLs assert claims, without notice to the JOLs and have behaved antagonistically and obstructively.

20. Should your clients fail to provide the information and undertakings requested by **4pm** on **6 June 2025**,

---

[2] '**Highland Entities'** defined in H Settlement MIT Agreement as Highland Capital Management, L.P, Highland Claimant Trust, Highland Litigation Sub-Trust, and Highland Indemnity Trust

[3] As defined in [1] above.

3

**CONFIDENTIAL**        TDIT006153

the JOLs will seek the assistance of the Court on these matters, without further notice.

Yours faithfully

**Johnstone Law**

# Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**BY EMAIL**

D +1 345 914 5898
T +1 345 949 2648
F +1 345 949 8613
E MGoodman@campbellslegal.com

Johnstone Law
Unit 9, Tropic Centre
18 Earth Close,
PO Box 926,
Grand Cayman, KY1-9006
Cayman Islands

campbellslegal.com

Our Ref:  MGM/ROD/18955-44959
Your Ref:

CAYMAN **|** BVI **|** HONG KONG

9 June 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

1.  Further to previous correspondence in relation to this matter, we enclose herewith a revised reporting protocol for the JOLs' consideration.

2.  As indicated in previous correspondence, we believe the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the Fund's assets outside of the ordinary course of business during the currency of the liquidation.

3.  For convenience, our clients' proposed amendments are tracked in the enclosure and serve to; (i) remove the value threshold from the historical reporting obligation at paragraph 2.1, and (ii) reduce the value threshold for the provision of advance notice at paragraph 2.5.

4.  Please confirm your agreement to, or provide any comments on, the draft protocol by **3pm on Wednesday, 11 June 2025**, failing which we are instructed to file a Summons without further notice and will rely on this letter, and previous correspondence, for costs purposes.

Yours faithfully,

*Campbells LLP*

3203729-1

#3264473v1

CONFIDENTIAL                                                                 TDIT006155

1198

**FSD2025-0116**                                                                                           **2025-08-19**

**Campbells LLP**

2

3203729-1

#3264473v1

**FSD2025-0116**                                                                                           **2025-08-19**

1118

**CONFIDENTIAL**                                                                                    **TDIT006156**

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

------------------

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

------------------

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a) *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b) *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")

**Formatted:** Font: Bold

**Formatted:** Font: (Default) Calibri, 10 pt

2033932-1

#3253267v3#3253267v3#3253267v2

**FSD2025-0116**                                                                 2025-08-19

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick and Paul Murphy are the directors of the GP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a)   To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

---

[1] Letter dated 22 May from Johnstone Law to Campbells.

2

**Formatted:** Font: (Default) Calibri, 10 pt

#3253267v3

FSD2025-0116                                                                    2025-08-19

b) To the Directors:

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

**2    Transactional Reporting**

2.1    Upon execution of this Protocol, the Directors will provide a report to the JOLs listing all transactions undertaken by DAF LP, or any of the CDM Entities, since 27 March 2025 which exceed US$5,000,000.

2.2    The Directors shall provide a business plan within 21 days of the signing of this Protocol which can be revised from time-to-time if it is determined to be necessary by the Directors and within the ordinary course of buisness for DAF LP (the "**Business Plan**"). Steps taken with respect to the management of DAF LP will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.3    The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Mission Statement. The Directors shall provide a monthly transactions report to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.

2.4    If the JOLs have any doubt about whether a transaction is or is not in the ordinary course of DAF LP's business, they may contact the Directors for clairfation.

2.5    The Directors will endeavour to provide advance notice to the JOLs in respect of any single transaction of DAF LP exceeding US$ 51,000,000 or any series of transactions in an aggregate amount exceeding US$51,000,000 **SAVE THAT** advance notice is not required, in relation to any single transaction or series of transactions in the ordinary course of business involving or related to (i) the proper operation and administration of the DAF Structure; and (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.6    Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3    Legal and Professional Fees**

The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4    Consultation**

**Formatted:** Font: (Default) Calibri, 10 pt

3

#3253267v3

FSD2025-0116                                                                    2025-08-19

1121

CONFIDENTIAL                                                                    TDIT006159

Save in exceptional circumstances, the JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities. The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.

**5      Confidentiality**

5.1     In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a)  keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph ~~6~~5.2 below;

~~(a)~~(b)          Not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

~~(b)~~(c)          ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2     The JOLs may disclose Confidential Information:

(a)   Subject to the restrictions in paragrpah 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b)   where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c)   with the Directors' prior written consent.

**6      Formalities**

6.1     This Protocol may not be waived, varied or amended without consent in writing from all parties.

> **Formatted:** Font: (Default) Calibri, 10 pt

4

#3253267v3

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3 For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4 In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct. If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary). Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

**Formatted:** Font: (Default) Calibri, 10 pt

#3253267v3

**CONFIDENTIAL** **TDIT006161**

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 437 of 759

**Annexure 1 – List of CDM Entities**

| | |
|---|---|
| (i) | CDH GP, Ltd. (Cayman Islands) |
| (ii) | CDMCFAD, LLC (Delaware) |
| (iii) | Charitable DAF Fund 2, LP (Cayman Islands) |
| (iv) | Charitable DAF Fund, LP (Cayman Islands) |
| (v) | CLO HoldCo, Ltd. (Cayman Islands) |
| (vi) | Liberty CLO HoldCo, Ltd. (Cayman Islands) |
| (vii) | HCT Holdco 2, Ltd. (Cayman Islands) |
| (viii) | MGM Studios Holdco, Ltd. (Cayman Islands) |
| (ix) | Liberty CLO HoldCo, LLC (Delaware) |
| (x) | Liberty Sub, Ltd. (Delaware) |
| (xi) | Charitable DAF Holdings Corp. (Delaware) |
| (xii) | DST Investco, LLC (Delaware) |
| (xiii) | Allanon Capital Management LLC (Texas) |

**Formatted:** Font: (Default) Calibri, 10 pt

#3253267v3

TDIT006162

**FSD2025-0116**    **Page 1209 of 1530**    2025-08-19



**MAPLES GROUP**

| | |
|---|---|
| **Our ref:** | CJM/JRN/858403-000001/83247181 |
| **Direct tel:** | +1 345 814 5245 / +1 345 814 5497 |
| **Email:** | caroline.moran@maples.com / luke.armitage@maples.com |

**By Email**

Campbells LLP
Floor 4, Willow House
Cricket Square
Grand Cayman
KY1-9010
Cayman Islands

Attn: Mark Goodman

19 June 2025

Dear Colleagues

**Charitable DAF HoldCo, Ltd (In Official Liquidation) (the "Company")**

**FSD Cause No: 2025-116 (JAJ)**

1    We refer to your letter to Johnstone Law dated 9 June 2025 and the previous correspondence in relation to the draft protocol as to the conduct and management of Charitable DAF Fund, LP (the "**Fund**") and related entities.

2    The JOLs appreciate your clients preparing a revised version of the protocol (the "**CDM Protocol**"). However, the JOLs' position is that the terms proposed by your clients are inadequate to serve the purpose of the protocol in a number of respects.

3    Rather than seek to significantly amend the CDM Protocol, the JOLs have prepared their own version in a form acceptable to them (copy enclosed) (the "**JOLs' Protocol**").  The JOLs' Protocol approximates as much as possible the level of protection that the JOLs/Company could expect to receive from an injunction order against your clients and ancillary disclosure orders.  This is both necessary and justified in the present circumstances.  Please note that whilst we are happy to use the language of "protocol", we will require any agreed scheme to be incorporated into an undertaking given formally in writing to the Court not only by your clients but also by the clients of Baker & Partners and Kobre & Kim (each of whom are copied to this letter).

4    Without being exhaustive, some of the aspects of the CDM Protocol which are unacceptable to the JOLs are:

Maples and Calder (Cayman) LLP
PO Box 309  Ugland House  Grand Cayman KY1-1104  Cayman Islands
Tel +1 345 949 8066  Fax +1 345 949 8080  maples.com

**FSD2025-0116**    2025-08-19
1125

**CONFIDENTIAL**    TDIT006163

1206

4.1 There is no provision expressly requiring CDH GP, Ltd. (the "**GP**"), CDMCFAD, LLC ("**CDM**") and DFW Charitable Foundation ("**DFW**") from disposing of or diminishing the value of any interest they hold in the Fund and its assets. This is an essential term that is needed in order to preserve the status quo whilst the JOLs continue their investigations.

4.2 Similarly, there should be an express requirement that Mark Patrick and Paul Murphy (together, the "**Directors**") and DFW must preserve any assets in their possession or control which have been previously been paid to them by the Company, the Fund and/or CDM, whether by way of distribution, divided or otherwise.

4.3 In relation to the proposed historical transaction report, the CDM Protocol would only require the Directors to provide confirmation of all transactions of the Fund and related entities since 27 March 2025 (i.e. just over 2 months ago). That period is obviously inadequate to serve the purpose of the protocol. The JOLs' position is that the period should commence on no later than 27 February 2024, being the date that the GP was incorporated and took over management of the Fund. Further, your clients' proposed reporting period would not cover the full period of the relevant sequence of transactions involved in the DAF Restructuring, which is not acceptable to the JOLs.

4.4 The CDM Protocol is lacking in any details of what is to be included in the historical transaction report (and in the monthly transaction reports moving forward). This is provided for at sections 3.1-3.2 and 4.9-4.12 of the JOLs' Protocol. This will add necessary certainty to your clients' obligations and will minimise the scope for future disputes about what is required. The required details are uncontroversial and we expect your clients will have no objection to them.

4.5 The CDM Protocol also would not require your clients to give full disclosure of the Fund's and related entities' assets and their current value. This is necessary in order for the JOLs to be able to properly police your clients' property preservation obligations referred to above and properly assess any requests by your clients to approve certain transactions moving forward.

4.6 The CDM Protocol is lacking any meaningful details as to what is to be included in the business plan for the ongoing management of the Fund and related entities and the deadline by which it should be submitted to the JOLs for approval. The JOLs' Protocol expressly provides for the information that is to be included in the business plan and requires the business plan to be provided to the JOLs within 21 days of execution of the protocol (with the JOLs then having 21 days to agree to it or reject it, in which case the JOLs can seek appropriate relief from the Court).

4.7 As there is likely scope for debate as to what is meant by the "ordinary course of business", we propose that your clients provide a written outline of what activities are within the Fund's "ordinary course of business" for the JOLs' approval. Your clients' proposed Protocol also does not prevent your clients from undertaking transactions that are not in the Fund's ordinary course of business. That is, for obvious reasons, an essential requirement for the JOLs and has therefore been included in the JOLs' Protocol.

4.8 The protocol needs to put in place protections for the period between the protocol being executed and the Business Plan being agreed. The JOLs' position is that the appropriate way to address this is to require that your clients must provide the JOLs with at least 7 days'

CONFIDENTIAL TDIT006164

advance notice of any transactions affecting the Fund, or any assets of the Fund, and for the JOLs to review and approve the transactions.

4.9   The US$1,000,000 threshold for transactions that are to be reported to the JOLs in the monthly transaction reports is still far too high.  The threshold should be set at what would be a typical threshold for a freezing injunction and disclosure orders, say US$10,000.  In addition, merely requiring the Directors to "endeavour" to provide advance notice of transactions is not sufficient.  The Directors must be required to provide written notice of a proposed transaction and the JOLs will then have the opportunity to approve or reject if it appears to be outside of the Fund's ordinary course of business or otherwise raises concerns.

4.10   Clause 2.6 of the CDM Protocol is not acceptable to the JOLs.  It is far too broad and leaves it up to the Directors to take virtually any action if they, in their discretion, consider it reasonably necessary to comply with their legal obligations.

4.11   Clause 4 of the CDM Protocol is also unacceptable to the JOLs.  The clause as presently drafted presupposes that the JOLs would consciously decide to exceed their powers, which the JOLs wholly disagree with.  The JOLs will exercise their powers in accordance with the order appointing them, any sanction obtained from the Court and their powers under the Companies Act (As Revised). If the JOLs need to obtain sanction to exercise a certain power, the JOLs will make a sanction application and attend to service as required.

5   Please confirm your clients' agreement to giving an undertaking to the Court in the form of the enclosed Protocol or provide comments by no later than 12pm on Thursday, 26 June 2025.  If ultimately the Protocol cannot be agreed by our respective clients, the JOLs reserve all of their rights to take other appropriate protective measures.

Yours faithfully

Maples and Calder (Cayman) LLP

With copy to:

Baker & Partners
PO Box 636
Buckingham Square
720 West Bay Road
Grand Cayman
KY1-1107
Cayman Islands
Attn: Jennifer Colegate

Kobre & Kim
9 Forum Lane
Camana Bay

**FSD2025-0116**                                                          **2025-08-19**

Grand Cayman
KY1-9006
Cayman Islands
Attn: Peter Tyers-Smith

**PROTOCOL AND COURT UNDERTAKING IN RESPECT OF CHARITABLE DAF FUND, LP (THE "FUND") AND THE FUND ENTITIES**

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision).

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025, the Court determined the supervision application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmik be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

**Preliminary statement**

The Fund is a Cayman Islands exempted limited partnership formed on 28 October 2011.  CDH GP, Ltd. (the "**GP**"), is a Cayman Islands company incorporated on 27 February 2024 and is the general partner of the Fund.  Mark Patrick is the sole director of the GP. Mr Patrick is also the Manager of CDMCFAD, LLC ("**CDM**") and the registered director, president and sole member of DFW Charitable Foundation ("**DFW**"). HoldCo was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011.  Until its voluntary liquidation on 2 April 2025, the directors of HoldCo were Mr Patrick and Paul Murphy (the "**Directors**").  From its incorporation until 27 March 2025, HoldCo was the sole limited partner of the Fund through which it indirectly owned the other entities in the DAF Structure (the "**Fund Entities**")[1]. For the avoidance of doubt, "Fund Entities" includes any other entities identified pursuant to clause 4.4(a) below.

The purpose of this protocol (the "**Protocol**") is to ensure the efficient and orderly administration of the Fund and the Fund Entities. The Protocol is designed to avoid conflict between the JOLs and the Fund, to assuage any concerns the JOLs may have regarding the commercial activities of the Fund and the Fund Entities with respect to the risk of dissipation / misuse of assets, and to (subject to compliance with the terms of this Protocol) avoid the need for the JOLs to seek injunctions and ancillary disclosure orders against the Fund and/or the Fund Entities.

1      **Notices**

1.1      In the interests of expedience, the JOLs and the Directors agree that any notices or communication required under this Protocol shall be sent by email as follows:

(a)      To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com

Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com

CDAF Core - CDAF.Core@uk.gt.com

(b)      To the Directors, the Fund, the GP, CDM and DFW:

Mark Patrick - mpatrick@dafholdco.com and mpatricktax1040@gmail.com

---

[1] As listed in Schedule A to the Protocol

CONFIDENTIAL                                                                                TDIT006167

Paul Murphy - paul@gkmanagement.com.ky

**2**      **Preservation of Property**

2.1      The GP, CDM and DFW each agree that they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish the value of (as applicable) their or any interest (of whatsoever nature), whether held directly or indirectly, in the Fund, and/or the Fund Entities and/or any assets of the Fund.

2.2      The Directors and DFW each agree that they will preserve and will not in any way dispose of, deal with, encumber, transfer or diminish any assets in their possession or control, whether they are in or outside the Cayman Islands, which were, are or may be received (whether directly or indirectly) by way of distribution, disposition, dividend, benefit, payment or other transfer from the HoldCo, and/or CDM and/or the Fund, and/or the Fund Entities and/or any assets of the Fund.

2.3      The Directors, the Fund, GP, CDM and DFW each agree that they shall not do anything to cause, procure, incite, promote or assist a breach by any other party of the above clauses 2.1 and 2.2 of this Protocol.

**3**      **Historical Transaction Report and Disclosure of Assets**

3.1      Within 14 days of the execution of this Protocol, the Directors shall provide to the JOLs a written report listing all transactions undertaken by the Fund and/or any of the Fund Entities since 27 February 2024 to the date of the report (the "**Historical Transaction Report**"). For each transaction in the Historical Transaction Report, the Directors shall include at least the following details:

(a)      The date of the transaction;

(b)      The identity of any party(ies) depositing funds in respect of the transaction;

(c)      The identity of any party(ies) receiving funds in respect of the transaction; and

(d)      An explanation as to the nature and purpose of the transaction.

3.2      Notwithstanding the above, the Historical Transaction Report must include the following:

(a)      Full details of all entities owned by the Fund, whether through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

(b)      With respect to the Fund Entities, full details of the holders of shares or other membership interests, directors, officers or other controllers, and places and details of incorporation.

(c)      Insofar as not covered by the above, full details of all assets owned by the Fund and their current values, whether the Fund holds such assets through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise.

**CONFIDENTIAL**                                                                            **TDIT006168**

FSD2025-0116 **Page 1215 of 1530** 2025-08-19

(d)     Full details of all disposals, assignments, transfers, sales, purchases or other transactions in respect of all or part of any asset owned by the Fund, whether the Fund holds such assets through any Fund Entity or any other subsidiaries, whether directly or indirectly or solely or jointly owned, or otherwise for the period commencing on 27 February 2024 until the date of the Historical Transaction Report.

(e)     Full details of every payment by way of salary, bonus, dividend, distribution or other compensation made to the Directors and/or any other officer, employee or consultant by HoldCo, the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(f)     Full details of every payment to any attorney, lawyer, third party consultant, accountant, or external professional services advisor, whether a firm, partnership, company or individual, by HoldCo, the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report. Such information is to include the dates and amounts of each payment, the basis of the payment, the identity of the paying party, and full details of the account into which payment was made.

(g)     Full and complete copies of all financial statements or records, including statements prepared on a consolidated basis and/or management accounts prepared in respect of the Fund, the GP, CDM, DFW or any of the Fund Entities between 27 February 2024 and the date of the Historical Transaction Report ("**Statements, Records and Accounts**"). Any Statements, Records and Accounts provided must be independently prepared and verified by a reputable accountancy firm to the satisfaction of the JOLs.

(h)     Full data and documents in support of the above. Copy documents shall be provided in electronic form but must be identified in clear terms (on a category basis) in the Historical Transaction Report.

(i)     The Directors must sign the Historical Transaction Report and confirm its accuracy.

**4     Regulation of the Fund**

Business Plan

4.1     Within 21 days of signing this Protocol, the Directors shall provide to the JOLs a written business plan (the "**Business Plan**").

4.2     The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of the Fund and the Fund Entities. The Business Plan requires the approval of the JOLs.

4.3     If agreement is not reached on the terms of the Business Plan within 21 days of the JOLs' receipt of it, or such other date as agreed between the Directors and the JOLs in writing,

LRA/858403-000001/83357259v1                                                                                      3

**CONFIDENTIAL**                                                                                  TDIT006169

FSD2025-0116                                                                    2025-08-19

the JOLs may apply to the Court for directions or seek any other relief they deem appropriate.

4.4     The Business Plan shall include, at a minimum, the following information:

(a)     A current and accurate group structure chart, clearly identifying all entities within the DAF Structure (including any of those not listed in Schedule A to this Protocol), their jurisdiction of incorporation, and their inter-relationships;

(b)     Up-to-date director registers for each of the Fund Entities, including full names, appointment dates, and any changes since the last reporting period;

(c)     Current member (shareholder or partner) registers for each of the Fund Entities, detailing ownership interests, classes of shares or partnership interests, and any recent transfers or changes; and

(d)     A detailed outline of the proposed operations and strategic objectives of the Fund and the Fund Entities. This should include key initiatives, anticipated expenditures, revenue projections, and any material contracts or engagements expected to be entered into.

4.5     The items listed in 4.4(a)-(c) above will be prepared by an independent advisor, [insert independent advisor] to be selected by the JOLs within [ ] days (the "[   ] Advice") on the following terms:

(a)     The instructions provided to [   ] shall be those set out at clauses 4.4(a)-(c) above; and

(b)     The JOLs shall be informed of, and given the opportunity to participate in, any discussions between the Directors and [   ] in respect of the [   ] Advice; and

(c)     The [   ] Advice shall be incorporated in the Business Plan as an exhibit to the Business Plan in the same form as it was provided to the Directors.

4.6     The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of Fund and the Fund Entities in accordance with the Business Plan (once agreed).

4.7     Any proposed revisions to the Business Plan must be submitted to the JOLs for prior written approval before implementation.

Overriding Principles applicable at all times

4.8     Where any proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer which affects the Fund, or any assets of the Fund, is with or to any of the Directors, the GP, CDM or DFW or their nominees, those parties (and each of them) shall not be entitled to execute or complete such transaction, distribution, disposition, dividend, benefit, payment or other transfer unless in receipt of the prior written approval of the JOLs.

4.9     In respect of any proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer which affects the Fund, or any assets of the Fund, which exceeds

LRA/858403-000001/83357259v1                                                            4

US$10,000, or any series of transactions that are connected or related in any way in an aggregate amount exceeding US$10,000:

(a)    The Directors and the GP shall inform the JOLs in writing in advance of any such proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer, and shall explain full details of the nature and purpose of the proposed transaction, distribution, disposition, dividend, benefit, payment or other transfer, together with documentary support to the satisfaction of the JOLs;

(b)    Such advance information and explanation of proposed transactions shall be provided at least 7 days prior unless the circumstances are an extreme emergency, in which case the information and explanation shall be provided as soon as possible and the urgent nature and inability to provide at least 7 days' prior notice shall be explained by the Directors in writing as soon as possible; and

(c)    No such transactions will be executed without the prior written approval of the JOLs.

Monthly Transaction Reports

4.10    Commencing on the date that the Business Plan is agreed and until further agreement or order of the Court, the Directors shall, within 7 days of the end of each calendar month, provide the JOLs with a written report listing all transactions that have been undertaken by the Fund and/or any of the Fund Entities during the calendar month just passed (the "**Monthly Transaction Report**").

4.11    Notwithstanding the above, the first Monthly Transaction Report shall list all such transactions dating back to the date of the provision of the Historical Transaction Report to the JOLs.

4.12    For each transaction in a Monthly Transaction Report, the Directors shall include the following details:

(a)    The date of the transaction;

(b)    The identity of any party(ies) depositing funds in respect of the transaction;

(c)    The identity of any party(ies) receiving funds in respect of the transaction; and

(d)    An explanation as to the nature and purpose of the transaction.

Legal expenses

4.13    The JOLs acknowledge the need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of the Fund, the GP, CDM, DFW, the Directors or the Fund Entities to seek legal or professional advice. However, it is agreed that any and all such expenses shall not be paid for out of assets which currently are or formerly were assets of the Fund, whether held directly or indirectly.

**5 Confidentiality**

5.1 In respect of any information of whatever nature relating to the Fund or any of the Fund Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (hereinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by clause 5.2 below;

(b) not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities (except to the extent that any of them become members of the Company's liquidation committee and the information is provided to them in furtherance of the JOLs' duty to consult with the liquidation committee); and

(c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall be notified by the JOLs to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required for the purpose of any application to, or directed by, any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c) with the Directors' prior written consent.

**6 The Directors**

6.1 Each of the Directors will procure that the Fund, CDM, DFW, the GP, the other Director and the Fund Entities fully comply with this Protocol.

**7 Reservation of Rights**

7.1 Nothing in this Protocol shall prevent or inhibit the JOLs from making any application to any Court of competent jurisdiction for any relief or remedy which the JOLs in their absolute discretion consider necessary or appropriate.

**8 Formalities**

8.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

**FSD2025-0116**                                                                                          2025-08-19

8.2      This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

8.3      This Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the exclusive jurisdiction of the Grand Court of the Cayman Islands.

LRA/858403-000001/83357259v1                                                                              7

**CONFIDENTIAL**                                                                          **TDIT006173**

**FSD2025-0116**                                                          2025-08-19

### SCHEDULE A: LIST OF FUND ENTITIES / ENTITIES IN THE DAF STRUCTURE

(i) CDH GP, Ltd. (Cayman Islands)

(ii) CDMCFAD, LLC (Delaware)

(iii) Charitable DAF Fund 2, LP (Cayman Islands)

(iv) Charitable DAF Fund, LP (Cayman Islands)

(v) CLO HoldCo, Ltd. (Cayman Islands)

(vi) Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii) HCT Holdco 2, Ltd. (Cayman Islands)

(viii) MGM Studios Holdco, Ltd. (Cayman Islands)

(ix) Liberty CLO HoldCo, LLC (Delaware)

(x) Liberty Sub, Ltd. (Delaware)

(xi) Charitable DAF Holdings Corp. (Delaware)

(xii) DST Investco, LLC (Delaware)

(xiii) Allanon Capital Management LLC (Texas)

(xiv) DFW Charitable Foundation (Delaware)

(xv) CLO HoldCo LLC (Delaware)

(xvi) Rand Advisors LLC (Delaware)

(xvii) CDHC Royse City Land LLC (Texas)

(xviii) Royse City Land Company LLC (Texas)

(xix) CDHC Assets LLC (Texas)

(xx) CDHC Fort Worth Land LLC (Texas)

(xxi) CDHC Stewart Creek LLC (Texas)

(xxii) BVP Property LLC (Delaware with CA registration)

LRA/858403-000001/83357259v1                                          8

**FSD2025-0116**                                                          2025-08-19
1136

**CONFIDENTIAL**                                        **TDIT006174**

# Campbells

Campbells LLP
Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

**D** +1 345 914 5898
**T** +1 345 949 2648
**F** +1 345 949 8613
**E** MGoodman@campbellslegal.com

campbellslegal.com

Our Ref:  MGM/ROD/18955-44959
Your Ref:

CAYMAN **|** BVI **|** HONG KONG

**BY EMAIL**

Maples and Calder (Cayman) LLP
Ugland House
PO Box 309
Grand Cayman, KY1-1104
Cayman Islands

29 June 2025

Dear Sirs

**Re: Charitable DAF Holdco, Ltd. (in Official Liquidation) (the "Company")**
**FSD Cause No. 116 of 2025 (JAJ)**

1. We refer to your letter dated 19 June 2025 (the "**Protocol Letter**"), to previous correspondence between this firm and Johnstone Law regarding a draft reporting protocol in respect of the assets and operations of Charitable DAF Fund, LP and related entities, to the letter sent by the joint official liquidators (the "**JOLs**") of the Company to the Trustees of the Highland Capital Management L.P. (the "**Trustees**") dated 24 June 2025 (the "**Trustee Letter**"), and to the **enclosed** stipulation dated 27 June 2025 entered into in between the Dallas Foundation and the HMIT Entities in the Highland Capital Management L.P. bankruptcy proceedings and which has been filed with the United States Bankruptcy Court (the "**Stipulation**").

2. Capitalised terms, unless otherwise defined, adopt the definitions applied in the Protocol Letter.

**Previous Correspondence in respect of CDM Protocol and JOLs' standing**

3. Before addressing the draft protocol enclosed with the Protocol Letter, it appears to be necessary to remind the JOLs of our previous correspondence with Johnstone Law regarding the CDM Protocol and the JOLs' standing to take steps against the Fund.

4. The JOLs have not established any direct or indirect beneficial interest in or creditor claim against the Fund or the CDM Entities. At most, the JOLs appear to have formed the view that they have an as yet unparticularized and unasserted claim to an indirect beneficial interest in the CDM Entities.

3203729-1

It is not necessary for us to pass comment on any such claim, other than to note that, even if the JOLs were able to establish an indirect beneficial interest in the Fund or any of the CDM Entities, that would not displace the directors' control of the CDM Entities.

5. We would remind you that the CDM Entities are managed by professionally qualified individuals who have repeatedly acknowledged their obligations to the companies to which they are appointed, and whose actions are guided by legal and other professional advice. The JOLs have no mandate or authority to interfere with the management of the CDM Entitles by those individuals.

6. However, in good faith, and without any legal obligation to do so, the CDM Entities voluntarily offered a transactional reporting protocol to the JOLs in an effort to alleviate (unwarranted) concerns the JOLs had with respect to the management of the CDM Entities and to demonstrate that their business operations were and are being conducted appropriately and transparently. This offer was made to the JOLs, by letter dated 16 May 2025. It is our clients' view that the JOLs, acting objectively, would have considered this protocol to be perfectly sufficient to allow them to discharge any duty they had to exercise oversight of the management of the CDM Entities.

7. However, Johnstone Law engaged in correspondence with this firm on behalf the JOLs but inexplicably refused to meaningfully engage with our clients' offer to provide a reporting protocol. Consequently, under cover of letter dated 30 May 2025, we sent a draft of the CDM Protocol to Johnstone Law and invited their agreement or comments. As noted at paragraph 13 of that letter, "*our clients reject the suggestion that they are under any duty to provide this information. However, in circumstances where the CDM Entities, including the Fund, are operating in the ordinary course to make investments on behalf of, and to support charitable causes, our clients are offering this Protocol to ensure that these charitable operations are not unnecessarily impacted by the JOLs*."

8. Johnstone Law responded on 5 June 2025 and again inexplicably refused to engage with the CDM Protocol. Our response dated 9 June 2025 reiterated that our clients are under no obligation to provide information to the JOLs, but were willing to do so "*in an attempt to assuage the JOLs' misplaced concerns and demonstrate that the CDM Entities are operating in the ordinary course of business*".

9. In a subsequent letter also dated 9 June 2025, the CDM Entities enclosed a revised version of the CDM Protocol which removed the value threshold from the proposed historical reporting protocol, and reduced the value threshold for the provision of advance notice from $5m to $1m. The letter reiterated the CDM Entities belief that "*the appropriate course of action is for the JOLs to engage on the terms of the protocol, which will appease any concerns they may have regarding the dissipation or misuse of the Fund's assets outside of the ordinary course of business during the currency of the liquidation*."

2

3203729-1

#3282196v7

**CONFIDENTIAL**                                                            TDIT006176

10. We note that at the hearing of the JOLs' sanction application on 24 June 2025, His Lordship, in obiter dictum, indicated that entry into a protocol seemed a sensible course of action. We believe that Court appointed liquidators acting objectively and in an even-handed manner would have accepted the original CDM Protocol, and that the JOLs' failure to do so indicates a predetermination that the conduct of the CDM Entities and their management merit investigation, which position is inconsistent with the JOLs' duty to "*maintain an even and impartial hand*".[1] However, we hope that the JOLs are willing to moderate their position in light of judicial encouragement to do so.

**The JOLs' Protocol**

11. In light of the foregoing, it is no surprise that our clients fundamentally object to the approach adopted in the JOLs' Protocol, which is completely inappropriate and unwarranted. The proposed restrictions, controls and undertakings sought by the JOLs would impose severe limitations on our clients' ability to operate, and would have the practical effect of placing their ongoing charitable activities under the de facto control of the JOLs, notwithstanding that no such legal authority exists.

12. Your references to the JOLs requiring what are, in effect, restrictions mirroring injunctive relief is entirely misguided. The only circumstances in which the draconian conditions sought in the JOLs' Protocol could be imposed would be if the JOLs, with the sanction of the Grand Court, sought and obtained a freezing injunction. That injunction would require the JOLs to, *inter alia*, make out a good arguable case (where it is denied that such a case exists) and provide evidence of that there is a real risk of dissipation of assets (where the CDM Protocol clearly demonstrates there is no such risk). Furthermore, were the JOLs to seek injunctive relief the CDM Entities would at least have the benefit of the protection afforded by the cross-undertaking in damages (which they do not have under the JOLs' Protocol). Following recent authority,[2] that cross-undertaking in damages would likely need to be supported by an indemnity from relevant stakeholders. The JOLs' Protocol seeks all of the benefits of an injunction without the JOLs or those funding them assuming any of the burdens that such relief would entail.

13. If the JOLs believe that injunctive or other restrictive relief is warranted, the proper course is for them to make an application to the Court in the ordinary course and satisfy these well-established

---

[1] See In *re Contract Corporation, Gooch's Case* [1871] 12 LR Ch App 207, p 211: "*In truth, it is of the utmost importance that the liquidator should, as the officer of the Court, maintain an even and impartial hand between all the individuals whose interests are involved in the winding up. He should have no leaning for or against any individual whatever. It is his duty to the whole body of shareholders, and to the whole body of creditors, and to the Court, to make himself thoroughly acquainted with the affairs of the company; and to suppress nothing, and to conceal nothing, which has come to his knowledge in the course of his investigation, which is material to ascertain the exact truth in every case before the Court. And it is for the Judge to see that he does his duty in this respect*" (emphasis added).

[2] See *Hunt v Ubhi* [2023] EWCA Civ 417 which cited SC Mezhdunarodniy Promyshlenniy Bank v Pugachev [2015] EWCA Civ 139

3

3203729-1

legal requirements. Our clients will of course strenuously resist any such application. However, there is no lawful or reasonable basis for the JOLs to seek to impose such intrusive restrictions on the CDM Entities, nor to demand undertakings that would exceed what the Court could properly order on an application for interim relief. If the JOLs and our clients are unable to agree the terms of a protocol, the correct course of action is to have the Court determine the scope of any such protocol as opposed to the JOLs seeking injunctive relief - the specter of which seems to be threatened in the Protocol Letter.

### The Stipulation

14. Further, we note the Dallas Foundation and other entities referred to in the Stipulation as the 'Foundation Parties', have now entered into a binding term sheet (the "**Term Sheet**") with the HMIT Entities. As you can see, the Foundation Parties withdrew their objections to the Settlement Motion (defined below) with prejudice. At the hearing of the Settlement Motion, Mr. Dondero was allowed to testify in opposition to the settlement on behalf of a family trust (Dugaboy), though we understand that a material portion of his attempted testimony was stricken or subject to successful objection, and it appears that the US Bankruptcy Court gave his testimony no weight. Ms Diaz of the Dallas Foundation, who signed the Term Sheet on behalf of the Foundation Parties, swore affidavits on behalf of the petitioners in both the just and equitable winding up, and supervision applications. Ms Diaz's evidence in the supervision application, which was provided on behalf of all 'Supporting Organisations', was that a supervision order was required in order to "*allow the JOLs to conduct a proper investigation of the affairs of the Company*"[3] (as you know, this evidence is disputed).

15. Page two of the Term Sheet mandates that the Dallas Foundation will undertake various actions in relation to "DAF", which is described in the Term Sheet as "*the historical corporate structure of Charitable DAF Holdco, Ltd, its parents and subsidiaries, in existence as of January 1, 2024, and changes thereto*" (which would include the CDM Entities). These actions include the Dallas Foundation agreeing to meet with Mr Raver (as a representative of HMIT) to review the DAF structure and the balance sheets of DAF as of 30 September 2024, 31 December 2024 and 31 March 2025. The Term Sheet also provides that the Dallas Foundation will be provided with "*an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any other entity, including another entity within the DAF structure*".

16. This meeting is now scheduled for 2 July 2025. The meeting will be face to face, and Mr. Raver intends to provide additional balance sheet information beyond that required under the Term Sheet. The meeting (defined as the "DF Meeting") is specifically described as a confidential settlement meeting "*with an eye to commencing negotiations with DF about the use of current*

---

[3] Paragraph 15(a) of the Second Affidavit of Julie Diaz dated 29 April 2025.

4

3203729-1

#3282196v7

FSD2025-0116                    **Page 1225 of 1530**                    2025-08-19

*support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution").*" The Term Sheet also provides for the prospect of a subsequent meeting which Mr Patrick will attend with the objective being to further discussions toward a "Resolution". The Term Sheet explicitly provides that if the parties can agree on a Resolution, then "*Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above*".

17. That the lead petitioner—having given evidence on behalf of all Supporting Organisations at the supervision application—has now entered into the Term Sheet is a clear indication that there is no longer any justification for the investigations it originally proposed (and which the JOLs appear to be myopically pursuing), and no real or justifiable risk of asset dissipation, particularly given that the CDM Entities' balance sheets and financial information will be shared with the Dallas Foundation. Given that the Term Sheet contemplates the Dallas Foundation and Supporting Organisations requesting a meeting with the JOLs with a view to concluding the liquidation of the Company and avoiding any application to wind up the Fund, it is difficult to reconcile the actions of the JOLs with the stated intention of the purported primary stakeholder.

**Updated CDM Protocol**

18. Notwithstanding, our clients remain willing to agree a reasonable protocol that provides the JOLs with an appropriate level of visibility into relevant matters while preserving our clients' right to conduct their charitable operations in the ordinary course of business. We do not, however, accept that the JOLs' Protocol represents a fair or proportionate proposal - it is neither necessary nor justified.

19. In particular, we make the following general observations:

(a) The JOL's Protocol seeks to prohibit entirely lawful transactions from being conducted in the ordinary course of business, absent Court order, and effectively subjects all of the CDM Entities' operations to prior approval and veto - a degree of control that (i) is completely unwarranted, and (ii) could only properly be obtained through injunctive relief.

(b) The financial thresholds, advance approvals, and granularity of the reporting provisions proposed in the JOLs' Protocol would materially and unfairly impede the CDM Entities' ordinary and necessary charitable operations and increase the costs of those operations to no obvious benefit to those entities.

5

3203729-1

#3282196v7

FSD2025-0116                                                                    2025-08-19

CONFIDENTIAL                                                                    TDIT006179

(c) The JOLs' request that the CDM Entities provide extensive documentation, including registers, asset holdings, and transaction histories, appears to simply repeat misconceived requests made by Johnstone Law on behalf of the JOLs and has no legal basis. As stated in response to those previous requests, "*Directors are bound by duties under common law and statute to protect the interests, confidentiality, and assets of the companies they serve. To comply with your baseless requests would place them in breach of those duties unless and until a court determines otherwise.*"[4]

(d) Your letter asserts that the scope of disclosure sought by the JOLs' Protocol is necessary to enable the JOLs "*to properly police* [our] *clients' property preservation obligations*". There is simply no basis for this assertion, which was also addressed in correspondence with Johnstone Law when it was suggested the JOLs are somehow authorized to "hold the ring" in order to protect the assets of the Fund.[5]

(e) Similarly, for the reasons outlined above, your proposal to set the advance reporting threshold at US$10,000 as "*that would be a typical threshold for a freezing injunction and disclosure order*" is wholly unrealistic and impractical. Despite the JOLs not having obtained a freezing injunction, the CDM Entities are willing to set a reporting threshold which would afford the JOLs advance notice of substantial and meaningful transactions. However, requiring the CDM Entities to provide advance notice of such de minimus transactions, and to wait for the JOLs to prospectively approve these transactions, would severely hamper the charitable operations of the CDM Entities.

20. We **enclose** a revised version of the CDM Protocol with this letter. This updated version reflects a number of clarifications aimed at addressing the JOLs' concerns, while preserving our clients' ability to conduct their affairs in the ordinary course of business. These revisions are marked-up against the previous version of the CDM Protocol sent to Johnstone Law on 9 June 2025 and include, *inter alia*:

(a) Confirmation that the CDM Entities will engage Armanino LLP as an independent accounting firm to provide the financial reporting and accounting analysis required under the CDM Protocol;

---

[4] Paragraph 6 of Campbells letter to Johnstone Law dated 30 May 2025.

[5] Paragraph 17 of Campbells letter to Johnstone Law dated 9 June 2025. "*As we have explained numerous times and attempted to demonstrate by way of our proposed reporting protocol, the CDM Entities, including the Fund, are operating in the ordinary course to support charitable causes and their assets do not need to be protected by the JOLs.*"

6

3203729-1

(b) Inclusion of the details which are to be provided in the Historical and Monthly Transaction Reports (which reflect the information requested at sections 3.1 and 4.12 of the JOLs' Protocol;

(c) Inclusion of wording at paragraph 2.6 which would require the JOLs to consult with the 'Directors' before unilaterally contacting our clients' third-party service providers. Unfortunately, given the JOLs repeated attempts to interfere with our clients' lawful operations (to which, see below regarding the Trustee Letter), we believe this is necessary;

(d) Extension of the date for the Historical Transaction Report to 1 July 2024 (we understand that the Skyview Group had access to the CDM Entities' financials through to 30 June 2024 so the JOLs can obtain any older financial information from other sources); and

(e) Reduction of the value threshold for the provision of advance notice from US$1m to US$250,000.

21. We invite the JOLs to consider the revised draft of the CDM Protocol and to engage with us to agree terms that are reasonable and proportionate. For the reasons outlined above, our clients are unwilling to accept the fundamentally disproportionate proposals set out in the JOLs' Protocol. However, they remain open to agreeing an appropriate protocol to facilitate the JOLs' ongoing investigations (which the Dallas Foundation no longer support or think necessary) and to avoid the need for unnecessary and costly Court proceedings.

22. Please confirm your agreement to, or provide any comments on, the revised CDM Protocol by **5pm on 4 July 2025**.

23. If, notwithstanding the proffered protocol, the JOLs consider it necessary to seek injunctive relief that is, of course, a matter for them, but given the extensive correspondence on this issue we would expect (i) any application for injunctive relief to be served on this firm where it would be plainly inappropriate to proceed on an ex parte basis; or (ii) at the very least, if the JOLs do seek injunctive relief on an ex parte basis, that this and previous correspondence regarding the protocol be provided to the Court in furtherance of the JOLs' duty of full and frank disclosure.

**Trustee Letter**

24. We refer to the Trustee Letter, which related to the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith*, Case No. 19-34054-sgj11 (Bankr. N.D.Tex.) [Dkt. 4216] (the "**Settlement Motion**"). We understand that your firm were also copied to this correspondence.

7

25. The Trustee Letter, sent on the eve of the hearing of the Settlement Motion, requested an adjournment to afford the JOLs additional time to progress their investigations of the HMIT Entities, or alternatively, that the Trustees defer making distributions to the HMIT Entities to allow the JOLs time to carry out investigations "*without the risk of asset dissipation in connection with protocol discussions*".  The protocol discussions were referred to in the JOLs' Letter, which notes that the JOLs "*are concerned to ensure the parameters of the protocol mitigate the risk of asset dissipation pending the completion of their investigations.*"

26. Quite how the JOLs were able to form the extraordinary view that a professionally qualified director acting with the benefit of legal and other professional advice seeking approval from the US Court to enter into a settlement with a resultant accretion to HMIT of $67 million might represent an attempt at asset dissipation calls for an explanation in and of itself, but particularly in light of the repeated attempts by the CDM Entities to engage in discussions with the JOLs and Johnstone Law about the terms of a protocol which was directly aimed at addressing the JOLs' (baseless) concerns in that regard.

27. To address unparticularised assertions in Johnstone Law's letters dated 30 May and 5 June 2025 of proprietary claims to certain assets of the CDM Entities, including in respect of assets which were the subject of the HMIT settlement agreement, our first letter dated 9 June 2025, to which we did not receive a reply, is worth repeating:

> "*Your reference to the so-called HMIT transaction is vague, speculative, and appears to rely on materials filed in separate bankruptcy proceedings in the United States concerning entities related to Mr James Dondero (the individual who swore evidence in support of FSD No. 99 seeking to have the Company and the Fund wound up on a just and equitable basis and who agreed to fund those proceedings). Given the assertions in your letter alleging the JOLs have received minimal cooperation, it is curious that you have such detailed knowledge of a transaction undertaken by entities which the JOLs have no interest in. Please confirm the source of this information.*
>
> *Further, it is clear that the Settlement Agreement benefits the HMIT Entities (as defined in your letter) and, accordingly, there is no question that assets of the CDM entities are being dissipated or misused. Taking your unfounded assertions in relation to the proprietary claims at their height, the HMIT transaction would inure to the benefit of the liquidation estate. It is perhaps telling that it is our understanding the HMIT transaction does not benefit Mr Dondero and his broader interests. In the circumstances, we do not understand*

3203729-1

#3282196v7

1225

*why the JOLs would not support the HMIT transaction even if a proprietary claim has not been established.*

*Our clients do not accept that any transaction involving the HMIT Entities warrants the JOLs' oversight, and they are not aware of any basis on which the JOLs are entitled to be 'notified' or to 'approve' their lawful dealings. Your claim that HMIT was formerly the beneficiary of a fund in which the Company had an indirect interest does not confer any rights on the JOLs in relation to any of the assets involved in the HMIT transaction."*

28. By failing to accurately address the correspondence relating to the CDM Protocol and any of the points made in our letter of 9 June 2025, the Trustee Letter was vague and misleading, and it is regrettably the case that the JOLs' attempt to interfere with the Settlement Motion in this manner can only be described as improper.

29. The fact that entities affiliated with Mr. Dondero immediately seized upon the Trustee Letter to support their own request for an adjournment, in circumstances where their previous application for an adjournment had been refused, leads to the impression that this was the true purpose of the Trustee Letter.

30. Similarly, the JOLs' initial failure to engage with the proposed protocol at all, and the insistence now that the protocol must replicate the effect of injunctive relief, do nothing to dispel the impression of a tendency towards bias in favour of the position of Mr. Dondero and his affiliates, particularly in light of Mr. Dondero's subsequent testimony at the Settlement Motion.

31. We reserve the right to refer to this and previous correspondence in any subsequent proceedings.

Yours faithfully

**Campbells LLP**

3203729-1

#3282196v7

CONFIDENTIAL TDIT006183

**FSD2025-0116**                                                          2025-08-19

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

_____

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**

_____

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a)    *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b)    *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised…*"

(the "**DAF Provisions**")

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick is the director of the GP and Paul Murphy and Mark Patrick are the directors of the Cayman-domiciled operating entities owned by DAF LP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the direct or indirect limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

1.2     In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a)   To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

---

[1]Letter dated 22 May from Johnstone Law to Campbells.

2

**FSD2025-0116**                                                                                           **2025-08-19**

    b)   To the Directors:

        Mark Patrick - mpatrick@dafholdco.com
        Paul Murphy - paul@gkmanagement.com.ky

**2**        **Transactional Reporting**

2.1    The CDM Entities have engaged Armanino LLP ("**Armanino**"), an independent accountancy firm to provide the financial statement reporting and accounting analysis required under this Protocol.

2.2    Within 14 days of the execution of this Protocol, the Directors shall provide to the JOLs a written report listing all Transactions (as defined below) undertaken by the CDM Entities between 1 July 2024 and the date of this Protocol (the "**Historical Transaction Report**"). For each Transaction in the Historical Transaction Report, the Directors shall include the following details:

    (a)   The date of the Transaction;

    (b)   The identity of any party(ies) depositing funds in respect of the Transaction;

    (c)   The identity of any party(ies) receiving funds in respect of the Transaction; and

    (d)   An explanation as to the nature and purpose of the Transaction.

"**Transaction(s)**" as used in this Protocol shall mean the acquisition or disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$10,000; provided, however, that "Transaction(s)" shall not include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.3    Within 21 days of the signing of this Protocol, the Directors shall provide a business plan to the JOLs (which can be revised from time-to-time if it is reasonably determined to be necessary by the Directors and within the ordinary course of busisness for DAF LP and the CDM Entities) (the "**Business Plan**"). The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of DAF LP and the CDM Entities. Steps taken with respect to the management of DAF LP and the CDM Entities will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.4    The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the Business Plan.

2.5    Armanino shall provide a monthly Transactions report and balance sheet (the "**Monthly Transaction Report**") to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.  For each Transaction in the Monthly Transaction Report, Armanino shall include the following details:

3

#3253267v5

**FSD2025-0116**                                                                                           **2025-08-19**

1148

**CONFIDENTIAL**
                                                                                           TDIT006186

(e)   The date of the Transaction;

(f)   The identity of any party(ies) depositing funds in respect of the Transaction;

(g)   The identity of any party(ies) receiving funds in respect of the Transaction; and

(h)   An explanation as to the nature and purpose of the Transaction.

2.6   If the JOLs have any doubt about whether a Transaction is or is not in the ordinary course of DAF LP's business, the JOLs shall consult with the Directors who agree to make reasonable efforts to provide clairfation. For the avoidance of doubt, the JOLs shall not unilaterally contact third party service providers of the CDM Entities in respect of any Transaction, or any any anticipated transaction which they have been put on notice of pursuant to paragraph 2.7, without first consulting with, and seeking clarifcation from, the Directors.

2.7   The Directors will use reasonable efforts to provide advance notice to the JOLs in respect of any disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$250,000 **SAVE THAT** advance notice is not required in relation to any disposition related to (i) the operation or administration of the DAF Structure in the ordinary course of business or (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.8   Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3      Legal and Professional Fees**

3.1   The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4      Consultation**

4.1   The JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities.

**5      Confidentiality**

5.1   In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

4

(a) keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 5.2 below;

(b) not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

(c) ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2 The JOLs may disclose Confidential Information:

(a) Subject to the restrictions in paragraph 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall agree in writing to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b) where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency;  or

(c) with the Directors' prior written consent.

**6       Formalities**

6.1 This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2 This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

6.3 For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4 In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

5

[SIGNATURES]

6

**CONFIDENTIAL**                                                                        **TDIT006189**

**FSD2025-0116**                    **Page 1236 of 1530**                    **2025-08-19**

**Annexure 1 – List of CDM Entities**

(i)     CDH GP, Ltd. (Cayman Islands)

(ii)    CDMCFAD, LLC (Delaware)

(iii)   Charitable DAF Fund 2, LP (Cayman Islands)

(iv)    Charitable DAF Fund, LP (Cayman Islands)

(v)     CLO HoldCo, Ltd. (Cayman Islands)

(vi)    Liberty CLO HoldCo, Ltd. (Cayman Islands)

(vii)   HCT Holdco 2, Ltd. (Cayman Islands)

(viii)  MGM Studios Holdco, Ltd. (Cayman Islands)

(ix)    Liberty CLO HoldCo, LLC (Delaware)

(x)     Liberty Sub, Ltd. (Delaware)

(xi)    Charitable DAF Holdings Corp. (Delaware)

(xii)   DST Investco, LLC (Delaware)

(xiii)  Allanon Capital Management LLC (Texas)

#3253267v5

**FSD2025-0116**                    **2025-08-19**

**CONFIDENTIAL**                    **TDIT006190**

**FSD2025-0116** 2025-08-19

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**FSD NO. 116 OF 2025 (JAJ)**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**

**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD (IN OFFICIAL LIQUIDATION)**

_____

**PROTOCOL IN RESPECT OF CHARITABLE DAF FUND, LP**
_____

By a petition filed on 2 May 2025, the (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund (the "**Highland Foundations**") sought an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd ("**HoldCo**") continue under the supervision of the Court (the "**Supervision Application**") pursuant to s.131 Companies Act (2025 Revision) (the "**Act**").

By order of the Grand Court of the Cayman Islands (the "**Court**") in respect of FSD 116 of 2025 (JAJ) dated 6 May 2025 (the "**Order**"), the Court determined the Supervision Application and directed that Ms. Margot MacInnis and Mr. Sandipan Bhowmilk be appointed as Joint Official Liquidators (the "**JOLs**") of HoldCo.

Paragraph 6, 6(a) and 6(b) of the Order provide as follows:

> "*The JOLs are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:*
>
> (a) *The power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;*
>
> (b) *The power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised...*"

(the "**DAF Provisions**")

2033932-1

#3253267v5

CONFIDENTIAL TDIT006191

1234

FSD2025-0116                    **Page 1238 of 1530**                    2025-08-19

Charitable DAF Fund, LP ("**DAF LP**") was not represented at the Supervision Application and understands that that the DAF Provisions were included in the Order "*on the basis of the evidence before* [the Court]".[1]

HoldCo was, and DAF LP is, part of a larger group of entities (collectively the "**DAF Structure**") whose establishment and aim is, according to its '**Mission Statement**', to "*make investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference*". "**CDM Entities**" means the DAF Structure entities listed on Annexure 1 hereto.

**Preliminary statement**

The purpose of this Protocol (the "**Protocol**") is to ensure the efficient and orderly administration of DAF LP, the CDM Entities, and the liquidation estate of HoldCo. The Protocol is designed to avoid conflict between the JOLs and DAF LP, to assuage any concerns the JOLs may have regarding the commercial activities of DAF LP with respect to the risk of dissipation / misuse of assets outside of the ordinary course of business, and, subject to the approval of the Court, to facilitate the removal of the DAF Provisions from the Order (without prejudice to the JOLs entitlement to seek sanction in the ordinary manner and in accordance with the Act and the Companies Winding Up Rules (2023 Consolidation)).

**Background**

DAF LP is a Cayman Islands limited partnership formed on 28 October 2011. CDH GP Ltd (the "**GP**"), is a Cayman Islands company incorporated in or around 7 February 2024 and is the general partner of DAF LP. Mark Patrick is the director of the GP and Paul Murphy and Mark Patrick are the directors of the GPCayman-domiciled operating entities owned by DAF LP (the "**Directors**"). Holdco was incorporated and registered as a Cayman Islands exempted limited company on 27 October 2011. From its incorporation until March 2025 when it was placed in voluntary liquidation, Holdco was the direct or indirect limited partner of DAF LP through which it indirectly owned the other entities in the DAF Structure.

**1. Notices**

1.2    In the interests of expedience, the JOLs and the Directors agree that any notices or coummincation required under this Protocol shall be sent by email as follows:

a)    To the JOLs:

Margot MacInnis - margot.macinnis@uk.gt.com
Sandipan Bhowmik - sandipan.bhowmik@uk.gt.com
CDAF Core - CDAF.Core@uk.gt.com

---

[1]Letter dated 22 May from Johnstone Law to Campbells.

2

#3253267v5

**CONFIDENTIAL**                                                    TDIT006192

**FSD2025-0116**                                                                                    2025-08-19

b)    To the Directors:

Mark Patrick - mpatrick@dafholdco.com
Paul Murphy - paul@gkmanagement.com.ky

**2      Transactional Reporting**

2.1      ~~Upon~~ The CDM Entities have engaged Armanino LLP ("**Armanino**"), an independent accountancy firm to provide the financial statement reporting and accounting analysis required under this Protocol.

~~2.1~~      Within 14 days of the execution of this Protocol, the Directors ~~will~~shall provide ~~a report~~ to the JOLs a written report listing all ~~transactions~~ Transactions (as defined below) undertaken by ~~DAF LP, or any of the CDM Entities, since 27 March 2025.~~

2.2      ~~The~~ the CDM Entities between 1 July 2024 and the date of this Protocol (the "**Historical Transaction Report**"). For each Transaction in the Historical Transaction Report, the Directors shall ~~provide a business plan within~~include the following details:

(a)    The date of the Transaction;

(b)    The identity of any party(ies) depositing funds in respect of the Transaction;

(c)    The identity of any party(ies) receiving funds in respect of the Transaction; and

(d)    An explanation as to the nature and purpose of the Transaction.

"**Transaction(s)**" as used in this Protocol shall mean the acquisition or disposition of assets in a single transaction or series of related transactions that is equal to or exceeds US$10,000; provided, however, that "Transaction(s)" shall not include renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

~~2.2~~2.3   Within 21 days of the signing of this Protocol, the Directors shall provide a business plan to the JOLs (which can be revised from time-to-time if it is reasonably determined to be necessary by the Directors and within the ordinary course of ~~buisness~~busisness for DAF LP and the CDM Entities) (the "**Business Plan**"). The Business Plan shall set out the Directors' proposal as to the ongoing operations and management of DAF LP and the CDM Entities. Steps taken with respect to the management of DAF LP and the CDM Entities will be considered to be in the ordinary course of business if they are provided for in the Business Plan.

2.4      The Directors and their employees, officers, agents and advisors, will operate and conduct the ordinary, day-to-day, business of DAF LP and the CDM Entities in accordance with the ~~Mission Statement. The Directors~~Business Plan.

3

#3253267v5

**FSD2025-0116**                                                                                    2025-08-19

**CONFIDENTIAL**                                                                            TDIT006193

2.32.5  Armanino shall provide a monthly ~~transactions~~Transactions report and balance sheet (the **"Monthly Transaction Report"**) to the JOLs so they have oversight of DAF LP's investment activity and financial performance, and the steps being taken by the Directors in the ordinary course of DAF LP's business.  For each Transaction in the Monthly Transaction Report, Armanino shall include the following details:

    (e)  The date of the Transaction;

    (f)  The identity of any party(ies) depositing funds in respect of the Transaction;

    (g)  The identity of any party(ies) receiving funds in respect of the Transaction; and

    (h)  An explanation as to the nature and purpose of the Transaction.

2.42.6  If the JOLs have any doubt about whether a ~~transaction~~Transaction is or is not in the ordinary course of DAF LP's business, ~~they may contact~~ the JOLs shall consult with the Directors ~~for~~ who agree to make reasonable efforts to provide clairfation. For the avoidance of doubt, the JOLs shall not unilaterally contact third party service providers of the CDM Entities in respect of any Transaction, or any any anticipated transaction which they have been put on notice of pursuant to paragraph 2.7, without first consulting with, and seeking clarifcation from, the Directors.

2.52.7  The Directors will ~~endeavour~~use reasonable efforts to provide advance notice to the JOLs in respect of any disposition of assets in a single transaction ~~of DAF LP exceeding US$ 1,000,000~~ or ~~any~~ series of related transactions ~~in an aggregate amount exceeding US$1,000~~that is equal to or exceeds US$250,000 **SAVE THAT** advance notice is not required, in relation to any ~~single transaction or series of transactions in the ordinary course of business involving or~~ disposition related to (i) the ~~proper~~ operation ~~and~~or administration of the DAF Structure~~; and~~ in the ordinary course of business or (ii) the renumeration of employees, officers and directors, agents, advisors and / or service providers of the CDM Entities.

2.62.8  Notwithstanding anything to the contrary in this Protocol, the Directors shall be under no obligation to undertake any action or refrain from taking any action to the extent they deem it reasonably necessary to comply with their legal obligations to the CDM Entities.

**3    Legal and Professional Fees**

3.1    The JOLs acknowledge DAF LP's need to take legal and other professional advice with respect to the liquidation of HoldCo. Nothing in this Protocol is intended to restrict or fetter the ability of DAF LP or the CDM Entites to seek legal or professional advice.

**4    Consultation**

4.1    ~~Save in exceptional circumstances, the~~The JOLs shall provide notice to the Directors of any intended exercise of powers by them which would be consistent with the DAF Provisions, and the JOLs shall

4

discuss and consult with the Directors in respect of any intended action against DAF LP or the CDM Entities. ~~The JOLS shall provide advice notice of any intended exercise of their powers without sanction by the Court with respect to DAF LP or any CDM Entity that could reasonably be expected to exceed the powers granted to the JOLs by the Court.~~

**5    Confidentiality**

5.1    In respect of any information of whatever nature relating to any member of the CDM Entities, any of their assets, liabilities, management or business which is or has been provided to the JOLs (or their directors, employees, agents or advisors) pursuant to this Protocol (herinafter referred to as "**Confidential Information**"), the JOLs undertake that they will:

(a)    keep the Confidential Information confidential and will not disclose it to anyone except as provided for by paragraph 5.2 below;

(b)    ~~Not~~not disclose any Confidential Information to Mr James Dondero, the Highland Foundations, or any known affiliates or service providers of these individuals / entities; and

(c)    ensure that all Confidential Information is properly stored and protected with security measures and a degree of care of a standard at least as good as would apply to the JOLs' Confidential Information.

5.2    The JOLs may disclose Confidential Information:

(a)    Subject to the restrictions in ~~paragrpah~~paragraph 5.1(b), to directors, employees, officers, advisors, or agents of the JOLs who are in each case desirable in the course of their duties to receive and consider the Confidential Information, who shall be made aware by the JOLs of their obligations under this Protocol and shall ~~be notified by the JOLs~~agree in writing to observe the same restrictions on the use of the Confidential Information as are contained in this Protocol;

(b)    where required or requested by any court of competent jurisdiction or where required or requested by any competent governmental, supervisory or regulatory body or rating agency; or

(c)    with the Directors' prior written consent.

**6    Formalities**

6.1    This Protocol may not be waived, varied or amended without consent in writing from all parties.

6.2    This Protocol may be signed in any number of counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument, and may be signed by PDF signature, which shall be deemed to constitute an original signature.

5

6.3   For the avoidance of doubt this Protocol is governed by, and to be construed in accordance with, the laws of the Cayman Islands, and any dispute arising hereunder will be subject to the adjudication of the Grand Court of the Cayman islands.

6.4   In the event that either party considers that the other party has acted contrary to this Protocol, it shall first raise the matter by telephone or by email with an explanation of the basis for such complaint and thereafter allow a reasonable period for the other party to remedy the situation or provide an explanation for its conduct.  If either party considers that the issue is not resolved then a conference call will be scheduled for a discussion between the Directors and the JOLs (and their respective legal advisors if necessary).  Only in the event that there remains a dispute after these steps have been taken will either party refer the matter to the Court.

[SIGNATURES]

6

**Annexure 1 – List of CDM Entities**

| | |
|---|---|
| (i) | CDH GP, Ltd. (Cayman Islands) |
| (ii) | CDMCFAD, LLC (Delaware) |
| (iii) | Charitable DAF Fund 2, LP (Cayman Islands) |
| (iv) | Charitable DAF Fund, LP (Cayman Islands) |
| (v) | CLO HoldCo, Ltd. (Cayman Islands) |
| (vi) | Liberty CLO HoldCo, Ltd. (Cayman Islands) |
| (vii) | HCT Holdco 2, Ltd. (Cayman Islands) |
| (viii) | MGM Studios Holdco, Ltd. (Cayman Islands) |
| (ix) | Liberty CLO HoldCo, LLC (Delaware) |
| (x) | Liberty Sub, Ltd. (Delaware) |
| (xi) | Charitable DAF Holdings Corp. (Delaware) |
| (xii) | DST Investco, LLC (Delaware) |
| (xiii) | Allanon Capital Management LLC (Texas) |

#3253267v5

**CONFIDENTIAL** TDIT006197

FSD2025-0116                                                                                          2025-08-19



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 27, 2025**

_____
**United States Bankruptcy Judge**

_____

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | **Re: Docket No. 4231** |
| | ) | |

**STIPULATION WITHDRAWING OBJECTION OF THE DALLAS FOUNDATION
AND CROWN GLOBAL LIFE INSURANCE, LTD TO MOTION FOR ENTRY OF
AN ORDER PURSUANT TO BANKRUPTCY RULE 9019 AND 11 U.S.C. § 363
APPROVING SETTLEMENT WITH THE HMIT ENTITIES AND AUTHORIZING
ACTIONS CONSISTENT THEREWITH**

'         This stipulation (the "Stipulation") is made by and among Hunter Mountain Investment

Trust ("HMIT"), Beacon Mountain LLC ("Beacon Mountain"), Rand Advisors, LLC ("Rand

Advisors"), Rand PE Fund I, LP ("Rand PE Fund"), Rand PE Fund Management, LLC ("Rand

---

[1]         Highland's last four digits of its taxpayer identification number are (8357). The headquarters and service
address for Highland is 100 Crescent Court, Suite 1850, Dallas, TX 75201.

1

FSD2025-0116                                                                                          2025-08-19
1160
CONFIDENTIAL                                                                                          TDIT006198

GP"), Atlas IDF, LP ("Atlas IDF"), and Atlas IDF GP, LLC ("Atlas GP" and together with HMIT, Beacon Mountain, Rand Advisors, Rand PE Fund, Rand GP, and Atlas IDF, the "HMIT Entities"); The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties"); Highland Capital Management, L.P., the reorganized debtor (the "Debtor" or "Highland," as applicable) in the above-captioned chapter 11 case (the "Bankruptcy Case"), the Highland Claimant Trust (the "Claimant Trust"), and the Highland Litigation Sub-Trust (the "Litigation Sub-Trust," and together with Highland and the Claimant Trust, the "Movants"), by and through their respective undersign counsel.

RECITALS

**WHEREAS**, on May 19, 2025, the Movants filed that certain *Motion for Entry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement with the HMIT Entities and Authorizing Actions Consistent Therewith* [Dkt. No. 4216] (the "9019 Motion");

**WHEREAS**, on June 9, 2025, the Foundation Parties filed that certain *Objection* [Dkt. No. 4231] to the 9019 Motion (the "Foundation Objection");

**WHEREAS**, on June 24, 2025, the Foundation Parties and the HMIT Entities entered into that certain *Settlement Term Sheet* which is annexed hereto as Attachment 1 to this Stipulation (the "Term Sheet");

**NOW, WHEREFORE, IT IS HEREBY JOINTLY STIPULATED AND AGREED** as follows:

1. The Foundation Parties withdraw the Foundation Objection with prejudice in accordance with the terms of the Term Sheet annexed hereto as **Attachment 1**.

2

CONFIDENTIAL                                                            TDIT006199

FSD2025-0116                                                                                     2025-08-19

2.  The Foundation Parties, the HMIT Entities, and the Movants agree that the following

language shall be contained in the proposed order on the 9019 Motion:

Notwithstanding anything in the Settlement Agreement or the 9019 Order to the contrary,
none of the Dallas Foundation, EDF, Okada Family, or Crown (the "Foundation Parties")
are or will be included in the definitions of HMIT Releasors or Highland Releasors. For
the avoidance of doubt, however, any attempt by the Foundation Parties to assert a Claim
against a HMIT Released Party by, through, or under, including derivatively, a Highland
Entity, or against a Highland Released Party by, through, or under, including derivatively,
a HMIT Entity is barred by this Order and the Settlement Agreement.

Respectfully Submitted:

**KELLY HART PITRE**

*/s/ Louis M. Phillips_____*
Louis M. Phillips (#10505)
One American Place
301 Main Street, Suite 1600
Baton Rouge, LA 70801-1916
Telephone: (225) 381-9643
Facsimile: (225) 336-9763
Email: louis.phillips@kellyhart.com
Amelia L. Hurt (LA #36817, TX #24092553)
400 Poydras Street, Suite 1812
New Orleans, LA 70130
Telephone: (504) 522-1812
Facsimile: (504) 522-1813
Email: amelia.hurt@kellyhart.com
*Counsel for the HMIT Entities*

and

**OKIN ADAMS BARTLETT CURRY LLP**
*By: /s/ David L. Curry_____*
Matthew S. Okin
Texas Bar No. 00784695
David L. Curry, Jr.
Texas Bar No. 24065107
1113 Vine Street, Suite 240
Houston, Texas 77002
Telephone: (713) 28-4100
Facsimile: (346)247-7158

3

FSD2025-0116                                                                          2025-08-19
                                                                                                1162

CONFIDENTIAL                                                                         TDIT006200

FSD2025-0116

2025-08-19

Email: mokin@okinadams.com
dcurry@okinadams.com
**ATTORNEYS FOR THE DALLAS
FOUNDATION AND CROWN GLOBAL
LIFE INSURANCE, LTD.**

and

**PACHULSKI STANG ZIEHL & JONES
LLP**

*/s/John A. Morris* _____
Jeffrey N. Pomerantz (admitted pro hac vice)
John A. Morris (admitted pro hac vice)
Gregory V. Demo (admitted pro hac vice)
Jordan A. Kroop (admitted pro hac vice)
Hayley R. Winograd (admitted pro hac vice)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Tel: (310) 277-6910
Fax: (310) 201-0760
Email: jpomerantz@pszjlaw.com
jmorris@pszjlaw.com
gdemo@pszjlaw.com
jkroop@pszjlaw.com
hwinograd@pszjlaw.com
- and -

**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110
*Counsel for Highland Capital
Management, L.P. and the Highland
Claimant Trust*

and

4

FSD2025-0116

2025-08-19
1163

CONFIDENTIAL

TDIT006201

Case 19-34054-sgj11   Doc 4291   Filed 06/27/25   Entered 06/27/25 15:05:18   Desc
Main Document   Page 5 of 11

**QUINN EMANUEL URQUHART & SULLIVAN LLP**

*/s/ Robert S. Loigman*

Deborah J. Newman (admitted pro hac vice)
Robert S. Loigman (admitted pro hac vice)
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone: (212) 849-7000
-and   SIDLEY AUSTIN LLP
Paige Holden Montgomery
2021 McKinney Avenue
Suite 2000
Dallas, Texas 75201
Telephone: (214) 981-3300
***Co-Counsel for Marc S. Kirschner, as Litigation Trustee of the Highland Litigation Sub-Trust***

CERTIFICATE OF SERVICE

I, undersigned counsel, hereby certify that a copy of the forgoing was served on all parties receiving notice in this chapter 11 case through this Court's CM/ECF System on this June 25, 2025.

*/s/ Louis M. Phillips*
Louis M. Phillips (#10505)

FSD2025-0116
CONFIDENTIAL
2025-08-19
1164
TDIT006202

## Attachment 1

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | *Case No. 19-34054-sgj11* |
| | § | |
| Debtor. | § | |

### BINDING TERM SHEET

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Trust, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

---

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

CONFIDENTIAL                                                          TDIT006203

Case 19-34054-sgj11 Doc 4627-6 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc
Exhibit 211 Part 02 Page 479 of 759

1246

FSD2025-0116 **Page 1250 of 1530** 2025-08-19

Case 19-34054-sgj11 Doc 4291 Filed 06/27/25 Entered 06/27/25 15:05:18 Desc
Main Document Page 7 of 11

| | |
|---|---|
| | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

CONFIDENTIAL TDIT006204

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 480 of 759

1247

FSD2025-0116                    **Page 1251 of 1530**                    2025-08-19
Case 19-34054-sgj11   Doc 4291   Filed 06/27/25   Entered 06/27/25 15:05:18   Desc
Main Document      Page 8 of 11

|  |  |
|---|---|
|  | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

_Julie Diaz_

Julie Diaz, Chief Executive Officer

The HMIT Entities

_____

Mark Patrick

CONFIDENTIAL                                                      TDIT006205

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 481 of 759

1248

FSD2025-0116                    **Page 1252 of 1530**                    2025-08-19
Case 19-34054-sgj11    Doc 4291    Filed 06/27/25    Entered 06/27/25 15:05:18    Desc
Main Document        Page 9 of 11

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **In re:** | § | |
| | § | **Chapter 11** |
| **HIGHLAND CAPITAL** | § | |
| **MANAGEMENT, L.P.,** | § | |
| | § | **Case No. 19-34054-sgj11** |
| **Debtor.** | § | |

**BINDING TERM SHEET**

This Summary of Terms and Conditions (this "Term Sheet") outlines certain agreements by and between the HMIT Entities,[1] on the one hand, and The Dallas Foundation (the "Foundation"), Empower Dallas Foundation ("EDF"), the Okada Family Foundation ("Okada Family Foundation"), and Crown Global Life Insurance, Ltd. ("Crown," and with the Foundation, EDF, and the Okada Family Foundation, the "Foundation Parties") resolving that Objection (the "Objection") of The Dallas Foundation and Crown Global Life Insurance, Ltd to Motion for Enry of an Order Pursuant to Bankruptcy Rule 9019 and 11 U.S.C. § 363 Approving Settlement With the HMIT Entities and Authorizing Actions Consistent Therewith [ECF No. 4216] (the "9019 Motion").

| | |
|---|---|
| **Clarification of 9019 Settlement Releases:** | The parties have agreed to include language in any order granting the 9019 Motion clarifying the scope of releases as to the Foundation Parties. |
| **Initial Settlement Payments to HMIT:** | The HMIT Parties agree that the Cash Payment and the Initial Interim Distribution (the "Initial Settlement Payments") shall be made as provided in the Settlement Agreement and shall be held in accordance with the terms of this agreement. The HMIT Entities agree that the Initial Settlement Payments shall only be used to pay ordinary expenses of the HMIT entities in the nature of legal expenses and ordinary customary general expenses (the "Expenses"). At the Dallas Foundation Meeting (defined below), the HMIT Parties shall provide a projected quarterly expense budget to the Foundation Parties and shall continue to provide expense reporting reflecting the paid Expenses every forty-five (45) days, commencing August 5, 2025 (relating to Expenses paid June 15, 2025 to July 31, 2025). Such Expenses and the reports are "Information" within the meaning of this Agreement subject to the restrictions herein. Notwithstanding the foregoing, the HMIT Parties shall hold, in accordance with this Agreement, not less than $7,500,000.00 of the Initial Settlement |

---

[1] Capitalized terms not defined herein shall have the meanings set forth in the 9019 Motion or 9019 Order.

1249

|  |  |
|---|---|
|  | Payments actually received for a period of not less than thirty (30) calendar days following receipt of the Initial Settlement Payments.<br><br>The HMIT Parties agree that the Initial Settlement Payments (less Expenses) shall be held in an account held by HMIT or CLO HoldCo LLC to be identified by the HMIT Parties. In identifying such account, the HMIT Parties shall provide the account number, the account name, and account location (institution name and location). |
| **HMIT Meeting with The Dallas Foundation:** | Mr. Shawn Raver, as representative of HMIT, will, as soon as is practicable, but no later than July 7, 2025 meet in person at a location mutually agreed upon (the "DF Meeting") with the Dallas Foundation and will review the current "DAF" structure, with an eye to commencing negotiations with DF about the use of current support organization(s) or the creation of new support organizations to support the DF and as appropriate the other Foundations mentioned above (the "Resolution"). Mr. Mark Patrick may attend the DF Meeting either in person or virtually. As used herein, the term "DAF" shall mean the historical corporate structure of Charitable DAF Holdco, LTD, its parents and subsidiaries, in existence as of January 1, 2024, and any changes thereto, including any changes described in that matter before the Grand Court of the Cayman Island – Financial Services Division, Cause No: FSD 99 of 2025 (JAJ).<br><br>At the DF Meeting, which will be a confidential settlement meeting covered by any and all state, federal, and international confidentiality statutes, laws, customs, etc., with all parties to agreeing that no information ("Information") shared at the meeting can be shared further by any person or entity outside of the group participating at the meeting, except as otherwise provided herein. Prior to the Initial Meeting, the HMIT Parties and Foundation Parties may, but shall not be required as a pre-condition of the Initial Meeting, enter into such confidentiality agreements as may be agreed upon by the parties. Nothing in this agreement shall, however, preclude a party from disclosing Information pursuant to a subpoena, or other such legal compulsion or seeking information through subpoena within a proceeding in a tribunal of competent jurisdiction.<br><br>At the DF Meeting, Mr. Raver will show and present the participants with a balance sheet for the DAF as of 9/30/2024, 12/31/2024, and 3/31/2025. For the avoidance of doubt, such accounting shall include an accounting of any transfer assets from an entity within the DAF structure during the periods covered by the balance sheets to any another entity, including another entity within the DAF structure. |

**CONFIDENTIAL**                    TDIT006207

| | |
|---|---|
| | At any time after the DF Meeting, either the HMIT Parties or Foundation Parties may declare an impasse (an "Impasse") in negotiations in writing delivered to the parties.<br><br>Unless an Impasse is declared following the DF Meeting, Mark Patrick agrees to meet with the Dallas Foundation and the other Supporting Organizations, or the Foundations they support, with an eye to furthering negotiations on the proposed Resolution.<br><br>If an acceptable Resolution is agreed upon, Mr. Patrick, the Supporting Organization, and Dallas Foundation shall jointly request a meeting with the JOLs and the DF, with a view toward winding up the liquidation proceedings of Charitable DAF Holdco, Ltd., including not seeking any equitable wind up of Charitable DAF Fund, LP., all of which should be able to be accomplished expeditiously in the event of agreements hoped to be achieved upon the meeting described above. |
| **Resolution of the Objection:** | In return for the foregoing, TDF and Crown Global agree to withdraw their objection to the 9019 Motion, in all capacities in which their objection has been filed, and to withdraw the notice of deposition of Mark Patrick.<br><br>The parties further agree that this Term Sheet shall be included as an attachment to the 9019 Order, and the terms of this Agreement enforceable in the Bankruptcy Court and the Bankruptcy Court shall maintain concurrent jurisdiction to resolve any dispute arising therefrom. |

Dated: June 24, 2025

The Dallas Foundation

_____

Julie Diaz, Chief Executive Officer

The HMIT Entities

_____

Mark Patrick

CONFIDENTIAL                                                        TDIT006208

**Rachel Baxendale**

---

| | |
|---|---|
| **From:** | Daniel Mills <Daniel.Mills@kobrekim.com> |
| **Sent:** | 30 June 2025 9:16 AM |
| **To:** | Luke Armitage; #MaplesCDAF |
| **Cc:** | Nia Statham; Peter Tyers-Smith; jennifercolegate@bakerandpartners.com; rodoherty@campbellslegal.com; mgoodman@campbellslegal.com |
| **Subject:** | RE: [EXTERNAL] RE: In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ) |
| **Attachments:** | 2025 06 13 (KK) Letter to Maples-c-c.pdf; 2025 05 14 (KK) Second Letter to GT-c-c.PDF |

*****This email has originated from outside your organisation*****

---

Dear Maples

We refer to your email below.

Your letter of 19 June 2025 is addressed to Campbells and cc'd to us. This is the third time we are making the same points:

1.  Kobre & Kim acts for the Management Shareholder and the Directors of Charitable DAF HoldCo, Ltd (in Official Liquidation) (the "**Company**").

2.  Our clients, as Management Shareholder and Directors of the Company have no powers to deal with any assets of the Fund or the asset-holding entities owned by the Fund.

3.  Moreover, and in any event under O.15, r.8(3) of the CWR, all of the powers of the Directors of the Company ceased on 6 May 2025 when the supervision order was made.

4.  In the circumstances, to the extent your 19 June 2025 letter requests undertakings from our clients (which it doesn't), that request is misconceived and they will not be providing any.

We will refer to this email as well as our letters of 14 May 2025 and 13 June 2025 (which make the same unanswered points above – attached again for your attention) on the question of costs as is required.

Kind regards

Daniel Mills
+1 345 749 4023

## KOBRE & KIM

**www.kobrekim.com**

**Americas** (New York, Delaware, Miami, San Francisco, São Paulo, Washington DC)
**APAC** (Hong Kong, Seoul, Shanghai), **Caribbean** (BVI, Cayman Islands), **EMEA** (Cyprus, Dubai, London, Tel Aviv)

This e-mail message is from Kobre & Kim (Cayman), a general partnership established under the laws of the Cayman

1

FSD2025-0116                                                                                                                2025-08-19

Islands, referred to above as Kobre & Kim, and may contain legally privileged and/or confidential information. If the reader of this message is not the intended recipient(s), or the employee or agent responsible for delivering the message to the intended recipient(s), you are hereby notified that any dissemination, distribution or copying of this e-mail message is strictly prohibited. If you have received this message in error, please notify the sender immediately and delete this e-mail message and any attachments from your computer without retaining a copy.

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** Friday, June 27, 2025 1:09 PM
**To:** mgoodman@campbellslegal.com; rodoherty@campbellslegal.com
**Cc:** Nia Statham <NiaStatham@bakerandpartners.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** [EXTERNAL] RE: In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ)

Dear Campbells, Bakers and K&K

We refer to the attached letter to each of your firms, which enclosed a draft protocol, and adopt the defined terms therein.  Our letter requested that you each confirm your clients' agreement to giving an undertaking to the Court in the form of the draft protocol or provide comments by no later than midday today.  You have each failed to do so.  This matter is, for obvious reasons, highly time sensitive.  The JOLs are not willing to let the negotiation of the protocol drag on indefinitely whilst the interest in the Fund and the Fund's assets remain under your clients' effective control without any acceptable safeguards in place.  Please therefore provide a substantive response to our letter, including agreement in principle to give an undertaking and comments on the draft protocol (if any), by no later than noon on Monday, 30 June 2025.  Absent a response from each of your firms by that time, the JOLs will have to consider their options to ensure that the position is adequately protected whilst the JOLs' continue their investigations. This will be without reference to your clients.

Kind regards
Luke


**Luke Armitage**
Associate

**MAPLES** GROUP
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

**maples.com**

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** 19 June 2025 9:27 AM
**To:** Mark Goodman | Campbells <MGoodman@campbellslegal.com>; rodoherty@campbellslegal.com
**Cc:** Nia Statham <NiaStatham@bakerandpartners.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ)

Dear Counsel

Please see attached correspondence and enclosure.

Best regards
Luke

2

FSD2025-0116                                                                                                                2025-08-19
                                                                                                                            1172
CONFIDENTIAL                                                                                                    TDIT006210

FSD2025-0116
2025-08-19

**Luke Armitage**
Associate

**MAPLES** GROUP
**Direct** +1 345 814 5473 | **Mobile** +1 345 936 5473 | **Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

**maples.com**

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

FSD2025-0116
2025-08-19
1173

CONFIDENTIAL
TDIT006211

**FSD2025-0116**                                                                                              **2025-08-19**

**Rachel Baxendale**

---

| | |
|---|---|
| **From:** | Jennifer Colegate <JenniferColegate@bakerandpartners.com> |
| **Sent:** | 30 June 2025 11:18 AM |
| **To:** | Luke Armitage |
| **Cc:** | Nia Statham; Peter Tyers-Smith; Daniel Mills; #MaplesCDAF; Mark Goodman \| Campbells; rodoherty@campbellslegal.com; Justina Zofia Stewart |
| **Subject:** | RE: In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ) |

*****This email has originated from outside your organisation*****

---

Dear Counsel

We refer to your letter dated Friday 27 June 2025 to which this office was copied.

We understand that Campbells have provided a substantive response to your correspondence regarding the proposed protocol.  We do not propose to add further to that correspondence save to note that his Lordship provided what we regard as a clear indication that it would be a sensible way forward for the JOLs to enter a protocol in respect of the CDM entities and assets.  DFW agrees with the views expressed by his Lordship in that regard.

For the avoidance of doubt, DFW was not an addressee of your letter 27 June and has not been requested by its terms to provide any form of undertaking to the JOLs.

DFW is giving further consideration to the letter that was issued by the JOLs immediately following the sanction hearing of last week to US attorneys engaged in the approval of the Hunter Mountain settlement, and the representations that were made at that hearing.  DFW's rights to bring the interference and overreach of the JOLs to the attention of the Court are reserved in full.

Best regards,
Jennifer

**Jennifer Colegate**
Partner

Tel: +1 (345) 746 3650





www.bakerandpartners.com
Baker & Partners LLP
P.O. Box 636, Buckingham Square, 720 West Bay Road
Cayman Islands, KY1-1107

1

**FSD2025-0116**                                                                                              **2025-08-19**



DISCLAIMER: This e-mail is confidential and may contain legally privileged information. If you are not named above as an addressee it may be unlawful for you to read, copy, distribute, disclose or otherwise use the information in this e-mail. Any views or opinions presented are solely those of the author, and do not necessarily represent those of Baker & Partners. If you are not the intended recipient and have received this e-mail in error please notify Baker & Partners on +44 (0) 1534 766254.

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** 27 June 2025 13:09
**To:** Mark Goodman | Campbells <MGoodman@campbellslegal.com>; rodoherty@campbellslegal.com
**Cc:** Nia Statham <NiaStatham@bakerandpartners.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; Jennifer Colegate <JenniferColegate@bakerandpartners.com>; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** RE: In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ)

Dear Campbells, Bakers and K&K

We refer to the attached letter to each of your firms, which enclosed a draft protocol, and adopt the defined terms therein.  Our letter requested that you each confirm your clients' agreement to giving an undertaking to the Court in the form of the draft protocol or provide comments by no later than midday today.  You have each failed to do so.  This matter is, for obvious reasons, highly time sensitive.  The JOLs are not willing to let the negotiation of the protocol drag on indefinitely whilst the interest in the Fund and the Fund's assets remain under your clients' effective control without any acceptable safeguards in place.  Please therefore provide a substantive response to our letter, including agreement in principle to give an undertaking and comments on the draft protocol (if any), by no later than noon on Monday, 30 June 2025.  Absent a response from each of your firms by that time, the JOLs will have to consider their options to ensure that the position is adequately protected whilst the JOLs' continue their investigations. This will be without reference to your clients.

Kind regards
Luke


**Luke Armitage**
Associate

**MAPLES** GROUP
**Direct** +1 345 814 5473 | **Mobile** +1 345 936 5473 | **Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

**maples.com**

---

**From:** Luke Armitage <Luke.Armitage@maples.com>
**Sent:** 19 June 2025 9:27 AM
**To:** Mark Goodman | Campbells <MGoodman@campbellslegal.com>; rodoherty@campbellslegal.com
**Cc:** Nia Statham <NiaStatham@bakerandpartners.com>; Peter Tyers-Smith <peter.tyers-smith@kobrekim.ky>; Daniel Mills <Daniel.Mills@kobrekim.com>; jennifercolegate@bakerandpartners.com; #MaplesCDAF <#MaplesCDAF@maples.com>
**Subject:** In the Matter of Charitable DAF Holdco Ltd (in Official Liquidation) – FSD Cause No. 116 of 2025 (JAJ)

CONFIDENTIAL
TDIT006213

1256

**FSD2025-0116**                    **Page 1260 of 1530**                    **2025-08-19**

Dear Counsel

Please see attached correspondence and enclosure.

Best regards
Luke

**Luke Armitage**
Associate

**MAPLES** GROUP
**Direct +1 345 814 5473 | Mobile +1 345 936 5473 | Bio**
Maples and Calder (Cayman) LLP, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands

**maples.com**

---

This email has been sent by and on behalf of Maples and Calder (Cayman) LLP (the Firm). The Firm is a limited liability partnership registered under the Limited Liability Partnership Act of the Cayman Islands with Registration Number 588490. The Firm is a separate and distinct business from other undertakings and entities called Maples and Calder operating outside of the Cayman Islands. The registered office of the Firm is at PO Box 309, Ugland House, South Church Street, George Town, Grand Cayman, KY1-1104, Cayman Islands. The Firm holds an operational licence issued by the Grand Court of the Cayman Islands under the Legal Practitioners Act of the Cayman Islands. A list of partners and associates of the Firm is available by clicking here. The title of "partner" is used to refer to a partner of the Firm or a consultant or employee with equivalent standing and qualifications.

The Firm provides legal services to its clients under its standard terms of engagement which are available by clicking here or from your usual contact at the Firm. Maples Corporate Services Limited provides registered office services to its clients under its standard terms and conditions which are available by clicking here or from your usual contact at the Firm. For further information about the Firm, please visit maples.com/locations/cayman-islands. For further information about the Maples Group, please visit maples.com.

This email (including any attachments) is confidential and may also be privileged. No confidentiality or privilege is waived or lost by any error in transmission. It is intended solely for the use of the recipient(s) to whom it is addressed. It should not be read, copied, distributed, relied upon or otherwise used by any other person. If you have received this e-mail in error, please delete it from your system and notify the sender immediately. All communications sent by the Firm to its clients are subject to its standard terms of engagement and the Firm does not accept or assume responsibility for any use of or reliance on this email by anyone, other than the client named in the applicable engagement letter with the Firm.

If you include or attach any personal information in or to your email, we may use, store, or disclose it for our own business purposes. For further explanation regarding why and how we handle personal information, please visit maples.com/privacy.

For legal and regulatory disclosures, please visit maples.com/legal-notices

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast, a leader in email security and cyber resilience. Mimecast integrates email defenses with brand protection, security awareness training, web security, compliance and other essential capabilities. Mimecast helps protect large and small organizations from malicious activity, human error and technology failure; and to lead the movement toward building a more resilient world. To find out more, visit our website.

3

**FSD2025-0116**                    **2025-08-19**

1176

CAUSE NO. _____

|  |  |
|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | |
| *Plaintiffs*, | IN THE TEXAS BUSINESS COURT |
| **v.** | 1ST DIVISION |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | DALLAS, TEXAS |
| *Defendants*. | |

**PLAINTIFFS' ORIGINAL PETITION, APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION, AND EMERGENCY <u>REQUEST FOR APPOINTMENT OF RECEIVER</u>**

**TO THE HONORABLE JUDGE OF SAID COURT:** The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc., (collectively, the "Plaintiffs" or "Supporting Organizations") file this Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Application for Appointment of Receiver, and in support thereof, respectfully show the Court as follows:

## I.     PRELIMINARY STATEMENT

1.1     Defendant, Mark Patrick, through a host of corporate manipulations, took over $270 million in cash and assets that supported some of the most important community-based

---

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                          PAGE 1

**CONFIDENTIAL**                          **TDIT006215**

charities in the country. In Patrick's own testimony from just last Wednesday, June 25th, the Supporting Organizations, plaintiffs here, were left with "nothing."[1]

1.2    Through the mechanism of Charitable DAF GP, LLC (organized in Delaware) and later via a secretly incorporated entity, CDH GP, Ltd., Mark Patrick held the sole control position of what was a $270 million charitable fund (Charitable DAF Fund, LP) that four charities and the Supporting Organizations relied on to perform vital and sustained philanthropic work in specific communities in the United States.  Patrick flagrantly violated both his express and implied fiduciary duties to the Supporting Organizations. He did so in order to redirect the fund's beneficial ownership to a brand-new sham charitable organization controlled by him, DFW Charitable Foundation. These actions come against a backdrop and pattern of sustained self-aggrandizement by Patrick using the fund's resources and his technical authority over them.  If the Defendants here are not immediately prevented from taking further adverse actions, then placed into receivership and subjected to judicial scrutiny, the Plaintiffs will be cut off from the lifeblood of their charitable work by the very person whose duty was to act in their interests.  Accordingly, Plaintiffs seek a Temporary Restraining Order and Temporary Injunction freezing the funds, followed by the appointment of a Receiver over the funds and the organization holding them.

## II.    DISCOVERY CONTROL PLAN AND MONETARY RELIEF

2.1    Plaintiffs intend that discovery be conducted under Level 2 as set forth in Rule 190.3 of the Texas Rules of Civil Procedure.  Plaintiffs reserve the right to request to conduct discovery pursuant to "Level 3" as set forth in Rule 190 of the Texas Rules of Civil Procedure.

---

[1] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, Case No. 19-34054-sgj-11 (App. Pg. 200)

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 2

CONFIDENTIAL                                                          TDIT006216

2.2 Plaintiffs seek damages in excess of $5,000,000 exclusive of interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs.

### III. PARTIES

3.1 T**he Highland Dallas Foundation, Inc. ("HDF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HDF provides funding to The Dallas Foundation, a Texas charitable entity established in 1929, which has awarded over $1 billion in charitable grants that support a broad range of public needs.

3.2 **The Highland Kansas City Foundation, Inc. ("HKCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HKCF provides funding to the Greater Kansas City Community Foundation, established in 1978, which has awarded over $7 billion in in charitable grants that support a broad range of public needs.

3.3 **The Highland Santa Barbara Foundation, Inc. ("HSBF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. HSBF provides funding to the Santa Barbara Foundation, established in 1928, that supports a broad range of public needs.

3.4 **DFW Charitable Foundation ("DFWCF")** is a Delaware non-profit corporation exempt from taxation under Section 501(c)(3) of the Internal Revenue Code. It was organized on December 9, 2024, with Defendant Mark Patrick as DFWCF's sole member. It purports to be a nonprofit nonstock corporation serving exclusively charitable purposes. DFWCF is headquartered at Mark Patrick's residence at 6716 Glenhurst Drive, Dallas, Texas 75254. DFWCF maintains a registered office at Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801, where it may be served with process.

3.5    **Mark Patrick ("Patrick")** is an individual who resides in Texas and holds management control over the Fund structure, as explained more thoroughly below. Patrick resides and may be served with process at 6716 Glenhurst Drive, Dallas, Texas 75254, or served anywhere he may be found.

3.6    **CDMCFAD, LLC** is a Delaware limited liability company with headquarters at 6716 Glenhurst Drive, Dallas, Texas 75254.  It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

3.7    **CDH GP, Ltd**. is a Cayman Island limited company with its registered office at Campbells Corporate Services Limited, Floor 4 Willow House, Cricket Square, Grand Cayman Ky1-9010. It may be served with process through Patrick, its 100% owner and sole director, at 6716 Glenhurst Drive, Dallas, Texas 75254, or anywhere he may be found.

3.8    **CHARITABLE DAF GP, LLC** is a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands. It may be served with process at Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.

## IV.    JURISDICTION AND VENUE

4.1    Pursuant to Government Code § 25A.004, this Court has jurisdiction over this matter because the amount in controversy exceeds $5 million excluding interest, statutory damages, exemplary damages, penalties, attorney's fees, and court costs:

- and is an action regarding the governance, governing documents, or internal affairs of organizations, namely Charitable DAF Fund, L.P., and DAF HoldCo, Ltd;

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 4

CONFIDENTIAL                                                        TDIT006218

- and is an action by an owner of an organization, namely the Supporting Organizations as participating and beneficial owners of DAF HoldCo, Ltd and thereby Charitable DAF, L.P., and is brought against a controlling person and managerial official of the organization, namely Patrick, Charitable DAF, GP, LLC, CDH GP, Ltd and Patrick's controlled entities, DFWCF, and CDMCFAD, LLC; and alleges numerous fiduciary and other breaches of Patrick's, Charitable DAF, GP, LLC's, and CDH GP, Ltd's obligations in the capacity of a controlling person and managerial official of DAF HoldCo, Ltd and Charitable DAF, L.P.;

- and is an action alleging that Patrick, as a controlling person, and managerial official, with the entities he dominated and used, breached a duty owed to the Supporting Organizations as a controlling owner of DAF HoldCo, Ltd, CDMCFAD, LLC, and Charitable DAF, L.P., DFW Charitable Foundation by reason of the Patrick's status as an owner of management interests, controlling person, and managerial official, including the breach of a duty of loyalty and good faith.

4.2    The Court also has related supplemental jurisdiction per Government Code § 25A.004.

4.3    The Court also maintains plenary power to appoint a receiver under Texas Government Code § 24.003, Texas Civil Practice and Remedies Code § 64.001(a)(3), Texas Business and Organizations Code §§ 11.401 and 11.410, and through the Court's inherent powers at equity.

4.4    Personal jurisdiction is proper by Texas courts pursuant to Texas Civil Practice & Remedies Code § 17.042 because Defendants committed tortious actions, including Texas resident,

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 5**

1262

Mark Patrick, who improperly took approximately $270 million in value, and other conduct within Texas, incorporated herein, which are the subject of this Petition.  Defendants are therefore subject to specific personal jurisdiction because of the complained-of acts that they committed in Texas.  Defendants all have substantial business operations, assets, and other connections to Texas.  Defendants are subject to general personal jurisdiction in Texas because they both reside in, and have continuous and systematic contacts with, Texas.  Defendants have also consented to the jurisdiction of Texas courts.

4.5     Venue is proper in this county under Texas Civil Practice & Remedies Code § 15.002 because Defendant Patrick is a resident of Dallas County, Texas and Patrick undertook and directed a substantial portion of the complained-of acts in Dallas County, Texas.  On information and belief, DFWCF, CDH GP, Ltd.  and CDMCFAD are headquartered in Dallas County.  Dallas County is within the 1st Division of the Texas Business Court.

## V.     FACTUAL BACKGROUND

### A.  *The Fund Structure*

5.1     James Dondero was the President of Highland Capital Management, L.P. ("**Highland**"), an SEC registered investment advisor. At Mr. Dondero's direction, in 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. The goal was to create a permanent, self-sustaining, self-governing charitable infrastructure to facilitate sustained philanthropic efforts in specific communities in the United States.

5.2     To that end, in 2011, "Charitable DAF Fund, L.P. ("**Charitable DAF Fund**") was formed to hold the donated assets.

**CONFIDENTIAL**                                                                          **TDIT006220**

5.3    The Charitable DAF Fund primarily holds assets through a wholly-owned subsidiary entity called CLO HoldCo, Ltd. ("**CLO HoldCo**").

5.4    At the same time the Charitable DAF Fund was created, Charitable DAF HoldCo, Ltd ("**Charitable DAF HoldCo**"), a Cayman Islands entity, was also organized. Charitable DAF HoldCo held all of the economic interest in the Charitable DAF Fund. In other words, Charitable DAF HoldCo was the beneficial owner of all monies flowing from the assets held in the Charitable DAF Fund.

5.5    The ultimate purpose of forming Charitable DAF Fund and Charitable DAF HoldCo was to benefit certain, substantial regional nonprofit charities and their supporting organizations in California, Kansas, and Texas. Participating shares in Charitable DAF HoldCo were therefore issued to four Supporting Organizations, which were the ultimate beneficial owners of the assets held in the Charitable DAF Fund. Together, the four Supporting Organizations owned 100% of Charitable DAF HoldCo. The four Supporting Organization held their beneficial ownership in the assets of the Charitable DAF Fund by virtue of those Participating Shares in Charitable DAF HoldCo. Put simply: the four Supporting Organizations owned 100% of Charitable DAF HoldCo, which was the beneficial owner of all the assets in the Charitable DAF Fund. Three of the four Supporting Organizations are the Plaintiffs in this Lawsuit.

5.6    In turn and as intended, the funds provided to the Plaintiff Supporting Organizations from the Charitable DAF Fund empowered them to provide funding directly to charitable foundations in three regions of the United States. Specifically, The Dallas Foundation, The Greater Kansas City Community Foundation, and The Santa Barbara Foundation (together, the "**Charities**") are each affiliated with one of the Supporting Organizations and receive regular grants for charitable work ultimately funded by Charitable DAF Fund.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 7**

FSD2025-0116                                                            2025-08-19

1183

**CONFIDENTIAL**                                                        **TDIT006221**

5.7     Since the Charitable DAF Fund's inception, the Supporting Organizations have granted over $42 million to charitable organizations, including donations to 275 organizations, with average annual grant payments of $3.7 million. The Supporting Organizations and the charitable organizations perform irreplaceable philanthropic work in their respective communities, and do so in a steady, reliable manner that permits them to build progress on initiatives year after year.

## B.  *Control of the Fund*

5.8     The founders of the Charitable DAF Fund and of Charitable DAF HoldCo wanted to ensure that the fund assets were professionally managed by experts. So, although the Supporting Organizations were the sole beneficiaries of the Charitable DAF Fund and together held all of the economic interest in it, management control of the Charitable DAF Fund and Charitable DAF HoldCo was vested not with those organizations but rather in "Management Shares," with general partner status. These "Management Shares" provided the only voting rights for any and all shareholders in Charitable DAF HoldCo. But they did not convey a right to any economic benefit of the assets in the Charitable DAF Fund, which belonged solely to the Supporting Organizations.

5.9     So, the "Management Shares" exercised control over the assets and over the operations of Charitable DAF HoldCo, even though they conveyed no economic benefit. In the interest of efficient management, the Management Shares and general partner status in the Charitable DAF Fund were concentrated in one person, the "**Control Position**."  The Control Position was therefore responsible to manage the Charitable DAF Fund and Charitable DAF HoldCo for the economic benefit of their economic beneficiaries—the "Supporting Organizations," which held their "Participating Shares."  The Control Position therefore owed the

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 8**

**CONFIDENTIAL**                                                      TDIT006222

Supporting Organizations fiduciary duties of candor, care, and loyalty, including a prohibition against any self-dealing.

5.10    In essence, the governing documents of Charitable DAF HoldCo grant complete control of Charitable DAF Fund structure to the holder of the 100 Management Shares in Charitable DAF HoldCo. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Charitable DAF Fund structure.

5.11    The Charitable DAF Fund, however, is also expressly, separately controlled by the Control Position. Similar to control over Charitable DAF HoldCo, control over the Charitable DAF Fund is separate from the beneficial economic ownership of the Charitable DAF Fund (which belongs entirely to the Supporting Organizations). Control over the Charitable DAF Fund was reposited in the Control Position through its complete ownership of a Delaware entity named Charitable DAF GP, LLC[2] (the "**Delaware GP**"). The Delaware GP was the managing general partner in the Charitable DAF Fund.

5.12    The Amended and Restated Limited Partnership Agreement of the Charitable DAF Fund, dated November 7, 2011 (the "**ARLPA**"), and the Amended and Restated Memorandum and Articles of Association of the LP dated January 19, 2015 ("**Articles**"), govern the Charitable DAF Fund and its partners. The ARLPA makes it clear the Control Position is to exercise his powers for the sole benefit of the Supporting Organizations.

5.13    For example, the Preamble to the ARLPA states:  "WHEREAS, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code

---

[2] The Charitable DAF GP, LLC, held all the general partnership shares in Charitable DAF Fund, which provided all management control over the Charitable DAF Fund, but conveyed no beneficial economic interest.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 9**

**CONFIDENTIAL**                                        TDIT006223

of 1986, as amended and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein[.]"

5.14    Likewise, Section 1.3 (Purpose and Powers) states that the Control Position must manage the fund assets "*for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.*"[3]

5.15    Section 1.6 (Powers) likewise emphasizes: "[T]he General Partner [Control Position] . . . is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*"[4]

5.16    The ARLPA thus provides that Charitable DAF Fund was formed to make investments, directly or indirectly, "for the economic benefit of the Limited Partner [DAF HoldCo] and its Indirect Charitable Owners" and contemplates the engagement of investment (and other service) advisors to achieve this. In this context, the Control Position is responsible for the governance and management functions of the Charitable DAF Fund as required for it to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support. The ARLPA is infused throughout with the singular command: The Control Position has great authority but is required to act with fidelity in exercising it for the benefit of the Supporting Organizations.

5.17    Grant Scott was initially selected for the Control Position. Mr. Scott was a longtime friend of Mr. Dondero's and a lawyer in North Carolina. Mr. Dondero knew and trusted Mr. Scott.

---

[3] Emphasis added.
[4] Emphasis added.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                              **PAGE 10**

Mr. Scott effectively served the Supporting Organizations' charitable purposes in his role in the Control Position. For this, Mr. Scott received $60,000 in annual compensation—a compensation rate that remained unchanged for the better part of decade. During this time, the Supporting Organizations and their respective charitable foundations made great strides in creating philanthropic, and charitable, work that was efficient, that was steady and reliable, and that grew and built on their progress year after year.

### C. *Mark Patrick's Assumption of Control*

5.18    Highland filed for bankruptcy in October 2019 ("**Highland Bankruptcy**") and, as a result, the Charitable DAF Fund became engaged in certain disputes arising from the bankruptcy, increasing the time and responsibilities associated with the Control Position. Mr. Scott did not feel qualified to manage those disputes and decided to resign from the Control Position.

5.19    Mark Patrick, a tax attorney and employee of Mr. Dondero who had played a significant role in developing the overall Charitable DAF Fund structure while at Highland, suggested to Mr. Scott and Mr. Dondero that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected Charitable DAF Fund.  At the time, Patrick was an employee of Mr. Dondero's enterprises and was serving as Mr. Dondero's attorney and Mr. Dondero had no objection to Mr. Scott transferring the Control Position to Patrick. As a result of his attorney and employee status, Mr. Patrick owed significant fiduciary duties to Mr. Dondero's entities and to the Charitable DAF Fund structure—fiduciary duties that he has violated in a series of self-serving and self-dealing transactions.

5.20    On March 25, 2021, Mr. Scott resigned and appointed Patrick as director of DAF HoldCo, transferring all his management shares and membership interest to Patrick for nominal consideration. Patrick therefore assumed the Control Position from that date. Patrick then hired

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 11

FSD2025-0116                                                                                2025-08-19
1187

CONFIDENTIAL                                                                                TDIT006225

Paul Murphy, a Cayman Islands' director, to join him in his efforts to abscond with the $270 million in assets.

5.21    At the time Patrick assumed the Control Position, he was employed at Skyview Partners, a service organization that provided support primarily to Mr. Dondero and entities in which Mr. Dondero had an interest. As an employee of Skyview, he owed fiduciary duties to his employer.

### D. *Patrick's Breaches of Fiduciary Duty*

5.22    In 2023, while still employed by Dondero entities, and as the sole fiduciary for the Charitable DAF Fund and DAF HoldCo, Patrick initiated a two-year pattern of malfeasance all culminating in his current effort to abscond with $270 million. His initial small infidelities quickly blossomed into a brazen, fraudulent play for the Charitable DAF Fund and its $270 million in holdings, putting at risk the charitable works supported by the Supporting Organizations.

### E. *Undisclosed Self-Dealing*

5.23    In June 2023, Patrick requested that The Highland Dallas Foundation, Inc. direct $10,000 to Creative HEARTS TX, a non-profit entity formed on June 13, 2023. Patrick expected this to be an annually recurring donation. Patrick failed to disclose that he, his wife, and daughter were the directors of this entity, which had been created approximately two weeks earlier. The Highland Dallas Foundation, Inc. funded an initial $10,000 contribution but declined to commit to doing so annually.

### F. *Attempted Fraudulent Kickback Scheme*

5.24    In September 2023, Patrick approached Kevin Cronin, CEO of Fortaris Capital Advisors, proposing a fraudulent kickback scheme to personally benefit Patrick. Fortaris previously provided legitimate services to the Charitable DAF Fund. Now, Patrick proposed that

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                          **PAGE 12**

the Charitable DAF Fund engage a new vendor controlled by Mr. Cronin. Patrick proposed that the Charitable DAF Fund pay this sham vendor a monthly fee of $25,000-$50,000. The sham vendor, however, would not provide any services to the Charitable DAF Fund. Instead, Patrick expected to collect half of the fee as undisclosed supplemental compensation. That is, he expected to collect something for nothing in a classic fraud.

5.25    Mr. Cronin declined and relayed what occurred to Mr. Dondero. Mr Dondero then confronted Patrick, who admitted that what Mr. Cronin reported was true.

5.26    Mr. Dondero ensured that Supporting Organizations were also informed about Patrick's kickback scheme. Despite significant concern, the Supporting Organizations had doubts about whether, based on the governing documents and Patrick's positions, they could remove Patrick from the Control Position.

### G. *Insider Trading*

5.27    In August 2024, Patrick tried to capitalize on material non-public information obtained through his employment at Skyview to advise The Dallas Foundation to exercise a put option in a NexPoint affiliated asset, constituting attempted violations of U.S. securities laws. The Dallas Foundation declined to trade on Patrick's improper tip.

5.28    Skyview's compliance department conducted an internal investigation that concluded Patrick's actions constituted serious breaches of compliance obligations and attempted serious breaches of U.S. securities laws.

5.29    Patrick resigned from Skyview immediately before the investigation was finalized and simultaneously terminated the Charitable DAF Fund's services agreement with Skyview without justification and against the Charitable DAF Fund's interests.

### H. *Financial Irregularities and Lack of Transparency*

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 13

FSD2025-0116                                                        2025-08-19

1189

CONFIDENTIAL                                                        TDIT006227

5.30   After resigning from Skyview, Patrick began shrouding the Charitable DAF Fund structure's overall financial reporting and communications to the point that the Supporting Organizations were essentially cut off from any view into the financial transactions and soundness of the fund. As of September 2024, the Charitable DAF Fund held approximately $270 million strictly for the financial benefit of the Supporting Organizations and ultimately their supported Charities.

5.31   But a review of the Charitable DAF Fund's last accessible financial records showed dramatic and unexplained increases in expenditures:

- Directors' fees increased from $40,000 in 2022 to almost $600,000 in 2023, and to approximately $2.25 million in the first half of 2024 alone (a 12,400% increase from 2022 if annualized).

- Legal expenses increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022 (a 300% increase if annualized).

- Overall expenses for the first half of 2024 were around $18.3 million, compared to $18.6 million for all of 2023.

5.32   Despite repeated requests from the Supporting Organizations and their counsel and counsel for the Charitable DAF Fund, Patrick and Murphy have ignored and refused to provide requested financial information or explanations for these dramatic expenditure increases.

5.33   Patrick must have personally benefited from the dramatic increases in director's fees and, given Patrick's prior attempt to implement a kickback scheme through Mr. Cronin, the other remarkable increases in expenses raise deep concerns about potential self-dealing.

I.   *Patrick Ignores the Supporting Organizations Concerns*

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 14**

CONFIDENTIAL                                              TDIT006228

5.34    On November 11, 2024, given what the Supporting Organizations already knew, the three major Supporting Organizations drafted a letter to Murphy, the Cayman Islands director, stating that "we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "**DAF-related entities**"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable."[5]

5.35    The letter continued, "because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."[6]

5.36    Patrick and Murphy never responded to the letter, other than a threat that if the Supporting Organizations did not withdraw it, then Patrick and Murphy would embark on an effort at the Internal Revenue Service to revoke the Supporting Organizations' charitable status.

5.37    In January 2025, the Supporting Organizations demanded Patrick and Murphy provide clarity into the Charitable DAF Fund's financial position, expressing dismay that Patrick and Murphy continued to ignore their repeated requests for information. Murphy responded via email to this request stating that he and Patrick would "present directly to the foundations/supporting organi[z]ations" to address some of the concerns in the No Confidence Letter. Murphy never did.[7]

---

[5] *See* Ex. 4-A, Ltr. of Nov. 11, 2024 (Appx. Pg. 162-163)
[6] *Id.*
[7] *See* Ex. 4-B, Email chain ending Jan. 23, 2025 (Appx. Pg. 171)

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 15

1272

5.38 Counsel for the Supporting Organizations and for the Charitable DAF Fund exchanged further communications, but Patrick, Murphy, and the Charitable DAF Fund's counsel never provided answers and information in response to the Supporting Organizations' basic requests. Instead, they wrapped all their future communications in half-truths and subterfuge.[8] At the same time, they offered the Supporting Organizations vague assurances that all their maneuvers were to improve the structure, focus, and performance of the fund, for the benefit of the Supporting Organizations.

5.39 The Charitable DAF Fund's counsel promised a meeting to address the Supporting Organizations' concerns, but after the Supporting Organizations' counsel suggested dates, the Charitable DAF Fund and its counsel delayed and delayed until it eventually went silent.[9]

5.40 In the interim, Patrick accelerated his multi-year fraud.

### J. *Dilution Scheme and Liquidation Maneuver*

5.41 Between December 2024 and the present, Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund, and alienate those same assets entirely away from them. The purpose and result of Patrick's moves was to entirely eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets. In short, he stole them.

5.42 In December 2024, Patrick formed new entities (as described below) with Patrick as the sole director. He then replaced the current entities holding and controlling the Charitable DAF Fund with his own entities, essentially transferring all ownership and control to himself in a brazen act of self-dealing. He never notified the Supporting Organizations of this massive

---

[8] *See* Exs. 4-A, Ltr. of Feb. 14, 2025 & Ex. 4-C Ltr. of Feb. 27, 2025 (Appx. Pg. 162-182).
[9] *See* Ex. 4-C, Email chain ending April 9, 2025 (Appx Pg. 179-182).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 16

CONFIDENTIAL TDIT006230

reorganization of the Charitable DAF Fund. Indeed, the Supporting Organizations found out about this monumental reorganization only when Patrick and his counsel had to admit it in a Cayman court as part of the Supporting Organization's successful effort to appoint Cayman Liquidators to unravel Patrick's fraud in that jurisdiction.

5.43   In a move that would make most fraudsters blanch, and certainly continued to violate all his fiduciary duties, on December 9, 2024, Patrick formed Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation. Patrick named himself the Sham Charity's sole member and its registered address was Patrick's home. Patrick then issued his charity a fifty-one percent (51%) interest in the charitable assets. In essence, Patrick awarded himself the ability to distribute over half of the Charitable DAF Fund's $270 million in economic interest to his own entity, from his living room in Dallas.

5.44   Three days later, on December 12, 2024, Patrick incorporated CDMCFAD, LLC, a Delaware limited liability company.

5.45   In secret, and without notice to the Supporting Organizations, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100 percent of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100 percent of the interest in CDMCFAD, LLC. As a result, CDMCFAD effectively was inserted as a blocking company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided). Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets of Charitable DAF Fund. Instead, Patrick ensured a different and new entity (CDMCFAD) held Charitable DAF Fund.

5.46   Patrick's fraud continued to evolve in February 2025. On February 7, 2025, again without notice to the Supporting Organizations, DAF HoldCo (in an *ultra vires act)* allotted 318

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                          **PAGE 17**

participating shares to DFWCF, the Sham Charity controlled by Patrick. This sham dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF HoldCo from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; (iii) HSBFI's interest was diluted from 32.787% to 16.05% and (iv) the HCMLP Charitable Fund's[10] interest was diluted from 1.639% to 0.80%. Said another way, Patrick absconded with over half of the participating interest of the Supporting Organizations and other charitable funds. Before, during, and after this action—and at all times it was contemplated and executed—Patrick and Charitable DAF HoldCo still owed fiduciary duties to the Supporting Organizations.

5.47    In February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Patrick's complete control of the assets of Charitable DAF Fund.

5.48    On March 27, 2025, Patrick caused CDMCFAD (the holder of $270 million in assets) to issue shares to the Sham Charity, *and only to the Sham Charity*. He issued no shares in CDMCFAD to the Supporting Organizations. His fraudulent scam was nearly complete. Now, Patrick's Sham Charity controlled all the direct economic interest in the entity Patrick had inserted between Charitable DAF HoldCo and the assets in Charitable DAF Fund, and the Supporting Organizations were left out in the cold.

5.49    On April 2, 2025, Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million. That is, he exchanged $270 million for $1.6

---

[10] The HCMLP Charitable Fund is a separate charity which provides funding for the North Texas Community Foundation. While it is not a named plaintiff, the damages it incurred because of the acts of Patrick are notable and relevant to show Patrick's impact across the State of Texas.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 18**

CONFIDENTIAL                                                    TDIT006232

million, a ridiculous transaction bereft of reasonably equivalent value.[11] After the transaction, Charitable DAF HoldCo purportedly had no assets and no remaining interest in Charitable DAF Fund. As a result, Patrick's Sham Charity, Defendant DFWCF, was the sole limited partner and beneficial owner of Charitable DAF Fund, through its now-100% ownership of CDMCFAD, and CDMCFAD's 100% ownership of the fund. This final step completely severed the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund. In Patrick's own words under oath, "the entity in liquidation [Charitable DAF Holdco, Ltd.] owns nothing."[12]

5.50    Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned 100% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Patrick allegedly distributed a paltry portion of $1.6 million to the Supporting Organizations, receipt of those funds has yet to be verified. Again, all of his self-dealing activity took place with no clarity or transparency. Patrick converted the Supporting Organizations' assets to Patrick's personal benefit and ownership, and violated his fiduciary duties of care, candor, and loyalty that he owed to the Supporting Organizations.

### K.  *The Cayman Island Proceedings*

5.51    On April 2, 2025, again unbeknownst to the Supporting Organizations, Patrick placed DAF HoldCo into *voluntary* liquidation in the Cayman Islands through written resolutions of directors executed by Patrick, with joint voluntary liquidators appointed.

5.52    But the Supporting Organizations already did know: that Patrick had (1) actively thwarted all financial transparency; (2) refused to address the Supporting Organizations well-

---

[11] *See* Ex. 3, p. 5, Written Resolutions of the Directors of the Company dated 2 April 2025 (Appx. Pg.  102-103)
[12] *See* Ex.5, June 25, 2025 Transcript of Proceedings; Testimony of Mark Patrick, p. 185:22-25; *In re Highland Capital Management, LP*, CaseNo. 19-34054-sgj-11; (Appx. Pg. 200).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 19**

FSD2025-0116                                                            2025-08-19

1195

CONFIDENTIAL                                                            TDIT006233

founded concerns including their expression of no-confidence; (3) engaged in a pattern of fraudulent self-dealing; (4) taken all participating ownership from the Supporting Organizations without any approval or appropriate compensation; and (5) and restructured the underlying funds. This was enough to convince the Supporting Organizations to take action.

5.53    The Supporting Organizations filed an *involuntary* Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.* Absent doing so, the Supporting Organizations would not have learned about Patrick's voluntary liquidation.

5.54    Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court. However, Defendants DFWCF and CDMCFAD are Delaware-organized entities and were not expressly named in the Grand Court proceedings.

5.55    The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things[13]:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

---

[13] Ex. 8, Supervision Order (Appx. Pg. 244-246)

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 20**

6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

5.56    While the Cayman Islands-appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick, DFWCF, and CDMCFAD (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the Charitable DAF Fund and DAF HoldCo.  In the meantime, the rightful beneficial owners, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the Charitable DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that rely on funding from the Charitable DAF Fund.

## VI.    CAUSES OF ACTION

### Count I - Breach of Fiduciary Duty Against Patrick,  CDH GP, Ltd., and Charitable DAF GP, LLC

6.1    Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

6.2     In "a limited partnership, the general partner stands in the same fiduciary capacity to the limited  partners as a trustee stands to the beneficiaries of a trust." *Hughes v. St. David's Support Corp.,* 944 S.W.2d 423, 425–26 (Tex. App.—Austin 1997, writ denied); *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661 (Del. Ch. 2012) (There "has never been any serious doubt that

---

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 21

CONFIDENTIAL                                                        TDIT006235

the general partner of a Delaware limited partnership owes fiduciary duties."). Likewise, under traditional principles of equity, and various statutes generally hold that a manager of an LLC would qualify as a fiduciary of that LLC and its members. *Auriga Capital Corp. v. Gatz Properties,* 40 A.3d 839, 850 (Del. Ch. 2012), judgment entered sub nom. *Auriga Capital Corp. v. Gatz Properties, LLC* (Del. Ch. 2012), aff'd, 59 A.3d 1206 (Del. 2012); *Davis v. Crawford*, 700 S.W.3d 438, 449 (Tex. App.—Eastland 2024, no pet.) ("[T]he relationship between a managing member of an LLC and a nonmanaging member is similar to that of a general partner/limited partner relationship, and that such an arrangement thereby creates a fiduciary obligation on the part of the managing member.").

6.3     By virtue of Patrick's Control Positions related to the overall Charitable DAF Fund structure and specifically DAF HoldCo and the Charitable DAF Fund, Patrick owed fiduciary duties to the Plaintiffs.

6.4     Patrick breached his fiduciary duties to the Plaintiffs by stripping them of their legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.5     Patrick breached these duties through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.6     Patrick breached his fiduciary duties by mismanaging the Charitable DAF Fund's finances, and dramatically increasing director compensation to his own benefit.

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                 **PAGE 22**

FSD2025-0116                                                 2025-08-19

1198

CONFIDENTIAL                                                 TDIT006236

6.7     Patrick breached his fiduciary duty by successfully soliciting a charitable contribution ultimately from a Supporting Organization to a charity controlled by Patrick and his immediate family without disclosing the relationship.

6.8     The actions incorporated herein have wrongfully deprived the Plaintiffs of substantial economic support and assets, harming, and threatening irreparable harm to, the Plaintiffs and the Charities that they support. Plaintiffs have suffered damages as a result of Patrick's breach of his fiduciary duties.

### Count II - Constructive Fraud Against Patrick

6.9     Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.10    "Constructive fraud is the breach of a legal or equitable duty that the law declares fraudulent because it violates a fiduciary relationship." *Hubbard v. Shankle*, 138 S.W.3d 474, 483 (Tex. App.—Fort Worth 2004, pet. denied).  "[I]n a claim for constructive fraud, the actor's intent is irrelevant." *Strobach v. WesTex Cmty. Credit Union*, 621 S.W.3d 856, 879 (Tex. App.—El Paso 2021, pet. denied).  "[C]onstructive fraud is the breach of some legal or equitable duty which, irrespective of moral guilt, the law declares fraudulent because of its tendency to deceive others, to violate confidence, or to injure public interests." *Id.*

6.11    As a fiduciary, Patrick's conduct in diluting the Plaintiffs' interests, selling assets at below-market values to undisclosed parties, and liquidating DAF HoldCo and transferring its interests to the Sham Charity without notice constitutes constructive fraud.

6.12    Patrick injured public interests by his conduct. Plaintiffs have suffered damages as a result of Patrick's fraud.

### Count III - Unjust Enrichment Against Patrick, CDMCFAD, and DFWCF

6.13    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 23**

6.14    A claim of unjust enrichment applies when a party obtains "a benefit from another by fraud, duress, or the taking of an undue advantage." *Sw. Bell Tel. Co. v. Mktg. on Hold Inc.*, 308 S.W.3d 909, 921 (Tex. 2010)).

6.15    Patrick and DFWCF stripped the Plaintiffs of their rightful legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.16    Patrick and DFWCF took these interests and assets for their own benefit via fraud and taking undue advantage of the access available through the Control Positions and overlapping control with DFWCF.

6.17    Patrick also took undue advantage through self-dealing, attempted secret profit schemes, use of inside information, financial mismanagement, orchestrating asset sales at below-market values, and transferring beneficial ownership to the Sham Charity.

6.18    Patrick and DFWCF have been unjustly enriched at the expense of the Plaintiffs. Plaintiffs have been damages by Patrick's unjust enrichment.

### Count IV – Conversion Against Patrick, CDMCFAD, and DFWCF

6.19    Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.20    Conversion requires a showing that (1) the plaintiff owned, had legal possession, or was entitled to possession of the property, (2) the defendant assumed and exercised dominion and control over the property in an unlawful and unauthorized manner, to the exclusion of and inconsistent with the plaintiff's rights, and (3) the defendant refused the plaintiff's demand for return of the property. *Automek, Inc. v. Orandy*, 105 S.W.3d 60, 63 (Tex. App.—Houston [1st Dist.] 2003, no pet.).

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 24**

FSD2025-0116                                                                2025-08-19

1200

**CONFIDENTIAL**                                                        TDIT006238

6.21   The Plaintiffs held legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit.

6.22   Patrick with DFWCF has unlawfully and without authorization, assumed and exercised dominion over the Plaintiffs' legal, equitable, and beneficial interests in the Charitable DAF Fund structure including their participation in DAF HoldCo, the Charitable DAF Fund, and Charitable DAF Fund assets through the dilution scheme that diverted all the legal and beneficial economic interests to Patrick's controlled entity, DFWCF.

6.23   The Plaintiffs requested distribution in kind of the Charitable DAF Fund structure assets, which Patrick and now, DFWCF, have ignored and refused. Plaintiffs have been damages as a result of these conversions.

**Count V – Imposition of Constructive Trust Against Patrick, CDMCFAD, and DFWCF**

6.24   Paragraphs 1.1 – 5.56 are incorporated as if fully restated herein.

6.25   "A constructive trust is considered a legal fiction and is a creation of equity to prevent a wrongdoer from profiting from his wrongful acts." *In re Harding*, 563 S.W.3d 366, 372 (Tex. App.—Texarkana 2018, no pet.).   "[T]o obtain a constructive trust, [a party] must prove: (1) breach of a special trust, fiduciary relationship,   or actual   fraud;   (2) unjust enrichment of the wrongdoer; and (3) tracing to an identifiable res." *Id.* (cleaned up).

6.26   Patrick through DFWCF has breached his fiduciary relationship with the Plaintiffs by converting legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit, resulting in the unjust enrichment of DFWCF and Patrick.

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                    PAGE 25

CONFIDENTIAL                                                           TDIT006239

6.27     All the legal, equitable, and beneficial interests in the Charitable DAF Fund structure including DAF HoldCo, the Charitable DAF Fund, and ultimately the substantial assets held for the Plaintiffs' benefit in the overall Charitable DAF Fund structure should be imposed with a constructive trust running to the benefit of the Plaintiffs.

### VII.   EMERGENCY APPLICATION FOR RECEIVERSHIP

7.1     Paragraphs 1.1 - 5.56 are incorporated as if fully restated herein.

7.2     The Plaintiffs seek the immediate appointment of a receiver over Defendants DFWCF and CDMCFAD, LLC (the "**Receivership Entities**") under three independent bases: Texas Civil Practice & Remedies Code §§ 64.001(a)(3), (7), Texas Business and Organizations Code § 11.410, and the Court's inherent equitable powers.

**A.  *Texas Civil Practice & Remedies Code***

7.3     [U]nder section 64.001 of the Texas Civil Practice and Remedies Code ("**CPRC**"), a court may appoint a receiver in an action between "partners or others jointly owning or interested in any property or fund," CPRC §§ 64.001(a)(3) or "in any case in which a receiver may be appointed under the rules of equity." CPRC §§ 64.001(a)(7); *Elliott v. Weatherman*, 396 S.W.3d 224, 228 (Tex. App.—Austin 2013, no pet.).

7.4     A party with a probable interest or a right to the property or fund has standing to seek the appointment of a receiver. CPRC § 64.001(b). "[T]he property or fund must be in danger of being lost, removed, or materially injured." *Id.*

7.5     A probable interest exists by statute in actions between partners and in actions between joint owners of property. CPRC § 64.001(a)(3).

7.6     One purpose of a receivership is to preserve assets and resolve issues relating to an entity's affairs where there are allegations of fraud or improper activities. *See Floyd v. MMWKM*

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                     PAGE 26

FSD2025-0116                                                        2025-08-19

                                                                        1202

CONFIDENTIAL                                                        TDIT006240

*Advisors, LLC*, No. 05-23-00638-CV, 2024 WL 549036 at *2 (Tex. App. – Dallas 2024, pet. denied, reh'g denied).

## B. *Texas Business and Organizations Code*

7.7     Like CPRC § 64.001, a court that has subject matter jurisdiction over specific property of a domestic or foreign entity in Texas may appoint a receiver for that property in several scenarios, including an action between "partners or others jointly owning or interested in the property or fund." Tex. Bus. & Orgs. Code § 11.403(a)(3).

7.8     Additionally, under Section 11.410 of the Texas Business and Organizations Code ("TBOC"), a court may appoint a receiver for all of the property, in and outside Texas, of a foreign entity doing business in Texas and its business if the court determines, in accordance with the ordinary usages of equity, that circumstances exist that necessitate the appointment of a receiver even if a receiver has not been appointed by another court. TBOC § 11.410(a).

## C. *Rules of Equity*

7.9     In addition to specific statutory authority to appoint receivers, Texas courts retain inherent equitable power to do so. The CPRC, § 64.004 makes clear that the rules of equity control the appointment and power of a receiver unless inconsistent with a statutory provision.

## D. *Receivership Standards Under Texas Law and Equity*

7.10    "The appointment of a receiver lies within the sound discretion of the trial court." *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App.—Corpus Christi–Edinburg 1998, no pet.). "The appointment of a receiver, either as authorized by statute or usages of equity, will not be disturbed on appeal unless the record reveals a clear abuse of discretion." *O & G Carriers, Inc. v. Smith Energy 1986-A P'ship*, 826 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1992, no writ).

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 27**

**CONFIDENTIAL**                                        **TDIT006241**

7.11    The party submitting an application for appointment of a receiver bears the burden of proof to present evidence justifying the appointment. *Furgerson v. First Nat'l Bank*, 218 S.W.2d 1019, 1020 (Tex. Civ. App. – Texarkana 1949, no writ). The party can meet that burden by submitting a sworn verification supporting the claimed grounds for the appointment, *In re Estate of Herring*, 983 S.W.2d 61, 65 (Tex. App. – Corpus Christi 1999, no pet.), and a court may consider oral testimony as evidence in support of an application. *See Furgerson*, 218 S.W.2d at 1020.

7.12    An application seeking a receivership pursuant to a statutory provision must allege facts that meet the elements of the provision. *Associated Bankers Credit Co. v. Meis*, 456 S.W.2d 744, 748 (Tex. Civ. App. – Corpus Christi 1970, no writ). The facts alleged in the application will be construed as favorably as possible for the applicant. *Couch Mortgage Co. v. Roberts*, 544 S.W.2d 944, 946-47 (Tex. Civ. App. – Houston [1st Dist.], no writ).

7.13    Conduct that supports a cause of action for fraud or breach of fiduciary duties is often the same type of conduct that supports an application for a receivership. *Ritchie v. Rupe*, 443 S.W.3d 856, 873 (Tex. 2014).

**E.    *The Supporting Organizations are entitled to the Emergency Appointment of a Receiver to Oversee the Receivership Entities***

7.14    The Plaintiffs have an ownership interest in their participating shares in DAF HoldCo and thereby its economic ownership of the Charitable DAF Fund and the assets that were rightfully held by the Charitable DAF Fund and entrusted to the control of Patrick.

7.15    Patrick wrongfully caused the Plaintiffs' participation shares to be diluted and then caused the Plaintiffs' beneficial economic interests in the Charitable DAF Fund structure to be wrongfully transferred to a collection of sham entities wholly dominated by Patrick.

7.16    Charitable DAF Fund was valued at $270 million as recently as September 2024. Now no assets remain in the Charitable DAF Fund structure.  The Plaintiffs have not received any

---

CONFIDENTIAL                                                                     TDIT006242

just compensation, participation, or other consideration for the conversion of their substantial interests in the Charitable DAF Fund structure.

7.17    Receivership Entities now maintain complete management control and beneficial rights over the Charitable DAF Fund structure's substantial assets or otherwise possess those assets to the exclusion of Charitable DAF Fund.

7.18    Patrick dominates and controls the Receivership Entities. As shown, Patrick has demonstrated a pattern of selling assets at below-market values, attempting to engage in self-dealing transactions, transacting assets at non-market terms in potential self-dealing transactions, dramatically increasing internal and professional administrative expenses that burdens and dissipates charitable assets, and secreting his activities while controlling assets dedicated to charitable causes. To preserve assets from further dissipation, a receiver should replace Patrick's oversight of the Receivership Entities and their assets, which were wrongfully acquired and held.

7.19    The Plaintiffs have been stripped of access to the benefit of assets meant to support charitable causes, resulting in financial distress and immediately threatening planned and ongoing support of countless charities including education, medical research, and community initiatives.

7.20    The Plaintiffs have demonstrated a strong likelihood of success on their claims given the documented pattern of breaches, financial irregularities and successful litigation in the Cayman Islands.

7.21    The Plaintiffs have demonstrated a clear and compelling need for immediate court oversight to prevent further injury and preserve the charitable assets at risk due to Patrick's actions via the Receivership Entities.

7.22    The participating shares in DAF HoldCo as well as assets valued at $270 Million are in danger of being lost, removed, or materially injured and circumstances exist to necessitate

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR**
**TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,**
**AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 29**

CONFIDENTIAL TDIT006243

the appointment of a receiver to conserve the property, fund, and avoid further, irreparable harm to Plaintiffs.

7.23   Given Patrick's demonstrated and recent malfeasance using the Receivership Entities as tools of fraud, no other adequate remedy exists under law.

### Count VI – APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION PENDING APPROVAL OF RECEIVERSHIP

8.1.   Plaintiffs seek immediate injunctive relief preventing the Defendants from further use, transfer, dispersal, and/or alienation of the assets that were held in the Charitable DAF Fund as of the instant date of this filing, regardless of where they are presently held.  If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment. This application is supported by the sworn declarations of Julie Diaz and James David Dondero.

8.2.   A writ of injunction is proper where "the applicant is entitled to the relief demanded and all or part of the relief requires the restraint of some act prejudicial to the applicant," or where "a party performs or is about to perform or is procuring or allowing the performance of an act relating to the subject of pending litigation, in violation of the rights of the applicant, and the act would tend to render the judgment in that litigation ineffectual," or where "irreparable injury to real or personal property is threatened, irrespective of any remedy at law." Tex. Civ. Prac. & Rem. Code § 65.011.  "A temporary injunction pending trial on the merits 'may be and usually is issued in connection with any species of litigation where it is necessary to preserve the status quo pending a final adjudication of the rights of the parties.'" *Lometa Bancshares, Inc. v. Potts*, 952 S.W.2d 631, 633 (Tex. App.-Austin 1997) (*quoting Turcotte v. Alice Nat'l Bank*, 402 S.W.2d 894, 896 (Tex.1966)). "In cases like the present, an applicant for the writ must show (1) a probable right to

---

**CONFIDENTIAL**                                        **TDIT006244**

recover on the merits after final hearing and (2) a probable and irreparable injury unless the writ is issued." *Lometa*, 952 S.W.2d at 633 (citing Tex. Civ. Prac. & Rem. Code Ann. § 65.011 (West 1997); *Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex.1993); *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex.1968)).

8.3.    Texas courts universally recognize that in cases where dispersal or liquidation of assets required to pay a judgment is likely, temporary injunctive relief is proper to preserve the status quo and ensure that the efficacy of ultimate relief for the Plaintiffs is not defeated by financial machinations while the case is pending.  In other words, "the adequacy of an available legal remedy must be judged in the circumstances of the particular case[,]" and "[i]n such circumstances, any legal remedy by way of a judgment for money damages is properly viewed as inadequate on the ground that the funds may be reduced pending final hearing and thus be unavailable in their entirety[.]"  *Lometa*, 952 S.W.2d at 633; *see also Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters.*, 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp*., 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.4.    The above authorities support the award of the temporary injunctive relief requested herein, because the assets formerly held in the Charitable DAF Fund for the benefit of the Plaintiffs are already being alienated from their beneficial owners and the conduct of Defendants demonstrates the likelihood of their continued transfer, alienation, expenditure, and dispersal while this case is pending and before the rights of the Plaintiffs to those funds can be vindicated.

8.5.    Unless enjoined, Patrick and the other Defendants will cause and continue to cause irreparable harm to Plaintiffs for which there is no adequate remedy at law; including, without

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 31**

FSD2025-0116                                                        2025-08-19
1207

**CONFIDENTIAL**                                                        TDIT006245

limitation, the dispersal, expenditure, transfer, and further alienation of more than $270 Million that can never be replaced because the Defendants will lack the means to do so.

8.6.    Plaintiffs will therefore suffer immediate and irreparable injury without adequate remedy at law if a Temporary Restraining Order ("**TRO**") is not granted against the Defendants. Accordingly, Plaintiffs request the Court issue a TRO that freeze:

(a) all assets that were held in the Charitable DAF Fund as of the instant date of this filing, and

(b) prohibiting Patrick and the other Defendants, or anyone acting in concert with them or at their direction, from any use, expenditure, transfer, dispersal, dilution, encumbrance, or alienation of any of those funds pending resolution of Plaintiff's Motion for Temporary Injunction.

8.7.    The harm to Plaintiffs is imminent, and if the Court does not issue a TRO and injunctive relief, it will be irreparably injured, as set forth herein. Conversely, the granting of a TRO will merely require Defendants to refrain from doing anything with the funds for two weeks. If the Defendants prevail on the merits, the funds will still be available to them for their use in future.  The balance of burdens thus strongly favors Plaintiffs, who stand to lose everything absent immediate injunctive relief—over Defendants, who will at most suffer a minor inconvenience if they ultimately prevail.

8.8.    The issuance of injunctive relief will not disserve the public interest. Balancing the equities and other factors, including the significant potential for irreparable harm to the Plaintiffs and the lack of harm to Defendants due to the entry of a TRO, demonstrates that the relief will not disserve the public interest. Indeed, freezing the funds at issue in place to ensure that this fraudulent

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                    **PAGE 32**

**CONFIDENTIAL**                                                        **TDIT006246**

scheme is not permitted consummation absent judicial scrutiny serves the public interest by protecting vital charitable interests.

8.9.    A temporary restraining order is necessary to maintain the *status quo* during the pendency of this action. *See In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) ("defining the status quo as "the last, actual, peaceable, non-contested status which preceded the pending controversy.") The facts above establish the required elements for Plaintiffs to obtain a TRO against Defendant, specifically: (1) a cause of action against Defendants with a probable right to relief; (2) a probable, imminent, and irreparable injury to Plaintiffs in the interim; (3) the threatened injury outweighs any damage the injunction might cause the opposing party; and (4) the injunction will not disserve the public interest. *See Butnaru v. Ford Motor Co.*, 84 S.W.3d 198. 204 (Tex. 2002).

**A.   *Plaintiffs have a Probable Right to the Relief Sought in their Claims Against Defendants.***

8.10.    Plaintiffs easily satisfy this test. Establishing a probable right to relief does not require the applicant for a TRO to establish that it will prevail at trial. *See Walling v. Metcalfe*, 863 S.W.2d 56, 58 (Tex. 1993). Instead, this element requires only that the applicant allege a cause of action and present evidence that tends to sustain that cause of action. *See Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 597 (Tex. App.— Amarillo 1995, no writ). The cause of action itself need not involve permanent injunctive relief—the trial court "[has] discretion to preserve the status quo so long as [a movant] demonstrate[s] his probable right to recover damages." *Metcalfe*, 863 S.W.2d at 58; *see also Gryphon Master Fund, L.P. v. Path 1 Network Technologies, Inc.*, No. 3:06 CV 0107 D, 2007 WL 1723703, at *5 (N.D. Tex., Jun. 14, 2007) (citing *Metcalfe*).

8.11.    Plaintiffs have a probable right to the relief sought on its claims for breach of fiduciary duty, constructive fraud, unjust enrichment, and conversion. As alleged in more detail

---

PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER                                        PAGE 33

above, Defendants have committed and continue to commit acts that have raided four vital charitable organizations of $270 Million that forms the lifeblood of vital philanthropic efforts relied upon by key communities across the nation. The evidence summarized herein thus establishes that these injuries arise as a direct result of Defendants' conduct.

**B.** ***Plaintiffs Will Suffer Immediate, Irreparable Injury in the Absence of a Temporary Restraining Order and Temporary Injunction.***

8.12. Plaintiffs will suffer immediate, irreparable injury in the absence of a temporary restraining order and temporary injunction, as summarized above. Plaintiffs will suffer precisely the sort of irreparable injuries Texas courts have sought to prevent by granting temporary injunctive relief. *Lometa*, 952 S.W.2d at 633; see also *Minexa Arizona, Inc. v. Staubach*, 667 S.W.2d 563, 567–68 (Tex.App.—Dallas 1984, no writ); *Sonics Int'l Inc. v. Dorchester Enters.*, 593 S.W.2d 390, 393 (Tex.Civ.App.—Dallas 1980, no writ*); Baucum v. Texam Oil Corp.*, 423 S.W.2d 434, 442 (Tex.Civ.App.—El Paso 1967, writ ref'd n.r.e.).

8.13. Plaintiffs have no adequate remedy at law. Without injunctive relief, the assets intended to benefit the Plaintiffs will be spent, dispersed, transferred, and alienated while this litigation unfolds. These losses, as well as others which will inevitably occur if Defendants are not enjoined, cannot be compensated in monetary terms once the funds are dispersed, and are the types of harm for which injunctive relief is particularly necessary and appropriate.

8.14. Accordingly, and in order to preserve the status quo during the pendency of this action, Defendants should be cited to appear and show cause why the funds at issue should not be frozen for the pendency of this Action, and why Defendants should not be temporarily restrained during the pendency of this action from directly or indirectly using, spending, transferring, encumbering, dispersing, or further alienating the funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing.

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER**                          **PAGE 34**

**CONFIDENTIAL**                          **TDIT006248**

1291

8.15. Plaintiffs seek a temporary restraining order and temporary injunction against Defendants freezing all funds and assets that were held in the Charitable DAF Fund as of as of the instant date of this filing, and enjoining Defendants and any others acting by, for, or in concert with them, including but not limited to their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive notice of the order by personal service or otherwise, from either directly or indirectly: spending, dispersing, using, encumbering, transferring, or alienating those funds and assets.

8.16. Plaintiffs further seeks a receivership over the funds and assets and the entities holding the funds and assets, whereupon the temporary injunctive relief sought here may properly expire because the assets will then be under the control of a receiver answering to this Court.

8.17. Plaintiffs is willing to post a bond in an amount directed by the Court.

## VIII. PRAYER FOR RELIEF

Plaintiffs respectfully request that this Court:

A. Appoint a receiver to take possession and control of all assets, properties, and operations of DFW Charitable Foundation and CDMCFAD, LLC;

B. Enjoin Defendants from further disposing of, transferring, encumbering, or dissipating any Charitable DAF Fund and DAF HoldCo assets;

C. Require the reversal of the dilution scheme and unauthorized asset transfers;

D. Impose a constructive trust over the res of DAF HoldCo, CDMCFAD, LLC and the Charitable DAF Fund wrongfully taken from the Plaintiffs;

E. Award actual damages in an amount to be proven at trial;

F. Award exemplary damages as permitted by law;

G. Award attorneys' fees and costs;

H. Grant such other and further relief as the Court deems just and proper.

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** PAGE 35

Respectfully submitted,

**McCarty Law PLLC**

*/s/ Darren L. McCarty*
Darren L. McCarty
State Bar No. 24007631
darren@mccartylawpllc.com
316 West 12th Street
Suite 400
Austin, Texas 78701
512-827-2902

- and -

**DUANE MORRIS LLP**

Craig M. Warner
State Bar No. 24084158
cmwarner@duanemorris.com
Joseph M. Cox
State Bar No. 04950200
jmcox@duanemorris.com
Jason E. Boatright
State Bar No. 24048138
jeboatright@duanemorris.com
100 Crescent Court, Suite 1200
Dallas, Texas 75201
(214) 257-7213 – Telephone
(214) 292-8442 – Facsimile

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document was served by

electronic means on this day, July 1, 2025, on all counsel or parties of record.

*/s/ Darren L. McCarty*
Darren L. McCarty

---

**PLAINTIFFS' ORIGINAL COMPLAINT, APPLICATION FOR
TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION,
AND EMERGENCY REQUEST FOR APPOINTMENT OF RECEIVER** **PAGE 36**

**CONFIDENTIAL** **TDIT006250**

## VERIFICATION

I, Julie Diaz, Vice President of Highland Dallas Foundation, Inc., and President of The Dallas Foundation, have read the above and foregoing Petition and the facts stated therein are true and correct to the best of my knowledge and belief.

_Julie Diaz_

Julie Diaz

My name is Julie Diaz, my date of birth is 3/23/64, and my address is 5711 Prestwick Lane, Dallas. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Barnstable County, State of MA, on the 1 day of July, 2025.

_Julie Diaz_

Julie Diaz

CONFIDENTIAL                                                            TDIT006251

FSD2025-0116                          **Page 1298 of 1530**                          2025-08-19

## The Business Court of Texas,
## First Division

| | | |
|---|---|---|
| THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC., | § § § § § § § § § | |
| | § | Cause No. _____ |
| *Plaintiffs*, | § § § | |
| v. | § § | |
| MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd., | § § § § § § § | |
| *Defendants*. | § § § | |

═══════════════════════════════════════

### Table of Contents—Exhibits

═══════════════════════════════════════

| Exhibit | Document | Appx. Page Nos. |
|---|---|---|
| Exhibit 1-A | DFW Charitable Foundation Formation Documents (12/9/2024) | 40-42 |
| Exhibit 1-B | CDMCFAD, LLC Formation Documents (12/12/2024) | 43 |
| Exhibit 1-C | CDH GP, Ltd. Formation Documents | 44-45 |
| Exhibit 2-A | Nov. 7, 2011, Amended and Restated Exempted Limited Partnership Agreement | 46-66 |

Appendix Page 38

FSD2025-0116                                                                         2025-08-19
1214

CONFIDENTIAL                                                                         TDIT006252

| Exhibit 2-B | Jan. 19, 2025, Amended and Restated Memorandum and Articles of Association | 67-96 |
|---|---|---|
| Exhibit 3 | Sykes Affidavit Exhibit GS-I | 97-161 |
| Exhibit 4-A | Nov. 11, 2024, No Confidence Letter | 162-163 |
| Exhibit 4-B | Jan. 23-Feb. 7, 2025, Emails Julie Diaz, Mark Partick, Paul Murphy, and Michael Stockham | 164-177 |
| Exhibit 4-C | Feb 14-April 3, 2025, Letters and Emails between David Rosenberg, Paul Murphy, Michael Stockham, and Douglas Mancino | 178-182 |
| Exhibit 5 | Hearing Transcript (Patrick Testimony) | 183-209 |
| Exhibit 6 | Dondero Declaration | 210-221 |
| Exhibit 7 | Diaz Declaration | 222-243 |
| Exhibit 8 | Supervision Order | 244-246 |

Appendix Page 39

**CONFIDENTIAL**                                    **TDIT006253**

1296

State of Delaware
Secretary of State
Division of Corporations
Delivered  04:06 PM 12/09/2024
FILED  04:06 PM 12/09/2024
SR  20244432762 - File Number  10030937



CERTIFICATE OF INCORPORATION
OF
DFW CHARITABLE FOUNDATION
a nonprofit nonstock corporation

### I.

The name of the Corporation is DFW Charitable Foundation.

### II.

The name of the incorporator is Douglas Mancino. The address of the incorporator is 2029 Century Park East, Suite 3500, Los Angeles, CA 90067.

### III.

The address of the registered office of the Corporation in the State of Delaware is Corporation Trust Center, 1209 Orange Street, Wilmington, New Castle County, Delaware 19801. The name of the registered agent of the Corporation at such address is The Corporation Trust Company.

### IV.

A.     The Corporation is a nonprofit nonstock corporation and is not organized for the private gain of any person.  It is organized under the General Corporation Law of the State of Delaware ("DGCL") exclusively for charitable purposes within the meaning of section 501(c)(3) of the Internal Revenue Code of 1986, as amended, or the corresponding provision of any future United States internal revenue law (the "Code").

B.     In furtherance of its purposes, the Corporation shall have all the general powers and privileges of a corporation granted by the DGCL, as now in effect or as may hereafter be amended, including the power to solicit grants and contributions to further its charitable purposes.

### V.

The Corporation shall not have any capital stock and the Corporation is not authorized . The member of the corporation is Mark Patrick. The rights and privileges of the member shall be set forth in the Corporation's bylaws, provided that the member shall not have a "membership interest" in the Corporation within the meaning of section 114(d)(2) of the DGCL.

### VI.

A.     No part of the activities of the Corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation. The Corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of, or in opposition to, any candidate for public office.

315132803v.2

**CONFIDENTIAL**                                                      **TDIT006254**

B.    Notwithstanding any other provision of this Certificate of Incorporation, the Corporation shall not directly or indirectly carry on any activity which would prevent it from obtaining exemption from Federal income taxation as a corporation described in section 501(c)(3) of the Code, or cause it to lose such exempt status, or carry on any activity not permitted to be carried on by a corporation, contributions to which are deductible under section 170(c)(2) of the Code.

## VII.

The property of the Corporation is irrevocably dedicated to charitable purposes, and no part of the net income or assets of the Corporation shall ever inure to the benefit of any director, officer, or member thereof or to the benefit of any private person.  Upon the dissolution or winding up of the Corporation, its assets remaining after payment, or provision for payment, of all debts and liabilities of the Corporation shall be distributed to a nonprofit fund, foundation, or corporation which is organized and operated exclusively for charitable purposes and which has established its tax-exempt status under section 501(c)(3) of the Code.

## VIII.

A director or officer of the Corporation shall not be liable to the Corporation for monetary damages for breach of fiduciary duty as a director or officer, except for liability: (a) for any breach of the director's or officer's duty of loyalty to the Corporation or its members, (b) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of the law, or (c) for any transaction from which the director or officer derived any improper personal benefit. If the DGCL is amended after adoption of this Article VIII to authorize Corporation action further eliminating or limiting the personal liability of directors or officers, then the liability of a director or officer of the Corporation shall be eliminated or limited to the fullest extent permitted by the DGCL, as so amended. Any repeal or modification of the foregoing provisions of this Article VIII shall not adversely affect any right or protection of a director or officer of the Corporation existing at the time, or increase the liability of any director or officer of the Corporation with respect to any acts or omissions of such director or officer occurring prior to such repeal or modification.

## IX.

The Corporation shall, to the maximum extent permitted from time to time under the law of the State of Delaware, indemnify and upon request shall advance expenses to any person who is or was a party or is threatened to be made a party to any threatened, pending or completed action, suit, proceeding or claim, whether civil, criminal, administrative or investigative, by reason of the fact that such person is or was or has agreed to be a member or director or officer of the Corporation, or while the person is or was serving at the request of the Corporation as a director, officer, partner, trustee, employee or agent of any corporation, limited liability company, partnership, joint venture, trust or other entity, against expenses (including reasonable attorneys' fees and expenses), judgments, fines, penalties and amounts paid in settlement incurred in connection with the investigation, preparation to defend, or defense of such action, suit, proceeding or claim; provided however that: (a) the foregoing shall not require the Corporation to indemnify, or advance expenses to, any member or director or officer in connection with any

2

315132803v.2

Appendix Page 41

CONFIDENTIAL                                                                          TDIT006255

action, suit, proceeding or claim initiated by or on behalf of such member or director or officer, or any against the Corporation initiated by or on behalf of such member or director or officer; and (b) a member or director or officer seeking indemnification under this Article IX shall execute a written undertaking (reasonably acceptable to the Corporation) to repay the Corporation any expense or other amounts advanced and/or paid to such member or director or officer under this Article IX in the event that it is ultimately determined that such member or director or officer is not entitled to be indemnified by the Corporation. Such indemnification shall not be exclusive of other indemnification rights arising under any bylaw, agreement, vote of directors or member or otherwise and shall inure to the benefit of the heirs and legal representatives of such person. Any person seeking such indemnification under this Article IX shall be deemed to have met the standard of conduct required for such indemnification unless the contrary shall be established. Any repeal or modification of the foregoing provisions of this Article IX shall not adversely affect any right or protection of a member or director or officer of the Corporation with respect to any acts or omissions of such member or director or officer occurring prior to such repeal or modification.

　　　　**IN WITNESS WHEREOF**, this Certificate of Incorporation has been executed by its incorporator this 9th day of December, 2024.

　　　　　　　　　　　　/s/ Douglas Mancino
　　　　　　　　　　　　Douglas Mancino, Incorporator

3

315132803v.2

Appendix Page 42

**CONFIDENTIAL**　　　　　　　　　　　　　　　　　　　TDIT006256



EXHIBIT
**1-B**

## CERTIFICATE OF FORMATION

### OF

### CDMCFAD, LLC

This Certificate of Formation of CDMCFAD, LLC (the "Company"), is being duly executed and filed by the undersigned, as an authorized person, to form a limited liability company under the Delaware Limited Liability Company Act (6 *Del. C.* § 18-101 *et seq.*) (the "Act").

1. <u>Name</u>. The name of the limited liability company formed hereby is CDMCFAD, LLC.

2. <u>Registered Office</u>. The address of the registered office of the Company in the State of Delaware is c/o The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

3. <u>Registered Agent</u>. The name and address of the registered agent for service of process on the Company in the State of Delaware is The Corporation Trust Company, 1209 Orange Street, City of Wilmington, County of New Castle, Delaware, 19801.

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Formation in accordance with the Act.

Name: Mark Patrick
Authorized Person

State of Delaware
Secretary of State
Division of Corporations
Delivered 11:33 AM 12/12/2024
FILED 11:33 AM 12/12/2024
SR 20244471736 - File Number 10035168

4930-4296-2948\1

Appendix Page 43

FSD2025-0116





# Search Report

| | |
|---|---|
| **Entity Name :** | CDH GP, Ltd. |
| **Jurisdiction :** | Cayman Islands |
| **Registration Number :** | 407515 |
| **Registration Date :** | 27th February 2024 |
| **Entity Type :** | EXEMPT |
| **Registered Office :** | CAMPBELLS CORPORATE SERVICES LIMITED |
| | Floor 4 |
| | Willow House, Cricket Square |
| | Grand Cayman  KY1-9010 |
| | Cayman Islands |
| **Initial Subscriber:** | |
| **Authorised Share Capital:** | CI$41,000.00 |
| **Nature of Business:** | General Partner |
| **Financial Year End:** | 31st December |

| | |
|---|---|
| **Status :** | ACTIVE |
| **Status Date :** | 27th February 2024 |

- INFORMATION REGARDING THE CORPORATE RECORDS AND REGISTERS ARE NOT AVAILABLE FOR PUBLIC INSPECTION

- THIS REPORT DOES NOT CONFIRM THE ENTITY IS IN GOOD STANDING

Authorisation Code : 379989138381
www.verify.gov.ky
10 February 2025

CONFIDENTIAL

TDIT006258

# Director Details

Entity Name:  **CDH GP, LTD.**

**Director Name**

Mark E. Patrick

Appendix Page 45

CONFIDENTIAL                                           TDIT006259

FSD2025-0116

1302

**Page 1306 of 1530**

EXHIBIT
**2-A**

-08-19

**DATED NOVEMBER 7, 2011**

**AMENDED AND RESTATED**

**EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF**

**CHARITABLE DAF FUND, LP**

**WARNING**

**THE TAKING OR SENDING BY ANY PERSON OF AN ORIGINAL OF THIS DOCUMENT INTO THE CAYMAN ISLANDS MAY GIVE RISE TO THE IMPOSITION OF CAYMAN ISLANDS STAMP DUTY**

FSD2025-0116                                                                 2025-08-19
                                                                            1222
CONFIDENTIAL                                                                 TDIT006260

**FSD2025-0116** 2025-08-19

## TABLE OF CONTENTS

PAGE

ARTICLE I   GENERAL PROVISIONS; COMPENSATION AND EXPENSES...................2
1.1   Continuation .......................................................................................................2
1.2   Name ..................................................................................................................2
1.3   Purpose and Powers ...........................................................................................2
1.4   Registered Office ...............................................................................................2
1.5   Partners...............................................................................................................2
1.6   Powers. ...............................................................................................................2
1.7   Term ...................................................................................................................3
1.8   Admission of New Partners ...............................................................................3
1.9   Taxable Year ......................................................................................................3
1.10   Liability of Partners...........................................................................................3
1.11   Limitation on Assignability of Partners' Interests. ..........................................3
1.12   Definitions..........................................................................................................4
1.13   Service Providers ..............................................................................................4
1.14   Partnership Expenses .........................................................................................4
1.15   Withdrawal of Initial Limited Partner...............................................................5

ARTICLE II   POWERS ...................................................................................................5
2.1   Partnership Powers.............................................................................................5
2.2   Rights, Powers, Limitations on Liability and Indemnification of General
      Partner. ...............................................................................................................6

ARTICLE III   CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES.........9
3.1   Capital Contributions. .......................................................................................9
3.2   Capital Account; Allocation of Profits and Losses. ..........................................9

ARTICLE IV   LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL
      WITHDRAWALS FROM CAPITAL ACCOUNT .........................................9
4.1   Legal Interest......................................................................................................9
4.2   Distributions......................................................................................................10
4.3   Withdrawal .......................................................................................................10

ARTICLE V   DURATION OF PARTNERSHIP...............................................................10
5.1   Termination .......................................................................................................10
5.2   Winding Up .......................................................................................................11

ARTICLE VI   MISCELLANEOUS ..................................................................................11
6.1   Tax Matters Partner...........................................................................................11
6.2   Right to Hire......................................................................................................11
6.3   Applicable Law, etc ..........................................................................................12
6.4   Power of Attorney .............................................................................................12
6.5   Tax Elections Under the Internal Revenue Code..............................................12
6.6   Amendments to Partnership Agreement ...........................................................12

i

**FSD2025-0116** 2025-08-19

1223

CONFIDENTIAL TDIT006261

6.7      Investment Representation ...................................................................................13
6.8      Notices .............................................................................................................13
6.9      General Partner Determinations .........................................................................14
6.10     Dispute Resolution ............................................................................................14
6.11     Successors and Assigns ......................................................................................16
6.12     Severability .......................................................................................................16
6.13     No Third Party Rights .......................................................................................16
6.14     No Right to Partition .........................................................................................16

ii

Appendix Page 48

**CONFIDENTIAL**                                             **TDIT006262**

## AMENDED AND RESTATED
## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
## CHARITABLE DAF FUND, LP

**THIS AMENDED AND RESTATED EXEMPTED LIMITED PARTNERSHIP AGREEMENT** (the "**Agreement**") is made on November 7, 2011

**BETWEEN**

(1)   Charitable DAF GP, LLC, a Delaware limited liability company registered as a foreign company in the Cayman Islands and having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as general partner (the "**General Partner**"); and

(2)   Charitable DAF HoldCo, Ltd, a Cayman Islands exempted Company having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands as limited partner (the "**Limited Partner**"); and

(3)   Each individual, partnership, corporation, limited liability company, trust or other entity (each, a "**Person**") admitted as a limited partner or general partner (collectively, the "**Partners**") of the Partnership (as defined below) in accordance with this Agreement, including any Persons hereafter admitted as Partners in accordance with this Agreement and excluding any Persons who cease to be Partners in accordance with this Agreement; and

(4)   Walkers Nominees Limited having its registered office at Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9005, Cayman Islands as the initial limited partner (the "**Initial Limited Partner**") solely for the purposes of withdrawing as such.

**WHEREAS**, Charitable DAF Fund, LP (the "**Partnership**") was formed and registered as an exempted limited partnership pursuant to and in accordance with the Exempted Limited Partnership Law (as amended) of the Cayman Islands (the "**Law**"), and since its formation has been governed by the Initial Limited Partnership Agreement of the Partnership, dated October 25, 2011 (the "**Initial Agreement**"); and

**WHEREAS**, the Partnership was formed in order to own, operate and make certain investments directly or indirectly on behalf of certain entities exempt from taxation under Section 501(c)(3) of the U.S. Internal Revenue Code of 1986, as amended (the "**Code**") and the parties hereto desire for the Partnership to be for the economic benefit of the Limited Partner and its Indirect Charitable Owners (as defined below) as set forth herein; and

**WHEREAS**, the parties hereto wish to amend and restate the Initial Agreement in its entirety and enter into this Agreement.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto hereby adopt this Agreement to be their Limited Partnership Agreement, as follows:

**IT IS AGREED:**

**ARTICLE I**
**GENERAL PROVISIONS; COMPENSATION AND EXPENSES**

1.1 <u>Continuation</u>. The parties hereto continue the Partnership as an exempted limited partnership formed on October 25, 2011 pursuant to the Law.

1.2 <u>Name</u>. The business of the Partnership shall be carried on under the name of Charitable DAF Fund, LP.

1.3 <u>Purpose and Powers</u>. The purpose of the Partnership shall be to invest and trade, directly or indirectly, in securities of all types and other investment vehicles and instruments. At least initially, a majority of the Partnership's assets shall be invested in shares of CLO HoldCo, Ltd., a Cayman Islands exempted company ("**CLO HoldCo**"), but the Partnership may make investments in other types of securities, investment vehicles and instruments in the sole discretion of the General Partner for the purpose of benefitting, directly or indirectly, the Indirect Charitable Owners.

1.4 <u>Registered Office</u>. The registered office of the Partnership is c/o Walkers Corporate Services Limited, Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9005, Cayman Islands.

1.5 <u>Partners</u>. The name and addresses of the Partners are as follows:

| Name | Address |
|---|---|
| Charitable DAF GP, LLC | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |
| Charitable DAF HoldCo Ltd<br>(Limited Partner) | c/o Walkers Corporate Services Limited<br>Walker House<br>87 Mary Street<br>George Town<br>Grand Cayman KY1-9005, Cayman Islands |

1.6 <u>Powers</u>.

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and

2

Appendix Page 50

1307

**FSD2025-0116**                    **Page 1311 of 1530**                    **2025-08-19**

obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; provided, however that the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.

(b)     Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

1.7     <u>Term</u>.  The Partnership was established on October 25, 2011 and shall continue until terminated in accordance with this Agreement or any amendment or modification thereof.

1.8     <u>Admission of New Partners</u>.  The General Partner may at any time admit one or more new Partners on such terms as it may determine in its sole discretion; provided that any such new Limited Partner shall have as its equity owners solely Indirect Charitable Owners.

1.9     <u>Taxable Year</u>.  The Taxable Year of the Partnership shall be a calendar fiscal year, or such other fiscal year as the General Partner shall determine in their sole discretion from time to time.

1.10    <u>Liability of Partners</u>.

(a)     The General Partner shall be liable for all of the debts, liabilities and obligations of the Partnership.

(b)     Except to the extent otherwise required by law or this Agreement, a Limited Partner shall not be personally liable for any obligations of the Partnership to third parties nor for the return of any distributions from the Partnership to the Limited Partner. A Limited Partner may be liable for the tax audit and related expenses referred to in Section 6.1.

1.11    <u>Limitation on Assignability of Partners' Interests</u>.

(a)     A Limited Partner may not assign his interest in whole or in part to any person, without the prior written consent of the General Partner, except by operation of law, nor shall he be entitled to substitute for himself as a Limited Partner any other person, without the prior written consent of the General Partner, which in either case may be given or withheld in the sole discretion of the General Partner. Any attempted assignment or substitution not made in accordance with this section shall be void *ab initio*.

3

**FSD2025-0116**                                                          **2025-08-19**
1227

**CONFIDENTIAL**                                        **TDIT006265**

(b) The General Partner may not assign their interests in the Partnership to any entity that is not under common control with the General Partner without the consent of a majority-in-interest of the Limited Partners. Notwithstanding the foregoing, the General Partner may freely assign their economic interest in the Partnership in whole or in part.

1.12 <u>Definitions</u>. For the purpose of this Agreement, unless the context otherwise requires:

(a) <u>General Partner</u>. The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) <u>Indirect Charitable Owners</u>. The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

(c) <u>Limited Partner</u>. The term "**Limited Partner**" shall refer to Charitable DAF HoldCo Ltd (and each person subsequently admitted as a limited partner by the General Partner pursuant to the terms of this Agreement).

(d) <u>Partner</u>. The term "**Partner**" shall refer to the General Partner or the Limited Partner.

1.13 <u>Service Providers</u>. The General Partner may engage one or more Persons to act, or remove any one or more Persons from so acting, as service providers to the Company (including, without limitation, as manager, administrator, custodian, registrar and transfer agent, investment manager, investment adviser, sponsor and/or prime broker, auditors and legal counsel to the Partnership) in its sole discretion; provided, that any compensation paid to any such service provider that is affiliated with the General Partner shall be in an amount customary for services of a similar nature.

1.14 <u>Partnership Expenses</u>. The Partnership will bear its own operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees (if any), taxes, research costs, legal and accounting expenses and other operating expenses. In addition, the Partnership will bear its pro rata share of CLO HoldCo's operating, administrative, trading and other expenses, including interest expense, brokerage commissions, management fees, taxes, research costs, legal and accounting expenses and other operating expenses. The Partnership will also bear (or reimburse the General Partner for) its organizational fees and expenses. To the extent the Partnership shares trading expenses with other accounts that may be managed by the General Partner or any affiliates, it will bear a proportionate share of the associated costs. In no event shall the General Partner receive any compensation from the Partnership.

4

**CONFIDENTIAL**                    **TDIT006266**

1.15   <u>Withdrawal of Initial Limited Partner</u>.  The Initial Limited Partner hereby withdraws as a limited partner immediately following the admission of the Limited Partners and thereafter shall have no further rights, liabilities or obligations under or in respect of this Agreement in its capacity as Initial Limited Partner.

## ARTICLE II
## POWERS

2.1   <u>Partnership Powers</u>.  The Partnership shall have the following powers:

(a)   To purchase, sell, invest and trade, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, syndicated debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; statutory claims; royalty claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (all such items being called herein a "**Financial Instruments**"), and to sell Financial Instruments short and cover such sales;

Appendix Page 53

**CONFIDENTIAL**                                                                        TDIT006267

1310

(b)  To possess, transfer, mortgage, pledge or otherwise deal in, and to exercise all rights, powers, privileges and other incidents of ownership or possession with respect to, Financial Interests held or owned by the Partnership with the ultimate objective of the preservation, protection, improvement and enhancement in value thereof and to hold such Financial Interests in the name of the Partnership, in the name of any securities broker or firm, in the name of any nominee of such firm, or in the name of any other nominee or any other street name, or any combination thereof;

(c)  To lend, either with or without security, any Financial Instruments, funds or other properties of the Partnership, including by entering into reverse repurchase agreements, and, from time to time, undertake leverage on behalf of the Partnership;

(d)  To borrow or raise moneys and, from time to time, without limit as to amount, to issue, accept, endorse and execute promissory notes, drafts, bills of exchange, warrants, bonds, debentures and other negotiable or non-negotiable instruments and evidences of indebtedness, and to secure the payment of any of the foregoing instruments and of the interest thereon by mortgage upon or pledge, conveyance or assignment in trust of the whole or any part of the property of the Partnership, whether at the time owned or thereafter acquired, and to sell, pledge or otherwise dispose of such bonds or other obligations of the Partnership for its purposes;

(e)  To have and maintain one or more offices within or without the Cayman Islands and in connection therewith to rent or acquire office space, engage personnel and do such other acts and things as may be necessary or advisable in connection with the maintenance of such office or offices;

(f)  To open, maintain and close bank accounts and brokerage accounts, including the power to draw checks or other orders for the payment of monies; and

(g)  To enter into, make and perform all contracts, agreements and other undertakings as may be necessary or advisable or incidental to the carrying out of the foregoing objects and purposes.

2.2  <u>Rights, Powers, Limitations on Liability and Indemnification of General Partner</u>.

(a)  Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the General Partner, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including members of any committee and parties acting as agents for the execution of transactions) (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be subject to the provisions of this Section.

(b)  To the fullest extent permitted by law, no Covered Person shall be liable to the Partnership or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the

6

Appendix Page 54

**CONFIDENTIAL**                    **TDIT006268**

business of the Partnership, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Partnership, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Partnership whom such Covered Person believes is authorized to make such suggestions on behalf of the Partnership, (iii) any act or omission by the Partnership, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Partnership selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)     Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Partnership or in furtherance of the business of the Partnership in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)     To the fullest extent permitted by law, the Partnership shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Partnership, any investment made under or in connection with this Agreement, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Partnership, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).   The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Partnership prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

(f)     The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may

7

FSD2025-0116                                                          2025-08-19
                                                                        1231
**CONFIDENTIAL**                                                      TDIT006269

otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

(g)   The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)   **Notwithstanding anything in this Agreement to the contrary, the aggregate maximum amount that a Covered Person may be liable to the Partnership and/or any of the Partners pursuant to this Agreement shall, to the extent not prohibited by law, never exceed the amount of management and incentive fees received by such Covered Person from the Partnership under this Agreement prior to the date that the acts or omissions giving rise to a claim for indemnification or liability shall have occurred.  In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.  No Covered Person shall incur any liability for interest on any monies at any time received by such Covered Person or any investment loss or other charge resulting therefrom with respect to amounts invested hereunder.**

(i)   **WAIVER OF CONSUMER RIGHTS:  The Partnership and each of the Limited Partners waive all of their respective rights, if any, under the Deceptive Trade Practices-Consumer Protection Act, Section 17.41 et seq., Texas Business & Commerce Code ("DTPA"), a law that gives consumers special rights and protections. After consultation with an attorney of Partnership's own selection, Partnership voluntarily consents to this waiver. This waiver includes any right to recover attorneys' fees under the DTPA. Further, Partnership waives all of its rights to any and all protections afforded by any other state or federal Consumer Protection Acts, including the recovery of attorneys' fees.**

(j)   No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

Pursuant to the foregoing indemnification and exculpation provisions applicable to each Covered Person, the Partnership (and not the applicable Covered Person) shall be responsible for any losses resulting from trading errors and similar human errors, absent gross negligence or reckless or intentional misconduct of any Covered Person.  Given the volume of transactions executed on behalf of the Partnership, Limited Partners acknowledge that trading errors (and similar errors) will occur and that the Partnership shall be responsible for any resulting losses, even if such losses result from the negligence (but not gross negligence) of any Covered Person.

(k)   This Section 2.2 shall survive a Limited Partner's withdrawal as a limited partner of the Partnership and any termination of this Agreement.

8

**CONFIDENTIAL**                    **TDIT006270**

1313

**FSD2025-0116** **Page 1317 of 1530** 2025-08-19

## ARTICLE III
### CAPITAL ACCOUNTS AND DIVISION OF PROFITS AND LOSSES

3.1 <u>Capital Contributions</u>.

(a) Each Partner has made the capital contributions to the Partnership in the amount set forth in the records of the Partnership. The Limited Partner has contributed to the Partnership all of the outstanding equity interests of CLO HoldCo.

3.2 <u>Capital Account; Allocation of Profits and Losses</u>.

(a) There shall be established for each Partner on the books of the Partnership as of the first day of the fiscal period during which such Partner was admitted to the Partnership a capital account for such Partner in an amount equal to his capital contribution to the Partnership.

(b) Since the General Partner's capital account and contributions shall be the minimum required by Law, all income, deductions, gains, losses and credits of the Partnership shall be allocated shall be for the benefit of the Limited Partner, except as may otherwise be required by law. In the event any valuation of assets is necessary or appropriate, the General Partner shall determine such value in any reasonable manner determined by the General Partner in its sole discretion consistent with relevant accounting principles and applicable law.

(c) For purposes of determining the share of any items allocated to any period during the relevant Taxable Year of the Partnership, such shares shall be determined by the General Partner using any method permitted by the Code and the regulations thereunder. All allocations to be made by the General Partner may be overridden if necessary to comply with the Code, the regulations thereunder or other applicable law.

(d) To the extent that the Partnership pays withholding taxes as to a Partner, such amounts shall be charged to the applicable Partner's capital account; provided, however, that any such amounts may be treated as an advance to the Partner with interest to be charged to that Partner's capital account at a rate determined by the General Partner.

(e) Each Partner agrees not to treat, on any tax return or in any claim for a refund, any item of income, gain, loss, deduction or credit in a manner inconsistent with treatment of such item by the Partnership.

## ARTICLE IV
### LEGAL INTERESTS, DISTRIBUTIONS AND PARTIAL
### WITHDRAWALS FROM CAPITAL ACCOUNT

4.1 <u>Legal Interest</u>. Each Partner shall have and own during any Taxable Year an undivided interest in the Partnership equal to his opening capital account for such period.

9

Appendix Page 57

**FSD2025-0116** 2025-08-19

1233

**CONFIDENTIAL** TDIT006271

4.2    Distributions.

(a)    Distributions shall be made to the Limited Partner at the times, in a manner (including in kind) and in the aggregate amounts determined by the General Partner, after taking into consideration available cash and the needs of the Indirect Charitable Owners of the Limited Partner for funds to cover their administrative and operating expenses.  In determining the amount of cash or securities available for distribution, the General Partner may retain reasonable reserves in such amounts as it determines may be necessary to cover expenses, contingencies and losses.  Notwithstanding the foregoing, distributions made in connection with a sale of all or substantially all of the Partnership's assets or a liquidation of the Partnership shall be made in accordance with the capital account balances of the Partners within the time period set forth in Treasury Regulations Section 1.704-1(b)(2)(ii)(b)(3).

(b)    The General Partner may withhold and pay over to the U.S. Internal Revenue Service (or any other relevant taxing authority) such amounts as the Partnership is required to withhold or pay over, pursuant to the Code or any other applicable law, on account of a Partner's distributive share of the Partnership's items of gross income, income or gain.

For purposes of this Agreement, any taxes so withheld or paid over by the Partnership with respect to a Partner's distributive share of the Partnership's gross income, income or gain shall be deemed to be a distribution or payment to such Partner, reducing the amount otherwise distributable to such Partner pursuant to this Agreement and reducing the capital account of such Partner.  If the amount of such taxes is greater than any such distributable amounts, then such Partner and any successor to such Partner's interest shall pay the amount of such excess to the Partnership, as a contribution to the capital of the Partnership.

4.3    Withdrawal.  Without the consent of the General Partner, no Partner may withdraw as a Partner or make withdrawals from such Partner's capital account.  In the event the General Partner permits any such withdrawal, the withdrawal shall be on such terms and conditions as the General Partner shall determine in its sole discretion.  The General Partner may terminate all or any part of the interest of any Limited Partner at any time for any reason or no reason by written notice; provided that any new or additional Limited Partner shall be directly or indirectly an entity or organization exempt from taxation under Section 501(c)(3) of the Code.

**ARTICLE V**
**DURATION OF PARTNERSHIP**

5.1    Termination.  The Partnership shall be required to be wound up and dissolved upon:

(a)    the service of a notice by the General Partner on the other Partners requiring that the Partnership be wound up and dissolved; or

10

**CONFIDENTIAL**                                                                                    **TDIT006272**

(b)      the withdrawal by or resignation of the General Partner as general partner of the Partnership; or

(c)      the withdrawal of all Limited Partners.

Upon the occurrence of any such event, the Partnership's affairs shall be wound up by the General Partner or such other Person as the General Partner shall appoint.

5.2      <u>Winding Up</u>.  Upon the Partnership being required to be wound up and dissolved, the General Partner shall proceed with the liquidation and distribution of the assets of the Partnership, and upon completion of the winding up of the Partnership, shall have the authority to and shall execute and file a dissolution notice and such other documents required to effect the dissolution and termination of the Partnership in accordance with the Law.  Before the distribution of all the assets of the Partnership, the business of the Partnership and the affairs of the Partners, as such, shall continue to be governed by this Agreement.  The winding up of the Partnership and payment of creditors shall be effected in accordance with the Law.

### ARTICLE VI
### MISCELLANEOUS

6.1      <u>Tax Matters Partner</u>.  The General Partner shall at all times constitute, and have full powers and responsibilities, as the Tax Matters Partner of the Partnership.  In the event the Partnership shall be the subject of an income tax audit by any Federal, state or local authority, to the extent the Partnership is treated as an entity for purposes of such audit, including administrative settlement and judicial review, the Tax Matters Partner shall be authorized to act for, and his decision shall be final and binding upon, the Partnership and each Partner thereof, and the Tax Matters Partner shall be indemnified and held harmless by the Partnership and each Partner for any action so taken by him in good faith.  All expenses incurred in connection with any such audit, investigation, settlement or review shall be borne by the Partnership to the extent of available Partnership funds, and any excess shall be paid by the Partners individually in proportion to their percentage interests in the Partnership.

6.2      <u>Right to Hire</u>.

(a)      Nothing herein shall preclude the General Partner from engaging on behalf of the Partnership the services of any person or firm, whether or not affiliated with the General Partner, including the General Partner, to render for compensation such services to the Partnership as may be necessary to implement the business purposes of the Partnership.

(b)      Each of the Partners consents that the General Partner, the Investment Manager or any Limited Partner or any affiliate (as defined in the Securities Act of 1933, as amended, and the regulations thereunder) of any of them, including without limitation the investment manager of the CLO HoldCo, may engage in or possess an interest in directly or indirectly, any other present or future business venture of any nature or description for his own account, independently or with others,

11

**CONFIDENTIAL**                                                              **TDIT006273**

including but not limited to, any aspect of the securities business or any other business engaged in by the Partnership, and may become the general partner in other partnerships; and neither the Partnership nor any Partner shall have any rights in or to such independent venture or the income or profits derived therefrom.

(c)     The General Partner, the Investment Manager and any affiliate or employee of such General Partner or Investment Manager, may hereafter render investment advisory services to other investors with respect to, and/or may own, purchase or sell, securities or other interests in property the same as or similar to those which the General Partner may purchase, hold or sell on behalf of the Partnership.

6.3     <u>Applicable Law, etc.</u>  This Limited Partnership Agreement:  (i) shall be binding on the executors, administrators, estates, heirs and legal successors of the Partners; (ii) shall be governed by, and construed in accordance with, the laws of the Cayman Islands; and (iii) may be executed in more than one counterpart with the same effect as if the parties executing the several counterparts had all executed one counterpart as of the day and year first above written; provided, however, that in the aggregate, they shall have been signed by all of the Partners.  All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine or neuter, singular or plural as the identity of the person may require.  The term "gross negligence" and its cognates shall be interpreted in accordance with the laws of the State of Delaware.

6.4     <u>Power of Attorney</u>.  Each of the undersigned does hereby constitute and appoint the General Partner, with full power of substitution, his true and lawful representative and attorney in-fact, in his name, place and stead to make, execute, sign and file this Agreement and any amendment to this Agreement authorized by the terms of this Agreement, and all such other instruments, documents and certificates (and any amendments thereto) which may from time to time be required by the laws of the Cayman Islands, the United States of America, or any state in which the Partnership shall determine to do business, or any political subdivision or agency thereof, to effectuate, implement and continue the valid and subsisting existence of the Partnership and to take any further action that the General Partner considers advisable in its sole discretion in connection with the exercise of its authority pursuant to this Agreement.  This power of attorney is intended to secure an interest in property and, in addition, the obligations of each relevant Limited Partner under this Agreement and shall be irrevocable.

6.5     <u>Tax Elections Under the Internal Revenue Code</u>.  The General Partner shall have the authority to make all tax elections and determinations on behalf of the Partnership under the Internal Revenue Code, the regulations promulgated thereunder or other applicable law to effect any elections, determinations or capital allocations.

6.6     <u>Amendments to Partnership Agreement</u>.  The terms and provisions of this Agreement may be modified or amended at any time and from time to time with the consent of the General Partner together with the consent of a majority in interest of the Limited Partners, insofar as is consistent with the laws governing this Agreement.  Notwithstanding the foregoing, the General Partner shall have the right to effect

12

Appendix Page 60

CONFIDENTIAL                                                              TDIT006274

amendments to this Agreement without the consent of any Limited Partner, including without limitation, to reflect: a change in the location of the Partnership's principal place of business; a change in the registered office or registered agent; a change in the name of the Partnership; admission of Partners in accordance with this Agreement; a change that is necessary to qualify the Partnership as a limited partnership under the laws of any state or that is necessary or advisable in the opinion of the Tax Matters Partner to ensure that the Partnership will not be treated as an association taxable as a corporation for Federal income tax purposes; a change of the provisions relating to the management fee or other compensation to the Investment Manager or the General Partner so that such provisions conform to any applicable requirements of the U.S. Securities and Exchange Commission and other regulatory authorities; a change (i) that is necessary or desirable to satisfy any requirements, conditions or guidelines contained in any opinion, directive, order, ruling or regulation of any Federal or state agency or contained in any Federal or state statute, compliance with any of which the General Partner deems to be in the best interests of the Partnership and the Limited Partners, (ii) that is required or contemplated by this Agreement, or (iii) that is necessary or desirable to implement new regulations published by the Internal Revenue Service with respect to partnership allocations of income, gain, loss, deduction and credit; a change to cure any ambiguity, to correct or supplement any provision herein which may be inconsistent with any other provision herein, or to make any other provision with respect to the matters or questions arising under this Agreement which will not be inconsistent with the provisions hereof; or a change that does not adversely affect the Limited Partners in any material respect; *provided, that* in no event shall the General Partner effect any amendment to this Agreement that has the effect of giving the General Partner any economic benefits in the assets of the Partnership; *provided further, that* the General Partner shall give notice to the Limited Partners of any such amendment.

6.7    Investment Representation. Each Partner hereby acknowledges and represents that it acquired its interest in the Partnership for investment purposes only and not with a view to its resale or distribution.

6.8    Notices. All notices, requests or approvals that any party hereto is required or desires to give to any Partner or to the Partnership shall be in writing signed by or on behalf of the party giving the same and delivered personally or sent overnight express mail by a reputable private carrier or by prepaid registered or certified mail, return receipt requested, addressed (i) to the Limited Partner at the addresses set forth beneath his signature to this Agreement; (ii) to the Partnership at the principal place of business of the Partnership with a copy of each such notice sent simultaneously to the General Partner and the Investment Manager at Nextbank Tower, 13455 Noel Road, 8th Floor, Dallas, Texas 75240; or (iii) to the respective party at such other address or addresses as the party may specify from time to time in a writing given to the Partnership in the manner provided in this Section 6.8 of ARTICLE VI. Notice shall be deemed to have been duly given and received (i) on the date of delivery, if personally delivered, (ii) on the next business day subsequent to sending by overnight express mail as aforesaid, or (iii) on the third day subsequent to mailing if mailed as aforesaid; provided that any withdrawal notices shall not be deemed to have been given until actually received by the Partnership.

13

CONFIDENTIAL TDIT006275

1318

**FSD2025-0116**                    **Page 1322 of 1530**                    **2025-08-19**

6.9    <u>General Partner Determinations</u>.    Any determinations or calculations made by the General Partner shall, if made in good faith and in the absence of manifest error, be binding upon the Partnership and its Limited Partners.

6.10    <u>Dispute Resolution</u>.    The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with the Agreement or otherwise involving the Partnership, its Partners and/or any Covered Person.    If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    <u>Mediation</u>.

(1)    Any Dispute shall be submitted to mediation by written notice to the other party or parties.    In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations.    The mediator will be selected by agreement of the parties.    If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect.

(2)    The mediation will be conducted as specified by the mediator and agreed upon by the parties.    The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute.

(3)    The mediation will be treated as a settlement discussion and therefore will be confidential.    The mediator may not testify for either party in any later proceeding relating to the dispute.    No recording or transcript shall be made of the mediation proceedings.

(4)    Each party will bear its own costs in the mediation.    The fees and expenses of the mediator will be shared equally by the parties.

(b)    <u>Arbitration</u>.    If a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration.    A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed.    Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein.    The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in this document and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**").    In the event of a conflict, the provisions of this document will control.

(1)    The arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the

14

Appendix Page 62

**CONFIDENTIAL**                                              **TDIT006276**

1319

Arbitration Rules.  Any issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however*, that the Partnership or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief.  Under no circumstances will a state arbitration act preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement.  No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures.

(2)   The arbitrators may not award non-monetary or equitable relief of any sort.  They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum.  In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction.  The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.  Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law.

(3)   The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees.  All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.  Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees.  The duty to arbitrate described above shall survive the termination of this Agreement.  This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive.

(4)   No discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it.  In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.  In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.  The

15

Appendix Page 63

**CONFIDENTIAL**                                                                          TDIT006277

total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted.

(5)     All aspects of the arbitration shall be treated as confidential, including its institution and/or settlement.  Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable opportunity to protect their interests.  In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered.  The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term.

(6)     The result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.

6.11    Successors and Assigns.  Subject to the limitations set forth in Section 1.11, this Agreement shall inure to the benefit of and be binding upon the parties and to their respective heirs, executors, administrators, successors and permitted assigns.  For the avoidance of doubt, any Limited Partner who becomes a former Limited Partner shall remain bound to all terms and conditions of this Agreement.

6.12    Severability.  Every provision of this Agreement is intended to be severable.  If any term or provision hereof is illegal or invalid for any reason whatsoever, such term or provision will be enforced to the maximum extent permitted by law and, in any event, such illegality or invalidity shall not affect the validity of the remainder of the Agreement.

6.13    No Third Party Rights.  Except for rights expressly granted hereunder to the Covered Persons, this Agreement is intended solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any Person other than the parties hereto.

6.14    No Right to Partition.  Each of the Partners, on behalf of themselves and their shareholders, partners, principals, members, successors and assigns, if any and as permitted hereunder, hereby specifically renounce, waive and forfeit all rights, whether arising under contract or statute or by operation of law, except as otherwise expressly provided in this Agreement, to seek, bring or maintain any action in any court of law or equity for partition of the Partnership or any asset of the Partnership, or any interest which is considered to be Partnership property, regardless of the manner in which title to such property may be held.

16

**CONFIDENTIAL** **TDIT006278**

**SIGNATURE PAGE FOR AMENDED AND RESTATED
EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
CHARITABLE DAF FUND, LP**

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By _____

James D. Dondero
Managing Member

Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: _____

Name: Grant Scott
Title: Director

Witnessed By: _____

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: _____

Name:
Title:

Witnessed by: _____

CONFIDENTIAL      TDIT006279

## SIGNATURE PAGE FOR AMENDED AND RESTATED
## EXEMPTED LIMITED PARTNERSHIP AGREEMENT OF
## CHARITABLE DAF FUND, LP

IN WITNESS WHEREOF, the undersigned have executed this Amended and Restated Exempted Limited Partnership Agreement as a Deed effective as amongst the parties as of the day and year first above written.

GENERAL PARTNER:

CHARITABLE DAF GP, LLC

By: _____
    James D. Dondero
    Managing Member


Witnessed By: _____

LIMITED PARTNER:

CHARITABLE DAF HOLDCO, LTD:

By: _____
    Name: Grant Scott
    Title: Director

Witnessed By: Candi L. Rizzo
    Candi L. Rizzo

INITIAL LIMITED PARTNER:

WALKERS NOMINEES LIMITED:

By: _____
    Name: ROD PALMER
    Title:

Witnessed by: _____

CONFIDENTIAL                                                      TDIT006280

**EXHIBIT**
**2-B**

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM AND ARTICLES OF ASSOCIATION

OF

CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)



**||| WALKERS**

190 Elgin Avenue, George Town
Grand Cayman KY1-9001, Cayman Islands
T +1 345 949 0100   F +1 345 949 7886   www.walkersglobal.com

REF: SSJ/VT/H0851-120776



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

**CONFIDENTIAL**                                                            **TDIT006281**

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

MEMORANDUM OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

1. The name of the company is Charitable DAF HoldCo, Ltd (the "**Company**").

2. The registered office of the Company will be situated at the offices of Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are unrestricted and the Company shall have full power and authority to carry out any object not prohibited by any law as provided by Section 7(4) of the Companies Law (as amended) of the Cayman Islands (the "**Law**")

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Law.

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Law and the Articles of Association the Company shall have power to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8. The Company may exercise the power contained in Section 206 of the Law to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



1

AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 08:15 EST

CONFIDENTIAL

TDIT006282

## TABLE OF CONTENTS

| CLAUSE | PAGE |
|---|---|
| TABLE A | 1 |
| INTERPRETATION | 1 |
| PRELIMINARY | 4 |
| SHARES | 4 |
| MANAGEMENT SHARES | 5 |
| PARTICIPATING SHARES | 6 |
| MODIFICATION OF RIGHTS | 6 |
| CERTIFICATES | 7 |
| FRACTIONAL SHARES | 7 |
| TRANSFER OF SHARES | 7 |
| TRANSMISSION OF SHARES | 7 |
| ALTERATION OF SHARE CAPITAL | 8 |
| REDEMPTION, PURCHASE AND SURRENDER OF SHARES | 8 |
| TREASURY SHARES | 9 |
| GENERAL MEETINGS | 9 |
| NOTICE OF GENERAL MEETINGS | 10 |
| PROCEEDINGS AT GENERAL MEETINGS | 10 |
| VOTES OF SHAREHOLDERS | 11 |
| CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS | 12 |
| DIRECTORS | 12 |
| ALTERNATE DIRECTOR | 13 |
| POWERS AND DUTIES OF DIRECTORS | 13 |
| BORROWING POWERS OF DIRECTORS | 15 |

AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

**FSD2025-0116**　　　　　　　**2025-08-19**

1245

**CONFIDENTIAL**　　　　　　　TDIT006283

THE SEAL ..................................................................................................... 15

DISQUALIFICATION OF DIRECTORS ............................................................. 15

PROCEEDINGS OF DIRECTORS ................................................................... 16

DIVIDENDS ..................................................................................................... 18

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ............... 18

CAPITALISATION OF RESERVES .................................................................. 19

SHARE PREMIUM ACCOUNT ....................................................................... 20

NOTICES ........................................................................................................ 20

NON-RECOGNITION OF TRUSTS ................................................................. 21

WINDING UP .................................................................................................. 21

AMENDMENT OF ARTICLES OF ASSOCIATION .......................................... 22

CLOSING OF REGISTER OR FIXING RECORD DATE .................................. 22

REGISTRATION BY WAY OF CONTINUATION ............................................. 22

MERGERS AND CONSOLIDATION ............................................................... 22

DISCLOSURE ................................................................................................. 23

INDEMNITY .................................................................................................... 23

DISPUTE RESOLUTION ................................................................................ 24



AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

ii

THE COMPANIES LAW (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

OF

# CHARITABLE DAF HOLDCO, LTD

(ADOPTED BY SPECIAL RESOLUTION DATED 19 JANUARY 2015)

## TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Law shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

## INTERPRETATION

1. In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Law**" means the Companies Law (as amended) of the Cayman Islands.

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Law and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

AMER_Docs  11255406.3 H0851 120776



1

CONFIDENTIAL                                                          TDIT006285

FSD2025-0116                               2025-08-19

"**Office**" means the registered office of the Company as required by the Law.

"**Ordinary Resolution**" means a resolution:

(a)     passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Law and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "**Participating Shares**" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Law and these Articles, means the Register maintained by the Company pursuant to the Law and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Law and includes any Branch Register(s) established by the Company in accordance with the Law.

"**Restricted Person**" means any Person holding Participating Shares:

(a)     in breach of the law or requirements of any country or governmental authority;

(b)     that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the US Internal Revenue Code of 1986, as amended (the "**Code**") or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)     in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.



2

AMER_Docs  11255406 3 H0851 120776

FSD2025-0116                2025-08-19
1248

CONFIDENTIAL                TDIT006286

FSD2025-0116                                                                2025-08-19

"Secretary" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"Share" means a Management Share or Participating Share or both as the context so requires.

"Shareholder" or "Member" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"Share Premium Account" means the share premium account established in accordance with these Articles and the Law.

"signed" means bearing a signature or representation of a signature affixed by mechanical means.

"Special Resolution" means a special resolution of the Company passed in accordance with the Law, being a resolution:

(a)     passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)     approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"Treasury Shares" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"United States" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)     words importing the singular number shall include the plural number and vice versa;

(b)     words importing the masculine gender only shall include the feminine gender and any Person as the context may require;

(c)     the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)     reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)     reference to a statutory enactment shall include reference to any amendment or re-enactment thereof for the time being in force;



AMER_Docs  11255406.3 H0851 120776

3

FSD2025-0116                                                                2025-08-19
1249
CONFIDENTIAL                                                                TDIT006287

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case; and

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another.

2.     Subject to the preceding Articles, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

### PRELIMINARY

3.     The business of the Company may be commenced at any time after incorporation.

4.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company. Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.     The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Law and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office. The Directors may keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Law, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Law.

### SHARES

7.     Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)     issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine; and

(b)     grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8.     The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions,

AMER_Docs  11255406.3 H0851 120776

1250

**CONFIDENTIAL**                                                      TDIT006288

preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9.    The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10.   The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MANAGEMENT SHARES

11.   The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

12.   Any Management Shares held by Grant Scott will be automatically redeemed by the Company upon his death or upon the Company receiving written notice from two board certified physicians confirming that he is of unsound mind or otherwise incapacitated ("**Automatic Redemption**").

13.   If at the time of an Automatic Redemption, Grant Scott is the sole Director of the Company, such office will be automatically vacated by Grant Scott.

14.   Upon an Automatic Redemption, the Company shall issue 100 Management Shares to a successor management shareholder ("**Successor Management Shareholder**") designated by James Dondero ("**Designator**"), or, if he is unable or declines to act, by an individual or individuals designated by James Dondero ("**Successor Designator**"), in either case within 15 days of the Automatic Redemption. If the Designator is:

(a)   deceased and has not named a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made in accordance with the provisions of the Designator's will, or if his will contains no such provisions, by the qualified personal representative of his estate (the "**Designator's Personal Representative**"); or

(b)   otherwise incapacitated and has not previously designated a Successor Designator, or if each named Successor Designator is unable or declines to act, the designation of the Successor Management Shareholder shall be made by the Designator's attorney-in-fact appointed for such purpose, under a valid, effective power of attorney instrument (the "**Designator's Attorney**").

15.   Any designation of a Successor Management Shareholder must be notified to the Company in writing and signed by either the Designator, the Successor Designator, the Designator's Personal Representative, or the Designator's Attorney, as appropriate, and accompanied by a consent to become a Shareholder signed by the Successor Management Shareholder ("**Issue Notice**"). The issue of the 100 Management Shares to the Successor Management Shareholder shall take effect upon receipt by the Company of the Issue Notice and the Register will be updated accordingly.

5

AMER_Docs 11255406.3 H0851.120776

CONFIDENTIAL                                                      TDIT006289

16. The Designator may name a Successor Designator (including an individual, or a series of individuals) at any time pursuant to a written notice delivered to the Company during his lifetime or by a provision in his will. Each Successor Designator upon succeeding and replacing the Designator or a prior Successor Designator, may in the same manner as set out above, designate an individual, or a series of individuals, to succeed him as Successor Designator. In the event of a conflict between such instruments, the one bearing the latest date shall control. A Successor Designator will assume such office upon consenting to so act.

17. The Successor Management Shareholder may not be a "disqualified person" (as that term is defined in Section 4946 of the United States Internal Revenue Code of 1986, as amended), other than a foundation manager, with respect to Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., or Highland Kansas City Foundation, Inc.

18. In connection with the appointment of the Successor Management Shareholder, the Company and its registered office service provider will be entitled to rely on the advice of counsel confirming that the designation of the Successor Management Shareholder has been made in accordance with the procedures set out in these Articles.

## PARTICIPATING SHARES

19. Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

20. Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

21. The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

AMER_Docs 11255406.3 H0851.120776

6

CONFIDENTIAL                                                        TDIT006290

## CERTIFICATES

22. No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

23. The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

## TRANSFER OF SHARES

24. The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer. The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

25. The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

26. The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

27. All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

28. If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

29. The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share. In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

30. Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person



7

AMER_Docs 11255406.3 H0851.120776

Uploaded 27-Jan-2015 16:49 EST
Filed 04-Feb-2015 09:13 EST

FSD2025-0116 2025-08-19
1253

CONFIDENTIAL TDIT006291

could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

31. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

## ALTERATION OF SHARE CAPITAL

32. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

33. The Company may by Ordinary Resolution:

   (a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

   (b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

   (c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

   (d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

34. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

## REDEMPTION, PURCHASE AND SURRENDER OF SHARES

35. Subject to the Law, the Company may:

   (a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

   (b) purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

   (c) make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Law; and

   (d) accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.



8

AMER_Docs 11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

FSD2025-0116

CONFIDENTIAL

2025-08-19

1254

TDIT006292

36. Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

37. The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

38. The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

### TREASURY SHARES

39. Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Law. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

40. No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

41. The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

    (a) the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

    (b) a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Law, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.

42. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

### GENERAL MEETINGS

43. The Directors may, whenever they think fit, convene a general meeting of the Company.

44. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, except for general meetings requisitioned by the Shareholders in accordance with these Articles, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting. The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

45. General meetings shall also be convened on the requisition in writing of any Shareholder or Shareholders entitled to attend and vote at general meetings of the Company holding at least ten percent of the paid up voting share capital of the Company deposited at the Office specifying the



9

AMER_Docs  11255406.3 H0851.120776

FSD2025-0116                                                      2025-08-19
                                                                 **1255**

CONFIDENTIAL
                                                                 TDIT006293

objects of the meeting for a date no later than 21 days from the date of deposit of the requisition signed by the requisitionists, and if the Directors do not convene such meeting for a date not later than 45 days after the date of such deposit, the requisitionists themselves may convene the general meeting in the same manner, as nearly as possible, as that in which general meetings may be convened by the Directors, and all reasonable expenses incurred by the requisitionists as a result of the failure of the Directors to convene the general meeting shall be reimbursed to them by the Company.

46. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

## NOTICE OF GENERAL MEETINGS

47. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

48. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

## PROCEEDINGS AT GENERAL MEETINGS

49. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

50. No business shall be transacted at any general meeting unless a quorum of Shareholders is present at the time when the meeting proceeds to business. Save as otherwise provided by these Articles, one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

51. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

52. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

10

AMER_Docs 11255406.3 H0851 120776

Uploaded: 27-Jan-2015 16:38 EST
Filed: 04-Feb-2015 09:13 EST

**CONFIDENTIAL**       TDIT006294

53.   The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

54.   If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

55.   The chairman may adjourn a meeting from time to time and from place to place either:

(a)   with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting); or

(b)   without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

(i)   secure the orderly conduct or proceedings of the meeting; or

(ii)   give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

56.   At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

57.   If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

58.   In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

59.   A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

### VOTES OF SHAREHOLDERS

60.   On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of



11

AMER_Docs   11255406.3 H0851 120776

Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

61. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

62. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

63. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

64. On a poll votes may be given either personally or by proxy.

65. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

66. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

67. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

68. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

69. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at general meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

## CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

70. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

## DIRECTORS

71. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

12

AMER_Docs 11255406.3 H0851.120776

72. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director

73. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

74. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

75. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

76. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.

77. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

## ALTERNATE DIRECTOR

78. Any Director may in writing appoint another Person to be his alternate and, save to the extent provided otherwise in the form of appointment, such alternate shall have authority to sign written resolutions on behalf of the appointing Director, but shall not be required to sign such written resolutions where they have been signed by the appointing Director, and to act in such Director's place at any meeting of the Directors at which he is unable to be present. Every such alternate shall be entitled to attend and vote at meetings of the Directors as a Director when the Director appointing him is not personally present and where he is a Director to have a separate vote on behalf of the Director he is representing in addition to his own vote. A Director may at any time in writing revoke the appointment of an alternate appointed by him. Such alternate shall not be deemed to be an officer of the Company solely as a result of his appointment as an alternate. The remuneration of such alternate shall be payable out of the remuneration of the Director appointing him and the proportion thereof shall be agreed between them.

79. Any Director may appoint any Person, whether or not a Director, to be the proxy of that Director to attend and vote on his behalf, in accordance with instructions given by that Director, or in the absence of such instructions at the discretion of the proxy, at a meeting or meetings of the Directors which that Director is unable to attend personally. The instrument appointing the proxy shall be in writing under the hand of the appointing Director and shall be in any usual or common form or such other form as the Directors may approve, and must be lodged with the chairman of the meeting of the Directors at which such proxy is to be used, or first used, prior to the commencement of the meeting.

## POWERS AND DUTIES OF DIRECTORS

80. Subject to the Law, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.



13

AMER_Docs  11255406.3 H0851 120776

Uploaded: 27-Jun-2013 16:49 EST
Filed: 04-Feb-2013 09:13 EST

**CONFIDENTIAL**                                                        TDIT006297

81.    The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution. The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

82.    The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit. Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

83.    The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

84.    The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an **"Attorney"** or **"Authorised Signatory"**, respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

85.    The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

86.    The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

87.    The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.



14

AMER_Docs  11255406 3 H0851 120776

Uploaded: 27-Jan-2013.16:49 CST
Filed: 04-Feb-2013 09 13 CST

FSD2025-0116                                                            2025-08-19
                                                                        1260

**CONFIDENTIAL**                                                        TDIT006298

88. Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

## BORROWING POWERS OF DIRECTORS

89. The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

## THE SEAL

90. The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal. The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

91. The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal.  The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

92. Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

## DISQUALIFICATION OF DIRECTORS

93. The office of Director shall be vacated, if the Director:

   (a)    becomes bankrupt or makes any arrangement or composition with his creditors;

   (b)    dies or is found to be or becomes of unsound mind;

   (c)    resigns his office by notice in writing to the Company;

   (d)    is removed from office by Ordinary Resolution;

   (e)    is removed from office by notice addressed to him at his last known address and signed by all of his co-Directors (not being less than two in number), or

15

AMER_Docs  11255406.3 H0851 120776



CONFIDENTIAL                                                      TDIT006299

(f)    is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

94.    The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

95.    A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

96.    The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two, and if there be one Director the quorum shall be one. A Director represented by proxy or by an alternate Director at any meeting shall be deemed to be present for the purposes of determining whether or not a quorum is present.

97.    A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

98.    A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established. A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

99.    Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.



16

AMER_Docs  11255406.3 H0851.120776

100. The Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

    (a)    all appointments of officers made by the Directors;

    (b)    the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

    (c)    all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

101. When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

102. A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be (an alternate Director, subject as provided otherwise in the terms of appointment of the alternate Director, being entitled to sign such a resolution on behalf of his appointer), shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be. When signed a resolution may consist of several documents each signed by one or more of the Directors or his duly appointed alternate.

103. The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.

104. The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

105. Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings. If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

106. A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

107. All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.



17

AMER_Docs 11255406.3 H0851.120776

FSD2025-0116    2025-08-19

**1263**

**CONFIDENTIAL**    TDIT006301

## DIVIDENDS

108.  Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Law and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

109.  Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

110.  The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

111.  Any dividend may be paid in any manner as the Directors may determine.  If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.  Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

112.  The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

113.  Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

114.  If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

115.  No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

116.  The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

117.  The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

118.  The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not



18

AMER_Docs  11255406.3 H0851.120776

CONFIDENTIAL                                                          TDIT006302

being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

119. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

120. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Law and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

## CAPITALISATION OF RESERVES

121. Subject to the Law and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d) authorise a Person to enter (on behalf of all the Shareholders concerned) into an agreement with the Company providing for either:

(i) the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

(ii) the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares,



19

AMER_Docs  11255406 3 H0851 120776

Uploaded: 27-Jan-2011 16:39 EST
Filed: 04-Feb-2011 09:11 EST

CONFIDENTIAL

TDIT006303

and any such agreement made under this authority being effective and binding on all those Shareholders; and

(e)   generally do all acts and things required to give effect to any of the actions contemplated by this Article.

## SHARE PREMIUM ACCOUNT

122.  The Directors shall in accordance with the Law establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

123.  There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Law, out of capital.

## NOTICES

124.  Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

125.  Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

126.  Any notice or other document, if served by:

(a)   post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

(b)   facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

(c)   recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

(d)   electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.



20

AMER_Docs  11255406.3 H0851.120776

Uploaded 27-Jun-2013 16:49 EST
Filed 04-Feb-2013 09:13 EST

FSD2025-0116                                                    2025-08-19
                                                                    1266

CONFIDENTIAL                                                    TDIT006304

127. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

128. Notice of every general meeting of the Company shall be given to:

   (a)   all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

   (b)   every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

## NON-RECOGNITION OF TRUSTS

129. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial interest in any Share or (except only as otherwise provided by these Articles or as the Law requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

130. If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

131. Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

   (a)   first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

   (b)   second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

132. If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such



21

AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2015 16:49 EST
Filed: 04-Feb-2015 09:13 EST

**CONFIDENTIAL**                                        TDIT006305

assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

133.    Subject to the Law and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

134.    For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

135.    In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

136.    If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

## REGISTRATION BY WAY OF CONTINUATION

137.    The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing. In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

## MERGERS AND CONSOLIDATION

138.    The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Law.

22

AMER_Docs 11255406.3 H0851.120776

Uploaded: 23-Jan-2015 16:49 EST
Filed 04-Feb-2015 09:13 EST

CONFIDENTIAL                                                                                TDIT006306

## DISCLOSURE

139. The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

## INDEMNITY

140. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "**Covered Person**" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or Gross Negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

141. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

142. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

143. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.



AMER_Docs 11255406.3 H0851.120776

23

FSD2025-0116

CONFIDENTIAL                                                    2025-08-19

1269

TDIT006307

144. The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

145. The following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a) Mediation:

(i) any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii) the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii) the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv) each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties;

(b) Arbitration:

if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. A party who files a suit in court regarding a Dispute rather than in arbitration waives its claim and must pay all attorney's fees and costs incurred by the other party in seeking to have such suit dismissed. Under no circumstances will a party maintain its right to pursue his/her/its Dispute if that party initiates a judicial suit instead of complying with the mediation and arbitration provisions herein. The arbitration will be conducted through JAMS/Endispute in accordance with the procedures in these Articles and the commercial dispute arbitration rules then in effect ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i) the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any

24

AMER_Docs 11255406.3 H0851.120776



**CONFIDENTIAL**                                                    TDIT006308

issue concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act ("**FAA**"), and resolved by the arbitrators, *provided, however,* that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement.   No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii)     the arbitrators may not award non-monetary or equitable relief of any sort.   They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum.   In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered.   Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii)    the party initiating arbitration shall pay all arbitration costs and arbitrator's fees.   All subject to a final arbitration award on who should bear costs and fees.   All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site.   Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv)     no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it.   In any event, there shall be no more than (i) two party depositions of six hours each.   Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production.   In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents.   The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v)      all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement.   Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements.  Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a



25

AMER_Docs  11255406 3 H0851 120776

reasonable opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)    the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction.



26

AMER_Docs  11255406.3 H0851.120776

Uploaded: 27-Jan-2013 16:49 EST
Filed: 04-Feb-2015 09:13 EST

FSD2025-0116    2025-08-19

1272

CONFIDENTIAL

TDIT006310



EXHIBIT
**3**

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

IN THE GRAND COURT OF THE CAYMAN ISLANDS

FINANCIAL SERVICES DIVISION

CAUSE NO:   FSD 99 OF 2025 (JAJ)

IN THE MATTER OF:   SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF:   CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)

BETWEEN

(1) THE HIGHLAND DALLAS FOUNDATION, INC.
(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.
(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.
(4) THE HCMLP CHARITABLE FUND

**PLAINTIFFS**

and

CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)

**DEFENDANT**

THIS IS EXHIBIT "**GS-1**" TO THE AFFIDAVIT OF

GEOFFREY SYKES

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

Fiona MacAdam
Notary Public in and for the Cayman Islands
My commission expires January 31, 20 26
Date: 27 April 2025 .

NOTARY PUBLIC

36068395.1.C8689.187150          Appendix Page 97



24 April 2025

Charitable DAF HoldCo Ltd
c/o Campbells Corporate Services Limited
Floor 4, Willow House, Cricket Square
Grand Cayman, KY1-9010
Cayman Islands

Dear Sir or Madam

**In the matter of Charitable DAF HoldCo Ltd | FSD No. 99 of 2025 | Service of Documents**

We act for the participating shareholders of the Charitable DAF HoldCo Ltd (*Company*), namely: (i) Highland Dallas Foundation, Inc., (ii) Highland Kansas City Foundation, Inc., (iii) Highland Santa Barbara Foundation, Inc., and (iv) HCMLP Charitable Fund (*Supporting Organisations*) which presented a winding up petition in relation to the Company (*Petition*), and a summons dated 10 April 2025 (*Summons*).

The Summons is listed for hearing before Justice Asif at 2pm on 28 April 2025.

Please find enclosed by way of service copies of the following:

1. The Petition (including Notice of Hearing)
2. The Summons
3. Affirmation of Julie Diaz and Exhibit JD-1
4. Affirmation of James Dondero and Exhibit JDD-1
5. Consent to act of Margot MacInnis and Exhibit MM-1
6. Consent to act of Sandipan Bhowmik and Exhibit SB-1

*Acknowledgment of Service*

I _____ am duly authorised to accept service of the enclosed documents, which were served at _____ pm on 24 April 2025.

_____
**Signed**

If you have any questions in relation to the above, please contact our office.

Yours faithfully

**Johnstone Law**

JL   Unit 9, Tropic Centre, 18 Earth Close, Grand Cayman
PO Box 926, 10 Market St, Grand Cayman, KY1-9006
345 929 3000 | info@j-law.ky | www.j-law.ky | LinkedIn

Appendix Page 98

FSD2025-0116 | Walkers | 2025-08-19

**BY EMAIL**

25 April 2025                                    Our Ref: PP/PA/187150

Johnstone Law
10 Market Street, PO Box 926
Grand Cayman KY1-9006

Dear Mr Johnstone

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

1.    We act as Cayman Islands counsel to the Company.

2.    We refer to the documents served yesterday by your firm on the Company at its registered office, which include a winding up petition ("**Petition**"), an application for the appointment of provisional liquidators ("**PL Application**"), and a cover letter of service ("**Service Letter**").

**The Company is already in Voluntary Liquidation**

3.    Please note the following (all documents enclosed):

      (a)    On 29 March 2025, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd executed a consent to act as joint voluntary liquidators of the Company ("**JVLs**").

      (b)    On 2 April 2025: (i) the directors of the Company executed written resolutions including to recommend to the management shareholder that the Company be wound up voluntarily and the JVLs be appointed; (ii) the management shareholder executed special resolutions that the Company be wound up voluntarily and the JVLs be appointed; and (iii) the directors of the Company executed a declaration of solvency.

      (c)    On 14 April 2025, Gazette Issue No. 8/2025 was published, which included notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the JVLs appointed.

4.    Further, please see enclosed:

      (a)    The current Memorandum and Articles of the Company, dated 20 February 2025 ("**M&A**").

36063132.1.C8689.187150          Appendix Page 99

FSD2025-0116                                    2025-08-19
1275
**CONFIDENTIAL**                               TDIT006313

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 1256 Page 589 of 759
**Page 1360 of 1530**

FSD2025-0116 WALKERS                                                                          Page 2025-08-19

(b)     The current Register of Members of the Company, dated 25 April 2025.

(c)     An email chain between your firm and our firm dated 23-24 April 2025.

5.      As outlined above, the Company is in Voluntary Liquidation.

6.      That fact should have been evident from a search of the Gazette prior to service, as per the enclosed notice referred to at paragraph 3(c) above.

7.      Further, the email chain referred to at paragraph 4(c) above is all that we received from your firm by way of pre-action correspondence.  We enquired as to the nature of the proceedings to be served, and had we been informed that it was a winding up petition and application for the appointment of provisional liquidators (rather than simply that the proceedings were in the process of being served on the Company's registered office), we would have informed you that the Company was already in Voluntary Liquidation.

8.      There is nothing in the M&A which entitles your clients to receive notice from the Company of its entry into Voluntary Liquidation.

**The appropriate course of action**

9.      As the Company is already in Voluntary Liquidation, the Petition and PL Application are plainly redundant, and we invite your clients to withdraw them without delay.

10.     If the JVLs (or your clients) consider it appropriate that the Voluntary Liquidation be brought under the supervision of the court, any of them may make an application for a supervision order pursuant to the Companies Act section 131.  If your clients would like to discuss such an application with the JVLs, including in respect of funding, please let us know.

11.     In the event that the Petition and PL Application are not withdrawn, or at the very least the hearing of the PL Application (which we understand from your firm's Service Letter is listed on Monday 28 April 2025 at 2pm) is not adjourned, this letter must be brought to the attention of the Court, and we will appear on behalf of the Company.

12.     If it becomes appropriate to do so, we will put this letter before the Court including on the question of costs.

Yours faithfully

*Walkers (Cayman) LLP*

**WALKERS (CAYMAN) LLP**

Direct Tel: +1 345 914 6365
Email: Barnaby.Gowrie@walkersglobal.com

**FSD2025-0116**                   **2025-08-19**

## THE COMPANIES ACT (AS AMENDED)

### <u>JOINT VOLUNTARY LIQUIDATORS' CONSENT TO ACT</u>

**CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")**

**REGISTRATION NO: 263805**

To:     The Registrar of Companies

**TAKE NOTICE** that we, Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, hereby consent to act as Joint Voluntary Liquidators of the above-named Company with effect from the commencement of the liquidation.

**DATED** this 29th day of March, 2025.

_____

**Mitchell Mansfield**
**Joint Voluntary Liquidator**

E: mitchell.mansfield@kroll.com
T: +1 345 743 8805

_____

**William Clarke**
**Joint Voluntary Liquidator**

E: will.clarke@kroll.com
T: +1 345 623 9905

**FSD2025-0116**                                      **2025-08-19**

**CONFIDENTIAL**                              1277          **TDIT006315**

**CHARITABLE DAF HOLDCO, LTD.**
**(THE "COMPANY")**

---

**WRITTEN RESOLUTIONS OF THE**
**DIRECTORS OF THE COMPANY DATED 2 APRIL 2025**

---

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025), unless the context otherwise requires.

The undersigned, being all the Directors of the Company for the time being, hereby take the following actions and adopt the following resolutions.

1. **VOLUNTARY LIQUIDATION**

1.1    **IT IS NOTED** that:

    (a)    the Company's sole investment, being 100% of the limited liability company interests in CDMCFAD, LLC, a Delaware limited liability company, was redeemed on 27 March 2025 (the "**CDMCFAD Redemption**");

    (b)    proceeds lawfully available for distribution from the CDMCFAD Redemption in the amount of $1,612,192 were distributed to holders of Participating Shares of the Company by way of a cash dividend paid on April 2;

    (c)    the Company will not be engaging in any further business or investment activity and the operations of the Company have been fully wound down;

    (d)    the Company has no assets and no liabilities;

    (e)    in the circumstances, there is no reason for the Company to continue as a going concern and the Directors are of the view that the Company should therefore be wound up voluntarily;

    (f)    Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands have indicated that they consent to act as joint voluntary liquidators of the Company (the "**JVLs**") if so appointed;

    (g)    the Directors have received and reviewed a liquidation proposal from the JVLs, together with its terms and conditions (the "**Liquidation Proposal**");

    (h)    the Directors have conducted a full enquiry into the Company's affairs and to the best of the Directors' knowledge and belief the Company will be able to pay its debts in full together with interest at the prescribed rate within twelve-month period from the commencement of the voluntary winding up; and

    (i)    the Directors have received a form of the declaration of solvency for execution pursuant to section 124 of the Companies Act (as amended) (the "**Declaration of Solvency**").

35894721.2.C8689.187150

CONFIDENTIAL

TDIT006316

1.2    IT IS RESOLVED that:

(a)    the Liquidation Proposal be approved;

(b)    the Directors recommend to Mark Patrick, being the only Shareholder having the right to receive notice of, attend, speak at and vote at general meetings of the Company, that:

    (i)    the Company be wound up voluntarily; and

    (ii)    Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company; and

(c)    if the Company is wound up voluntarily, each Director execute the Declaration of Solvency.

2.    **GENERAL AUTHORISATION**

2.1    **IT IS RESOLVED** that, in connection with or to carry out the actions contemplated by the foregoing resolutions, any Director, officer or (if applicable) any attorney or duly authorised signatory of the Company (any such person being an "**Attorney**" or "**Authorised Signatory**" respectively), and such other persons as are authorised by any of them be, and each hereby is, authorised, in the name and on behalf of the Company, to do such further acts and things as any Director or officer or such duly authorised other person shall deem necessary or appropriate, including to do and perform (or cause to be done and performed), in the name and on behalf of the Company, all such acts and to sign, make, execute, deliver, issue or file (or cause to be signed, made, executed, delivered, issued or filed) with any person including any governmental authority or agency, all such agreements, documents, instruments, certificates, consents or waivers and all amendments to any such agreements, documents, instruments, certificates, consents or waivers and to pay, or cause to be paid, all such payments, as any of them may deem necessary or advisable in order to carry out the intent of the foregoing resolutions, the authority for the doing of any such acts and things and the signing, making, execution, delivery, issue and filing of such of the foregoing to be conclusively evidenced thereby.

3.    **RATIFICATION OF PRIOR ACTIONS**

3.1    **IT IS RESOLVED** that any and all actions of the Company, or of any Director or officer or any Attorney or Authorised Signatory, taken in connection with the actions contemplated by the foregoing resolutions prior to the execution hereof be and are hereby ratified, confirmed, approved and adopted in all respects as fully as if such action(s) had been presented to for approval and approved by, all the Directors prior to such action being taken.

_____
Mark Patrick
**Director**

_____
Paul Murphy
**Director**

2

35894721.2.C8689.187150

CONFIDENTIAL

TDIT006317

FSD2025-0116                                                                                   2025-08-19

CHARITABLE DAF HOLDCO, LTD.
(THE "COMPANY")

### WRITTEN RESOLUTIONS OF THE SOLE VOTING SHAREHOLDER OF THE COMPANY DATED 2 APRIL 2025

Capitalised terms used herein shall have the meaning ascribed to such terms in the Company's Amended and Restated Memorandum and Articles of Association (as adopted by Special Resolution dated 20 February 2025) (the "**Articles**"), unless the context otherwise requires.

The undersigned, being the only Shareholder of the Company having the right to receive notice of, attend, speak at and vote at general meetings and having considered the written resolutions of the Directors dated 2 April 2025 which state that the Directors recommend that the Company be wound up voluntarily and that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands be appointed as the joint voluntary liquidators of the Company (the "**JVLs**"), hereby consents to the following actions and adopts the resolutions set out below.

1.   **VOLUNTARY LIQUIDATION**

1.1   IT IS RESOLVED BY SPECIAL RESOLUTION that:

(a)   the Company be wound up voluntarily; and

(b)   Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd be appointed as the JVLs of the Company.

1.2   IT IS RESOLVED BY ORDINARY RESOLUTION that:

(a)   the JVLs be authorised, in accordance with Article 123 of the Articles, to divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for that purpose, set such value as they deem fair upon any property to be divided as aforesaid and may determine how such division will be carried out as between the Participating Shareholders or different Classes; and

(b)   the JVLs shall have the power to retain the Company's administrator, manager or such other person as determined by the JVLs to assist them in discharging any registration and notification obligations and any obligation to complete the Company's final filings and retain records pursuant to the US Foreign Account Tax Compliance Act and/or Common Reporting Standard and/or Economic Substance Reporting.

Mark Patrick

1

35895767.2.C8689.187150

Appendix Page 104

FSD2025-0116                                                                                   2025-08-19
1280

CONFIDENTIAL                                                                          TDIT006318

THE COMPANIES ACT (AS AMENDED)

DECLARATION OF SOLVENCY

CHARITABLE DAF HOLDCO, LTD. (IN VOLUNTARY LIQUIDATION) (THE "COMPANY")

REGISTRATION NO: 263805

We, Mark Patrick and Paul Murphy, being the Directors of the Company do solemnly and sincerely declare that we have made a full inquiry into the affairs of the Company and that, having done so, we believe that the Company will be able to pay its debts in full, together with interest at the prescribed rate within a period of twelve (12) months from the commencement of the winding up.

**Mark Patrick**

6716 Glenhurst Drive, Dallas, Texas, TX 75254, United States

Date of signature: 4/2/2025

Date of appointment as Director: 25 March 2021

**Paul Murphy**

Windsor Village, Unit 24, South Sound, Grand Cayman, Cayman Islands

Date of signature: 2nd April 2025

Date of appointment as Director: 22 April 2021

CONFIDENTIAL                                        TDIT006319

**Contacts for enquiries:**

Bryce Doran or Zhouming Kang

Telephones: (345) 949 7576 or +852 2583 1167

Emails: BDoran@RHRestructuring.com
 or zhouming.kang@acclime.com

### GATN FINANCE LIMITED
#### Notice of Voluntary Winding Up (O.13, r.2)
#### (In Voluntary Liquidation)
#### The Companies Act (As Amended)

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century Yard, Cricket Square, Grand Cayman, KY1-1102 Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**

Name: Colin Eastburn-Mallory

Telephone: (345) 949 5122

c/o Paget-Brown Financial Services Limited

P.O. Box 1111

Century Yard, Cricket Square

Grand Cayman KY1-1102

Cayman Islands

Tel: 345 949 5122

### AMP FUNDING LIMITED
#### (In Voluntary Liquidation)
#### The Companies Act (As Amended)
#### Notice of Voluntary Winding Up (O.13, r.2)

TAKE NOTICE that the above-named Company was put into liquidation on 2 April 2025 by a special resolution passed at an extraordinary meeting of the Company held on 2 April 2025.

AND FURTHER TAKE NOTICE that Westport Services Ltd., of PO Box 1111, Century

Yard, Cricket Square, Grand Cayman KY1-1102, Cayman Islands, has been appointed Voluntary Liquidator of the Company.

Creditors of the company are to prove their debts or claims on or before 7 May 2025and to establish any title they may have under The Companies Act (as amended), or be excluded from the benefit of any distribution made before such debts are proved or from objecting to the distribution.

**Date of liquidation: 2 April 2025**

WESTPORT SERVICES LTD.
Voluntary Liquidator

**Officer for enquiries:**

Name: Colin Eastburn-Mallory

Telephone: (345) 949 5122

c/o Paget-Brown Financial Services Limited

P.O. Box 1111

Century Yard, Cricket Square

Grand Cayman KY1-1102

Cayman Islands

Tel: 345 949 5122

### CHARITABLE DAF HOLDCO, LTD.
#### (In Voluntary Liquidation)
#### ("The Company")
#### The Companies Act (As Amended)
#### Notice Of Voluntary Winding Up
#### Registration No: 263805

TAKE NOTICE that the Company was put into liquidation on 2 April 2025 by a special resolution passed by written resolution of the sole voting shareholder of the Company, executed on 2 April 2025.

AND FURTHER TAKE NOTICE that Mitchell Mansfield and William Clarke of Kroll (Cayman) Ltd, Strathvale House, 3rd Floor, 90 North Church Street, George Town, Grand Cayman, KY1-1204, Cayman Islands, have been appointed as joint voluntary liquidators of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice and to establish any title they may have under the Companies Act (as amended) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of

**CONFIDENTIAL** TDIT006320

any distribution made before such debts and/or claims are proved or from objecting to the distribution.

**Dated this 14th day of April 2025**

MITCHELL MANSFIELD AND WILLIAM CLARKE

Joint Voluntary Liquidators

**Contact for enquiries:**

William Clarke
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman KY1-1204
Cayman Islands
E: will.clarke@kroll.com
T: +1 345 623 9905

**Address for service:**

Kroll (Cayman) Ltd
Strathvale House, 3rd Floor
90 North Church Street
George Town
Grand Cayman, KY1-1204
Cayman Islands

**AARO DIRECTIONAL CRYPTO MULTIFUND LIMITED**
**(In Voluntary Liquidation)**
**(the Company)**
**Notice Of Voluntary Winding Up**
**Registration No: 390083**

TAKE NOTICE that the Company was placed into voluntary liquidation on 28 March 2025 by a special resolution passed by written resolution of the voting shareholder of the Company.

AND FURTHER TAKE NOTICE that R&H Restructuring VL Services Ltd. of Windward 1, Regatta Office Park, PO Box 897, Grand Cayman KY1-1103, Cayman Islands has been appointed voluntary liquidator of the Company.

AND NOTICE IS HEREBY GIVEN that creditors of the Company are to prove their debts or claims within 21 days of the publication of this notice to establish any title they may have under the Companies Act (as revised) by sending their names, addresses and the particulars of their debts or claims to the undersigned, or in default thereof they will be excluded from the benefit of any distribution made before such debts and/or claims

are proved or from objecting to the distribution.

**Dated: 03 April 2025**

OWEN WALKER
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator
MARTIN TROTT
Authorised signatory for and on behalf of
R&H Restructuring VL Services, Ltd.
Voluntary Liquidator

**Contact for Enquiries:**

Robert Knight
Telephone: +1 (345) 949 7576
Email: RKnight@RHRestructuring.com

**XP PHALANX CT FUND**
**(In Voluntary Liquidation)**
**(the "Company")**
**The Companies Act (as amended)**
**Notice of Voluntary Winding Up**
**Registration No: 391110**

TAKE NOTICE that the above-named Company was put into liquidation on 26 March 2025 by a Special Resolution passed by the sole voting shareholder by way of a written resolution in lieu of a meeting.

AND FURTHER TAKE NOTICE that FFP Limited of 2nd Floor Harbour Centre, 159 Mary Street, George Town, Grand Cayman, Cayman Islands has been appointed Voluntary Liquidator of the Company.

CREDITORS OF THE COMPANY are to prove their debts or claims within 21 days of the publication of this notice, and to establish any title they may have under the Companies Act (as amended) or are to be excluded from the benefit of any distribution made before the debts are proved or from objecting to the distribution.

**Dated this 3rd day of April 2025**

FFP LIMITED
Voluntary Liquidator

**Contact for enquiries:**

James Allen
FFP Limited
2nd Floor Harbour Centre
159 Mary Street
George Town, Grand Cayman
Cayman Islands

**CONFIDENTIAL**   TDIT006321

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM AND ARTICLES OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

## Campbells

Floor 4, Willow House, Cricket Square
Grand Cayman KY1-9010
Cayman Islands

campbellslegal.com

(14133-42760)

Appendix Page 108

*www.verify.gov.ky File#: 263805*





*Filed: 21-Feb-2025 09:26 EST*

*Auth Code: E90228166495*

**CHARITABLE DAF HOLDCO, LTD**

---

**THE COMPANIES ACT (AS AMENDED)**

**COMPANY LIMITED BY SHARES**

**AMENDED AND RESTATED**

**MEMORANDUM OF ASSOCIATION**

**(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)**

---

1. The name of the Company is Charitable DAF HoldCo, Ltd.

2. The registered office of the Company will be situated at the offices of Campbells Corporate Services Limited, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands or at such other location as the Directors may from time to time determine.

3. The objects for which the Company is established are:

   (a) to benefit community-focused non-profit foundations established or located anywhere in the world or for the purposes recognised as charitable, as the Directors may from time to time determine, in furtherance of the following mission statement: "Charitable DAF makes investments in order to support community-focused non-profit foundations with a demonstrated focus of giving funds to worthy causes and making a difference"; and

   (b) to do all such things in the opinion of the Directors are or may be incidental or conducive to the above objects or any part of them.

4. The Company shall have and be capable of exercising all the functions of a natural person of full capacity irrespective of any question of corporate benefit as provided by Section 27(2) of the Companies Act (as amended) of the Cayman Islands (the "**Act**").

5. The Company will not trade in the Cayman Islands with any person, firm or corporation except in furtherance of the business of the Company carried on outside the Cayman Islands; provided that nothing in this section shall be construed as to prevent the Company effecting and concluding contracts in the Cayman Islands, and exercising in the Cayman Islands all of its powers necessary for the carrying on of its business outside the Cayman Islands.

6. The liability of the shareholders of the Company is limited to the amount, if any, unpaid on the shares respectively held by them.

7. The capital of the Company is US$50,000.00 divided into 4,999,900 Participating Shares of a nominal or par value of US$0.01 each 100 Management Shares of a nominal or par value of US$0.01 each provided always that subject to the Act and the Articles of Association the Company shall have power

35631852.5.C8689.187150

1

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

to redeem or purchase any of its shares and to sub-divide or consolidate the said shares or any of them and to issue all or any part of its capital whether original, redeemed, increased or reduced with or without any preference, priority, special privilege or other rights or subject to any postponement of rights or to any conditions or restrictions whatsoever and so that unless the conditions of issue shall otherwise expressly provide every issue of shares whether stated to be ordinary, preference or otherwise shall be subject to the powers on the part of the Company hereinbefore provided.

8.     The Company may exercise the power contained in Section 206 of the Act to deregister in the Cayman Islands and be registered by way of continuation in some other jurisdiction.



35631852.5.C8689.187150

2

Appendix Page 110

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**

**TDIT006324**

**TABLE OF CONTENTS**

CLAUSE                                                                                           PAGE

TABLE A ........................................................................................................... 1

INTERPRETATION ...................................................................................................... 1

PRELIMINARY ........................................................................................................... 5

SHARES ..................................................................................................................... 6

MANAGEMENT SHARES.............................................................................................. 6

PARTICIPATING SHARES ............................................................................................. 7

MODIFICATION OF RIGHTS ......................................................................................... 7

CERTIFICATES ........................................................................................................... 7

FRACTIONAL SHARES ................................................................................................. 7

TRANSFER OF SHARES ............................................................................................... 8

TRANSMISSION OF SHARES ........................................................................................ 8

ALTERATION OF SHARE CAPITAL ............................................................................... 9

REDEMPTION, PURCHASE AND SURRENDER OF SHARES ............................................. 9

TREASURY SHARES .................................................................................................... 10

GENERAL MEETINGS .................................................................................................. 11

NOTICE OF GENERAL MEETINGS ................................................................................ 11

PROCEEDINGS AT GENERAL MEETINGS ...................................................................... 11

VOTES OF SHAREHOLDERS......................................................................................... 13

CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS .................................... 14

DIRECTORS................................................................................................................. 14

POWERS AND DUTIES OF DIRECTORS.......................................................................... 15

35631852.5.C8689.187150

i

www.verify.gov.ky File#: 263805

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**1287**

**CONFIDENTIAL**                                                                    **TDIT006325**



BORROWING POWERS OF DIRECTORS ........................................................................ 17

THE SEAL ...................................................................................................................... 17

DISQUALIFICATION OF DIRECTORS .......................................................................... 17

PROCEEDINGS OF DIRECTORS ................................................................................. 18

DIVIDENDS .................................................................................................................... 21

ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION ............................ 21

CAPITALISATION OF RESERVES ............................................................................... 22

SHARE PREMIUM ACCOUNT ...................................................................................... 23

NOTICES ....................................................................................................................... 23

NON-RECOGNITION OF TRUSTS ............................................................................... 24

WINDING UP ................................................................................................................. 25

AMENDMENT OF ARTICLES OF ASSOCIATION ........................................................ 25

CLOSING OF REGISTER OR FIXING RECORD DATE ................................................ 25

REGISTRATION BYWAY OF CONTINUATION ............................................................ 26

MERGERS AND CONSOLIDATION .............................................................................. 26

DISCLOSURE ............................................................................................................... 26

INDEMNITY ................................................................................................................... 27

DISPUTE RESOLUTION ............................................................................................... 28

AEOI .............................................................................................................................. 30



www.verify.gov.ky File#: 263805

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116                                                      2025-08-19

1288

CONFIDENTIAL

TDIT006326

**FSD2025-0116**

2025-08-19

CHARITABLE DAF HOLDCO, LTD

THE COMPANIES ACT (AS AMENDED)

COMPANY LIMITED BY SHARES

AMENDED AND RESTATED

ARTICLES OF ASSOCIATION

(ADOPTED BY SPECIAL RESOLUTION DATED 20 FEBRUARY 2025)

TABLE A

The Regulations contained or incorporated in Table 'A' in the First Schedule of the Act shall not apply to Charitable DAF HoldCo, Ltd (the "**Company**") and the following Articles shall comprise the Articles of Association of the Company.

INTERPRETATION

1.     In these Articles the following defined terms will have the meanings ascribed to them, if not inconsistent with the subject or context:

"**Act**" means the Companies Act (as amended) of the Cayman Islands.

"**AEOI**" means:

(i)     sections 1471 to 1474 of the Code and any associated legislation, regulations or guidance, and any other similar legislation, regulations or guidance enacted in any other jurisdiction which seeks to implement similar financial account information reporting and/or withholding tax regimes;

(ii)     the OECD Standard for Automatic Exchange of Financial Account Information in Tax Matters - the Common Reporting Standard and any associated guidance;

(iii)     any intergovernmental agreement, treaty, regulation, guidance, standard or other agreement between the Cayman Islands (or any Cayman Islands government body) and any other jurisdiction (including any government bodies in such jurisdiction), entered into in



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**

**2025-08-19**

**1289**

**CONFIDENTIAL**

**TDIT006327**

1370

order to comply with, facilitate, supplement or implement the legislation, regulations or guidance described in sub-paragraphs (i) and (ii); and

(iv)     any legislation, regulations or guidance in the Cayman Islands that give effect to the matters outlined in the preceding sub-paragraphs.

"**Articles**" means these articles of association of the Company, as amended or substituted from time to time.

"**Branch Register**" means any branch Register of such category or categories of Members as the Company may from time to time determine.

"**Class**" or "**Classes**" means any class or classes of Shares as may from time to time be issued by the Company.

"**Code**" means the US Internal Revenue Code of 1986, as amended.

"**Directors**" means the directors of the Company for the time being, or as the case may be, the directors assembled as a board or as a committee thereof.

"**Electronic Record**" has the same meaning as in the Electronic Transactions Act.

"**Electronic Transactions Act**" means the Electronic Transactions Act (as amended) of the Cayman Islands.

"**Gross Negligence**" has the meaning ascribed under the laws of the State of Delaware in the United States.

"**Management Director**" means a director of the Company holding a Management Share (as defined below).

"**Management Share**" means a voting non-participating share in the capital of the Company of $0.01 nominal or par value, that shall be non-redeemable at the option of the holder but redeemable by the Company in accordance with these Articles, and issued subject to and in accordance with the provisions of the Act and these Articles and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Shares.

"**Material Transaction**" means any transaction (or series of connected transactions), including an acquisition, distribution, investment or divestiture by the Company, for the aggregate amount in excess of $250,000;

"**Memorandum of Association**" means the memorandum of association of the Company, as amended or substituted from time to time.

"**Office**" means the registered office of the Company as required by the Act.

"**Ordinary Resolution**" means a resolution:

(a)     passed by a simple majority of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company and where a

35631852.5.C8689.187150                                  2

www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

CONFIDENTIAL                                             TDIT006328

**FSD2025-0116**                                                                 **2025-08-19**

poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)      approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the resolution so adopted shall be the date on which the instrument, or the last of such instruments, if more than one, is executed.

"**paid up**" means paid up as to the par value in respect of the issue of any Shares and includes credited as paid up.

"**Participating Share**" means a non-voting, participating, non-redeemable share in the capital of the Company of $0.01 nominal or par value issued subject to and in accordance with the provisions of the Act and these Articles, and having the rights and being subject to the restrictions as provided for under these Articles with respect to such Share. All references to "Participating Shares" herein shall be deemed to be Participating Shares of any or all Classes or Series as the context may require. For the avoidance of doubt, in these Articles the expression "Participating Share" shall include a fraction of a Participating Share.

"**Person**" means any natural person, firm, company, joint venture, partnership, corporation, association or other entity (whether or not having a separate legal personality) or any of them as the context so requires.

"**Principal Register**", where the Company has established one or more Branch Registers pursuant to the Act and these Articles, means the Register maintained by the Company pursuant to the Act and these Articles that is not designated by the Directors as a Branch Register.

"**Register**" means the register of Members of the Company required to be kept pursuant to the Act and includes any Branch Register(s) established by the Company in accordance with the Act.

"**Restricted Person**" means any Person holding Participating Shares:

(a)      in breach of the law or requirements of any country or governmental authority;

(b)      that is not an entity or organisation exempt from taxation under Section 501(c)(3) of the Code or an entity or organisation all of whose beneficiaries are exempt under Section 501(c)(3) of the Code; or

(c)      in circumstances (whether directly or indirectly affecting such Person and whether taken alone or in conjunction with any other Person, connected or not, or any other circumstances) which, in the opinion of the Directors, might result in the Company incurring any liability to taxation or suffering any other pecuniary, legal, regulatory or administrative disadvantage which the Company might not otherwise have incurred or suffered.



www.verify.gov.ky File#: 263805

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

**FSD2025-0116**                                                                 **2025-08-19**

**1291**

**CONFIDENTIAL**                                                         **TDIT006329**

FSD2025-0116                                                                                2025-08-19

"**Seal**" means the common seal of the Company (if adopted) including any facsimile thereof.

"**Secretary**" means any Person appointed by the Directors to perform any of the duties of the secretary of the Company.

"**Share**" means a Management Share or Participating Share or both as the context so requires.

"**Shareholder**" or "**Member**" means a Person who is registered as the holder of Shares in the Register and includes each subscriber to the Memorandum of Association pending entry in the Register of such subscriber.

"**Share Premium Account**" means the share premium account established in accordance with these Articles and the Act.

"**signed**" means bearing a signature or representation of a signature affixed by mechanical means.

"**Special Resolution**" means a special resolution of the Company passed in accordance with the Act, being a resolution:

(a)      passed by a majority of not less than two-thirds of such Shareholders as, being entitled to do so, vote in person or, where proxies are allowed, by proxy at a general meeting of the Company of which notice specifying the intention to propose the resolution as a special resolution has been duly given and where a poll is taken regard shall be had in computing a majority to the number of votes to which each Shareholder is entitled; or

(b)      approved in writing by all of the Shareholders entitled to vote at a general meeting of the Company in one or more instruments each signed by one or more of the Shareholders and the effective date of the special resolution so adopted shall be the date on which the instrument or the last of such instruments, if more than one, is executed.

"**Treasury Shares**" means Shares that were previously issued but were purchased, redeemed, surrendered or otherwise acquired by the Company and not cancelled.

"**United States**" and "**US**" means the United States of America (including the District of Columbia), its states, territories and possessions.

In these Articles, save where the context requires otherwise:

(a)      words importing the singular number shall include the plural number and vice versa;

(b)      words importing the masculine gender only shall include the feminine gender and any Person as the context may require;



35631852.5.C8689.187150                                        4

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116                                                                        2025-08-19
1292

**CONFIDENTIAL**                                                            **TDIT006330**

(c)     the word "may" shall be construed as permissive and the word "shall" shall be construed as imperative;

(d)     reference to a dollar or dollars or USD (or $) and to a cent or cents is reference to dollars and cents of the United States of America;

(e)     reference to a statutory enactment shall include reference to any amendment or re- enactment thereof for the time being in force;

(f)     reference to any determination by the Directors shall be construed as a determination by the Directors in their sole and absolute discretion and shall be applicable either generally or in any particular case;

(g)     reference to "in writing" shall be construed as written or represented by any means reproducible in writing, including any form of print, lithograph, email, facsimile, photograph or telex or represented by any other substitute or format for storage or transmission for writing or partly one and partly another;

(h)     any requirements as to execution or signature under the Articles including the execution  of the Articles themselves can be satisfied in the form of an electronic signature as  defined in the Electronic Transactions Act; and

(i)     sections 8 and 19(3) of the Electronic Transactions Act shall not apply.

2.     Subject to the preceding Articles, any words defined in the Act shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

**PRELIMINARY**

3.     The business of the Company may be commenced at any time after incorporation.

4.     The Office shall be at such address in the Cayman Islands as the Directors may from time to time determine. The Company may in addition establish and maintain such other offices and places of business and agencies in such places as the Directors may from time to time determine.

5.     The expenses incurred in the formation of the Company and in connection with the offer for subscription and issue of Participating Shares shall be paid by the Company.  Such expenses may be amortised over such period as the Directors may determine and the amount so paid shall be charged against income and/or capital in the accounts of the Company as the Directors shall determine.

6.     The Directors shall keep, or cause to be kept, the Register at such place or (subject to compliance with the Act and these Articles) places as the Directors may from time to time determine. In the absence of any such determination, the Register shall be kept at the Office.  The Directors may

35631852.5.C8689.187150                                5

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**1293**

**CONFIDENTIAL**                                                                **TDIT006331**

keep, or cause to be kept, one or more Branch Registers as well as the Principal Register in accordance with the Act, provided always that a duplicate of such Branch Register(s) shall be maintained with the Principal Register in accordance with the Act.

## SHARES

7.     Subject to these Articles, all Shares for the time being unissued shall be under the control of the Directors who may:

(a)     issue, allot and dispose of the same to such Persons, in such manner, on such terms and having such rights and being subject to such restrictions as they may from time to time determine;

(b)     and grant options with respect to such Shares and issue warrants or similar instruments with respect thereto;

and, for such purposes, the Directors may reserve an appropriate number of Shares for the time being unissued.

8.     The Directors, or the Shareholders by Ordinary Resolution, may authorise the division of Participating Shares into any number of Classes and the different Classes shall be authorised, established and designated (or re-designated as the case may be) and the variations in the relative rights (including, without limitation, voting, dividend and redemption rights), restrictions, preferences, privileges and payment obligations as between the different Classes (if any) may be fixed and determined by the Directors or the Shareholders by Ordinary Resolution.

9.     The Company may insofar as may be permitted by law, pay a commission to any Person in consideration of his subscribing or agreeing to subscribe whether absolutely or conditionally for any Shares. Such commissions may be satisfied by the payment of cash or the lodgement of fully or partly paid-up Shares or partly in one way and partly in the other. The Company may also pay such brokerage as may be lawful on any issue of Shares.

10.    The Directors may refuse to accept any application for Shares, and may accept any application in whole or in part, for any reason or for no reason.

## MANAGEMENT SHARES

11.    The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganisation or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. Management Shares confer no other right to participate in the profits or assets of the Company.

35631852.5.C8689.187150                          6

Appendix Page 118

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116                                      2025-08-19
                                                       1294
**CONFIDENTIAL**                                      TDIT006332

## PARTICIPATING SHARES

12.     Participating Shares shall confer upon a Shareholder no right to receive notice of, to attend, to speak at nor to vote at general meetings of the Company but may be entitled to vote at a separate class meeting in relation to a modification of rights pursuant to the immediately following Article. The Participating Shares shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

## MODIFICATION OF RIGHTS

13.     Whenever the capital of the Company is divided into different Classes the rights attached to any such Class may, subject to any rights or restrictions for the time being attached to any Class, only be materially adversely varied or abrogated with the consent in writing of the holders of not less than two-thirds of the issued Participating Shares of the relevant Class or with the sanction of a resolution passed at a separate meeting of the holders of the Participating Shares of such Class by a majority of two-thirds of the votes cast at such a meeting. To every such separate meeting all the provisions of these Articles relating to general meetings of the Company or to the proceedings thereat shall, *mutatis mutandis*, apply, except that the necessary quorum shall be one or more Persons at least holding or representing by proxy one-third in nominal or par value amount of the issued Participating Shares of the relevant Class (but so that if at any adjourned meeting of such holders a quorum as above defined is not present, those Shareholders who are present shall form a quorum) and that, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, every Shareholder of the Class shall on a poll have one vote for each Share of the Class held by him. For the purposes of this Article the Directors may treat all the Classes or any two or more Classes as forming one Class if they consider that the variation or abrogation of the rights attached to such Classes proposed for consideration is the same variation or abrogation for all such relevant Classes, but in any other case shall treat them as separate Classes.

14.     The rights conferred upon the holders of the Participating Shares of any Class issued with preferred or other rights shall not, subject to any rights or restrictions for the time being attached to the Participating Shares of that Class, be deemed to be materially adversely varied or abrogated by, *inter alia*, the creation, allotment or issue of further Participating Shares ranking *pari passu* with or subsequent to them or the redemption or purchase of any Participating Shares of any Class by the Company.

## CERTIFICATES

15.     No Person shall be entitled to a certificate for any or all of his Shares, unless the Directors shall determine otherwise.

## FRACTIONAL SHARES

16.     The Directors may issue fractions of a Share and, if so issued, a fraction of a Share shall be subject to and carry the corresponding fraction of liabilities (whether with respect to nominal or par value, premium, contributions, calls or otherwise), limitations, preferences, privileges, qualifications, restrictions, rights (including, without prejudice to the generality of the foregoing, voting and participation rights) and other attributes of a whole Share. If more than one fraction of a Share of the same Class is issued to or acquired by the same Shareholder such fractions shall be accumulated.

35631852.5.C8689.187150                              7

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

## TRANSFER OF SHARES

17.     The instrument of transfer of any Share shall be in any usual or common form or such other form as the Directors may, in their absolute discretion, approve and be executed by or on behalf of the transferor and if in respect of a nil or partly paid up Share, or if so required by the Directors, shall also be executed on behalf of the transferee and shall be accompanied by the certificate (if any) of the Shares to which it relates and such other evidence as the Directors may reasonably require to show the right of the transferor to make the transfer.  The transferor shall be deemed to remain a Shareholder until the name of the transferee is entered in the Register in respect of the relevant Shares.

18.     The Directors may in their absolute discretion decline to register any transfer of Shares without assigning any reason therefor including any purported transfer that does not comply with applicable securities or tax laws.

19.     The registration of transfers may be suspended at such times and for such periods as the Directors may from time to time determine.

20.     All instruments of transfer that are registered shall be retained by the Company, but any instrument of transfer that the Directors decline to register shall (except in any case of fraud) be returned to the Person depositing the same.

21.     If it comes to the notice of the Directors that any Shares are held by a Restricted Person the Directors may by notice in writing require the transfer of such Shares in exercise of their powers under these Articles.

## TRANSMISSION OF SHARES

22.     The legal personal representative of a deceased sole holder of a Share shall be the only Person recognised by the Company as having any title to the Share.  In the case of a Share registered in the name of two or more holders, the survivors or survivor, or the legal personal representatives of the deceased holder of the Share, shall be the only Person recognised by the Company as having any title to the Share.

23.     Any Person becoming entitled to a Share in consequence of the death or bankruptcy of a Shareholder shall upon such evidence being produced as may from time to time be required by the



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                                              **2025-08-19**

Directors, have the right either to be registered as a Shareholder in respect of the Share or, instead of being registered himself, to make such transfer of the Share as the deceased or bankrupt Person could have made; but the Directors shall, in either case, have the same right to decline or suspend registration as they would have had in the case of a transfer of the Share by the deceased or bankrupt Person before the death or bankruptcy.

24. A Person becoming entitled to a Share by reason of the death or bankruptcy of a Shareholder shall be entitled to the same dividends and other advantages to which he would be entitled if he were the registered Shareholder, except that he shall not, before being registered as a Shareholder in respect of the Share, be entitled in respect of it to exercise any right conferred by membership in relation to meetings of the Company.

**ALTERATION OF SHARE CAPITAL**

25. The Company may from time to time by Ordinary Resolution increase the share capital by such sum, to be divided into Shares of such Classes and amount, as the resolution shall prescribe.

26. The Company may by Ordinary Resolution:

    (a) consolidate and divide all or any of its share capital into Shares of a larger amount than its existing Shares;

    (b) convert all or any of its paid up Shares into stock and reconvert that stock into paid up Shares of any denomination;

    (c) subdivide its existing Shares, or any of them into Shares of a smaller amount provided that in the subdivision the proportion between the amount paid and the amount, if any, unpaid on each reduced Share shall be the same as it was in case of the Share from which the reduced Share is derived; and

    (d) cancel any Shares that, at the date of the passing of the resolution, have not been taken or agreed to be taken by any Person and diminish the amount of its share capital by the amount of the Shares so cancelled.

27. The Company may by Special Resolution reduce its share capital and any capital redemption reserve in any manner authorised by law.

**REDEMPTION, PURCHASE AND SURRENDER OF SHARES**

28. Subject to the Act, the Company may:

    (a) issue Shares on terms that they are to be redeemed or are liable to be redeemed at the option of the Company or the Shareholder on such terms and in such manner as the Directors may determine;

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                                              **2025-08-19**

**1297**

**CONFIDENTIAL**                                                                              **TDIT006335**

1378

(b)    purchase its own Shares (including any redeemable Shares) on such terms and in such manner as the Directors may determine and agree with the Shareholder;

(c)    make a payment in respect of the redemption or purchase of its own Shares in any manner authorised by the Act; and

(d)    accept the surrender for no consideration of any paid up Share (including any redeemable Share) on such terms and in such manner as the Directors may determine.

29.    Any Share in respect of which notice of redemption has been given shall not be entitled to participate in the profits of the Company in respect of the period after the date specified as the date of redemption in the notice of redemption.

30.    The redemption, purchase or surrender of any Share shall not be deemed to give rise to the redemption, purchase or surrender of any other Share.

31.    The Directors may when making payments in respect of redemption or purchase of Shares, if authorised by the terms of issue of the Shares being redeemed or purchased or with the agreement of the holder of such Shares, make such payment either in cash or in specie.

### TREASURY SHARES

32.    Shares that the Company purchases, redeems or acquires (by way of surrender or otherwise) may, at the option of the Company, be cancelled immediately or held as Treasury Shares in accordance with the Act. In the event that the Directors do not specify that the relevant Shares are to be held as Treasury Shares, such Shares shall be cancelled.

33.    No dividend may be declared or paid, and no other distribution (whether in cash or otherwise) of the Company's assets (including any distribution of assets to members on a winding up) may be declared or paid in respect of a Treasury Share.

34.    The Company shall be entered in the Register as the holder of the Treasury Shares provided that:

(a)    the Company shall not be treated as a member for any purpose and shall not exercise any right in respect of the Treasury Shares, and any purported exercise of such a right shall be void;

(b)    a Treasury Share shall not be voted, directly or indirectly, at any meeting of the Company and shall not be counted in determining the total number of issued shares at any given time, whether for the purposes of these Articles or the Act, save that an allotment of Shares as fully paid bonus shares in respect of a Treasury Share is permitted and Shares allotted as fully paid bonus shares in respect of a treasury share shall be treated as Treasury Shares.



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                                    **2025-08-19**

35. Treasury Shares may be disposed of by the Company on such terms and conditions as determined by the Directors.

### GENERAL MEETINGS

36. The Directors may, whenever they think fit, convene a general meeting of the Company.

37. The Directors may cancel or postpone any duly convened general meeting at any time prior to such meeting, for any reason or for no reason at any time prior to the time for holding such meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.  The Directors shall give Shareholders notice in writing of any postponement, which postponement may be for a stated period of any length or indefinitely as the Directors may determine.

38. If at any time there are no Directors, any two Shareholders (or if there is only one Shareholder then that Shareholder) entitled to vote at general meetings of the Company may convene a general meeting in the same manner as nearly as possible as that in which general meetings may be convened by the Directors.

### NOTICE OF GENERAL MEETINGS

39. At least seven clear days' notice in writing counting from the date service is deemed to take place as provided in these Articles specifying the place, the day and the hour of the meeting and, in case of special business, the general nature of that business, shall be given in the manner hereinafter provided or in such other manner (if any) as may be prescribed by the Company by Ordinary Resolution to such Persons as are, under these Articles, entitled to receive such notices from the Company, but with the consent of all the Shareholders entitled to receive notice of some particular meeting and attend and vote thereat, that meeting may be convened by such shorter notice or without notice and in such manner as those Shareholders may think fit.

40. The accidental omission to give notice of a meeting to or the non-receipt of a notice of a meeting by any Shareholder shall not invalidate the proceedings at any meeting.

### PROCEEDINGS AT GENERAL MEETINGS

41. All business carried out at a general meeting shall be deemed special with the exception of sanctioning a dividend, the consideration of the accounts, balance sheets, any report of the Directors or of the Company's auditors, and the fixing of the remuneration of the Company's auditors. No special business shall be transacted at any general meeting without the consent of all Shareholders entitled to receive notice of that meeting unless notice of such special business has been given in the notice convening that meeting.

42. No business shall be transacted at any general meeting unless a quorum of Shareholders Is present at the time when the meeting proceeds to business.  Save as otherwise provided by these Articles,

35631852.5.C8689.187150                                     11

Appendix Page 123

*www.verify.gov.ky File#: 263805*

**FSD2025-0116**                                                                    **2025-08-19**

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

1299

**CONFIDENTIAL**                                                    **TDIT006337**

one or more Shareholders holding at least a majority of the paid up voting share capital of the Company present in person or by proxy and entitled to vote at that meeting shall form a quorum.

43. If within half an hour from the time appointed for the meeting a quorum is not present, the meeting, if convened upon the requisition of Shareholders, shall be dissolved. In any other case it shall stand adjourned to the same day in the next week, at the same time and place, and if at the adjourned meeting a quorum is not present within half an hour from the time appointed for the meeting the Shareholder or Shareholders present and entitled to vote shall form a quorum.

44. If the Directors wish to make this facility available for a specific general meeting or all general meetings of the Company, participation in any general meeting of the Company may be by means of a telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

45. The chairman, if any, of the Directors shall preside as chairman at every general meeting of the Company.

46. If there is no such chairman, or if at any general meeting he is not present within fifteen minutes after the time appointed for holding the meeting or is unwilling to act as chairman, any Director or Person nominated by the Directors shall preside as chairman, failing which the Shareholders present in person or by proxy shall choose any Person present to be chairman of that meeting.

47. The chairman may adjourn a meeting from time to time and from place to place either:

    (a) with the consent of any general meeting at which a quorum is present (and shall if so directed by the meeting): or

    (b) without the consent of such meeting if, in his sole opinion, he considers it necessary to do so to:

        (i) secure the orderly conduct or proceedings of the meeting; or

        (ii) give all persons present in person or by proxy and having the right to speak and / or vote at such meeting, the ability to do so,

    but no business shall be transacted at any adjourned meeting other than the business left unfinished at the meeting from which the adjournment took place. When a meeting, or adjourned meeting, is adjourned for fourteen days or more, notice of the adjourned meeting shall be given in the manner provided for the original meeting. Save as aforesaid, it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

48. At any general meeting a resolution put to the vote of the meeting shall be decided on a show of hands, unless a poll is (before or on the declaration of the result of the show of hands) demanded



by the chairman or one or more Shareholders present in person or by proxy entitled to vote, and unless a poll is so demanded, a declaration by the chairman that a resolution has, on a show of hands, been carried, or carried unanimously, or by a particular majority, or lost, and an entry to that effect in the book of the proceedings of the Company, shall be conclusive evidence of the fact, without proof of the number or proportion of the votes recorded in favour of, or against, that resolution.

49. If a poll is duly demanded it shall be taken in such manner as the chairman directs, and the result of the poll shall be deemed to be the resolution of the meeting at which the poll was demanded.

50. In the case of an equality of votes, whether on a show of hands or on a poll, the chairman of the meeting at which the show of hands takes place or at which the poll is demanded, shall be entitled to a second or casting vote.

51. A poll demanded on the election of a chairman of the meeting or on a question of adjournment shall be taken forthwith. A poll demanded on any other question shall be taken at such time as the chairman of the meeting directs.

### VOTES OF SHAREHOLDERS

52. On a show of hands every holder of Management Shares present in person and every Person representing such a Shareholder by proxy shall have one vote, and on a poll every holder of Management Shares present in person and every Person representing such Shareholder by proxy shall be entitled to one vote in respect of each of the Management Shares held by them.

53. In the case of joint holders the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders and for this purpose seniority shall be determined by the order in which the names stand in the Register.

54. A Shareholder of unsound mind, or in respect of whom an order has been made by any court having jurisdiction in lunacy, may vote in respect of Shares carrying the right to vote held by him, whether on a show of hands or on a poll, by his committee, or other Person in the nature of a committee appointed by that court, and any such committee or other Person, may vote in respect of such Shares by proxy.

55. No Shareholder shall be entitled to vote at any general meeting of the Company unless all calls, if any, or other sums presently payable by him in respect of Shares carrying the right to vote held by him have been paid.

56. On a poll votes may be given either personally or by proxy.

57. The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or, if the appointor is a corporation, either under Seal or under the hand of an officer or attorney duly authorised. A proxy need not be a Shareholder.

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

CONFIDENTIAL

TDIT006339

**FSD2025-0116**                                                              **2025-08-19**

58. An instrument appointing a proxy may be in any usual or common form or such other form as the Directors may approve.

59. The instrument appointing a proxy shall be deposited at the Office or at such other place as is specified for that purpose in the notice convening the meeting no later than the time for holding the meeting or, if the meeting is adjourned, the time for holding such adjourned meeting.

60. The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll.

61. A resolution in writing signed by all the Shareholders for the time being entitled to receive notice of and to attend and vote at genera! meetings of the Company (or being corporations by their duly authorised representatives) shall be as valid and effective as if the same had been passed at a general meeting of the Company duly convened and held.

### CORPORATIONS ACTING BY REPRESENTATIVES AT MEETINGS

62. Any corporation which is a Shareholder or a Director may by resolution of its directors or other governing body authorise such Person as it thinks fit to act as its representative at any meeting of the Company or of any meeting of holders of a Class or of the Directors or of a committee of Directors, and the Person so authorised shall be entitled to exercise the same powers on behalf of the corporation which he represents as that corporation could exercise if it were an individual Shareholder or Director.

### DIRECTORS

63. The name(s) of the first Director(s) shall either be determined in writing by a majority (or in the case of a sole subscriber that subscriber) of, or elected at a meeting of, the subscribers of the Memorandum of Association.

64. The Company may by Ordinary Resolution appoint any natural person or corporation to be a Director.

65. Subject to these Articles, a Director shall hold office until such time as he is removed from office by Ordinary Resolution.

66. The Company may by Ordinary Resolution from time to time fix the maximum and minimum number of Directors to be appointed but unless such numbers are fixed as aforesaid the minimum number of Directors shall be one and the maximum number of Directors shall be unlimited.

67. The remuneration of the Directors may be determined by the Directors or by Ordinary Resolution.

68. There shall be no shareholding qualification for Directors unless determined otherwise by Ordinary Resolution.



35631852.5.C8689.187150                          14

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                              **2025-08-19**
                                                                                     **1302**

**CONFIDENTIAL**                                                              **TDIT006340**

69. The Directors shall have power at any time and from time to time to appoint a natural person or corporation as a Director, either as a result of a casual vacancy or as an additional Director, subject to the maximum number (if any) imposed by Ordinary Resolution.

70. The Management Director shall be entitled to cast ten (10) votes on all matters and each other Director shall be entitled to cast one (1) vote. Such voting powers shall apply to voting in any committee or subcommittee of the Board. Every reference in these Articles to a majority or other proportion of the Directors, including for purposes of determining a quorum, shall refer to a majority or other proportion of the votes of the Directors then in office.

## POWERS AND DUTIES OF DIRECTORS

71. Subject to the Act, these Articles and to any resolutions passed in a general meeting, the business of the Company shall be managed by the Directors, who may pay all expenses incurred in setting up and registering the Company and may exercise all powers of the Company. No resolution passed by the Company in general meeting shall invalidate any prior act of the Directors that would have been valid if that resolution had not been passed.

72. The Directors may from time to time appoint any natural person or corporation , whether or not a Director to hold such office in the Company as the Directors may think necessary for the administration of the Company, including but not limited to, the office of president, one or more vice-presidents, treasurer, assistant treasurer, manager or controller, and for such term and at such remuneration (whether by way of salary or commission or participation in profits or partly in one way and partly in another), and with such powers and duties as the Directors may think fit. Any natural person or corporation so appointed by the Directors may be removed by the Directors or

35631852.5.C8689.187150        15

Appendix Page 127

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**        **2025-08-19**

**1303**

**CONFIDENTIAL**        **TDIT006341**

by the Company by Ordinary Resolution.  The Directors may also appoint one or more of their number to the office of managing director upon like terms, but any such appointment shall ipso facto determine if any managing director ceases from any cause to be a Director, or if the Company by Ordinary Resolution resolves that his tenure of office be terminated.

73.    The Directors may appoint any natural person or corporation to be a Secretary (and if need be an assistant Secretary or assistant Secretaries) who shall hold office for such term, at such remuneration and upon such conditions and with such powers as they think fit.  Any Secretary or assistant Secretary so appointed by the Directors may be removed by the Directors or by the Company by Ordinary Resolution.

74.    The Directors may delegate any of their powers to committees consisting of such member or members of their body as they think fit; any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Directors.

75.    The Directors may from time to time and at any time by power of attorney (whether under Seal or under hand) or otherwise appoint any company, firm or Person or body of Persons, whether nominated directly or indirectly by the Directors, to be the attorney or attorneys or authorised signatory (any such person being an "**Attorney**" or "**Authorised Signatory**", respectively) of the Company for such purposes and with such powers, authorities and discretion (not exceeding those vested in or exercisable by the Directors under these Articles) and for such period and subject to such conditions as they may think fit, and any such power of attorney or other appointment may contain such provisions for the protection and convenience of Persons dealing with any such Attorney or Authorised Signatory as the Directors may think fit, and may also authorise any such Attorney or Authorised Signatory to delegate all or any of the powers, authorities and discretion vested in him.

76.    The Directors may from time to time provide for the management of the affairs of the Company in such manner as they shall think fit and the provisions contained in the three next following Articles shall not limit the general powers conferred by this Article.

77.    The Directors from time to time and at any time may establish any committees, local boards or agencies for managing any of the affairs of the Company and may appoint any natural person or corporation to be a member of such committees or local boards and may appoint any managers or agents of the Company and may fix the remuneration of any such natural person or corporation.

78.    The Directors from time to time and at any time may delegate to any such committee, local board, manager or agent any of the powers, authorities and discretions for the time being vested in the Directors and may authorise the members for the time being of any such local board, or any of them to fill any vacancies therein and to act notwithstanding vacancies and any such appointment or delegation may be made on such terms and subject to such conditions as the Directors may think fit and the Directors may at any time remove any natural person or corporation so appointed and



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**                                                    **TDIT006342**

may annul or vary any such delegation, but no Person dealing in good faith and without notice of any such annulment or variation shall be affected thereby.

79.     Any such delegates as aforesaid may be authorised by the Directors to sub-delegate all or any of the powers, authorities, and discretion for the time being vested in them.

### BORROWING POWERS OF DIRECTORS

80.     The Directors may exercise all the powers of the Company to borrow money and to mortgage or charge its undertaking, property and uncalled capital or any part thereof, to issue debentures, debenture stock and other securities whenever money is borrowed or as security for any debt, liability or obligation of the Company or of any third party.

### THE SEAL

81.     The Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of the Seal and if given after may be in general form confirming a number of affixings of the Seal.  The Seal shall be affixed in the presence of a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose and every Person as aforesaid shall sign every instrument to which the Seal is so affixed in their presence.

82.     The Company may maintain a facsimile of the Seal in such countries or places as the Directors may appoint and such facsimile Seal shall not be affixed to any instrument except by the authority of a resolution of the Directors provided always that such authority may be given prior to or after the affixing of such facsimile Seal and if given after may be in general form confirming a number of affixings of such facsimile Seal.  The facsimile Seal shall be affixed in the presence of such Person or Persons as the Directors shall for this purpose appoint and such Person or Persons as aforesaid shall sign every instrument to which the facsimile Seal is so affixed in their presence and such affixing of the facsimile Seal and signing as aforesaid shall have the same meaning and effect as if the Seal had been affixed in the presence of and the instrument signed by a Director or a Secretary (or an assistant Secretary) or in the presence of any one or more Persons as the Directors may appoint for the purpose.

83.     Notwithstanding the foregoing, a Secretary or any assistant Secretary shall have the authority to affix the Seal, or the facsimile Seal, to any instrument for the purposes of attesting authenticity of the matter contained therein but which does not create any obligation binding on the Company.

### DISQUALIFICATION OF DIRECTORS

84.     The office of Director shall be vacated, if the Director:

        (a)     becomes bankrupt or makes any arrangement or composition with his creditors;

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

(b)     dies or is found to be or becomes of unsound mind;

(c)     resigns his office by notice in writing to the Company;

(d)     is removed from office by Ordinary Resolution;

(e)     is removed from office by notice addressed to him at his last known address and signed by ail of his co-Directors (not being less than two in number); or

(f)     is removed from office pursuant to any other provision of these Articles, including without limitation, in the circumstance set out in Article 13.

## PROCEEDINGS OF DIRECTORS

85.     The Directors may meet together (either within or without the Cayman Islands) for the despatch of business, adjourn, and otherwise regulate their meetings and proceedings as they think fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman shall have a second or casting vote. A Director may, and a Secretary or assistant Secretary on the requisition of a Director shall, at any time summon a meeting of the Directors.

86.     A Director may participate in any meeting of the Directors, or of any committee appointed by the Directors of which such Director is a member, by means of telephone or similar communication equipment by way of which all Persons participating in such meeting can communicate with each other and such participation shall be deemed to constitute presence in person at the meeting.

87.     The quorum necessary for the transaction of the business of the Directors may be fixed by the Directors, and unless so fixed, if there be two or more Directors the quorum shall be two which must include the Management Director, and if there be one Director the quorum shall be one.

88.     A Director who is in any way, whether directly or indirectly, interested in a contract or proposed contract with the Company shall declare the nature of his interest at a meeting of the Directors. A general notice given to the Directors by any Director to the effect that he is a member of any specified company or firm and is to be regarded as interested in any contract which may thereafter be made with that company or firm shall be deemed a sufficient declaration of interest in regard to any contract so made. A Director may vote in respect of any contract or proposed contract or arrangement notwithstanding that he may be interested therein and if he does so his vote shall be counted and he may be counted in the quorum at any meeting of the Directors at which any such contract or proposed contract or arrangement shall come before the meeting for consideration.

89.     A Director may hold any other office or place of profit under the Company (other than the office of auditor) in conjunction with his office of Director for such period and on such terms (as to remuneration and otherwise) as the Directors may determine and no Director or intending Director

*www.verify.gov.ky File#: 263805*



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**                                                                                   **TDIT006344**

**FSD2025-0116**                                                          **2025-08-19**

shall be disqualified by his office from contracting with the Company either with regard to his tenure of any such other office or place of profit or as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested, be liable to be avoided, nor shall any Director so contracting or being so interested be liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relation thereby established.  A Director, notwithstanding his interest, may be counted in the quorum present at any meeting of the Directors whereat he or any other Director is appointed to hold any such office or place of profit under the Company or whereat the terms of any such appointment are arranged and he may vote on any such appointment or arrangement.

90.     Any Director may act by himself or his firm in a professional capacity for the Company, and he or his firm shall be entitled to remuneration for professional services as if he were not a Director; provided that nothing herein contained shall authorise a Director or his firm to act as auditor to the Company.

91.     The  Directors shall cause minutes to be made in books or loose-leaf folders provided for the purpose of recording:

(a)      all appointments of officers made by the Directors;

(b)      the names of the Directors present at each meeting of the Directors and of any committee of the Directors; and

(c)      all resolutions and proceedings at all meetings of the Company, and of the Directors and of committees of Directors.

92.     When the chairman of a meeting of the Directors signs the minutes of such meeting the same shall be deemed to have been duly held notwithstanding that all the Directors have not actually come together or that there may have been a technical defect in the proceedings.

93.     A resolution in writing signed by all the Directors or all the members of a committee of Directors entitled to receive notice of a meeting of Directors or committee of Directors, as the case may be, shall be as valid and effectual as if it had been passed at a duly called and constituted meeting of Directors or committee of Directors, as the case may be.  When signed a resolution may consist of several documents each signed by one or more of the Directors. Notwithstanding anything to the contrary herein, a resolution in writing signed by all the Directors in respect of a Material Transaction must be duly notarized by a notary public.

94.     The continuing Directors may act notwithstanding any vacancy in their body but if and for so long as their number is reduced below the number fixed by or pursuant to these Articles as the necessary quorum of Directors, the continuing Directors may act for the purpose of increasing the number, or of summoning a general meeting of the Company, but for no other purpose.



*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                          **2025-08-19**
                                                                          **1307**

**CONFIDENTIAL**                                                          **TDIT006345**

1388

**FSD2025-0116**                    **Page 1392 of 1530**                    **2025-08-19**

95.    The Directors may elect a chairman of their meetings and determine the period for which he is to hold office but if no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the Directors present may choose one of their number to be chairman of the meeting.

96.    Subject to any regulations imposed on it by the Directors, a committee appointed by the Directors may elect a chairman of its meetings.  If no such chairman is elected, or if at any meeting the chairman is not present within fifteen minutes after the time appointed for holding the meeting, the committee members present may choose one of their number to be chairman of the meeting.

97.    A committee appointed by the Directors may meet and adjourn as it thinks proper. Subject to any regulations imposed on it by the Directors, questions arising at any meeting shall be determined by a majority of votes of the committee members present and in case of an equality of votes the chairman shall have a second or casting vote.

98.    All acts done by any meeting of the Directors or of a committee of Directors, or by any Person acting as a Director, shall notwithstanding that it be afterwards discovered that there was some defect in the appointment of any such Director or Person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such Person had been duly appointed and was qualified to be a Director.

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                    **2025-08-19**
1308

**CONFIDENTIAL**                    **TDIT006346**

**FSD2025-0116**                                                                    **2025-08-19**

## DIVIDENDS

99.     Subject to any rights and restrictions for the time being attached to any Shares, or as otherwise provided for in the Act and these Articles, the Directors may from time to time declare dividends (including interim dividends) and other distributions on Shares in issue and authorise payment of the same out of the funds of the Company lawfully available therefor.

100.    Subject to any rights and restrictions for the time being attached to any Shares, the Company by Ordinary Resolution may declare dividends, but no dividend shall exceed the amount recommended by the Directors.

101.    The Directors may, before recommending or declaring any dividend, set aside out of the funds legally available for distribution such sums as they think proper as a reserve or reserves which shall, in the absolute discretion of the Directors be applicable for meeting contingencies, or for equalising dividends or for any other purpose to which those funds may be properly applied and pending such application may in the absolute discretion of the Directors, either be employed in the business of the Company or be invested in such investments as the Directors may from time to time think fit.

102.    Any dividend may be paid in any manner as the Directors may determine. If paid by cheque it will be sent through the post to the registered address of the Shareholder or Person entitled thereto, or in the case of joint holders, to any one of such joint holders at his registered address or to such Person and such address as the Shareholder or Person entitled, or such joint holders as the case may be, may direct. Every such cheque shall be made payable to the order of the Person to whom it is sent or to the order of such other Person as the Shareholder or Person entitled, or such joint holders as the case may be, may direct.

103.    The Directors when paying dividends to the Shareholders in accordance with the foregoing provisions of these Articles may make such payment either in cash or in specie.

104.    Subject to any rights and restrictions for the time being attached to any Participating Shares, all dividends shall be declared and paid in such amounts as may be declared by the Director's in their sole and absolute discretion without a requirement to pay such dividends on a pro-rata basis as to the paid-up or par value of the Shares.

105.    If several Persons are registered as joint holders of any Share, any of them may give effectual receipts for any dividend or other moneys payable on or in respect of the Share.

106.    No dividend shall bear interest against the Company.

## ACCOUNTS, AUDIT AND ANNUAL RETURN AND DECLARATION

107.    The books of account relating to the Company's affairs shall be kept in such manner as may be determined from time to time by the Directors.

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                                    **2025-08-19**
                                                                                    **1309**

**CONFIDENTIAL**                                                                    **TDIT006347**

108. The books of account shall be kept at the Office, or at such other place or places as the Directors think fit, and shall always be open to the inspection of the Directors.

109. The Directors may from time to time determine whether and to what extent and at what times and places and under what conditions or regulations the accounts and books of the Company or any of them shall be open to the inspection of Shareholders not being Directors, and no Shareholder (not being a Director) shall have any right of inspecting any account or book or document of the Company except as conferred by law or authorised by the Directors or by Ordinary Resolution.

110. The accounts relating to the Company's affairs shall only be audited if the Directors so determine, in which case the financial year end and the accounting principles will be determined by the Directors.

111. The Directors in each year shall prepare, or cause to be prepared, an annual return and declaration setting forth the particulars required by the Act and deliver a copy thereof to the Registrar of Companies in the Cayman Islands.

### CAPITALISATION OF RESERVES

112. Subject to the Act and these Articles, the Directors may:

(a) resolve to capitalise an amount standing to the credit of reserves (including a Share Premium Account, capital redemption reserve and profit and loss account), whether or not available for distribution;

(b) appropriate the sum resolved to be capitalised to the Shareholders in proportion to the nominal amount of Participating Shares (whether or not fully paid) held by them respectively and apply that sum on their behalf in or towards:

(i) paying up the amounts (if any) for the time being unpaid on Participating Shares held by them respectively; or

(ii) paying up in full unissued Participating Shares or debentures of a nominal amount equal to that sum,

and allot the Participating Shares or debentures, credited as fully paid, to the Shareholders (or as they may direct) in those proportions, or partly in one way and partly in the other, but the Share Premium Account, the capital redemption reserve and profits which are not available for distribution may, for the purposes of this Article, only be applied in paying up unissued Participating Shares to be allotted to Shareholders credited as fully paid;

(c) make any arrangements they think fit to resolve a difficulty arising in the distribution of a capitalised reserve and in particular, without limitation, where Participating Shares or

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                                                    **2025-08-19**
1310

**CONFIDENTIAL**                                                    **TDIT006348**

debentures become distributable in fractions the Directors may deal with the fractions as they think fit;

(d)     authorise a Person to enter (on behalf of ail the Shareholders concerned) into an agreement with the Company providing for either:

    (i)     the allotment to the Shareholders respectively, credited as fully paid, of Participating Shares or debentures to which they may be entitled on the capitalisation, or

    (ii)    the payment by the Company on behalf of the Shareholders (by the application of their respective proportions of the reserves resolved to be capitalised) of the amounts or part of the amounts remaining unpaid on their existing Participating Shares, and any such agreement made under this authority being effective and binding on all those Shareholders; and

    (iii)   generally do all acts and things required to give effect to any of the actions contemplated by this Article.

### SHARE PREMIUM ACCOUNT

113.    The Directors shall in accordance with the Act establish a Share Premium Account and shall carry to the credit of such account from time to time a sum equal to the amount or value of the premium paid on the issue of any Share.

114.    There shall be debited to any Share Premium Account on the redemption or purchase of a Share the difference between the nominal value of such Share and the redemption or purchase price provided always that at the discretion of the Directors such sum may be paid out of the profits of the Company or, if permitted by the Act, out of capital.

### NOTICES

115.    Any notice or document may be served by the Company or by the Person entitled to give notice to any Shareholder either personally, or by posting it airmail or air courier service in a prepaid letter addressed to such Shareholder at his address as appearing in the Register, or by electronic mail to any electronic mail address such Shareholder may have specified in writing for the purpose of such service of notices, or by facsimile should the Directors deem it appropriate. In the case of joint holders of a Share, all notices shall be given to that one of the joint holders whose name stands first in the Register in respect of the joint holding, and notice so given shall be sufficient notice to all the joint holders.

116.    Any Shareholder present, either personally or by proxy, at any meeting of the Company shall for all purposes be deemed to have received due notice of such meeting and, where requisite, of the purposes for which such meeting was convened.

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**                    **TDIT006349**

117. Any notice or other document, if served by:

    (a) post, shall be deemed to have been served five clear days after the time when the letter containing the same is posted;

    (b) facsimile, shall be deemed to have been served upon production by the transmitting facsimile machine of a report confirming transmission of the facsimile in full to the facsimile number of the recipient;

    (c) recognised courier service, shall be deemed to have been served 48 hours after the time when the letter containing the same is delivered to the courier service; or

    (d) electronic mail, shall be deemed to have been served immediately upon the time of the transmission by electronic mail.

In proving service by post or courier service it shall be sufficient to prove that the letter containing the notice or documents was properly addressed and duly posted or delivered to the courier service.

118. Any notice or document delivered or sent by post to or left at the registered address of any Shareholder in accordance with the terms of these Articles shall notwithstanding that such Shareholder be then dead or bankrupt, and whether or not the Company has notice of his death or bankruptcy, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder, unless his name shall at the time of the service of the notice or document, have been removed from the Register as the holder of the Share, and such service shall for all purposes be deemed a sufficient service of such notice or document on all Persons interested (whether jointly with or as claiming through or under him) in the Share.

119. Notice of every general meeting of the Company shall be given to:

    (a) all Shareholders holding Shares with the right to receive notice and who have supplied to the Company an address for the giving of notices to them; and

    (b) every Person entitled to a Share in consequence of the death or bankruptcy of a Shareholder, who but for his death or bankruptcy would be entitled to receive notice of the meeting.

No other Person shall be entitled to receive notices of general meetings.

### NON-RECOGNITION OF TRUSTS

120. Subject to the proviso hereto, no Person shall be recognised by the Company as holding any Share upon any trust and the Company shall not, unless required by law, be bound by or be compelled in any way to recognise (even when having notice thereof) any equitable, contingent, future or partial

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**CONFIDENTIAL**        **TDIT006350**

interest in any Share or (except only as otherwise provided by these Articles or as the Act requires) any other right in respect of any Share except an absolute right to the entirety thereof in each Shareholder registered in the Register, provided that, notwithstanding the foregoing, the Company shall be entitled to recognise any such interests as shall be determined by the Directors.

## WINDING UP

121.   If the Company shall be wound up the liquidator shall apply the assets of the Company in such manner and order as he thinks fit in satisfaction of creditors' claims.

122.   Subject to any rights and restrictions for the time being attributed to any Class or Series, the assets available for distribution among the Shareholders shall then be applied in the following priority:

(a)   first, in the payment to the holders of Participating Shares and Management Shares, *pari passu*, of a sum equal to the par value of the Participating Shares or Management Shares held by them; and

(b)   second, in the payment of any balance to holders of Participating Shares, such payment being made in proportion to the number Participating Shares of the relevant Class and Series held.

123.   If the Company shall be wound up, the liquidator may, with the sanction of an Ordinary Resolution divide amongst the Participating Shareholders in specie or kind the whole or any part of the assets of the Company (whether they shall consist of property of the same kind or not) and may, for such purpose set such value as he deems fair upon any property to be divided as aforesaid and may determine how such division shall be carried out as between the Participating Shareholders or different Classes. The liquidator may, with the like sanction, vest the whole or any part of such assets in trustees upon such trusts for the benefit of the Participating Shareholders as the liquidator, with the like sanction shall think fit, but so that no Shareholder shall be compelled to accept any assets whereon there is any liability.

## AMENDMENT OF ARTICLES OF ASSOCIATION

124.   Subject to the Act and the rights attaching to the various Classes, the Company may at any time and from time to time by Special Resolution alter or amend these Articles in whole or in part.

## CLOSING OF REGISTER OR FIXING RECORD DATE

125.   For the purpose of determining those Shareholders that are entitled to receive notice of, attend or vote at any meeting of Shareholders or any adjournment thereof, or those Shareholders that are entitled to receive payment of any dividend, or in order to make a determination as to who is a Shareholder for any other purpose, the Directors may provide that the Register shall be closed for transfers for a stated period which shall not exceed in any case 40 days. If the Register shall be so closed for the purpose of determining those Shareholders that are entitled to receive notice of,

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

1394

attend or vote at a meeting of Shareholders the Register shall be so closed for at least ten days immediately preceding such meeting and the record date for such determination shall be the date of the closure of the Register.

126.   In lieu of or apart from closing the Register, the Directors may fix in advance a date as the record date for any such determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of the Shareholders and for the purpose of determining those Shareholders that are entitled to receive payment of any dividend the Directors may, at or within 90 days prior to the date of declaration of such dividend, fix a subsequent date as the record date for such determination.

127.   If the Register is not so closed and no record date is fixed for the determination of those Shareholders entitled to receive notice of, attend or vote at a meeting of Shareholders or those Shareholders that are entitled to receive payment of a dividend, the date on which notice of the meeting is posted or the date on which the resolution of the Directors declaring such dividend is adopted, as the case may be, shall be the record date for such determination of Shareholders. When a determination of those Shareholders that are entitled to receive notice of, attend or vote at a meeting of Shareholders has been made as provided in this Article, such determination shall apply to any adjournment thereof.

### REGISTRATION BYWAY OF CONTINUATION

128.   The Company may by Special Resolution resolve to be registered by way of continuation in a jurisdiction outside the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing.  In furtherance of a resolution adopted pursuant to this Article, the Directors may cause an application to be made to the Registrar of Companies to deregister the Company in the Cayman Islands or such other jurisdiction in which it is for the time being incorporated, registered or existing and may cause all such further steps as they consider appropriate to be taken to effect the transfer by way of continuation of the Company.

### MERGERS AND CONSOLIDATION

129.   The Company may by Special Resolution resolve to merge or consolidate the Company in accordance with the Act.

### DISCLOSURE

130.   The Directors, or any authorised service providers (including the officers, the Secretary and the registered office agent of the Company), shall be entitled to disclose to any regulatory or judicial authority, or to any stock exchange on which the Shares or any Class or Series may from time to time be listed, any information regarding the affairs of the Company including, without limitation, information contained in the Register and books of the Company.

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

## INDEMNITY

131. To the fullest extent permitted by law, no Director, Secretary, Assistant Secretary, committee member or other officer for the time being and from time to time of the Company (each, a "Covered Person" and collectively, "**Covered Persons**") shall be liable to the Company or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the Company, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the Company, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the Company whom such Covered Person believes is authorized to make such suggestions on behalf of the Company, (iii) any act or omission by the Company, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the Company selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes wilful misconduct or Gross Negligence by such Covered Person (as determined by a non-appeaiable judgment of a court of competent jurisdiction).

132. Covered Person may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

133. To the fullest extent permitted by law, the Company shall indemnify and save harmless Covered Persons (the "**Indemnitees**"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnitee and arise out of or in connection with the business of the Company, any investment made, or the performance by the Indemnitee of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnitee in connection with the Company, provided that an Indemnitee shall not be entitled to indemnification hereunder to the extent the Indemnitee's conduct constitutes willful misconduct or Gross Negligence (as determined by a non-appealable judgment of a court of competent jurisdiction). The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnitee's conduct constituted willful misconduct or Gross Negligence.

134. Expenses incurred by an Indemnitee in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnitee to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnitee is not entitled to be indemnified hereunder.

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

**FSD2025-0116**                    **2025-08-19**

**1315**

**CONFIDENTIAL**                    **TDIT006353**

135.    The right of any Indemnitee to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnitee may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnitee's successors, assigns and legal representatives.

## DISPUTE RESOLUTION

136.    Subject to the prior written consent of all parties involved in the Dispute (as defined below) to such dispute resolution procedures, the following procedures shall be used to resolve any controversy or claim ("**Dispute**") arising out of, relating to or in connection with these Articles or otherwise involving the Company, a trustee appointed to represent the Company on claims derivative of the Company, its Shareholders and/or any Covered Person. If any of these provisions are determined to be invalid or unenforceable, the remaining provisions shall remain in effect and binding on the parties to the fullest extent permitted by law.

(a)    Mediation:

(i)    subject to the prior written consent of all parties involved in the Dispute, any Dispute shall be submitted to mediation by written notice to the other party or parties. In the mediation process, the parties will try to resolve their differences voluntarily with the aid of an impartial mediator, who will attempt to facilitate negotiations. The mediator will be selected by agreement of the parties. If the parties cannot agree on a mediator, a mediator shall be designated by JAMS/Endispute at the request of a party using, if necessary, strike and rank procedures then in effect;

(ii)    the mediation will be conducted as specified by the mediator and agreed upon by the parties. The parties agree to discuss their differences in good faith and to attempt, with the assistance of the mediator, to reach an amicable resolution of the dispute;

(iii)    the mediation will be treated as a settlement discussion and therefore will be confidential. The mediator may not testify for either party in any later proceeding relating to the dispute. No recording or transcript shall be made of the mediation proceedings; and

(iv)    each party will bear its own costs in the mediation. The fees and expenses of the mediator will be shared equally by the parties,

(b)    Arbitration:

Subject to the prior written consent of all parties involved in the Dispute to such dispute resolution procedure, if a Dispute has not been resolved within 90 days after the written notice beginning the mediation process (or a longer period, if the parties agree to extend the mediation), the mediation shall terminate and the dispute will be settled by arbitration. The arbitration will be administered by JAMS/Endispute pursuant to JAMS' Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. ("**Arbitration Rules**"). In the event of a conflict, the provisions of these Articles will control:

(i)    the arbitration will be conducted before a panel of three arbitrators, regardless of the size of the dispute, to be selected as provided in the Arbitration Rules. Any issue

35631852.5.C8689.187150                          28

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

CONFIDENTIAL                                                              TDIT006354

concerning the extent to which any dispute is subject to arbitration, or concerning the applicability, interpretation, or enforceability of these procedures, including any contention that all or part of these procedures are invalid or unenforceable, shall be governed by the United States Federal Arbitration Act
("**FAA**"), and resolved by the arbitrators, provided, however, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with confidentiality covenants or agreements binding on any party, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. Under no circumstances will a State arbitration act of the United States preclude application of the FAA, including any choice of law provisions in this agreement, or any other agreement. No potential arbitrator may serve on the panel unless he or she has agreed in writing to abide and be bound by these procedures;

(ii) the arbitrators may not award non-monetary or equitable relief of any sort. They shall have no power to award punitive damages or any other damages not measured by the prevailing party's actual damages, and the parties expressly waive their right to obtain such damages in arbitration or any in other forum. In no event, even if any other portion of these provisions is held to be invalid or unenforceable, shall the arbitrators have power to make an award or impose a remedy that could not be made or imposed by a court deciding the matter in the same jurisdiction. The arbitrators) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law;

(iii) the party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. This provision is intended to supersede any rights under Texas Civil Practices and Remedies Code § 38.001(8), which rights the parties expressly waive;

(iv) no discovery will be allowed in connection with the arbitration unless the arbitration panel, upon a showing of substantial need, expressly authorizes it. In any event, there shall be no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted;

(v) all aspects of the arbitration shall be treated as confidential, including its institution and/or settlement. Neither the parties nor the arbitrators may disclose the existence, content or results of the arbitration, except as necessary to comply with legal or regulatory requirements. Before making any such disclosure, a party shall give written notice to all other parties and shall afford such parties a reasonable

35631852.5.C8689.187150 29

Appendix Page 141

*www.verify.gov.ky File#: 263805*

*Filed: 21-Feb-2025 09:26 EST*
*Auth Code: E90228166495*

FSD2025-0116 2025-08-19

1317

CONFIDENTIAL

TDIT006355

opportunity to protect their interests. In the event a party who recovered monies by settlement, award by the arbitration panel, or otherwise in connection with the Dispute violates this confidentiality term, he, she, or it shall refund all such sums recovered. The parties expressly intend to waive the right to retain any monies received through settlement, award by the arbitration panel, or otherwise in connection with the Dispute in the event that that party violates the aforementioned confidentiality term; and

(vi)     the result of the arbitration will be binding on the parties, and judgment on the arbitrators' award may be entered in any court having jurisdiction. This clause shall not preclude parties from seeking provisional remedies in aid of arbitration from a court of appropriate jurisdiction.

(c)  Notwithstanding anything to the contrary herein, for greater certainty, in accordance with the terms herein, if all parties involved in the Dispute do not provide written consent to following the mediation and/or arbitration provisions herein, a party shall maintain its right to pursue his/her/its Dispute in court.

### AEOI

137.   Notwithstanding any other Article, in order to comply with AEOI, any Director shall be entitled to release and/or disclose on behalf of the Company to the Cayman Islands Tax Information Authority or equivalent authority (the "**TIA**") and any other foreign government body as required by AEOI, any information in its or its agents' or delegates' possession regarding a Member including, without limitation, financial information concerning the Member's investment in the Company, and any information relating to any shareholders, principals, partners, beneficial owners (direct or indirect) or controlling persons (direct or indirect) of such Member. Any such Director may also authorise any third party agent, including but not limited to, the Investment Manager or Administrator, to release and/or disclose such information on behalf of the Company.

138.   In order to comply with AEOI and, if necessary, to reduce or eliminate any risk that the Company or its Members are subject to withholding taxes pursuant to AEOI or incur any costs, debts, expenses, obligations or liabilities (whether external, or internal, to the Company) (together, "**costs**") associated with AEOI, the Directors may cause the Company to undertake any of the following actions:

(a)   compulsorily redeem any or all of the Shares held by a Member either (i) where the Member fails to provide (in a timely manner) to the Company, or any agent or delegate of the Company, including but not limited to, the Investment Manager or the Administrator, any information requested by the Company or such agent or delegate pursuant to AEOI; or (ii) where there has otherwise been non-compliance by the Company with AEOI whether caused, directly or indirectly, by the action or inaction of such Member, or any related person, or otherwise;

(b)   deduct from, or hold back, redemption or repurchase proceeds, dividend payments or any other distributions, in order to:

(i)     comply with any applicable requirement to apply and collect withholding tax pursuant to AEOI;

(ii)    allocate to a Member an amount equal to any withholding tax imposed on the Company as a result of the Member's, or any related person's, action or inaction (direct or indirect), or where there has otherwise been non-compliance by the Company with AEOI;

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

1318

(iii)    ensure that any AEOI related costs are recovered from the Member(s) whose  action or inaction (directly or indirectly, including the action or inaction of any person related to such Member) gave rise or contributed to such costs.

139.    In order to give effect to the requirements imposed upon the Company by AEOI, as well as any of the actions contemplated by Articles 138(a) and 139(b), the Directors may undertake any of the following actions:

(a)    create separate classes and/or series of Shares ("**AEOI Shares**"), with such rights and terms as the Directors may in their sole discretion determine, and following the compulsory redemption of some or all of a Member's Shares may immediately apply such redemption proceeds in subscribing for such number of AEOI Shares as the Directors determine;

(b)    may re-name any number of Shares  (whether issued or unissued) as AEOI Shares, create a Separate Account with respect to such AEOI Shares and apply any AEOI related costs or withholding taxes to such Separate Account;

(c)    allocate any AEOI costs or withholding tax among Separate Accounts on a basis determined solely by the Directors; and

(d)    adjust the Net Asset Value per Share of any relevant Shares (including any AEOI Share).

Filed: 21-Feb-2025 09:26 EST
Auth Code: E90228166495

**CONFIDENTIAL**                                                                 **TDIT006357**

1400

**FSD2025-0116**

**2025-08-19**

**Annexure**

**Fiscal Year**

The fiscal year of the Company ends on the 31st day of December in each year, unless the Directors prescribe some other period therefor.

35631852.5.C8689.187150

32

Appendix Page 144

*www.verify.gov.ky File#: 263805*



*Filed: 21-Feb-2025 09:26 EST*

*Auth Code: E90228166495*

**FSD2025-0116**

**2025-08-19**

**1320**

**CONFIDENTIAL**

**TDIT006358**

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 634 of 759

Register of Members of

## Charitable DAF HoldCo, Ltd

Registration No: 263805

**Share Class: Management**

**Authorised Capital of USD 1.00 divided into 100.00 Management shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | WNL Limited<br>190 Elgin Avenue<br>George Town<br>Grand Cayman KY1-9001<br>Cayman Islands | 7-Nov-2011 | | 1.00 | 0.01 | In Full | 7-Nov-2011 : Allotment of 1.00 Management share(s) | 7-Nov-2011 | 1.00 | | 0.00 | 7-Nov-2011 : Repurchase of 1.00 Management share(s) |
| 2 | Grant James Scott<br>Highland Capital Managment, L.P.<br>13455 Noel Road, Suite 800<br>Dallas, TX 75240<br>USA | 7-Nov-2011 | | 100.00 | 1.00 | In Full | 7-Nov-2011 : Allotment of 100.00 Management share(s) | 25-Mar-2021 | 100.00 | | 0.00 | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick |
| 3 | Mark E. Patrick<br>6716 Glenhurst Dr<br>Dallas, TX 75254<br>USA | 25-Mar-2021 | | 100.00 | 1.00 | In Full | 25-Mar-2021 : Transfer of 100.00 Management share(s) to Mark E. Patrick | | 0.00 | | 100.00 | |

Notes

1    Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.

Appendix Page 145

CONFIDENTIAL
Printed on 25 April 2025

FSD2025-0116

Page 1 of 2

2025-08-19

1321

TDIT006359

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 635 of 759

Register of Members of

## Charitable DAF HoldCo, Ltd

**Registration No: 263805**

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Mark E. Patrick | 100.00 | Management |
| | | |

| |
|---|
| **Total Management Shares outstanding: 100.00** |
| **Total Management Shares remaining unissued: 0.00** |

TDIT006360

Appendix Page 146

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 636 of 759

Register of Members of

## Charitable DAF HoldCo, Ltd

Registration No: 263805

**Share Class: Participating**

**Authorised Capital of USD 49,999.00 divided into 4,999,900.00 Participating shares of par value USD 0.01 each**

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | **The Highland Capital Management Partners CharitableTrust #2** Highland Capital Management, L.P 13455 Noel Rd, Suite 800 TX 75240 Dallas Texas USA | 7-Nov-2011 | | 300.00 | 3.00 | In Full | 7-Nov-2011 : Allotment of 300.00 Participating share(s) | 30-Nov-2011 | 300.00 | | 0.00 | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc |
| 2 | **Highland Kansas City Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Kansas City Foundation, Inc | | 0.00 | | 100.00 | |
| 3 | **Highland Dallas Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Dallas Foundation, Inc | | 0.00 | | 100.00 | |
| 4 | **Highland Santa Barbara Foundation, Inc** - | 30-Nov-2011 | | 100.00 | 1.00 | In Full | 30-Nov-2011 : Transfer of 100.00 Participating share(s) to Highland Santa Barbara Foundation, Inc | | 0.00 | | 100.00 | |

Appendix Page 147

CONFIDENTIAL
Printed on 25 April 2025

FSD2025-0116

Page 1 of 2

2025-08-19
1323

TDIT006361

CONFIDENTIAL

Case 19-34054-sgj11   Doc 4627-6   Filed 05/11/26   Entered 05/11/26 17:05:52   Desc
Exhibit 211 Part 02   Page 637 of 759

Register of Members of

## Charitable DAF HoldCo, Ltd

Registration No: 263805

| Entry No. | Name and Address of Shareholder | Date of Entry | Cert. Nr | Shares Acquired | Issue Price | Amount Paid | Nature of Acquisition | Date Shares Disposed | Shares Disposed | Remarks | Balance Shares | Transaction Details |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 5 | **Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT** 306 W. 7th St., Suite 1045 Forth Worth TX 76102 USA | 13-Aug-2015 | | 5.00 | 0.05 | In Full | 13-Aug-2015 : Allotment of 5.00 Participating share(s) | | 0.00 | | 5.00 | |
| 6 | **DFW Charitable Foundation** The Corporation Trust Company 1209 Orange Street Wilmington, DE 19801 United States | 7-Feb-2025 | | 318.00 | 3.18 | In Full | 7-Feb-2025 : Allotment of 318.00 Participating share(s) | | 0.00 | | 318.00 | |

Notes

1    Where there is only one class of shares in issue, all issued shares carry equal (and unconditional) voting rights. Unless shares are described as "Non-Voting" they carry voting rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). Where shares are described as "Non-Voting" this designates that they do not carry rights to vote at general meetings on all or substantially all matters (including the right to appoint or remove directors). All shares carry unconditional voting rights, save where shares are described as "conditional" which designates that they only carry rights to vote at general meetings in certain circumstances.

**Summary**

| Name | Number and Class of Shares Held | |
|---|---|---|
| Highland Kansas City Foundation, Inc | 100.00 | Participating |
| Highland Dallas Foundation, Inc | 100.00 | Participating |
| Highland Santa Barbara Foundation, Inc | 100.00 | Participating |
| Community Foundation of North Texas ("CFNT"), for the Highland Capital Management, L.P. Charitable Fund at CFNT | 5.00 | Participating |
| DFW Charitable Foundation | 318.00 | Participating |
| **Total Participating Shares outstanding: 623.00** | | |
| **Total Participating Shares remaining unissued: 4,999,277.00** | | |

Appendix Page 148

TDIT006362

| From: | Andrew Johnstone <aj@j-law.ky> |
|---|---|
| Sent: | 24 April 2025 11:46 AM |
| To: | Geoffrey Sykes; Barnaby Gowrie |
| Cc: | Rhiannon Zanetic; Philip Aubry; Nicholas Geldard; Chris Beck |
| Subject: | Re: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181] |

**[this message is from an external sender]**

Hi Geoff

Given your failure to respond yesterday, we are in the course of serving on Charitable DAF HoldCo Ltd at its registered office.

Best

AJ

**Andrew Johnstone**
Founder | Partner



**+1 (345) 929-3000**
**www.j-law.ky** | **LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

**From:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>
**Sent:** 24 April 2025 11:35
**To:** Andrew Johnstone <aj@j-law.ky>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>; Chris Beck <Chris.Beck@walkersglobal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd [WALKERS-AMER_DOCS.FID2294181]

Dear Mr Johnstone

Please could you confirm the nature of the proceeding to be served.

Best regards,

**Geoffrey Sykes**
Associate
**Walkers (Cayman) LLP**

**T** +1 345 814 6834 | **M** +1 345 814 6834
www.walkersglobal.com

Bermuda | British Virgin Islands | Cayman Islands | Dubai | Guernsey | Hong Kong | Ireland | Jersey | London | Singapore

**From:** Andrew Johnstone <aj@j-law.ky>
**Sent:** 23 April 2025 13:42
**To:** Geoffrey Sykes <Geoffrey.Sykes@walkersglobal.com>; Barnaby Gowrie <Barnaby.Gowrie@walkersglobal.com>
**Cc:** Rhiannon Zanetic <rz@j-law.ky>; Philip Aubry <Philip.Aubry@walkersglobal.com>; Nicholas Geldard <ng@j-law.ky>
**Subject:** Charitable DAF HoldCo, Ltd

**[this message is from an external sender]**

Dear Colleagues

We act for the Participating Shareholders of Charitable DAF HoldCo, Ltd (the ***Company***).

Please can you confirm whether you are instructed to act for and accept service on behalf of the Company.

Best

AJ

### Andrew Johnstone
Founder | Partner



**+1 (345) 929-3000**
**www.j-law.ky | LinkedIn**
**Johnstone Law**, 10 Market Street, PO Box 926
Grand Cayman, KY1-9006, Cayman Islands

*This email and any attachments transmitted with it are confidential and intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error, please notify the sender immediately and delete the email from your system. Any unauthorised use, distribution, or copying of this email is strictly prohibited.*

All services are supplied on the basis of the firm's standard Terms of Engagement which can be found here. We take the protection of personal data very seriously. Full details of how we will process your personal data can be found in our Privacy Statement.

WALKERS' DISCLAIMER: The information in this email may be confidential, legally privileged and exempt from disclosure under applicable laws. If you are not the intended recipient, you must not read, use or disseminate the information in any way. If you receive this email in error, please inform us immediately and then delete it from your system. Due to the nature of email communication, Walkers and its affiliated entities accept no responsibility for any viruses or for the reliability, security, inaccuracy, incompleteness, interception, corruption, loss or delay of information exchanged.

| | |
|---|---|
| **From:** | Brandon R. Schaller <bschaller@shieldslegal.com> |
| **Sent:** | 24 April 2025 4:52 PM |
| **To:** | Barnaby Gowrie; Philip Aubry; Geoffrey Sykes; Chris Beck |
| **Cc:** | mpatrick@dafholdco.com; Paul Murphy; sraver@dafholdco.com; Bart Higgins |
| **Subject:** | FW: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232] |
| **Attachments:** | 2025 24 04 - Charitable DAF HoldCo Ltd.zip |
| **Importance:** | High |

**[this message is from an external sender]**

FYI

**Brandon R. Schaller**
**ATTORNEY**

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

---

**From:** Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 4:45 PM
**To:** Michelle Richie | Campbells <MRichie@campbellslegal.com>; Brandon R. Schaller <bschaller@shieldslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]
**Importance:** High

> CAUTION: This email originated from outside of the organization.

All

Johnstone law, who are acting for the participating shareholders of Charitable DAF HoldCo Ltd, served the following documents this afternoon (via Campbells, as we remain Charitable DAF's registered office):

- A Petition seeking orders that Charitable DAF be wound up and that joint official liquidators be appointed.
- A Summons seeking an order appointing joint provisional liquidators over Charitable DAF.
- Supporting affirmations of Julie Diaz (of The Dallas Foundation) and James Dondero.
- Consent to acts as a liquidator from Margot MacInnis and Sandipan Bhowmik, both of Grant Thornton.

The Summons seeking the appointment of joint provisional liquidators over Charitable DAF has been listed for hearing before Justice Asif at 2pm on **Monday, 28 April 2025**.

We will forward copies of the attached materials to Kroll, as the voluntary liquidators of Charitable DAF. Our understanding is that Kroll will be taking point on next steps as the voluntary liquidators, but we will review and are available to assist. We will also forward these materials onto Walkers, who have requested a copy.

Kind regards

FSD2025-0116                                                                    2025-08-19

**Matheo Vinciullo**
Associate

E mvinciullo@campbellslegal.com
**T** +1 345 949 2648   **D** +1 345 914 6931   **C** +1 345 327 6931

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman  KY1-9010, Cayman Islands

campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

This email including any attachments are strictly private and confidential. It is solely for the use of the intended recipient(s) and may contain confidential and privileged information. Internet email is not a secure communications medium and may contain viruses. All work carried out by us is subject to our standard terms and conditions (click here to view) unless other terms and conditions are agreed in writing between you and us. The Campbells Group is deemed not to be the author, editor or publisher of personal messages, which fall outside the scope of any individual's employment. Thank you.

**From:** Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Sent:** Thursday, April 24, 2025 1:00 PM
**To:** Brandon R. Schaller <bschaller@shieldslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>; Matheo Vinciullo | Campbells <MVinciullo@campbellslegal.com>; Mark Goodman | Campbells <MGoodman@campbellslegal.com>
**Subject:** RE: Charitable DAF HoldCo, Ltd. [IMAN-IMANCORP.FID488232]

Brandon

We have not received anything as yet but will provide copies when we do.  We have received a similar request from Walkers attached.  Do we have authorisation to provide the same to them?

**Michelle Richie**
Partner

E mrichie@campbellslegal.com
**T** +1 345 949 2648   **D** +1 345 914 6933   **C** +1 345 525 6933

**Campbells LLP**
Floor 4, Willow House, Cricket Square
Grand Cayman  KY1-9010, Cayman Islands

campbellslegal.com | LinkedIn

CAYMAN | BVI | HONG KONG

**From:** Brandon R. Schaller <bschaller@shieldslegal.com>
**Sent:** Thursday, April 24, 2025 12:48 PM
**To:** Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Aliana Dodds | Campbells <ADodds@campbellslegal.com>; Chris Smith | Campbells <CSmith@campbellslegal.com>; Amanda Atkins | Campbells <AAtkins@campbellslegal.com>; Michelle Richie | Campbells <MRichie@campbellslegal.com>
**Cc:** mpatrick@dafholdco.com; Paul Murphy <paul@gkmanagement.com.ky>; sraver@dafholdco.com; Bart Higgins <bhiggins@shieldslegal.com>
**Subject:** Charitable DAF HoldCo, Ltd.

**EXTERNAL EMAIL: This email originated from outside of Campbells.**

Campbells team,

FSD2025-0116                                                                    2025-08-19

CONFIDENTIAL                                                                    1328

TDIT006366

FSD2025-0116                                                                                      2025-08-19

We heard that Johnstone law is attempting service on Charitable DAF HoldCo, Ltd. as its registered office. Can you please advise if you have received anything, and if not, provide us a copy when you do?

Thanks,
Brandon

**Brandon R. Schaller**
**ATTORNEY**

16400 Dallas Parkway, Suite 300
Dallas, TX 75248

**Phone** | 469.726.3055
**Email** | bschaller@shieldslegal.com
**Bio** | **LinkedIn** | **vCard**

**SHIELDSLEGAL.COM**

This e-mail message is confidential and is being sent by or on behalf of Shields Legal Group, P.C. The information contained in this e-mail may be protected from disclosure by one or more privileges, including without limitation, the attorney-client communication privilege. If you are not the intended recipient, please notify the sender immediately at 469.726.3055 and/or by reply e-mail, and immediately destroy this message.  You should not copy it or disclose its contents to any other person.  Please note that internet communications are not secure; are subject to possible data corruption, either accidentally or on purpose; and may contain viruses.  This e-mail message does not contain or constitute legal advice and/or federal tax advice.  The contents of this e-mail message are not intended to be used and cannot be used to avoid penalties under the Internal Revenue Code, or to promote, market, or recommend to any person any transaction or matter addressed herein.

FSD2025-0116                                                                                      2025-08-19

CONFIDENTIAL                                                                              1329

TDIT006367

| | |
|---|---|
| **From:** | Mark Patrick <mpatrick@dafholdco.com> |
| **Sent:** | 27 April 2025 12:51 AM |
| **To:** | Mansfield, Mitchell |
| **Cc:** | Paul Murphy |
| **Subject:** | Voluntary Liquidators |

**[this message is from an external sender]**

Dear Voluntary Liquidators

I write to you in my capacity as the management shareholder and director of the company. My fellow director, Paul Murphy, is copied to this email and agrees with its contents.

Please note the following:

The management shareholder of the company and its directors intend in providing cooperation to the voluntary liquidators in accordance with Cayman law.
The management shareholder has no intention of taking any steps to remove the voluntary liquidators from office.
Assuming the voluntary liquidators consider it appropriate having consulted with relevant stakeholders of the company, the management shareholder and the directors have no objections to the voluntary liquidators making the necessary court application to have the voluntary liquidation brought under the supervision of the Cayman Court.
If you have any questions, please do not hesitate to contact me.

Kind regards.

Mark Patrick
Management Shareholder

**CONFIDENTIAL**                                                    1330                                                    **TDIT006368**

CONFIDENTIAL

Case 19-34054-sgj11 Doc 4627-6 Filed 05/11/26 Entered 05/11/26 17:05:52 Desc
Exhibit 211 Part 02 Page 644 of 759

# Before



Appendix Page 155

TDIT006369

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 645 of 759

CONFIDENTIAL

# Current – DAF Holdco



TDIT006370

FSD2025-0116   2025-08-19

FSD2025-0099   **Page 1 of 5**   2025-04-28



1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**

**FINANCIAL SERVICES DIVISION**

**CAUSE NO:   FSD 99 OF 2025 (JAJ)**

IN THE MATTER OF:       **SECTION 92 OF THE COMPANIES ACT (2025 REVISION)**

AND IN THE MATTER OF:  **CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)**

BETWEEN                     **(1) THE HIGHLAND DALLAS FOUNDATION, INC.**

**(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.**

**(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.**

**(4) THE HCMLP CHARITABLE FUND**

**PLAINTIFFS**

**and**

**CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)**

**DEFENDANT**

_____

**FIRST AFFIDAVIT OF GEOFFREY SYKES**

_____

36068369.1.C8689.187150                                                      1

Case 19-34054-sgj11    Doc 4627-6    Filed 05/11/26    Entered 05/11/26 17:05:52    Desc
Exhibit 211 Part 02    Page 647 of 759

1414

FSD2025-0116
FSD2025-0099

Page 1418 of 1530
Page 2 of 5

2025-08-19
2025-04-28

I, **GEOFFREY SYKES**, of 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands being duly sworn **MAKE OATH and SAY** as follows:

**Preliminary**

1.      I am an Attorney-at-Law and Associate in the Insolvency and Dispute Resolution Group at Walkers (Cayman) LLP ("**Walkers**"), and I act for Charitable DAF HoldCo, Ltd (in Voluntary Liquidation) (the "**Company**").

2.      I make this Affidavit in response to the winding up petition by which Cause No. FSD 99 of 2025 was commenced, and the summons listed in that proceeding seeking, among other things, "*An order appointing joint provisional liquidators over Charitable DAF HoldCo…*".

3.      There is now shown to me a bundle of documents marked Exhibit "**GS-1**" and references to page numbers herein are to pages of that Exhibit. For the avoidance of doubt, no privilege is waived by the inclusion of the information set out herein.

4.      Save where the contrary is stated to be the case, the facts and matters to which I depose are within my own knowledge and are true. Where the facts and matters are not within my own knowledge, they derive from my instructions by the company, acting either through its directors or the Joint Voluntary Liquidators (defined below) as the case may be at the relevant time, or I identify the source of my knowledge and confirm that those facts and matters are true to the best of my knowledge and belief.

**Recent events and documents**

5.      On 24 April 2025, Johnstone Law served on the Company at its registered office a bundle of documents including the winding up petition and the summons referred to above.  A copy of the cover letter to this bundle of documents is at

36068369.1.C8689.187150

2

FSD2025-0099
FSD2025-0116

Appendix Page 158

2025-04-28
2025-08-19
1334

CONFIDENTIAL

TDIT006372

page 1 (noting that the remainder of the documents will already be before the Court).

6. On 25 April 2025, Walkers sent to Johnstone Law a letter enclosing the following documents:

(a) A consent to act as joint voluntary liquidators of the Company by Mitchell Mansfield and William Clarke of Kroll Cayman Ltd (the "**Joint Voluntary Liquidators**"), dated 29 March 2025;

(b) Written resolutions of the directors of the Company including to recommend to the management shareholder that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(c) Special resolutions of the management shareholder of the Company that the Company be wound up voluntarily and the Joint Voluntary Liquidators be appointed, dated 2 April 2025;

(d) A declaration of solvency by the directors of the Company, dated 2 April 2025;

(e) An extract from Gazette Issue No. 8/2025, which includes notice that on 2 April 2025 the Company was placed into Voluntary Liquidation and the Joint Voluntary Liquidators were appointed, dated 14 April 2025;

(f) The current Memorandum and Articles of the Company, dated 20 February 2025;

(g) The current Register of Members of the Company, dated 25 April 2025; and

36068369.1.C8689.187150                                                    3

(h)   An email chain between Walkers and Johnstone law, dated 23-24 April 2025.

7.   That letter and its enclosures are at **pages 2 – 53**.

8.   On 24 April 2025, emails were exchanged between Campbells LLP as the registered office of the Company, and Shields Legal (acting for the directors of the Company), in respect of the bundle of documents served by Johnstone Law. A copy of that email chain is at **pages 54 – 56**.

9.   On 27 April 2025, Mark Patrick (in his capacity as the management shareholder and a director of the Company) sent an email to the Joint Voluntary Liquidators in respect of the joint voluntary liquidation. A copy of that email is at **page 57**.

10.   A copy of the structure chart of the Company prior to 27 March 2025 is at **page 58**. A copy of the current structure chart Company as of 27 March 2025 is at **page 59**.

SWORN at George Town, )
)
Grand Cayman )
)   GEOFFREY SYKES
)
on the 27th day of April 2025 )
)
before me )
)
)
)

NOTARY PUBLIC

Fiona MacAdam
Notary Public in and for the Cayman Islands
My commission expires January 31, 20 26
Date: 27th April 2025 .

This **AFFIDAVIT** is filed by Walkers (Cayman) LLP, Attorneys-at-Law, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands, for the Applicant whose address for service is care of said Attorneys-at-Law.

36068369.1.C8689.187150

4

CONFIDENTIAL                                         TDIT006374

FSD2025-0099                Page 5 of 5                2025-04-28

1. Defendant
2. Geoffrey Sykes
3. First Affidavit
4. Exhibit "GS-1"
5. 27 April 2025

IN THE GRAND COURT OF THE CAYMAN ISLANDS
FINANCIAL SERVICES DIVISION

CAUSE NO:   FSD 99 OF 2025 (JAJ)

IN THE MATTER OF:   SECTION 92 OF THE COMPANIES ACT (2025 REVISION)

AND IN THE MATTER OF:   CHARITABLE DAF HOLDCO, LTD (IN VOLUNATRY LIQUIDATION)

BETWEEN

(1) THE HIGHLAND DALLAS FOUNDATION, INC.
(2) THE HIGHLAND KANSAS CITY FOUNDATION, INC.
(3) THE HIGHLAND SANTA BARBARA FOUNDATION, INC.
(4) THE HCMLP CHARITABLE FUND

PLAINTIFFS

and

CHARITABLE DAF HOLDCO, LTD (IN VOLUNTARY LIQUIDATION)

DEFENDANT

THIS IS EXHIBIT "GS-1" TO THE AFFIDAVIT OF

GEOFFREY SYKES

SWORN BEFORE ME THIS 27TH DAY OF APRIL 2025

Fiona MacAdam
Notary Public in and for the Cayman Islands
My commission expires January 31, 2026

Date: 27 April 2025 .

NOTARY PUBLIC



FSD2025-0116   DocuSign Envelope ID: 11CD8132-6630-49A0-A1FB-Da69E946142   2025-08-19



November 11, 2024

**From**: Highland Dallas Foundation, Inc.
          Highland Kansas City Foundation, Inc.
          Highland Santa Barbara Foundation, Inc.

**To**:    Mr. Paul Murphy
          Director of Charitable DAF HoldCo, Ltd.
          and Charitable DAF Holdings Corp.
          paul@gkmanagement.com.ky

Dear Mr. Murphy:

We write to you collectively on behalf of the following organizations:

1.   Highland Dallas Foundation, Inc., a participation shareholder in Charitable DAF HoldCo, Ltd., of which you are a director along with Mark Patrick. As you know, Mr. Patrick also is the managing member of the Charitable DAF GP, LLC, which governs the related Charitable DAF Fund, LP.

2.   Highland Kansas City Foundation, Inc., also a participation shareholder in Charitable DAF HoldCo, Ltd.

3.   Highland Santa Barbara Foundation, Inc., also a participation shareholder in Charitable DAF Holdco, Ltd.

Highland Dallas Foundation, Inc is a supporting organization of The Dallas Foundation. Highland Kansas City Foundation, Inc. is a supporting organization of Greater Kansas City Community Foundation. Highland Santa Barbara Foundation, Inc. is a supporting organization of Santa Barbara Foundation. The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation (collectively the "Foundations") have worked closely with their respective supporting organizations named above to award grants and funding to a wide range of charitable causes that have made tangible, lasting impacts on the communities they serve. Our primary commitment has been, and always will be, our concern for the community, respect for donors, thoughtful giving, and careful investing—core values that have guided each of us throughout our existence.

With these core values and with the well-being of these Foundations in mind, we write you to voice that we no longer have confidence that the governance structures of, including but not limited to Charitable DAF-GP, LLC, Charitable DAF HoldCo, Ltd., Charitable DAF Fund, L.P. and CLO HoldCo, Ltd. (collectively the "DAF-related entities"), can function appropriately. We believe a reorganization must occur or the DAF-related entities should be equitably wound up because the governance structure has become unworkable. Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner

FSD2025-0116                                                      2025-08-19
                                                                      1338
**CONFIDENTIAL**                                                 TDIT006376

FSD2025-0116    DocuSign Envelope ID: 11CD8132-6630-49A0-A1FE-D888454517A    2025-08-19

Mr. Paul Murphy
November 11, 2024
Page 2

workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts.

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities.

Thank you for your attention to this matter. Our counsel with the law firm of Holland & Knight LLP is copied on this letter should you have any questions.

Sincerely yours,

HIGHLAND DALLAS FOUNDATION, INC.

By: _____
    Julie Diaz
    Vice President

HIGHLAND KANSAS CITY FOUNDATION, INC.

By: _____
    Debbie Wilkerson
    Vice President

HIGHLAND SANTA BARBARA FOUNDATION, INC.

By: _____
    Jacqueline M. Carrera
    Secretary and Treasurer

cc:   David M. Rosenberg
      (via email at david.rosenberg@hklaw.com)

      Michael Stockham
      (via email at michael.stockham@hklaw.com)

FSD2025-0116                                                        2025-08-19
                                                                        1339
CONFIDENTIAL                                                    TDIT006377

**FSD2025-0116**

**EXHIBIT 4-B**

8-19

---

**Rhiannon Zanetic**

---

**Subject:**                     [EXTERNAL]-RE: DAFHoldCo information request

**From:** Michael.Stockham@hklaw.com
**Date:** February 7, 2025 at 12:43:56 PM CST
**To:** Paul Murphy
<paul@gkmanagement.com.ky>, Julie Diaz
<jdiaz@dallasfoundation.org>,
mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson
<wilkerson@growyourgiving.org>, Jackie Carrera
<jcarrera@sbfoundation.org>,
David.Rosenberg@hklaw.com,
DMancino@seyfarth.com
**Subject: [EXTERNAL]-RE: DAFHoldCo
information request**

> **CAUTION:** This email originated from outside of the
> organization. Do not click links or open attachments unless
> you recognize the sender and know the content is safe.

Paul-

I appreciate your email, and your willingness to find a
framework to resolve the concerns, but am flummoxed
by your, "struggle" to understand our growing
frustration.

I do not believe it should be difficult to comprehend the
request for transparency around $270 million dollars
you control as a fiduciary for the benefit of charities in
Dallas, Kansas City, and Santa Barbara. Indeed, these
odd legal and rhetorical machinations of yours and Mr.
Patrick miss the point. These monies are for improving
the quality of life of children, building pathways for
everyone to have a fair opportunity to succeed, and—
among other things—creating a lasting impact on
young minds by fostering a love for education. They are
not meant to pay you and Mr. Patrick millions in
director fees. If I'm wrong, please educate me.

Your failure to be forthcoming about the underlying
assets, the investment philosophy of the fund, and the
"revised" governance, have caused me to start digging.
I am not only a lawyer but also a Certified Fraud
Examiner and a Certified Compliance & Ethics

**FSD2025-0116**

**2025-08-19**
1340

**CONFIDENTIAL**

TDIT006378

Professional, and what I have found is nothing short of alarming.

- As I mentioned, director fees for 2024 appeared to be on track to exceed $5 million, which was an over 12,000 percent increase—up from zero. It is hard to fathom what you and Mr. Patrick have changed or contributed to the funds to warrant such a drastic change in director fees. I could be wrong, but if so, then tell me why. What is the dramatic value add?

- As I understand it, the annualized expenses of the funds were on pace to outstrip the actual return on the investments. So I am at a loss as to how you can justify running the fund at a loss while apparently paying the directors handsomely and freezing Supporting Organizations (the shareholders) out of basic information.

On November 6, 2024, we had an introductory video call with Doug Mancino, who announced himself as Compliance Counsel. But no details of the assets or financial condition of the funds were communicated.

On November 20, 2024, we had another video call with folks from your side, including ValueScope, and it was informative; however, the thrust of the presentation was why you refused proposed investments from NexPoint. It had nothing to do with the underlying assets and financial conditions of the fund. This was perplexing as ValueScope has been the valuation firm for the fund for years; yet they were silent about the condition of the fund.

On December 11, 2024, we had a video call with you, Doug Mancino, and your Cayman counsel. The thrust of that discussion was your vision of running the fund more as an institutional investment vehicle and a promise to provide financial information in the future. But the presentation again lacked any information on the underlying assets and financial conditions of the fund. It did, however, include a discussion that the Supporting Orgs had no right to information under the structure of the funds.

Shortly after the December 11 call, we received your first demand to withdraw our concerns about the governance of the funds, and it also advanced that if the Supporting Organizations wanted more

CONFIDENTIAL

FSD2025-0116                                                                 2025-08-19

transparency they must sign a non-disclosure agreement with a liquidated damages clause. Which is, quite frankly, ridiculous.

In sum, and as I understand the thread running through the communications, your continuing posture is the following. The Supporting Orgs have no right to information. And, if the Supporting Organizations want more information, they must both recant their governance concerns and then sign the NDA. Those are both coercive non-starters. Again, if I'm wrong please tell me how.

Finally, and this I find perhaps the most egregious, I just discovered through my own research that Mark Patrick cancelled the Delaware charter of Charitable DAF GP, LLC on October 30, 2024 and rechartered it in Cayman. I can find no legitimate reason to recharter the general partner, and instead believe it to be a move to further insulate Mr. Patrick's and your actions by retreating from jurisdiction in the United States and offshore the entity in its entirety. If I've misunderstood, please let me know in detail how, but I remain skeptical. Further, in the calls listed above, not one representative from your side spoke up to explain, or even mention, the rechartering of the general partner. That is a striking repeated omission.

So the change of tone should not provide any struggle to puzzle through. Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted.

If I'm wrong, fine. It won't be the first time. But this also isn't my first rodeo, and the way to diffuse this is through immediate full transparency and facts. So if I've misunderstood, and your intent is to provide a fully transparent briefing to the Supporting Organizations without coercive caveats, then we stand ready to have that conversation after receiving the basic financial information requested by Julie Diaz in her January 23, 2025 email.

3
Appendix Page 166

FSD2025-0116                                                                 2025-08-19

CONFIDENTIAL                                                                 TDIT006380

FSD2025-0116

**Michael Stockham, JD, CFE, CCEP | Holland & Knight**

Partner

Holland & Knight LLP

One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201

Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435

michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

*Licensed to practice law in Texas, Kansas, and New York
CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com
CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org*

2025-08-19

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, February 4, 2025 9:31 AM
**To:** Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

*[External email]*

Dear Mike,

We remain open to finding a framework within which we can resolve your clients' concerns.

I don't want to repeat points already made in my email dated 30th January 2025, but our understanding was that we were to prepare a presentation for the Foundations to address these concerns. This was a course of action suggested by you in our call last year and one which we thought was very sensible.

We are struggling to understand what happened between 21st January (when David Rosenburg, from your firm, confirmed a video conference would be acceptable) and 23rd January when an email was sent to Mark's old email address repeating various allegations that we were going to address in the presentation.

FSD2025-0116

2025-08-19

1343

CONFIDENTIAL

TDIT006381

FSD2025-0116 2025-08-19

We remain committed to trying to work with your clients and would be grateful if you could confirm your clients' willingness to do so.
Many thanks,
Paul.

---

**From:** Michael.Stockham@hklaw.com <Michael.Stockham@hklaw.com>
**Sent:** Friday, January 31, 2025 3:32 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; David.Rosenberg@hklaw.com; DMancino@seyfarth.com
**Subject:** RE: DAFHoldCo information request

Paul-

I have added Doug Mancino to this email chain, as you are represented by counsel, I believe it appropriate to loop him in for this communication. I also told you that I had a tendency toward the blunt.

I am appalled by your response. As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions. And your focus and mission should be not only to ensure the success of the investments, but transparency to the ultimate beneficiaries. The assets are for their benefit, not Mr. Dondero, not Mr. Patrick, and not you.

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024 — before Mr. Patrick shut down that line of communication and information — showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022. If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024. Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. Yet, no information has been provided by you

5
Appendix Page 168

CONFIDENTIAL TDIT006382

FSD2025-0116

2025-08-19

and Mr. Patrick, no clarity given. It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10 percent on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns. But telling us we have no legal right to the answers is not workable.

Upon Mr. Patrick taking control, you and he should have immediately engaged with the Supporting Organizations to explain the transition, your plans, and how the assets are being managed. I would have thought that a fiduciary would have engaged in a campaign of maximum transparency and disclosure. Instead, as to the actual financial condition of the assets, you have been opaque at best and purposefully elusive at worse, and your email below retreats into statements about having no legal obligation to disclose the activities of the funds. And it seems to condition further transparency on the Supporting Organizations recanting their earlier expressed concerns. I think you should reconsider such an entrenchment.

The Supporting Organizations have no interest in the animosity or dysfunction between Mr. Patrick and Mr. Dondero. What they do have an interest in, is an active campaign by you and Mr. Patrick to continue to manage the assets in a shroud of mystery, dripping out details and information whenever you deem it appropriate. To do so simply proves our concerns that the governance structure of these entities is broken.

Yes, it is true that we have been in discussions for months about transparency, and you provided some information. However, what has been ignored are the repeated requests for a simple set of financials. But how hard is it to create a short PowerPoint on the current state of financial statements, a simple diagram of the alleged new governance structure (who are the advisory board members?), your visions for the funds, and then provide a one-hour briefing to the Supporting Organizations? If you are truly managing the funds to the institutional-investor standards represented in our call, these details should be at your fingertips. Yet somehow this has all devolved into delays and posturing related to the dust up between Messrs. Dondero and Patrick.

That type of myopic thinking is not appropriate in this situation. The Supporting Organizations deserve

6
Appendix Page 169

FSD2025-0116

2025-08-19

1345

CONFIDENTIAL

TDIT006383

FSD2025-0116                                                                                    2025-08-19

answers, and the transparency needs to happen sooner rather than later. And, the answer you provided, which essentially said that you can tell the organizations to pound sand and they should be grateful for the information you do provide, is not acceptable.

**Michael Stockham, JD, CFE, CCEP | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.2515 | Fax 214.969.1751 | Mobile 214.542.6435
michael.stockham@hklaw.com | www.hklaw.com

Add to address book | View professional biography

*Licensed to practice law in Texas, Kansas, and New York
 CFE - Certified Fraud Examiner - Association of Certified Fraud Examiners www.acfe.com
  CCEP - Certified Compliance and Ethics Professional - Society of Corporate Compliance and Ethics Professionals www.corporatecompliance.org

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, January 30, 2025 12:13 PM
**To:** Julie Diaz <jdiaz@dallasfoundation.org>; mpatrick@dafholdco.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

*[External email]*
Dear Julie,

I am an independent director of Charitable DAF HoldCo, Ltd. (which I believe is the entity you refer to as "DAF HoldCo" in your email dated 28 January 2025 (the "**28 January Email**")).

As an initial matter, I hope you will find the tone of this initial response to the 28 January Email conciliatory as I am keen to avoid any misunderstandings in circumstances where I had understood the next steps following the meetings between our respective legal

7
Appendix Page 170

FSD2025-0116                                                                                    2025-08-19

CONFIDENTIAL

1346

TDIT006384

FSD2025-0116

2025-08-19

representatives (Douglas Mancino and David Rosenberg) in December last year was for us to present directly to the foundations/supporting organizations in order to address some of the concerns in the letter dated 11 November 2024 (the "**11 November Letter**"). This proposed presentation would supplement the two Zoom conference calls with your attorneys held by me and our independent valuation experts, ValueScope, in December last year as well as the ValueScope 9/30/24 report sent to you on 7 January that provided a balance sheet and information on all investment holdings.

As recently as 21 January 2025, David again confirmed that a Zoom conference call with yourselves would be an effective way to address your concerns and move forward in a cooperative manner.

Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter. Please note that neither Mark nor myself received your email dated 23 January 2025 given that it was sent to an out-of-use email address for Mark (which I understand he communicated to you and your assistant in person) and did not copy me. Therefore, the basis of the concerns and request to wind-up expressed in the 28 January Email, appears to be the single failure to respond to an email that was sent to a defunct email address. Having now been reminded that the email address is not functional, I hope you can take some comfort that you were not being ignored.
However, given the content and tone of the 28 January Email and David's request to progress the direct presentation to the foundations/supporting organizations only 7 days prior on 21 January 2025, there seems to be a disconnect between the conciliatory approach adopted in the latter and the more aggressive position set out in the former.

For our part, at this stage we are more than happy to continue to engage with the foundations/supporting organizations in an

8

FSD2025-0116

2025-08-19

1347

CONFIDENTIAL

TDIT006385

effort to provide clarity on investments and the DAF HoldCo governance structure.

I must, however, record that we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets. As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control. In particular, without waiving applicable privileges, we are advised that any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero. We hope we are wrong, but the supporting organizations have received the same ValueScope quarterly financial reports and charitable distributions over time without change and without issue.

Please let us know if you are prepared to withdraw the allegations made in the 11 November Letter and the 23 and 28 January Emails and are content to proceed with our proposed delivery of the presentation which we are confident will provide a complete answer to your concerns.

Finally, as a matter of record, it is important that I outline the following:

> The 11 November 2024 Letter was not directly sent to me. I received it from Charitable DAF HoldCo's US attorneys who had, in turn, received it from a US law firm acting for Mr. Dondero. As set out above, this supports our belief, which is also based on other actions we have seen to date, that Mr. Dondero is seeking to improperly

CONFIDENTIAL                                         TDIT006386

1429

exerting influence over the foundations and supporting organizations for self-serving purposes to the detriment of DAF HoldCo, the foundations and supporting organizations.

We note that your communications to date contain several misstatements of fact and we reject all of your allegations. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so (which is not disputed). In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies.

We look forward to hearing from you in relation to the proposed presentation and withdrawal of the allegations.

Kind regards,

Paul.

**Paul Murphy**
**G.K. Management Limited**
P.O. Box 10729
Suite 1, Artemis House
67 Fort Street
Grand Cayman KY1-1007
Cayman Islands
Phone: +1 345 946 3459
Mobile: +1 345 324 1121
Fax: +1 345 946 3493
E-mail: paul@gkmanagement.com.ky

1349

**CONFIDENTIAL**

TDIT006387

**FSD2025-0116**                                                                 **2025-08-19**

---

**From:** Julie Diaz <jdiaz@dallasfoundation.org>
**Sent:** Tuesday, January 28, 2025 9:14 PM
**To:** Mark Patrick <MPatrick@CharitableDAF.com>; Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>; Michael.Stockham@hklaw.com; Rosenberg, David M (DFW - X61508) <David.Rosenberg@hklaw.com>
**Subject:** RE: DAFHoldCo information request

Mark and Paul-

We have great concern that our reasonable requests below have not been acknowledged. This failure to provide the courtesy of a response continues a pattern of a lack of communication and transparency as to assets and financials of DAF HoldCo under your stewardship. These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the assets further.

---

**From:** Julie Diaz
**Sent:** Thursday, January 23, 2025 9:45 AM
**To:** MPatrick@CharitableDAF.com
**Cc:** Debbie Wilkerson <wilkerson@growyourgiving.org>; Jackie Carrera <jcarrera@sbfoundation.org>
**Subject:** DAFHoldCo information request

Hi Mark –

11
Appendix Page 174

**FSD2025-0116**                                                                 **2025-08-19**
                                                                                 **1350**

**CONFIDENTIAL**                                                                 **TDIT006388**

FSD2025-0116

2025-08-19

Since we spoke last fall, the three CEOs from Santa Barbara, Kansas City, and Dallas community foundations (copied here) were discussing our plans for 2025 and wanted to reach out to you to check in on the DAFHoldCo. We have been discussing the need for a better understanding of the assets and thought it would be helpful if you could provide us with several detailed reports now that the new structure is in place.

Specifically, could you send:

- **Income Statements for the last for years**: A complete set of income statements (or profit and loss statements) for the last four fiscal years (2021-2024), including any supplemental notes or breakdowns that provide insight into revenue streams and expenses

- **Listing of Underlying Assets**: A detailed listing of the underlying assets held by DAF HoldCo, including both tangible and intangible assets. This should include any real estate, investments, intellectual property, or other significant assets that contribute to the company's operations or value.

- **Audited Financial Statements**: The most recent audited financial statements for DAFHoldCo, including the balance sheet, statement of cash flows, and any related auditor's reports. Please include any supplementary schedules or disclosures that are typically associated with these statements.

- **Current Structure of DAFHoldCo Operations:** An up-to-date organizational chart or structural overview detailing the key divisions, subsidiaries, and any relevant operational or financial entities that comprise the DAFHoldCo structure, including any significant changes that may have occurred over the last few years.

As you can appreciate, our job as leaders of our respective community foundations is to ensure proper stewardship of the charitable assets that are owned by our organizations. We are grateful for the decade plus of charitable investments that we have been able to make from the proceeds of the DAFHoldCo and would like to have confidence that this vehicle will continue to grow and make

FSD2025-0116

2025-08-19

CONFIDENTIAL

TDIT006389

FSD2025-0116

1432

2025-08-19

additional meaningful contributions to our respective communities.

Please let us know your ability to get this information to us by Feb. 10, 2025.

Thank you and happy New Year.



**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park Drive, Suite 930
Dallas, Texas 75247

NOTE: This e-mail is from a law firm, Holland & Knight LLP ("H&K"), and is intended solely for the use of the individual(s) to whom it is addressed. If you believe you received this e-mail in error, please notify the sender immediately, delete the e-mail from your computer and do not copy or disclose it to anyone else. If you are not an existing client of H&K, do not construe anything

13
Appendix Page 176

FSD2025-0116

2025-08-19

1352

**CONFIDENTIAL**

TDIT006390

FSD2025-0116

2025-08-19

in this e-mail to make you a client unless it contains a specific statement to that effect and do not disclose anything to H&K in reply that you expect it to hold in confidence. If you properly received this e-mail as a client, co-counsel or retained expert of H&K, you should maintain its contents in confidence in order to preserve the attorney-client or work product privilege that may be available to protect confidentiality.



**Julie Diaz**
President & CEO

**P** 2146942506
**C** 2143173784
**E** jdiaz@dallasfoundation.org
**L** /julie-h-diaz
**W** dallasfoundation.org

**The Dallas Foundation**
Pegasus Park
3000 Pegasus Park
Drive, Suite 930
Dallas, Texas 75247

<~WRD0000.jpg>  <~WRD0000.jpg>  <~WRD0000.jpg>

DISCLAIMER-Securities offered through NexPoint Securities, Inc., ("NexPoint Securities") Member FINRA/SIPC. This email may contain privileged and/or confidential information. Use by other than intended recipients is prohibited. If received in error, please immediately delete this email from your computer, destroy any hard copies and notify the sender. NexPoint Securities archives email, which are subject to review by NexPoint Securities and various regulators. This email is for informational purposes only and is not an offer, recommendation or solicitation to purchase or sell any security nor is it an official confirmation of terms. NexPoint Securities makes no representation about the accuracy or completeness of information herein. Past performance is not indicative of future returns. Investments may lose money and such investment losses are not insured.

DISCLAIMER: This email is intended for the recipient(s) only and should not be copied or reproduced without explicit permission. The material provided herein is for informational purposes only and does not constitute an offer or commitment, a solicitation of an offer, or any advice or recommendation, to enter into or conclude any transaction. It may contain confidential, proprietary, or legally privileged information. If you received this message in error, please immediately delete it.

PRIVILEGE WARNING: The sender or recipient of this message is a member of the legal department at Skyview Group. This message and any attachments hereto may constitute attorney work product or be protected by the attorney-client privilege. Do not disclose this message or any attachments hereto without prior consent of a member of the legal department at Skyview Group.

FSD2025-0116

CONFIDENTIAL

2025-08-19
1353
TDIT006391

1434

FSD2025-0116



February 27, 2025

*Via Email: dmancino@seyfarth.com*

Douglas M. Mancino, Esq.
Seyfarth Shaw LLP
2029 Century Park East, Suite 3500
Los Angeles, California 90067-3021

      Re: Charitable DAF Holdco, Ltd. ("Charitable DAF")

Doug-

I received your letter dated February 14, 2025. I apologize if you believe my previous emails to be "over the top." However, what you perceive as "hostility" is nothing more than frustration at the circuitous dialogue and veiled threats we receive in response to simple and repeated requests for transparency as to the finances and governance of Charitable DAF. So far, our specific concerns have been met with denials but no real data on the particular issues raised. In a world where Messrs. Dondero and Patrick appear to be feuding, the Supporting Organizations can, at best, adopt a position of "trust but verify." They will, therefore, continue to push for transparency.

Further, the frustration you perceive arises from comments in many of the communications we have received from you and your clients attempting to position the Supporting Organizations as being manipulated by Mr. Dondero. The Supporting Organizations are nobody's patsy, proxy, or puppet. To suggest otherwise insults the intellect and professionalism of the executive leadership at each of the Supporting Organizations.

Paul Murphy continues to assert that he is ready to present to the Supporting Organizations and clear up all the misunderstandings. You know our concerns; let us get to it. Please propose dates in the next two weeks on which Paul is ready to present to, and answer questions from, the Supporting Organizations.

        Sincerely yours,

        Michael W. Stockham

cc:    David Rosenberg

CONFIDENTIAL

TDIT006392

1435

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 18 March 2025 09:27 |
| **To:** | Mancino, Douglas; Michael.Stockham@hklaw.com |
| **Cc:** | Paul Murphy |
| **Subject:** | RE: Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this. |

Doug, we are available on:

- Wednesday March 26, after 4:00 p.m. U.S. Central Daylight Time.

- Monday, March 31, until 12:00 p.m. U.S. Central Daylight Time.

- Thursday, April 3 until 12:00 p.m. U.S. Central Daylight Time.

**David Rosenberg | Holland & Knight**
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas, Texas 75201
Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

_____

Add to address book | View professional biography

---

**From:** Mancino, Douglas
**Sent:** Monday, March 17, 2025 1:00 PM
**To:** Rosenberg, David M (DAL - X61508) ; Stockham, Michael W (DAL - X62515)
**Cc:** Paul Murphy
**Subject:** Can you get me a couple of dates for Paul Murphy to make a presentation to your three clients? We would like to do this as soon as practicable. Thanks for your attention to this.


Doug

**Douglas Mancino** (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326
DMancino@seyfarth.com | www.seyfarth.com

CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.

**CONFIDENTIAL**                          **TDIT006393**

FSD2025-0116                                                                          2025-08-19
Rhiannon Zanetic

| | |
|---|---|
| **From:** | David.Rosenberg@hklaw.com |
| **Sent:** | 03 April 2025 09:51 |
| **To:** | Mancino, Douglas |
| **Cc:** | Michael.Stockham@hklaw.com; Paul Murphy |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, no such call is on our calendar, so I am not sure of the source of the confusion.  We will circle back with our clients and provide some windows starting on April 16.

I wish your wife the best of health with her back.  Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | https://urldefense.proofpoint.com/v2/url?u=http-
3A__www.hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpS
NaOg8_Sk5D&s=dUaYK7RyBQ-__Uvhuz_UbZY9LLgA8fqgfSQfMU9IREk&e=

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <https://urldefense.proofpoint.com/v2/url?u=http-3A__David.Rosenberg-
40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpS
NaOg8_Sk5D&s=dK186X1LRwbLe82XNr4DiwVprLY83NgIEL5KUk2L9wM&e=>
Cc: Stockham, Michael W (DAL - X62515) <https://urldefense.proofpoint.com/v2/url?u=http-3A__Michael.Stockham-
40hklaw.com&d=DwIFAg&c=euGZstcaTDllvimEN8b7jXrwqOf-
v5A_CdpgnVfiiMM&r=RjdPX5h2cOpgbX1KbC0WsA&m=rtNqaByRU1S_SGisTolK5eacT1e3ojm6eK4M4xkty0lq4Kq7A8kNpS
NaOg8_Sk5D&s=H8AOyc2PQyRIKod6ljjomBwRDxne7__BsTh9i-RGFDY&e=>; Paul Murphy
<paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar. Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas  Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

FSD2025-0116                                                                          2025-08-19
1356

CONFIDENTIAL                                                      TDIT006394

**FSD2025-0116**                                                                                 **2025-08-19**

-----------------------------------------
CONFIDENTIALITY WARNING: This email may contain privileged or confidential information and is for the sole use of the intended recipient(s). Any unauthorized use or disclosure of this communication is prohibited. If you believe that you have received this email in error, please notify the sender immediately and delete it from your system.
-----------------------------------------

**FSD2025-0116**                                                                                 **2025-08-19**
                                                                                                  **1357**

**CONFIDENTIAL**                                                                                 **TDIT006395**

1438

**Rosenberg, David M (DAL - X61508)**

| | |
|---|---|
| **From:** | Rosenberg, David M (DAL - X61508) |
| **Sent:** | Wednesday, April 9, 2025 11:40 AM |
| **To:** | Mancino, Douglas |
| **Cc:** | Stockham, Michael W (DAL - X62515) |
| **Subject:** | RE: Zoom call with Paul Murphy |

Doug, here is our availability beginning April 16 and for the next week:

April 16 - available after 2:30 p.m.

April 17 - available between 10:00 a.m. and noon and after 1:30 p.m.

April 21 - generally available after 1:30 p.m.

April 22 - available after 2:00 p.m.

April 23 - generally available except between 11:00 a.m. and 12:30 p.m.

All times are CDT.  Thanks.

David Rosenberg | Holland & Knight
Partner
Holland & Knight LLP
One Arts Plaza, 1722 Routh Street, Suite 1500 | Dallas Texas 75201 Phone 214.969.1508 | Fax 214.964.9501
david.rosenberg@hklaw.com | www.hklaw.com

-----Original Message-----
From: Mancino, Douglas <DMancino@seyfarth.com>
Sent: Thursday, April 3, 2025 9:47 AM
To: Rosenberg, David M (DAL - X61508) <David.Rosenberg@hklaw.com>
Cc: Stockham, Michael W (DAL - X62515) <Michael.Stockham@hklaw.com>; Paul Murphy
<paul@gkmanagement.com.ky>
Subject: Zoom call with Paul Murphy

Good morning. I just learned there is a call scheduled with Paul Murphy tomorrow that I do not have on my calendar.
Did I miss an evite? If so I apologize.
I need to be on any such call. I am unavailable tomorrow as I am in Miami for a wedding. I am in New Zealand next week
leaving on April 7th and returning on April 14th. I have to take my wife for CT scans of her back on the 15th so the zoom
meeting can be rescheduled on the 16th or thereafter but I need to be on the zoom call.
Let me know what dates work for your clients.
Sorry for any inconvenience
Doug

Sent from my iPhone

Douglas  Mancino (he/him/his) | Partner | Seyfarth Shaw LLP
2029 Century Park East | Suite 3500 | Los Angeles, California 90067-3021
Direct: +1-310-201-5241 | Fax: +1-310-551-8326 DMancino@seyfarth.com |

1

CONFIDENTIAL                                                                    TDIT006396

**EXHIBIT**

**5**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|  |  |  |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
|  | ) | Chapter 11 |
|  | ) |  |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | June 25, 2025 |
|  | ) | 9:30 a.m. Docket |
| Reorganized Debtor. | ) |  |
|  | ) | - MOTION TO EXTEND DURATION OF |
|  | ) |   TRUSTS (4213) |
|  | ) | - MOTION TO APPROVE SETTLEMENT |
|  | ) |   (4216) |
|  | ) |  |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Highland Capital          John A. Morris
Management Claimant Trust:         PACHULSKI STANG ZIEHL & JONES, LLP
                                   780 Third Avenue, 34th Floor
                                   New York, NY  10017-2024
                                   (212) 561-7760

For the Highland Capital          Hayley R. Winograd
Management Claimant Trust:         Gregory V. Demo
                                   PACHULSKI STANG ZIEHL & JONES, LLP
                                   1700 Broadway, 36th Floor
                                   New York, NY  10019
                                   (212) 561-7732

For the Highland Capital          Jeffrey N. Pomerantz
Management Claimant Trust:         PACHULSKI STANG ZIEHL & JONES, LLP
                                   10100 Santa Monica Blvd.,
                                    13th Floor
                                   Los Angeles, CA  90067
                                   (310) 277-6910

For Marc S. Kirschner,            Robert Scott Loigman
Litigation Trustee:               QUINN EMANUEL URQUHART & SULLIVAN,
                                    LLP
                                   295 5th Avenue
                                   New York, NY  10016
                                   (212) 849-7000

Appendix Page 183

CONFIDENTIAL                                              TDIT006397

2

APPEARANCES, cont'd.:

For the Hunter Mountain       Louis M. Phillips
Entities:                     Amelia L. Hurt
                              KELLY HART & PITRE
                              301 Main Street, Suite 1600
                              Baton Rouge, LA  70801
                              (225) 381-9643

For the Dugaboy              Deborah Rose Deitsch-Perez
Investment Trust:            STINSON, LLP
                             2200 Ross Avenue, Suite 2900
                             Dallas, TX  75201
                             (214) 560-2201

For the Dugaboy              Michael Justin Lang
Investment Trust:            CRAWFORD WISHNEW & LANG, PLLC
                             1700 Pacific Avenue, Suite 2390
                             Dallas, TX  75201
                             (214) 817-4500

For Crown Global Life        David L. Curry, Jr.
Insurance, Ltd. and          OKIN ADAMS, LLP
The Dallas Foundation:       1113 Vine Street, Suite 240
                             Houston, TX  77002
                             (713) 228-4100

For Patrick Daugherty:       Andrew K. York
                             Drake Rayshell
                             Joshua Smeltzer
                             GRAY REED & MCGRAW, LLP
                             1601 Elm Street, Suite 4600
                             Dallas, TX  75201
                             (214) 954-4135

For the U.S. Trustee:        Erin Marie Schmidt
                             OFFICE OF THE UNITED STATES
                               TRUSTEE
                             1100 Commerce Street, Room 976
                             Dallas, TX  75242-1496
                             (214) 767-1075

Recorded by:                 Michael F. Edmond, Sr.
                             UNITED STATES BANKRUPTCY COURT
                             1100 Commerce Street, 12th Floor
                             Dallas, TX  75242
                             (214) 753-2062

Appendix Page 184

**CONFIDENTIAL** **TDIT006398**

3

Transcribed by:                Kathy Rehling
                               311 Paradise Cove
                               Shady Shores, TX   76208
                               (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

Appendix Page 185

**CONFIDENTIAL**                                        **TDIT006399**

Patrick - Direct                    171

THE WITNESS:  My bad.

THE COURT:  -- call my attention to it when you find it.

THE WITNESS:  All right.

(The witness steps down.)

THE COURT:  All right.  Your next witness?

MR. YORK:  I believe we're calling Mark Patrick.

THE COURT:  All right, Mr. Patrick.  All right. Please raise your right hand.

MARK PATRICK, DUGABOY INVESTMENT TRUST'S WITNESS, SWORN

THE COURT:  All right.  Please be seated.

And, Courtney, you're going to start the clock going.  I show 2:12.  I don't know if my clock's right.

You may proceed.

MR. LANG:  And, Your Honor, may I hand the witness -- this is from Mr. Morris' opening.  May I use this as Exhibit 3?

THE COURT:  Oh, okay.  You're talking about the back page of his PowerPoint?

MR. LANG:  Yes.  Org chart.

THE COURT:  Yes.  I've got it in front of me.  And for the record, I'm going to put this PowerPoint, even though it's not an exhibit *per se*, as a demonstrative aid in the file for this matter.  And so it's the last item of the Highland PowerPoint.  All right.

CONFIDENTIAL
TDIT006400

Patrick - Direct                                       172

MR. LANG:  Yes.

DIRECT EXAMINATION

BY MR. LANG:

Q    Mr. Patrick, does this Hunter Mountain Investment Trust org chart that I just handed you accurately reflect the structure of the Hunter Mountain Investment Trust ownership today?

A    Just give me a few moments to review.

Q    Sure.

MR. LEWIS:  Your Honor, I had mentioned early on that we object to this whole line of questioning because it's outside the scope of the objection of Dugaboy.  And I don't want to interrupt, but I want to make sure that my objection is continuing, because this has nothing to do with the objection presented by Dugaboy.

THE COURT:  All right.

MR. PHILLIPS:  So we object to the question.

THE COURT:  Okay.  So the record will reflect basically a running objection from Hunter Mountain?

MR. PHILLIPS:  We would appreciate that, Your Honor.

THE COURT:  Okay.  In light of the failure of Dugaboy to disclose Mark Patrick as a witness, as well as the failure to challenge in a written objection his authority.  Okay.  So I recognized that this was quite a persuasive objection, but given the magnitude, I would say, of what is going on here,

CONFIDENTIAL                                            TDIT006401

‖  **Page 1448 of 1530**

Patrick - Direct                              173

potentially a settlement that could come very close to ending this long-running plan implementation process, I'm erring, if it's an error, I'm erring on the side of allowing this.  All right.  But you have a running objection that the record will reflect if one day there is an appeal.

MR. MORRIS:  And, Your Honor, the Highland Claimant Trust and the Highland Litigation Subtrust and Highland Capital Management, LP join Mr. Phillips' objection.

THE COURT:  Okay.  Understood.

MR. PHILLIPS:  Thank you very much, Your Honor.

THE COURT:  All right.

BY MR. LANG:

Q   Mr. Patrick, have you had time to study this Hunter Mountain Investment Trust org chart?

A   Yes, I have.

Q   And does this accurately show the ownership structure for Hunter Mountain Investment Trust today?

A    I'm not sure, without reviewing the underlying corporate documents on some of these entities that you have listed here.

Q   Did you help prepare this chart?

A   No.

Q   No?  Okay.  So Hunter Mountain Investment Trust is owned by Beacon Mountain, LLC, correct?

A   Yes.

Q   And Beacon Mountain, LLC is owned by CLO Holdco, LLC,

Appendix Page 188

CONFIDENTIAL                                          TDIT006402

Patrick - Direct                              174

correct?

A    Correct.

Q    And CLO Holdco, LLC is owned by CLO Holdco, Limited?

A    That's correct.

Q    And CLO Holdco, Limited is owned by Charitable DAF Fund, LP?

A    Correct.

Q    And Charitable DAF Fund 1, LP is owned by CDMC FAD, LLC?

A    The ultimate beneficial owner is DFW Charitable Foundation.  To my -- to the best of my recollection, I would say that appears accurate.  I'm just not a hundred percent.

Q    Okay.  And --

A    But I am a hundred percent that DFW Charitable Foundation is the ultimate beneficial owner.  And I'm a hundred percent that Dugaboy Investment Trust has no interest in it.  And I'm also a hundred percent that The Dallas Foundation or any --

        MR. LANG:  Judge, I haven't asked --

        THE WITNESS:  -- or any other nonprofit has any --

        MR. LANG:  -- any of these questions.

        THE COURT:  Okay.  There's an objection, nonresponsive.  I sustain.

BY MR. LANG:

Q    Mr. Patrick, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct?

A    (Pause.)  I'm just waiting for a relevancy.  I don't

Appendix Page 189

CONFIDENTIAL                                          TDIT006403

Patrick - Direct                          175

understand how that's relevant to my authority --

THE COURT:  Okay.  You're not allowed to make a relevancy objection.  Okay.

MR. PHILLIPS:  Your Honor, I think the problem is that, if I could, we have made an objection.  And our objection, our running objection is founded on relevancy and founded on improper process.  So I would like to just tell the Court, and so my client representative can hear it, that the fact that I'm not standing up every time there's a problematic question, --

THE COURT:  Okay.

MR. PHILLIPS:  -- because every question is problematic, my objection is being maintained to every question that's being asked.

THE COURT:  Okay.  You understand that, right?

THE WITNESS:  I --

THE COURT:  There's a running relevancy objection. You're the witness.  You can't make the objection.  But it's on the record for whatever use it might have down the road.

MR. PHILLIPS:  I have objected to every question that's coming in connection with this line of questioning on the basis of relevance.

THE COURT:  I got it.  I think we all have it.

MR. PHILLIPS:  I'm just --

MR. LANG:  Understood.

Appendix Page 190

CONFIDENTIAL                                              TDIT006404

                         Patrick - Direct                    176

THE COURT: Yes. And you're thinking he's eating into your 30 minutes?

MR. LANG: Yes.

THE COURT: Okay. We've got it.

THE CLERK: I stopped the time.

MR. LANG: So -- thank you.

THE COURT: Did you stop the time for a minute?

THE CLERK: Yes, I did.

MR. LANG: Thank you.

THE COURT: Okay.

BY MR. LANG:

Q    So, to my question, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, correct? Charitable DAF Holdco, Limited?

A    And where is that on the chart?

Q    I'm asking, before December of 2024, Charitable DAF Fund, LP was owned by Charitable DAF Holdco, Limited.

A    Can you show me a corporate document so I know the precise corporation you're referring to?

Q    You're the -- you are the manager of -- or the control person of CDHGP Limited, correct?

A    Again, I'd have to refresh my recollection, but I am the control person over CDMC.

Q    Okay. And CDMC --

A    As well as Charitable DAF Fund. I'll represent that to

CONFIDENTIAL                                                    TDIT006405

1448

Patrick - Direct                         177

you.

Q   Okay.  Was there a transaction in December of 2024 where Charitable DAF Holdco, Limited sold its interest or transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A   I know you're trying to help other litigation and --

MR. PHILLIPS:  Mark.

THE COURT:  Okay.  Nonresponsive.

THE WITNESS:  Your Honor, he's using your time to fish for other litigation to support that --

THE COURT:  Okay.  Okay.  We have a running objection to relevance.  I'm going to say that one more time.  Okay. Just answer the question as best you can.

THE WITNESS:  I'd have to review the corporate documents to refresh my recollection for that time period.

BY MR. LANG:

Q   Up until December of 2024, Charitable DAF Fund, LP was owned 100 percent by Charitable DAF Holdco, Limited, wasn't it?

A   I don't know what entity you're referring to without a refreshment of corporate documents of that entity.  There could be a lot of entities called that.

Q   You're aware that there is a proceeding in the Caymans investigating the December 2024 transaction that sold -- where Charitable DAF Holdco, Limited sold its interest in -- and or

Appendix Page 192

CONFIDENTIAL                                                    TDIT006406

Patrick - Direct                              178

transferred its interest in Charitable DAF Fund, LP to CDMC FAD, LLC?

A    There are several parts to that question.  So the answer is no.

Q    Are you aware of a proceeding pending in the Caymans involving Charitable DAF Holdco, Limited?

A    Again, I don't know what entity you're referring to.  Show me a -- show me a corporate document.

MR. LANG:  Your Honor, this was on the Foundation's exhibit list.  We cross-designated any document designated as an exhibit by any other party in this case.  And I'd like to hand this to the witness.

MR. MORRIS:  Which exhibit is it?

THE COURT:  Which is -- yes.

MR. LANG:  It was on the -- it was on the DAF -- or, the Foundation's exhibit list.

MR. MORRIS:  They haven't been admitted into evidence and they've withdrawn their objection.  We object, Your Honor.

THE COURT:  Yes, they've not been admitted.

MR. LANG:  Okay.  Well, can I --

MR. PHILLIPS:  We object to that, Your Honor.  We object to any witness --

MR. LANG:  We cross-designated every --

THE COURT:  I already discussed at the beginning what we were admitting and that was not disclosed.

CONFIDENTIAL                                          TDIT006407

Patrick - Direct                                179

MR. LANG:  Okay.

THE COURT:  As I recall, I said you've only designated the plan and settlement agreement, and the answer was yes.

MR. LANG:  Okay.

BY MR. LANG:

Q   And we're aware that the Joint Official -- are you aware that there is a Joint Official Liquidator appointed over a Charitable DAF entity in the Cayman Islands?

MR. PHILLIPS:  Objection to form.

THE WITNESS:  Again, without more specific --

THE COURT:  Overruled.  Yes.

THE WITNESS:  -- specificity, there could be a thousand different actions that you're referring to, in my mind.

BY MR. LANG:

Q   Are you aware that the Joint Official Liquidators in the Caymans are investigating transactions involving Charitable DAF Fund, LP and Charitable DAF Holdco, Limited?

A   Again, again, I don't specifically know what you're referring to.

MR. PHILLIPS:  Your Honor, may I -- excuse me.  I don't know that my running objection includes an objection to form for each of the questions.  This objection is to form of the questions about, quote, --

Appendix Page 194

CONFIDENTIAL                                              TDIT006408

Patrick - Direct                                     180

THE COURT:  What's wrong with the form?

MR. PHILLIPS:  -- investigation.

THE COURT:  What is wrong with the form of that question?  I'm not clear.

MR. PHILLIPS:  My objection to form is that the question is an open-ended question with an undefined term, investigation.

THE COURT:  Overruled.  I don't think that's a vague term.  So you may answer.

THE WITNESS:  If you show me some document, some complaint or something, I'll be very happy to verify whatever questions related to that.  But just giving me verbal words of entities and names and actions, I don't know precisely what you are talking about.

BY MR. LANG:

Q    Mr. Patrick, who set up the entities in the Hunter Mountain Investment Trust org chart that is sitting in front of you?

A    I'm sorry.  Repeat the question?

Q    Who set up the various entities that are in the org chart that is on your -- on the stand?

MR. PHILLIPS:  Objection to form.  Set up.  What does that mean?

THE WITNESS:  It -- yeah, it's very --

THE COURT:  I think we know what it means.  Creating,

Appendix Page 195

FSD2025-0116 2025-08-19

Patrick - Direct                                    181

perhaps.

BY MR. LANG:

Q    Created?

A    Who?  Are you asking if I created it?

Q    Did you participate in creating them?

A    Did I participate?  In which ones?

Q    CDMC FAD, LLC.

A    What do you mean by participate?

Q    Were you involved in creating -- did you initiate the creation of CDMC FAD, LLC?

A    Lawyers were.

Q    Did you engage in any capacity on behalf of any entity? Were you involved in engaging the lawyers to set up CDMC FAD, LLC?

A    Yes, I engaged lawyers to set up entities.

        MR. LANG:  Objection.  Nonresponsive.

        THE COURT:  Sustained.

        MR. LANG:  Did you --

        THE COURT:  He asked about this one particular entity, I think.

BY MR. LANG:

Q    Did you --

A    Which entity, again, did you ask?

Q    CDMC FAD, LLC.

A    Yes, I believe I hired a lawyer.

Appendix Page 196

FSD2025-0116

CONFIDENTIAL

TDIT006410

Patrick - Direct                         182

Q     And when did CDMC FAD, LLC become a hundred percent owner of Charitable DAF Fund, LP?

A     Around the end of March of 2025.  I believe.

Q     And were you involved in the transaction between -- in which CDMC FAD, LLC obtained a hundred percent interest in Charitable DAF Fund, LP?

A     What do you mean by involved?  How?

        THE COURT:  Okay.  I can see what's happening here or I have an impression of what's happening here.  I feel like you're slowing down this process where I've given 30 minutes to this lawyer.  Okay?  And I feel like you're feigning confusion.  I don't mean to be insulting, but that's how it comes across.  Okay?  So I need you to speed up your answers and not be confused about things you shouldn't be confused about.  Okay?

        THE WITNESS:  Okay.

        THE COURT:  I feel like it's late 1980s *Dondi*.  Does anyone know what I mean by that?  Okay.  We've been there, done that, in the federal courts, and we don't like the looking at -- you're not looking up at the ceiling.  That's what they did in *Dondi*.  Confusion.  Delay.  Okay?

    So I don't mean to chastise you.  I'm just telling you that you're going to make us be here a lot longer, and nobody wants that, because I will give him extra time for this.  Okay?

Appendix Page 197

CONFIDENTIAL                                                           TDIT006411

Patrick - Direct                    183

THE WITNESS:  Understood.

THE COURT:  Thank you.

BY MR. LANG:

Q   Okay.  So you were involved in the transaction in which CDMC FAD, LLC acquired 100 percent ownership interest in Charitable DAF Fund, LP in or around March of 2025, correct?

A   Correct.

Q   Who did CDMC FAD, LLC obtain its interests in Charitable DAF Fund, LP from in March of 2025?

A   From an -- from an entity called Charitable DAF Holdco, Ltd.

Q   Charitable DAF Holdco, Ltd., the entity that I asked about earlier, correct?

A   Of the same name.

Q   Yes.  And Charitable DAF Holdco, Ltd. has had Joint Liquidated -- Liquidators, Joint Official Liquidators appointed over it in the Cayman Islands, correct?

A   Yes.

Q   And those Joint Official Liquidators were appointed over Charitable DAF Holdco, Limited in or around May 6th, 2025?

A   In May is what I recall.

MR. LANG:  Your Honor, we'll pass the witness.

THE COURT:  All right.  Do we have any questions?

MR. YORK:  No questions, Your Honor.

THE COURT:  Okay.  Any cross?

Appendix Page 198

CONFIDENTIAL                                    TDIT006412

FSD2025-0116 2025-08-19

Patrick - Cross                                     184

MR. MORRIS:  Just briefly, Your Honor.

CROSS-EXAMINATION

BY MR. MORRIS:

Q   Mr. Patrick, do you know who initiated the proceedings to get the appointment of the Joint Official Liquidators in the Cayman Islands?

A   The director and myself, we initially filed for a voluntary joint liquidation in May.

Q   And did there come a time when the Cayman court appointed the Joint Official Liquidators?

A   Yes.

Q   Do you know who asked the court to appoint the Joint Official Liquidators?

A   We did, as well as other -- it was an agreement with the participation holders of that entity.

Q   And who are the participation holders of that entity?

A   It was the DFW Charitable Foundation as a 51 percent holder as well as the Highland Dallas Foundation, Highland Santa Barbara Foundation, and the Highland Kansas City Foundation.

Q   And those three foundations that you just mentioned, do you know who controls them?

A   Jim Dondero.

Q   Is it your understanding that Mr. Dondero was funding the litigation in the Cayman Islands?

FSD2025-0116

CONFIDENTIAL                                    TDIT006413

Patrick - Cross                185

A    Yes.

Q    The Joint Official Liquidators, are you aware of any statement that they've ever made that you are not authorized to act on behalf of any of the HMIT entities?

A    Yeah, they've never made a statement that I'm not authorized to act under any of those entities.

Q    Okay.  Did you receive a letter last night that was purportedly authored by the Joint Official Liquidators?

A    Yes.

Q    Did you review that letter?

A    Yes.

Q    Did that letter refer to today's hearing?

A    Yes.

Q    Are you aware of the Joint Official Liquidators making any appearance in this proceeding?

A    No, I'm not aware they made any appearance in this proceeding.

Q    Based on your recollection of the contents of that letter, did the Joint Official Liquidators challenge your authority to enter into the settlement agreement on behalf of the HMIT entities?

A    No, they did not, because there's no ownership interest.

Q    Okay.  And what do you mean by that?

A    The entity in liquidation owns nothing.  And the DFW Charitable Foundation is the ultimate beneficial owner.

CONFIDENTIAL                TDIT006414

Patrick - Cross                                186

Q    Are you aware that The Dallas Foundation filed an objection to the settlement agreement on behalf of Empower Dallas Foundation, the Okada Family Foundation, and Crown Global?

A    Yes.

Q    Are you aware that that objection was withdrawn?

A    Yes.

Q    Was the withdrawal of that objection the product of negotiations that your counsel had with lawyers for The Dallas Foundation and Crown Global?

A    Yes, it was.

Q    Did The Dallas Foundation or Crown Global require you to surrender your control position of the HMIT entities as a condition to the withdrawal of their objection?

A    To give up my control?  No.

Q    They didn't ask you to do that, did they?

A    No.  No.

Q    You are the control person for each of the HMIT entities that are party to the settlement agreement, correct?

A    That is correct.

Q    Are you aware of any requirement in any of the governance documents --

        MR. CURRY:  Your Honor, I'm not questioning, but I'm going to object to the line of questioning here about what was asked and what was not received into negotiations, because,

Appendix Page 201

Patrick - Cross                    187

frankly, you're getting an imperfect picture there.  And I
don't think it should be misrepresented.  The communications
didn't happen with Mr. Patrick.

THE COURT:  Okay.  I don't know if that objection was
a confidential settlement communications.

MR. CURRY:  It's a combination of foundation and that
he's going into confidential settlement discussions.

MR. MORRIS:  Your Honor, it's a very simple question.
I'll ask it again.

THE COURT:  Okay.  We'll let --

BY MR. MORRIS:

Q   To the best of best of your knowledge, Mr. Patrick, did
The Dallas Foundation or any of the entities on whose behalf
it filed its objection require you to surrender your position
as the control person of the HMIT entities in exchange for the
withdrawal of their objection?

A   No, they did not.

Q   Thank you.  Are you aware -- are you familiar with the
governance documents for the HMIT entities?

A   Yes, I am.

Q   Are you aware of any restriction on your ability to act on
behalf of those HMIT entities with respect to -- withdrawn.
Are you required to obtain the consent of anyone in order to
enter into the settlement agreement on behalf of the HMIT
entities?

Appendix Page 202

CONFIDENTIAL                    TDIT006416

FSD2025-0116                                                      2025-08-19

Patrick - Cross                                    188

A    No, I am not.  I'm the sole authority and control person for that entity.

Q    And do you believe that you're entering into the settlement agreement on behalf of the HMIT entities in good faith?

A    Yes, I do.

Q    Have you received legal counsel before entering into the agreement?

A    Yes, I have.

Q    Do you believe that you've negotiated the best terms that you could get on behalf of the HMIT entities?

A    Yes, I do.

Q    Do you believe that you received the information that you believed you required in order to make an informed decision before you entered into the settlement agreement on behalf of the HMIT entities?

A    Yes, I did.

        MR. MORRIS:  I have no further questions, Your Honor.

        THE COURT:  All right.  Mr. Phillips, anything from you?

        MR. PHILLIPS:  No questions.

        THE COURT:  Okay.  Any redirect?

        MR. LANG:  Briefly.

        THE COURT:  Uh-huh.

        MR. LANG:  Your Honor, because they mentioned the

Appendix Page 203

FSD2025-0116                                                      2025-08-19

1379

CONFIDENTIAL                                                      TDIT006417

FSD2025-0116

2025-08-19

Patrick - Redirect                                    189

letter of last night from Grant Thornton, the Liquidators, I'm going to offer that into evidence as the letter that we talked about this morning.  But Mr. Morris directly asked him if he reviewed it and asked him questions about it.

THE COURT:  Response?

MR. MORRIS:  No objection, Your Honor.  Go right ahead.

THE COURT:  I'll admit it.

MR. LANG:  This is --

THE COURT:  Do I have it in my notebook?

MR. LANG:  -- Dugaboy --

THE COURT:  Okay.

REDIRECT EXAMINATION

BY MR. LANG:

Q   Mr. Patrick, I've handed you --

THE COURT:  We're going to call this Dugaboy 3?

MR. LANG:  Dugaboy 3.

THE COURT:  Okay.

(Dugaboy Investment Trust's Exhibit 3 is admitted into evidence.)

BY MR. LANG:

Q   Mr. Patrick, I've handed you a letter.  It's from Grant Thornton dated June 24th, 2025.  Do you see that?

A   Yes.

Q   And is this a true and correct copy of the letter that you

Appendix Page 204

CONFIDENTIAL

TDIT006418

Patrick - Redirect                    190

received or that you reviewed from the Joint Liquidators that you referred to in your answers to Mr. Morris' questions?

A   Well, it's a PDF.  I mean, I'm assuming it's from the Official Liquidators.

Q   But this is the letter you were referring to in your testimony a few minutes ago?

A   Yes.

Q   And do you see on the second paragraph it says that, on May 6th, 2025, the Grand Court of Cayman Islands Financial Services Division appointed Margot MacInnis and Sandipan Bhowmik, each of Grant Thornton Special Services (Cayman) Limited, as the Joint Official Liquidators of the company.  Do you see that?

A   Yes.

Q   And do you see on the second page, it says:  Since our appointment, we have been diligently investigating these transactions, including a corporate transaction that occurred in or around December 2024 where the company transferred a hundred percent of its interest in the Fund to CDMC FAD, LLC, which resulted in the company being the sole member of CDM and subsequent redemptions of the company's interests in CDM.

Do you see that?

A   Yes.

Q   Is that your understanding of what is happening in the Caymans right now, is investigating these transactions?

CONFIDENTIAL                                                        TDIT006419

Patrick - Recross                          191

A    Correct.

MR. LANG:  Pass the witness.

MR. MORRIS:  May I just have that letter, please?

THE COURT:  Any recross?

MR. MORRIS:  Yeah, just real brief.

RECROSS-EXAMINATION

BY MR. MORRIS:

Q    None of the transactions that you were just asked about has anything to do with any of the HMIT entities, correct?

A    That's absolutely correct.

Q    Okay.  And now that we have the letter in the record, if you could look at the third paragraph.  Do you see --

A    Yeah.

Q    Do you see it refers to the Highland Dallas Foundation, Highland Santa Barbara Foundation, and Highland Kansas City Foundation?

A    Yes.

Q    Are those the three entities that you referred to earlier that are, to the best of your understanding, controlled by Mr. Dondero?

A    Yes.

Q    Okay.  And this is the letter that you said you reviewed and concluded that the Joint Official Liquidators weren't challenging your authority to enter into the agreement on behalf of the HMIT entities; do I have that right?

CONFIDENTIAL                                                    TDIT006420

Patrick - Examination by the Court          192

A    Yes.  Yes, you do.

MR. MORRIS:  I have no further questions, Your Honor.

THE COURT:  Okay.  I have a question or two.

EXAMINATION BY THE COURT

THE COURT:  And again, I apologize if I sounded harsh earlier.  I recognize different people present different ways when they testify.  It just appeared to me that maybe we were slowing things down unnecessarily.  All right?

THE WITNESS:  I apologize, too.  I'm just a little emotionally upset they're using this proceeding for a benefit someplace else.

THE COURT:  Okay.  My question, very general question:  Do you think this settlement is fair and equitable as far as HMIT is concerned?

THE WITNESS:  Absolutely.

THE COURT:  And could you tell me why?

THE WITNESS:  Yeah.  There was no obvious pathway for HMIT to, in my mind, to receive the residual interest of the bankruptcy estate without a settlement with the Debtor.  Otherwise, it just seemed to me that it would go on forever.  And then I balanced that against the existing litigation and the probability of the outcome weighted against the costs, and determined that it made sense from HMIT's perspective to enter into the settlement agreement.

THE COURT:  Okay.  And you understand that, as part

Appendix Page 207

CONFIDENTIAL                                                    TDIT006421

1464

Patrick - Examination by the Court              193

of this, you're giving up some litigation claims that have

been waged now for a couple of years or more?

THE WITNESS:  That is correct, but I'm also receiving

the Kirschner Litigation, which I did negotiate to receive.

THE COURT:  Okay.  And there was a note that the

estate -- I've heard it called at some point the $57 million

note that HMIT owed Highland, a December 2015 note -- that

basically gets credited against the capital account.  You

understand that?

THE WITNESS:  Yes, I do.

THE COURT:  Okay.  And then you understand that if I

approve this deal, I'm not sure why there's going to be

$500,000 to HMIT and then also another $10 million to HMIT,

but subsequent payments could get held up if there are

litigation threats to the Highland Claimant Trust.  You

understand that, correct?

THE WITNESS:  Yes, I do.

THE COURT:  Okay.  I just, I have to ask.  I'm

confused about what's going on here.  I thought that -- well,

let me just ask this:  Would you consider yourself crossways

with Mr. Dondero now?

THE WITNESS:  No, but I'll answer the question.  Upon

advice of counsel, I quit Skyview Group.  And upon advice of

counsel, I terminated the back office services that Skyview

Group was providing to the DAF.

1384

CONFIDENTIAL                                          TDIT006422

FSD2025-0116

2025-08-19

Patrick - Examination by the Court          194

THE COURT:  Okay.  Well, you said you're getting maybe a little emotional because of other litigation.  I'm just trying -- I don't understand what all that other --

THE WITNESS:  Unrelated -- well, unrelated to that. They're clearly trying to use this forum to benefit their Cayman actions.  They hired U.S. counsel called Reed Smith, and they've been begging for an organization chart to issue a variety of frivolous lawsuits against the operating DAF entities.  So I do apologize, but that's a little upsetting to me because I know we're going to -- that I've just fed them a list of targets in another unrelated matter.

THE COURT:  Okay.  Reed Smith.  Here we go again with -- they've made an appearance for Mr. Seery in this litigation.

MR. MORRIS:  Exactly.  And we have raised that issue.

THE COURT:  Okay.

MR. MORRIS:  And I'm surprised to hear that they think they still have the ability to do this.  But we will pursue that later.

THE COURT:  Okay.  All right.  I had nothing further. Thank you, Mr. Patrick.

(The witness steps down.)

THE COURT:  All right.  So where are we now?  I said that, again, just trying to balance the playing field, if Dugaboy was given the ability to question Mr. Patrick, then I

CONFIDENTIAL                    TDIT006423

FSD2025-0116

**EXHIBIT**

**6**

5-08-19

CAUSE NO. _____

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC.,** et al., | |
| *Plaintiffs*, | |
| **v.** | **IN THE TEXAS BUSINESS COURT** |
| **MARK PATRICK, et al.,** | |
| *Defendants.* | **1ST DIVISION** |
| | **DALLAS, TEXAS** |

### DECLARATION OF JAMES DAVID DONDERO

I, **JAMES DAVID DONDERO**, of 300 Crescent Court, Suite 700, Dallas, Texas, United States, 75201, DECLARE under penalty of perjury:

1. I am the President of NexPoint Advisors, L.P. (*NexPoint*), an investment advisor registered with the U.S. Securities and Exchange Commission (*SEC*). I am a Certified Public Accountant and Chartered Financial Analyst with over forty years of investment advisory experience managing billions of dollars of investments across various assets classes.

2. I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

3. I founded NexPoint in 2012. NexPoint is an alternative investment firm, with a particular focus on investment in the real estate sector. NexPoint has assets under management exceeding $16 billion in value. I was formerly the President of Highland Capital Management, L.P. (*Highland*), also an SEC registered investment advisor which I founded in 1993. From that time until 2015, Highland was majority owned by me and/or

Appendix Page 210

FSD2025-0116

2025-08-19
1386

CONFIDENTIAL

TDIT006424

my affiliates. In December 2015, I divested my majority stake of Highland (*2015 Transaction*).

## THE FUND

4.  In addition to my business interests, I am a regular donor to philanthropic and charitable causes. The Fund is one of the vehicles I utilize to donate such funds to charitable organizations.

5.  In 2010, the finance, accounting, and tax staff of Highland identified certain assets to be donated to a charitable foundation. In 2011, I requested the Donor Advised Fund (or DAF) to be formed and structured in a way that allowed these donations to be receipted and distributed to certain charitable foundations, as the ultimate beneficial owners of the Fund's economic interest. The structure proposed by the tax and legal advisors to effect this was for the Fund to have one limited partner (i.e. the LP) which would issue 'participation shares' to be held by certain charitable supporting organizations (together, the *Supporting Organizations*) and in turn each of those entities would provide funding directly to certain charitable foundations in the U.S. (together, the *Charities*).

6.  The Amended and Restated Limited Partnership Agreement of the Fund dated 7 November 2011 (*ARLPA*), and the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (*Articles*), govern the Fund and its partners.

7.  The LP held 100% of the economic interest in the Fund. The Fund's general partner, Charitable DAF GP, LLC (the *GP*), a Delaware company incorporated on 25 October 2011, held management shares.

8.  The LP issued 100 management shares (the *Management Shares*) with the only voting rights for any and all shareholders in the LP. In essence, the Articles and ARLPA therefore grant complete control of the Fund structure to the holder of the Management Shares in

Appendix 2 Page 211

CONFIDENTIAL TDIT006425

the LP and the entirety of the issued share capital of the GP. Those shares have at all material times been held by a single individual, who as a result has substantial control over the entire Fund structure (the ***Control Position***).

9. The ARLPA provides that the Fund was formed to make investments, directly or indirectly, on behalf of certain entities "*for the economic benefit of the Limited Partner and its Indirect Charitable Owners*" and contemplates the engagement of investment (and other service) advisors to effect this. In this context, the Control Position is responsible for the governance and management functions of the Fund as required in order for the Fund to carry out its sole purpose of benefiting the Supporting Organizations and the Charities they support.

10. The governing documents of the Fund plainly state in multiple places that all of the powers of the Control Position exist solely for the purpose of benefitting the Supporting Organizations and their Charities. This ubiquitous language was created for an express purpose. The expectation by the founders of the Fund (myself included) at the time it was formed was that the governing documents would ensure that the Control Position would be bound through his or her fiduciary obligations to safeguard and advance the interests of the charitable organizations that held actual beneficial ownership of the Fund.

**GRANT SCOTT**

11. I initially selected Grant Scott for the Control Position, a person I have known for years who also has great integrity.

12. From 2010 until the 2015 Transaction, the Fund operated as a non-discretionary advised account of Highland, meaning Highland provided back-and-middle-office staff to the Fund and also provided recommendations regarding potential investments to Mr. Scott as the Control Person. However, Mr. Scott had complete discretion in adopting or rejecting the

CONFIDENTIAL TDIT006426

FSD2025-0116       **Page 1473 of 1530**       2025-08-19

investment recommendations provided to the Fund by Highland.  He also had final discretion over payments made by the Fund to third parties. In his position as the Control Person, Mr. Scott was paid $60,000 per annum.

13. After the 2015 Transaction, my affiliates and I no longer owned a majority stake in Highland. Subsequently, I was advised that, as a result of the change of ownership, the Fund was permitted to enter into a paying Investment Advisory Agreement with Highland. This form of investment advisory agreement was in place from January 2017 until it was terminated effective March 2021.

### MARK PATRICK

14. Mark Patrick was hired as Tax Counsel at Highland in 2008.  His job duties included maximizing tax saving to Highland's limited partners, including me and my affiliates.  In that role, Mr. Patrick directly represented me as my personal tax counsel. He represented me in tax efficiency planning and tax- deductible charitable giving, among other things. He provided the same services for various trusts and companies affiliated with me. Mr. Patrick served that role at Highland from 2008 until his departure in February 2021.

15. In March 2021, Mr. Patrick was hired by Skyview as Tax Counsel and continued to  perform substantially similar tax counsel duties for me.  At Mr. Patrick's request, his job title was changed to "Managing Director, Tax" in September 2021, although his role with respect to me and my affiliates remained substantially the same.

16. The legal structure of the Fund (including as regards its partners and ultimate beneficiaries as discussed above) was created in 2011 on the advice of Mr. Patrick working with outside counsel.  Mr. Patrick advised me that, to avoid potential negative findings by the U.S. Internal Revenue Service, as the donor/grantor of assets to the Fund, I could not have any control over the Fund or its entities.  I followed his advice as my tax counsel.

FSD2025-0116                   2025-08-19

CONFIDENTIAL                   TDIT006427

17. In March 2021, Mr. Scott informed me that he wanted to resign from the Control Position. The Fund had become engaged in certain disputes arising from the bankruptcy of Highland filed in 2019, and he did not believe he was equipped to handle those disputes. Mr. Patrick suggested to Mr. Scott and me that he was prepared to take on the Control Position and, in that role, to handle the litigation related to the Highland Bankruptcy as it affected the Fund. At the time, Mr. Patrick was my attorney and Mr. Scott was my trusted friend, and I was happy for Mr. Scott to pass the Control Position to Mr. Patrick.

18. On 25 March 2021, Mr. Scott: (i) resigned as director of the LP, (ii) appointed Mr. Patrick as director of the LP, and (iii) transferred to Mr. Patrick the Management Shares for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

19. At some point, I understand that a person named Paul Murphy based in the Cayman Islands also was appointed as director to the LP and a portion of the Fund's subsidiaries, giving those entities two directors. However, I understand that in the event of a dissenting vote by Mr. Murphy, Mr. Patrick's vote counts as the tiebreaker for corporate voting.

## MR. PATRICK'S CONTROL OF THE FUND

20. In the initial period following Mr. Patrick's assumption of the Control Position, there was no noticeable change in the management of the Fund. NexPoint provided, without charge, investment ideas to the Fund, as Highland previously had done, and Mr. Patrick was free (as Mr. Scott had been) to decide whether or not the Fund wished to follow NexPoint's recommendations. This approach was similar to the non-discretionary advised account status of the Fund prior to 2017.

21. Subsequently, however, communications between Mr. Patrick, Skyview, and me began to become less frequent, and over time I came to suspect that Mr. Patrick was utilizing the Control Position not for the benefit of the Supporting Organizations, the Charities or the

CONFIDENTIAL                                        TDIT006428

Fund, but rather for his own personal enrichment.

22. On 28 June 2023, Mr. Patrick sent an email to Lauren Short, an employee of NexPoint, requesting that the Highland Dallas Foundation (i.e. the Supporting Organization that supports the Dallas Foundation) "*direct $10,000*" to Creative HEARTS TX, a non-profit entity formed on 13 June 2023. Following due diligence, Ms. Short learned that the directors of the entity were Mr. Patrick, Darees Patrick and Alyse Patrick (his daughter and wife). Mr. Patrick had made the grant request without disclosing his and/or his family's involvement.

23. Ms. Short discussed the matter with Mr. Patrick, who did not provide many details, but said the non-profit was formed to facilitate paying for trainers or speakers on self-defense training for teenage girls. Ms. Short understood that Patrick's expectation was that this would be an annual donation to a "club" at his daughter's school. While Ms. Short inquired, there was no detail forthcoming as to whether or not Creative Hearts would be a pass-through donating the monies to other charities or would directly do any work with the trainers or speakers itself. There also was not clarity if Creative Hearts' members intended to take a salary from the grant. The grant payment was authorized on September 5, 2023, but Mr. Patrick was informed that further payments were unlikely. I was informed of this process by Ms. Short and her supervisor. Contemporaneously with the grant approval, my team also informed the Dallas Foundation of the situation.

24. As another example, in or around September 2023, I was contacted by Kevin Cronin of Fortaris Capital Advisors (**Fortaris**). Fortaris provides litigation support services including due diligence, internal investigations, fraud detection, asset verification and in-depth background checks. Mr. Cronin is a former police sergeant and Special Agent with the Department of Homeland Security.

CONFIDENTIAL                                                                TDIT006429

25. Fortaris was at the time engaged by the Fund in respect of an unrelated matter and Mr. Cronin was known to me personally. In September 2023, Mr. Cronin and I met, and he informed me that he had been approached by Mr. Patrick with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin (other than Fortaris) at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick as a supplement to Mr. Patrick's compensation. Mr. Cronin informed me that he had asked Mr. Patrick if this arrangement would amount to fraud, and that Mr. Patrick's response had been: "*you can't steal from yourself.*"

26. Mr. Cronin informed me that he understood from this statement that Mr. Patrick believed he owned the Fund and could use the funds controlled by it however he pleased. Mr. Cronin further informed me that he was uncomfortable about Mr. Patrick's proposal and that he subsequently communicated this to Mr. Patrick, whereupon Mr. Patrick cut off all further communications between them.

27. Mr. Cronin's allegations that Mr. Patrick was seeking to make a secret, undisclosed personal profit from the Fund were extremely concerning. I have subsequently been informed by my attorneys in the United States that, had Mr. Cronin agreed with this proposal, it would have likely constituted U.S. federal wire fraud, and/or violations of the Texas Penal Code's prohibitions on bribery and misapplication of fiduciary property. Shortly after Mr. Cronin contacted me, I met with Mr. Patrick and confronted him about the allegations, which he admitted to me were true. I informed the Supporting Organizations about the matter and Mr. Patrick's admission. However, at the time, both the Supporting Organizations and I were concerned that under the Articles, the Supporting Organizations did not have the power (in their capacity as Participating Shareholders) to limit Mr. Patrick's powers or remove him from his position.

28. Given the situations described above, and the lack of communication about the Fund, I became increasingly concerned about Mr. Patrick's management of the Fund, including the potential misuse and/or misappropriation of its assets. In June 2024 therefore I requested that my team at NexPoint analyze the financial information of the Fund that I had in my possession, covering the calendar years ending 2018 to 2023 and the first half of 2024. My team produced an annual expense summary of that information (the **Expense Summary**) which indicated substantial increases in expenditures during Mr. Patrick's tenure, particularly during early 2023 and mid-2024, as follows:

(a) Directors' fees increased from around $40,000 in 2022 to almost $600,000 in 2023 – and increased even further to around $2.25 million in the first half of 2024 alone.

(b) Expenses overall for the first half of 2024 were around $18.3 million – roughly the same amount spent over the entire course of 2023 (i.e. $18.6 million).

29. The Expense Summary reinforced my concern that Mr. Patrick is using the Control Position for his own enrichment rather than to benefit the Supporting Organizations and the causes they support. I therefore directed my employees at NexPoint to provide the Expense Summary to the Supporting Organizations, and which they promptly did.

30. In August 2024, I became aware of yet another issue concerning Mr. Patrick. NexPoint and its affiliates, through their investment activities, regularly obtain material non-public information (**MNPI**) related to those investments. As a service provider to NexPoint and its affiliates, Skyview employees also obtain the same MNPI. Trading on the basis of MNPI amounts to 'insider trading' which is prohibited under U.S. securities laws. As a result, NexPoint and its affiliates, and Skyview, all have the same robust regulatory compliance program to prevent, among other things, insider trading (**Compliance Policy**). NexPoint and its affiliates, and Skyview, require their employees to abide by the

CONFIDENTIAL TDIT006431

Compliance Policy at all times and employees are required to confirm in writing on a quarterly basis that they will not use MNPI while trading.  Mr. Patrick completed the annual 2023, Q4 2023, Q1 2024, and Q2 2024 certifications, among others.

31.  I was informed that my director of charitable giving had been contacted by Ms. Diaz, the CEO of the Highland Dallas Foundation, Inc. (***Dallas Foundation***), one of the Charities. Ms. Diaz stated that on August 28, 2024, Mr. Patrick contacted the Dallas Foundation's attorney to provide information about an asset held by the Dallas Foundation, which was held directly and separately from the Fund. This information was obtained by Mr. Patrick through his employment at Skyview and constituted MNPI, which is prohibited by U.S. securities laws from being disclosed and/or acted upon. On the basis of this MNPI, Mr. Patrick advised the Dallas Foundation to exercise a put option it held in a NexPoint affiliated asset. The Dallas Foundation did not act on the information or recommendation provided by Mr. Patrick, but in the event it had exercised the put option, both the Dallas Foundation and Mr. Patrick would have committed violations of the U.S. securities laws that prohibit insider trading.

32.  Upon receipt of the allegations against Mr. Patrick, Skyview's compliance department commenced an internal investigation which, due to the serious nature of the allegations, was conducted without Mr. Patrick's knowledge, so as to avoid potentially tipping off Mr. Patrick about the investigation. By the end of September 2024, the investigation was substantially complete, and the conclusion had been reached that Mr. Patrick's actions constituted a serious breach of his compliance and employee obligations. On October 1, 2024, as part of the finalization of the investigation report, Skyview's chief compliance officer interviewed Ms. Diaz about the allegations against Mr. Patrick, which I understand confirmed Skyview's conclusions. The final investigation report was issued on October 11,

2024 and concluded that Mr. Patrick had attempted a serious breach of U.S. securities laws.

33.   On October 2, 2024, Mr. Patrick abruptly resigned his position from Skyview and thereafter became openly hostile towards the Charities, my affiliated companies, and me. Although neither I nor anyone at Skyview has direct evidence of Mr. Patrick having been tipped off about the investigation, the timing of his resignation causes me to conclude that Mr. Patrick became aware of the investigation into his behavior and resigned before the report was published.

34.   On the same day that Mr. Patrick resigned his position at Skyview, he also terminated Skyview's service agreement with the Fund, and as a result all legal, compliance, back office and other services provided to the Fund. Mr. Patrick and Mr. Murphy have stated that that they intend to take on the role of investment advisors for the Fund. I am not aware of Mr. Murphy's qualifications for this role, nor am I aware of any third-party investment advisor that has been retained by the Fund to fill this role. Based on my knowledge and expertise in investment management, and my sixteen years working with Mr. Patrick as my counsel, I believe that Mr. Patrick is a well-qualified tax counsel, but does not have the experience, training, or expertise to be an investment professional.

**FUNDING OF PROCEEDINGS**

35.   As stated above, I do not hold a controlling interest in any of the Charities or the Supporting Organizations. However, I sit on the boards of the Supporting Organizations for the purpose of understanding how the Charities are deploying the Fund's assets for charitable purposes, and the impact of those donations in the community. I am only one of three votes, and the other two votes on each board are held by the respective Charity. Historically, the boards have had no hesitation in exercising their powers to chart

CONFIDENTIAL                                                       TDIT006433

independent courses even if those decisions differ from my preferences.

36.  The Supporting Organizations approached me about the costs associated with legal action and their reticence to use funds that should and otherwise would be used for charitable purposes, and asked whether I would be prepared to fund the action personally. I agreed to do so. I have not and will not at any time receive a benefit, nor do I have control of the proceedings, because of this funding arrangement. The Supporting Organizations have decision making authority in relation to these proceedings. My concern is solely to ensure that the Fund, and the funds that I have donated over time that are held in the Fund, are used only to benefit the Charities and the causes they support.


***************REMAINER OF PAGE INTENTIONALLY LEFT BLANK***************

CONFIDENTIAL                                                        TDIT006434

1477

My name is James David Dondero, my date of birth is June 29, 1962, and my address is 300

Crecent Court, Dallas, Texas 75201. I declare under penalty of perjury that the foregoing is true

and correct. Executed in Dallas County, State of Texas, on the 1st day of July 2025.

JA      **MES DAVID DONDERO**

1397

**CONFIDENTIAL**

TDIT006435

1478

**FSD2025-0116**

**Page 1482 of 1530**



EXHIBIT 9

**7**

CAUSE NO. _____

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,** | **IN THE TEXAS BUSINESS COURT** |
| *Plaintiffs,* | |
| **v.** | **1ST DIVISION** |
| **MARK PATRICK and DFW CHARITABLE FOUNDATION,CDMCFAD, LLC, CDH GP, Ltd., and CHARITABLE DAF FUND, LP** | |
| *Defendants.* | **DALLAS, TEXAS** |

---

### DECLARATION OF JULIE DIAZ

---

I, **JULIE DIAZ**, of 3000 Pegasus Park Dr, Suite 930, Dallas, Texas 75247, declare under penalty of perjury as follows:

1.  I am the President and Chief Executive Officer of The Dallas Foundation, an exempt charitable organization based in Dallas, Texas which partners with donors and works with the community to support various philanthropic causes in Greater Dallas.

2.  I am also a Director of the Highland Dallas Foundation Inc., an exempt charitable entity incorporated in Delaware as a supporting organization to provide funding directly to The Dallas Foundation.

3.  I make this declaration from matters within my own personal knowledge and believe the information contained herein to be true and accurate in all respects.

**FSD2025-0116**

**2025-08-19**

**1398**

CONFIDENTIAL

TDIT006436

4. This Declaration is presented in support of Plaintiffs' Original Petition, Application for Temporary Restraining Order and Temporary Injunction, and Emergency Request for Appointment of Receiver in the above-captioned case. I verify that, to the best of my knowledge, information, and belief, the statements in it are true.

## PROFESSIONAL EXPERIENCE

5. I hold a Bachelor's Degree in Arts Management from Salem College, and a Masters Degree in Business Administration from Boston University.

6. I joined The Dallas Foundation in 2019 as Vice President, Philanthropic Partnerships. I was appointed as President and CEO in 2024.

7. I have extensive nonprofit experience in strategy, governance, and revenue growth, having led resource development teams at the Perot Museum, Greenhill School and Southern Methodist University, and having held leadership roles at the Philadelphia Orchestra, the Boston Symphony Orchestra, and GBH Public Television and Radio in Boston.

8. I am an active member of The Dallas Assembly and Charter 100, organizations which champion collaboration in community development and philanthropy.

9. I also served in 2018 as an adjunct professor at SMU Meadows School for the Arts.

## THE FUND

10. The Fund is a Cayman Islands limited partnership formed on 28 October 2011 (registration number 53083) whose registered office is Walkers Corporate Services Ltd, Walker House, 87 Mary St, George Town, Grand Cayman, KY1-9005, Cayman Islands.

11. The Fund is governed by the Amended and Restated Limited Partnership Agreement dated 7 November 2011 (the *ARLPA*).

12. From approximately its inception until approximately March 2025, the sole limited partner of the Fund (the LP) was a Cayman Islands exempt company incorporated on 27 October 2011

2
Appendix Page 223

CONFIDENTIAL TDIT006437

1480

(registration number 263805) called Charitable DAF Holdco, Ltd.

13. The LP is governed by the Amended and Restated Memorandum and Articles of Association of the LP dated 19 January 2015 (the *Articles*).

14. The general partner of the Fund is (or at least was at the time of the Fund's formation and pursuant to the ARLPA) Charitable DAF GP, LLC (the *GP*), a Delaware company incorporated on 25 October 2011.

### Ownership and Management

15. The Fund was formed to "*make certain investments directly or indirectly on behalf of certain entities exempt from taxation under section 501(c)(3) of the U.S. Internal Revenue Code (the* **Code**) *... for the economic benefit of the Limited Partner and its* <u>*Indirect Charitable Owners*</u>" (ARLPA, Recitals).

16. From my experience in nonprofit entities, I understand that exempt entities under section 501(c)(3) of the Code, commonly referred to as charitable organizations, must be operated exclusively for charitable purposes and not for the benefit of private interests. 'Supporting organizations' under section 509(a)(3) of the Code must carry out such exempt purposes by supporting *other* charities. The relationship between a supporting organization and its supported charity is sometimes described as similar to that of a parent and subsidiary.

17. In this context:

    (a) The LP holds or held all of the economic interest in the Fund. The GP held control shares, but had no economic interest.

    (b) The LP issued 305 participation shares (the ***Participation Shares***), 300 of which are held by three Delaware corporate entities (together, the ***Supporting Organizations*** and/or ***Petitioners***). Each Supporting Organization provides funding to its respective U.S.-charitable foundation (together, the ***Charities***) which are the ultimate beneficial

3
Appendix Page 224

1400

CONFIDENTIAL     TDIT006438

owners of the Fund's entire economic interest. These Supporting Organizations are the Plaintiffs in the above-captioned litigation.

(c)   The LP also issued 100 management shares (the *Management Shares*) which attach the only voting rights for all shareholders of the LP.  The terms of the ARLPA and the Articles together grant complete management control of the Fund to the holder of the Management Shares, and the entire issued share capital in the GP (the *Membership Interest*).

18.   The Management Shares and Membership Interest have at all material times been held by a single individual who as a result has substantial control of the Fund structure (the *Control Position*). In this regard, the relevant terms of the ARLPA and Articles are as follows.

(a)   **The ARLPA**

Clause 1.12

(a) The term "**General Partner**" shall refer to Charitable DAF GP, LLC, and each other person subsequently admitted as a general partner pursuant to the terms of this Agreement. The General Partner shall give each Limited Partner notice of any change in control of the General Partner. The General Partner shall give each Limited Partner notice of the admission of any additional general partner to the Partnership.

(b) The term "**Indirect Charitable Owner**" shall refer to the indirect equity owners of the Limited Partners, which shall at all times be entities or organizations exempt from taxation under Section 501(c)(3) of the Code or entities or organizations whose sole beneficiaries are entities or organizations exempt from taxation under Section 501(c)(3) of the Code.

Clause 1.6

(a) Subject to the terms and conditions of this Agreement, the General Partner shall have

4

Appendix Page 225

CONFIDENTIAL                                                                                    TDIT006439

full, exclusive and complete discretion in the management and control of the business and affairs of the Partnership, shall make all decisions regarding the business of the Partnership, and shall have all of the rights, powers and obligations of a general partner of a limited partnership under the laws of the Cayman Islands. Except as otherwise expressly provided in this Agreement, the General Partner is hereby granted the right, power and authority to do on behalf of the Partnership all things which, in the General Partner's sole discretion, are necessary or appropriate to manage the Partnership's affairs and fulfill the purposes of the Partnership; *provided, however the Partnership's assets and investments shall be for the benefit of the Limited Partners and not for the economic benefit of the General Partner.*

(b) Except as otherwise provided herein, the Limited Partners, in their capacity as Limited Partners, shall not participate in the management of or have any control over the Partnership's business nor shall the Limited Partners have the power to represent, act for, sign for or bind the General Partner or the Partnership. The Limited Partners hereby consent to the exercise by the General Partner of the Powers conferred on it by this Agreement.

(b)  **The Articles**

Article 11

The Management Shares shall be issued at par value and shall carry the right to receive notice of and to attend, to speak at and to vote at any general meeting of the Company. In the event of a winding up or dissolution of the Company, whether voluntary or involuntary or for the purposes of a reorganization or otherwise or upon any distribution of capital, the entitlement of the holders of Management Shares shall be determined in accordance with these Articles. *Management Shares confer no other right to participate*

**CONFIDENTIAL**                                   **TDIT006440**

*in the profits or assets of the Company*.

Article 19

Participating Shares … shall confer upon the Shareholders rights in a winding-up or repayment of capital and the right to participate in the profits or assets of the Company in accordance with these Articles.

### SUPPORTING ORGANIZATIONS

19.   The Supporting Organizations provide funding directly to the Charities as follows:

(a)   Prior to the events at issue in this Action, The Highland Dallas Foundation, Inc. (**HDF**) held 32.87% of the Participating Shares. HDF provides funding to The Dallas Foundation, a charitable entity established in Texas in 1929, which has awarded over $1.2 billion in charitable grants that support a broad range of public needs and manages over $650 million in assets.

(b)   Prior to the events at issue in this Action, The Highland Kansas City Foundation, Inc. (**HKCF**) held 32.87% of the Participating Shares. HKCF provides funding to the Greater Kansas City Community Foundation, a charitable entity established in Kansas in 1978 which has awarded over $7 billion in grants that support a broad range of public needs and currently manages over $5 billion in assets.

(c)   Prior to the events at issue in this Action, The Highland Santa Barbara Foundation, Inc. (**HSBF**) held 32.787% of the Participating Shares. HSBF provides funding to the Santa Barbara Foundation, a charity established in 1928 which is the largest community foundation on California's Central Coast and manages assets of over $800 million.

(d)   Prior to the events at issue in this Action, HCMLP Charitable Fund (**HCMLP**) held 1.639% of the Participating Shares. HCMLP provides funding to the North Texas Community Foundation, which manages assets totaling $513 million that support a broad

CONFIDENTIAL                                                      TDIT006441

FSD2025-0116

2025-08-19

range of public needs and donated $38.9 million to local nonprofits in 2023.

20.  Since the Fund's inception in 2011, the Supporting Organizations have granted over $42 million to charitable foundations and have funded $32 million in total commitments, including donations to 275 organisations, with average annual grant payments of $3.7 million.

## BACKGROUND

21.  As stated in paragraph 6 above, I joined The Dallas Foundation in 2019 and do not therefore have direct personal knowledge of any factual matters, including regarding the formation of the Fund and/or the Fund's operations, prior to that time. I understand these matters are covered in the declaration of James Dondero.

22.  A summary of those matters that I understand to be most relevant to this application are accurately summarized as follows:

(a)  **Control Position**. From the Fund's formation until March 2021, the Control Position was held by Grant Scott. On 25 March 2021, Mr. Scott: (i) resigned as director of the Fund and LP (ii) appointed Mark Patrick as director of the Fund and LP; and (iii) transferred to Mr. Patrick the Management Shares in the LP and Management Interest in the GP for nominal consideration. Mr. Patrick therefore assumed the Control Position from that date.

(b)  **Mark Patrick**. From 2008 to 2021, Mr. Patrick was employed as tax counsel by Highland Capital Management, LP (*Highland*), an investment advisor founded by Mr. Dondero. From March 2021 to October 2024, Mr. Patrick was employed as tax counsel at Skyview Group (*Skyview*). In both positions, Mr. Patrick acted as an advisor to Mr. Dondero. Mr. Patrick played a significant role in developing the overall Charitable DAF Fund structure.

## CONCERNS ABOUT MR. PATRICK'S CONDUCT

23.  I became aware that in June 2023, Mr. Patrick made a grant request to the Highland Dallas Foundation in relation to 'Creative HEARTS TX', an entity of which Mr. Patrick and his family

CONFIDENTIAL

TDIT006442

were directors, without disclosing this information.   I became aware of this situation contemporaneously with its occurrence and it caused me concern regarding Mr. Patrick.

24.   I understand from the Dondero Declaration (not my personal knowledge) that in September 2023, Mr. Patrick approached Kevin Cronin of Fortaris with a proposition whereby Mr. Patrick (on behalf of the Fund) would engage an entity controlled by Mr. Cronin at a monthly fee of between $25,000 and $50,000, and that this fee would be split between Fortaris and Mr. Patrick. I became aware of this situation shortly after its occurrence and it caused me concern regarding Mr. Patrick.

25.   In August 2024, I personally became aware of the potential disclosure of material non-public information (**MNPI**) to the Highland Dallas Foundation (**HDF**). On 28 August 2024, I was informed by David Rosenberg of Holland & Knight (**H&K**), the Charities' US-attorneys, that Mr. Douglas Mancino, an attorney with Seyfarth Shaw LLP (**Seyfarth**) in Los Angeles, California, had called Mr. Rosenberg, identified himself as Mr. Patrick's "*outside compliance counsel*" and recommended that Mr. Rosenberg advise HDF to exercise put-options over units it holds in the NexPoint Hospitality Trust (**NHT**). Mr. Rosenberg reported this to me. I was very concerned by this information and therefore immediately contacted Lucy Bannon, an employee of NexPoint and someone I have known in a professional capacity for many years, to inform her of the situation.

26.   I have since become aware through my position at The Dallas Foundation and role as a board member of HDF, that the information Mr. Mancino provided to H&K could have constituted MNPI. This matter is discussed in more detail in paragraphs 33-35 of Dondero 1.

<strong><u>FINANCIAL IRREGULARITIES</u></strong>

27.   In or around August 2024, NexPoint provided the Charities with a financial analysis of the Fund's annual expenses (the **Expense Summary**) which appeared to indicate substantial

increases in expenditures in recent years.

28.    As stated in paragraph 31 of Dondero 1, the Expense Summary indicated as follows:

(a)    Directors' fees increased from US$40,000 in 2022 to almost US$600,000 in 2023, and in the first half of 2024 alone, directors' fees increased further to around US$2.25 million.

(b)    Expenses overall for the first half of 2024 were around US$18.3 million – roughly the same amount had been spent in2023 (i.e. US$18.6 million). I was not aware of any basis for this extraordinary legal expenditure in a period of just 18 months.

29.    The Charities were concerned by the Expense Summary and considered it was necessary to seek to verify and/or understand the apparent increases in expenditure. Accordingly, in October 2024, the Charities made a reasonable request to Mr. Patrick for financial information about the Fund, which Mr. Patrick failed to provide at that time, or any time thereafter.

30.    On 11 November 2024, the Charities' US-attorneys, Holland & Knight (*H&K*), conveyed a letter to Mr. Murphy from the Charities (the ***No Confidence Letter***) advising that the Charities no longer have confidence in the governance of the Fund and consider a reorganization is required:

"Recently, various competing constituencies provided the Foundations with conflicting information related to the operations and financial inner workings of the DAF-related entities. This conflicting information raises significant concerns about how the corpus of these funds is administered and spent. **The Foundations have no real pathway to verify the information as the current governance structures prevent them from receiving such information, and indeed, efforts to secure additional information have been rebuffed. As a result, these recent submissions demonstrate that the current governance structure is ill-equipped to address such allegations and provide sufficient protection to the economic funds that support so many charitable efforts**.

9
Appendix Page 230

Further, because we have substantial concerns, out of an abundance of caution, and until an accounting can be conducted, we believe it is inappropriate for anyone to authorize the depletion of further assets of DAF-related entities. We urge you to take our accounting and governance concerns seriously because depletion of assets in the DAF-related entities has a direct impact on our mission and the charitable good works in our communities."

31.  The Charities did not receive a response to the No Confidence Letter. Accordingly, on 23 January 2025, I sent an email to Mr. Murphy (a director that Mr. Patrick appointed in the Cayman Islands) stating that the Charities wished to better understand the Fund's asset position and requesting that the Fund provide certain information by 10 February 2025, including: (i) income statements for the past four years, (ii) listing of underlying assets, (iii) audited financial statements, and (iv) the current structure of the LP's operations.

32.  On 28 January 2025, I sent a further email to Mr. Patrick and Mr. Murphy expressing serious concern that the Charities' requests continued to be disregarded, reflecting an ongoing lack of transparency about the Fund:

"...These failures exacerbate the concerns we previously communicated in our letter to Paul in November 2024 (copy attached), which highlighted our concerns that the governance of the DAF HoldCo has failed in its current structure. The situation as it now stands is untenable. The lack of engagement on the true financial condition of the DAF HoldCo and the underlying assets leads us to believe that you have rejected our request to revise the governance of the DAF HoldCo and related structure. As such we are requesting that DAF HoldCo and the related entities be wound up and the underlying assets be distributed in kind to the Supporting Organizations so they can manage those assets for the benefit of the charities and the communities they serve. As previously requested, until these issues are resolved, we are insisting that you do not dissipate the

10
Appendix Page 231

CONFIDENTIAL                                                            TDIT006445

**Page 1492 of 1530**

assets further".

33.  On 30 January 2025, I received a response from Mr. Murphy stating that neither he nor Mr. Patrick received my 23 January 2025 email, and that he understood the next step was that he and Mr. Patrick would "present directly to the foundations/supporting organizations" to address some of the concerns in the No Confidence Letter:

> "…**we have some growing concern around the content and circumstances your email of 23 January 2025, specifically that it might be interpreted as a premise to attempt to inappropriately exercise control over DAF HoldCo and/or its assets.** As a reminder, when the participating shares in DAF HoldCo were issued to the supporting organizations, there was no conveyance of voting rights or control, and it has always been well understood that such shares did not convey voting rights or control … any attempt to exert control of DAF HoldCo or its assets by James Dondero would be both inappropriate, unlawful and inconsistent with DAF HoldCo's charitable mission. We are deeply concerned that this outreach, which began following Mark's resignation from Skyview in October 2024, may be the supporting organizations acting as proxy for Mr. Dondero …

> …**We note that your communications to date contain several misstatements of fact and we reject all of your allegations**. DAF HoldCo holds itself to the highest standards in achieving its goal of maximizing returns in risk-adjusted assets to achieve its charitable objectives. It is important to underline that we have policies and procedures in place to preserve DAF HoldCo's independence and are advised by best-in-class, independent experts.

> **Whilst we are cooperating with the foundations/supporting organizations to provide additional information we have no legal obligation to do so** (which is not disputed).

CONFIDENTIAL   TDIT006446

In no way should our cooperation be construed as an implicit acknowledgment of any duty to continue providing information to you or as a waiver of any DAF HoldCo's rights and remedies."

34.   I understand (and as stated in paragraph 12 of Dondero 1) the Control Position to be responsible for governance and management functions to enable the Fund to carry out its sole purpose of benefiting its ultimate beneficial owners (i.e. the Charities). In this context, the Charities were very surprised and concerned by Mr. Patrick and Mr. Murphy's responses to requests for information and the lack of transparency regarding the Fund's financial position. It remains unclear to the Charities the basis upon which access to such information was (and continues to be) restricted.

35.   On 31 January 2025, H&K responded to Mr. Murphy's email as follows:

"As fiduciaries, you and Mr. Patrick manage $270 million in assets for the benefit of charities that support the most vulnerable in their communities. Whatever your side's obvious antagonism to Mr. Dondero, the fact remains that the underlying assets are ultimately for these charitable missions

...

The Supporting Organizations have legitimate concerns. The last information they received from SEI in July of 2024, before Mr. Patrick shut down [communication] **showed legal expenses had increased to $6 million in the first six months of 2024 compared to $4 million for all of 2022.** If annualized, and at that pace, legal expenses appeared to be on path to exceed $12 million for 2024. That's a 300% increase. **Director fees skyrocketed from $40 thousand in 2022 to $2.25 million in the first six months of 2024.** Again, annualized, these fees are on a path to exceed $5 million in 2024. That is a 12,400% increase. **Yet, no information has been provided by you and Mr. Patrick,**

**CONFIDENTIAL**                                                          TDIT006447

**no clarity given.** It appears that total expenses for 2024, if annualized, were on pace to exceed $36 million. Even if you earned a return of 10% on the $270 million invested, the fund would be at $11 million of negative revenue for 2024. **If the information we received is wrong, then please explain why, and provide the detailed information to disabuse us of these concerns**…

36.   On 4 February 2025, Mr. Murphy responded that while open to resolving the concerns, they were struggling to understand the Charities' change in position.

37.   On 7 February 2025, H&K responded as follows:

"I do not believe it should be difficult to comprehend the request for transparency around $270 million dollars you control as a fiduciary for the benefit of charities in Dallas, Kansas City, and Santa Barbara. Indeed, these odd legal and rhetorical machinations of yours and Mr. Patrick miss the point. These monies are for improving the quality of life of children, building pathways for everyone to have a fair opportunity to succeed, and—among other things—creating a lasting impact on young minds by fostering a love for education. They are not meant to pay you and Mr. Patrick millions in director fees.

…

Over the last three months, you have not provided any information about the assets and financial health of the fund. You have demanded that information only flows under an NDA with liquidated damages. You continually issue a veiled threat that information is a privilege not a right under the agreements. Expenses have gone through the roof, and the governance has been changed to further insulate it in a foreign jurisdiction. To say the least, I see red flags all over this situation, but have not received any facts, yet, that tell me they are unwarranted."

38.   On 14 February 2025, H&K received a fax from Seyfarth which rejected the reported increases

1491

in legal and directors' fees and sent a further email on 18 February 2025 which attached a valuation of the Fund from 2020 in support of his suggestion that similar information was provided to the Charities when Mr. Scott was in the Control Position.  Copies are at **Tabs 15** and **16**, respectively.

39.   On 27 February 2025, H&K responded to Seyfarth that the Charities were becoming frustrated by the ongoing lack of transparency and refusal to respond to simple inquiries about the financial position and governance of the Fund.

40.   On 17 March 2025, Seyfarth sent an email to H&K requesting available dates for Mr. Murphy to make a presentation to the Charities. The next day, H&K suggested three potential dates/times for such a call between 26 March and 3 April 2025, but did not receive any response. On 3 April 2025, Seyfarth replied, stating they had just learned of a call arranged for the following day, and seeking to reschedule. H&K responded that they had no knowledge of the purported call and would revert with available dates from 16 April 2025. On 9 April 2025, HK responded with its availability.

41.   At the date of this declaration, none of the financial information requested by the Charities has been provided by Mr. Patrick or Mr. Murphy.

**MR. PATRICK DILUTES THE SUPPORTING ORGANIZATION'S INTERESTS IN THE CHARITABLE DAF FUND.**

42.   I am aware that between December 2024 and the present, Mr. Patrick executed a series of moves to dilute the Supporting Organization's interests in the Charitable DAF Fund and then to entirely alienate those assets.  Mr. Patrick's acted to eliminate the Supporting Organization's ownership of the Charitable DAF Fund assets, while awarding ownership to at least one purported charitable entity that he personally controls.

43.   I have come to know now that Mr. Patrick held the controlling general partner shares in the

**CONFIDENTIAL**                                                                              **TDIT006449**

Charitable DAF Fund via the Delaware GP.  Without any prior notice or even disclosure to the Supporting Organizations, in February 2024, Mr. Patrick incorporated CDH GP, Ltd in the Cayman Islands, with Mr. Patrick as the sole director.  He used this newly created Cayman Islands entity to replace and redomicile Delaware GP.  CDH GP became the general partner holding all the controlling shares in the DAF Fund.  The Supporting Organizations only found out about the replacement and redomicile of the Delaware GP in February 2025, through independent investigation.

44.   On December 9, 2024, Mr. Patrick created Defendant DFWCF (also referred to herein as the "**Sham Charity**"), a Delaware nonprofit corporation.  Mr. Patrick was named the Sham Charity's sole member and sole director; its registered address is Mr. Patrick's home address.  The apparent purpose and the clear effect of forming DFWCF was to create a facsimile of the Charitable DAF Fund beneficiaries—the nonprofit charities and their Supporting Organizations—but in the form of a "charitable" entity controlled by Mr. Patrick.

45.   I learned that Mr. Patrick later incorporated CDMCFAD, LLC, a Delaware limited liability company.

46.   Without notice to the Supporting Organizations or to me, on December 18, 2024, Charitable DAF HoldCo transferred to CDMCFAD, LLC 100% of its interest in Charitable DAF Fund, and Charitable DAF HoldCo acquired 100% of the interest in CDMCFAD, LLC.  The Supporting Organizations' technical interest was in Charitable DAF Holdco.  As a result, CDMCFAD effectively was inserted as a company in between Charitable DAF HoldCo, owned by the Supporting Organizations, and the Charitable DAF Fund itself (where the assets resided).  Suddenly, the Supporting Organizations no longer held a 100 beneficial interest in the entity that held the assets in Charitable DAF Fund.  Instead, a different and new entity (CDMCFAD) held the assets in Charitable DAF Fund; the Supporting Organizations only held shares in an

CONFIDENTIAL                                                                           TDIT006450

1493

entity (Charitable DAF Holdco) that notionally held that new entity.

47.   On February 7, 2025, again without notice to the Supporting Organizations or to me, DAF HoldCo allotted 318 participating shares to DFWCF, the Sham Charity controlled by Mr. Patrick himself.  This dilution reduced the Supporting Organizations' cumulative holding in Charitable DAF Holdco from 100% of the participation shares to 48.9%. Following the new issuance: (i) HDFI's interest was diluted from 32.787% to 16.05%; (ii) HKCF's interest was diluted from 32.787% to 16.05%; and (iii) HSBFI's interest was diluted from 32.787% to 16.05%.

48.   I now know that in February 2025, the Sham Charity acquired IRS 501(c)(3) tax exempt status. The By-Laws of the Charitable DAF Fund required that its limited partnership interests be owned by an entity with such tax-exempt status. Therefore, obtaining 501(c)(3) status for the Sham Charity was a necessary step to effectuate Mr. Patrick's complete control of the assets of DAF Fund.

49.   And I now know that on March 27, 2025, Mr. Patrick caused CDMCFAD to issue shares to the Sham Charity, and only to the Sham Charity.  None of the Supporting Organizations were issued shares in CDMDFAD.  Now, the sham charity controlled by Mr. Patrick held a direct economic interest in the entity that Mr. Patrick had newly inserted between Charitable DAF Holdco and the assets in Charitable DAF Fund.  Meanwhile, the two direct beneficial owners of CDMCFAD were (1) Charitable DAF Holdco—in which the Supporting Organizations still held a minority beneficial interest; and (2) Mr. Patrick's new sham charity, which he controlled.

50.   On April 2, 2025, Mr. Patrick caused Charitable DAF HoldCo to redeem its interests in CDMCFAD for a total payment of $1.6 million, after which Charitable DAF Holdco purportedly had no assets and no remaining interest in Charitable DAF Fund at all.  Needless to say, a one-time $1.6 Million payment for the release of the beneficial ownership of more than

CONFIDENTIAL                                                      TDIT006451

1494

$270 Million in the Fund—held entirely for the benefit of the Supporting Organizations as late as December 2024—is not an exchange that I or any other person with fiduciary loyalty to the Supporting Organizations would ever have approved, had we known it was happening at the time. As a result, Mr. Patrick's Sham Charity, Defendant DFWCF, was the sole remaining limited partner and beneficial owner of Charitable DAF Fund, through its 100% ownership of the fund by CDMCFAD. The effect of this final step was to consummate the complete severance of the Supporting Organizations and their nonprofit charities from the assets of the Charitable DAF Fund.

51. Before the start of these self-dealing transactions, in October 2024, the Supporting Organizations owned more than 98% of the Participation Shares representing the economic ownership of $270 million in assets. As of April 2025, the Supporting Organizations owned Participation Shares worth zero. While Mr. Patrick purportedly caused $1.6 million to be distributed to the Supporting Organizations receipt of those funds have yet to be verified.

### REPLACEMENT OF GP

52. For the first time, in February 2025, I learned that Mr. Patrick had redomiciled and replaced the general partner of the Fund, without notice to the Charities, almost one year prior. This information was, I understand, obtained via background checks into the various parties.

53. I understand that on 27 February 2024, CDH GP, Ltd (the **New GP**) was incorporated in the Cayman Islands (registration number 407515) with its registered office at Campbells Corporate Services Ltd, Floor 4, Willow House, Cricket Square, Grand Cayman KY1-9010, Cayman Islands.

54. I also understand that Mr. Patrick is the sole director of the New GP.

55. It is unclear to the Charities on what basis Mr. Patrick and/or Mr. Murphy removed and redomiciled the general partner of the Fund, nor the reason the Charities were not notified of

CONFIDENTIAL                                                      TDIT006452

this change.

## PURPOSE OF APPLICATION

56. It is clear the Fund's assets are being diminished for the benefit of Mr. Patrick and Mr. Murphy; and in any case, the Defendants in this Action are engaged in a series of secretive transactions intended to completely alienate from the Supporting Organizations more than $270 Million that was held for their benefit, and upon which their charitable activities depend. These are the sole motivations of the Charities in bringing this application.

57. Unless enjoined, Mr. Patrick and the other Defendants will cause and continue to cause irreparable harm to the Charities including, without limitation, the dispersal, expenditure, transfer, and further alienation of more than $250 Million that can never be replaced because the Defendants lack the means. In addition to the permanent loss of funds in the future, the immediate continuation of key programs at the Charities is imperiled by the conduct at issue here and the reality that the Charities, as of this moment, are cut off from the funds intended for their support. Moreover, the conduct of the Defendants to date creates a pattern suggesting that further creative transfers, alienation, spending, and dissipation of the monies in the fund are likely to be imminent. If this happens, it is likely they will never be recovered.

58. The harm to the Charities is imminent if the Defendants are not enjoined. Enjoining the Defendants will merely require them to refrain from doing anything with the Funds for two weeks. If the Defendants are not acting adversely to the Charities, the Funds will still be available to them for their use in future. The Charities suffer a greater burden as they stand to lose everything.

59. Enjoining the Defendants will not disserve the public interest as without the injunction, there is significant potential for irreparable harm to the Charities and the Defendants will not be harmed

CONFIDENTIAL                                                        TDIT006453

if enjoined. Freezing the funds to ensure that Mr. Patrick's scheme is not hurting charitable interests vital to key communities serves the public interest.

## ARGUMENTS THAT MAY BE MADE BY THE RESPONDENT

60. I draw attention to the following matters which the Defendants may raise by way of attempted defense against the application.

61. The Defendants may assert (as they have repeatedly suggested in correspondence) that the Charities are acting on the instructions of Mr. Dondero and that we are being used as a proxy for his own disputes with Mr. Patrick. Any suggestion of that nature is entirely rejected. On the contrary, the Charities have at all times taken steps to independently verify information provided to them by Mr. Dondero and entities associated with him, have taken advice solely from their own attorneys in the US and Cayman, and have required Mr. Dondero to recuse himself from board meetings of the Supporting Organisations at which decisions as to whether to bring these proceedings were discussed. The Charities have no interest in any dispute there may be between Mr. Patrick and Mr. Dondero.

62. The Defendants also may assert that the Charities are not entitled to any information regarding the Fund, and that the structure was designed specifically to exclude the Charities from information or control rights. Whether that is true or not, the Charities are the sole economic beneficiaries of the Fund's activities, and Defendants owed and owe them fiduciary duties of care, loyalty, and candor. If the Fund is being used for a purpose other than that for which it was established, that cannot be allowed to continue to the detriment of the charitable causes and in violation of those duties. The Fund would otherwise be an unsupervised vehicle susceptible to being used for the wishes and benefit of the individual holding the Control Position, to the detriment of the Charities and the express purposes of the governing documents.

19
Appendix Page 240

CONFIDENTIAL TDIT006454

63. The Defendants may deny that the expenditures are as significant as that appearing from the documents. If that is the case, the Defendants have had ample opportunity to correct this, but have chosen not to do so.

64. I am not aware of any other points that the Defendants have made or alluded to in correspondence which could materially affect this application.

### THE CAYMAN ISLANDS PROCEEDINGS

65. Given Patrick's pattern of malfeasance the Supporting Organizations filed an involuntary Petition for Winding Up in the Grand Court of the Cayman Islands (the "**Grand Court**"), Financial Services Division, Cause No. FSD 99 OF 2025 (JAJ), styled *In the Matter of Section 92 of the Companies Act (2025 Revision) and In the Matter of Charitable DAF HoldCo, Ltd.*

66. Cayman Islands counsel for the Supporting Organizations alleged essentially the same facts as recounted in this Petition before the Grand Court.  However, DFWCF as a Delaware entity was not expressly named in the Grand Court proceedings.

67. The Grand Court, after lengthy hearing and in consideration of written submissions and evidentiary exhibits, ordered among other things:

> 5. The joint official liquidators are authorized to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:
>
> a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and
>
> b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.
>
> 6. The joint official liquidators are in addition authorized to exercise the following powers and to take the following steps without further sanction by the Court:

**CONFIDENTIAL**         **TDIT006455**

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

68.   While the Cayman Islands appointed official liquidators now conduct their investigation of the assets and other matters pertaining to the Cayman Islands' proceedings, Defendants Patrick and DFWCF (all sited in the United States, and more specifically Dallas County) remain in actual control and beneficial ownership of all assets that were held by the DAF Fund and DAF HoldCo.   In the meantime, the Supporting Organizations, are without the benefit of the considerable assets formerly held by the DAF Fund and without any insight into the current status and security of the assets. This not only damages the Supporting Organizations, but the charitable causes in their communities that relief on funding from the DAF Fund.

69.   Further, while Defendants Patrick and DFWCF wrongfully remain in control of the participation shares that rightfully belong to the Supporting Organizations, the Defendants wrongfully hold a seat on the liquidators' committee.

## ORDERS SOUGHT

70.   Given the refusal of the Defendants to answer legitimate questions raised by the Charities and the weight of evidence that suggests that the Defendants are dealing with or spending the assets of the Fund in a manner that is not in the best interest of the Charities, the Charities respectfully seek orders placing the Fund, its Limited Partner, and its General Partner under the control of an independent Receiver who can investigate the affairs of the Fund and the decisions taken by management, and manage those affairs for the benefit of the intended beneficiaries, under the supervision of the Court. The Charities have no confidence in the current management to provide this information themselves without independent oversight.

71.   Until such time as a Receiver may be appointed, the Charities further seek a temporary

CONFIDENTIAL                                                         TDIT006456

1499

restraining order and temporary injunction to prevent the Defendants from the use, transfer, dispersal, and/or alienation of any interests or assets, regardless of where they are presently held. If not enjoined, Defendants' actions pose an immediate threat of irreparable harm and injury to Plaintiffs for which there is no adequate remedy at law because the harm cannot be undone by a damages award, as once the assets are spent or dispersed, Defendants will be unable to pay a judgment.

My name is Julie Diaz, my date of birth is ___3/23/64___, and my address is ___5711 Prestwick Lane___. I declare under penalty of perjury that the foregoing is true and correct. Dallas, TX 75252

Executed in ___Burnstalle___ County, State of ___NaA___,

on the __1__ day of ___July___, 2025.

/s/ _Julie Diaz_

**JULIE DIAZ**

22

Appendix Page 243

CONFIDENTIAL                                                           TDIT006457

FSD2025-0116 **Page 1504 of 1530** 2025-08-19
FSD2025-0116 **Page 1 of 3** 2025-05-06

**EXHIBIT 8**



FSD NO. 116 OF 2025 (JAJ)

**IN THE GRAND COURT OF THE CAYMAN ISLANDS**
**FINANCIAL SERVICES DIVISION**

**IN THE MATTER OF SECTION 131 OF THE COMPANIES ACT (2025 REVISION)**
**AND IN THE MATTER OF CHARITABLE DAF HOLDCO, LTD**

**BEFORE THE HONOURABLE JUSTICE JALIL ASIF KC**
**IN CHAMBERS**

**6 MAY 2025**

---

### SUPERVISION ORDER

---

**UPON** the petition filed on 2 May 2025 by (1) the Highland Dallas Foundation, Inc., (2) the Highland Kansas City Foundation, Inc., (3) the Highland Santa Barbara Foundation, Inc., and (4) the HCMLP Charitable Fund for an order that the voluntary liquidation of Charitable DAF HoldCo, Ltd continue under the supervision of the Court pursuant to s.131 Companies Act (2025 Revision)

**AND UPON** hearing counsel for the Petitioners and counsel for DFW Charitable Foundation

**AND UPON** reading the petition herein, the affidavit of Julie Diaz and exhibit JD-2 sworn on 29 April 2025 and the affirmation of Rhiannon Zanetic and exhibit RMZ-1 signed (but not affirmed) on 29 April 2025

**AND UPON** reading the following documents filed in Cause FSD 2025-0099 (JAJ): the winding up petition filed on 10 April 2025, the first affidavit of Julie Diaz and exhibit JD-1 sworn on 10 April 2025, the affidavit of James Dondero and exhibit JDD-1 sworn on 9 April 2025 and the affidavit of Geoffrey Sykes and exhibit GS-1 sworn on 27 April 2025

**AND UPON** reading the affidavit of Margot Macinnis and exhibit MM-1 sworn on 28 April 2025 and the affidavit of Sandipan Bhowmik and exhibit SB-1 sworn on 28 April 2025 providing their consents to act as official liquidators of Charitable DAF HoldCo, Ltd

**IT IS HEREBY ORDERED that:**

1. The voluntary liquidation of Charitable DAF HoldCo, Ltd ("the Company") be continued under the supervision of the Court pursuant to s.131 of the Act and O.15, r.8 of the Companies Winding Up Rules (2023 Consolidation).

2. The following persons are appointed as joint official liquidators of the Company:

| Name | Address | Contact Details |
|---|---|---|
| Margot MacInnis | Grant Thornton Specialist Services (Cayman) Limited, 2nd Floor, Century Yard, Cricket Square, Grand Cayman, KY1-1102, Cayman Islands | +1 345 949 8588 margot.macinnis@uk.gt.com |
| Sandipan Bhowmik | | +1 345 949 8588 sandipan.bhowmik@uk.gt.com |

3. The joint official liquidators may act jointly and severally.

4. The joint official liquidators are not required to give security for their appointment.

5. The joint official liquidators are authorised to exercise the following powers in Part I of Third Schedule 3 to the Companies Act, without requiring further sanction by the Court:

a) the power to commence legal proceedings in the name and on behalf of the Company to obtain the provision of information and/or documents and/or the examination of individuals in the Cayman Islands or the United States; and

b) the power to apply in the Cayman Islands or the United States for the preservation, freezing or attachment of assets to which the Company is or may arguably be entitled.

6. The joint official liquidators are in addition authorised to exercise the following powers and to take the following steps without further sanction by the Court:

a) the power to present a petition for the winding up of Charitable DAF Fund, LP (the Fund) if so advised;

b) the power to file a summons and to apply for an order appointing provisional liquidators of the Fund if so advised; and

c) the power to seek registration or recognition of themselves and/or the Official Liquidation in any State in the United States for any purpose connected with the exercise of the powers specified in paragraphs 5(a) or 5(b) of this Order.

7. The Court dispenses with the requirement for the summons herein and the hearing of the summons to be advertised pursuant to CWR O.15.

8. The joint official liquidators' reasonable remuneration and expenses be paid out of the assets of the Company in accordance with s.109 of the Act, Part III of the Insolvency Practitioners Regulations and CWR O.20.

9. The joint voluntary liquidators shall prepare a final report and accounts for the period from the commencement of the voluntary liquidation until the date of this Order and shall deliver such report to the joint official liquidators within 28 days of this Order.

CONFIDENTIAL                                                        TDIT006459

10. The costs of this summons shall be paid out of the assets of the Company as an expense in the liquidation, such costs to be taxed on the indemnity basis if not agreed with the joint official liquidators.

**Dated 6 May 2025**

Filed   6  May 2025



_____

**THE HONOURABLE JUSTICE JALIL ASIF KC**
**JUDGE OF THE GRAND COURT**

CONFIDENTIAL                                           TDIT006460

CAUSE NO. _____

| | |
|---|---|
| **THE HIGHLAND DALLAS FOUNDATION, INC., THE HIGHLAND KANSAS CITY FOUNDATION, INC., and THE HIGHLAND SANTA BARBARA FOUNDATION, INC.,,** | **IN THE TEXAS BUSINESS COURT** |
| *Plaintiffs*, | |
| **v.** | **1ST DIVISION** |
| **MARK PATRICK and DFW CHARITABLE FOUNDATION, CDMCFAD, LLC, CHARITABLE DAF GP, LLC and CDH GP, Ltd.,** | **DALLAS, TEXAS** |
| *Defendants.* | |

**TEMPORARY RESTRAINING ORDER**
**AND ORDER SETTING HEARING FOR TEMPORARY INJUNCTION**

After considering the application for temporary restraining order filed by The Highland

Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa

Barbara Foundation, Inc., (collectively, the "Plaintiffs"), Plaintiff's Original Petition, Application

for Temporary Restraining Order and Temporary Injunction, and Emergency Application for

Appointment of Receiver (the "Petition"), the Affidavit of Julie Diaz in support of the injunctive

relief sought in the Petition (the "Affidavit"), and statements of counsel, the Court finds there is

evidence that harm is imminent to Plaintiffs, and if the Court does not issue the temporary

restraining order, Plaintiffs will be irreparably injured because they will be denied their rights to

realize the full value of the assets that were held in the Charitable DAF Fund, L.P. (the "Charitable

DAF Fund") expressly held for the Plaintiffs' as indirect charitable owners if Defendants transfer,

conceal, encumber or endanger those assets or liquidate or modify the governance or ownership

of Charitable DAF Fund or any of its affiliates or subsidiaries, or the DFW Charitable Foundation, or any of its affiliates or subsidiaries, CDMCFAD, LLC, or any of its affiliates or subsidiaries, Charitable DAF GP, LLC, or any of its affiliates or subsidiaries, and CDH GP, Ltd. or any of its affiliates or subsidiaries (collectively the "Covered Entities") and that the injury to Plaintiffs will be irreparable because of the inability to recover the assets coupled with the likely insolvency of Defendants.

Therefore, by this order, the Court:

(a) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from transferring, concealing, withdrawing, alienating, expending, dispersing, or otherwise disposing of any and all funds, assets, receivables, or shares ever held by the Covered Entities, regardless of where they are presently held;

(b) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from taking any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

(c) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from taking any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

CONFIDENTIAL                                                        TDIT006462

FSD2025-0116                                                                2025-08-19

(d) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from taking any action to modify or alter the current ownership of the Covered Entities, including but not limited to the admission of new shareholders, partners, members, or other equity interest holders or the transfer of any shares, partnership interests, member interests, or other equity interests to any other party;

(e) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from altering, concealing, or destroying any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(f) restrains, enjoins, and prohibits Defendants and Defendants' respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for Defendants, from exercising any control over the Covered Entities;

(g) orders the clerk to issue notice to Defendants, that the hearing on Plaintiff's application for temporary injunction is set for July ____, 2025, at _____ a.m./p.m. to determine whether this temporary restraining order should be made a temporary injunction pending a full trial on the merits; and

(h) Sets bond at $_____, which may be paid by Plaintiff with check (or by attorney or law firm check) payable to the [Dallas County District Clerk], approved and conditioned as the law requires.

Once effective, this temporary injunction shall remain in full force and effect until it expires

fourteen (14) days after the date and hour of issue reflected below, unless extended by this Court

or by agreement of the parties.

SO ORDERED.

SIGNED on July ___, 2025, at _____ a.m./p.m.

_____
JUDGE PRESIDING

**CONFIDENTIAL**                                        TDIT006464

# DuaneMorris®

FIRM and AFFILIATE OFFICES

NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
BOSTON
HOUSTON
DALLAS
FORT WORTH
AUSTIN

JOSEPH M. COX
PARTNER
DIRECT DIAL: +1 214 257 7252
PERSONAL FAX: +1 214 853 9480
E-MAIL: JMCox@duanemorris.com

www.duanemorris.com

HANOI
HO CHI MINH CITY
SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NORTH JERSEY
LAS VEGAS
SOUTH JERSEY
SYDNEY
MYANMAR

ALLIANCES IN MEXICO

July 11, 2025

*Sent via email*

Mr. Brian Shaw
Carrington, Coleman, Sloman, & Blumenthal
901 Main Street, Suite 5500
Dallas, Texas 75202
bshaw@ccsb.com

Re:    **The Highland Dallas Foundation, Inc, et al v. Mark Patrick, et al,**
       **Cause No. 25-BC01B-0027**
       **Rule 11 Agreement**

Dear Mr. Shaw:

Pursuant to Texas Rule of Civil Procedure 11, the parties in this matter The Highland Dallas Foundation, Inc., The Highland Kansas City Foundation, Inc., and The Highland Santa Barbara Foundation, Inc. (collectively "Plaintiffs"), and Mark Patrick, DFW Charitable Foundation, CDMCFAD, LLC, and CDH GP, Ltd. (collectively "Defendants"), agree to the following:

(1) The "Covered Entities" as referred to herein is defined to include collectively Charitable DAF Fund, LP and/or any of its subsidiaries, the DFW Charitable Foundation and/or any of its subsidiaries, CDMCFAD, LLC and/or any of its subsidiaries, and/or any of its subsidiaries, and CDH GP, Ltd. and/or any of its subsidiaries.

(2) Defendants shall have until Monday, July 14, 2025, to file a challenge to the court's jurisdiction (the "Plea").

(3) Plaintiffs shall have until Monday, July 21, 2025, to file a response to the Plea.

(4) Defendants shall have until Thursday, July 24, 2025, to file a reply to the Plea.

(5) The Parties agree to the following limits on discovery prior to any hearing on Plaintiffs' application for temporary injunction/appointment of receiver (the "Temporary Injunction")

DUANE MORRIS LLP

100 CRESCENT COURT, SUITE 1200
DALLAS, TX 75201

PHONE: +1 214 257 7200    FAX: +1 214 257 7201
DM1\16831875.1

CONFIDENTIAL                                                          TDIT006465

FSD2025-0116 **Page 1512 of 1530** 2025-08-19

DuaneMorris

Brian Shaw, Esq.
July 11, 2025
Page 2

in this matter (these limits shall have no effect on any discovery conducted after the Temporary Injunction is decided):

a. Plaintiffs and Defendants each (not per party) may serve 25 requests for production to the other, may serve 5 interrogatories, may serve 10 requests for admission, and may take 3 depositions (2 of which shall be limited to 3 hours, and one of which shall be limited to 6 hours, the selection of the witness for the six hour deposition to be determined by the party seeking the deposition).

b. The Parties shall serve all discovery requests no later than Wednesday, July 16, 2025.

c. Responses to the written discovery and substantial completion of related any related document production shall be served as follows: (1) if the Court denies the Plea as to any Defendant, seven business days after the Court order denying the Plea is entered; (2) if the Court grants the Plea as to all Defendants, then responses to written discovery shall not be due, if at all, until seven business days after the Court's order granting the Plea is reversed or overturned.

Depositions shall take place within seven days after the written discovery responses and documents are served as set forth in c. above.

(6) If the Court denies the Plea, the Temporary Injunction shall be heard as reasonably practicable after the ruling, unless stayed by an appellate court. If the Plea is granted, but is later reversed or overturned, the same timelines for discovery provided in (5) above shall be followed and the Parties shall then seek to expeditiously set a hearing before the Court.

(7) Pending the Court's decision on the Temporary Injunction or grant of the Plea relating to the Temporary Injunction or Plea), the Covered Entities and their respective agents, servants, employees, representatives, and all other persons acting under the aegis of, in concert with, or for any Covered Entity, agree:

a. not to transfer, conceal, withdraw, alienate, redeem, expend, encumber, disperse, or otherwise dispose of any and all funds, assets, receivables, or shares outside of the ordinary course of business;

b. not take any action to increase the compensation paid to any employee of the Covered Entities;

c. not to take any action to dissolve, winddown, liquidate, or otherwise alter the corporate standing of Covered Entities;

d. not to take any action to modify or alter the corporate governance of the Covered Entities, including but not limited to any amendment to their respective bylaws or organizational documents;

e. not to take any action to sell, exchange, or dispossess any asset of one of the Covered Entities unless (i) the sale is to a bona third party purchaser for reasonably equivalent value, (ii) except in the case of marketable securities, the bona fide

DM1 16831875.1

1509

FSD2025-0116                    **Page 1513 of 1530**                    2025-08-19

DuaneMorris

Brian Shaw, Esq.
July 11, 2025
Page 3

purchaser is made aware of this Rule 11 Agreement, and (iii) the proceeds from that sale, exchange, or disposition remain owned by the Covered Entities;

f.  not to alter, conceal, or destroy any business records concerning the Defendants, including any transfers of funds, assets, receivables, or shares to the Defendants;

(8) This Agreement shall be filed with the Court and, as provided in the first sentence of this letter, constitutes an enforceable agreement pursuant to Texas Rule of Civil Procedure 11. This Agreement shall expire and be of no force or effect on the earlier of (a) thirty days after a final order of the Court dismissing this case or (b) the Court's ruling on Plaintiffs' current request for a temporary injunction (or as subsequently amended). This does not prevent a party from requesting that a court of appeals issue an order to keep this Rule 11 Agreement in place during the pendency of such appeal or any objection to such request.

If the terms above accurately reflect our agreement, please acknowledge your agreement by signing below.

Best regards,

Sincerely,

Joseph M. Cox

AGREED TO FORM AND CONTENT:

Brian Shaw, Counsel for Defendants

JMC/kr
cc:    (all via email)
       Darren McCarty, Esq.
       Craig Warner, Esq.
       Clients

DM1 16831875.1

FSD2025-0116                                                              2025-08-19

1429

**CONFIDENTIAL**                                                          TDIT006467

FSD2025-0116    2025-08-19



**Department of State: Division of Corporations**

[Delaware] | Governor | General Assembly | Courts | Elected Officials | State Agencies

Allowable Characters

HOME

### Entity Details

**THIS IS NOT A STATEMENT OF GOOD STANDING**

| | | | |
|---|---|---|---|
| File Number: | 10030937 | Incorporation Date / Formation Date: | 12/9/2024 (mm/dd/yyyy) |
| Entity Name: | DFW CHARITABLE FOUNDATION | | |
| Entity Kind: | Corporation | Entity Type: | Exempt |
| Residency: | Domestic | State: | DELAWARE |

**REGISTERED AGENT INFORMATION**

| | |
|---|---|
| Name: | THE CORPORATION TRUST COMPANY |
| Address: | CORPORATION TRUST CENTER 1209 ORANGE ST |
| City: | WILMINGTON | County: | New Castle |
| State: | DE | Postal Code: | 19801 |
| Phone: | 302-658-7581 |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or more detailed information including current franchise tax assessment, current filing history and more for a fee of $20.00.

Would you like ◯ Status ◯ Status,Tax & History Information

Submit

New Entity Search

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

CONFIDENTIAL    TDIT006468

FSD2025-0116

2025-08-19



CONFIDENTIAL

TDIT006469



*Certificate Of Incorporation*

WK–263805

I, *FLOSSIEBELL M. MARAGH* Assistant Registrar of Companies of the Cayman Islands DO HEREBY CERTIFY, pursuant to the Companies Law CAP. 22, that all requirements of the said Law in respect of registration were complied with by

**Charitable DAF HoldCo, Ltd**

an Exempted Company incorporated in the Cayman Islands with Limited Liability with effect from the 27th day of October Two Thousand Eleven

Given under my hand and Seal at George Town in the Island of Grand Cayman this 27th day of October Two Thousand Eleven

(SGD. FLOSSIEBELL M. MARAGH)

**Assistant Registrar of Companies, Cayman Islands.**

CERTIFIED TO BE A TRUE AND CORRECT COPY

Sig.--

Flossiebell M. Maragh
Assistant Registrar

Date   27 October 2011

CONFIDENTIAL     TDIT006470

## MEMORANDUM – WORK PLAN[1]

RE:          Work Plan, Scope of Work, and Deliverables

DATE:        November 9, 2023

---

This Memorandum is intended to be informational and provide guidance. It sets forth the work plan, scope of work, and requested deliverables for your review of matters relating to the following entities (highlighted in red). We would like your review to focus on the entities highlighted. As a general overview, we are looking for memorandums and opinions relating to potential disputes and corporate reviews and best practices for each, including proactive corporate actions, solidifying defenses, etc., as further outlined below and to be flagged as part of your review.



I.     **LEGAL RESEARCH/ POTENTIAL LITIGATION ISSUES[2]**

a.   <u>Transfer of 100% of Management Shares in Charitable DAF Holdco, Ltd., and 100% ownership interest in Charitable DAF GP, LLC, by Grant Scott to Mark Patrick.</u>

---

[1] This Memorandum is attorney worked product, privileged, and confidential. Neither it nor its contents may be shared in any manner without express written permission from Shields Legal Group, P.C.

[2] The client will require a written agreement detailing the scope of work (this may be used as an attachment or reference) and hourly rates.

1. Confirm each of these transfers is valid and enforceable under Cayman law?

2. Is consideration a requirement under Cayman law?

3. If so, did each transfer have consideration under Cayman law?

4. Note: we understand there was no monetary consideration for each transfer, but there were tax considerations for this transfer including potential future tax liability. Donor also implicitly consented to the transfer of the voting shares by not objecting since the transfer.

5. Analyze whether holders of the participation shares in org chart have legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.?

6. Analyze whether Donor has legal standing to challenge the validity of these transfers and bring any other claims against Charitable DAF Holdco, LTD., Charitable DAF Fund LP, and CLO Holdco, LTD.

   ii. **Priority: high[3].**

   iii. **Work product: legal opinion[4] and/or memorandum.**

      1. **Note: we may need to rely on opinions and memoranda in potential future disputes.**

   iv. **Anticipated attorney hours to completion: 30.**

b. Who would have standing under Cayman law for alleged corporate malfeasance or assert lack of corporate control from the transfers? Specifically, we want to understand third parties' abilities (in addition to regulators' abilities).

---

[3] Guides for priority:
-High: response requested within two weeks;
-Medium: response requested within four weeks; and
-Low: response requested within six weeks.
[4] Legal opinions and memorandums should include citations to and copies of relevant and applicable authorities.

**CONFIDENTIAL**                                                   **TDIT006472**

    i. **Priority: high.**

    ii. **Work product: legal opinion and/or memorandum.**

    iii. **Anticipated attorney hours to completion: 10.**

c. <u>What are defenses under Cayman law – estoppel, waiver, statute of limitations, consent, others?</u>

    i. **Priority: high.**

    ii. **Work product: legal opinion and/or memorandum.**

    iii. **Anticipated attorney hours to completion: 10.**

d. <u>Is there a corporate alter ego concept under Cayman law, and if so, what are defenses to it?</u>

    i. **Priority: high.**

    ii. **Work product: memorandum.**

    iii. **Anticipated attorney hours to completion: 10.**

II. **CORPORATE REVIEW**.

a. <u>Top-down review of each entity with respect to corporate structure, management, ownership, capitalization, and voting</u>.

    i. **Priority: medium.**

    ii. **Work product: memorandum.**

    iii. **Anticipated attorney hours to completion: 30.**

b. <u>Written confirmation that the DAF is not a "regulated entity" under Cayman law and not subject to those compliance requirements. To reiterate, the DAF is not a "Fund" in the traditional sense: (i) there is no PPM and (ii) there are no subscribers/investors</u>.

    i. **Priority: medium.**

    ii. **Work product: memorandum.**

    iii. **Anticipated attorney hours to completion: 5.**

FSD2025-0116                                                                                    2025-08-19

c. Confirm who controls these entities. We have reviewed the corporate documents and understand the Delaware law implications but only the plain language of the Cayman documents. To streamline your review, our short-form analysis is attached on Annex A

    i. **Priority: medium.**

    ii. **Work product: memorandum.**

    iii. **Anticipated attorney hours to completion: 25.**

d. Who can remove a director?

    i. **Priority: medium.**

    ii. **Work product: memorandum.**

    iii. **Anticipated attorney hours to completion: 0.**

e. Who, or under what circumstances, can change the ownership of the Management Shares in Charitable DAF Holdco, Ltd.?

    i. **Priority: medium.**

    ii. **Work product: memorandum.**

    iii. **Anticipated attorney hours to completion: 0.**

f. What control rights does the donor James Dondero have (note: it appears he appoints the successor to the Management Shares if there is a death or disability event)?

    i. **Priority: medium.**

    ii. **Work product: memorandum.**

    iii. **Anticipated attorney hours to completion: 5.**

g. Are there any actions the controlling person/managing member cannot take?

    i. **Priority: medium.**

    ii. **Work product: memorandum.**

    iii. **Anticipated attorney hours to completion: 2.**

h. Given there are two directors of several entities (Mark Patrick and Paul Murphy) and Mark appears to control the ownership/shareholder voting interest, and given certain provisions

FSD2025-0116                                                                                    2025-08-19

CONFIDENTIAL                                                                          TDIT006474

seem to say "the directors run the business," how is this share of control divided among what one director can do, what two directors can do, and what the voting interest can do?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 10.**

i. Can the controlling person dilute shares, e.g., the Participation Shares in Charitable DAF Holdco, Ltd.?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

j. Can the controlling person redeem shares, e.g., the Participation Shares in Charitable DAF Holdco, Ltd.?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

k. Is there any Cayman law requirement that Charitable DAF Holdco, Ltd. distribute money upwards to the next level of entities (Highland Dallas Foundation, Inc. and others)?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

l. Could Charitable DAF Holdco, Ltd. liquidate, distribute all its assets elsewhere, or otherwise make the Participation Shares worthless?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

III. **CORPORATE PROACTIVE ACTIONS.**

a. What can be done at this point to make these share transfers bulletproof?

   i. **Priority: medium.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 15.**

b. Is it possible to proactively confirm the validity of these transfers with the government?

   i. **Priority: low.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 10.**

c. Would Cayman regulators perform a prophylactic checkup?

   i. **Priority: low.**

   ii. **Work product: email answer.**

   iii. **Anticipated attorney hours to completion: 1.**

d. Determine whether any compliance with corporate formalities generally or new rules effective 10/13/23 is required or advisable.

   i. **Priority: low.**

   ii. **Work product: memorandum.**

   iii. **Anticipated attorney hours to completion: 5.**

e. Given the scope and focus of this review, please feel free to flag any other ideas that supplement these points. Our "issue spotting" is from the standpoint of a U.S. law firm.

   i. **Priority: low.**

   ii. **Work product: email advice/discussion.**

   iii. **Anticipated attorney hours to completion: TBD.**

f. For your context, we are working on an indemnification and affidavit from the former Director of these entities, Grant Scott, who will attest to the validity of the share transfer.

**CONFIDENTIAL**                     **TDIT006476**

Annex A

**Plain Language Control Analysis[5]**

1. <u>Charitable DAF Holdco, Ltd.</u>: Mark Patrick controls this entity.
   a. Mark Patrick owns 100% of the Management Shares[1], which are the only voting shares[2].
   b. The Directors run the company.[3] The Directors are Mark Patrick and Paul Murphy.[4]
   c. Mark Patrick may remove Paul Murphy as Director.[5]
2. <u>Charitable DAF GP, LLC</u>: Mark Patrick controls this entity.
   a. Mark Patrick is the Managing Member and Sole Member.[6]
   b. The Managing Member runs the company.[7]
3. <u>Charitable DAF Fund, LP</u>: Mark Patrick controls this entity.
   a. Mark Patrick controls Charitable DAF GP, LLC.[8]
   b. Charitable DAF GP, LLC is the GP and controls this entity.[9]
4. <u>CLO Holdco, Ltd.</u>: Mark Patrick controls this entity.
   a. Mark Patrick controls Charitable DAF Fund, LP.[10]
   b. Charitable DAF Fund, LP is the sole shareholder.[11]
   c. The Directors run the company.[12] The Directors are Mark Patrick[13] and Paul Murphy[14].
   d. Mark Patrick may remove Paul Murphy as Director.[15]
5. <u>Liberty CLO Holdco, Ltd.</u>: Mark Patrick controls this entity.
   a. Mark Patrick controls CLO Holdco, Ltd.
   b. CLO Holdco, Ltd. is the sole shareholder.[16]
   c. The Directors run the company.[17] Mark Patrick and Paul Murphy are Directors.[18][19]

---

[5] This is not intended to be legal advice and is provided in a summary format for reference purposes only.

[1] *See* Tab 24_Share Trans_Scott to Patrick_03.24.21; Tab 25_Assign & Assump of Mem Int Agr_ 03.24.21; and Tab 31_Reg of Mems_10.27.11.

[2] *See* definitions of "Management Shares" and "Participating Shares" and Paragraph 11 of Tab 22_A&R Memo and Arts of Assoc_01.19.15.

[3] *See* Paragraph 80 of Tab 22_A&R Memo and Arts of Assoc_01.19.15.

[4] *See* Tabs 26-27_SH Resol of Sole SH, appt Patrick as Dir_03.24.21 and Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.

[5] *See* Paragraph 93(d) of Tab 22_A&R Memo and Arts of Assoc_01.19.15 (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Management Shares).

[6] *See* Tab 25_Assign & Assum of Mem Int Agr_ 03.24.21.

[7] *See* Paragraph 5 of Tab 07_A&R Co Agr_substit Scott for Dondero as Managing Mem (the Managing Member controls the company).

[8] See above.

[9] *See* Section 1.6(a) of Tab 10_A&R LP Agr_11.07.11 (the GP shall have full discretion in management and control).

[10] See above.

[11] *See* Tab 03_Regist of Mems_12.13.10.

[12] *See* Paragraph 85 of Tab 01_Memo and Arts of Assoc_12.13.10 (the business of the Company shall be managed by the Directors).

[13] *See* Tab 30_SH Resol of Sole SH, appt Patrick as Dir_04.02.21.

[14] *See* Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.

[15] *See* Paragraph 98(d) of Tab 01_Memo and Arts of Assoc_12.13.10 (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Shares).

[16] *See* LIBERTYCLO HOLDCO, LTD_ROM.

[17] *See* Paragraph 89 of Liberty CLO Holdco, Ltd. Memorandum and Articles of Incorporation (6 Jun 12).

[18] *See* Tab 26_Resol of Sole SH, appt Patrick as Dir_03.24.21 and Tab 32_Resol of Sole Dir, appt Murphy_4.22.21.

[19] *See* LIBERTY CLO HOLDCO, LTD._ROD (the Intertrust Register of Directors, listing Mark E. Patrick and Paul Murphy).

**CONFIDENTIAL**          TDIT006477

         d.    Mark Patrick may remove Paul Murphy as Director.[20]

6.   <u>Charitable DAF Holdings Corp. (f/k/a Rand Advisors Holding Corp.)</u>: Mark Patrick controls this entity.

         a.    Mark Patrick controls Charitable DAF Fund, LP.[21]

         b.    Charitable DAF Fund, LP is the sole shareholder.[22]

         c.    Mark Patrick is the sole member of the Board of Directors[23] and runs the company[24].

---

[20] *See* Paragraph 102(d) of Liberty CLO Holdco, Ltd. Memorandum and Articles of Incorporation (6 Jun 12) (providing that a Director can be removed by Ordinary Resolution) and definition of "Ordinary Resolution" (a vote by Shares).

[21] See above.

[22] *See* fourth "Resolved" paragraph in Tab 03_Consent of BOD_01.05.22.

[23] *See* Tab 03_Consent of BOD_01.05.22.

[24] *See* Section 3.01 of Tab 04_Bylaws.

**CONFIDENTIAL**                                                                 TDIT006478

FSD2025-0116      **Page 1525 of 1530**      2025-08-19

 **Seyfarth**

Seyfarth Shaw LLP
2029 Century Park East
Suite 3500
Los Angeles, California 90067-3021
T (310) 277-7200
F (310) 201-5219

dmancino@seyfarth.com
T (310) 201-5241

www.seyfarth.com

May 1, 2025

Internal Revenue Service
1100 Commerce Street
MC 4910 DAL
Dallas, TX 75242-1027

Re:    Update to Form 13909 previously filed on behalf of Charitable DAF Holdco, Ltd.

Dear Sir or Madam:

I sent a letter to the Internal Revenue Service dated March 20, 2025 on behalf of my client, Charitable DAF Holdco, Ltd, a Cayman Islands exempt company ("DAF Holdco")[1], along with an IRS Form 13909, *Tax-Exempt Organization Complaint (Referral)*. In my letter, I identified three Participating Shareholders of DAF Holdco which are supporting organizations of The Dallas Foundation, Greater Kansas City Community Foundation and Santa Barbara Foundation. In a letter dated April 15, 2025, I supplemented that letter with additional information relevant to the extensive and improper control James Dondero exerts over these three supporting organizations.

**The Dugaboy Investment Trust Charitable Contribution**

In my March 20, 2025 letter, at pages 4-6, I brought to your attention that Mr. Dondero's family trust, The Dugaboy Investment Trust ("Dugaboy"), contributed 1,500,000 Class B Units of NexPoint Hospitality Trust, a real estate investment trust majority-controlled by Mr. Dondero and his related entities (the "REIT"), to Highland Dallas Foundation, Inc., a supporting organization of The Dallas Foundation ("Highland Dallas"). This contribution likely caused Dugaboy and Mr. Dondero (Dugaboy's beneficiary) to become (if they were not already) substantial contributors of Highland Dallas and, therefore, disqualified persons with respect to Highland Dallas for purposes of section 4958(c)(3) of the Code.

At the same time Mr. Dondero caused Dugaboy to make the contribution of REIT Units to Highland Dallas, Dugaboy also granted Highland Dallas an "embedded" put option to sell those Units back to Dugaboy for $6.19 per Unit (the "Put Option"). The use of this Put Option (theoretically, in the opinion of ValueScope) allowed Dugaboy to claim a higher valuation for its charitable contribution deduction of $11,505,000 at that time than its stand-alone valuation without the Put Option for the benefit of Mr. Dondero.

---

[1] As a reminder, DAF Holdco is neither a charitable corporation nor is it a tax-exempt organization under section 501(c)(3) of the Internal Revenue Code.



May 1, 2025
Page 2

The Put Option, if exercised, would have a value to Highland Dallas of $9,285,000 ($6.19 X 1,500,000 Units) on the date of the gift.

The merger of the REIT's subsidiaries with and into another Dondero-controlled entity, NexPoint Diversified Real Estate Trust, closed on April 17, 2025, and there is no evidence from publicly-available information that Highland Dallas ever exercised its Put Option. The Form 8-K filed with the Securities and Exchange Commission with respect to the merger (copy enclosed) disclosed a number of material transactions (many of a compensatory nature) that took place in connection with the REIT subsidiary mergers but there is no continued recognition of the enforceability of the Put Option, which presumably would have been a material disclosure item if extended or exercised after the merger was approved by the REIT's Unitholders.

The fiduciary behavior of the management and Board of Directors of Highland Dallas with respect to their handling of this gift raises a number of federal income tax and Texas law fiduciary duty issues, from the time of its acceptance of the gift on December 19, 2019 through the effective time of the merger of the REIT's subsidiaries with and into NexPoint Diversified Real Estate Trust and the REIT's dissolution on April 17, 2025.

First, at the time of the acceptance of the gift, in December 2019, the objective facts raise serious questions concerning Highland Dallas's decision to accept the gift with a purported fair market value of $11,505,000 in the first place.[2] Although the value of the REIT's assets had at the time a theoretical value of $6.19 per Unit, according to the ValueScope valuation previously provided to the Service with my March 20, 2025 letter, public information concerning the REIT's trading price per Unit on December 19, 2020 (see detailed attachment) suggests that the actual value per Unit was only $4.00 on the date of the contribution.

As the Service has argued, in cases such as *Pierre v. Commissioner*, 113 T.C. 24 (2009) (for gift tax purposes) and *RERI Holdings I, LLC v. Commissioner*, 149 T.C. 1 (2917) (for section 170 purposes), the value of a gift must be based on the interest transferred, not the value of the assets held by the separate legal entity, especially when there are other related or unrelated shareholders or owners as in the case of the REIT. See, e.g., *Shepherd v. Commissioner*, 1115 T.C. 376 (2000), aff'd, 283 F.3d 1258 (11th Cir. 2002); *Senda v. Commissioner*, 433 F.3d 1044 (8th Cir. 2006).

The willingness of Highland Dallas's officers and directors (who are essentially the same people) to accept property so over-valued (by approximately 35% on the date of the gift based on public information readily available at that time) suggests Highland Dallas may have willingly acted as an accommodation party (i.e., as an aider or abettor) to a tax shelter scheme within the meaning of section 6701 of the Internal Revenue Code (the "Code") because of Mr. Dondero's influence as a previous substantial contributor and thus made the Put Option price of $6.19 per Unit and the decision to exercise or not exercise it all the more important.

Furthermore, this pattern of substantial overvaluations (including the firearms gift mentioned on page 6 of my March 20, 2025 letter) not only raises concerns under the gross valuation

---

[2] Highland Dallas would be aware of the valuation of the gift because a representative signed the Form 8283, *Noncash Charitable Contributions*, form at that time, which calls for a disclosure of the amount claimed as a deduction as well as other relevant information.



misstatement penalty provisions in section 6662 but also may implicate civil fraud, which could suspend running of the statute of limitations under section 6501(c)(1).

Then, one has to question whether the officers and Board of Highland Dallas acted prudently when they chose not to exercise the Put Option promptly after receiving the gift in 2021, 2022, 2023, and in any case before November 25, 2024, when the Unit value on November 22, 2024 (the Friday before the announcement of the going private transaction) was a mere $0.02. This is especially problematic in our view because the present value of the Put Option would decline for every year it went unexercised given the continued decline of the Unit price from the date of the initial gift, and, as we noted in our March 20 letter, was essentially a $9.285 million interest-free loan to Dugaboy, itself an automatic excess benefit transaction under section 4958(c)(3)(A) of the Code.

While we are speculating, because we have no knowledge of what type of agreement, written or otherwise, was reached between The Dallas Foundation representatives on the Highland Dallas Board and with Mr. Dondero or his designated NexPoint representative Lucy Bannon, if a deal was in fact made to vote in favor of the going private transaction or to refrain from exercising the Put Option, that would suggest sufficient interest to make the business judgment rule inapplicable to all directors.

The REIT announced the going private transaction on November 25, 2024 and ultimately it was consummated on April 17, 2025, theoretically netting Highland Dallas $540,000, about 0.58% of what it would have realized had the Put Option been exercised at any time prior to April 17, 2025. But any prudent investor would have, or should have, known by the one-year anniversary of the contribution that the Unit price dropped precipitously (i.e., by more than a third of its value) between December 19, 2019 ($4.00 per Unit) and December 17, 2020 ($2.50 per Unit). By the two-year anniversary of the contribution, on December 17, 2021, it was $2.10 per Unit (i.e., by then, about one-third of the Put Option exercise price), and by the three-year anniversary, on December 19, 2022 it was $1.50 per Unit. By December 19, 2023, the fourth anniversary of the gift, a Unit's trading price became essentially valueless at $0.01 per Unit.

All the while, the Units remained thinly traded. Thus, the conclusion is inescapable that either the directors and officers were potentially grossly negligent by not exercising the Put Option or they were unduly influenced by Mr. Dondero if they made a conscious decision not to exercise the Put Option. We respectfully submit that even a cursory review of the Highland Dallas corporate minutes will have a complete explanation of that forbearance decision-making process. The absence of such a discussion will support a conclusion that two Dallas Foundation Board members, including Julie Diaz, acted in a grossly negligent manner by not insisting the Put Option be exercised well before the going-private transaction was even contemplated.

Finally, it appears that the Put Option was not exercised prior to the announcement of the going private transaction and the vote by the theoretically independent Unitholders as required under Canadian corporate law. If this proves to be the case, Dugaboy would have received a material economic benefit from Highland Dallas, resulting in inurement of net earnings to Dugaboy and most likely an automatic excess benefit transaction under section 4958(c)(3)(A) of the Code requiring correction.

In addition, if Highland Dallas failed to exercise the Put Option and allowed it to lapse, it raises the possibility that the Service should look into whether other contributions made directly or

CONFIDENTIAL                                                                  TDIT006481



May 1, 2025
Page 4

indirectly by Mr. Dondero to Highland Dallas were similarly overvalued, such as the contribution of firearms mentioned on page 6 of my March 20th letter. If that is determined to be the case, then section 6700's tax shelter promoter penalties may be implicated for both Mr. Dondero and Dugaboy and Highland Dallas may be implicated as an aider and abettor under section 6701 by serving as a willing accommodation party. *See, e.g., Tarpey v. United States* collection of cases involving inflated time share deductions made to a controlled charitable organization and Rev. Rul. 80-69, 1980-1 C.B. 55.

**NexBank (Dondero-Controlled) Banking Relations with Highland Dallas**

We also recommend that the IRS review the banking relationships between Highland Dallas and NexBank, a privately held bank owned or controlled by Mr. Dondero. Based on our information, we believe that Highland Dallas's officers and directors (other than Mr. Dondero) have exercised little or no control over bank accounts maintained in Highland Dallas's name with NexBank. Instead, control over those accounts is, to the best of our knowledge, vested with employees of Mr. Dondero's private entities, including NexPoint Advicors, L.P. If this is proven correct, this will further demonstrate that Highland Dallas is being operated for the private benefit of Mr. Dondero.

As a recent example, on April 2, 2025, Highland Dallas's NexBank account received a wire transfer in the amount of $528,587.54, but Highland Dallas's officers could not locate the money, cannot access it, and cannot confirm theyhad received it. Upon information and belief, this NexBank account was was the sole bank account for Highland Dallas from 2012 until at least 2021, yet their officers do not seem to know of its existence.[3]

**Further Evidence of Non-Compliance with Section 509(a)(3)'s**

In another recent development, on April 17, 2025, NexPoint Philanthropies Dallas, Inc. (the d/b/a now used by Highland Dallas, as explained page 6 of my March 20, 2025 letter), announced a $1,299,410 committed funding to the Community Park at Fair Park in Dallas. While on its face this grant is laudable, it violates the operational test applicable to section 509(a)(3) supporting organizations, discussed on pages 15-16 of my March 20,2025 letter.

**New, Ongoing Texas Attorney General Investigation**

Finally, the Texas Attorney General has opened an investigation of DAF Holdco and its relationship to Highland Dallas. We believe this was initiated by Highland Dallas at Mr. Dondero's request/demand as a means to get a State actor like the Texas Attorney General to wrest control of DAF Holdco from Mark Patrick (even though DAF Holdco is not itself a charitable organization). We believe Mr. Dondero's motive is to use DAF Holdco's assets to satisfy a growing number of his judgment creditors like UBS described in my earlier correspondence.

---

[3] After Mark Patrick advised David Rosenberg (outside counsel to Highland Dallas) that it would be important for Highland Dallas to have a bank account not held at NexBank due to its control and ownership by Mr. Dondero, Mr. Rosenberg caused Highland Dallas to open an account with Schwab.

**CONFIDENTIAL**                                                          TDIT006482



May 1, 2025
Page 5

We have provided the attorneys and investigators of the Texas AG with copies of all letters and materials we have provided to the Service and have requested a meeting in Austin with them as we have with you to discuss our concerns/positions in a manner that complies with your section 6103 obligations and the Texas law equivalent.

In addition, the behavior of the Highland Dallas Board and officers raise concerns about waste of corporate assets (e.g., failure to exercise the Put Option when the value of the Class B Units held by Highland Dallas dropped precipitously from $4.00 on December 19, 2019 to $0.02 on November 22, 2024, days before the going private transaction was announced), breach of the duty of care (e.g., failure to exercise adequate oversight of the NexBank banking relationship), and multiple breaches of the duty of loyalty by Mr. Dondero (e.g., by using his influence and control over Highland Dallas to attempt to wrest control of DAF Holdco so he can use its assets as his own piggy bank to pay his creditors).

This is not just a matter of Texas corporate law, it is a matter of federal tax law as well. As Judge Posner, now retired, famously said, in *United Cancer Council v. Commissioner*, 165 F.3d 1173 (7th Cir. 1999), after he concluded the fundraiser (Watson & Hughey) was not an insider for purposes of the inurement prohibition in section 501(c)(3) of the Code:

"Remember the IRS's alternative basis for yanking UCC's exemption? It is that as a result of the contract's terms, UCC was not really operated exclusively for charitable purposes, but rather for the private benefit of W&H as well. Suppose that UCC was so irresponsibly managed that it paid W&H twice as much for fundraising services, so that UCC's $26 million in fundraising expense $13 million was the equivalent of a gift to the fundraiser. Then it would have been happy to accept for those services, so that UCC's $26 million in fundraising expense $13 million was the equivalent of a gift to the fundraiser. Then it could be argued that UCC was in fact being operated to a significant degree for the private benefit of W&H, though not because it was the latter's creature. That then would be a route for using tax law to deal with the problem of improvident or extravagant expenditures by a charitable organization that do not, however, inure to the benefit of insiders."

. . .

"[T]he board of a charity has a duty of care, just like a the board of an ordinary business corporation, [citations omitted], and a violation of that duty of care which involved the dissipation of the charity's assets might . . . support a finding that the charity was conferring a private benefit, even if the contracting party did not control, or exercise undue influence over the charity. This, for all we know, may be such a case." 83 AFTR 2d 99-812, at 99-818-819.

Of course, all Highland Dallas officers and directors are insiders for purposes of the inurement prohibition.

*                    *                    *

Feel free to reach me (or have one of your staff reach me) on my mobile (310-890-1300) if you desire to discuss the Form 13909 or have any questions. Also, as indicated in my March 20th letter, I can arrange to meet you, along with Mark Patrick, to meet you in your Dallas office to

 Seyfarth

May 1, 2025
Page 6

discuss this and my previous correspondence in a manner consistent with your section 6103 obligations.

Very truly yours,

SEYFARTH SHAW LLP

*Douglas M Mancino*

Douglas M. Mancino

cc. Mark Patrick, Shawn Raver and Paul Murphy and Christopher Krhovjak, Investigator, Charitable Trust Section, Texas Attorney General (w/Encls.)

CONFIDENTIAL                                                                                          TDIT006484