Michael J. Edney
Martha B. Stolley
Avery Joseph Welker
Morgan Lewis Bockius LLP
1111 Pennsylvania Avenue, NW
Washington, D.C. 20004
michael.edney@morganlewis.com
martha.stolley@morganlewis.com
avery.welker@morganlewis.com
T: (202)-739-3000
F: (202)-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

*Counsel for The Dugaboy Investment Trust*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054-sgj |
| Debtor. | |

**THE DUGABOY INVESTMENT TRUST'S MOTION TO ALTER OR AMEND AND
FOR RECONSIDERATION OF ORDER DENYING MOTION FOR RELIEF FROM
ORDER AND MOTION TO VACATE**

**TABLE OF CONTENTS**

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.  BACKGROUND ............................................................................................... 3

III. LEGAL STANDARD........................................................................................ 7

IV.  ARGUMENT .................................................................................................... 9

    A.   The Evidence of Mark Patrick Having Stolen the Assets of the Charitable
         DAF Was Not Stated in the April 2025 Dondero Affidavit and Is Evidence
         Newly Discovered After the 9019 Motion............................................................. 9

    B.   Relief is Warranted under Rule 60(b)(3) Due to Mark Patrick's Omissions,
         Misrepresentations, and Misconduct During Highly Restricted Discovery. ....... 19

    C.   Rule 60(b)(6) Relief is Warranted Absent Restoration of the Charitable
         Structures to Avoid Rewarding Mark Patrick's Misconduct. ............................... 23

V.   CONCLUSION................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*,
173 F.Supp.3d 363 (N.D. Tex. 2016) ...................................................................18

*Banister v. Davis*,
590 U.S. 504 (2020) ...............................................................................................7

*Bank One, Texas, N.A. v. Federal Deposit Ins. Corp.*,
16 F. Supp. 2d 698 (N.D. Tex. 1998) .....................................................................7

*In re Charitable DAF Holdco Ltd. (In Official Liquidation)*,
No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1 ....................................5

*Charles L.M. v. N.E. Indep. Sch. Dist.*,
884 F.2d 869 (5th Cir. 1989) ..................................................................................7

*Demahy v. Schwarz Pharma, Inc.*,
702 F.3d 177 (5th Cir. 2012) ..................................................................................7

*Dupree v. Younger*,
598 U.S. 729 (2023) ...............................................................................................2

*Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*,
6 F.3d 350 (5th Cir. 1993) .................................................................................8, 23

*In re Endeavour Highrise, L.P.*,
432 B.R. 583 (Bankr. S.D. Tex. 2010) ..................................................................18

*Gen. Universal Sys., Inc. v. Lee*,
379 F.3d 131,156–57 (5th Cir. 2004) ....................................................................19

*Hamilton Plaintiffs v. Williams Plaintiffs*,
147 F.3d 367 (5th Cir. 1998) ..................................................................................6

*Heirs of Guerra v. United States*,
207 F.3d 763 (5th Cir. 2000) ................................................................................18

*Inryco, Inc. v. Metro. Engr. Co., Inc.*,
708 F.2d 1225 (7th Cir. 1983) ................................................................................7

*In re J.A.R. Concrete, Inc.*,
673 B.R. 663 (W.D. Tex. 2025)..............................................................................18

Case 19-34054-sgj11   Doc 4684   Filed 06/29/26   Entered 06/29/26 23:26:09   Desc
Main Document      Page 4 of 31

*In re Kakal*,
2019 WL 1868626 (S.D. Tex. Bankr. 2019) ..................................................................6

*Pruett v. Stephens*,
608 Fed. Appx. 182 (5th Cir. 2015) ...........................................................................7

*Rhodes v. Amarillo Hosp. Dist.*,
654 F.2d 1148 (5th Cir. 1981) ...................................................................................18

*Rismed Oncology Systems, Inc. v. Baron*,
297 F.R.D. 637 (N.D. Ala. 2014) ..............................................................................21

*Shepherd v. Int'l Paper Co.*,
372 F. 3d 326 (5th Cir. 2004) .....................................................................................6

*Silas v. Sears, Roebuck & Co.*,
586 F.2d 382 (5th Cir. 1978) ......................................................................................7

*In re Transtexas Gas Corp.*,
303 F.3d 571 (5th Cir. 2002) ......................................................................................7

*Williams v. French*,
2024 WL 3929894 (S.D. Tex. Aug. 23, 2024) ...........................................................7

**Statutes**

Bankruptcy Code Chapter 15 ..............................................................................................5

**Rules**

Federal Rule of Bankruptcy Procedure 9019 .............................................................. *passim*

Federal Rule of Bankruptcy Procedure 9023 ...............................................................6, 7

Federal Rule of Bankruptcy Procedure 9023(a) ..............................................................1

Federal Rule of Bankruptcy Procedure 9024 ...................................................................1

Federal Rule of Civil Procedure 50(e) .............................................................................6

Federal Rule of Civil Procedure 59(e) .................................................................1, 6, 7, 24

Federal Rule of Civil Procedure 60(b) ..................................................................... *passim*

Federal Rule of Civil Procedure 60(b)(3) ............................................................... *passim*

Federal Rule of Civil Procedure 60(b)(6) ............................................................... *passim*

Rule 60(b)(2) ........................................................................................................... *passim*

-iii-

The Dugaboy Investment Trust ("Dugaboy") respectfully moves under Fed. R. Civ. P 59(e), as incorporated by Federal Rule Bankruptcy Procedure 9023(a), to alter or amend and otherwise to reconsider the Court's June 15, 2026 Order denying Dugaboy's Motion for Relief from Order and Motion to Vacate under Federal Rule of Civil Procedure 60(b) (the "Denial Order"), as incorporated by Federal Rule Bankruptcy Procedure 9024.  The Court should alter its order to grant the motion to vacate the approval of the settlement between the Highland entities and the Hunter Mountain Investment Trust.

## I.    **INTRODUCTION**

The Court should alter, amend, and otherwise reconsider its denial of Dugaboy's motion for relief under Federal Rule of Civil Procedure 60(b) for multiple reasons.  The June 2025 order approving the settlement between the Highland-related entities and the Hunter Mountain Investment Trust should be vacated.

First, the Court's denial of Dugaboy's motion based on newly discovered evidence under Rule 60(b)(2) rests on an incorrect factual premise: That Mr. Dondero and his family trust already possessed the evidence of Mr. Patrick's theft of Charitable DAF on which the motion to vacate was based, as of April 16, 2025,.  April 16, 2025, is when Mr. Dondero filed an affidavit supporting the opening of liquidation proceedings in the Cayman Islands, proceedings that only much later revealed the outcomes, mechanisms, and motives of Mr. Patrick's brazen theft of the assets that had been maintained under a charitable structure that included the Hunter Mountain Investment Trust ("Hunter Mountain") and the equity position in Highland Capital Management, L.P. ("Highland").

The April 16, 2025, affidavit did not set forth the evidence of Mr. Patrick's fraudulent restructuring of the Charitable DAF, including his theft of the Highland equity position from an

established Dallas charity. Instead, the affidavit detailed Mr. Patrick's lack of transparency with respect to this recent operation of the Charitable DAF and compliance lapses in areas separate and apart from his Charitable DAF restructuring efforts. Mr. Patrick's brazen theft of all the assets of the charitable structures was instead first alleged by the Cayman Liquidators in a July 15, 2025, "statement of claim," with actionable evidence of those allegations later revealed in the Cayman proceedings and elsewhere.

Relief is also appropriate under Federal Rule of Civil Procedure 60(b)(3). In its Denial Order, the Court held that no one had engaged in fraud or discovery misconduct in the proceedings leading up to the 9019 order in June 2025. That is not so. That process was unnecessarily rushed and frantic. But Mark Patrick was deposed, and he lied in that deposition to conceal his theft of the charitable assets until the very last minute.

Finally, the Court should grant relief under Federal Rule of Civil Procedure 60(b)(6). The fraud and misconduct is not adjacent to this Court's mission and charge. We know today, due to the evidence elicited in the May 2026 hearings, that Mark Patrick came to this Court in May 2025 asking for approval to deal away stolen property to Highland. That is because, by the time he had arrived, he had misappropriated Hunter Mountain and the residual equity position in Highland from the established charity to which it was given and belonged. Having (albeit unwittingly) approved the transfer of stolen property is an anathema to justice and this Court's role as a court of equity, and that is a "reason" in addition to many others "that justifies relief." Fed. R. Civ. P. 60(b)(6).

In addition, this Court has a special responsibility to monitor arrangements made between Highland's appointed managers and third parties. That is because the predecessor bankruptcy judge stimulated the removal of Highland's founder and most effective guardian of its equity

2

interest in the first hearing after this case was transferred from Delaware.  And at the Court's

insistence, appointed managers effectively acting in the Court's stead followed.  If the Highland

managers made an arrangement with wrongdoers (either knowingly or not), that should be of

special concern to the Court.  Today, we know Mr. Patrick was a wrongdoer and the appointed

managers reached a settlement with him precisely because he was eager to advance and to deter

scrutiny into his wrongdoing.

Dugaboy limits this motion for reconsideration to these issues but reserves the right to

address additional errors in the appellate courts in the event the instant motion is not granted. See

*Dupree v. Younger*, 598 U.S. 729 (2023) (holding that parties are not required to renew legal

arguments to preserve them for appellate review).  Today, Dugaboy has also filed a notice of appeal

in an abundance of caution to ensure all timelines to secure future review if necessary.  The

Bankruptcy Rules provide that this Court retains jurisdiction to decide the motion to amend until

it is decided or withdrawn, despite the sequential filing of a notice of appeal.  Fed. R. Bankr. P.

8002(b)(2).

## II.      **BACKGROUND**

This motion arises from the Chapter 11 bankruptcy proceedings involving Highland.  On

May 19, 2025, Highland and Hunter Mountain moved for approval of a settlement pursuant to

Federal Rule of Bankruptcy Procedure 9019.  Dkt. 4216. Although Dugaboy challenged this

proposed settlement, *see* Dkt. 4230, it ultimately was approved on June 30, 2025. *See* Dkt. 4297

("9019 Settlement Approval Order").

Dugaboy filed a motion to vacate the settlement approval order under Federal Rule of Civil

Procedure 60(b).  Dkt. 4513 ("Rule 60(b) Motion").  Dugaboy moved for relief under Rule 60(b)(2)

based on newly discovered evidence, under Rule 60(b)(3) based on fraud, misrepresentations, and

misconduct by an opposing party, and under Rule 60(b)(6) for any other reason justifying relief. *Id.* at 33–43. With respect to its motion for relief under Rule 60(b)(2), Dugaboy directed the Court to developments in proceedings in the Cayman Islands that had occurred after the Court's hearing regarding and order approving the settlement agreement with Hunter Mountain. In those proceedings, the Grand Court of the Cayman Islands had appointed a form of receiver—what the Cayman legal system calls Joint Official Liquidators—to step into the shoes of one of the core, Cayman-incorporated entities at the heart of the Charitable DAF structure, the Charitable DAF Fund, L.P.

Mr. Dondero had established the Charitable DAF years earlier to create a legacy of good works in the community that would outlive him. May 21, 2026 Hr'g Tr. at 135:23–24. At the top of this structure were four charities that Mr. Dondero had selected, each with a decades-long track record for doing good. *Id.* at 136:24–137:8 (App. 115). They were to be the recipients of Mr. Dondero's generosity and the growth of the assets Mr. Dondero had given to the structure. And each had set up a structure—a so-called "supporting organization"—that would allow Mr. Dondero to have a significant say in how the charities used the proceeds from the DAF. May 21, 2026 Hr'g Tr. at 137:9–18; May 11, 2026 Hr'g Tr. at 208:1–12.

The Cayman Liquidators uncovered detailed, new, and breathtaking evidence of Mr. Patrick's stealing all the Charitable DAF's assets from the charities and from Mr. Dondero's ability to guide the good works to which they were to be put. Mr. Patrick proceeded to put them in his own pocket, in the hands of a sham "charity" run from his kitchen table. And along the way, he looted the charitable assets, paying himself more than $14 million in just over 18 months. He went out of his way to conceal his misconduct. The Cayman Liquidators uncovered communications instructing his co-conspirators to make the new entities "hard to find or track, or trace." *See*

Dugaboy Ex. 169 at 1 (App. 042).  And he told the charities that he was going to "leave the structure exactly as it was" and that transparency in the form of financial statements would be coming soon.  *See* Dugaboy Ex. 204 at 171-72 (App. 049– 050) ("Given our transparency and cooperation with the foundations/supporting organizations, as well as the agreed way forward, it was surprising to receive the 28 January Email which repeats some of the allegations in the 11 November Letter  . . . [W]e are more than happy to continue to engage with the foundations/supporting organizations in an effort to provide clarity on investments and the DAF HoldCo governance structure."); *id.* at 167 (App. 045) ("[O]ur understanding was that we were to prepare a presentation for the Foundations to address these concerns."); *id.* at 179 (App. 057) (unanswered scheduling emails from charities' counsel).  All of this legerdemain occurred from late 2024 through the spring of 2025.

Mr. Patrick's theft of the Charitable DAF's assets had everything to do with the Hunter Mountain Investment Trust, which owned most of the equity in the Debtor, Highland Capital Management LP.  The Court will recall that on February 12, 2025, Mr. Patrick sold Hunter Mountain for $1 million to CLO HoldCo, LLC.  Dugaboy Ex. 15 at 1 (App. 027); May 12, 2026 Hr'g Tr. at 69:23–25 (App. 110).  That entity was entirely owned by Charitable DAF LP and the entire Charitable DAF structure.  May 12, 2026 Hr'g Tr. at 72:11–13; *see also* Dugaboy Ex. 242 at 18 (App. 066).  Before the sale, all the value in Hunter Mountain was supposed to be entirely for the benefit of The Dallas Foundation.  Dugaboy Ex. 242 at 12 (App. 065).  After the sale, it became part of the Charitable DAF structure, which was to be owned by The Dallas Foundation and three other established charities, with Mr. Dondero having input as to the philanthropic ends for which his charitable gift would be used.  *Id.* at 14; May 21, 2026 Hr'g Tr. at 137:9–18.  But, on March 27, 2025, Mr. Patrick stole the Charitable DAF's assets—including Hunter Mountain

and the equity position in Highland Capital Management—from The Dallas Foundation and from

Mr. Dondero's guidance.   Highland Ex. 63 at 53.   He did this through a secret transaction that

dispossessed the established charities from the equity stake in Highland and $270 million in other

assets in exchange for a mere $1.6 million, transferring hundreds of millions of dollars to the sham

charity he set up in his basement. *Id.*

The evidence documenting this perfidy came from the Cayman Liquidators, who were able

to obtain it because they were empowered to step into the shoes of The Charitable DAF Fund, L.P.,

the core entity in the Charitable DAF, and obtain information in its name from Cayman

government registrars, corporate service providers, and the company's own files.  May 11, 2026

Hr'g Tr. at 77:4–19.  Importantly, this fraud was largely pulled off in the Cayman Islands, by

corporate entities outside the United States.  Unbeknownst to the predecessor bankruptcy judge in

this case, by the time Mr. Patrick was trading away the property interests of the equity holders in

Highland Capital Management, he was dealing in stolen property. The Court-appointed managers

of Highland were receiving settlement of Hunter Mountain's claims from the very person who had

stolen the assets from the charities they were meant to benefit.  And the Court was blessing it.

The Cayman Liquidators first alleged what they had uncovered in a Statement of Claim,

filed on July 15, 2025.  That Statement contained only allegations, but those allegations were so

earthshattering that Dugaboy asked the predecessor judge to stay the effect of her settlement

approval ruling in light of them.  Dkt. 4326.  The evidence behind those allegations was

presumptively confidential under Cayman law.  May 11, 2026 Hr'g Tr. at 77:16–19.  It was

released later, beginning with the Liquidators' July 21, 2025, filing in Delaware bankruptcy court

seeking Chapter 15 recognition of its proceedings and then in successive affidavits of Margot

MacInnis (one of the joint liquidators), only made accessible in the weeks surrounding hearings in

the Cayman proceedings. *See* Caymans Exhibit D, Chapter 15 Petition for (I) Recognition of a Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code, *In re Charitable DAF Holdco Ltd. (In Official Liquidation)*, No. 25-11376-BLS (Bankr. D. Del. July 21, 2025), Dkt. 1. The full evidentiary record, thus, came into focus only in December 2025, less than three months before Dugaboy filed its Rule 60(b) motion. *See* May 11, 2026 Hr'g Tr. at 78:4–21 (App. 085); Dkt. 4513 (Dugaboy's Feb. 9, 2026 Rule 60(b) motion).

On June 15, 2026, after full briefing and a three-day evidentiary hearing, this Court denied Dugaboy's motion to vacate. Dkt. 4678. With respect to the request for relief under Rule 60(b)(2), the Court ruled that the evidence presented at the May 2026 hearing was not "newly discovered" because Mr. Dondero had introduced evidence of Mr. Patrick's misconduct in an affidavit he filed on April 16, 2025—before the Rule 9019 hearing in June 2025. *Id.* at 10–11. The Court also denied relief under Rule 60(b)(3) on the grounds that the provision requires fraud or misconduct to have occurred in the judicial proceedings itself, and that Highland had not provided misleading or incomplete answers to inquiries in discovery leading to the Rule 9019 order. *Id.* at 12–13. Finally, the Court denied relief under Rule 60(b)(6) by determining that Dugaboy did not present a basis for equitable relief that was separate from the grounds presented for Rules 60(b)(2) and 60(b)(3), and by determining that undoing the Rule 9019 Settlement Order would not restore the original structure of the DAF or Hunter Mountain. *Id.* at 13–14.

## III.    **LEGAL STANDARD**

While the Federal Rules of Civil Procedure do not specifically provide for motions for reconsideration, a party seeking such relief may file a request that "may be considered either a Rule 59(e) motion to alter or amend judgment or a Rule 60(b) motion for relief from judgment or

7

order." *See Shepherd v. Int'l Paper Co.,* 372 F. 3d 326, 328 n. 1 (5th Cir. 2004) (citing *Hamilton*

*Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n.10 (5th Cir. 1998)).  If such a motion is filed

within 14 days of the judgment or order of which the party complains, it is considered a Rule 59(e)

motion. *In re Kakal*, 2019 WL 1868626, at *1 (S.D. Tex. Bankr. 2019) (citing *Shepherd*, 372 F.3d

at 328 n.1).  *See also* Fed. R. Bankr. P. 9023 (incorporating Fed. R. Civ. P. 50(e) and requiring

that a Rule 59(e) motion "be filed within 14 days after the judgment is entered).  Importantly,

motions to alter or amend a judgment can be made with respect to orders denying or granting

motions to vacate prior judgments under Rule 60(b). *See, e.g.*, *Charles L.M. v. N.E. Indep. Sch.*

*Dist.*, 884 F.2d 869 (5th Cir. 1989); *Pruett v. Stephens*, 608 Fed. Appx. 182, 184 (5th Cir. 2015);

*see also Inryco, Inc. v. Metro. Engr. Co., Inc.*, 708 F.2d 1225, 1232 (7th Cir. 1983) ("[D]enial of

a Rule 60(b) motion is itself an appealable judgment…. Therefore, a losing party may challenge

that judgment with a motion to alter or amend under Rule 59(e)").  Here, the Denial Order[1] was

issued on June 15, 2026.  Dugaboy files this Motion on June 29, 2026, fourteen days after the

Denial Order's issuance.  Accordingly, this Motion is a timely Fed. R. Civ. P. 59(e) motion under

Fed. R. Bankr. P. 9023.

A Rule 59(e) motion "calls into question the correctness of a judgment," *In re Transtexas*

*Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002), and "gives a district court the chance to rectify its

own mistakes in the period immediately following its decision." *Banister v. Davis*, 590 U.S. 504,

508 (2020).  Under Fed. R. Civ. P. 59(e), amending or altering a judgment is appropriate (1) when

there has been an intervening change in the controlling law; (2) where the movant presents newly

discovered evidence that was previously unavailable; or (3) to correct a manifest error of law or

---

[1] The Denial Order of Dugaboy's Rule 60(b) motion is a final, appealable order.  *See Silas v. Sears,*
*Roebuck & Co.*, 586 F.2d 382, 384 n.2 (5th Cir. 1978).

fact. *Demahy v. Schwarz Pharma, Inc.*, 702 F.3d 177, 182 (5th Cir. 2012).  In the Fifth Circuit, a

"manifest error of fact" sufficient to warrant Rule 59(e) relief is one that is "an obvious mistake or

departure from the truth."  *Williams v. French*, 2024 WL 3929894, at \*3 (S.D. Tex. Aug. 23, 2024)

(citing *Bank One, Texas, N.A. v. Federal Deposit Ins. Corp.*, 16 F. Supp. 2d 698, 712 (N.D. Tex.

1998)).  In deciding a Rule 59(e) motion, this Court has "considerable discretion" but must "strike

the proper balance between two competing imperatives: (1) finality and (2) the need to render just

decisions on the basis of all facts."  *Edward H. Bohlin Co., Inc. v. Banning Co., Inc.*, 6 F.3d 350,

355 (5th Cir. 1993).

## IV.    **ARGUMENT**

###      A.    **The Evidence of Mark Patrick Having Stolen the Assets of the Charitable DAF Was Not Stated in the April 2025 Dondero Affidavit and Is Evidence Newly Discovered After the 9019 Motion.**

Mr. Dondero executed an affidavit on April 16, 2025.  *See* Dugaboy Ex. 36 (App. 030–

040).   Its purpose was to support the three established charities at the top of the Charitable DAF

structure in their request that the Cayman Islands Grand Court step in and appoint a neutral to run

the key corporate entity at the heart of the structure, The Charitable DAF Fund, L.P.

Without question, that affidavit was not a hagiography of Mark Patrick.  It asserted that

Mr. Patrick had not been doing a great job when, in addition to his role with the Charitable DAF,

he was also working for Skyview, an entity that provides legal and other services to Mr. Dondero's

corporate entities.

The Court, however, manifestly erred in determining that the information that later arose

from the Cayman proceedings—after the Caymans Liquidators stepped into the shoes of The

Charitable DAF Fund, L.P.—was not "newly discovered" because of the assertions in the April

2025 affidavit.  There is a yawning chasm between the criticisms of Mr. Patrick on other matters

in that April 2025 affidavit and the conclusive and directly germane evidence of his theft of the

Charitable DAF assets—including *the equity position in the Debtor* and a quarter billion dollars in other assets—later uncovered in the Cayman proceedings. Because of the timing of the revelation of that evidence by the Cayman Liquidators, the predecessor bankruptcy judge did not consider this significant evidence of misconduct, directly relevant to the equity interests that were attempting to compromise their claims in front of her. By that point, unbeknownst to anyone but Mark Patrick and his co-conspirators, Mr. Patrick was dealing away stolen property right under the predecessor judge's nose.

i.   **The Dondero Affidavit Lacked Any Evidence of Mark Patrick's Theft of the DAF Structure.**

The April 2025 affidavit initiating the Cayman proceedings did not detail Mr. Patrick's theft of the Charitable DAF's assets. It is important to be precise about what the April 2025 affidavit said. That affidavit expressed concerns about two compliance issues in Mr. Patrick's past work, as well as his more recent lack of transparency regarding his operations of the Charitable DAF.

First, in late June 2023, Mr. Patrick sought to have the Charitable DAF make a $10,000 donation to a charity called Creative Hearts TX. Dugaboy Ex. 36 at 4–5 (App. 034–035). His wife and daughter were directors of Creative Hearts. *Id.* at 5 (App. 035). Also in June 2023, Mr. Patrick asked former FBI agent Kevin Cronin and his firm to charge $25,000-$50,000 in fees for financial advisory services and to split the proceeds with him. *Id.* Mr. Cronin promptly informed Mr. Dondero of Mr. Patrick's conduct. Importantly, Mr. Dondero had addressed both of these issues in 2023 with Mr. Patrick and did not seek to remove him from his position at Skyview, his corporate services company, much less from the Charitable DAF. Mr. Dondero believed Mr. Patrick's actions were inappropriate but did not warrant terminating Mr. Patrick. Third, Mr. Patrick contacted one of the charitable entities, The Dallas Foundation, to advise the entity to

10

exercise a put option on one of its investments in a fund related to Mr. Dondero. *Id.* at 6–7 (App. 036–037). The advice was based on material non-public information Mr. Patrick had gained from his employment at Skyview. *Id.* The Dallas Foundation did not act on the advice, and informed Mr. Dondero. Mr. Patrick resigned from Skyview in October 2024 while Skyview was investigating the facts and potential compliance issues of the episode. *Id.*

With the background of these historical episodes, Mr. Dondero became concerned when Mr. Patrick began to avoid answering the charities' questions regarding the financial condition of the DAF. The affidavit recounted that Mr. Patrick and (who ultimately proved to be) his co-conspirators declined to provide information regarding its financial condition, while promising Mr. Dondero the structure would remain the same. *Id.* at 7–8 (App. 037–038); May 21, 2026 Hr'g Tr. at 144:23–145:1. Mr. Dondero also recounted the bits and pieces of information he had learned regarding recent transactions, including indications that Mr. Patrick had effected a sale of Beacon Mountain (and therefore of its wholly-owned subsidiary Hunter Mountain) for $1 million, but expressly noting that he lacked information regarding the other details of that transaction, including the identity of the buyer. *Id.* at 8 (App. 038). For these reasons, Mr. Dondero supported judicial appointment of a neutral steward for both Charitable DAF Holdco and The Charitable DAF Fund, L.P., who could then make sure that the Charitable DAF entities were being run correctly. *Id.* at 1 (App. 031), 9–10 (App. 039–040). *See also* Dkt. 4534-6 at 1.

Importantly, Cayman law does not require a showing of fraud or misconduct for the appointment of a liquidator. Testimony of Margot McInnis, May 11, 2026 Hr'g Tr. at 71:11–18 (App. 078). Instead, a Cayman court may appoint a liquidator on a petition from a concerned creditor seeking independent review of the winding up of an insolvent company without more allegations. *Id.* ("Broadly, it's – your appointment comes about when a – in an insolvent case

11

where a creditor or stakeholder petitions the court to appoint an independent person to review the affairs or wind up the company.")

        ii.      <u>Using Court-Appointed Authority over a Charitable DAF Entity, the Cayman Liquidators Uncover Mr. Patrick's Brazen Theft of Hundreds of Millions of Dollars in Charitable Assets.</u>

What was revealed by the Cayman Liquidators was of a different character and severity far beyond anything mentioned in the April 2025 affidavit. Because the Cayman Liquidators were able to take over management of a Charitable DAF entity, they obtained otherwise confidential records that were in the hands of Cayman government agencies, law firms, accounting firms, and advisors. This unparalleled power revealed that *Mr. Patrick had stolen everything from the four established charities that owned the Charitable DAF* and had stuffed it into his own pocket. The product of the Liquidators' investigation began to be revealed in a July 15, 2025, Statement of Claim. As the chief liquidator testified in this Court, the Statement of Claim itself is not evidence in the Cayman judicial system, and it is not evidence in the United States; it is akin to a complaint— a series of allegations. Testimony of Margot McInnis, May 11, 2026 Hr'g Tr. 73:1–22 (App. 080) (stating a statement of claim requires "reasonable prospect of success on that claim" to initiate liquidation proceedings). But it was backed by evidence that the Liquidators needed Cayman judicial permission or open proceedings to reveal. *Id.* at 77:4–19 (App. 084); 78:6–21 (App. 085) (noting the circumstances which "lift[] the sort of privacy rules governing Cayman proceedings" and allowed the documents in connection with the Statement of Claim to be made public). And that evidence was revealed through later filings in Delaware and in the Cayman Islands by the Liquidators. In the May 2026 hearing, Ms. MacInnis was called to testify and that evidence was authenticated and admitted.

The Cayman Liquidators uncovered:

- That Mr. Patrick had embarked on a complicated scheme, starting in late 2024, to scramble the Charitable DAF by creating a series of new entities. *Id.* at 85:18–21 (App. 086); *compare* Dugaboy Ex. 242 at 2 (App. 064) *with* Dugaboy Ex. 242 at 18 (App. 066).

- That the object of Mr. Patrick's ultimately successful scheme was to exit the Dallas Foundation and three other charities from beneficial ownership—and Mr. Dondero from a say in the use for good works of—more than a quarter billion dollars in assets. May 11, 2026 Hr'g Tr. 128:7–11 (App. 098) (noting that the four original charities were "left with nothing"); Dugaboy Ex. 7 at 8 –9 (App. 012–014); *compare* Dugaboy Ex. 11 at 3 (App. 019) *with* Dugaboy Ex. 12 at 4 (App. 025).

- That the destination of the ill-gotten gains was a sham "charity" run from Mr. Patrick's basement, the so-called "DFW Charitable Foundation." Testimony of Margot MacInnis, May 11, 2026 Hr'g Tr. 106:10–18 (App. 091) ("I understand [DFW Charitable Foundation's headquarters is] at Mark Patrick's residence") 128:12–14 (App. 098) (noting that DFW Charitable received the DAF's assets); *see also* Dugaboy Ex. 8; Dugaboy Ex. 13.

- That, as if stealing all the assets from the charities were not enough, Mr. Patrick was also diverting eight figures in charitable assets into his own bank account, ostensibly as compensation for running the Charitable DAF. Testimony of Margot MacInnis, May 11, 2026 Hr'g Tr. 131:15–23 (App. 101).

- That, if there were any doubt that DFW Charitable is a sham, it is easily dispelled by looking at what DFW has given away: Less than $1 million during its 15 months of sitting on the charitable assets. Testimony of Margot MacInnis, May 12, 2026 Hr'g Tr. 83:18–21 (App. 114). At the same time, Mr. Patrick has used those assets to pay himself and his "directors" 20 times the amount he has given to charity. Testimony of Margot McInnis, May 12, 2026 Hr'g Tr. 82:5–14

13

(App. 113), 82:25–83:12 (App. 113–114).  And he has paid law firms and advisors millions more to arrange and then cover up his fraud.  May 12, 2026 Hr'g Tr. 75:13–76:9 (App. 111–112); Dugaboy Ex. 211 at 34 (App. 061).

• That there was zero justification for Mr. Patrick's moves other than enriching himself.  To divorce the charities from more than a quarter billion dollars in assets, Mr. Patrick conspired with an accounting firm named ValueScope to paper the transactions.  May 11, 2026 Hr'g Tr. 123:6–124:13 (App. 093) (noting that ValueScope's March 2025 valuation of the assets was "materially different from others on the basis that the valuation method changed and the level of discount changed"); *see also* Dugaboy Ex. 11 at 3 (App. 019); Dugaboy Ex. 12 at 4 9App. 025).  ValueScope obligingly reversed course in March 2025 from valuations it had provided just a half a year earlier, claiming a cache of assets it said were worth $270 million in September 2024 was now worth just $1.6 million.  *Compare* Dugaboy Ex. 11 at 3 (App. 019) *with* Dugaboy Ex. 12 at 4 (App. 025).  Mr. Patrick happily paid that much and ran off with hundreds of millions.

• That Mr. Patrick from the earliest days of his scheme took steps to conceal his theft.  He instructed his lawyers to create Cayman Islands corporate entities that would be "hard to find or track, or trace.  Or find owners, etc. Generic name.  Strong litigation protection."  Dugaboy Ex. 169 at 1 (App. 042); May 11, 2026 Hr'g Tr. 89:11–17.  This resulted in the birth of an alphabet soup of indecipherable corporate entities, such as CDMCFAD LLC and CDH GP, Ltd.  May 12, 2026 Hr'g Tr. 48:25–49:7; May 11, 2026 Hr'g Tr. 87:9–23 (App. 090).  He deliberately took steps to avoid apprising the charities or anyone else that he was either in the process of stealing or had stolen all Charitable DAF's assets from them.  May 12, 2026 Hr'g Tr. 29:17–24 (App. 106); Dugaboy Ex. 204 at 167 (App. 045), 171–72 (App. 049–050), 179 (App. 057).

14

- That all of this came to a head on March 27, 2025. On that day, Mr. Patrick and his co-conspirators gave the boot to the four historical charities from the "hard to track or trace" corporate entities they had created, by separating those charities from more than a quarter billion dollars in assets for $1.6 million. Highland Ex. 63 at 53. Of course, he did not tell anyone associated with the charities or Mr. Dondero that he had done so. *Id.* at 55.

March 27, 2025, was a momentous day indeed. The exiting of the traditional charities from beneficial ownership of the Charitable DAF's assets was not just theft of the $270 million dollars that had grown from Mr. Dondero's generous donations of historical assets to the Charitable DAF. *Id.* at 53. It was also the event that finally stole the Hunter Mountain Investment Trust and its equity position in the Debtor from the Dallas Foundation. Dugaboy Ex. 242 at 7, 18 (App. 066). In the April 2025 affidavit, Mr. Dondero said there were indications that Hunter Mountain and its residual equity interest in Highland had been sold from its historical structure. Dugaboy Ex. 36 at 8 (App. 038). But he expressly stated he did not know to whom it was sold. *Id.* Prior to the sale, the equity interest in Highland Capital Management resided in the structure to which Mr. Dondero generously gave it, with the Dallas Foundation to receive and (with the input of Mr. Dondero) to deploy the value of that equity position.

This structure is captured in the following chart, which was admitted into evidence:



Dugaboy Ex. 242 at 12 (App. 065).

Mr. Patrick, as it turns out, sold Hunter Mountain to CLO Holdco LLC, an entity organized

under the historical Charitable DAF structure.  May 12, 2026 Hr'g Tr. at 69:23–25 (App. 110).

That sale occurred on February 12, 2025, and brought it into the following ownership structure:



Dugaboy Ex. 242 at 18 (App. 066); *see* Dugaboy Ex. 15 at 1 (App. 027).

Had Mr. Patrick stopped with just there, at least the asset would have resided under the

ultimate beneficial ownership of the Dallas Foundation and three other established charities, all

with structures that enabled Mr. Dondero to provide input into the ultimate good causes the success

of the Debtor's equity position was to serve.  But the mortal sin was stealing Hunter Mountain, the

equity position in Highland, and the rest of the Charitable DAF assets from those charities in a

series of steps, including on March 27, 2025, having been sold into the Charitable DAF structure.

And that heist was unknown to Dugaboy or Mr. Dondero at the time of the April 16, 2025 affidavit,

its mechanisms and outcomes revealed only later by the work of the Cayman Liquidators.  May

11, 2026 Hr'g Tr. at 76:21–77:23 (App. 083–084) (the documents were not available until

appointment as a liquidator because it was "private company information"), 172:23–173:1 (App.

102–103) (Cayman Liquidators' investigation began on May 6, 2025).

16

To the extent the Court in its June 14, 2026, order is determining that, even though Mr. Patrick's massive theft scheme was unknown leading into the Rule 9019 settlement proceedings, Mr. Dondero should have sought Mr. Patrick's removal from his seat at the Hunter Mountain Investment Trust on the basis of the compliance issues detailed in the April 2025 affidavit, that decision would be incorrect.  Such arguments would have been met with a louder version of the indecorous guffaws of Highland's appointed managers and their lawyers witnessed in the May 2026 hearings.  They would have said that the issues identified in the April 2025 affidavit were minor deviations from best practices at most and had nothing to do with Hunter Mountain itself. That, even if the Hunter Mountain Trust Agreement automatically removes administrators for crimes, or fraud, or breaches of fiduciary duty, there must be some materiality threshold and the lapses ought to have something to do with Hunter Mountain itself.  And that, for many of the issues, Mr. Dondero somehow forfeited pursuing remedies for them, because Mr. Dondero learned of them while Mr. Patrick was working for a company associated with Mr. Dondero—Skyview— and tolerated Mr. Patrick retaining his job despite the minor compliance issues.  Dugaboy Ex. 36 at 5–6 (App. 035–036).

Of course, Highland's Court-appointed managers could not make any of these arguments with respect to Mr. Patrick's theft of a quarter billion dollars in assets—including the equity stake in Highland—from four established charities.  Is it material?  Nine figures of thievery counts.  Is it germane to Hunter Mountain?  Absolutely, the March 27, 2025, fraudulent dispossession of the charities from the Charitable DAF's assets included stealing Hunter Mountain too.  Had Mr. Dondero tolerated this theft for too long?  Of course not.  He pulled the fire alarm with the Court just two days after the Cayman Liquidators released their Statement of Claim, with Dugaboy's motion to stay the judgment.  Dkt. 4326 (Dugaboy's July 17, 2025 Motion to Stay 9019 Order).

17

In the end, Mr. Patrick's earlier deviations from the path of righteousness might have been portrayed as simple disputes between Mr. Dondero and Mr. Patrick about how he handled Mr. Dondero's confidential information or other internecine disputes. But his misconduct with respect to the Charitable DAF—which included the Highland equity position when he struck his March 27, 2025, perfidious final blow—meant the following: , By the time Mr. Patrick arrived at the Court for the Rule 9019 hearing on June 25, 2025, he was attempting to deal stolen assets to the Court-appointed managers of Highland. No court of equity should have tolerated that. The newly discovered evidence of Mr. Patrick's theft is grounds for vacatur not only under Rule 60(b)(2), but also Rule 60(b)(6), which is precisely designed to remedy courts unwittingly having descended into the inequitable misconduct of the parties before it. *See Heirs of Guerra v. United States*, 207 F.3d 763, 767 (5th Cir. 2000) (Rule 60(b)(6) relief available to vacate a judgment where "appropriate to accomplish justice" otherwise not available under the judgment). Bankruptcy courts have a responsibility to avoid that, especially when one of the parties is the appointed manager of the Debtor, installed at judicial urging.

In addition, there is absolutely no support for the proposition that a party somehow waives his contractual rights against certain conduct if he does not press remedies against earlier, materially different, and less severe instances of other breaching conduct. That argument has been tried and rejected by court after court after court. *See e.g., Rhodes v. Amarillo Hosp. Dist.*, 654 F.2d 1148, 1152 (5th Cir. 1981) (prior forbearance in seeking remedies does not waive subsequent breach); *Balfour Beatty Rail, Inc. v. Kan. City S. R.R. Co.*, 173 F.Supp.3d 363 (N.D. Tex. 2016) (continued contractual performance does not operate to waive prior breach); *In re J.A.R. Concrete, Inc.*, 673 B.R. 663, 715 n.294 (W.D. Tex. 2025) ("forbearance does not permit reliance" on waiver by breaching party); *In re Endeavour Highrise, L.P.*, 432 B.R. 583, 655-56 (Bankr. S.D. Tex.

2010) ("[N]either an innocent party's continuing performance following a breach of contract nor his efforts to induce a breaching party to perform under a defaulted contract constitute a waiver."). Nor does Rule 60(b)(2) supply any analogous principle supporting waiver. It speaks to the presence of "newly discovered evidence." It does not disqualify that newly discovered evidence as grounds for relief simply because evidence of other lesser or unrelated wrongful conduct was already known at the time of the prior judgment.

B.     Relief is Warranted under Rule 60(b)(3) Due to Mark Patrick's Omissions, Misrepresentations, and Misconduct During Highly Restricted Discovery.

In addition, Mr. Patrick's omissions and misrepresentations are actionable under Rule 60(b)(3) because obstructed discovery into his theft. Rule 60(b)(3) permits relief due to "fraud (whether intrinsic or extrinsic), misrepresentation, or misconduct by and opposing party[.]" Fed. R. Civ. P. 60(b)(3). Such relief is warranted when "the opposing party withheld information called for by discovery or willfully committed perjury." *Gen. Universal Sys., Inc. v. Lee*, 379 F.3d 131,156–57 (5th Cir. 2004).

Here, most notable were Mr. Patrick's obstructive conduct and lies during his June 23, 2025, deposition, just two days before the Rule 9019 hearing, which included:

•     His testimony that he could not remember whether one of his new entities—CDMCFAD, LLC—was owned by the four traditional charities. We know now that Mr. Patrick had used this new entity to steal the charitable assets and had put it under the total ownership and control of his sham charity, DFW Charitable. *Compare* Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 7:22–25 (App. 068) ("Yeah, again, without corporate documents that you can present to me, I – you know – I – I just don't want to be inaccurate" when asked who owned CDMCFAD, LLC) *with* Dugaboy Hr'g Ex. 35 (June 25, 2025 Hearing Transcript) at 174:8–14 (App. 074) ("I am hundred percent that DFW Charitable Foundation is the ultimate beneficial

19

owner" of CDMCFAD, LLC). Of course, Mr. Patrick was not having a memory lapse, as the Court astutely concluded at the June 25, 2025 hearing. Dugaboy Hr'g Ex. 35 (June 25, 2025 Hearing Transcript) at 182:4–15 (App. 074) ("I can see what's happening here or I have an impression of what's happening here . . . I feel like you're feigning confusion . . . I need you to speed up your answers and not be confused about things you shouldn't be confused about."). He orchestrated every detail of this theft, conducting the orchestra of lawyers and agents to steal a quarter billion dollars from established charities.

- His testimony that he could not remember whether he had changed the general partner of The Charitable DAF Fund, L.P. (the Charitable DAF entity directly on top of all the assets). Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 7:5–9 (App. 068) ("I don't – I don't recall precisely and I, you know, I want – I want to be – when I give you an answer, a hundred percent accurate" when asked about the general partner of The Charitable DAF Fund, L.P.); 13:6–18 (App. 070) ("Yeah, and then this is where my memory is – is – I'd have to kind of revisit the actual organizational documents to give you a confident a hundred percent answer" when asked about the general partner of The Charitable DAF Fund, L.P.). Of course, his lack of recollection was a lie. Mr. Patrick had secretly substituted in his own entity as general partner of the DAF structure on March 7, 2024. Dkt. 4521-1 (Statement of Claim) at 28.

- His testimony that he did not know whether DFW Charitable, the supposed charity Mr. Patrick had set up and run from his home address with almost nonexistent charitable activities, had any ownership in the CDMCFAD entity. Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 8:1–6 (App. 068) ("Yeah, again, you know, Mr. Lang, you know, there are several entities in this structure, and I – I just don't want to go beyond what I have a hundred percent knowledge of" when asked whether DFW Charitable owned CDMCFAD). Of

course, this too was a lie.  After all, just a few weeks earlier, on March 27, 2025, he had thrown the charities out of any beneficial interest in anything and left DFW Charitable alone at the top with all the assets (to the extent he had not paid them to himself in more than $10 million in compensation).

- His misleading answers to questions about who owned Hunter Mountain.  He testified that Beacon Mountain was the ultimate owner of Hunter Mountain when in fact multiple entities, including DFW Charitable, sat in the ownership chain above both Hunter Mountain and Beacon Mountain. Highland Hr'g Ex. 58 (June 23, 2025 Deposition Transcript of Mark Patrick) at 11:10–19 (App. 069) ("Beacon Mountain LLC" owns Hunter Mountain).

Mr. Patrick's omissions and misrepresentations suffice by themselves to warrant relief under Rule 60(b)(3), because Mr. Patrick is an "opposing party" by virtue of his control over Hunter Mountain, which is an opposing party for purposes of the Rule 9019 settlement proceedings.  *See, e.g.*, *Rismed Oncology Systems, Inc. v. Baron*, 297 F.R.D. 637, 656 (N.D. Ala. 2014) (applying Rule 60(b)(3) to fraudulent conduct by party entity's corporate officers who were not named parties).  Hunter Mountain is a party in interest in this bankruptcy, and it has been specifically adverse to Dugaboy throughout the Rule 9019 settlement proceedings.  Hunter Mountain was one of the two parties to the 9019 Settlement and argued strenuously in favor of its approval, which Dugaboy opposed.  And no one disputes that Mr. Patrick controlled Hunter Mountain.  Accordingly, Mr. Patrick's fraud is attributable to Hunter Mountain and Rule 60(b)(3) applies.

Furthermore, the discovery misconduct was not limited to Mr. Patrick.  Highland's Court-appointed managers—who are unquestionably "opposing parties" under Rule 60(b)(3)—also were eager to throw parties off the scent.  Highland was asked for documents pertinent to its review of the propriety of Mr. Patrick acting on behalf of Hunter Mountain.  It produced a string of corporate

documents, all relating to the historical structure of companies leading to The Dallas Foundation's beneficial interest. Cross-Examination of James Seery, May 21, 2026 Hr'g Tr. at 46:8–52:6 (App. 118–124) (questions and answers comparing the list of documents (Dkt. 4277) that he testified at the 9019 proceedings as those he reviewed to establish Mr. Patrick's current authority to act on behalf of the Hunter Mountain Investment Trust to the historical ownership structure of Hunter Mountain and its new structure under the DAF); *see also* Closing Deck, Demonstrative Exhibit 292, at Slides 63–65 (doing same). If those Highland managers were aware that Mr. Patrick had sold Hunter Mountain and the Debtor equity position into the Charitable DAF and restructured it, they withheld that documentation in discovery and gave misleading testimony when testifying about Mr. Patrick's authority to act. *See* Dugaboy Ex. 35 at 99:13–20 (Seery testifying that Mr. Patrick had "complete authority over" Hunter Mountain and the associated entities). During trial for the Rule 60(b) Motion, Mr. Seery testified that he had only reviewed the organizational documents identified in Highland's June 24, 2025, exhibit list for the 9019 Settlement Hearing. *See* Cross-Examination of James Seery, May 21, 2026 Hr'g Tr. at 47:14–24 (App. 119). Those documents related to Hunter Mountain as part of the stack of companies as originally formulated by Mr. Dondero in 2011, including Atlas IDF and the Rand PE Fund. *Id.* at 52:7–11 (App. 124). Yet by that time, Hunter Mountain was no longer within the previous structure, having been sold to the Charitable DAF stack of entities on February 12, 2025. Mr. Seery agreed that he was aware that Beacon Mountain had sold Hunter Mountain by the consummation of the 9019 Settlement but requested no additional documentation of the Charitable DAF structure to confirm Mr. Patrick's authority to enter into the settlement. *Id.* at 52:7–10 (App. 124); *but see id.* at 55:17–23 (App. 127).

Even if Mr. Patrick had not omitted or misrepresented his knowledge about the DAF restructuring he had engaged in, the highly truncated discovery process prior to the Rule 9019 Settlement hearing could not have produced the evidence in the later-released Statement of Claim. Discovery lasted all of two weeks from June 10 to June 25, 2025.[2]  Dkt. 4678 at 12.

More importantly, the Cayman evidence would not have popped up in this heavily truncated process.  The theft of the Charitable DAF assets occurred, for the most part, overseas, and obtaining discovery from foreign corporate custodians would have been impossible in the time allotted.  On top of that, the undisputed evidence in the record is that the information that the Cayman Liquidators uncovered was confidential under Cayman law and could only have been unearthed by the Liquidators stepping into the shoes of a Charitable DAF entity and using that authority to request it.  May 11, 2026 Hr'g Tr. at 77:4–19 (App. 084) (Official Liquidator Margot MacInnis testifying that company documents were "private" or otherwise confidential and were only accessible to her because as liquidator she "steps into the shoes of the company").  This is equally true of information in the hands of Cayman government agencies, regarding corporate formation and transactions.  *Id.*  Engagement with a foreign judicial system through the Hague Convention on the Taking of Evidence is a time-consuming and sometimes fruitless endeavor.

C.  **Rule 60(b)(6) Relief is Warranted Absent Restoration of the Charitable Structures to Avoid Rewarding Mark Patrick's Misconduct.**

At its core, denying the Rule 60(b) motion because Dugaboy should have discovered Mr. Patrick's misconduct sooner rewards only the intentional concealment of the scheme here and is exactly what Mr. Patrick intended.  This Court, particularly as a court of equity, must consider the "need to render a just decision on the basis of all facts." *Banning Co., Inc.*, 6 F.3d at 355.  Were

---

[2] Because of the Court's requirement to produce exhibit and witness lists three days prior to a hearing, effectively discovery lasted only 12 days.

the Court to deny this motion, it would not have considered all the facts and, instead, it would reward the very misconduct that concealed the evidence which necessitated this briefing in the first place.

We now know, due to the evidence adduced in the May 2026 hearings before the Court, that Mr. Patrick was dealing away stolen property when he "settled" with Highland's appointed managers and transferred to them a bundle of the rights of Highland's residual equity. If the Court had been fully informed, the Court should not have approved the transfer of this property from the corporate entities to which it was secreted, to Highland's managers, who would claim some level of protection from it being recovered, due to the settlement approval. It would be inconsistent with the Court's role as one of equity and with a charge to do justice.

Whatever the merits of bankruptcy courts taking a light touch when evaluating settlements between the Debtor and third parties,[3] this Court has a special responsibility to make sure managers of a Debtor appointed at the Court's insistence and separating the Debtor from its owners are getting involved with parties who have engaged in misconduct. The Court to grant relief today need not determine that the appointed managers of Highland knew about the misconduct that brought Mr. Patrick to its doorstep. The evidence presented in the motion to vacate now shows that court-appointed managers and the Court should have stayed away from Mr. Patrick, a man that should have been acting in the best interests of four established charities and came to the Court through misconduct and fraud, acting only for himself.

The Denial Order points out that vacatur of the 9019 Settlement Approval Order would not undo Mark Patrick's misconduct as a reason why Rule 60(b)(6) relief is inappropriate. Denial

---

[3] And this touch is not as light as some have claimed, as bankruptcy courts ought not and do not approve settlements when one of the parties or the settlement arrives at the court through fraud, collusion, or bad faith conduct. *In re Age Refining, Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).

Order at 13–14.  That misses the point.  Dugaboy does not seek to unwind the restructuring—at least before this Court—but seeks to vacate the 9019 Settlement.  This Court, as a court of equity, should not reward Mr. Patrick with approval of a highly favorable settlement agreement gained as a result of his illusory control, control he was automatically divested of when he absconded with the charitable entities' assets for his own benefit.  Mr. Patrick's statement that he would retain control even if the DAF restructuring were rescinded is false, as effectuating a complex scheme to steal from the DAF would constitute cause to automatically remove Mr. Patrick as administrator.  *See* Dugaboy Ex. 1 at 1 (App. 002).  His further assertion that he would (or even could) reappoint himself as administrator should he be removed for fraud or theft from the DAF shocks the conscience and offends this Court's equitable powers to assist such misconduct by blessing the 9019 Settlement Agreement.  May 12, 2026 Hr'g Tr. at 103:3–6.

## V.    <u>CONCLUSION</u>

Rule 59(e) exists to permit a court to correct factual mistakes before appellate review becomes necessary.  The Denial Order rests upon one such mistake. It treats evidence first disclosed after the Rule 9019 hearing as though Dugaboy possessed it before that hearing.  The record establishes otherwise.  Because the Court's Rule 60(b)(2) analysis depends upon that erroneous factual premise, reconsideration is warranted.  It should also be granted under Rules 60(b)(3) and 60(b)(6) for the reasons discussed above.  Denying this motion would only reward the very misconduct that concealed the evidence which necessitated this briefing in the first place.

Date: June 29, 2026

By: */s/ Michael J. Edney*
Michael J. Edney
Martha Stolley
Avery Joseph Welker
MORGAN LEWIS BOCKIUS LLP
1111 Pennsylvania Avenue NW

Washington, DC 20004
Michael.edney@morganlewis.com
Martha.stolley@morganlewis.com
Avery.welker@morganlewis.com
T: 202-739-3000
F: 202-739-3001

Geoffrey S. Harper
Texas Bar No. 00795408
John Michael Gaddis
Texas Bar No. 24069747
KING & SPALDING LLP
2601 Olive Street, Suite 2300
Dallas, TX 75201
gharper@kslaw.com
mgaddis@kslaw.com
T: (214) 764-4600

***Counsel for The Dugaboy Investment Trust***

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 29, 2026, a true and correct copy of this

document was served electronically via the Court's CM/ECF system to the parties registered or

otherwise entitled to receive electronic notices in this case.

<u>/s/ Michael J. Edney</u>
Michael J. Edney